## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DAVID DATE, JR.,

                Plaintiff,                      Case Number: 07-15474

v.                                    JUDGE PAUL D. BORMAN
                                    UNITED STATES DISTRICT COURT
SONY ELECTRONICS INC., and ABC
APPLIANCE, INC. d/b/a ABC WAREHOUSE,

                Defendants.

_____ /

### OPINION AND ORDER REJECTING CLASS ACTION SETTLEMENT

Before the Court is Plaintiff David Date, Jr.'s motion for final approval of the class action

settlement, filed October 20, 2008. (Doc. No. 64). Defendants Sony Electronics Inc. and ABC

Appliance, Inc. have filed a statement in support of final approval of the class action settlement.

(Doc. No. 65). Nineteen people filed objections to the proposed settlement. The Court held a

fairness hearing on November 3, 2008, at which the parties were present, and one objector, Elliot

Handler, was represented by counsel. Having reviewed the entire record, and for the reasons

discussed below, this Court concludes that the objectors have met their significant burden in

opposing the settlement, and, therefore, the Court REJECTS the class action settlement.

## I. BACKGROUND

Plaintiff David Date, Jr. ("Plaintiff") filed this action in the United States District Court for

the Southern District of California on behalf of a nationwide class of consumers against Defendants

Sony Electronics, Inc. and ABC Appliance, Inc., d/b/a ABC Warehouse, (collectively "Sony"), relating to the false advertising in the sale of certain Sony television sets. (Complaint, ¶¶ 10, 12). Specifically, Sony advertised and promoted the television sets as being capable of displaying 1080p resolution; but the television sets do not accept the 1080p digital video signal.[1] (Def.'s Br. Ex. K, Jean-Pierre Guillou Decl. ¶ 10). As sold, the television sets at issue display 1080i resolution, a less desirable resolution.[2] Today, as Sony Engineer Guillou noted, "only Blu-ray Disc Players and certain High-Definition DVD Players are capable of transmitting a 1080p signal." (Guillou Decl. ¶ 12). The instant television sets cannot accept, and therefore cannot display a 1080p picture. Like the instant Sony television sets, the vast majority of television sets on the market in 2004 and 2005 were not capable of accepting 1080p digital video input signals. (*Id.* at ¶¶ 10, 11). Finally, the instant television sets cannot be redesigned or augmented to display native 1080p digital video input signals.

Plaintiff's counsel accurately set forth the claim at the November 3, 2008, fairness hearing as follows:

> The essence of the lawsuit was that Sony misled consumers . . . that the televisions themselves gave what was known as a 1080p resolution . . . . [T]he essence of the litigation is that there's a difference between a television that was advertised or promoted as being a 1080p, or what's known as a progressive scan, and one that was 1080i, which is known as an interlaced scan.

---

[1] 1080p is the shorthand name for a category of display resolutions. The number "1080" represents 1,080 lines of horizontal pixel rows that the display component is capable of projecting onto the television screen, while the letter "p" stands for progressive scan. (Guillou Decl. ¶ 7). A progressive scan television simultaneously scans all of the pixel rows onto the screen, whereas a 1080i television displays half of the pixel rows in one field, then displays the remaining half in the next field. (Id. at ¶ 5). 1080p is the superior signal and display resolution.

[2] Over-the-air television signals are not currently broadcast in 1080p, nor is it likely that television will ever be broadcast in 1080p because the necessary bandwidth is not available. (Guillou Decl. ¶ 12). However, at the fairness hearing, Objector Handler claimed that the Dish Network is now broadcasting on-demand movies in 1080p. (Tr. 93-94).

Fairness Hr'g Tr, Mansfield, 9, November 3, 2008 [hereinafter Tr.].

Objector Handler's counsel later added: "Even though they were sold as 1080p televisions, they did not accept a 1080p signal, period, end of story. Defendants admit that." (Tr. 96, Kaplan).

Presently, there are devices that transmit 1080p digital video input signals. Sony Blu-ray disc players, certain HD-DVD players, specific gaming devices (e.g. Playstation 3), and a limited number of personal computers all transmit a 1080p signal. (*Id.* at ¶ 12; Def.'s Br. 11). The television sets at issue are not capable of displaying the 1080p signal that these devices transmit because the television sets lack the input mechanisms to support them. Furthermore, over-the-air television signals are not currently broadcast in 1080p, so the television sets cannot input the over-the-air signal. (Guillou Decl. ¶ 12).

In 2004, Sony introduced two of the television sets at issue, the KDS-70Q006 and KDX-46Q005 (the "QUALIA television sets"); the other two models, the KDS-R50XBR1 and KDS-R60XBR1 (the "XBR1 television sets") (collectively, "television sets"), were introduced in the Summer of 2005.   (Def.'s Br. Ex. J, Jeff Goldstein Decl. ¶ 2).   Sony sold the majority of the television sets at issue to third-party retailers, such as ABC Warehouse, which in turn sold them to the public. (Id.) Sony sold a small number of these sets directly to consumers through its website and outlet stores. (Id.)  Sony charged consumers $2,999 to $3,999 for the KDS-R50XBR1 model, $3,999 to $4,999 for the KDS-R60DBR1 model, $13,000 for the KDS-70Q006 model and $14,999 for the KDX-46Q005 model. (Parties' Response to Court's November 21, 2008 Order Requesting Information 3 n. 1).  All totaled, Sony sold approximately 3,000 QUALIA television sets and 172,000 XBR1 television sets. (Goldstein Decl. ¶ 2).

In the Summer and Fall of 2006, Sony introduced a new high-definition television product line to succeed the XBR1 television sets. (Id. at ¶ 3). The QUALIA televisions sets were never succeeded by a second generation product line, and Sony no longer manufactures or sells either the QUALIA or XBR1 televisions sets. (Id.) The last shipment of XBR1 televisions sets was sent to retailers in September 2006. (Id. at ¶ 2).

Plaintiff's lawsuit was transferred to this Court on December 27, 2007. (Doc. No. 1). In his second amended complaint, Plaintiff alleges that Sony and ABC misled consumers by describing the television sets' display resolution as "1080p" because the television sets do not display 1080p resolution, are incapable of accepting 1080p video signals, and cannot accept and display video content at 1080p resolution via the PC or HDMI input jacks. (Second Am. Compl.¶¶ 21, 25, 27). Plaintiff alleged claims of breach of contract and warranty, false advertising, unjust enrichment and violations of the Magnuson-Moss Warranty Act, 15 U.S.C. §2301, and the Michigan Consumer Protection Act, M.C.L. §§445.901, *et seq*. (Id.) Plaintiff sought damages to compensate him for overpaying for what was advertised as, but was not, a 1080p capable television set. (Id.)

Sony argues, in response to Plaintiff's claims, that representing that a television set has a certain display resolution tells a consumer only what the display resolution is, and does not indicate which of the many types of video signals the television can accept. (Memo. of Points and Authorities in Support of Joint App. for Prelim. Approval of Settlement Class Action [hereinafter Memo.] 4).

The parties reached a proposed settlement on February 4, 2008. (Memo. 14). According to the parties, settlement discussions were conducted from September 2007 until February 4, 2008. (Doc. No. 27, Valenzuela Decl. ¶ 6; Doc. No. 26, Alan Mansfield Decl. ¶ 5). The parties claim that

the settlement negotiations were often contentious, that the parties exchanged extensive information about the technical specifications of the television sets and the television sets' sales and marketing, and further that the parties participated in two all-day mediation sessions held on January 23 and 29, before retired Justice Howard B. Wiener, a former Associate Justice of the California Court of Appeal. (Valenzuela Decl. ¶ 7; Mansfield Dec. ¶¶ 4-5; Doc. No. 23, Justice Howard B. Wiener Decl. ¶¶ 2, 6.) During the mediation, Sony performed a side-by-side comparison of three of its television sets, including the model Plaintiff purchased. (Id. at ¶ 4). Justice Wiener concluded that the settlement terms, and the demonstration, supported the value of the proposed settlement. (Id.)

The proposed settlement class consists of all original United States end user consumers who purchased, or received as a gift from the original purchaser at retail, a QUALIA television set or XBR1 television set ("Settlement Class"). (Valenzuela Decl., Ex. A, Settlement Agreement § 1.10 [hereinafter Settlement Agreement]). The proposed settlement described by Plaintiff's counsel at the Court's fairness hearing on November 3, 2008, was set forth in this format:

**Settlement Terms**

- Class wide settlement
- 3 Benefits:

  Benefit I:
  - $90 Cash
  - called Sony prior to January 8, 2008
  - called about 1080p input & using TV as a computer monitor

  Benefit II:
  - $180 e-credit if QUALIA owner
  - $60 e-credit if XBR1 owner
  - must have bought 1080p device (e.g., HD-DVD player, Blu-ray disc player, gaming console) – any brand – before July 25, 2008

  Benefit III:
  - $75 e-credit if QUALIA owner
  - $28 e-credit if XBR1 owner
  - must buy Sony Blu-ray Disc Player between July 25, 2008 and 30 days after final judgment is final

*5A*

The proposed settlement offers two types of benefits: cash payments (Benefit I) and e-credit good toward the purchase of merchandise at Sony's online store (Benefit II), and e-credits good toward the purchase of a Sony Blu-ray Disc Player (Benefit III). (Settlement Agreement § 3.1).

### A. Benefit I

Only those very few Settlement Class members who contacted Sony, prior to the lawsuit to register a complaint about their television set's computer deficiency regarding 1080p input, are eligible to receive Benefit I, the $90 cash payment. (Settlement Agreement § 3.1.1).

According to Sony's counsel, the Benefit I class is restricted to the following purchasers:

> The Court: Well, let me ask, does the $90 go to anyone who called to complain about 1080p input?
>
> Ms. Cohen: No. If anybody called to complain about 1080p input, Your Honor, they will get direct notice from us, but this benefit only goes to the people who called who had a computer monitor which, Your Honor, as I mentioned in my statement, mirrors the *Date* case. So they brought a particular problem that – at issue. They raised these other issues, but that was Mr. Date, and Mr. Date wanted the people in his position to have the benefit, and so we did.

(Tr. 90-91, Cohen). Thus, Benefit I does not even go to all purchasers who called to complain about the television sets' 1080p deficiency; the caller had to fit within the further limitation set forth by Sony's counsel.

### B. Benefit II

Only those settlement class members who have already purchased a 1080p device before July 25, 2008, qualify for the Benefit II e-credit redeemable only at the Sony online store.

### C. Benefit III

Settlement class members who did not complain and did not purchase a 1080p device before July 25, 2008, but who purchase a Sony Blu-ray Disc Player between July 25, 2008 and 30 days

"after final judgment is final" qualify for the Benefit III e-credit redeemable only at the Sony online store.

### D. The Benefits in General

Settlement Class members, eligible for the $90 cash payment, can also receive Benefit II, an e-credit redeemable for any item sold at Sony's online store, in the amount of $180 (QUALIA owners), or $60 (XBRI owners) (Settlement Agreement § 3.1.2 - 3.1.5). Benefit III is available to all settlement class members who did not complain or previously purchase a 1080p device, but only if they purchase a Sony Blu-ray Disc Player. Thus, Benefit III class members, to receive any settlement benefit, they must buy a Sony Blu-ray Disc Player, costing more than their e-credits-- $75 for the 3000 potentially qualifying QUALIA set owners, and $28 for the 172,000 potentially qualifying XBR1 set owners.

The bottom line is that not all 175,000 class members will receive "benefits" because those who did not utter the settlement required "magic words" in complaining or did not complain at all, or who have not purchased a 1080p device, must spend money to purchase a Sony Blu-ray to qualify for a non-cash Sony e-credit redeemable only at Sony's online store. Thus, category III class members who decline to further enrich Sony by purchasing a Sony Blu-ray Disc Player, receive nothing.

Significantly, none of the class members will have a television set capable of receiving and displaying a 1080p video signal natively. Thus, the Benefit II and III class members, even after the purchase of a 1080p device, will still not receive 1080p resolution when using the device.

As Objector Handler's counsel stated regarding Benefit III– the class member has to buy a Sony Blu-Ray player which outputs 1080p, while the television set that the class member purchased

from Sony is incapable of accepting and displaying a native 1080p video signal. "In order to take advantage of a [sic] settlement a class member is expected to purchase something that they can't use the full capability of which is the foundation of the case." (Kaplan, Tr. 95).

The settlement agreement also provides that Plaintiff Date will receive $5,000, plus costs related to the litigation, and the installation of his television, not to exceed $1,600. (Settlement Agreement § 3.4). Plaintiff's lawyers receive $300,000, plus $25,000 in litigation costs. (Settlement Agreement § 3.6.1).

Settlement Class members who are eligible for the $90 cash payment will automatically receive the payment from Sony. (Settlement Agreement § 3.3.1). Those who are eligible for an e-credit, applicable only to the Sony online store website, must submit a claim form and proof of purchase of their television set and their 1080p device or Sony Blu-ray disc player. (Settlement Agreement § 3.3.1).

With regard to the $90 cash payment, as of January 8, 2008, only 234 people had called Sony raising the specific issue complaint required by Sony to qualify for Benefit I. (Parties' Response to Court's November 21, 2008 Order Requesting Information 2). Thus, the cash payout for Sony to settle with this small subgroup is 234 x $90 = $21,060; that is the total Sony cash payout in this entire settlement. The remainder of the settlement, Benefits II and III, involve Sony e-credits, redeemable only for purchases at the Sony online store.

The parties are unable to estimate how many people qualify for Benefits II and III, because it is unknown how many class members have purchased or will purchase a 1080p device. (Id. at 5-6). Purchasers of the deficient television sets at issue who do not purchase a 1080p device receive

8

nothing in the proposed settlement. There is no reason to assume that fifty percent of the class will qualify for any part of the settlement.

Sony states that the settlement is predicated on Sony's belief, with which Plaintiff disagrees, that unless a Settlement Class member has a device that generates a 1080p video signal, that member is not impacted by the fact that the television sets cannot accept a 1080p signal. (Memo. 11). This conclusion assumes that the consumer is not entitled to what Sony advertised he/she would receive from the instant purchase. Second, Sony contends that even though the television sets cannot accept a 1080p signal, the television sets still work with 1080p devices, because these devices offer not only a 1080p signal, but also other input video signals the televisions can accept. (Memo. 11; Guillou Decl. ¶ 10). "If, for example, a Sony Blu-ray Disc Player is connected to a Television and delivers a 1080p signal to it, the disc player will receive an electronic message from the Television "telling" it that the Television cannot accept the 1080p signal. The disc player then sends a 1080i video signal to the Television that the Television can accept." (Memo. 11). Albeit a little bit of an extreme example, this reasoning is analogous to purchasing an automobile advertised as being able to run on gas or electricity and then having no ability to plug in the car for electric power.

Simply stated, Sony admits that these televisions, advertised and sold as capable of displaying 1080p resolution, are currently incapable of displaying 1080p resolution.

Nineteen objections to the settlement were filed with this Court. Two of the objections were not objections at all, and two objections were not timely but considered by this Court. The majority of the objectors complained that they were mislead by Sony's advertisements, and believed that the television sets would accept and display a 1080p signal. Many of the objectors complained about having to purchase a 1080p device in order to qualify for the settlement, which they believe does not

9

remedy Sony's misrepresentation of the television sets' capabilities. Most of the objectors request a new 1080p capable television set, or compensation for the premium they paid for a 1080p television set. One objection filed was not an objection, but a letter in support of Sony. (Doc. No. 59, MacDonald Objection). Another objection was a rambling missive against the "prison industrial complex" from a prisoner housed in Florida, who did not even allege ownership of one of the television sets at issue. (Doc. No. 55, Rivera Objection).

Objector, Elliot Handler, was represented by counsel at the fairness hearing, after filing objections to the settlement. (Doc. No. 62, Handler Objection). Mr. Handler has a pending class action lawsuit concerning the Sony television sets at issue in this case, in the federal district court in the Central District of California. He objects to the settlement on these grounds: 1) the proposed settlement is fatally flawed because the settlement waives the legal claims of a substantial portion of the class for no compensation, the settlement awards the named plaintiff a recovery far in excess of the recovery of any other class member the settlement was reached before any meaningful litigation or discovery occurred, rendering plaintiff's counsel ill-informed to decide whether the settlement is the best option for the class; 2) the settlement is not the product of good faith negotiations; and 3) the proposed notice of the settlement is deficient. (Id. at 1-2).

## II. STANDARD OF REVIEW

The law favors the voluntary settlement of class action litigation. *Steiner v. Fruehauf Corp.*, 121 F.R.D. 304, 305 (E.D. Mich.1988), *aff'd sub nom. Priddy v. Edelman*, 883 F.2d 438 (6th Cir.1989). Therefore, this Court must not "decide the merits of the case or resolve unsettled legal questions," but, rather, must "judge the fairness of a proposed compromise" by "weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in

the settlement." *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. General Motors*, 497 F.3d 615, 631 (6th Cir. 2007) (quoting *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n. 14, (1981)).

As the Sixth Circuit recently noted in *UAW*, "before approving a settlement, a district court must conclude that it is 'fair, reasonable, and adequate.'" 497 F.3d at 631; *see* Fed. R. Civ.P. 23(e)(1)(C); Fed. R. Civ. P. 23(e)(1)(A). The Sixth Circuit specified:

> Several factors guide the district court's inquiry: 1) the risk of fraud or collusion; 2) the complexity, expense and likely duration of the litigation; 3) the amount of discovery engaged in by the parties; 4) the likelihood of success on the merits; 5) the opinions of class counsel and class representatives; 6) the reaction of absent class members; and 7) the public interest.

*UAW*, 497 F.3d at 631. The district court enjoys wide discretion in assessing the weight and applicability of these factors. *Granada Investments, Inc. v. DWG Corp.*, 962 F.2d 1203, 1206 (6th Cir. 1992).

## III. ANALYSIS

### A. The Risk of Fraud or Collusion

There is no evidence, or allegation, of fraud or collusion between the parties in reaching this settlement. There is, however, a serious question about the aggressiveness and effectiveness of Plaintiff's attorneys' representation of the entire class in agreeing to this settlement, as discussed *infra.*

### B. The Amount of Discovery Engaged in by the Parties

Mr. Handler argues that this Court should not approve the final settlement because the settlement was reached in the "absence of any adversarial litigation." (Handler Objection, 8). According to Handler, plaintiff's counsel cannot know that this settlement is the best that can be

achieved for the class because the litigation has not proceeded past the pleadings stage, and discovery has not been conducted. (Id. at 8-9). Plaintiff responds that while this case is in a relatively early stage of litigation, his counsel benefitted from Sony supplying a significant amount of evidentiary information regarding the technical workings of the televisions and the claims at issue. (Pl.'s Mot. 16). Plaintiff contradicts Handler's assertion that counsel was ill-informed, stating that his attorneys had sufficient information to evaluate the strengths and weaknesses of the lawsuit and make an intelligent and informed decision regarding the reasonableness of the settlement. (Id. at 16-17). Sony states that Handler's objection is meritless because the parties had sufficient information to insure that their decision to settle was well-informed. (Memo. 9-10).

In considering whether there has been sufficient discovery to permit the plaintiff to make an informed evaluation of the merits of a possible settlement, the court should take into account the formal and informal discovery in which the parties engaged during the litigation. *UAW v. GM*, No. 05-73991, 2006 WL 891151, *19 (E.D. Mich. Mar. 31, 2006) (Cleland, J.) (citing *Levell v. Monsanto Research Corp.*, 191 F.R.D. 543, 557 (S.D. Ohio 2000) (although little formal discovery was conducted, class counsel retained experts and conducted informal discovery before negotiating the settlement agreement)). Here, the parties state that they had sufficient information to settle this case. Plaintiff asserts that Sony provided him with ample evidentiary information, and his counsel conducted its own investigation and hired a technological consultant. (Pl.'s Mot. 16). Under these circumstances, particularly when the objectors have not contradicted the parties claim that informal discovery was conducted, or disputed the technical information the parties' relied on to settle this lawsuit, this Court concludes that adversarial litigation is not a *sine qua non* of a supportable settlement of a class action lawsuit.

**C. The Likelihood of Success on the Merits**

Sony urges this Court to approve the settlement because, it argues, Plaintiff's claims are fatally defective as a matter of law and susceptible to summary judgment. (Memo. 5-6). Plaintiff responds that he believes that his case is meritorious but decided to settle this case after considering the proof issues the class might face, and the fact that Sony may win this case, thereby reducing the class recovery to zero. (Pl.'s Mot. 12). Objector Handler believes that Plaintiff's claims are meritorious, and that there is a strong likelihood of success.

This Court concludes that Plaintiff's case can be regarded as meritorious. The objector-purchasers complain that they did not receive television sets with the capability that Sony had advertised; the objectors believed that they were buying a 1080p television set capable of accepting 1080p digital video signals and displaying 1080p digital video signals at 1080p resolution when, in fact, the television sets cannot accept and thus cannot display 1080p video signals natively.

The advertisements produced by Sony and ABC Warehouse touting the televisions' capabilities underscore this belief. Sony promoted the televisions as "Full HDTV," the "Worlds Greatest High Definition Television," and specifically as having "new display technology . . . to meet and exceed the demands of a High Definition Image at its full 1080 line resolution," and being able to display digitally transmitted high definition signals without interlacing. (Hayes Objection, Ex. A; Complaint, Ex. A, Spec. Sheet KDS-R50XBR1). Sony also stated in the specifications sheet that the televisions' native video resolution was 1080p. (Complaint, Ex. A). ABC Warehouse described the televisions as a "1080p." (Second Am. Compl. Ex. D). Based on these representations, a jury could conclude that Plaintiff was promised a 1080p television that accepted and displayed 1080p resolution natively.

13

Sony's advertising claims touting the instant television sets' 1080p capability are not "puffery." While an expression of opinion not made as a representation of fact constitutes puffery, Sony's advertising claims in this case are not statements of opinion; they are statements of fact. The United States Court of Appeals for the Fifth Circuit recently elaborated that even a statement of opinion may not constitute puffery:

> Although Skilling is correct that "an expression of opinion not made as a representation of fact" can constitute puffery, not all statements of opinion are properly classified as puffery.

*United States v. Skilling*, ___ F.3d ___, No. 06-20885, 2009 WL 22879, at *18 (5th Cir. Jan. 6, 2009). In the instant case, there is no basis for even claiming puffery; unlike *Skilling*, where there was an issue of whether the statement was opinion or fact, here we are dealing with Sony 1080p facts, not Sony opinion.

Sony further argues that Plaintiff is unlikely to succeed on the merits of this case because a federal district court in California granted summary judgment to a manufacturer of a television on claims similar to those at issue in this case. (Memo. 6-8). In *Johnson v. Mitsubishi Digital Electronics America, Inc.*, 578 F. Supp.2d 1229, 1238 (C.D. Cal. 2008), the court concluded that, although Mitsubishi designated its television set as a 1080p television set, the phrase 1080p "does not convey a specific claim that is recognizable to the targeted customer." This Court disagrees with that finding, noting the Los Angeles U.S. District Judge appears to have based his conclusion, in part, on that plaintiff's admission that the term 1080p did not have a specific meaning to him. *Id.* at 7.[3] That is definitely not true in the instant case.

---

[3] This Court disagrees with the following conclusion of the Los Angeles U.S. District Judge:

> The ATSC Standard's intended audience is engineering professionals, not consumers; and the ATSC Standard is not written in such a manner as to be accessible to consumers.

14

The instant Plaintiff has stated that the term 1080p carried a specific meaning for himself and the objectors in the case at bar. Supporting Plaintiff's claim is the fact that the Advanced Televisions Systems Committee (hereinafter "ATSC") specifically defines 1080p resolution. The ATSC digital television standard in effect at the time the televisions were produced and sold called for television video inputs to *accept* a video signal format with 1080 lines of horizontal resolution by 1920 of vertical resolution in a progressive scan, i.e.1080p video signals. (Doc. No. 72, Ex. A, ATSC Digital Television Standard)(emphasis added).[4]

This Court concludes that the term 1080p resolution carries a specific meaning for a reasonable consumer, and that Plaintiff and at least some of the class members were well aware of the specific meaning of and advantages of owning a television set capable of 1080p resolution when they purchased the television sets at issue. That the *Johnson* plaintiff just wanted to blindly purchase a "top of the line" TV set, and may not have known about or cared about 1080p resolution, does not

*Johnson*, 578 F.Supp.2d at 1237. The Sony information sheet touting to consumers the KDS-R50XBR1 television set states in pertinent part:

Specifications:
    ***
VIDEO
Native Resolution: 1080p

[4] The Los Angeles U.S. District Judge stated in his opinion:
The [Mitsubishi] manual explicitly states that the HDMI input ports can process 480i, 480p, 720p, and 1080i signals. . . .[T]he omission of the 1080p signal from this exhaustive list is as good as an affirmative disclosure that its HDMI input ports cannot process a 1080p signal.

***

Mr. Johnson admits that he did not search for information about the television and was not exposed to any MDEA marketing materials prior to his purchase of the television. The truth of the matter is that Mr. Johnson did not care about whether the HDMI input ports on his television could accept 1080p signals.

*Johnson*, 578 F.Supp.2d at 1240.

"dumb down" Date, the instant purchaser, who read and bought a Sony television set based on Sony's fact-based advertising regarding 1080p resolution, and other purchasers such as Handler.

The *Johnson* opinion also notes that Mitsubishi only promised consumers that they would be able to "take full advantage" of new technology with the television, and that the television would provide "unsurpassed picture quality." 578 F.Supp. 2d at 1238. Judge Carney concluded that these statements were mere sales puffery. *Id.* Those quotes may not constitute fact, and may indeed constitute puffery. However, in the instant case, Sony promised consumers "Full HDTV," the "Worlds Greatest High Definition Television" and native 1080p video input capability. ABC Warehouse described the television on its website as a "1080p" television set. Although the television sets at issue were the "Worlds Greatest" may be Sony's puffing opinion of superiority, the statements that the televisions were "Full HDTV" and "1080p" factually describes the technical capability of the television sets, and do not constitute mere opinion puffery.

### D. The Opinions of Class Counsel and Class Representative

Class attorney Alan Mansfield submitted a declaration in support of final approval of the settlement. Mr. Mansfield states that, "[d]espite the relative strength of plaintiff's claims in this action . . . continued prosecution of this action was not without considerable risk in terms of recovering significant monetary relief for the Settlement Class members, particularly when compared to what the individual Settlement Class members are provided the opportunity to obtain under this settlement." (Mansfield Decl. ¶ 13). Mr. Mansfield further states that receiving immediate benefits for the class is preferable to protracted litigation that may result in no recovery, and he believes that the settlement is fair, reasonable and adequate. (Id.) Class representative David Date did not file a declaration, but in his motion to approve the settlement, Date states that the "settlement provides

significant monetary relief to the individual class members" and argues that the settlement is fair, reasonable and adequate considering the risk of continued litigation. (Pl.'s Mot. 3, 12).

The Court notes that Mr. Mansfield is an experienced consumer protection attorney, and Mr. Date has been extensively involved in litigating and settling this case. However, this Court also notes that both Mr. Mansfield and Mr. Date will receive significant financial remuneration in the proposed settlement. If this Court were to approve the settlement, Mr. Mansfield and his co-counsel will receive an attorney fee award of $300,000, and Mr. Date will receive $6,600, which will fully compensate him for his allegedly defective television and for his litigation costs. The $300,000 of attorney fees come despite an absence of aggressive discovery, any litigation and, more importantly, a pittance or even nothing for the settling class. Only the few class members who complained will be compensated with cash. Other class members will only receive voucher benefits if they have spent or will proceed to spend yet even more money to further enrich Sony who they are suing for taking their money in exchange for a very expensive product that could not perform as advertised.

### E. The Reaction of Absent Class Members

This Court received nineteen objections, seventeen of which were actual objections to the proposed settlement, out of a settlement class of approximately 175,000 persons who purchased the subject television sets.

Although the objectors are few, the objections illuminate the inherent unreasonableness of the settlement. The objectors complain that they were mislead by Sony and third-party sellers about the technical capabilities of the televisions. The objectors believed that they were buying a 1080p television that would accept and display 1080p signals natively. However, the televisions cannot display a 1080p video signal natively; instead the television de-interlaces the 1080p signal, turning

17

it into a 1080i signal and then upconverts the 1080i signal when it is displayed on the television. (Tr 33-34). This process creates a picture that is close to what would appear if the television displayed a native 1080p signal, but the picture quality does not reach the level of a native 1080p signal displayed on a 1080p resolution television. Nevertheless, the settlement only provides a benefit to the class members who, after purchasing a deficient television set, purchased or will purchase a 1080p device; this is best described as throwing good money after bad. As one objector cogently stated, "what good is a 1080p device without a 1080p TV?" (Sheffield Objection).

Sony defends the settlement by arguing that unless a Settlement Class member has a device that generates a 1080p video signal, that member is not impacted by the fact that the televisions cannot accept a 1080p signal. (Memo. 11).

This Court disagrees with Sony's theory that a Settlement Class member suffers damages only if he or she owns a 1080p device. The class members purchased these high-end televisions because of the advertised "bells and whistles" -- 1080p display resolution -- and were misled and short-changed by Defendants. The class members thought they had purchased a 1080p capable television, in the midst of an electronics world that changes and upgrades everyday. These purchasers eagerly anticipated the possibility of 1080p over-the-air television signals, and 1080p devices, which have become a reality, e.g. Blu-ray, computers and Playstation 3.

That many of the class members have not previously purchased a 1080p device is not surprising given that it was only January of 2008, that an industry standard was created. A recent New York Times article stated:

> The biggest news at the Consumer Electronics Show in Las Vegas last January was not the birth of a new product but the death of one.
> A decision by Warner Brothers to withdraw support for the HD DVD video disc

18

format sent shock waves through the electronics industry and appeared to hand the future of home entertainment to Blu-ray, a rival format.

***

Still for some consumers, nothing beats the crisp, clear picture of a Blu-ray disc. "It's a huge difference," said Gary Tsang, 31, a computer network engineer in San Francisco who bought a $299 Blu-ray in October and was among the shoppers who rushed out to buy "The Dark Knight" last month.

Mr. Tsang added that Blu-ray made a real difference only when viewed on a good high-definition television, like the one his family bought in February for $2,700. "We're not bleeding edge, but we're cutting edge."

Matt Richtel and Brad Stone, *Blu-ray's Fuzzy Future*, N.Y. Times, Jan. 5, 2009, at B1-2.

When the objectors discovered that the televisions would not display 1080p video signals, it is not surprising that many of them chose to not purchase a 1080p device that could not achieve fulfillment with the instant television sets. Under the terms of this proposed settlement, class members who purchased one of the deficient television sets, but do not own and refuse to purchase a 1080p device will not be compensated for their being victimized by Sony and third-party retailers.

Unlike Mr. Date, who is settling his claim with Sony for $6,600, which fully compensates him for his defective television, the unnamed Settlement Class members will not be compensated for what they believe is their injury: a television set that is not capable of the 1080p quality of display resolution advertised.

As noted before, Plaintiff's attorneys receive a $300,000 fee, and $25,000 in costs in this settlement; Sony reaps benefits by providing e-credits to certain class members, redeemable only at its online store, for partial payment of purchases. And to qualify for Benefit III, the settlement requires class members to further enrich Sony by purchasing a Sony Blu-ray Disc Player. With the exception of Mr. Date, Sony is not close to adequately compensating the Settlement Class members for their injuries.

19

This Court, therefore, concludes that a settlement that does not remedy the injury alleged by the class members, and is not close to a fair "compromise" meriting this Court's approval.

### G. The Public Interest

This settlement does not serve the public interest because it does not hold Sony accountable for its conduct, and does not come close to compensating the victim class for the injuries it caused. Furthermore, it would not sufficiently deter Sony from factually misrepresenting its products' technical capabilities in the future.   In this proposed settlement, Sony provides $90 cash compensation only to a few early complainers, provides Sony-only vouchers to some other class members, the number unknown, and provides nothing to most of the class.  Moreover, a component of the proposed settlement requires the victims to further enrich Sony by purchasing an additional product from Sony, the party that has victimized them.

All the class members allege the same injury. Because all the class members sustained the same injury, and their alleged damages are equal, all class members have the same right of recovery. *See Petruzzi's, Inc. v. Darling-Delaware Co., Inc.*, 880 F. Supp. 292, 300 (M.D. Penn. 1995).

In *Petruzzi's*, a supermarket chain brought a class action alleging Sherman anti-trust violations against fat and bone rendering companies for restraint of trade.  *Id.* at 294.   The supermarket negotiated a settlement with one of the two defendants, and moved for approval of a proposed partial settlement.  *Id.* at 293.  The proposed partial settlement discharged class members' claims, who sold raw materials to defendant Moyer Packing Company and co-defendant Darling-Delaware, Inc., in exchange for "up to $2 million in 'premium certificates' which are to 'be claimed by class members based on the dollar value of their sale of raw materials to Moyer.'"  *Id.* at 293.

A class member objected to the proposed settlement in *Petruzzi's* on the ground that it

excluded more than 600 class members who only sold raw materials to Darling-Delaware, as those class members would receive no compensation for their release of Moyer. *Id.* at 294. U.S. District Court Judge Thomas Vanaskie, in rejecting the settlement, pointed out:

> Judicial review is not limited to ascertaining whether the settlement is the product of fraud or collusion. Instead, the reviewing court has an independent duty to ensure that the proponents of the settlement have met their burden of establishing that the settlement is fair, adequate, and reasonable.

*Id.* at 296.

Judge Vanaskie held that the proposed partial settlement was not "fair, adequate or reasonable" largely because the settlement provided compensation to only fifty percent of the class, but required the entire class to release its claims against the settling defendant. *Id.* at 299. The court opined that the proponents of the proposed partial settlement carried a "substantial burden to show that the settlement is fair to the class as a whole," when the proposed partial settlement only benefitted fifty percent of the class, and found that the settlement proponents had not met that burden. *Id.* at 299. Further, with respect to the value of the settlement, Judge Vanaskie found that there was no basis for estimating the real value of the settlement, as neither party had presented evidence regarding likely redemption rates, which precluded the court from determining whether the settlement was reasonable "in light of the best possible recovery and the risks of litigation." *Id.* at 297. Judge Vanaskie emphasized that it is "also important to estimate the actual value of the settlement in order to assess the appropriateness" of the attorney fees and expenses award. *Id.* at 298.

As in *Petruzzi's*, this proposed settlement does not compensate all class members equally, and will not compensate many class members at all. Unlike in *Petruzzi's*, where at least fifty percent

21

of the class will be compensated, here, it is unknown whether even fifty percent of the class will receive compensation for the release of their claims against Sony.

Also like in *Petruzzi's*, in the present case, there are no facts upon which to estimate the real value of the settlement or the cost of the settlement to Sony; as neither party has provided any evidence regarding likely redemption rates. Thus, the Court is unable to determine whether the settlement is reasonable in light of the potential recovery and the risks of litigation. Further, it is impossible to assess whether the attorney fees and expenses award of $300,000 is appropriate, in light of the fact that the actual value of the settlement is unknown.

"In this regard, 'fairness' is not demonstrated by the silence of class members in response to the proposed settlement." *Id.* at 299. As in *Petruzzi's*, here, few class members objected to the proposed settlement. However, "[a]s stated by Judge Friendly in *National Super Spuds, Inc. v. New York Mercantile Exchange,* 660 F.2d 9, 16 (2d Cir. 1981), '[l]ack of objection by the great majority of claimants means little when the point of objection is limited to a few who interests are being sacrificed for the benefit of the majority.'" *Id.* at 300. Here, an unknown but large number of class members will release their claims against Sony without being compensated. Only a very few will receive the $90 settlement. The remainder will either receive e-credits redeemable at Sony's online store or nothing at all. There is simply no justification for requiring those class members to release their claims without being provided any consideration for their release when they suffered the same injury as the class members who will be compensated, television sets advertised as displaying 1080p native resolution that do not deliver.[5] This Court will not sacrifice the claims of some class members

---

[5]Mark Schmidt, Sony Electronics' TV Group Director of Quality Engineer testified at the fairness hearing that the Advanced Television Systems Committee (ATSC) standard defines 1080p. (Tr. 77, Schmidt). Schmidt further testified that as to the television sets at issue in the instant case, while the antenna input accepts 1080p signals, the composite and component inputs

in order to satisfy a select portion of the class' claims.

## III. CONCLUSION

The television sets at issue include approximately 175,000 Sony high-end, high resolution models manufactured between 2004 and 2006. (Tr. 9, Mansfield).

Sony mislead consumers about a particular feature of the television set–1080p native resolution. The television sets, advertised as having 1080p progressive scan capability did not; they had only 1080i capability.

Plaintiff Date noticed that when he plugged in his computer into the television, the television would only accept inputs of the 1080i signal, the lower resolution signal.

Plaintiff Date complained about the 1080p deficiency to the Better Business Bureau, to ABC Warehouse and to Sony. (Tr. 11, Mansfield).

The instant complaint was filed in San Diego, California. Motions filed by Defendant and answered by Plaintiff were not heard because the parties chose to proceed to facilitation. Plaintiff's counsel also deposed a Sony engineer and retained a consultant. (*Id.* at 20). A two day facilitation process took place that resulted in the instant proposed settlement. (*Id*. 11-12).

Of the 175,000 purchasers – i.e., settlement class members – over 65,000 received direct notice of the settlement.

At the fairness hearing on November 3, 2008, the Court viewed the television sets at issue

cannot accept a 1080p signal. (*Id.* at 78).

Schmidt further acknowledged during the television set demonstration provided to the Court at the fairness hearing on November 3, 2008, that there was "feathering" or shadowing of an image on the subject television sets at issue. (*Id.* at 81). To be clear, "feathering" is not a positive attribute. Further elaborating the mechanics of the deficiency, Objector attorney Kaplan asked: "And that [feathering] was because it was taking a 1080i signal off the Blu-ray player and deinterlacing it to display at 1080p? (*Id.* at 81). Schmidt answered, "yes," confirming that the deinterlacing is less than native 1080p resolution. (*Id.* at 81).

23

and confirmed the deficiency between the advertised 1080p native resolution and the 1080i resolution upconverted. The Court noted the "feathering" or shadows on the 1080i television set at issue in the instant case. Feathering provides a defective resolution. The Court finds that Plaintiff's claim of damages is not *de minimis*. The instant expensive television sets were advertised and touted as top of the line with 1080p resolution that did not "deliver" for Plaintiff Date and the other purchasers.

The Court strongly disagrees with Sony's counsel's description of the settlement:

> We believe that the benefits generously compensate the settlement class members for the difference between watching an upconverted 1080i signal and the 1080p signal. And you'll see that that [sic] difference is de minimis.

(Tr. 46, Cohen). The benefits are not generous or adequate. In fact, it is likely that there will be no benefits at all for the majority of the class if they decide not to purchase a 1080p device that cannot provide them with 1080p capability on their inferior television set.

Benefit I, $90 cash, only goes to a very few members of the class.

Benefits II and II are not generous, much less fair. Benefit II's e-credit for class members who previously purchased a 1080p device is like a manufacturer's coupon to induce a consumer to buy products more expensive than the coupon at Sony's online store.

Benefit III requiring purchase of a Sony Blu-ray Disc player to receive the Sony online store e-credit is likely to create new revenue and profits for Sony.

The Court concludes that this settlement is not fair, adequate and reasonable. *See Williams v. Vukovich*, 720 F.2d 909 (6th Cir. 1983). The proposed settlement does not fairly or adequately compensate the unnamed Settlement Class members for their injuries. The objectors have met the heavy burden of demonstrating that the settlement is unreasonable. Because the parties have failed

24

to come to an agreement that is beneficial to the class, this Court concludes that the settlement is unreasonable. The Court, therefore, rejects the settlement.

 SO ORDERED.

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: 1 - 16 - 09
 Detroit, Michigan

25