UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID DATE, JR. and ELIOT HANDLER,
Individually and On Behalf of All Others
Similarly Situated,

               Plaintiffs,

vs.

SONY ELECTRONICS, INC. and ABC
APPLIANCE, INC., d/b/a ABC
WAREHOUSE,

               Defendants.

Case No. 07-CV-15474

Honorable Paul D. Borman
Magistrate Judge R. Steven Whalen

---

## APPENDIX OF UNPUBLISHED AUTHORITIES
## IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
## <u>DEFENDANT ABC APPLIANCE, INC.'S MOTION TO DISMISS</u>

# UNPUBLISHED AUTHORITIES

**CASES**                                                                                                                   **TAB**

*ABC Appliance, Inc. v. Yaffe & Co.,*
No. 92-CV-76771, 1993 U.S. Dist. LEXIS 4599 (E.D. Mich. Jan. 15, 1993) ........................... A

*Association of Frigidaire Model Makers v. General Motors Corp.,*
No. 93-3184, 1995 U.S. App. LEXIS 7615 (6th Cir. Mar. 31, 1995) ........................................ B

*AT&T Corp. v. Mich. Internet Ass'n, Ltd.,*
No. 06-14385, 2008 U.S. Dist. LEXIS 31202 (E.D. Mich. Apr. 16, 2008) .............................. C

*Cooper v. Samsung Electronics, America, Inc.,*
No. 08-4376, 2010 U.S. App. LEXIS 6602 (3d Cir. Mar. 30, 2010) ........................................ D

*Date v. Sony Electronics, Inc.,*
No. 07-15474, 2009 U.S. Dist. LEXIS 15837 (E.D. Mich. Feb. 20, 2009) .............................. E

*Eaton Corp. v. Minerals Technology Inc.,*
No. 96-CV-162, 1999 WL 33485557 (W.D. Mich. Mar. 19, 1999) ....................................... F

*Evans v. Ameriquest Mortgage Co.,*
No. 233115, 2003 Mich. App. LEXIS 564 (Mar. 4, 2003)....................................................... G

*Gernhardt v. Winnebago Indus.,*
No. 03-73917, 2003 U.S. Dist. LEXIS 25747 (E.D. Mich. Dec. 30, 2003)............................. H

*Kenny v. Franklin Bank, NA,*
No. 227122, 2002 Mich. App. LEXIS 2369 (Feb. 26, 2002)...................................................... I

*Peters v. Cars to Go,*
No. 1:97-CV-920, 1999 WL 33502378 (W.D. Mich. Mar. 17, 1999) ........................................ J

*Pressalite Corporation v. Matsushita Electric Corp. of America,*
No. 02-C7086, 2003 U.S. Dist. LEXIS 5600 (N.D. Ill. Apr. 3, 2004) ....................................... K

*Vandegiessen v. First of Michigan Corporation,*
No. K86-276A CA, 1989 U.S. Dist. LEXIS 16231 (W.D. Mich. Jan. 19, 1989)........................ L

By:  /s/ Lance A. Raphael

Dani K. Liblang
LIBLANG & ASSOCIATES
346 Park Street, Suite 200
Birmingham, Michigan 48009

Alan Mansfield
CONSUMER LAW GROUP
OF CALIFORNIA
9466 Black Mountain Road
Suite 225
San Diego, California 92126

Lance A. Raphael
THE CONSUMER
ADVOCACY CENTER, P.C.
180 West Washington
Suite 700
Chicago, Illinois 60602

Darren T. Kaplan
CHITWOOD HARLEY
HARNES LLP
1230 Peachtree Street, NE,
Suite 2300
Atlanta, GA 30309

Brian S. Kabateck
KABATECK BROWN
KELLNER LLP
644 South Figueroa Street
Los Angeles, CA 90071

TAB A



LEXSEE 1993 U.S. DIST. LEXIS 4599

**ABC APPLIANCE, INC., Plaintiff, v. YAFFE & COMPANY, FREDERICK YAFFE and FRETTER, INC., Defendants, and YAFFE & COMPANY, and FRETTER, INC., Counter-Plaintiffs, v. ABC APPLIANCE, INC., Counter-Defendant.**

**CASE NO: 92-CV-76771-DT**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION**

*1993 U.S. Dist. LEXIS 4599*

**January 15, 1993, Decided**

**JUDGES:** [*1] DUGGAN

**OPINION BY:** PATRICK J. DUGGAN

**OPINION**

HON. PATRICK J. DUGGAN

*OPINION*

Currently before the Court are defendants Yaffe & Company's and Frederick Yaffe's motions to partially dismiss various counts contained in plaintiff's complaint and for *Rule 11* sanctions. Subsequent to the filing of the original complaint and the defendants' filing of their motions to dismiss, plaintiff filed an amended complaint, thereby mooting some of the issues raised in defendants' motions to dismiss. Defendants have responded to the filing of the amended complaint. This Court shall address the issues raised both before and after the filing of the amended complaint. For the reasons contained herein, this Court shall deny defendants' motions.

*Facts*

The following facts are taken from plaintiff's amended complaint. Plaintiff, ABC Appliance, Inc., doing business as ABC Warehouse, Mickey Shorr, Shorr Electronics, and Hawthorne Home Appliance & Electronics, is a corporation existing under the laws of the State of Michigan (hereinafter "ABC Warehouse"). Defendant Yaffe & Company, a Michigan corporation, is engaged in the business of providing advertising services. Defendant Frederick Yaffe is an officer of Yaffe & [*2] Company. Defendant Fretter, Inc. (hereinafter "Fretter") is a Michigan corporation and, like ABC Warehouse, is engaged in the sale of appliances to consumers, including kitchen appliances, televisions, stereo systems, and automobile appliances.

Plaintiff claims that on October 11th, 1991, plaintiff and Yaffe & Company entered into an agreement effective October 1st, 1991 under which Yaffe & Company agreed to serve as an advertising agency for plaintiff. During 1985, 1988, and 1989, plaintiff and Yaffe & Company had entered into similar agreements.

In April of 1992, ABC Warehouse, Yaffe & Company and Fred Yaffe discussed, and ABC Warehouse approved an advertising campaign which included a slogan "Botta Boom, Botta Bing" in connection with conveying a message that Plaintiff sells appliances at low prices." (Amended Complaint, P 14). Plaintiff claims that plaintiff and defendants Yaffe & Company and Fred Yaffe agreed in general terms "as to the personal characteristics of the spokesperson to be utilized in such advertising campaign." *Id.*

Plaintiff claims to be the owner of the advertising campaign. Yaffe & Company and Fred Yaffe confirmed, in writing on April 8, 1992, plaintiff's [*3] approval of the advertising campaign as well as plaintiff's "confidential advertising plans for the remainder of 1992 and certain confidential advertising plans which were to extend beyond December 31, 1992." *Id.*

Plaintiff alleges that defendant Fretter, Inc. contacted Yaffe & Company and Fred Yaffe prior to June,

Case 2:07-cv-15474-PDB-RSW   Document 138   Filed 08/02/10   Page 6 of 84

Page 2
1993 U.S. Dist. LEXIS 4599, *

1992, to have Yaffe & Company serve as advertising agency for Fretter, Inc. Plaintiff claims that Fretter informed Yaffe & Company that it would not wait until January 1, 1993 (at which time the contract between plaintiff and Yaffe & Company would have been completed) for Yaffe & Company to provide advertising services for Fretter, Inc., but indicated that if Yaffe & Company would not commence representing Fretter in 1992, then Fretter would utilize a different advertising agency.

Plaintiff paid Yaffe & Company creative fees for the period subsequent to April 8, 1992, which fees included working on the advertising campaign which included the slogan "Botta Boom, Botta Bing." (Amended Complaint, P 20). In June of 1992, Yaffe & Company and Fred Yaffe announced to plaintiff their intention to provide advertising services for Fretter. Plaintiff alleges that, as a result of [*4] this announcement, the agreement between plaintiff and Yaffe & Company was terminated prior to September 1, 1992. (Amended Complaint, P 21).

On September 3, 1992, plaintiff introduced new commercials on television stations in the Detroit Metropolitan Area using the advertising campaign which included a slogan "Botta Boom, Botta Bing" "in connection with conveying a message that Plaintiff sells appliances at low prices, and a spokesperson having the characteristics generally agree upon with Yaffe & Company." (Amended Complaint, P 22).

Within approximately one week after plaintiff released the commercials, Fretter released a new advertising campaign, "including new commercials on television stations in the Detroit Metropolitan Area which included the same advertising campaign referred to in this Amended Complaint, including the slogan "Botta Boom, Botta Bing" and a spokesperson having the characteristics generally agreed upon between Plaintiff and Defendants Yaffe & Company and Fred Yaffe." (Amended Complaint, P 24).

Plaintiff's amended complaint purports to allege, *inter alia,* the following causes of action: Count I, False Description of Services (in violation of the Lanham Act, [*5] *15 U.S.C. § 1125(a)*; Count II, Breach of Contract; Count III, Breach of Fiduciary Duty; Count IV, Tortious Interference with Contract; Count V, Quantum Meruit/Unjust Enrichment; and Count VII (plaintiff failed to include a Count VI), Unjust Enrichment.

Defendants Yaffe & Company, Fred Yaffe and Fretter have filed counterclaims against plaintiffs, claiming that prior to 1992, Yaffe was in the process of developing a nationwide syndicated advertising program with "noted actor/comedian Dom Irrera as the featured performer portraying a humorous, likeable Italian character referred to as 'Vinne'." (Yaffe Counterclaim, P 5). Yaffe claims that on April 8, 1992, Yaffe discussed, with ABC

Warehouse, the idea for its new syndicated advertising campaign featuring Irrera. Yaffe claims that ABC Warehouse told Yaffe that it would be interested in purchasing this campaign for the Detroit market "if the price was right." (Yaffe Counterclaim, P 7). Yaffe "thereafter continued developing the subject campaign, which included negotiations with Dom Irrera to perform his 'Vinne' character in the syndicated advertising campaign tailored to the needs of ABC Warehouse." [*6] (Yaffe Counterclaim, P 8). Yaffe claims that early in May, 1992, Fretter approached Yaffe and Yaffe's availability to perform advertising services for Fretter. Yaffe asserts that they informed ABC Warehouse of these discussions and "assured ABC that it would not be entering into any contract with Fretter to perform services for Fretter in any market where ABC conducts business until after expiration of the agreement between Yaffe and ABC." (Yaffe Counterclaim, P 9).

Yaffe and Fretter subsequently agreed that Yaffe would handle Fretter's advertising and marketing campaigns in advertising markets that did not conflict with ABC Warehouse and, after Yaffe's contract with ABC Warehouse expired on December 31, 1992, Yaffe would assume responsibility for Fretter's advertising and marketing services.

According to Yaffe, shortly after the conversation between ABC Warehouse and Yaffe, "ABC wrongfully terminated its relationship with Yaffe despite the fact that Yaffe was willing and able to perform advertising services for ABC and, in fact, had continued to develop a Dom Irrera/'Vinne' syndicated advertising campaign for use by ABC in the Detroit market." (Yaffe Counterclaim, P 11).

After terminating [*7] its contract with Yaffe, Yaffe claims that ABC Warehouse continued to develop an infringing advertising campaign substantially similar to the campaign conceived of by Yaffe, which included an attempt by ABC Warehouse to obtain Dom Irrera and his "Vinne" character for ABC Warehouse's commercials.

After Irrera refused to participate, ABC Warehouse hired another actor to imitate the role that Irrera would have performed. On September 3, 1992, ABC Warehouse began broadcasting television and radio advertisements in the Detroit market "using an actor imitating the humorous, likeable Italian character that Yaffe had conceived and disclosed to ABC in early April, 1992, and using advertising messages substantially similar to those being developed by Yaffe." (Yaffe Couterclaim, P 15). Yaffe has alleged claims of breach of contract, misappropriation, and unjust enrichment against ABC Warehouse. Fretter has likewise filed a counterclaim alleging "wrongful misappropriation."

## Discussion

### A. Defendant Fred Yaffe's Motion to Dismiss

Defendant Fred Yaffe claims that plaintiff's complaint fails to set forth any legal basis for naming Fred Yaffe as a defendant and that, accordingly, Fred [*8] Yaffe should be dismissed as a defendant. This Court finds defendant's arguments unpersuasive. First, defendant argues that "no contract is identified to which Mr. Yaffe is alleged to be a party, and ABC identifies no duty separately owed to it by Mr. Yaffe that has allegedly been breached." (Defendant Yaffe's motion for partial dismissal, at 3).

Plaintiff has alleged that in April of 1992, plaintiff and Yaffe & Company and Fred Yaffe discussed, and plaintiff approved, an advertising campaign which included a slogan "Botta Boom, Botta Bing" in connection with "conveying a message that Plaintiff sells appliances at low prices." (Amended Complaint, P 14). At paragraph 11 of the amended complaint, plaintiff alleges that each of the agreements between plaintiff and Yaffe & Company "included, implicitly if not explicitly, that Defendant Yaffe & Company and Defendant Fred Yaffe would have access to confidential information and confidential business plans of" plaintiff. At paragraph 13, plaintiff alleges that each of the agreements between plaintiff and Yaffe & Company included "that Yaffe & Company and Fred Yaffe would use best creative efforts to prepare advertising for the benefit of [*9] plaintiff." In this Court's opinion, plaintiff has alleged facts which tend to show that Fred Yaffe was a party to the contract at issue between plaintiff and Yaffe & Company. Thus, this Court shall not grant defendant Fred Yaffe's motion to dismiss counts II (breach of contract), V (quantum meruit), and VII (unjust enrichment) of the amended complaint.

Second, defendant Fred Yaffe argues that, with respect to count I, "ABC makes no claim that Mr. Yaffe, *acting independently* of Yaffe & Co., provided goods in commerce or created advertising messages that were confusingly similar to ABC's advertisements. (Yaffe's brief in support of motion for partial dismissal, at 3) (emphasis in original). Following the filing by ABC Warehouse of their amended complaint, defendants submitted a reply brief in support of their motion for partial dismissal and sanctions. Defendant Fred Yaffe claims, in the reply brief, that "the Amended Complaint has again alleged no basis upon which liability could be imposed agaisnt him individually." (Reply brief, at 2).

Defendants have failed to cite any authority for the proposition that plaintiff must allege that defendant Fred Yaffe acted independently of Yaffe [*10] & Company in order to properly be named as a party defendant. Counts

I and II of the amended complaint are tort claims. In Michigan, "courts have long held that an employee can be held accountable when his or her negligent conduct causes the injuries of third persons. . . ." *Harris v. Great Lakes Steel Corp., 752 F. Supp. 244 (E.D. Mich. 1990)* (citing *Ellis v. McNaughton, 76 Mich. 237, 42 N.W. 1113 (1889)* and *Bannigan v. Woodbury, 158 Mich. 206, 122 N.W. 531 (1909))*. "It is beyond question" that a corporate employee is personally liable for all the tortious acts in which he participates, regardless of whether he was acting on his own behalf or on behalf of the corporation. *Attorney General v. Ankersen, 148 Mich. App. 524, 557, 385 N.W.2d 658 (1986)*. Accordingly, this Court finds defendant Fred Yaffe's arguments without merit, and shall deny his motion to be dismissed as a defendant in the instant lawsuit.

### B. Defendant Yaffe & Company's and Fred Yaffe's Motions to Dismiss

Yaffe & Company and Fred Yaffe first argue that plaintiff's claim for "reformation of contract" fails to state a claim upon which [*11] relief can be granted. This Court notes that the amended complaint does not include a claim for reformation of contract; thus, defendant's argument is now moot and their motion shall be denied.

Second, defendants argue that counts V and VII of the amended complaint should be dismissed pursuant to *Fed.R.Civ.P. 12(b)(6)*. Defendants argue that plaintiff's claims for unjust enrichment fail "because a party cannot disavow a written contract in favor of an implied contract, citing *United States v. Palmer Smith Co., 679 F. Supp. 641, 646 (E.D. Mich. 1987)* ("Michigan law forbids a *quantum meruit* recovery where an express contract covers the subject matter") and *Cloverdale Equipment Co. v. Simon Aerials, Inc., 869 F.2d 934, 939 (6th Cir. 1989)* ("A quasi-contractual theory of recovery is inapplicable when the parties are bound by an express contract").

This Court finds Yaffe & Company's reliance on this authority misplaced. Those cases stand for the principle that when parties are bound by an express contract covering the subject matter at issue, a quasi-contractual theory of recovery is inapplicable. In neither of those cases [*12] was the court faced with a 12(b)(6) motion to dismiss.

*Federal Rule of Civil Procedure 8(e)(c)* permits a party to set forth two or more statements of a claim, even though the statements may be inconsistent. *See e.g., Teledyne Industries, Inc. v. N.L.R.B., 911 F.2d 1214, 1217 n.3 (6th Cir. 1990)* ("Rule 8(e)(2) concerns the ability to plead alternative legal arguments, even if they are inconsistent or based on inconsistent facts"). It is true, in

1993 U.S. Dist. LEXIS 4599, *

the case at hand, that if plaintiff successfully proves that a contract covering the subject matter exists between plaintiff and defendants, plaintiff will be unable to recover on a quasi-contractual theory. However, *Rule 8(e)(2)* expressly authorizes the plaintiff to plead inconsistently.

A claim should not be dismissed "unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 101-02, 2 L. Ed. 2d 80 (1957).* In the case at hand, if plaintiff is unable to prove the existence of a contract covering the subject-matter at issue, it is [*13] possible that plaintiff might prove an entitlement to recovery under a the-

ory of unjust enrichment. The defendants have not argued otherwise. Accordingly, defendants' motion to dismiss counts V and VII shall be denied.

For the reasons contained in this Opinion, the defendants' motions to dismiss shall be denied. Furthermore, defendants' motion for *Rule 11* sanctions shall likewise be denied. An Order consistent with this Opinion shall issue forthwith.

DATED: January 15, 1993

PATRICK J. DUGGAN

UNITED STATES DISTRICT JUDGE

TAB B



LEXSEE 1995 U.S. APP. LEXIS 7615

**ASSOCIATION OF FRIGIDAIRE MODEL MAKERS, et al., Plaintiffs-Appellants, v. GENERAL MOTORS CORP. and INTERNATIONAL UNION OF ELECTRICAL, RADIO, & MACHINE WORKERS, LOCAL 801, AFL-CIO-CFC, Defendants-Appellees.**

**Nos. 93-3184/93-3245/93-3645/93-3697**

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

*1995 U.S. App. LEXIS 7615*

**March 31, 1995, FILED**

**NOTICE:** [*1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 24 LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 24 BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: *51 F.3d 271, 1995 U.S. App. LEXIS 13399.*

**PRIOR HISTORY:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO. District No. 81-00343. Rice, District Judge.

**DISPOSITION:** AFFIRMED

**JUDGES:** BEFORE: MARTIN and BOGGS, Circuit Judges; and FORESTER, District Judge *

    * The Honorable Karl S. Forester, United States District Judge for the Eastern District of Kentucky, sitting by designation.

**OPINION**

    **PER CURIAM** The plaintiffs ("the Model Makers") are a group [1] of skilled tradesmen formerly employed as model makers by the now-defunct Frigidaire Division of defendant General Motors Corporation ("GM"). They

appeal the district court's entry of judgment as a matter of law dismissing their hybrid § 301 breach of agreement/duty of fair representation claim against GM and co-defendant International Union of Electrical, Radio & Machine Workers, Local 801, AFL-CIO-CLC ("the Union").

    1 There seems to be a question of how many people are suing the defendants. Petitioners refer to forty-nine plaintiffs, respondents state that there are forty-eight, and our count of those listed in the complaint is fifty-two (including the estates of eight who have died).

    [*2] The Model Makers make three arguments on appeal: (1) *Federal Rule of Civil Procedure 50(b)* precludes consideration of the defendants' renewed motion for judgment as a matter of law; (2) the district court violated the "law of the case" by applying *Air Line Pilots Ass'n Int'l v. O'Neill, 499 U.S. 65, 113 L. Ed. 2d 51, 111 S. Ct. 1127 (1991)*; and (3) the district court deprived the plaintiffs of due process by denying them expeditious resolution of this case. We reject these arguments and affirm the district court's dismissal of this case.

**I**

    This appeal comes to the court with a tortured past.[2] Briefly, this suit arose out of the decision by GM in 1979 to sell its Frigidaire Division and to convert two Dayton, Ohio, Frigidaire production plants for use by its Chevrolet division.[3] Almost all employees at the Frigidaire plants were to be laid off during a two-year transition period.

1995 U.S. App. LEXIS 7615, *

2   After the district court entered the final judgment on its docket sheet on December 31, 1992, plaintiffs filed their first notice of appeal (No. 93-3097) on January 28, 1993, within the thirty days allowed by *Fed. R. App. P. 4(a)(1)*. However, they improperly identified the party taking appeal as "Association of Model Makers, et al." instead of listing each party individually. On February 16, 1993, plaintiffs moved for an extension of time to appeal (No. 93-3184) pursuant to *Fed. R. App. P. 4(a)(5)*, which permits such motions within *sixty* days of a final judgment "upon a showing of excusable neglect or good cause." The next day, the district court granted the extension in a notation order. Defendants moved for relief from this order since they were not given an opportunity to contest plaintiffs' motion. Plaintiffs again moved for an extension of time to appeal (No. 93-3245) on February 26.

In an order dated March 18, 1993, the district court vacated its notation order *sua sponte,* thus mooting defendants' motion for relief. On May 28, 1993, the court granted the extension of time to appeal that was sought by plaintiff's motion of February 26, giving plaintiffs ten days to file notice of appeal; they did so on June 2, 1993 (No. 93-3645). Defendants appealed the court's extension on June 18 (No. 93-3697), arguing that there was neither good cause or excusable neglect.

We find no abuse of discretion, and agree completely with the district court's reasoning in its May 28 decision. Since both of plaintiff's motions were within sixty days of the final judgment, we have jurisdiction to hear this appeal.

[*3]

3   The opinion in *Adkins v. International Union of Elec. Radio & Mach. Workers, 769 F.2d 330 (6th Cir. 1985)*, gives a more detailed history of this litigation.

The defendants agreed to employ in the Chevrolet plant, with unbroken seniority, those Frigidaire workers who were union members. Most of the skilled tradespersons from the Frigidaire facilities could have found equivalent positions at Chevrolet, but since Chevrolet had relegated all modeling activity to its facility in Warren, Michigan, the Model Makers were no longer needed in Dayton. The defendants informally agreed to establish a joint union-management committee to reclassify the Model Makers into another skilled trade classification, which would make them eligible for jobs in Dayton.

Union members ratified the plant closing agreement in February of 1979, and layoffs began shortly thereafter. During the transition period, the joint committee success-

fully reclassified all model makers at the Dayton plants, but these reassigned workers were not given seniority credit for their time working at Frigidaire. On June 24, 1981, the [*4] plaintiffs sued, alleging that GM had breached the plant-closing agreement, in violation of the labor Management Relations Act, *29 U.S.C. § 185*, and that the Union had breached its duty of fair representation by permitting the plaintiffs to be reclassified without retaining their seniority rights.

The district court bifurcated the liability and damages issues, and the liability question was tried before a jury. On June 23, 1982, the jury rendered a verdict for the Model Makers, and the court entered judgment "for the Plaintiffs and against the defendants as to liability only" on July 26, 1982.

Following the jury verdict, the defendants moved for judgment notwithstanding the verdict. On September 21, 1983, the trial court held that the statute of limitations barred the Model Makers' claims and granted the defendants' motion.[4] The plaintiffs appealed the decision to this court, and the defendants cross-appealed, arguing that the Model Makers had failed to produce sufficient evidence of bad faith or arbitrary conduct by the Union or breach of the plant-closing agreement by GM.

4   *Association of Frigidaire Model Makers v. General Motors Corp., 573 F. Supp. 236 (S.D. Ohio 1983)*.

[*5]   In *Adkins v. International Union of Elec., Radio & Mach. Workers, Local 801, 769 F.2d 330 (6th Cir. 1985)*, another panel of this court agreed that a six-month statute of limitation applied, but remanded the case for a determination of when the plaintiffs' cause of action accrued. The court also rejected the defendants' cross-appeal:

A hybrid section 301/unfair representation claim requires the plaintiff to show that the employer breached the collective bargaining agreement and that the union acted in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation. *[DelCostello v. International Bhd. of Teamsters, 462 U.S. 151, 163-64, 76 L. Ed. 2d 476, 103 S. Ct. 2281 (1983)]*. . . . Plaintiffs properly produced evidence that [GM] agreed to immediately reclassify the plaintiffs and failed to do so and that the union represented the model makers in an arbitrary or perfunctory manner; *we reject defendants' contention that arbitrariness*

*is an inappropriate standard to apply to union conduct when negotiating contract provisions.* The evidence of a claim was far from uncontroverted, but it was sufficient to sustain [*6] a jury verdict.

*Adkins, 769 F.2d at 336-37* (emphasis added).

Upon remand, the district court concluded that the plaintiffs' claim accrued late enough to make its suit timely, and entered an order on July 1, 1988, captioned as follows:

DECISION AND ENTRY AFFIRMING THE VERDICT OF THE JURY; JUDGMENT ENTERED IN FAVOR OF THE PLAINTIFFS AND AGAINST THE DEFENDANTS; ORDER OF REFERENCE TO UNITED STATES MAGISTRATE TO ASSESS AMOUNT OF DAMAGES AND TO AFFIX THE SENIORITY RIGHTS AND OBLIGATIONS OF THE PARTIES, PURSUANT TO THE JURY VERDICT.

In the order, the court concluded that "the verdict of the jury must be affirmed and that judgment must *ultimately* be entered in favor of the Plaintiffs and against the Defendants." (emphasis added).

With the issue of damages still pending before the magistrate judge, the defendants, on May 28, 1991, renewed their motion for judgment notwithstanding the verdict, (now designated as a motion for judgment as a matter of law). They asserted that in *Air Line Pilots Ass'n Int'l v. O'Neill, 499 U.S. 65, 113 L. Ed. 2d 51, 111 S. Ct. 1127 (1991)*, the Supreme Court had articulated a new definition of arbitrary union conduct in hybrid [*7] § 301 suits, and that the plaintiffs had not satisfied this standard. On December 31, 1992, the district court agreed and entered judgment in favor of the defendants. This appeal followed.

**II**

The standard for reviewing a district court's ruling on a motion for judgment as a matter of law is identical to that governing a motion for judgment notwithstanding the verdict. *Black v. Ryder/P.I.E. Nationwide, Inc., 15 F.3d 573, 583 (6th Cir. 1994)*:

This court reviews a motion for judgment as a matter of law using the same standard used by the district court. The court should not weigh the evidence, evaluate the credibility of witnesses, or substitute its judgment for that of the jury; rather, it must view the evidence in the light most favorable to the party against whom the motion is made, and give that party the benefit of all reasonable inferences.

*Ibid.* (citations omitted). Accordingly, the motion should be sustained only "if the evidence 'points so strongly in favor of the movant that reasonable minds could not come to a different conclusion.'" *Marsh v. Arn, 937 F.2d 1056, 1060 (6th Cir. 1991)*, quoting *Ratliff v. Wellington Exempted Village Schools* [*8] *Bd. of Educ., 820 F.2d 792, 795 (6th Cir. 1987)*.

**III**

The Model Makers argue that the district court's order granting judgment as a matter of law violated *Rule 50(b)*[5] because the defendants renewed their prior motion on May 28, 1991, almost nine years after the district court originally entered judgment for the plaintiffs on July 26, 1982. Alternatively, they argue that the district court's July 1, 1988 "decision and entry" constituted a judgment in the plaintiffs' favor, and that the defendants' May 1991 renewed motion was not filed within 10 days of this judgment. They urge this court to find that there was a judgment outstanding when the defendants filed their May 1991 motion, because for the court to hold the trial record open for nine years would be "patently ludicrous, manifestly unjust, and probably a denial of due process." Thus, the plaintiffs' timeliness challenge hinges upon whether the district court had ever entered a judgment sufficient to start the running of the ten-day limitations period of *Rule 50(b)*.

5   A motion for judgment as a matter of law, having been made and denied at the close of all the evidence, "may be renewed by service and filing not later than 10 days after entry of judgment." *Fed. R. Civ. P. 50(b)*.

[*9]   We hold that there has not been such a judgment in this case. A jury finding of liability is not a final judgment for the purposes of *Federal Rule of Civil Procedure 50(b)*. The federal rules define "judgment" to include "a decree and any order from which an appeal lies." *Fed. R. Civ. P. 54(a)*. In addition, "every judgment shall be set forth on a separate document . . . [and] is effective only when so set forth and when entered as provided in *Rule 79(a)* [into the civil docket]." *Fed. R. Civ. P. 58*.

This court has observed that a district court's filing of a memorandum opinion does not constitute a judg-

ment, and that the time limitations for post-judgment motions do not begin to run until "a separate document setting forth the judgment in compliance with *Rule 58* [has been] entered." *Jetero Constr. Co., Inc. v. South Memphis Lumber Co., 531 F.2d 1348, 1351 (6th Cir. 1976).* Further, a court's jurisdiction continues "until the entry of its judgment disposing of the litigation," and a court retains the "inherent power to correct any error of its own which it may have previously made . . . ." Ibid. (citations omitted).

A judgment in a bifurcated proceeding is not final until [*10] both liability and damages have been fully resolved. *Brown v. United States Postal Serv., 860 F.2d 884, 886 (9th Cir. 1988)* (concluding that "[a] district court judgment of liability is not a final judgment where it remains for the district court to assess damages or adjudicate other claims for relief"); *O. Hommel Co. v. Ferro Corp., 659 F.2d 340, 353 (3d Cir. 1981)* (holding that the term "judgment" in *Rule 50(b)* is limited to final judgments), cert. denied, *455 U.S. 1017, 72 L. Ed. 2d 134, 102 S. Ct. 1711 (1982); Warner v. Rossignol, 513 F.2d 678, 684 n.3 (1st Cir. 1975)* (rejecting in a bifurcated trial "plaintiff's contention that a new trial motion with respect to liability had to be filed within ten days of entry of the interlocutory judgment . . . [because] 'the judgment' referred to in [Rule 59(b)] is the final judgment that will be entered after damages are assessed.").

Despite the passage of almost nine years from the jury's verdict, there simply was no outstanding judgment on record at the time the defendants filed their renewed motion. The remand from this court did not order reinstatement of the July 26, 1982, judgment in the plaintiffs' favor, but [*11] instead required "a determination of whether the plaintiffs' January 1981 attempt to file grievances prevented accrual of their claim until that time." *Adkins,* 769 F.2d at 337. Nor was the district court's July 1, 1988, "DECISION AND ENTRY" a final judgment for this purpose: the document was in the form of a memorandum opinion that specifically stated that "a judgment *must ultimately* be entered in favor of the plaintiffs." In addition, no separate document entering judgment pursuant to this memorandum opinion was ever filed as required by *Fed. R. Civ. P.* 58. Accordingly, the district court was correct in concluding that "as of the time of the filing of the motion under discussion, there was no valid judgment in force in this litigation."

**IV**

The absence of a final judgment is of consequence only if the Supreme Court's decision in Air Line Pilots set forth a new rule. Thus, the district court could not revisit its prior determination that the union's conduct breached its duty of fair representation without violating the law already established in this case. This court has

observed that the law of the case "applies with equal vigor to the decisions of a coordinate [*12] court in the same case and to a court's own decisions." *United States v. Todd, 920 F.2d 399, 403 (6th Cir. 1990).*

In *Arizona v. California, 460 U.S. 605, 618, 75 L. Ed. 2d 318, 103 S. Ct. 1382 (1983),* the Supreme Court noted that "the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Nonetheless, "law of the case directs a court's discretion, it does not limit the tribunal's power. . . . It is not improper for a court to depart from a prior holding if convinced that it is clearly erroneous and would work a manifest injustice." *Id. at 618* & n.8 (citations omitted). Therefore, the "law of the case" doctrine precludes reconsideration of settled issues unless a "controlling authority" sets forth a "contrary view of the law." *White v. Murtha, 377 F.2d 428, 431-32 (5th Cir. 1968).*

The plaintiffs' position rests entirely on their characterization of the Supreme Court's intervening decision in *Air Line Pilots Ass'n Int'l v. O'Neill, 499 U.S. 65, 113 L. Ed. 2d 51, 111 S. Ct. 1127 (1991),* as a mere clarification of the law, rather than a contrary decision of law. [*13] In Air Line Pilots, the Court considered the case of striking airline pilots who, by virtue of the back-to-work agreement negotiated by their union, received less favorable treatment than if they had unilaterally agreed to return to work. *499 U.S. at 79.* The Court held that the standard for determining whether a union breaches its duty of fair representation in contract negotiations was the same as that for other union conduct: "a union breaches its duty . . . if its actions are either 'arbitrary, discriminatory, or in bad faith.'" *Id. at 67.* The Court's definition of "arbitrary" afforded great deference to the union:

> Any substantive examination of a union's performance, therefore, must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities. . . . The final product of the bargaining process may constitute evidence of a breach of duty only if it can be fairly characterized as so far outside a 'wide range of reasonableness,' that it is wholly 'irrational' or 'arbitrary.'

*Id. at 78* (citation omitted).

While the Court characterized its decision in Air Line Pilots as "clarifying" [*14] the duty of fair representation standard, this court saw it in *Ackley v. Local 337, Int'l Brotherhood of Teamsters, 948 F.2d 267 (6th*

*Cir. 1991*), as enough of a change in existing circuit law to warrant vacating a decision it had held for rehearing, pending the outcome of Air Line Pilots. The Ackley case involved an employer's decision to merge the employees and functions of two separate facilities into a new facility. Different union locals had represented employees of the two original facilities, but only one was allowed to represent the combined workforce. The appointed local negotiated full seniority for its members, but "endtailed"[6] the seniority of the other local's workers, who were on layoff status when the facilities merged. A jury found that the local had breached its duty of fair representation to the endtailed employees.

> 6    The term "endtailing" refers to the practice, when two locals merge, of giving less seniority to some employees.

In this court's vacated opinion, the majority held [*15] that the plaintiffs had presented sufficient evidence of hostility by the local to sustain the jury verdict. *Ackley v. Local 337, Int'l Brotherhood of Teamsters, 910 F.2d 1295, 1300 (6th Cir. 1990)* ("Ackley I"). Judge Nelson dissented on the grounds that there was nothing irrational or hostile about the local's action, and that the company and the union, faced with a shrinking market, had made a difficult decision.[7] Under such circumstances, he reasoned that the fact that some employees received full seniority while others were endtailed was not a breach of the union's duty to represent the workers fairly:

> This is not a case where the union was motivated to discriminate against one faction on racial grounds . . . [or] because that group had resisted unionization. . . . [Nor is it] a case where a motive to discriminate unfairly and in bad faith could be inferred from the fact that the union's position was "unsupported by any rational argument whatsoever." . . . The bargaining position taken by the union . . . was supported by an eminently rational argument.

*Id. at 1307-08* (Nelson, J., dissenting) (citations omitted).

> 7    "Because there were not enough jobs to go around . . . some employees who wanted to work there and who felt they had legitimate claims on jobs at the facility were inevitably going to lose out. It was up to the union and the company to decide, through the collective bargaining process, who the individual winners and losers would be

in this zero-sum game." *Id. at 1307* (Nelson, J., dissenting).

[*16]    Following the Supreme Court's decision in Air Line Pilots, Judge Nelson's dissenting opinion was summarily adopted as the majority opinion:

> The O'Neill case has now been decided. It teaches us that what a union does in its negotiating capacity is not actionable absent proof of bad faith, discrimination, or behavior so unreasonable as to be irrational. . . . Having reexamined the record of the instant case in light of O'Neill, we are satisfied, essentially for the reasons stated by Judge Nelson in the dissenting opinion . . . that there is no basis on which the jury could properly have found the union's conduct to have been arbitrary, discriminatory, or irrational.

*Ackley v. Local 337, Int'l Brotherhood of Teamsters, 948 F.2d 267 (6th Cir. 1991)* (citation omitted).

This court agrees that Air Line Pilots enunciated a "contrary view of the law" applicable to this case. Otherwise, there would have been no need for the Ackley I court to reverse itself. Given that the district court is not only constrained by the law of the case, but is also obligated to follow controlling authority, adopting the plaintiffs' position would require the district court [*17] to ignore a decision of the Supreme Court, which clearly "would work a manifest injustice." *Arizona v. California, 460 U.S. at 618 n.8* Admittedly, a district court will only rarely be forced to vacate a jury's verdict, but that makes it no less appropriate in particular circumstances. The parties' own actions in prolonging the damages portion of the litigation only increased the possibility of an intervening change in the law. Based on the foregoing, the plaintiffs' contention that the district court's decision violated the law of the case is without merit.

**V**

The Model Makers argue that the passage of more than a decade since their complaint was filed violates their trial rights under the *Seventh Amendment* and *Federal Rule of Civil Procedure 1*, and that the protracted nature of the proceedings has denied them due process. The defendants counter that the plaintiffs should not prevail simply because of the length of the proceedings. Moreover, the defendants maintain that most of the delays in this case are directly attributable to the plaintiffs, and that the plaintiffs have identified no instance in which the defendants engaged in dilatory tactics.

1995 U.S. App. LEXIS 7615, *

The *Seventh Amendment* [*18] does not address the speed with which civil litigation must proceed. It would be unprecedented to read it as authorizing a judgment in the plaintiffs' favor merely because it took the court system thirteen years to dispose of their claim finally; the defendants have been equally hindered. This unusually long delay was due in part to the parties' own decisions, so that any injustice or outrage is self-inflicted; the primary culprit is the parties' inability to conclude the damages segment of the trial for almost thirteen years. Both sides contributed to, as well as benefitted from, the delay: six years of the litigation was spent adjudicating a threshold issue of the statute of limitations, a ruling that enabled the plaintiffs to proceed to trial. In short, both sides have nobody to blame but themselves.

For the foregoing reasons, we put this litigation to final rest and AFFIRM the district court's judgment for the defendants.

TAB C



LEXSEE 2008 U.S. DIST. LEXIS 31202

**AT&T CORP., Plaintiff, v. MICHIGAN INTERNET ASSOCIATION, LTD., Defendant.**

**Case No. 06-14385**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION**

*2008 U.S. Dist. LEXIS 31202*

**April 16, 2008, Argued**
**April 16, 2008, Decided**
**April 16, 2008, Filed**

**COUNSEL:** [*1] For AT and T Corporation, Plaintiff: Jonathan T. Walton, Jr., LEAD ATTORNEY, David G. Michael, Walton & Donnelly, Detroit, MI; Paul R. Franke, III, LEAD ATTORNEY, Franke, Greenhouse, Denver, CO.

**JUDGES:** PRESENT: Honorable Gerald E. Rosen, United States District Judge.

**OPINION BY:** Gerald E. Rosen

**OPINION**

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

At a session of said Court, held in the U.S. Courthouse, Detroit, Michigan on April 16, 2008

PRESENT: Honorable Gerald E. Rosen United States District Judge

Plaintiff AT&T Corp. commenced this action in this Court on October 5, 2006, alleging in its complaint that Defendant Michigan Internet Association, Ltd. has failed to pay $ 198,407.83 in service and other charges for telecommunications services provided to Defendant by Plaintiff and its predecessors-in-interest dating back to 1997. Based on these allegations, Plaintiff has asserted state-law claims of breach of contract and quantum meruit/unjust enrichment. The Court's subject matter jurisdiction rests upon the parties' diverse citizenship. See *28 U.S.C. § 1332(a)*.

Through the present motion, Defendant now seeks partial summary judgment in its favor on Plaintiff's claim of quantum meruit, arguing that this claim [*2] cannot go forward in light of an express contract between the parties. In response, Plaintiff contends that the contract produced in support of Defendant's motion addresses only a small portion of the parties' overall relationship, and does not govern the telecommunications services for which Plaintiff seeks to recover in this case. Because Defendant has denied that any written contracts govern this remaining portion of the parties' relationship, Plaintiff asserts that its claim of quantum meruit remains viable. As discussed briefly below, the Court readily concludes that Plaintiff has the better of the argument on this point.

Defendant's motion rests on the principle, as recognized by the Michigan courts, that an implied contract or unjust enrichment claim can succeed "only if there is no express contract [between the parties] covering the same subject matter." *Barber v. SMH (US), Inc., 202 Mich. App. 366, 509 N.W.2d 791, 796 (1993)*; see also *Keywell & Rosenfeld v. Bithell, 254 Mich. App. 300, 657 N.W.2d 759, 776 (2002)*. Defendant then points to a "Master Equipment Agreement" executed by Defendant and Plaintiff's predecessor-in-interest, TCG/Detroit, in March of 1997. (See Defendant's [*3] Motion, Ex. A.) Because this contract includes an integration clause stating that "[a]ll prior agreements and understandings of the parties are merged within this Agreement, which alone fully and completely sets forth the understanding of the parties," (id. at 3), Defendant contends that any claim of quantum

meruit or unjust enrichment cannot survive in the face of this written agreement.

This argument, however, overlooks an important limit to the above-cited principle of Michigan law -- namely, that claims of unjust enrichment or quantum meruit are foreclosed only to the extent that the parties have entered in to an express agreement *covering the same subject matter*. Simply stated, Defendant has failed to produce any evidence that the "Master Equipment Agreement" accompanying its motion addresses the tele-communications services that are the subject of Plaintiff's claims in this case. To the contrary, this agreement, on its face, granted permission for Defendant to place certain equipment in a portion of a Southfield, Michigan office leased by Plaintiff's predecessor-in-interest, TCG/Detroit, in exchange for which Defendant agreed to pay TCG/Detroit the sum of $ 750.00 per month. Nothing [*4] in this agreement purports to govern the tele-communications services which, according to the complaint, Plaintiff and its predecessors-in-interest have provided to Defendant dating back to December of 1997, and for which Defendant allegedly owes $ 198.407.83. [1]

> 1  Notably, even if Defendant had failed to make a single payment to Plaintiff under the Master Equipment Agreement, and even if this agreement had remained in effect for the entire 11-year period from March of 1997 to the present, the total amount owed by Defendant would be $ 99,000, considerably less than the amount allegedly owed by Defendant under the complaint. It also is worth noting that the integration clause in the Master Equipment Agreement does not purport to supersede any agreements entered into by the parties *after* the execution of this agreement in March of 1997.

To confirm that issues of fact remain, to say the least, as to whether the agreement produced by Defendant covers the subject matter giving rise to the parties' dispute in this case, one need only consider Plaintiff's complaint and accompanying exhibits. The complaint alleges that at least some of the telecommunications services at issue were provided pursuant [*5] to a number of order forms and service contracts, which are attached to the complaint as exhibits. Plainly, then, Plaintiff is alleging that these materials constitute the written contracts upon which its breach of contract claim is based, at least in part. Nothing in Defendant's motion or its sole accompanying exhibit, the Master Equipment Agreement, establishes as a matter of law that the materials accompanying Plaintiff's complaint do not govern the telecommunications services provided by Plaintiff, and that the Master Equipment Agreement instead was intended by the parties to set forth their obligations with respect to these services.

It also is clear that issues of fact remain as to Plaintiff's ability to recover under a theory of quantum meruit or unjust enrichment. While Plaintiff alleges in its complaint that telecommunications services were provided to Defendant pursuant to a number of written forms and documents that qualify as contracts, Defendant flatly denies in its present motion that it entered into "any subsequent written agreements with AT&T or its predecessors" following its execution of the Master Equipment Agreement in March of 1997, apart from "signing some order [*6] forms" that Defendant evidently believes have no contractual force. (Defendant's Motion, Br. in Support at 3.) To the extent that Plaintiff provided telecommunications services to Defendant over the years but cannot establish that these services were governed by written or oral agreements, it may seek to recover for these services under the quantum meruit/unjust enrichment theory advanced in its complaint. Moreover, it may continue to pursue this and its breach of contract theory in the alternative, so long as questions of fact remain as to whether all of the services provided by Plaintiff were covered under a contract. Such questions of fact clearly remain in dispute under the present record.

For these reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's November 2, 2007 motion for summary judgment is DENIED.

s/ Gerald E. Rosen

United States District Judge

Dated: April 16, 2008

TAB D



LEXSEE 2010 U.S. APP. LEXIS 6602

**NATHAN COOPER, on Behalf of Himself and All Others Similarly Situated v. SAMSUNG ELECTRONICS AMERICA, INC., a New York Corporation Nathan Cooper, Appellant.**

No. 08-4736

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*2010 U.S. App. LEXIS 6602*

**November 9, 2009, Argued
March 30, 2010, Opinion Filed**

**NOTICE:** NOT PRECEDENTIAL OPINION UNDER THIRD CIRCUIT INTERNAL OPERATING PROCEDURE RULE 5.7. SUCH OPINIONS ARE NOT REGARDED AS PRECEDENTS WHICH BIND THE COURT.

PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**PRIOR HISTORY:** [*1]
Appeal from the United States District Court for the District of New Jersey. (D.C. No. 07-cv-03853). District Court Judge: Hon. Jose L. Linares.
*Cooper v. Samsung Elecs. Am., Inc., 2008 U.S. Dist. LEXIS 75810 (D.N.J., 2008)*

**COUNSEL:** Darren T. Kaplan, Esquire (Argued), Chitwood Harley Harnes, LLP, Atlanta, Georgia; Arnold C. Lakind, Esquire, Szaferman, Lakind, Blumstein & Blader, P.C., Lawrenceville, New Jersey, Counsel for Appellant.

Robert A. Assuncao (Argued), Arthur F. Fergenson, Steven F. Gooby, Ansa Assuncao, East Brunswick, New Jersey, Counsel for Appellee.

**JUDGES:** Before: AMBRO, GARTH and ROTH, Circuit Judges. AMBRO, Circuit Judge, dissenting in part.

**OPINION BY:** ROTH

**OPINION**

ROTH, Circuit Judge:

Appellant Nathan Cooper ("Cooper") appeals from the District Court's dismissal of his complaint against appellee Samsung Electronics America, Inc. ("Samsung") pursuant to *Federal Rules of Civil Procedure 9(b)* and *12(b)(6)*, and the District Court's decision to construe his consumer fraud claim under Arizona, rather than New Jersey, law. We will affirm.

**I. Background**

**A. Factual History**

In October 2005, plaintiff-appellant Cooper purchased a 61-inch television manufactured by defendant-appellee Samsung from a retail store located in Maricopa County, Arizona. The model of the television purchased by Cooper was [*2] the "Samsung HL-R6178W," also known as the "628 Series 1080p DLP HDTV" (hereinafter referred to as "the 1080p television"). Cooper alleges that, as a result of representations made by Samsung in the marketing materials it produced for the 1080p television, Cooper was, at the time of his purchase, under the impression that the 1080p television he was buying was capable of accepting and displaying a high-quality video signal, known as a 1080p signal, via an input known as "HDMI." The ability to accept a 1080p signal via the HDMI input would allow the television to display high-quality video from sources that produced native 1080p signals, such as HD-DVD players. Cooper alleges that he paid a premium price for the television on the expectation that it would be able to display the high-quality 1080p signal.

In fact, the 1080p television purchased by Cooper was incapable of accepting a 1080p signal via its HDMI input. [1] Cooper learned of this problem "several months" after purchasing the 1080p television, when he "unsuccessfully attempt[ed] to connect native 1080p devices" to his television. However, upon learning of the problem, Cooper did not provide notice to Samsung of the alleged defect [*3] in its product. In fact, Cooper failed to provide formal notice to Samsung regarding the 1080p problem at any time during the year following his purchase, as is expressly required by the "Samsung Color Television & Projection Television Limited Warranty to Original Purchases" (referred to hereinafter at "the Warranty") included with the 1080p television purchased by Cooper.

> 1   While Cooper's 1080p television *was* able to accept a 1080p signal via its **VGA** input, this feature was effectively useless for retail consumers such as Cooper, since the VGA input is primarily used to receive signals from computing hardware. In other words, while Cooper's television was, in fact, able to receive a high-quality 1080p signal, it could do so only when functioning as a computer screen. Since the model purchased by Cooper was 61 inches wide, usage of the monitor for personal computing purposes would have been highly impractical.

Cooper calculates that the loss he sustained as a result of being misled into buying his 1080p television is $ 349.

**B. Procedural History**

On August 10, 2007, Cooper brought a putative class action against Samsung in the United States District Court for the District of New Jersey. [*4] In his complaint, Cooper alleged that Samsung's sale of televisions it called "1080p" but in reality were unable to accept a 1080p signal via HDMI was misleading and deceptive. Cooper asserted six claims against Samsung in his complaint: (1) breach of express warranty; (2) breach of implied warranty; (3) violation of the Magnuson-Moss Warranty Act (*15 U.S.C. § 2310(d)(1)*); (4) violation of the New Jersey Consumer Fraud Act ("NJCFA") (*N.J. Stat. Ann. § 56:8-2*); (5) fraudulent concealment; and (6) unjust enrichment. Cooper sought to represent a nationwide class comprising all persons in the U.S. who had purchased Samsung "1080p" televisions that were incapable of accepting a 1080p signal via HDMI.

Samsung moved to dismiss the complaint, and on September 29, 2008, the District Court granted Samsung's motion to dismiss with respect to all his claims except the consumer fraud claim brought under the NJCFA. The District Court concluded that Arizona law applied, and therefore *sua sponte* construed the consumer

fraud claim as if it had been brought under Arizona's consumer fraud statute, (*Ariz. Rev. Stat. Ann. §§ 44-1521 et seq.*) ("AZCFA"). The District Court then denied Samsung's motion to [*5] dismiss with respect to the AZCFA claim.

Cooper subsequently voluntarily agreed to a dismissal of his AZCFA claim with prejudice for the sole purpose of appealing the District Court's application of Arizona (rather than New Jersey) law to his consumer fraud claim, and on November 13, 2008, the District Court entered judgment in favor of Samsung. Cooper timely appealed: (1) the dismissal of his breach of express warranty claim; (2) the dismissal of his Magnuson-Moss act claim; (3) the District Court's application of Arizona law to his consumer fraud claim; and (4) the dismissal of his fraudulent concealment claim. We will affirm the District Court's rulings on all of these issues.

**II. Discussion**

The District Court had subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, *28 U.S.C. § 1332(c)*. We have appellate jurisdiction pursuant to *28 U.S.C. § 1291*.

**A. Breach of Express Warranty Claim**

We exercise plenary review over a district court's dismissal of a claim pursuant to *12(b)(6)*. *Grammar v. John J. Kane Regional Centers--Glen Hazel, 570 F.3d 520, 523 (3d Cir. 2009)*.

To establish a breach of express warranty claim under New Jersey law [2], a plaintiff "must allege (1) [*6] a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Frederico v. Home Depot, 507 F.3d 188, 203 (3d Cir. 2007)*. Cooper's claim fails as a matter of law because he has failed to properly allege a breach of contract.

> 2   We generally apply the law of the forum state--here, New Jersey--to state law claims unless there is an objection by any of the parties, and since there is no objection by either party, we apply New Jersey law to Cooper's breach of express warranty claim.

The contract upon which Cooper's claim is premised--i.e., the Warranty [3] --states, in pertinent part:

> This SAMSUNG brand product, as supplied and distributed by SAMSUNG and delivered new, in the original carton to the original consumer purchaser, is warranted by SAMSUNG against **manufacturing**

2010 U.S. App. LEXIS 6602, *

defects in materials and workmanship for a limited warranty period of: [...] LCD TV: One (1) Year Parts and Labor, including Display Panels. [...] This limited warranty begins on the original date of purchase, and is valid only on products purchased and used in the United States. **To receive warranty service, the purchaser [*7] must contact SAMSUNG for a problem determination and service procedures.**

J.A. 244 (emphases added).

3  In general, when ruling on a motion to dismiss pursuant to *12(b)(6)*, a court may only consider the contents of the pleadings. *Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir. 2002)* (quoting 62 Fed. Proc. L.Ed. § 62:508). However, "[d]ocuments that the defendant attaches to the motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claim...." Id. In this case, while Cooper's complaint did not contain the Warranty, it was clearly referenced in the context of Cooper's breach of express warranty claim, and was central to that claim. Thus, since Samsung attached the Warranty to its motion to dismiss, we can properly consider the Warranty in the course of our 12(b)(6) analysis.

Since, in the instant case, it is undisputed that Cooper failed to provide the requisite notice to Samsung within one year of the date of his purchase of the 1080p television, Samsung is not obligated to perform under the Warranty. Moreover, the plain language of the Warranty covers only "manufacturing defects in materials and [*8] workmanship encountered in normal . . . noncommercial use of this product." Cooper does not allege a manufacturing defect; indeed, he agrees his TV was manufactured as designed. His complaint is that the design deviated from Samsung's advertisements and packaging. This is not a "manufacturing defect" that would be covered by this warranty. Given the foregoing, Cooper cannot prevail under the Warranty.

**B. Fraudulent Concealment Claim**

We agree with the District Court's dismissal of Cooper's fraudulent concealment claim because the amended class action complaint failed to plead fraud with adequate specificity under *Federal Rule of Civil Procedure 9(b)*.

**C. Magnuson-Moss Warranty Act Claim**

The District Court dismissed Cooper's claim under the Magnuson-Moss Warranty Act, *15 U.S.C. § 2301 et seq.*, concluding that it failed as a matter of law pursuant to *12(b)(6)* because Cooper failed to state any viable underlying state claims. We exercise plenary review over a dismissal pursuant to *12(b)(6)*. *Grammar, 570 F.3d at 523.*

In the instant case, Cooper's Magnuson-Moss claim is based upon his state law claims of breach of express and implied warranties. Since the District Court correctly dismissed both   [*9] of those claims, Cooper's Magnuson-Moss claim was also properly dismissed.

**D. Consumer Fraud Claim**

Cooper appeals the District Court's conclusion that Arizona law applies to his consumer fraud claim. We exercise plenary review over a district court's choice-of-law conclusions. *Shuder v. McDonald's Corp., 859 F.2d 266, 269 (3d Cir. 1988).*

We apply the choice-of-law rules of the forum state--New Jersey--to determine what law governs Cooper's consumer fraud claim. *Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Thabault v. Chait, 541 F.3d 512, 535 (3d Cir. 2008).* Under New Jersey law, choice-of-law determinations involve a two-step inquiry. In the first step, a determination is made as to whether or not an actual conflict exists between the substance of the laws of each respective potential forum. *Lebegern v. Forman, 471 F.3d 424, 430 (3d Cir. 2006).* If no actual conflict is found to exist, "the inquiry is over and, because New Jersey would apply its own law in such a case, a federal court sitting in diversity must do the same." *Id. at 428.* If, however, an actual conflict is found to exist, the inquiry proceeds to the second step.

At the time   [*10] of the District Court's decision, New Jersey used the "governmental interest" analysis for tort claims. In November 2008, the New Jersey Supreme Court adopted the "most significant relationship" test, as found in the Restatement (Second) of Conflict of Laws. *P.V. v. Camp Jaycee, 197 N.J. 132, 962 A.2d 453 (N.J. 2008).* [4] This test "embodies all of the elements of the governmental interest test plus a series of other factors deemed worthy of consideration." *Id. at 459 n.4.*

4  P.V. v. Camp Jaycee, which announced a new choice-of-law analysis in New Jersey, had not been filed when the District Court decided its choice-of-law analysis in favor of Arizona. However, in light of the *Restatement § 148*, we are satisfied that the District Court's choice-of-law

2010 U.S. App. LEXIS 6602, *

analysis was correct despite the fact that it did not have the benefit of Camp Jaycee.

Under the first step of the analysis, the court must determine whether an actual conflict exists between the laws of the two states. There is no dispute there is an actual conflict between the consumer protection statutes of New Jersey and Arizona. The second step is to weigh the factors in the Restatement corresponding to the plaintiff's cause of action.

Under the [*11] *Camp Jaycee* analysis, our point of departure for the second step of the choice-of-law inquiry is the *Restatement (Second) of Conflict of Laws § 148*, which addresses fraud and misrepresentation. Fraud and misrepresentation torts are covered in *§ 148 of the Restatement.* Under subsection (1), when the plaintiff's action in reliance on the defendant's false representations takes place in the same state where the false representations were made and received, there is a presumption the law of that state applies. Here, though, Samsung's representations were alleged to have been made in a different state (New Jersey) than they were received and relied upon (Arizona). Thus, this case is governed by subsection (2), under which the following contacts must be weighed:

> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
>
> (b) the place where the plaintiff received the representations,
>
> (c) the place where the defendant made the representations,
>
> (d) the domicil, residence, nationality, place of incorporation and place of business of the parties,
>
> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the [*12] time, and
>
> (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

*Restatement (Second) of the Conflict of Laws § 148(2).*

Cooper, who purchased the television in his home state of Arizona, is not entitled to sue under the New Jersey consumer fraud statute. The transaction in question bears no relationship to New Jersey other than the location of Samsung's headquarters. Cooper's claim bears

the most significant relationship with Arizona, the state in which the television was marketed, purchased, and used. [5]

> 5   We reject Cooper's argument that the District Court erred in resolving the choice-of-law determination as to his statutory consumer fraud act claim at the motion to dismiss stage, rather than wait until the class certification stage.

## III. Conclusion

The District Court did not err in granting Samsung's motion to dismiss. For the reasons set forth above, we will affirm the judgment of the District Court.

**DISSENT BY:** AMBRO (In Part)

**DISSENT**

AMBRO, Circuit Judge, dissenting in part

I join my colleagues in all but Part II.D. Because the District Court did not have the benefit of the *Camp Jaycee* decision and thus  [*13] did not conduct the "most significant relationship" analysis, I would vacate and remand for that Court to conduct the choice-of-law analysis in the first instance. Moreover, I do not view the answer to the choice-of-law question presented here to be as easy to discern as my colleagues perceive it.

First, New Jersey has a strong interest in deterring fraudulent conduct occurring within its state borders by domestic businesses. *See In re Mercedes-Benz Tele Aid Contract Litig., 257 F.R.D. 46, 67 (D.N.J. 2009)* ("Given the fact that all of the conduct underlying Plaintiffs' consumer fraud claim took place in [New Jersey], consideration of the place where the defendant made the representations[] strongly supports applying the [New Jersey Consumer Fraud Act] to Plaintiffs' claims.") (internal quotation marks and citation omitted). This is an important consideration under the Restatement (Second) of Conflict of Laws ("Restatement"), but one the District Court and the majority do not consider. *See Restatement § 148(2)(c)* (including as a relevant factor "the place where the defendant made the representations"); *id. § 148 cmt. c* ("The place where the defendant made his false representations .  [*14] . . is as important a contact in the selection of the law governing actions for fraud and misrepresentation as is the place of the defendant's conduct in the case of injuries to persons or to tangible things."). According to Cooper, Samsung conceived of and created the alleged misrepresentations in New Jersey and orchestrated the alleged fraud from New Jersey. That the plaintiff is from Arizona, rather than any other state in which these Samsung televisions were sold, is happenstance from Samsung's perspective. *Cf. P.V. v. Camp*

*Jaycee, 197 N.J. 132, 962 A.2d 453, 466 (N.J. 2008)* (noting that the court has "continuously deferred to the rights of other jurisdictions to regulate conduct within their borders," particularly "when the conduct is ongoing and directed towards residents and non-residents alike").

The Restatement also directs courts to put "emphasis upon the purpose sought to be achieved by the relevant tort rules of the potentially interested states, the particular issue and the tort involved." *Restatement § 148 cmt. e*; *see also id. § 6(2)* (including as relevant factors "the relevant policies of the forum" and "other interested states" and the "basic policies underlying the particular field [*15] of law"); *id. § 6 cmt. h* ("[T]here is good reason for the court to apply the local law of that state which will best achieve the basic policy, or policies, underlying the particular field of law involved."). While one purpose of the New Jersey Consumer Fraud Act is to compensate defrauded consumers, it "serves as a deterrent" by awarding successful plaintiffs "treble damages, attorneys' fees, filing fees, and costs." *Cox v. Sears Roebuck & Co., 138 N.J. 2, 647 A.2d 454, 463 (N.J. 1994)*. "That deterrent effect would be compromised" if Samsung could "avail itself of the law of states which limit recovery in consumer fraud actions to compensatory damages simply because its alleged wrongful activity, which took place within New Jersey, had nationwide effects." *In re Mercedes-Benz, 257 F.R.D. at 68*. As for the interest in compensating fraud victims, because New Jersey's law is recognized as one of the strongest in the country, [1] those residing in other states usually will receive no less--and perhaps more--protection than their own states would provide. Accordingly, application of New Jersey's law often will not frustrate other states' interests in compensation for their residents. Under the Restatement, [*16] "[i]f the purposes sought to be achieved by a local statute or common law rule would be furthered by its application to out-of-state facts, this is a weighty reason why such application should be made." *Restatement § 6 cmt. e*.

    1   Indeed, New Jersey courts have concluded the state legislature *intended* the Act to "be one of the strongest consumer protection laws in the nation." *Huffmaster v. Robinson, 221 N.J. Super. 315, 534 A.2d 435, 437 (N.J. Super. Ct. Law Div. 1986)* (internal quotation marks and citation omitted).

Legislative intent is also relevant, as the Restatement instructs courts to "give a local statute the range of application intended by the legislature when these intentions can be ascertained and can constitutionally be given effect." *Id. § 6 cmt. b*. "If the legislature intended that the statute should be applied to the out-of-state facts involved, the court should so apply it unless constitutional considerations forbid." *Id.* Here, the Act permits recovery to "[a]ny person who suffers any ascertainable loss," *N.J. Stat. Ann. § 56:8-19*, and one court has observed that there is "little doubt that the New Jersey Legislature intended its Consumer Fraud statute to apply to sales made by New Jersey [*17] sellers even if the buyer is an out-of-state resident and some aspect of the transaction took place outside New Jersey." *Boyes v. Greenwich Boat Works, Inc., 27 F. Supp. 2d 543, 547 (D.N.J. 1998)*. This is an important consideration for the choice-of-law determination in this case.

I am troubled that the majority conducts a fact-intensive, six-factor inquiry in two sentences, as there are good arguments on both sides. I would remand for the District Court to conduct the choice-of-law analysis under the "most significant relationship" test, and thus respectfully dissent in part.

TAB E



LEXSEE 2009 U.S. DIST. LEXIS 15837

**DAVID DATE JR., Plaintiff, v. SONY ELECTRONICS INC., and ABC APPLI-
ANCE, INC. d/b/a ABC WAREHOUSE, Defendants.**

**Case Number:07-15474**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
MICHIGAN, SOUTHERN DIVISION**

*2009 U.S. Dist. LEXIS 15837*

**February 20, 2009, Decided
February 20, 2009, Filed**

**PRIOR HISTORY:** *Date v. Sony Elecs., Inc., 2009 U.S.
Dist. LEXIS 65968 ( E.D. Mich., Jan. 16, 2009)*

**COUNSEL:** [*1] For David Date, Jr, Plaintiff: Hallen
D. Rosner, LEAD ATTORNEY, Rosner & Mansfield,
San Diego, CA; Lance A. Raphael, LEAD ATTORNEY,
The Consumer Advocacy Center, Chicago, IL; Dani K.
Liblang, Liblang Assoc., Birmingham, MI.

For Jason Demas, Plaintiff: Hallen D. Rosner, LEAD
ATTORNEY, Rosner & Mansfield, San Diego, CA;
Lance A. Raphael, LEAD ATTORNEY, The Consumer
Advocacy Center, Chicago, IL.

For John Renninger, Plaintiff: Lance A. Raphael, LEAD
ATTORNEY, The Consumer Advocacy Center, Chi-
cago, IL.

For Sony Electronics, Incorporated, Defendant: Douglas
C. Salzenstein, Honigman, Miller, (Detroit), Detroit, MI;
Nancy S. Cohen, Ronald A. Valenzuela, Proskauer Rose
LLP, Los Angeles, CA; Richard E. Zuckerman, Honig-
man, Miller, Detroit, MI.

For ABC Appliance, Incorporated, Doing business as
ABC Warehouse, Defendant: Nancy S. Cohen, Ronald
A. Valenzuela, Proskauer Rose LLP, Los Angeles, CA.

For Elliot Handler, Objector: Hans J. Massaquoi, Lewis
& Munday, Detroit, MI.

**JUDGES:** PAUL D. BORMAN, UNITED STATES
DISTRICT JUDGE.

**OPINION BY:** PAUL D. BORMAN

**OPINION**

**ORDER (1) WITHDRAWING REQUEST FOR
BRIEFING, AND (2) AMENDING THE COURT'S
JANUARY 16, 2009, OPINION AND ORDER RE-
JECTING CLASS ACTION SETTLEMENT**

Before the Court is Defendants' [*2] Motion to
Amend Court's January 16, 2009 Order Rejecting Class
Action Settlement. (Doc. No. 77). Having considered
Defendants' motion, the Court has amended its January
16, 2009, order; consequently, briefing by Plaintiff and
objector Elliot Handler is no longer necessary. The
amended opinion and order is attached to this order. Sen-
tences that have been deleted appear with a line through
the sentence, and additions are underlined.

SO ORDERED.

/s/ Paul D. Borman

PAUL D. BORMAN

UNITED STATES DISTRICT JUDGE

Dated: 2/20/09

Detroit, Michigan

**AMENDED OPINION AND ORDER REJECTING
CLASS ACTION SETTLEMENT**

Before the Court is Plaintiff David Date, Jr.'s motion for final approval of the class action settlement, filed October 20, 2008. (Doc. No. 64). Defendants Sony Electronics Inc. and ABC Appliance, Inc. have filed a statement in support of final approval of the class action settlement. (Doc. No. 65). Nineteen people filed objections to the proposed settlement. The Court held a fairness hearing on November 3, 2008, at which the parties were present, and one objector, Elliot Handler, was represented by counsel. Having reviewed the entire record, and for the reasons discussed below, this Court concludes [*3] that the objectors have met their significant burden in opposing the settlement, and, therefore, the Court REJECTS the class action settlement.

## I. BACKGROUND

[EDITOR'S NOTE: TEXT WITHIN THESE SYMBOLS [O> <O] IS OVERSTRUCK IN THE SOURCE.]

Plaintiff David Date, Jr. ("Plaintiff") filed this action in the United States District Court for the Southern District of California on behalf of a nationwide class of consumers against Defendants Sony Electronics, Inc. and ABC Appliance, Inc., d/b/a ABC Warehouse, (collectively "Sony"), relating to the false advertising in the sale of certain Sony television sets. (Complaint, PP 10, 12). Specifically, Sony advertised and promoted the television sets as being capable of displaying 1080p resolution; but the television sets do not accept the 1080p digital video signal. [1] (Def.'s Br. Ex. K, Jean-Pierre Guillou Decl. P 10). As sold, the television sets at issue [O> display <O] can, at best, display an unconverted 1080i digital video input signal from a 1080p device [O> resolution, a less desirable resolution. <O] [2] (Fairness Hr'g Schmidt 67-68). Today, as Sony Engineer Guillou noted, "only Blu-ray Disc Players and certain High-Definition DVD Players are [*4] capable of transmitting a 1080p signal." (Guillou Decl. P 12). [O> The instant television sets eamiot accept, and therefore eannot display a 1080p picture. <O] The television sets cannot accept and display a native 1080p digital video input signal, unless the 1080p device first downconverts the 1080p source material to a 1080i signal, and the 1080i signal is transmitted to the television, where the television set then re-interlaces and upconverts the 1080i signal before it is displayed. (Fairness Hr'g Schmidt 67-68). This process creates artifacts, such as feathering, in the television picture. (Id. at 52-53). Feathering does not occur when a native 1080p digital video input signal is outputted on a 1080p television without de-interlacing and upconverting the signal. The Court observed the feathering, a deficient display, at the fairness hearing. Like the instant Sony television sets, the vast majority of television sets on the market in 2004 and 2005 were not capable of accepting 1080p digital video input signals. (Id. at PP 10, 11). Finally, the instant television sets cannot be redesigned or augmented to display native 1080p digital video input signals.

[1]   1080p is the shorthand [*5] name for a category of display resolutions. The number "1080" represents 1,080 lines of horizontal pixel rows that the display component is capable of projecting onto the television screen, while the letter "p" stands for progressive scan. (Guillou Decl. P 7). A progressive scan television simultaneously scans all of the pixel rows onto the screen, whereas a 1080i television displays half of the pixel rows in one field, then displays the remaining half in the next field. (Id. at P 5). 1080p is the superior signal and display resolution.

[2]   Over-the-air television signals are not currently broadcast in 1080p, nor is it likely that television will ever be broadcast in 1080p because the necessary bandwidth is not available. (Guillou Decl. P 12). However, at the fairness hearing, Objector Handler claimed that the Dish Network is now broadcasting on-demand movies in 1080p. (Tr. 93-94).

Plaintiff's counsel accurately set forth the claim at the November 3, 2008, fairness hearing as follows:

The essence of the lawsuit was that Sony misled consumers . . . that the televisions themselves gave what was known as a 1080p resolution . . . . [T]he essence of the litigation is that there's a difference [*6] between a television that was advertised or promoted as being a 1080p, or what's known as a progressive scan, and one that was 1080i, which is known as an interlaced scan.

Fairness Hr'g Tr, Mansfield, 9, November 3, 2008 [hereinafter Tr.].

Objector Handler's counsel later added: "Even though they were sold as 1080p televisions, they did not accept a 1080p signal, period, end of story. Defendants admit that." (Tr. 96, Kaplan).

Presently, there are devices that transmit 1080p digital video input signals. Sony Blu-ray disc players, certain HD-DVD players, specific gaming devices (e.g. Playstation 3), and a limited number of personal computers all transmit a 1080p signal. (Id. at P 12; Def.'s Br. 11). The television sets at issue are not capable of displaying the 1080p signal that these devices transmit because the television sets lack the input mechanisms to support them. Furthermore, [O> over-the-air television signals

2009 U.S. Dist. LEXIS 15837, *

are not currently broadcast in 1080p, so the television sets cannot <O] while the television sets can input [O> the <O] a 1080p over-the-air broadcast signal, such a signal does not currently exist and it is not likely to ever exist. (Guillou Decl. P 12). This does not adversely [*7] affect Plaintiff's claim that Sony advertised the television sets as being capable of inputting a 1080p digital video signal, but the television sets cannot display that signal without deinterlacing and upconverting, which produces feathering.

In 2004, Sony introduced two of the television sets at issue, the KDS-70Q006 and KDX-46Q005 (the "QUALIA television sets"); the other two models, the KDS-R50XBR1 and KDS-R60XBR1 (the "XBR1 television sets") (collectively, "television sets"), were introduced in the Summer of 2005. (Def.'s Br. Ex. J, Jeff Goldstein Decl. P 2). Sony sold the majority of the television sets at issue to third-party retailers, such as ABC Warehouse, which in turn sold them to the public. (Id.) Sony sold a small number of these sets directly to consumers through its website and outlet stores. (Id.) Sony charged consumers $ 2,999 to $ 3,999 for the KDS-R50XBR1 model, $ 3,999 to $ 4,999 for the KDS-R60DBR1 model, $ 13,000 for the KDS-70Q006 model and $ 14,999 for the KDX-46Q005 model. (Parties' Response to Court's November 21, 2008 Order Requesting Information 3 n. 1). All totaled, Sony sold approximately 3,000 QUALIA television sets and 172,000 XBR1 television sets. (Goldstein [*8] Decl. P 2).

In the Summer and Fall of 2006, Sony introduced a new high-definition television product line to succeed the XBR1 television sets. (Id. at P 3). The QUALIA television sets were never succeeded by a second generation product line, and Sony no longer manufactures or sells either the QUALIA or XBR1 televisions. (Id.) The last shipment of XBR1 televisions sets was sent to retailers in September 2006. (Id. at P 2).

Plaintiff's lawsuit was transferred to this Court on December 27, 2007. (Doc. No. 1). In his second amended complaint, Plaintiff alleges that Sony and ABC misled consumers by describing the television sets' display resolution as "1080p" because the television sets do not display 1080p resolution, are incapable of accepting 1080p video signals, and cannot accept and display video content at 1080p resolution via the PC or HDMI input jacks. (Second Am. Compl. PP 21, 25, 27). Plaintiff alleged claims of breach of contract and warranty, false advertising, unjust enrichment and violations of the Magnuson-Moss Warranty Act, *15 U.S.C. §2301*, and the Michigan Consumer Protection Act, *M.C.L. §§445.901, et seq.* (Id.) Plaintiff sought damages to compensate him for overpaying [*9] for what was advertised as, but was not, a 1080p capable television set. (Id.)

Sony argues, in response to Plaintiff's claims, that representing that a television set has a certain display resolution tells a consumer only what the display resolution is, and does not indicate which of the many types of video signals the television can accept. (Memo. of Points and Authorities in Support of Joint App. for Prelim. Approval of Settlement Class Action [hereinafter Memo.] 4).

The parties reached a proposed settlement on February 4, 2008. (Memo. 14). According to the parties, settlement discussions were conducted from September 2007 until February 4, 2008. (Doc. No. 27, Valenzuela Decl. P 6; Doc. No. 26, Alan Mansfield Decl. P 5). The parties claim that the settlement negotiations were often contentious, that the parties exchanged extensive information about the technical specifications of the television sets and the television sets' sales and marketing, and further that the parties participated in four all-day mediation sessions held on January 23 and 29, before retired Justice Howard B. Wiener, a former Associate Justice of the California Court of Appeal. (Valenzuela Decl. P 7; Mansfield Dec. [*10] PP 4-5; Doc. No. 23, Justice Howard B. Wiener Decl. PP 2, 6.) During the mediation, Sony performed a side-by-side comparison of three of its television sets, including the model Plaintiff purchased. (Id. at P 4). Justice Wiener concluded that the settlement terms, and the demonstration, supported the value of the proposed settlement. (Id.)

The proposed settlement class consists of all original United States end user consumers who purchased, or received as a gift from the original purchaser at retail, a QUALIA television set or XBR1 television set ("Settlement Class"). (Valenzuela Decl., Ex. A, Settlement Agreement § 1.10 [hereinafter Settlement Agreement]). The proposed settlement described by Plaintiff's counsel at the Court's fairness hearing on November 3, 2008, was set forth in this format:

**Settlement Terms**

. Class wide settlement

. 3 Benefits:

  Benefit I:

   . $ 90 Cash

   . called Sony prior to January 8, 2008

   . called about 1080p input & using TV as a computer monitor

  Benefit II:

   . 180 e-credit if QUALIA owner

   . 60 e-credit if XBR1 owner

2009 U.S. Dist. LEXIS 15837, *

. must have bought 1080p device (e.g., HD-DVD player, Blu-ray disc player, gaming console) -- any brand -- before July 25, 2008

Benefit III:

. $ 75 e-credit if [*11] QUALIA owner

. $ 28 e-credit if XBR1 owner

. must buy Sony Blu-ray Disc Player between July 25, 2008 and 30 days after final judgment is final

The proposed settlement offers two types of benefits: cash payments (Benefit I) and e-credit good toward the purchase of merchandise at Sony's online store (Benefit II), and e-credits good toward the purchase of a Sony Blu-ray Disc Player (Benefit III). (Settlement Agreement § 3.1).

## A. Benefit I

Only those very few Settlement Class members who contacted Sony, prior to the lawsuit to register a complaint about their television set's computer deficiency regarding 1080p input, are eligible to receive Benefit I, the $ 90 cash payment. (Settlement Agreement § 3.1.1).

According to Sony's counsel, the Benefit I class is restricted to the following purchasers:

The Court: Well, let me ask, does the $ 90 go to anyone who called to complain about 1080p input?

Ms. Cohen: No. If anybody called to complain about 1080p input, Your Honor, they will get direct notice from us, but this benefit only goes to the people who called who had a computer monitor which, Your Honor, as I mentioned in my statement, mirrors the *Date* case. So they brought a particular problem that [*12] -- at issue. They raised these other issues, but that was Mr. Date, and Mr. Date wanted the people in his position to have the benefit, and so we did.

(Tr. 90-91, Cohen). Thus, Benefit I does not even go to all purchasers who called to complain about the television sets' 1080p deficiency; the caller had to fit within the further limitation set forth by Sony's counsel.

## B. Benefit II

Only those settlement class members who have already purchased a 1080p device before July 25, 2008, qualify for the Benefit II e-credit redeemable only at the Sony online store.

## C. Benefit III

Settlement class members who did not complain and did not purchase a 1080p device before July 25, 2008, but who purchase a Sony Blu-ray Disc Player between July 25, 2008 and 30 days "after final judgment is final" qualify for the Benefit III e-credit redeemable only at the Sony online store.

## D. The Benefits in General

Settlement Class members, eligible for the $ 90 cash payment, can also receive Benefit II, an e-credit redeemable for any item sold at Sony's online store, in the amount of $ 180 (QUALIA owners), or $ 60 (XBRI owners) (Settlement Agreement § 3.1.2 - 3.1.5). Benefit III is available to all settlement class members [*13] who did not complain or previously purchase a 1080p device, but only if they purchase a Sony Blu-ray Disc Player. Thus, Benefit III class members, to receive any settlement benefit, they must buy a Sony Blu-ray Disc Player, costing more than their e-credits--$ 75 for the 3000 potentially qualifying QUALIA set owners, and $ 28 for the 172,000 potentially qualifying XBRI set owners.

The bottom line is that not all 175,000 class members will receive "benefits" because those who did not utter the settlement required "magic words" in complaining or did not complain at all, or who have not purchased a 1080p device, must spend money to purchase a Sony Blu-ray to qualify for a non-cash Sony e-credit redeemable only at Sony's online store. Thus, category III class members who decline to further enrich Sony by purchasing a Sony Blu-ray Disc Player, receive nothing.

Significantly, none of the class members will have a television set capable of receiving and displaying a 1080p video signal natively. Thus, the Benefit II and III class members, even after the purchase of a 1080p device, will still not receive 1080p resolution when using the device.

As Objector Handler's counsel stated regarding Benefit [*14] III- the class member has to buy a Sony Blu-Ray player which outputs 1080p, while the television set that the class member purchased from Sony is incapable of accepting and displaying a native 1080p video signal. "In order to take advantage of a [sic] settlement a class member is expected to purchase some-

thing that they can't use the full capability of which is the foundation of the case." (Kaplan, Tr. 95).

The settlement agreement also provides that Plaintiff Date will receive $ 5,000, plus costs related to the litigation, and the installation of his television, not to exceed $ 1,600. (Settlement Agreement § 3.4). Plaintiff's lawyers receive $ 300,000, plus $ 25,000 in litigation costs. (Settlement Agreement § 3.6.1).

Settlement Class members who are eligible for the $ 90 cash payment will automatically receive the payment from Sony. (Settlement Agreement § 3.3.1). Those who are eligible for an e-credit, applicable only to the Sony online store website, must submit a claim form and proof of purchase of their television set and their 1080p device or Sony Blu-ray disc player. (Settlement Agreement § 3.3.1).

With regard to the $ 90 cash payment, as of January 8, 2008, only 234 people had [*15] called Sony raising the specific issue complaint required by Sony to qualify for Benefit I. (Parties' Response to Court's November 21, 2008 Order Requesting Information 2). Thus, the cash payout for Sony to settle with this small subgroup is 234 x $ 90 = $ 21,060; that is the total Sony cash payout in this entire settlement. The remainder of the settlement, Benefits II and III, involve Sony e-credits, redeemable only for purchases at the Sony online store.

The parties are unable to estimate how many people qualify for Benefits II and III, because it is unknown how many class members have purchased or will purchase a 1080p device. (Id. at 5-6). Purchasers of the deficient television sets at issue who do not purchase a 1080p device receive nothing in the proposed settlement. There is no reason to assume that fifty percent of the class will qualify for any part of the settlement.

Sony states that the settlement is predicated on Sony's belief, with which Plaintiff disagrees, that unless a Settlement Class member has a device that generates a 1080p video signal, that member is not impacted by the fact that the television sets cannot accept a 1080p signal. (Memo. 11). This conclusion assumes [*16] that the consumer is not entitled to what Sony advertised he/she would receive from the instant purchase. Second, Sony contends that even though the television sets cannot accept a 1080p signal, the television sets still work with 1080p devices, because these devices offer not only a 1080p signal, but also other input video signals the televisions can accept. (Memo. 11; Guillou Decl. P 10). "If, for example, a Sony Blu-ray Disc Player is connected to a Television and delivers a 1080p signal to it, the disc player will receive an electronic message from the Television "telling" it that the Television cannot accept the 1080p signal. The disc player then sends a 1080i video signal to the Television that the Television can accept."

(Memo. 11). Albeit a little bit of an extreme example, this reasoning is analogous to purchasing an automobile advertised as being able to run on gas or electricity and then having no ability to plug in the car for electric power.

Simply stated, Sony admits that these televisions, advertised and sold as capable of displaying 1080p resolution, are currently incapable of displaying 1080p resolution.

Nineteen objections to the settlement were filed with this Court. [*17] Two of the objections were not objections at all, and two objections were not timely but considered by this Court. The majority of the objectors complained that they were mislead by Sony's advertisements, and believed that the television sets would accept and display a 1080p signal. Many of the objectors complained about having to purchase a 1080p device in order to qualify for the settlement, which they believe does not remedy Sony's misrepresentation of the television sets' capabilities. Most of the objectors request a new 1080p capable television set, or compensation for the premium they paid for a 1080p television set. One objection filed was not an objection, but a letter in support of Sony. (Doc. No. 59, MacDonald Objection). Another objection was a rambling missive against the "prison industrial complex" from a prisoner housed in Florida, who did not even allege ownership of one of the television sets at issue. (Doc. No. 55, Rivera Objection).

Objector, Elliot Handler, was represented by counsel at the fairness hearing, after filing objections to the settlement. (Doc. No. 62, Handler Objection). Mr. Handler has a pending class action lawsuit concerning the Sony television sets [*18] at issue in this case, in the federal district court in the Central District of California. He objects to the settlement on these grounds: 1) the proposed settlement is fatally flawed because the settlement waives the legal claims of a substantial portion of the class for no compensation, the settlement awards the named plaintiff a recovery far in excess of the recovery of any other class member the settlement was reached before any meaningful litigation or discovery occurred, rendering plaintiff's counsel ill-informed to decide whether the settlement is the best option for the class; 2) the settlement is not the product of good faith negotiations; and 3) the proposed notice of the settlement is deficient. (Id. at 1-2).

## II. STANDARD OF REVIEW

The law favors the voluntary settlement of class action litigation. *Steiner v. Fruehauf Corp., 121 F.R.D. 304, 305 (E.D. Mich.1988), aff'd sub nom. Priddy v. Edelman, 883 F.2d 438 (6th Cir.1989).* Therefore, this Court must not "decide the merits of the case or resolve

unsettled legal questions," but, rather, must "judge the fairness of a proposed compromise" by "weighing the plaintiff's likelihood of success on the merits against the amount and [*19] form of the relief offered in the settlement." *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. General Motors, 497 F.3d 615, 631 (6th Cir. 2007)* (quoting *Carson v. Am. Brands, Inc., 450 U.S. 79, 88 n. 14, 101 S. Ct. 993, 67 L. Ed. 2d 59, (1981))*.

As the Sixth Circuit recently noted in *UAW*, "before approving a settlement, a district court must conclude that it is 'fair, reasonable, and adequate.'" *497 F.3d at 631*; *see Fed. R. Civ.P. 23(e)(1)(C)*; *Fed. R. Civ. P. 23(e)(1)(A)*. The Sixth Circuit specified:

> Several factors guide the district court's inquiry: 1) the risk of fraud or collusion; 2) the complexity, expense and likely duration of the litigation; 3) the amount of discovery engaged in by the parties; 4) the likelihood of success on the merits; 5) the opinions of class counsel and class representatives; 6) the reaction of absent class members; and 7) the public interest.

*UAW, 497 F.3d at 631*. The district court enjoys wide discretion in assessing the weight and applicability of these factors. *Granada Investments, Inc. v. DWG Corp., 962 F.2d 1203, 1206 (6th Cir. 1992)*.

## III. ANALYSIS

### A. The Risk of Fraud or Collusion

There is no evidence, or allegation, of fraud or collusion [*20] between the parties in reaching this settlement. There is, however, a serious question about the aggressiveness and effectiveness of Plaintiff's attorneys' representation of the entire class in agreeing to this settlement, as discussed *infra*.

### B. The Amount of Discovery Engaged in by the Parties

Mr. Handler argues that this Court should not approve the final settlement because the settlement was reached in the "absence of any adversarial litigation." (Handler Objection, 8). According to Handler, plaintiff's counsel cannot know that this settlement is the best that can be achieved for the class because the litigation has not proceeded past the pleadings stage, and discovery has not been conducted. (Id. at 8-9). Plaintiff responds that while this case is in a relatively early stage of litigation, his counsel benefitted from Sony supplying a significant amount of evidentiary information regarding the techni-

cal workings of the televisions and the claims at issue. (PL's Mot. 16). Plaintiff contradicts Handler's assertion that counsel was ill-informed, stating that his attorneys had sufficient information to evaluate the strengths and weaknesses of the lawsuit and make an intelligent and informed [*21] decision regarding the reasonableness of the settlement. (Id. at 16-17). Sony states that Handler's objection is meritless because the parties had sufficient information to insure that their decision to settle was well-informed. (Memo. 9-10).

In considering whether there has been sufficient discovery to permit the plaintiff to make an informed evaluation of the merits of a possible settlement, the court should take into account the formal and informal discovery in which the parties engaged during the litigation. *UAW v. GM, No. 05-73991, 2006 U.S. Dist. LEXIS 14890, 2006 WL 891151, *19 (E.D. Mich. Mar. 31, 2006)* (Cleland, J.) (citing *Levell v. Monsanto Research Corp., 191 F.R.D. 543, 557 (S.D. Ohio 2000)* (although little formal discovery was conducted, class counsel retained experts and conducted informal discovery before negotiating the settlement agreement)). Here, the parties state that they had sufficient information to settle this case. Plaintiff asserts that Sony provided him with ample evidentiary information, and his counsel conducted its own investigation and hired a technological consultant. (PL's Mot. 16). Under these circumstances, particularly when the objectors have not contradicted the parties claim [*22] that informal discovery was conducted, or disputed the technical information the parties' relied on to settle this lawsuit, this Court concludes that adversarial litigation is not a *sine qua non* of a supportable settlement of a class action lawsuit.

### C. The Likelihood of Success on the Merits

Sony urges this Court to approve the settlement because, it argues, Plaintiff's claims are fatally defective as a matter of law and susceptible to summary judgment. (Memo. 5-6). Plaintiff responds that he believes that his case is meritorious but decided to settle this case after considering the proof issues the class might face, and the fact that Sony may win this case, thereby reducing the class recovery to zero. (Pl.'s Mot. 12). Objector Handler believes that Plaintiff's claims are meritorious, and that there is a strong likelihood of success.

This Court concludes that Plaintiff's case can be regarded as meritorious. The objector-purchasers complain that they did not receive television sets with the capability that Sony had advertised; the objectors believed that they were buying a 1080p television set capable of accepting 1080p digital video signals and displaying 1080p digital video signals at [*23] 1080p resolution when, in fact, the television sets cannot accept and thus cannot display 1080p video signals natively.

The advertisements produced by Sony and ABC Warehouse touting the televisions' capabilities underscore this belief. Sony promoted the televisions as "Full HDTV," the "Worlds Greatest High Definition Television," and specifically as having "new display technology . . . to meet and exceed the demands of a High Definition Image at its full 1080 line resolution," and being able to display digitally transmitted high definition signals without interlacing. (Hayes Objection, Ex. A; Complaint, Ex. A, Spec. Sheet KDS-R50XBR1). Sony also stated in the specifications sheet that the televisions' native video resolution was 1080p. (Complaint, Ex. A). ABC Warehouse described the televisions as a "1080p." (Second Am. Compl. Ex. D). Based on these representations, a jury could conclude that Plaintiff was promised a 1080p television that accepted and displayed 1080p resolution natively.

Sony's advertising claims touting the instant television sets' 1080p capability are not "puffery." While an expression of opinion not made as a representation of fact constitutes puffery, Sony's advertising [*24] claims in this case are not statements of opinion; they are statements of fact. The United States Court of Appeals for the Fifth Circuit recently elaborated that even a statement of opinion may not constitute puffery:

> Although Skilling is correct that "an expression of opinion not made as a representation of fact" can constitute puffery, not all statements of opinion are properly classified as puffery.

*United States v. Skilling, 554 F.3d 529, No. 06-20885, 2009 U.S. App. LEXIS 204, 2009 WL 22879, at *18 (5th Cir. Jan. 6, 2009).* In the instant case, there is no basis for even claiming puffery; unlike *Skilling*, where there was an issue of whether the statement was opinion or fact, here we are dealing with Sony 1080p facts, not Sony opinion.

Sony further argues that Plaintiff is unlikely to succeed on the merits of this case because a federal district court in California granted summary judgment to a manufacturer of a television on claims similar to those at issue in this case. (Memo. 6-8). In *Johnson v. Mitsubishi Digital Electronics America, Inc., 578 F. Supp.2d 1229, 1238 (CD. Cal. 2008),* the court concluded that, although Mitsubishi designated its television set as a 1080p television set, the phrase 1080p "does [*25] not convey a specific claim that is recognizable to the targeted customer." This Court disagrees with that finding, noting the Los Angeles U.S. District Judge appears to have based his conclusion, in part, on that plaintiff's admission that the

term 1080p did not have a specific meaning to him. *Id.* at 7. [3] That is definitely not true in the instant case.

> 3   This Court disagrees with the following conclusion of the Los Angeles U.S. District Judge:
>
> > The ATSC Standard's intended audience is engineering professionals, not consumers; and the ATSC Standard is not written in such a manner as to be accessible to consumers.

*Johnson, 578 F.Supp.2d at 1237.* The Sony information sheet touting to consumers the KDS-R50XBR1 television set states in pertinent part:
Specifications:

\*\*\*

VIDEO

Native Resolution: 1080p

The instant Plaintiff has stated that the term 1080p carried a specific meaning for himself and the objectors in the case at bar. Supporting Plaintiff's claim is the fact that the Advanced Televisions Systems Committee (hereinafter "ATSC") specifically defines 1080p resolution. The ATSC digital television standard in effect at the time the televisions were produced and sold called for television [*26] video inputs to *accept* a video signal format with 1080 lines of horizontal resolution by 1920 of vertical resolution in a progressive scan, i.e. 1080p video signals. (Doc. No. 72, Ex. A, ATSC Digital Television Standard)(emphasis added). [4]

> 4   The Los Angeles U.S. District Judge stated in his opinion:
>
> > The [Mitsubishi] manual explicitly states that the HDMI input ports can process 480i, 480p, 720p, and 1080i signals. . . .[T]he omission of the 1080p signal from this exhaustive list is as good as an affirmative disclosure that its HDMI input ports cannot process a 1080p signal.
>
> > \*\*\*
>
> > Mr. Johnson admits that he did not search for information about the television and was not

exposed to any MDEA marketing materials prior to his purchase of the television. The truth of the matter is that Mr. Johnson did not care about whether the HDMI input ports on his television could accept 1080p signals.

*Johnson, 578 F.Supp.2d at 1240.*

This Court concludes that the term 1080p resolution carries a specific meaning for a reasonable consumer, and that Plaintiff and at least some of the class members were well aware of the specific meaning of and advantages of owning a television set capable of 1080p resolution when [*27] they purchased the television sets at issue. That the *Johnson* plaintiff just wanted to blindly purchase a "top of the line" TV set, and may not have known about or cared about 1080p resolution, does not "dumb down" Date, the instant purchaser, who read and bought a Sony television set based on Sony's fact-based advertising regarding 1080p resolution, and other purchasers such as Handler.

The *Johnson* opinion also notes that Mitsubishi only promised consumers that they would be able to "take full advantage" of new technology with the television, and that the television would provide "unsurpassed picture quality." *578 F.Supp. 2d at 1238.* Judge Carney concluded that these statements were mere sales puffery. *Id.* Those quotes may not constitute fact, and may indeed constitute puffery. However, in the instant case, Sony promised consumers "Full HDTV," the "Worlds Greatest High Definition Television" and native 1080p video input capability. ABC Warehouse described the television on its website as a "1080p" television set. Although the television sets at issue were the "Worlds Greatest" may be Sony's puffing opinion of superiority, the statements that the televisions were "Full HDTV" and "1080p" [*28] factually describes the technical capability of the television sets, and do not constitute mere opinion puffery.

**D. The Opinions of Class Counsel and Class Representative**

Class attorney Alan Mansfield submitted a declaration in support of final approval of the settlement. Mr. Mansfield states that, "[d]espite the relative strength of plaintiff's claims in this action . . . continued prosecution of this action was not without considerable risk in terms of recovering significant monetary relief for the Settlement Class members, particularly when compared to what the individual Settlement Class members are provided the opportunity to obtain under this settlement." (Mansfield Decl. P 13). Mr. Mansfield further states that

receiving immediate benefits for the class is preferable to protracted litigation that may result in no recovery, and he believes that the settlement is fair, reasonable and adequate. (Id.) Class representative David Date did not file a declaration, but in his motion to approve the settlement, Date states that the "settlement provides significant monetary relief to the individual class members" and argues that the settlement is fair, reasonable and adequate considering [*29] the risk of continued litigation. (Pl.'s Mot. 3, 12).

The Court notes that Mr. Mansfield is an experienced consumer protection attorney, and Mr. Date has been extensively involved in litigating and settling this case. However, this Court also notes that both Mr. Mansfield and Mr. Date will receive significant financial remuneration in the proposed settlement. If this Court were to approve the settlement, Mr. Mansfield and his co-counsel will receive an attorney fee award of $ 300,000, and Mr. Date will receive $ 6,600, which will fully compensate him for his allegedly defective television and for his litigation costs. The $ 300,000 of attorney fees come despite an absence of aggressive discovery, any litigation and, more importantly, a pittance or even nothing for the settling class. Only the few class members who complained will be compensated with cash. Other class members will only receive voucher benefits if they have spent or will proceed to spend yet even more money to further enrich Sony who they are suing for taking their money in exchange for a very expensive product that could not perform as advertised.

**D. The Reaction of Absent Class Members**

This Court received nineteen objections, [*30] seventeen of which were actual objections to the proposed settlement, out of a settlement class of approximately 175,000 persons who purchased the subject television sets.

Although the objectors are few, the objections illuminate the inherent unreasonableness of the settlement. The objectors complain that they were mislead by Sony and third-party sellers about the technical capabilities of the televisions. The objectors believed that they were buying a 1080p television that would accept and display 1080p signals natively. However, the televisions cannot display a 1080p video signal natively; instead the television de-interlaces the 1080p signal, turning it into a 1080i signal and then upconverts the 1080i signal when it is displayed on the television. (Tr 33-34). This process creates a picture that is close to what would appear if the television displayed a native 1080p signal, but the picture quality does not reach the level of a native 1080p signal displayed on a 1080p resolution television. Nevertheless, the settlement only provides a benefit to the class members who, after purchasing a deficient television set, pur-

chased or will purchase a 1080p device; this is best described as [*31] throwing good money after bad. As one objector cogently stated, "what good is a 1080p device without a 1080p TV?" (Sheffield Objection).

Sony defends the settlement by arguing that unless a Settlement Class member has a device that generates a 1080p video signal, that member is not impacted by the fact that the televisions cannot accept a 1080p signal. (Memo. 11).

This Court disagrees with Sony's theory that a Settlement Class member suffers damages only if he or she owns a 1080p device. The class members purchased these high-end televisions because of the advertised "bells and whistles" [approximately] 1080p display resolution [approximately] and were misled and shortchanged by Defendants. The class members thought they had purchased a 1080p capable television, in the midst of an electronics world that changes and upgrades everyday. These purchasers eagerly anticipated the possibility of 1080p over-the-air television signals, and 1080p devices, which have become a reality, e.g. Blu-ray, computers and Playstation 3.

That many of the class members have not previously purchased a 1080p device is not surprising given that it was only January of 2008, that an industry standard was created. [*32] A recent New York Times article stated:

> The biggest news at the Consumer Electronics Show in Las Vegas last January was not the birth of a new product but the death of one.
>
> A decision by Warner Brothers to withdraw support for the HD DVD video disc format sent shock waves through the electronics industry and appeared to hand the future of home entertainment to Blu-ray, a rival format.
>
> ***
>
> Still for some consumers, nothing beats the crisp, clear picture of a Blu-ray disc. "It's a huge difference," said Gary Tsang, 31, a computer network engineer in San Francisco who bought a $ 299 Blu-ray in October and was among the shoppers who rushed out to buy "The Dark Knight" last month.
>
> Mr. Tsang added that Blu-ray made a real difference only when viewed on a good high-definition television, like the one his family bought in February for $ 2,700. "We're not bleeding edge, but we're cutting edge."

Matt Richtel and Brad Stone, *Blu-ray's Fuzzy Future*, N.Y. Times, Jan. 5, 2009, at Bl-2.

When the objectors discovered that the televisions would not display 1080p video signals, it is not surprising that many of them chose to not purchase a 1080p device that could not achieve fulfillment with the instant television [*33] sets. Under the terms of this proposed settlement, class members who purchased one of the deficient television sets, but do not own and refuse to purchase a 1080p device will not be compensated for their being victimized by Sony and third-party retailers.

Unlike Mr. Date, who is settling his claim with Sony for $ 6,600, which fully compensates him for his defective television, the unnamed Settlement Class members will not be compensated for what they believe is their injury: a television set that is not capable of the 1080p quality of display resolution advertised.

As noted before, Plaintiff's attorneys receive a $ 300,000 fee, and $ 25,000 in costs in this settlement; Sony reaps benefits by providing e-credits to certain class members, redeemable only at its online store, for partial payment of purchases. And to qualify for Benefit III, the settlement requires class members to further enrich Sony by purchasing a Sony Blu-ray Disc Player. With the exception of Mr. Date, Sony is not close to adequately compensating the Settlement Class members for their injuries.

This Court, therefore, concludes that a settlement that does not remedy the injury alleged by the class members, and is not [*34] close to a fair "compromise" meriting this Court's approval.

## G. The Public Interest

This settlement does not serve the public interest because it does not hold Sony accountable for its conduct, and does not come close to compensating the victim class for the injuries it caused. Furthermore, it would not sufficiently deter Sony from factually misrepresenting its products' technical capabilities in the future. In this proposed settlement, Sony provides $ 90 cash compensation only to a few early complainers, provides Sony-only vouchers to some other class members, the number unknown, and provides nothing to most of the class. Moreover, a component of the proposed settlement requires the victims to further enrich Sony by purchasing an additional product from Sony, the party that has victimized them.

All the class members allege the same injury. Because all the class members sustained the same injury, and their alleged damages are equal, all class members

have the same right of recovery. *See Petruzzi's, Inc. v. Darling-Delaware Co., Inc., 880 F. Supp. 292, 300 (M.D. Penn. 1995)*.

In *Petruzzi's*, a supermarket chain brought a class action alleging Sherman anti-trust violations against fat and [*35] bone rendering companies for restraint of trade. *Id. at 294*. The supermarket negotiated a settlement with one of the two defendants, and moved for approval of a proposed partial settlement. *Id. at 293*. The proposed partial settlement discharged class members' claims, who sold raw materials to defendant Moyer Packing Company and co-defendant Darling-Delaware, Inc., in exchange for "up to $ 2 million in 'premium certificates' which are to 'be claimed by class members based on the dollar value of their sale of raw materials to Moyer.'" *Id. at 293*.

A class member objected to the proposed settlement in *Petruzzi's* on the ground that it excluded more than 600 class members who only sold raw materials to Darling-Delaware, as those class members would receive no compensation for their release of Moyer. *Id. at 294*. U.S. District Court Judge Thomas Vanaskie, in rejecting the settlement, pointed out:

> Judicial review is not limited to ascertaining whether the settlement is the product of fraud or collusion. Instead, the reviewing court has an independent duty to ensure that the proponents of the settlement have met their burden of establishing that the settlement is fair, adequate, and reasonable.

*Id. fat 296*.

Judge [*36] Vanaskie held that the proposed partial settlement was not "fair, adequate or reasonable" largely because the settlement provided compensation to only fifty percent of the class, but required the entire class to release its claims against the settling defendant. *Id. at 299*. The court opined that the proponents of the proposed partial settlement carried a "substantial burden to show that the settlement is fair to the class as a whole," when the proposed partial settlement only benefitted fifty percent of the class, and found that the settlement proponents had not met that burden. *Id. at 299*. Further, with respect to the value of the settlement, Judge Vanaskie found that there was no basis for estimating the real value of the settlement, as neither party had presented evidence regarding likely redemption rates, which precluded the court from determining whether the settlement was reasonable "in light of the best possible recovery and the risks of litigation." *Id. at 297*. Judge Vanaskie emphasized that it is "also important to estimate the actual value of the settlement in order to assess the appropriateness" of the attorney fees and expenses award. *Id. at 298*.

As in *Petruzzi's*, this proposed [*37] settlement does not compensate all class members equally, and will not compensate many class members at all. Unlike in *Petruzzi's*, where at least fifty percent of the class will be compensated, here, it is unknown whether even fifty percent of the class will receive compensation for the release of their claims against Sony.

Also like in *Petruzzi's*, in the present case, there are no facts upon which to estimate the real value of the settlement or the cost of the settlement to Sony; as neither party has provided any evidence regarding likely redemption rates. Thus, the Court is unable to determine whether the settlement is reasonable in light of the potential recovery and the risks of litigation. Further, it is impossible to assess whether the attorney fees and expenses award of $ 300,000 is appropriate, in light of the fact that the actual value of the settlement is unknown.

"In this regard, 'fairness' is not demonstrated by the silence of class members in response to the proposed settlement." *Id. at 299*. As in *Petruzzi's*, here, few class members objected to the proposed settlement. However, "[a]s stated by Judge Friendly in *National Super Spuds, Inc. v. New York Mercantile Exchange, 660 F.2d 9, 16 (2d Cir. 1981)*, [*38] '[l]ack of objection by the great majority of claimants means little when the point of objection is limited to a few who interests are being sacrificed for the benefit of the majority.'" *Id. at 300*. Here, an unknown but large number of class members will release their claims against Sony without being compensated. Only a very few will receive the $ 90 settlement. The remainder will either receive e-credits redeemable at Sony's online store or nothing at all. There is simply no justification for requiring those class members to release their claims without being provided any consideration for their release when they suffered the same injury as the class members who will be compensated, television sets advertised as displaying 1080p native resolution that do not deliver. [5] This Court will not sacrifice the claims of some class members in order to satisfy a select portion of the class' claims.

> 5   Mark Schmidt, Sony Electronics' TV Group Director of Quality Engineer testified at the fairness hearing that the Advanced Television Systems Committee (ATSC) standard defines 1080p. (Tr. 77, Schmidt). Schmidt further testified that as to the television sets at issue in the instant case, while the [*39] antenna input accepts 1080p signals, the composite and component inputs cannot accept a 1080p signal. (*Id.* at 78).

Schmidt further acknowledged during the television set demonstration provided to the Court at the fairness hearing on November 3, 2008, that there was "feathering" or shadowing of an image on the subject television sets at issue. (*Id.* at 81). To be clear, "feathering" is not a positive attribute. Further elaborating the mechanics of the deficiency, Objector attorney Kaplan asked: "And that [feathering] was because it was taking a 1080i signal off the Blu-ray player and deinterlacing it to display at 1080p? (*Id.* at 81). Schmidt answered, "yes," confirming that the deinterlacing is less than native 1080p resolution. (*Id.* at 81).

### III. CONCLUSION

The television sets at issue include approximately 175,000 Sony high-end, high resolution models manufactured between 2004 and 2006. (Tr. 9, Mansfield).

Sony mislead consumers about a particular feature of the television set-1080p native resolution. The television sets, advertised as having 1080p progressive scan capability did not; they had only 1080i capability.

Plaintiff Date noticed that when he plugged in his computer into the television, [*40] the television would only accept inputs of the 1080i signal, the lower resolution signal.

Plaintiff Date complained about the 1080p deficiency to the Better Business Bureau, to ABC Warehouse and to Sony. (Tr. 11, Mansfield).

The instant complaint was filed in San Diego, California. Motions filed by Defendant and answered by Plaintiff were not heard because the parties chose to proceed to facilitation. Plaintiff's counsel also deposed a Sony engineer and retained a consultant. (*Id.* at 20). A two day facilitation process took place that resulted in the instant proposed settlement. (*Id.* 11-12).

Of the 175,000 purchasers - i.e., settlement class members - over 65,000 received direct notice of the settlement.

At the fairness hearing on November 3, 2008, the Court viewed the television sets at issue and confirmed the deficiency between the advertised 1080p native resolution and the 1080i resolution upconverted. The Court noted the "feathering" or shadows on the 1080i television set at issue in the instant case. Feathering provides a defective resolution. The Court finds that Plaintiff's claim of damages is not *de minimis*. The instant expensive

television sets were advertised and touted as top [*41] of the line with 1080p resolution that did not "deliver" for Plaintiff Date and the other purchasers.

The Court strongly disagrees with Sony's counsel's description of the settlement:

> We believe that the benefits generously compensate the settlement class members for the difference between watching an upconverted 1080i signal and the 1080p signal. And you'll see that that [sic] difference is de minimis.

(Tr. 46, Cohen). The benefits are not generous or adequate. In fact, it is likely that there will be no benefits at all for the majority of the class if they decide not to purchase a 1080p device that cannot provide them with 1080p capability on their inferior television set.

Benefit I, $ 90 cash, only goes to a very few members of the class.

Benefits II and II are not generous, much less fair. Benefit II's e-credit for class members who previously purchased a 1080p device is like a manufacturer's coupon to induce a consumer to buy products more expensive than the coupon at Sony's online store.

Benefit III requiring purchase of a Sony Blu-ray Disc player to receive the Sony online store e-credit is likely to create new revenue and profits for Sony.

The Court concludes that this settlement [*42] is not fair, adequate and reasonable. *See Williams v. Vukovich, 720 F.2d 909 (6th Cir. 1983)*. The proposed settlement does not fairly or adequately compensate the unnamed Settlement Class members for their injuries. The objectors have met the heavy burden of demonstrating that the settlement is unreasonable. Because the parties have failed to come to an agreement that is beneficial to the class, this Court concludes that the settlement is unreasonable. The Court, therefore, rejects the settlement.

SO ORDERED.

/s/ Paul D. Borman

PAUL D. BORMAN

UNITED STATES DISTRICT JUDGE

Dated: 2-20-09

Detroit, Michigan

# TAB F

Westlaw.

Not Reported in F.Supp.2d, 1999 WL 33485557 (W.D.Mich.)
**(Cite as: 1999 WL 33485557 (W.D.Mich.))**

**H**Only the Westlaw citation is currently available.

United States District Court, W.D. Michigan.
EATON CORPORATION, Plaintiff,
v.
MINERALS TECHNOLOGIES INC.; and SPE-
CIALTY MINERALS INC., Defendants.
No. 96CV162.

March 19, 1999.

Richard A. Kay, Varnum, Riddering, Schmidt &
Howlett, LLP, Grand Rapids, Richard W. Hosking,
Daniel J. Sponseller, Kirkpatrick & Lockhart, LLP,
Pittsburgh, PA, for Eaton Corporation, pltfs.

Richard A. Glaser, John L. Teeples, Dickinson
Wright, PLLC, William D. Howard, Strain, Murphy &
VanderWal, Grand Rapids, for Minerals Technologies
Inc., Specialty Minerals Inc., defts.

OPINION

BELL, District J.

**\*1** This is an action by Plaintiff Eaton Corporation
against Defendants Minerals Technologies Inc. and
Specialty Minerals Inc. (collectively referred to as
"MTI/SMI") for damages incurred by Eaton as a result
of MTI/SMI's sale of allegedly defective pyrolytic
carbon friction material ("PCFM") to Eaton. This
matter is currently before the Court on 5 motions:
Plaintiff's motion for summary judgment on
MTI/SMI's counterclaim; Defendants' motion for
summary judgment based upon UCC 2-207 and the
preclusion of express and implied warranties; Defen-
dants' motion for summary judgment based upon
Plaintiff's inability to prove damages; Defendants'
motion for summary judgment as to Count I; and
Defendants' motion to exclude Plaintiff's database
extraction from admission into evidence.

I.

MTI/SMI has filed a counterclaim against Eaton,
alleging misrepresentation. MTI/SMI contends that in
late 1994 and early 1995 it informed Eaton that it was
planning to purchase a new $250,000 furnace to use in
the production of PCFM for Eaton. MTI/SMI claims
that in light of this communication, Eaton's failure to
advise MTI/SMI that it intended to sue MTI/SMI, that
it intended to replace MTI/SMI as a supplier and that it
would shortly stop using MTI/SMI's PCFM on its
synchronizers, amounted to silent fraud.

Eaton has filed a motion for summary judgment on
MTI/SMI's counterclaim. Under Rule 56(c) of the
Federal Rules of Civil Procedure, summary judgment
is proper if there is no genuine issue as to any material
fact and the moving party is entitled to judgment as a
matter of law. In evaluating a motion for summary
judgment the Court must look beyond the pleadings
and assess the proof to determine whether there is a
genuine need for trial. Matsushita Elec. Indus. Co. v.
Zenith Radio Corp., 475 U.S. 574, 587 (1986). If the
moving party carries its burden of showing there is an
absence of evidence to support a claim then the
non-moving party must demonstrate by affidavits,
depositions, answers to interrogatories, and admis-
sions on file, that there is a genuine issue of material
fact for trial. Celotex Corp. v. Catrett, 477 U.S. 317,
324-25 (1986). The mere existence of a scintilla of
evidence in support of the non-moving party's position
is not sufficient to create a genuine issue of material
fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
252 (1986). The proper inquiry is "whether the evi-
dence presents a sufficient disagreement to require
submission to a jury or whether it is so one-sided that
one party must prevail as a matter of law." Id. at
251-52.

A prima facie case of misrepresentation or fraud re-
quires the following elements: (1) that the defendant
made a material representation; (2) that it was false;
(3) that when the defendant made it the defendant
knew that it was false, or that the defendant made it
recklessly, without any knowledge of its truth and as a
positive assertion; (4) that the defendant made it with
the intention that it should be acted on by the plaintiff;
(5) that the plaintiff acted in reliance on it; and (6) that
the plaintiff thereby suffered injury. Hord v. Envi-
ronmental Research Institute of Michigan, 228
Mich.App. 638, 642 (1998). "Each of these facts must
be proved with a reasonable degree of certainty, and
all of them must be found to exist; the absence of any

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 33485557 (W.D.Mich.)
**(Cite as: 1999 WL 33485557 (W.D.Mich.))**

one of them is fatal to a recovery." *Id.* (quoting *Candler v. Heigho,* 208 Mich. 115, 121, 175 N.W. 141 (1919)). "An action for fraudulent misrepresentation must be predicated on a statement relating to a past or an existing fact." *Eerdmans v. Maki,* 226 Mich.App. 360, 366, 573 N.W.2d 329 (1997). *See also Forge v. Smith,* 458 Mich. 198, 212, 580 N.W.2d 876 (1998) ("A promise regarding the future cannot form the basis of a misrepresentation claim.").

**\*2** An action for silent fraud involves a failure to disclose information where there is a duty to do so. *Hord,* 228 Mich.App. at 641 n. 1. "A silent fraud claim differs from a traditional fraud claim in that the false representation needed to establish the first three elements of fraud may be shown by the defendant's failure to divulge a fact that the defendant had an affirmative duty to disclose." *Id.* at 646-47 (Hoekstra, P.J., dissenting).

Eaton contends that it is entitled to summary judgment on the counterclaim because there is an absence of evidence on the following three elements of MTI/SMI's claim: 1) that Eaton was silent as to a past or existing fact; 2)that Eaton had a duty to disclose the information; and 3) that MTI/SMI relied on Eaton's silence.

In response to Eaton's contention that MTI/SMI has not alleged silence as to a past or existing fact, MTI/SMI contends that Eaton failed to disclose its then-existing intent to sue them, and to replace them as material suppliers. Under Michigan law, one can be held liable for broken promises when one has, at the time of the promise, a then-existing bad faith intent to break the promise. *Thompson v. Paasche,* 950 F.2d 306, 312 (6th Cir.1991).

MTI/SMI has produced evidence that as early as November 8, 1993, Eaton made the decision not to raise the accountability issue with MTI/SMI too early because they might choose to exit the business before Eaton had arranged for new material or an alternate source of material. MTI/SMI has also presented the testimony of Mr. Kinney that Eaton had "no intention of going forward with the lawsuit without a backup supply, an alternative supply-supplier-of EFM-1 ."

Although the nature of the nondisclosures appears to involve uncertain future events rather than existing fact, the Court will assume, for purposes of this mo-

tion, that MTI/SMI's evidence is sufficient to create an issue of fact with respect to whether Eaton had already committed to a plan to sue MTI/SMI and to drop them as a supplier prior to learning of MTI/SMI's intent to purchase the new furnace.

Assuming that Eaton had a then-existing intention to sue MTI/SMI and to drop them as suppliers, the Court must determine whether MTI/SMI has come forward with sufficient evidence to create an issue of fact as to whether Eaton had a legal duty to disclose its then-existing intention, and whether MTI/SMI reasonably relied on Eaton's silence when they purchased the furnace.

Michigan courts recognize an equitable duty of disclosure in a business transaction when "circumstances surrounding a particular transaction are such as to require the giving of information." *Hand v. Dayton-Hudson,* 775 F.2d 757, 759 (6th Cir.1985) (quoting *Ainscough v. O'Shaughnessey,* 346 Mich. 307, 316, 78 N.W .2d 209 (1956)). Although Michigan courts have not defined with precision when an equitable duty of disclosure arises, "they have imposed such a duty on parties engaged in business transactions, particularly where one party has made partial and misleading disclosures of information during the course of the relationship." *Three D Departments, Inc. v. K Mart Corp.,* 670 F.Supp. 1404, 1409 (N.D.Ill.1987).[FN1]

> FN1. In *Three D* the Plaintiff alleged that K Mart committed silent fraud by entering into a 48-month agreement with Three D and encouraging Three D to expand its operations in K Mart's stores without revealing its intention of closing the stores before Three D could recoup its investment. 670 F.Supp. at 1409. The court dismissed the silent fraud claim because Three D did not allege that K Mart, either at the time it executed the agreement or at the times it encouraged Three D to expand, knew that it would soon be closing the chain. *Id.* at 1410. The court did not decide whether there was a duty to disclose under the circumstances.

**\*3** Thus, in *Hand,* the Court held that an employee had fraudulently obtained his employer's signature on a release where the employee had surreptitiously altered a release prepared by his employer. Because the em-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 33485557 (W.D.Mich.)
**(Cite as: 1999 WL 33485557 (W.D.Mich.))**

ployee had given the impression that he was consenting to the release prepared by the employer, and because the altered document was superficially identical to the release prepared by the employer, the court found that the employee had a duty to disclose the changes he had made in the release. 775 F.2d at 759.

The circumstances in this case are not such as to require Eaton to disclose to MTI/SMI its intention to sue them or to drop them as a supplier. The evidence is undisputed that Eaton was not contractually obligated to make future purchases from MTI/SMI. The parties were operating under a blanket purchase order, and there was no long-term binding commitment for future purchases of PCFM by Eaton. MTI/SMI has produced no evidence of any specific statements made by Eaton which could be construed as partial or misleading disclosures that required it to make the disclosures at issue. In fact, prior to purchasing the furnace, MTI/SMI sought and failed to receive a five year requirements contract from Eaton.

Allen J. Wenzel of MTI/SMI testified that the request for a requirements contract came up several times. What he received in response to his request was a platitude: "Don't worry, be happy. We have a long-term relationship. That is all I received." (Wenzel dep. p. 238). Eaton never signed an agreement committing to a specific term. (Wenzel dep. p. 234). The most specific assurance MTI/SMI can identify was described by Mr. Wenzel as follows: "I was assured that we had a long-term, ongoing relationship, and at one point I was assured that there was no intention of replacing us for EFM-1.... It was an understanding that if we performed, we would continue the business." (Wenzel dep. p. 234-35). Such general statements are not sufficiently concrete or specific to require disclosure of Eaton's intentions with respect to the future of its business relationship with MTI/SMI.

MTI/SMI has also failed to come forward with sufficient evidence to support the element of reliance. Because MTI/SMI expressly sought, and failed to obtain, a future commitment, they cannot now claim they purchased the furnace in reliance on Eaton's commitment to continue to purchase their material. Moreover, there is undisputed evidence that in late 1992 MTI/SMI was aware that Eaton was obtaining quotes from other suppliers of PCFM, and understood that it might be facing potential competitors. There is also undisputed evidence that in February 1994

MTI/SMI was aware of the possibility that Eaton might sue them in connection with the rise in warranty claims. Despite such knowledge, before purchasing the furnace MTI/SMI did not seek or obtain any assurances from Eaton that it would not sue MTI/SMI, or that it would not procure alternative suppliers.

*4 MTI/SMI has not come forward with sufficient evidence to create an issue of fact with respect to two elements of its silent fraud claim. There is insufficient evidence to go to a jury on duty to disclose or reliance. Accordingly, Eaton's motion for summary judgment on MTI/SMI's counterclaim will be granted.

II.

Defendants have filed a motion for partial summary judgment of Eaton's third amended complaint based on UCC 2-207 and the preclusion of express and implied warranties.

Eaton's third amended complaint contains three counts: I) Breach of Contract/Breach of Express Warranty; II) Breach of Contract/Breach of Express Warranties and Promises Arising Under the Terms of the Blanket Purchase Orders, including: a) not suitable for use, b) not fit for ordinary purposes, c) not fit for particular purposes, d) not free from defects, e) subcontracting work without permission, f) failure to indemnify, and g) failure to comply with specification; and III) Breach of Contract/Breach of Implied Warranties.

Based upon a "battle of the forms" analysis, Defendants contend that they are entitled to summary judgment on all of Eaton's claims except Count II, ¶ 29(b), which alleges breach of the warranty of merchantability, and ¶ 29(g) which alleges breach of product specification.

The parties recognize the existence of a contract, but do not agree upon its warranty terms. The parties never discussed what warranties would apply. Instead, they sent each other forms with conflicting warranty provisions.

In 1987 Eaton sent a blanket purchase order to MTI/SMI. In small print on the back of the form are 19 paragraphs containing the purchase order terms and conditions. These include a list of seller's warran-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 33485557 (W.D.Mich.)
**(Cite as: 1999 WL 33485557 (W.D.Mich.))**

ties.[FN2] The form also states in paragraph 1: "This order expressly limits acceptance to the terms and conditions stated herein, and any additional or different terms proposed by the Seller are rejected unless expressly assented to in writing by Buyer. No contract shall exist except as hereinabove provided."

> FN2. Paragraph 7 provides:
>
> Seller's Warranties: Seller hereby warrants that the whole of the goods furnished hereunder shall be of merchantable quality and fit for Buyer's purposes and that they shall conform with Buyer's instructions, specifications, drawings and data. Seller hereby further warrants that the whole of the goods furnished hereunder shall conform to all representations, affirmations, promises, descriptions, samples or models forming the basis of this contract. Seller agrees that these warranties shall survive acceptance of the goods. Seller further warrants that all services performed for or on behalf of the Buyer will be performed in a competent, workmanlike manner and shall be free from faults and defects. Said Warranties shall be in addition to any warranties of additional scope given by Seller to Buyer. None of said warranties and no other implied or express warranties shall be deemed disclaimed or excluded unless evidenced by a purchase order change notice or revision issued and signed by Buyer.

From 1988 to 1991, with each shipment of EFM-1 to Eaton, MTI/SMI attached a copy of its standard invoice. On the back of the invoice are seller's standard conditions of sale, which disclaim all warranties, express or implied, except that the goods shall be of merchantable quality, and limit damages and exclude consequential damages.[FN3] The form also states in paragraph 6 that "Acceptance of Buyer's order by Seller is expressly made conditional upon the Buyer's acceptance of conditions of sale as set forth herein, notwithstanding acknowledgement or receipt of Buyer's purchase order containing additional or different provisions, or conflicting oral representation by any agent of the Seller."

> FN3. Paragraph 5 provides: "SELLER

MAKES NO WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO FITNESS FOR ANY PURPOSE, except that the goods sold hereunder shall be of merchantable quality."

After testing the EFM-1 in a limited number of Roadranger truck transmissions, Eaton determined in 1992 that EFM-1 was suitable for full-scale deployment in all Roadranger transmissions. Eaton contacted MTI/SMI about making additional purchases of EFM-1 in larger quantities sufficient for full scale production. Eaton sent a letter dated March 18, 1992, which states: "Per our current phone conversations and relative to Eaton's projected friction material requirements, the following chart has been generated. [list of dates, material, sheet size, volume, and purchase order number] Please use this as your approval to begin procurement of the required materials to insure delivery." The purchase order numbers listed in the March 18, 1992, letter correspond to the blanket HYPERLINK s=dfa1.0&vr=2.0&DB=1000043&DocName=MIST4 chase orders.

**\*5** MTI/SMI filled orders for Eaton in 1992 and 1993, and with each shipment continued its practice of sending its own invoice with its disclaimer of warranties.

MTI/SMI contends that because its acceptance of Eaton's offer was expressly made conditional upon Eaton's acceptance of MTI/SMI's terms, in accordance with the terms of section 2-207(1) of the Michigan Uniform Commercial Code,[FN4] the final terms of the parties' agreement must be determined by reference to UCC § 2-207(3) .[FN5]

> FN4. Section 2-207 of the UCC provides:
>
> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
>
> (2) The additional terms are to be construed as proposals for addition to the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 33485557 (W.D.Mich.)
**(Cite as: 1999 WL 33485557 (W.D.Mich.))**

contract. Between merchants such terms become part of the contract unless:

(a) the offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this act.

M.C.L.A. § 440.2207; M.S.A. § 19.2207.

FN5. For purposes of this motion, MTI/SMI does not contend that Eaton assented to MTI/SMI's terms, but Defendants' reserve the right to make this argument at trial.

Eaton contends that UCC § 2-207 does not come into play because Eaton's offer to purchase was unconditionally accepted in March 1992, and confirmed in writing by Eaton, well before MTI/SMI submitted its conflicting forms.

Eaton's contention is not supported by the evidence. There was undoubtedly an agreement between the parties that MTI/SMI would supply more EFM-1 pursuant to a new schedule, but there is no evidence that MTI/SMI agreed to be bound by the warranties on the back of Eaton's standard purchase order. Under Michigan law, "the incorporating instrument must clearly evidence an intent that the writing be made part of the contract." *Forge v. Smith,* 458 Mich. 198, 207 n. 21 (1998) (quoting *United California Bank v. Prudential Ins. Co.,* 681 P.2d 390 (Ariz.1983)). In light of MTI/SMI's consistent submission of its own conflicting warranty disclaimers over the prior years, the

warranties on the back side of the 1987 purchase order were not adequately incorporated by reference in the March 18, 1992 letter. If Eaton had wanted its warranty provisions to control over the contrary provisions contained in MTI/SMI's invoices, Eaton should have taken additional steps to obtain MTI/SMI's consent to those terms. *See Challenge Mach.,* 138 Mich.App. at 26. The March 18, 1992, letter's vague reference to the purchase order numbers corresponding to the 1987 blanket purchase orders is not sufficient to incorporate by reference the warranties on the backs of those orders.

Both parties' forms expressly condition the formation of a contract on acceptance of their own terms. Such conditional assent provisions, however, are "narrowly construed to require that the acceptance must clearly reveal that the offeree is unwilling to proceed unless assured of the offeror's assent to the additional or different terms." *Challenge Mach. Co. v. Mattison Mach. Works,* 138 Mich.App. 15, 22 (1984). Despite the language of the parties' standard forms, there is nothing in the parties' conduct which would indicate an unwillingness to proceed unless they obtained the assent of the other party to the warranty provisions.

In this case the invoices were responsive to the purchase orders. There was clearly an agreement between the parties on the essential terms of price, quantity, delivery schedule and manufacture according to Eaton's specifications. There was a definite and seasonal expression of acceptance sufficient to establish a contract. Accordingly, the Court finds that the parties' writings indicate the formation of a contract. However, because the offer and the acceptance contain conflicting warranty provisions, those conflicting warranty provisions do not become part of the contract under 2-207(1). *Challenge Mach.,* 138 Mich.App. at 26. *See also S.C. Gray, Inc. v. Ford Motor Co.,* 92 Mich.App. 789, 286 N.W.2d 34 (1979); *Bosway Tube & Steel Corp. v. McKay Machine Co.,* 65 Mich.App. 426, 237 N.W.2d 488 (1975). As noted in *Challenge Mach.,* "[a]lthough each party attempted to forestall the inclusion of any additional, different, or inconsistent terms into the contract, the end result of such maneuvering was to cancel out the conflicting provisions.... [T]he reason for discarding the conflicting provisions is that it is assumed that each party objected to the other's contrary clause." 138 Mich.App. at 26. "In such a case, we find that neither provision becomes a part of the contract and that the provisions of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 33485557 (W.D.Mich.)
**(Cite as: 1999 WL 33485557 (W.D.Mich.))**

the UCC will be given effect." *Id.* The result reached in *Challenge Mach.* is precisely the result called for in this case. The conflicting warranty provisions cancel each other out, and the only warranties that are left are those on which the parties agreed (an express warranty of merchantability), and those warranties supplied by the UCC. [FN6]

> FN6. It may be a purely academic point, but because the Court finds that the parties' writings are sufficient to establish a contract, the Court does not look to UCC § 2-207(3) to supply additional terms. By its terms, § 2-207(3) only comes into play when the writings do not establish the existence of a contract. *See also Challenge Mach ., 138 Mich.App. at 22-23* (§ 2-207(3) "only comes into play if the writings fail to establish a contract, but the conduct of the parties recognizes the existence of such a contract."). *But see Bosway Tube & Steel Corp. v. McKay Machine Co., 65 Mich.App. 426, 237 N.W.2d 488 (1975).* In *Bosway Tube* the court found a contract under 2-207(1) despite the parties' disagreement as to warranties. The court then looked to 2-207(3) for authority to look to supply additional terms from the UCC. According to James J. White, the *Bosway Tube* court reached the correct result, but was technically incorrect in finding that 2-207(3) can apply to a case in which the court has already found a 2-207(1) contract. The UCC's gap fillers dealing with price or warranty or terms of delivery would enter the contract without any reference to 2-207. James J. White & Robert S. Summers, *Uniform Commercial Code,* 4th ed., § 1-3, p. 12.

**\*6** MTI/SMI contends that based upon the battle of the forms analysis above, all but two of Eaton's claims, Count II ¶ 29(b) and ¶ 29(g), must be dismissed because there was never an agreement as to these other warranties and the UCC would not impose them absent an agreement. The Court believes that MTI/SMI's suggestion as to the proper result of the battle of the forms is too broad.

Count I of Eaton's third amended complaint alleges breach of an express warranty that the goods would conform to the quality of the samples delivered to

Eaton in 1988-1992. MTI/SMI contends that such an express warranty under M.C.L.A. § 440.2313; M.S.A. § 19.2313, is barred by the battle of the forms analysis above because there was no agreement as to this warranty. The Court disagrees.

Express warranties are contractual in nature and arise only where a promise by the seller or a description of the goods to be sold is made a part of the basis of the parties' bargain. *Price Bros. Co. v. Philadelphia Gear Corp., 649 F.2d 416, 422 (6th Cir.), cert. denied, 454 U.S. 1099 (1981).* Nevertheless, "[t]he UCC does not require that express warranties be made a part of the written agreement of the parties, and express warranties may be added by proof of oral warranties so long as the writing is not itself a complete integration of the agreement." *Id.* Moreover, § 2-313 clearly provides that it is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he or she have a specific intention to make a warranty. M.C.L.A. § 440.2313(2); M.S.A. § 19.2313(2). "However, any statements not incorporated in the written sales agreement must be shown to be a part of the bargain of the parties before they can be recognized as express warranties." *Price,* 649 F.2d at 422. "The trier of fact must determine whether the circumstances necessary to create an express warranty are present in a given case." *Overstreet v. Norden Laboratories, Inc.,* 669 F.2d 1286, 1290 (6th Cir.1982).

Eaton has presented sufficient evidence in this case to create a question of fact for the jury on the issue of whether conformity to a sample was made a part of the basis of the bargain. Eaton's allegations in Count I that MTI/SMI's goods breached an express warranty that the goods would conform to a sample is not barred by this Court's analysis on the battle of the forms.

The other warranties that may potentially be supplied by the UCC under the facts of this case are an implied warranty of merchantability, M.C.L.A. § 440.2314; M.S.A. § 19.2314, an implied warranty arising from course of dealing, *id.,* and an implied warranty of fitness for a particular purpose, M.C.L.A. § 440.2315; M .S.A. § 19.2315. "These implied warranties arise by operation of law when certain factual circumstances attend a sales transaction." *Price Bros. Co. v. Philadelphia Gear Corp., 649 F.2d 416, 423 (6th Cir.), cert. denied, 454 U.S. 1099 (1981).* MTI/SMI contends that none of these implied warranties apply under the facts

Not Reported in F.Supp.2d, 1999 WL 33485557 (W.D.Mich.)
**(Cite as: 1999 WL 33485557 (W.D.Mich.))**

of this case.

*7 There is no implied warranty arising from a course of dealing in this case. The course of dealing is ambiguous. In the time period from 1987 to 1991 Eaton supplied its blanket purchase order which included the various seller's warranties and MTI/SMI responded by sending with its shipment its own disclaimer of warranties. The warranty issue was never tested or resolved by the parties.

MTI/SMI argues that neither the express or implied warranty of merchantability nor the implied warranty of fitness for a particular purpose can apply under the facts of this case, where (1) the product was unique, (2) it was manufactured pursuant to the buyer's detailed specifications, (3) the buyer did not reveal to MTI/SMI its actual end-use transmission requirements, and (4) did not share with MTI/SMI its quality control or performance standards for the product.

Under the implied (and the express) warranty of merchantability the seller warrants that the goods are "fit for the ordinary purposes for which such goods are used." M.C.L.A. § 440.2314; M.S.A. § 19.2314. A warranty of merchantability is breached when goods are not of an average quality within the industry and are unfit for the ordinary purposes for which such goods are used. _Sullivan Industries, Inc. v. Double Seal Glass Co.,_ 192 Mich.App. 333, 359, 480 N.W.2d 623 (1991).

In _Price Bros._ the Sixth Circuit reversed the trial court's determination that the defendant had breached an implied warranty of merchantability and an implied warranty of fitness for a particular fitness. The case involved the manufacture of a component of a highly complex piece of machinery that had never before been used in machinery of that type; the specific machinery was new and had never been operated with or without the components; and the component was manufactured to the buyer's specifications. The Sixth Circuit observed that it was difficult to imagine how a standard warranty of merchantability could have been determined under the facts of that case. _Id._ at 424. "In these circumstances no average or usual standards for determining ordinary performance or quality for the components can be determined, and no warranty of merchantability arises from the transaction." _Id._

As to the implied warranty of fitness for a particular

purpose, its existence is contingent on two general facts: "First, the seller must be aware at the time of contracting of a particular purpose for which the buyer intends to use the goods. Second, the buyer must rely on the seller's skill or judgment to select or furnish goods suitable for that particular purpose." _Id._ at 423. The Sixth Circuit held that there was no implied warranty of fitness for a particular purpose in _Price Bros._: "the degree of specificity of Price Brothers' purchase order and Price Brothers' own undisputed high degree of knowledge regarding the mechanical requirements of its own pipe wrapping machine make any finding that Price Brothers relied on Philadelphia Gear's selection clearly erroneous." _Id._ at 423.

*8 Although _Price Bros._ is somewhat analogous to the case before this Court, in this case there is evidence that EFM-1 was used in limited transmission synchronizers during the 4 years that the parties spent in qualifying the material. This provides some evidence of a standard that could be used to determine ordinary performance or quality of EFM-1. Moreover, Eaton has come forward with evidence sufficient to create an issue of fact regarding Eaton's reliance on MTI/SMI's expertise in developing the appropriate manufacturing process for EFM-1. The EFM-1 specifications described only limited characteristics applicable to EFM-1, such as the size, weight, density and thickness. It did not specify all of the manufacturing details. Dale Muyskens of Eaton noted on March 28, 1988, that "[t]hrough the analysis of Batch 5, Pfizer [FN7] has locked in on the temperature and time plateaus required during carbonizing to eliminate the brittle condition." He also states in his affidavit that Pfizer was able to correct problems of brittleness and lack of density by adjusting their "proprietary production process." Based upon the record presented, the Court cannot say, as a matter of law, that the specifications were the sole basis for the contract. There are issues of fact regarding whether a particular production process was developed by MTI/SMI and relied upon by Eaton, and whether Eaton reasonably expected the 1992/93 material to not only meet the specifications, but to also meet the basic chemical and material properties and wear characteristics of the qualified material.

> FN7. Defendants are Pfizer's successor and succeeded to Pfizer's business relationship with Eaton regarding EFM-1.

The evidence is sufficient to create a question of fact

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 33485557 (W.D.Mich.)
**(Cite as: 1999 WL 33485557 (W.D.Mich.))**

regarding the existence of an express warranty based upon a sample and the applicability of implied warranties of merchantability and fitness for a particular purpose. Accordingly, Defendants' motion for partial summary judgment based on UCC 2-207 and the preclusion of express and implied warranties will be granted in part and denied in part. The motion will be granted as to Count II, with the exception of ¶¶ 29(b) and 29(g), which allege breach of the express warranty of merchantability and breach of the specification. The motion will be denied as to Counts I and III.

### III.

Defendants have filed a separate motion for summary judgment on Count I, which alleges breach of an express warranty by sample. Defendants contend that even if they are not entitled to judgment on Count I under the battle of the forms, they are nevertheless entitled to judgment on Count I because Eaton cannot establish the existence of a sample which was made part of the basis of the bargain between the parties.

Under UCC § 2-313 "[a] sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model." M.C.L.A. § 440.2313(1)(c); M.S.A. § 19.2313(1)(c).

Defendants do not dispute Eaton's assertions that Defendants began supplying Eaton with PCFM in 1987, and that after Eaton ran extensive performance tests on the material, Eaton began purchasing limited production quantities of the material to test in transmissions. Based upon its successful experience with the PCFM supplied between 1988 and 1992, Eaton placed a full production order for the material. MTI/SMI contends, however, that Eaton cannot produce any "sample" by which the quality of the subject material could be compared; there is no allegation that the parties mutually agreed that the past sales constituted a sample for purposes of sales after March 1992; MTI/SMI agreed only to supply material satisfying Eaton's specifications; and finally, because EFM-1 is a highly variable and non-homogeneous material, it is impossible to point to any particular portion of the fabric as a sample.

*9 The fact that there were past sales of the PCFM material is not enough to create an express warranty by sample. In *Dormont Mfg. Co. v. ITT Grinnell*

*Corp.,* 323 Pa.Super. 17, 469 A.2d 1138 (1983), the court held that "under § 2-313, an express warranty is not created by the buyer's reliance on the past sales, absent proof that both parties mutually agreed that the past sales constituted a sample for the present bargain." *Id.* at 1139-40.

Generally, however, whether a sample "is made part of the basis of the bargain" is essentially a question of fact. *Glyptal Inc. v.. Engelhard Corp.,* 801 F.Supp. 887, 895 (D.Mass.1992). In *Glyptal* there was evidence that Glyptal obtained a sample of cadmium 20 from Engelhard; that Glyptal performed tests incorporating the sample cadmium 20 into its paint formulation; and that the paint formulation incorporating the sample cadmium 20 met the required specifications for viscosity. The court held that on that basis, a reasonable trier of fact could conclude that the sample cadmium 20 was made part of the basis of the bargain with respect to Glyptal's two orders for cadmium 20. *Id.*

The evidence in this case is similar to the evidence in *Glyptal* . There is evidence that MTI/SMI cooperated with Eaton in the development of the specifications for the EFM-1; that Eaton tested the material manufactured by MTI/SMI; that the EFM-1 tests were successful; and that based upon the successful testing of the EFM-1 Eaton ordered larger quantities of the material. There are sufficient facts of record to create an issue of fact as to whether the 1988-1992 material constituted a prototype or sample and, if so, whether conformity to that sample was made a basis of the bargain. There is also sufficient evidence from which a reasonable trier of fact could conclude that, under § 2-313(1)(c), MTI/SMI breached a warranty created by the sample. Because of the existence of material questions of fact, Defendants' motion for summary judgment as to Count I will be denied.

### IV.

Defendants also move for summary judgment on the basis of their contention that Eaton cannot prove damages attributable to Defendants.

Eaton has admitted that it cannot prove what caused any one synchronizer identified in its database to fail unless that synchronizer has been inspected. Eaton did not inspect the vast majority of the synchronizers which allegedly failed. Even as to those failed syn-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 33485557 (W.D.Mich.)
**(Cite as: 1999 WL 33485557 (W.D.Mich.))**

chronizers that were inspected by Eaton, the majority of those synchronizers have been scrapped, so there is no way to know whether they failed due to defective EFM-1 or some other reason without reviewing the corresponding inspection records. Those inspection records, however, no longer exist.

On the basis of these gaps in Plaintiff's proofs, Defendants request the Court to dismiss Plaintiff's third amended complaint in its entirety or, alternatively, to dismiss all claims for damages except for (a) those synchronizers that are currently available for inspection or (b) those synchronizers that were inspected by Eaton.

**\*10** Defendants have accurately described the holes in Plaintiff's proofs. Plaintiff cannot show, on a synchronizer-by-synchronizer basis, the cause of the 15,000 or more failed synchronizers in late 1992-1993 time period. The evidence is insufficient to rule out the possibility that the failures were caused by other factors unrelated to the quality of the EFM-1.

Under Michigan law, however, a plaintiff may utilize circumstantial proof to show cause in fact. *Skinner v. Square D Co*., 445 Mich. 153, 163, 516 N.W.2d 475 (1994). "To be adequate, a plaintiff's circumstantial proof must facilitate reasonable inferences of causation, not mere speculation." *Id.* at 164. It is not sufficient "to submit a causation theory that, while factually supported, is, at best, just as possible as another theory. Rather, the plaintiff must present substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred." *Id.* at 164-65.

There is no requirement under Michigan law that a Plaintiff be able to prove causation on an item-by-item basis. In *Mulholland v. DEC Int'l Corp.*, 432 Mich. 395 (1988), dairy farmers sued the supplier of a milking system, claiming that a defect in the machinery caused mastitis and a decrease in milk production. The plaintiffs could not show that each case of mastitis was caused by the defective machinery and not by some other cause such as improper bedding, unsanitary stalls, or mud in the barnyard. The Michigan Supreme Court held that there was sufficient evidence on causation even though the plaintiffs' expert could not rule out these alternative possibilities, and had not determined how any particular cow had

contracted mastitis:

A plaintiff in a product liability action need not offer evidence which positively excludes every other possible cause. It is enough that the Plaintiff establishes a logical sequence of cause and effect, notwithstanding the existence of other plausible theories, although other plausible theories may have evidentiary support.

*Id.* at 415 (citing *Holloway v. General Motors Corp.*, 403 Mich. 614, 623, 271 N.W.2d 777 (1978)).

Eaton does not intend to offer proofs on causation and damages on a synchronizer-by-synchronizer basis. Instead, Eaton will attempt to prove causation through other means. Eaton has four experts who have concluded that the change in carbonization temperature from 1050° to 1600° C negatively impacted the EFM-1, causing it to be more brittle and less durable. Laboratory simulations conducted by Eaton in 1993 and 1998 show that the 1992/93 batches had a faster wear rate than the pre-1992 material. High magnification photography from electron microscopes show that the pre-1992 and the 1992/93 materials had significant differences. Eaton has presented evidence of a spike in the warranty claims on synchronizers that contained EFM-1 manufactured by MTI during 1992/93, and a drop in the warranty claims when the manufacturing process was changed. Eaton also intends to rely on reports by personnel who inspected the failed synchronizers, and the 800 synchronizers which are still available for inspection.

**\*11** Eaton's approach to causation and damages is not purely conjectural or speculative. Eaton's explanation of the cause of the failed synchronizers is consistent with known facts or conditions, and is deductible from them as a reasonable inference. *See Austin v. Mitsubishi Electronics Am., Inc.*, 966 F.Supp. 506, 517 (E.D.Mich.1997). The evidence, viewed in the light most favorable to Eaton, is sufficient to enable a jury to find a logical sequence of cause and effect, and a probability of causation rather than a mere possibility, notwithstanding the existence of other plausible theories. Defendants' motion for summary judgment based on Plaintiff's inability to prove damages attributable to Defendants will accordingly be denied.

V.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 33485557 (W.D.Mich.)
**(Cite as: 1999 WL 33485557 (W.D.Mich.))**

Eaton has a company-wide database created to store many kinds of information, including warranty claims. For purposes of this trial Eaton intends to rely on an extraction from the database that shows a dramatic increase in the number of warranty claims arising out of failed synchronizers.

Defendants have filed a motion to exclude Plaintiff's database extraction from admission into evidence. Defendants contend that the database extraction is riddled with such errors, inaccuracies and misleading entries that its output is unreliable and cannot be accepted at face value. Defendants also contend that because the database extraction was created specifically for this litigation it cannot be considered a business record.

The business records exception to the hearsay rule applies where the record is made "at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the ... record ..., unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." FED. R. EVID. 803(6).

> Computer business records are admissible if (1) they are kept pursuant to a routine procedure designed to assure their accuracy, (2) they are created for motives that tend to assure accuracy (e.g., not including those prepared for litigation), and (3) they are not themselves mere accumulations of hearsay.

_United States v. Hernandez,_ 913 F.2d 1506, 1512 (10th Cir.1990).

There is no question that the database as a whole was kept in the ordinary course of Eaton's business. The database extraction may have been created for litigation purposes, but that does not alter the nature of the information in that extraction. If Defendants are not satisfied with the selected portions proffered by Plaintiff, they may move for the introduction of such other portions of the database as may be necessary to put the records in context.

The real thrust of Defendants' motion is not whether the database extraction is a business record, but whether it should be excluded due to a lack of trustworthiness.

The database at issue contains several fields of information, including failure code ("FCODE") and failed part ("FPART"). FCODE purports to describe the cause of the synchronizer failure. FPART identifies the part that failed or the parts used to replace the failed part.

**\*12** Eaton has admitted that it does not consider its database to contain reliable relevant information regarding the cause of failure of any single synchronizer, except for those synchronizers which were inspected by Eaton, and this Court has found, as an established fact, that Eaton's historical FCODE information is unreliable as evidence for causation, damages or any other purpose. February 1, 1999, Order (Docket # 255).[FN8]

> FN8. The database caused significant difficulties during discovery. The database was the subject of several discovery motions, and Eaton has been sanctioned for some of the problems associated with the database. One of the sanctions was the entry of findings of fact, which included Eaton's admission that the FCODE contains multiple errors and unreliable information.

Defendants argue that because the FCODE has been determined to be unreliable, this unreliability contaminates FPART, the field of information on which Eaton bases its damage calculation.

The Court disagrees. The information in FPART does not suffer from the same problems of subjectivity that make the FCODE unreliable. The FPART information was provided to Eaton by mechanics in the field. MTI/SMI has not identified any reason to reject the mechanics' identification of the transmission part that failed and was replaced.

The Magistrate Judge's order establishing certain facts for purposes of this case concentrates on problems associated with FCODE. The order identifies only one problem relating to FPART. Paragraph 8(b) of the order provides: "the failed part designation for entries into the historical database records was assigned by Eaton (part number 17549) in connection with Eaton's merger/conversion of its historical database into the current database, such that the failed part designation does not identify specifically the part number of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 33485557 (W.D.Mich.)
**(Cite as: 1999 WL 33485557 (W.D.Mich.))**

synchronizer which allegedly failed." The designation of one failed part number makes the failed part designation less precise, but it does not affect the ability of the FPART entry to properly identify that the failed part was part of a synchronizer.

Defendants point out, however, that because Eaton chose to use a single part number, the FPART entry does not differentiate between Gylon synchronizers and EFM-1 synchronizers. According to Defendants, Gylon was the predominant friction material before 1993 and continued to be used on certain models well into 1993. Eaton personnel concede that because MTI/SMI did not supply Gylon, they should not be held responsible for those failed synchronizers.

Eaton contends that its expert has excluded damages attributable to synchronizers made during the Gylon era from its damages calculations in order to insure that MTI/SMI is not held responsible for failures of Gylon synchronizers. Whether or not the expert has been able to fairly differentiate between Gylon and EFM-1 synchronizers in his damages calculations is a proper inquiry for trial.

Defendants have raised several other arguments regarding inaccuracies in the FPART entries and problems with the imprecise nature of some of the entries. These are appropriate arguments to bring before the jury. Defendants have many strong arguments to bring up in their defense of this case. They will undoubtedly be able to use the errors in the database and the destruction of evidence to their own advantage at trial. These deficiencies in the database extraction, like the Gylon question, may affect the weight to be accorded the database extraction, but they are not so overwhelming as to require the total exclusion of the database extraction.

**\*13** The Court is satisfied that the database extraction is not inadmissible because of inaccuracies. Accordingly, Defendants' motion in limine to exclude Eaton's database extraction from admission into evidence will be denied.

An order consistent with this opinion will be entered.

ORDER

In accordance with the opinion entered this date,

IT IS HEREBY ORDERED that Plaintiff's motion for summary judgment on MTI/SMI's counterclaim (Docket # 229) is GRANTED.

IT IS ORDERED that JUDGMENT is granted in favor of Plaintiff on Defendants' counterclaim and Defendants' counterclaim is DISMISSED.

IT IS FURTHER ORDERED that Defendants' motion for summary judgment based on UCC 2-207 and the preclusion of express and implied warranties (Docket # 231) is GRANTED IN PART and DENIED IN PART. To the extent Defendants seek judgment as to Count II, breach of express warranties and promises arising under the terms of the blanket purchase orders, the motion is GRANTED except as to ¶ 29(b) alleging breach of express warranty of merchantability and ¶ 29(g) alleging failure to comply with specification. To the extent Defendants seek judgment as to Counts I, breach of express warranty based upon sample, Count II, ¶¶ 29(b) & (g), and Count III, breach of implied warranties, the motion is DENIED.

IT IS FURTHER ORDERED that Defendants' motion for summary judgment based upon Plaintiff's inability to prove causation and damages (Docket # 233) is DENIED.

IT IS FURTHER ORDERED that Defendants' motion for summary judgment on Count I (Docket # 235) is DENIED.

IT IS FURTHER ORDERED that Defendant's motion in limine to exclude Plaintiff's database extraction from admission into evidence (Docket # 238) is DENIED.

W.D.Mich.,1999.
Eaton Corp. v. Minerals Technologies Inc.
Not Reported in F.Supp.2d, 1999 WL 33485557 (W.D.Mich.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

TAB G



LEXSEE 2003 MICH. APP. LEXIS 564

**KENNETH EVANS and GLORIA EVANS, Plaintiffs-Appellants, v AMERIQUEST MORTGAGE COMPANY and OCWEN FEDERAL BANK, Defendants-Appellees.**

**No. 233115**

**COURT OF APPEALS OF MICHIGAN**

*2003 Mich. App. LEXIS 564*

**March 4, 2003, Decided**

**NOTICE:**      [*1]  THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**PRIOR HISTORY:**      Ingham Circuit Court. LC No. 00-092060-NZ.

**DISPOSITION:**      Affirmed in part, reversed in part, and remanded.

**JUDGES:**  Before: O'Connell, P.J., and Griffin and Markey, JJ.

**OPINION**

PER CURIAM.

Plaintiffs appeal as of right from the trial court's order granting defendants' motion for summary disposition.[1] This case arose from a home refinancing with the workout of two existing mortgages and payment of property tax arrearage. Plaintiffs Kenneth Evans and Gloria Evans seek damages under allegations of fraud, breach of contract, and violations of the federal Truth in Lending Act (TILA) and the Michigan Consumer Protection Act (CPA). We affirm in part, reverse in part, and remand.

    1   Defendant Ocwen Federal Bank is the assignee of defendant Ameriquest Mortgage Company's mortgage.

I

Plaintiffs first argue that the trial court erred in granting summary disposition [*2]  to defendants on their claim of fraud. A trial court's decision to grant a motion for summary disposition under *MCR 2.116(C)(10)* is reviewed de novo to determine whether the moving party was entitled to judgment as a matter of law. *Maiden v Rozwood, 461 Mich. 109, 118; 597 NW2d 817 (1999).*

Generally, to establish actionable fraud, a plaintiff must show that: (1) the defendant made a material representation; (2) it was false; (3) when made by the defendant, the defendant knew that the statement was false, or made it recklessly without knowledge of its truth and as a positive assertion; (4) the defendant made it with the intent that it would be acted on by the plaintiff; (5) the plaintiff acted in reliance on the statement; and (6) the plaintiff consequently suffered injury. *Webb v First of Michigan Corp, 195 Mich. App. 470, 473; 491 N.W.2d 851 (1992).*

Plaintiffs argue that the summary of debts and disbursements document and alleged oral representations by Ameriquest indicated that both existing mortgages[2] would be paid off with the Ameriquest loan proceeds. However, even a cursory review of the documents signed by plaintiffs [*3]  at closing would have revealed they continued to have a remaining balance on one of the existing mortgages after the refinancing. "There can be no fraud where the means of knowledge regarding the truthfulness of the representation are available to the plaintiff and the degree of their utilization has not been prohibited by the defendant." *Id. at 474.* Because defendants did not prohibit plaintiffs from reading the documents, plaintiffs cannot claim fraud based on an alleged misrepresentation clearly contradicted by the documents.

2    At the time plaintiffs applied for the loan through Ameriquest, plaintiffs were in default on two existing mortgages, one with Commercial Credit Corporation and one with Contimortgage Corporation.

Plaintiffs also argue that defendants induced them not to read the documents. When a party's general fraudulent scheme prohibits the signer from reading the contract, then the signer's failure to read the contract provides no defense to the first party's fraud. *Otto Baedeker & Associates* [*4] *, Inc v Hamtramck State Bank, 257 Mich. 435, 441; 241 NW 249 (1932)*. However, taking plaintiffs' claim in the light most favorable to them, *Rose v Nat'l Auction Group, Inc, 466 Mich. 453, 461; 646 N.W.2d 455 (2002)*, they have not shown a fraudulent scheme that induced them to sign the contract without reading the documents. Accordingly, summary disposition with respect to the count of fraud was proper.

II

Plaintiffs next argue that the trial court erred in dismissing the breach of contract claim. Plaintiffs contend that Ameriquest's alleged oral representation that the loan would resolve all of plaintiffs' indebtedness constituted an oral contract. We disagree.

Plaintiffs failed to establish the existence of a valid oral contract. "A valid contract requires mutual consent on all essential terms." *Eerdmans v Maki, 226 Mich. App. 360, 364; 573 N.W.2d 329 (1997)*. A contract also requires both an offer and an acceptance. "Mere discussions and negotiations cannot be a substitute for the formal requirements of a contract." *Id*. Moreover, even if an oral agreement existed as plaintiffs allege, [*5] it would have resulted in a lien on plaintiffs' property. Oral agreements that relate to an interest in land are unenforceable under the statute of frauds. *MCL 566.106; Schultz v Schultz, 117 Mich. App. 454, 457; 324 N.W.2d 48 (1982)*. The trial court's grant of summary disposition with regard to this issue was proper.

III

Plaintiffs next claim that Ameriquest violated the provisions of the Truth in Lending Act (TILA), *15 USC 1601 et seq.*, that require that each borrower be provided two completed copies of the notice of the right to cancel the transaction. *15 USC 1635(a); 12 CFR 226.15(b)*. In this case, plaintiffs both signed an acknowledgment stating: "The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL" (emphases in original). This acknowledgement creates a presumption that the forms were in fact provided. *15 USC 1635(c)*. While the presumption can be rebutted, plaintiffs failed to do so here.

Although plaintiffs provided an affidavit that they received only two completed copies total rather than two each, plus [*6] several "blank" [3] copies, Kenneth also provided deposition testimony that he did not read the documents given to him at closing. At one point in his deposition, he was shown a form with his signature, acknowledged the signature as his, but said he did not recall seeing it before. Kenneth stated that there were many documents at the closing, the process went very quickly, and that he signed the documents as they were put before him. Because Kenneth admits to not reading documents and to blindly signing documents, an affidavit that plaintiffs did not receive the correct number of completed right-to-cancel forms carries little weight and is insufficient to rebut the presumption created by the acknowledgement. See *id*. That plaintiffs may have received additional partially completed forms is not determinative of whether they received the correct number of completed forms.

3    Although plaintiffs use the word "blank" in their argument, it should be noted that the documents referred to are not in fact blank. Rather, they are complete with the exception of the date of the transaction and the final date to cancel. They include the name of the borrower, the address of the property in question, the name and address of the lender, the date, the loan number, the type of loan, and the contact information in the event the borrower wishes to exercise his right to cancel. In addition, although the final date to cancel is not specified, the documents state "or MIDNIGHT of the THIRD BUSINESS DAY" following the latest of the three events listed above" (emphasis in original), one of which is receipt of the document by the buyer.

[*7] Plaintiffs also argue that Ameriquest violated § *1638(a)* of the TILA by failing to disclose an existing security interest on their property already held and retained by prior lender. *15 USC 1638(a)*. Plaintiffs argue that this previous loan was restructured in a way that created a larger balance and a higher rate; thus, it qualified as a "refinancing" defined in *12 CFR 226.20(a)(4)*, which requires defendants' disclosure of the security interest on the TILA disclosure statement. We disagree. The balance of the loan was lower and the interest rate did not increase; therefore, the restructuring of this existing loan did not qualify as a "refinancing" under *12 CFR 226.20(a)(4)* and consequently was not required to be included on the disclosure statement.

Next, plaintiffs argue that the summary of debts and disbursements document, the TILA disclosure form, and the loan modification agreement are inconsistent with each other and thus violate the underlying purpose of the

TILA. *15 USC 1601*. Plaintiffs' complaint did not allege this violation, and defendants were not reasonably informed of this claim against them. See *MCR 2.111(B)(1)*. Nevertheless, [*8] in the interest of judicial economy, we will review this unpreserved issue for plain error. *Kern v Blethen-Coluni, 240 Mich. App. 333, 336; 612 N.W.2d 838 (2000)*. While it is true that the documents cited do not contain identical information, neither do they contradict one another. None of the forms indicates that the existing balance of the prior mortgage would be paid off in full by this transaction. Accordingly, plaintiffs fail to demonstrate plain error. See *id.* Thus the trial court's grant of summary disposition regarding the TILA claims was proper.

IV

Finally, plaintiffs argue that alleged misrepresentations by Ameriquest violated nine provisions of the Michigan Consumer Protection Act (MCPA), specifically *MCL 445.903(1)(n), (o), (s), (v), (w), (x), (y), (bb)*, and *(cc)*. [4] While we affirm the trial court's grant of summary disposition regarding *MCL 445.903(1)(n), (o), (v), (w), (x)*, and *(bb)*, we reverse regarding *MCL 445.903(1)(y)* and *(cc)*.

    4  This statute has been amended since the present case was decided below.

[*9]  Summary disposition under *MCR 2.116(C)(10)* tests the factual support of a claim and is proper only where there is no genuine issue concerning any material fact. *De Sanchez v State, 467 Mich. 231, 235; 651 N.W.2d 59 (2002)*. "In ruling on such a motion, a trial court must consider not only the pleadings, but also depositions, affidavits, admissions, and other documentary evidence, *MCR 2.116(G)(5)*, and . . . be liberal in finding a genuine issue of material fact." *Zine v Chrysler Corp, 236 Mich. App. 261, 270; 600 N.W.2d 384 (1999)*.

In granting summary disposition in this case, the trial court summarily concluded that a claim under the MCPA was analogous to a claim of fraud and subject to the same analysis. We disagree. The MCPA prohibits the use of "unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce." *MCL 445.903(1)*; *Zine, supra*. While a cause of action under the MCPA has similarities to a fraud claim, the MCPA captures more conduct within its sweep and offers greater protection to consumers. See *Dix v American Bankers Life Assurance Co, 429 Mich. 410*; [*10] *415 N.W.2d 206 (1987)*.

Not all provisions of the MCPA require that a plaintiff establish each of the elements of fraud in order to be successful. Section 3 of the MCPA includes 33 separate "unfair, unconscionable or deceptive methods, acts or practices" sufficient to establish a violation of the statute, the majority of which are based on some form of misrepresentation. While a common law fraud claim based on misrepresentation requires that the plaintiff show reasonable reliance on misrepresentation, *Webb, supra*, only two of the MCPA's thirty-three "unfair, unconscionable, or deceptive methods, acts or practices" expressly require some form of reasonable reliance by the consumer. See *MCL 445.903(1)(s)* ("which fact could not be reasonably known by the consumer"), and (bb) ("a person reasonably believes"). Indeed, if reasonable reliance were required, plaintiffs' claim would fail for the same reason the fraud claim failed. The plaintiffs were provided and signed a written contract stating the terms of the agreement. As stated above, reliance is not reasonable "where the means of knowledge regarding the truthfulness of the representation [*11] are available to the plaintiff and the degree of their utilization has not been prohibited by the plaintiff." *Webb, supra*. For this reason, we affirm the trial court's grant of summary disposition as it relates to *MCL 445.903(1)(s)* and (bb). In addition, we affirm the trial court's grant of summary disposition as it relates to *MCL 445.903(1)(n)* and *(o)* for similar reasons. Both subsections (1)(n) and (o) prohibit acts that "caus[e] a probability of confusion or of misunderstanding." The use of the word probability implies an objective standard. In other words, these provisions prohibit acts that result in a probability of confusion or misunderstanding *in a reasonable person*. To hold otherwise would result in an impossible standard and *any act* that would result in a probability that *any consumer* would be confused or misunderstand would be prohibited. In this case, while plaintiffs may have subjectively misunderstood or been confused by the transaction entered into with defendant, that is not the relevant inquiry. The record does not support a probability of confusion or misunderstanding by a reasonable person. [*12] For that reason, plaintiffs have failed to establish a genuine issue of material fact as it relates to MCPA subsections (1)(n) and (o) and summary disposition of those claims was proper. *MCR 2.119(C)(10)*; *De Sanchez, supra*.

Further, we find that summary disposition of the MCPA claims under subsections (1)(v), (w), and (x) was proper. There is simply no factual support on the record to establish a violation of the MCPA on those grounds. Thus, the trial court did not err is dismissing those claims. *MCR 2.116(C)(10)*.

However, we disagree with the trial court's grant of summary disposition as it relates to plaintiff's MCPA claims under subsections (1)(y) and (cc). The prohibited acts under these provisions consist of:

    (y) Gross discrepancies between the oral representations of the seller and the writ-

ten agreement covering the same transaction or failure of the other party to the transaction to provide the promised benefits.

* * *

(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner. [*MCL 445.903(1)*.]

In this case, plaintiffs claim - with supporting deposition [*13] testimony - that they were told by defendant that the two preexisting mortgages would be paid off as a result of the transaction between plaintiffs and defendant. Plaintiffs also claim that defendant failed to reveal the mortgage with Contimortgage would be only *partially* paid off and that once the transaction was completed, plaintiffs would be indebted to both Contimortgage and Ameriquest. As part of the support for these claims, Kenneth provided the following deposition testimony:

No. She told me she was going to pay off Conti Mortgage. Not part of it. She told me they was [sic] going to pay off Conti Mortgage. They was [sic] going to pay off Commercial Credit. They was [sic] going to pay my taxes. And she said

that I would have the one mortgage because I asked her, I said, ["]Now, is this one mortgage, one payment[?]["] She said, ["]Sure, this is one payment, Mr. Evans.["]

Defendants deny these assertions by plaintiffs. Therefore, there exists a genuine issue of material fact regarding MCPA subsections (1)(y) and (cc) and summary disposition of these claims was improper. *Steward v Panek, 251 Mich. App. 546, 556-557; 652 N.W.2d 232 (2002).* [*14] Whether these claims can be sufficiently proven at trial is a question for the finder of fact.

In conclusion, we affirm the trial court's grant of summary disposition regarding the fraud, breach of contract, TILA claims, and the MCPA claims under subsections (1)(n), (o), (s), (v), (w), (x), and (bb). We reverse regarding the MCPA claims under subsections (1)(y) and (cc) and remand for further proceedings consistent with this opinion. We do not retain jurisdiction. No taxable costs pursuant to *MCR 7.219*, neither party having prevailed in full.

Affirmed in part, reversed in part, and remanded.

/s/ Peter D. O'Connell

/s/ Richard Allen Griffin

/s/ Jane E. Markey

TAB H



LEXSEE 2003 U.S. DIST. LEXIS 25747

**SANDY GERNHARDT and TERRY GERNHARDT, Plaintiffs, -vs- WINNEBAGO INDUSTRIES, Defendant.**

**CASE NO. 03-73917**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION**

*2003 U.S. Dist. LEXIS 25747*

**December 30, 2003, Decided**
**December 30, 2003, Filed**

**SUBSEQUENT HISTORY:** Summary judgment granted, in part, summary judgment denied, in part by *Gernhardt v. Winnebago Indus., 2005 U.S. Dist. LEXIS 23274 ( E.D. Mich., Oct. 12, 2005)*

**DISPOSITION:** [*1] Defendant's Motion to Dismiss and for a More Definite Statement granted in part and denied in part. Counts I-IV of the Complaint dismissed. Any allegations of fraud contained in Count V dismissed.

**COUNSEL:** For Sandy Gernhardt, Terry Gernhardt, Plaintiffs: Dani K. Liblang, LEAD ATTORNEY, Liblang Assoc., Birmingham, MI.

For Winnebago Industries, Defendant: Kimberly A. Steinberg, LEAD ATTORNEY, Segal, McCambridge, Chicago, IL.

For Winnebago Industries, Defendant: Kimberly A. Steinberg, Paul E. Wojcicki, LEAD ATTORNEYS, Segal, McCambridge, Brighton, MI.

**JUDGES:** PAUL D. BORMAN, UNITED STATES DISTRICT COURT JUDGE.

**OPINION BY:** PAUL D. BORMAN

**OPINION**

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS**

Presently before the Court is Defendant's Motion to Dismiss and for a More Definite Statement (Docket Entry 3).

**BACKGROUND:**

This case involves a 1999 Winnebago "Ultimate Freedom" motor home. Presently before the Court is Defendant's Motion to Dismiss and for a More Definite Statement (Docket Entry 3).

On May 1, 1999, Terry and Sandy Gernhardt (collectively "Plaintiffs") purchased the Winnebago Ultimate Freedom [*2] from Meyers Campers, Inc. in New York State. Plaintiffs received Winnebago's 1999 New Vehicle Limited Warranty ("Limited Warranty") in conjunction with the purchase. The Limited Warranty provides, in pertinent part:

> The basic Warranty Period is 12 months or 15,000 miles (24,135 kilometers), on the odometer, whichever occurs first. Winnebago does not authorize any person to create for it any other obligations or liability in connection with this vehicle. ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE APPLICABLE TO THIS VEHICLE IS LIMITED IN DURATION TO THE DURATION OF THIS WRITTEN WARRANTY AS HEREINBEFORE OR HEREINAFTER PROVIDED. THE PERFORMANCE OF REPAIRS IS THE

EXCLUSIVE REMEDY UNDER THIS WRITTEN WARRANTY.

(Defendant's Motion, Ex. 2)(emphasis in original).

Shortly after taking possession of the Ultimate Freedom, Plaintiffs' "freedom" became significantly restricted -- the vehicle began to experience numerous defects in its components. (Complaint, Defendant's Motion, Ex. 1, P6). Plaintiffs contend that Winnebago was offered numerous attempts to cure these defects, but failed to do so.

On August 13, 2003, Plaintiffs filed the present action [*3] in Oakland County, Michigan Circuit Court. Due to the federal claim contained in Plaintiffs' Complaint, on September 30, 2003, Defendant removed the action to this Court. Plaintiffs' Complaint alleges the following counts:

> Count I: Breach of Express and Implied Warranties Under Michigan's Uniform Commercial Code ("UCC"), M.C.L. § 440.2314Count II: Revocation of Acceptance, M.C.L. § 440.2608Count III: Breach of the Obligation of Good Faith, M.C.L. § 440.1203Count IV: Liability Under Magnuson-Moss Warranty Act, 15 U.S.C. § 2301Count V: Violation of Michigan Consumer Protection Act, M.C.L. § 445.901

(Complaint, Defendant's Motion, Ex. 1).

On October 15, 2003, Defendant filed the present motion, seeking to dismiss Counts I-V of the Complaint or, in the alternative, for a more definite statement of Count V. On November 14, 2003, Plaintiffs filed their Answer in Opposition. Defendant filed a Reply which was stricken by the Court because it exceeded the five-page limit of Local Rule 7.1. No Reply has subsequently been filed.

Plaintiffs primarily argue that the Federal Magnuson-Moss Warranty Act ("the Act") preempts contrary [*4] state law and, thus, Plaintiffs' claims under the Act must be considered separately from Plaintiffs' UCC or common law claims. (Brief in Support of Plaintiffs' Answer, p. 2). Specifically, Plaintiffs argue that "requiring privity for enforcement of Magnuson-Moss claims is inconsistent with the remedial pruposes of the Act." (Id., p. 3). Plaintiffs contend that "the majority of state and federal courts permit revocation of acceptance under [the Act] regardless of state law privity rules." (Id., p. 6). Plaintiffs next argue that they have properly pled

their claims for breaches of both express and implied warranties. (Id., p. 9). Plaintiffs claim that "under Michigan law, Plaintiff may bring a claim for breach of the duty of good faith arising under article 2 of the UCC." (Id., p. 17). Finally, Plaintiffs argue that they are not required to plead or prove fraud in order to prevail on their claims under the Michigan Consumer Protection Act ("MCPA"). (Id., p. 19).

Defendant makes six principal arguments supporting its motion to dismiss: (1) the Limited Warranty is not a UCC "express warranty" (Memorandum in Support of Defendant's Motion, p. 3); (2) because Plaintiff is not in privity [*5] with Winnebago, the implied warranty of merchantability did not arise (Id., p. 4); (3) revocation of acceptance is not available against a manufacturer with whom a plaintiff is not in privity (Id., p. 7); (4) the duty of good faith imposed by the UCC does not support an independent cause of action (Id.); (5) the Act's refund-or-replacement provisions do not apply where a limited warranty is at issue (Id., p. 8); and (6) Plaintiffs' MCPA claim is wholly unsupported by allegations of fact and thus fails to state a claim. (Id., p. 9).

## ANALYSIS

### A. Standard of Review

A claim should not be dismissed under *Fed. R. Civ. P. 12(b)(6)* for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*. When ruling on a motion to dismiss, a court must consider all affidavits and pleadings in a light most favorable to the plaintiffs, and does not weigh the controverting assertions of the party seeking dismissal. *Niemi v. NHK Spring Co., 276 F. Supp. 2d 717 (E.D. Mich. 2003)* [*6] (citing *6 Dean v. Motel Operating, LLP, 134 F.3d 1269, 1272 (6th Cir. 1998)*).

### B. Count I of the Complaint

Count I of the Complaint alleges breach of express warranty and breach of the implied warranty of merchantability under M.C.L. § 440.2314.

### 1. Express Warranty

M.C.L. § 440.2313 defines "express warranty."

> (1) Express warranties by the seller are created as follows:

> (a) An affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express

warranty that the goods shall conform to the affirmation or promise.

(b) A description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) A sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

M.C.L. § 440.2313(1).

Defendant argues that the Limited Warranty does not fall into one of these categories and therefore is not an "express warranty." Defendant relies primarily on *Rokicsak v. Colony Marine Sales and Service, Inc., 219 F. Supp. 2d 810 (E.D. Mich. 2002).* [*7] Plaintiffs, on the other hand, argue that "Michigan jurisprudence is replete with examples of cases applying UCC express warranty rules and remedies to 'repair or replace warranties,' such as the Winnebago Limited Warranty at issue here." (Brief in Support of Plaintiffs' Answer, p. 9) (citing *Kelynack v. Yamaha Motor Co., 152 Mich. App. 105, 394 N.W.2d 17 (1986); Head v. Phillips Camper Sales & Rental, Inc., 234 Mich. App. 94, 593 N.W.2d 595(1999); Krupp P.M. Engineering, Inc. v. Honeywell, Inc., 209 Mich. App. 104, 530 N.W.2d 146 (1995) ; King v. Taylor Chrysler Plymouth, 184 Mich. App. 204, 457 N.W.2d 42 (1990)*).

The Court agrees with Defendant on this issue. The Michigan Court of Appeals cases cited by Plaintiffs do not stand for the proposition for which Plaintiffs cite them. The cases deal primarily with a buyer's ability to revoke its acceptance under the UCC. No mention is made in any of the cases of the question currently before the Court. *Rokicsak,* however, speaks directly on the issue before the Court. In *Rokicsak,* the court examined a purchase agreement for a boat. [*8]  The agreement in that case stated that "Buyer agrees that the sole exclusive remedy against Seller shall be limited to the repair and replacement of parts and equipment, provided Seller is promptly notified in writing of any defect." *219 F. Supp. 2d at 813.* The court examined this agreement in light of M.C.L. § 440.2313:

The Purchase Agreement language relied upon by plaintiff as creating an express warranty plainly describes "the sole exclusive remedy" against Colony Marine "to the extent that any warranties exist which have not been disclaimed." Such

does not constitute an affirmation of fact or promise to which the boat had to conform, a description of the boat, or a sample or model of the boat. See M.C.L. § 440.2313.

*Id. at 816.*

The Court finds that the Limited Warranty at issue in this case also serves to describe the sole exclusive remedy against Winnebago. That is, for the first 12 months or 15,000 miles, Plaintiffs sole remedy for defects in the Ultimate Freedom was to have Winnebago repair or replace the defects. Such a limitation of remedy does not fit within the parameters of M.C.L. § 440.2313. Accordingly, the Court grants [*9]  Defendant's motion to dismiss with respect to Plaintiffs' breach of express warranty claim.

**2. Implied Warranty**

The UCC describes the implied warranty of merchantability:

(1) Unless excluded or modified (section 2316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2) Goods to be merchantable must be at least such as

(a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of fair average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality and quality within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

(3) Unless excluded or modified (section 2316) other implied warranties [*10] may arise from course of dealing or usage of trade.

M.C.L. § 440.2314.

In this case, Defendant argues that, under Michigan law, the implied warranty did not arise because the parties were not in privity of contract. Plaintiffs argue that requiring privity is inconsistent with the remedial purposes of the Act. Plaintiffs also argue that the Act preempts Michigan's version of the UCC with regard to privity. In the alternative, Plaintiffs argue that the majority of state and federal courts do not require privity in an implied warranty action.

The Court rejects Plaintiffs' argument. While Plaintiffs state that a majority of courts do not require privity, Plaintiffs have not shown this Court any binding precedent which supports their contention. While it may be true that a majority of other state and federal courts do not require privity, this Court is bound to follow Michigan law in the instant case. A review of relevant Michigan law leads to the conclusion that, in the context of a consumer purchasing goods for personal use, privity is required in order to enforce an implied warranty of merchantability. In *Chiasson v. Winnebago Industries, 2002 U.S. Dist. LEXIS 27462, Case No. 01-74809 (E.D. Mich. Slip Op. 5/15/2002)*, [*11] United States District Judge George Caram Steeh provided a thorough and well-reasoned review of Michigan law on the subject currently in contention before this Court. After reviewing the impact of cases from the Michigan Court of Appeals, [1] the Michigan Supreme Court, [2] and Federal courts construing Michigan law, [3] Judge Steeh held:

This court is persuaded that the Michigan Supreme Court would rule, if faced with the issues, that: (1) a consumer must prove privity of contract on a UCC implied warranty of merchantability claim against a remote manufacturer, and; (2) an express warranty running from a remote manufacturer to a consumer does not create the requisite contractual privity. Michigan law establishes a link between application of the economic loss doctrine recognized in McGhee, Auto-Owners, and Neibarger: if the economic loss doctrine applies, a plaintiff's claims against a remote manufacturer are limited to the remedies available under the UCC; if the economic loss doctrine does not apply, a plaintiff may pursue tort remedies against

the remote manufacturer. The majority decision in Auto-Owners - that a consumer must prove contractual [*12] privity to pursue a UCC implied warranty of merchantability claim against a remote manufacturer - remains the law in Michigan. This court cannot disregard this decision in the absence of persuasive data indicating that the Michigan Supreme Court would decide otherwise and adopt the Auto-Owners dissenting opinion.

*Chiasson, 2002 U.S. Dist. LEXIS 27462, slip op.at 15* (internal citations omitted)(emphasis in original).

1   *See Chiasson* Opinion at p. 4-9 (citing *Henderson v. Chrysler Corp., 191 Mich. App. 337, 477 N.W.2d 505 (1991)* (holding that the UCC remedy of revocation of acceptance was not available to the consumer as against Chrysler because there was no contractual privity); *Sullivan Industries, Inc. v. Double Seal Glass Co., Inc., 192 Mich. App. 333, 480 N.W.2d 623 (1991)* (holding that the absence of contractual privity between the plaintiff and defendant di not preclude actionable UCC breach of implied warranty claims); *McGhee v. GMC Truck & Coach Div., General Motors Corp., 98 Mich. App. 495, 296 N.W.2d 286 (1980)* (economic loss doctrine)).

[*13]

2   *SeeChiasson* Opinion, *2002 U.S. Dist. LEXIS 27462, at slip op. p. 9-11* (citing *Neibarger v. Universal Cooperatives, Inc., 439 Mich. 512, 527-28, 486 N.W.2d 612 (1992)* ("Where a plaintiff seeks to recover for economic loss covered by a defective product purchased for commercial purposes, the exclusive remedy is provided by the UCC, including its statute of limitations")(emphasis in *Chiasson* Opinion).

3   *See Chiasson* Opinion at p. 11-14 (citing *Mt. Holly Ski Area v. U.S. Electrical Motors, 666 F. Supp. 115 (E.D. Mich. 1987)* (holding that in order for a plaintiff to recover economic losses on a breach of implied warranty theory under Michigan contract law, privity of contract must exist between the plaintiff and defendant); *Cameron v. American Dental Technologies, Inc., 1995 WL 599871 (E.D. Mich. 1995)*(expressly adopting the reasoning and analysis of *Mt. Holly*);*Consumers Power Co. v. Mississippi Valley Structural Steel Co., 636 F. Supp. 1100, 1108-1109 (E.D. Mich. 1986)*("When all the parties to a transaction are commercial enterprises of relatively equal strength, have bargained for the production and

treatment of specially manufactured goods, and they only damages pleaded are commercial economic losses resulting from defects in the goods themselves, then the UCC and its remedies govern the transaction. Tort remedies, such as, negligence and breach of implied warranty in tort, are unavailable to the business plaintiff.")(emphasis in *Chiasson* Opinion)).

[*14]   While not binding precedent, this Court adopts the well-reasoned analysis in *Chiasson* and holds that Michigan law requires contractual privity for a consumer to bring an implied warranty claim against a remote manufacturer. In this case, Plaintiffs, who purchased the Winnebago from a dealer in New York, cannot establish contractual privity. Accordingly, their claim for breach of implied warranty under the UCC must be dismissed.

**C. Count II of the Complaint**

Count II of the Complaint alleges Revocation of Acceptance. M.C.L. *§ 440.2608* states:

(1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it

(a) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

(b) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods [*15] which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

M.C.L. *§ 440.2608.*

Under existing Michigan law:

Revocation of acceptance ... is typically utilized against an immediate seller ...

There is nothing to indicate that the Legislature intended the revocation of acceptance of a contract to apply to parties not in privity of contract. Acceptance under the UCC concerns the relationship between a buyer and a seller ... Thus, revocation is inextricably connected to the contractual relationship between a buyer and a seller.

*Henderson, 191 Mich. App. at 341* (internal citations omitted).

Plaintiffs argue that the Act preempts the UCC, creates a federal revocation of acceptance remedy, and abolishes privity requirements. Plaintiffs cannot point to a section of the Act, however, that is in direct conflict with this provision of the UCC. No court has held that the Act serves to preempt the entire UCC. Therefore, the Court holds that the UCC applies to this case. Accordingly, because [*16]  there is no privity of contract, the Court grants Defendant's Motion to Dismiss Count II of the Complaint.

**D. Count III of the Complaint**

In Count III, Plaintiffs allege a breach of the obligation of good faith imposed by M.C.L. *§ 440.1203.* That section provides: "Every contract or duty within this act imposes an obligation of good faith in its performance or enforcement." M.C.L. *§ 440.1203.* That section, however, does not serve to create an independent cause of action for failure to perform or enforce in good faith. *UCC Comment to § 1-203.* A cause of action for breach of the duty of good faith does exist, however, "where a party to a contract makes the manner of its performance a matter of its own discretion." *Ferrell v. Tanny Int'l, Inc., 137 Mich. App. 238, 243, 357 N.W.2d 669, 672* (1984) (quoting *Burkhardt v. City National Bank of Detroit, 57 Mich. App. 649, 652, 226 N.W.2d 678 (1975)* ). The situation described in *Ferrell* is not present in this case. Accordingly, the Court grants Defendant's Motion to Dismiss Count III of the Complaint.

**E. Count IV of the Complaint.**

Plaintiffs' Magnuson-Moss [*17]   claims can be broken down into two separate claims: (1) a claim for refund-or-replacement under *section 104(a) of the Act*; and (2) breach of an implied warranty under the Act.

1. *Section 104(a)*

Defendant argues that *§ 104(a) of the Act* does not apply where there is a limited warranty given. (Memorandum in Support of Defendant's Motion, p. 8). Plaintiffs do not challenge this contention in their Response.

Defendant cites authority from other jurisdictions in support of its position. [4] The Court finds that Plaintiffs' failure to answer Defendant's argument in this situation entitles Defendant to dismissal of Plaintiffs' claim under *§ 104(a) of the Act*.

> 4   See Brief in Support of Defendant's Motion to Dismiss at 8-9 (citing *MacKenzie v. Chrysler Corp., 607 F.2d 1162 (5th Cir. 1979)*(holding that *§ 104 of the Act* does not apply to "limited warranties"); *Sorce v. Naperville Jeep Eagle, 309 Ill. App. 3d 313, 722 N.E.2d 227, 242 Ill. Dec. 738 (Ill. App. 1999)*(same); *Skelton v. General Motors, 660 F.2d 311, 315 (7th Cir. 1981)*(holding that only if the warranty is designated as "full," does *§ 104 of the Act* apply)).

[*18]   2. ***Implied Warranty***

*15 U.S.C. 2301(7)* of the Act defines an implied warranty as "an implied warranty arising under State law ..." Based upon the discussion of implied warranties above, the Court grants Defendant's Motion to Dismiss Count IV of Plaintiffs' Complaint.

**F. Count V of the Complaint**

Count V of the Complaint deals with allegations that Defendant violated the MCPA. Defendant argues that Plaintiffs have failed to state the circumstances constituting fraud with particularity, pursuant to *Fed. R. Civ. P. 9(b)*. Plaintiffs contend that they have satisfied federal pleading requirements because a violation of the MCPA does not involve the same elements as common law fraud. Count V of the Complaint includes the following statement of conduct engaged in by Defendant:

> A. Making fraudulent and/or negligent representations, as hereinbefore alleged;
>
> B. Representing the subject vehicle to be of good, merchantable quality, free of defects, when it in fact was not;
>
> C. Represented that the subject vehicle had been properly and adequately repaired, when it in fact had not;
>
> D. Failing to adequately [*19]  and properly inform Plaintiffs of their rights and remedies with respect to the transactions which are the subject of this Complaint;
>
> E. Attempting to disclaim or limit the implied warranty of merchantability and fitness for use without clearly and conspicuously disclosing same;

> F. Attempting to disclaim or limit the implied warranty of merchantability and fitness for use without obtaining Plaintiffs' specific consent to the disclaimer or limitation;
>
> G. Represented that the repairs could be performed properly, within a reasonable time, when Defendant knew, or in the exercise of reasonable care, should have known that this was not the case;
>
> H. Failing to reveal material facts including but not limited to the nature of the defects complained of herein;
>
> I. Failing to provide promised benefits, including but not limited to, proper repairs, and other benefits provided by law;
>
> J. failing to offer a refund or replacement of the subject vehicle in accordance with the applicable warranties and applicable law.

(Complaint, P41).

United States District Judge Robert H. Cleland dealt with a similar issue in *Joslyn v. Winnebago Industries,* Case No. 01-75001 (E.D. Mich. Slip Op. 4/22/2002). [*20]  Judge Cleland held that "having thus indicated to the court that they are not alleging fraud against Winnebago, Plaintiffs seemingly do not oppose dismissal of Count IV to the extent it alleges otherwise. Accordingly, the court will grant Winnebago's motion to the extent it seeks dismissal of any allegations of fraud." *Id.,* p. 6. The Court will follow a similar procedure. Because Plaintiffs in this case state that they are not alleging fraud, then any allegations of fraud made in the Complaint or otherwise are dismissed. Plaintiffs remaining MCPA claims survive.

**CONCLUSION**

For the reasons stated above, the Court GRANTS IN PART and DENIES IN PART the motion. Counts I-IV of the Complaint are dismissed in their entirety. Any allegations of fraud contained in Count V are likewise dismissed. Plaintiffs' remaining claims under the MCPA survive.

**SO ORDERED.**

PAUL D. BORMAN

UNITED STATES DISTRICT COURT JUDGE

Dated: DEC 30 2003

2003 U.S. Dist. LEXIS 25747, *

Detroit, Michigan

# TAB I



LEXSEE 2002 MICH. APP. LEXIS 2369

**THOMAS P. KENNY, Plaintiff-Appellant, v FRANKLIN BANK, NA, Defendant-Appellee.**

**No. 227122**

**COURT OF APPEALS OF MICHIGAN**

*2002 Mich. App. LEXIS 2369*

**February 26, 2002, Decided**

**NOTICE:**   [*1]  THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**PRIOR HISTORY:**   Oakland Circuit Court. LC No. 99-017070-CH.

**DISPOSITION:**   Affirmed.

**JUDGES:** Before: Whitbeck, C.J., and Markey and K.F.Kelly, JJ.

**OPINION**

PER CURIAM.

Plaintiff appeals by right the grant of summary disposition in favor of defendant Franklin Bank pursuant to *MCR 2.116(C)(8)*. Plaintiff's complaint alleged that he was entitled to the "windfall" that defendant received when as foreclosure sale purchaser after the redemption period had expired, defendant both collected a fire insurance settlement and also sold the foreclosed fire-damaged property for more than the secured debt plaintiff owed. The trial court concluded that plaintiff had failed to state a cause of action for unjust enrichment because plaintiff had conferred no benefit on defendant, and title to the foreclosed property vested in defendant when plaintiff failed to redeem the property. We affirm.

Defendant bank held a one million dollar mortgage on plaintiff's former home on which defendant foreclosed after plaintiff failed to meet his payment obligations. [*2]  Defendant subsequently purchased the property at foreclosure sale on October 14, 1997 for $ 1,021,460, the amount plaintiff owed defendant at that time. On July 19, 1998, during the one-year redemption period, a fire damaged the property. Defendant had maintained fire insurance on the property and after the redemption period expired, collected an insurance settlement from two insurance companies of less than the amount of plaintiff's debt, which the parties do not dispute was a total of $ 503,045.50. Also, after the redemption period had expired, defendant sold the damaged foreclosed property for $ 1,200,000.

The crux of plaintiff's complaint was that the mortgage he granted to defendant required defendant to give notice to him of any claim for insurance and also required defendant to use insurance proceeds to either rebuild the property or reduce plaintiff's debt, neither of which defendant did. Plaintiff alleged that defendant failed to provide the mortgage-required notice and that plaintiff had a legal and equitable right to have the insurance proceeds used to reduce the amount necessary to redeem the property. Plaintiff further alleged that because the property and insurance on [*3]  the property were only different forms of security for plaintiff's debt, plaintiff was entitled to any excess over the amount of his debt that defendant received. Plaintiff alleged that defendant was therefore unjustly enriched by the amount of the insurance settlement when the subsequent sale of the property exceeded plaintiff's debt.

A trial court's grant or denial of summary disposition is reviewed de novo on appeal. *Spiek v Dep't of Transportation, 456 Mich. 331, 337; 572 N.W.2d 201 (1998)*. In this case, defendant's claim to summary disposition was based on *MCR 2.116(C)(8)* (failure to state a claim upon which relief can be granted). A motion under *MCR 2.116(C)(8)* tests the legal sufficiency of the claim based

on the pleadings alone and may not be supported with documentary evidence. *Simko v Blake, 448 Mich. 648, 654; 532 N.W.2d 842 (1995); Patterson v Kleiman, 447 Mich. 429, 432; 526 N.W.2d 879 (1994).* In deciding a motion for summary disposition based on failure to state a claim, the court must take factual allegations in support of the claim [*4] as true and construe them in the light most favorable to the nonmoving party. *Maiden v Rozwood, 461 Mich. 109, 119; 597 N.W.2d 817 (1999).*

To establish a claim of unjust enrichment the plaintiff must prove: (1) that defendant received a benefit from the plaintiff, and (2) that an inequity results to plaintiff because of the retention of the benefit by defendant. *Barber v SMH (US), Inc, 202 Mich. App. 366, 375; 509 N.W.2d 791 (1993); B & M Die Co v Ford Motor Co, 167 Mich. App. 176, 181; 421 N.W.2d 620 (1988).* In such circumstances, the law will imply a contract to prevent the unjust enrichment of the defendant. *Kammer Asphalt Paving Co v East China Twp Schools, 443 Mich. 176, 185-186; 504 N.W.2d 635 (1993).* Because implying a contract ignores normal contract principles, the courts employ the doctrine of unjust enrichment with caution. *Id. at 186; Hollowell v Career Decisions, Inc, 100 Mich. App. 561, 570; 298 N.W.2d 915 (1980).* Moreover, a contract will not be implied where there is an express contract covering the same subject matter. [*5] *Barber, supra at 375; Martin v East Lansing School Dist, 193 Mich. App. 166, 177; 483 N.W.2d 656 (1992).*

In the case at bar, the trial court correctly determined that plaintiff had not alleged that he had conferred a benefit upon defendant. Plaintiff only alleged that he had defaulted on a substantial debt that forced defendant to foreclose the mortgage plaintiff had granted as security for the debt. Plaintiff also alleged that defendant maintained insurance on the foreclosed property (an obligation of plaintiff under the mortgage that was also in default). Plaintiff further alleged that a fire had damaged the foreclosed property (substantially impairing defendant's security). Finally, the complaint lacked any allegation that plaintiff took any action at all to redeem the property or file a claim for fire insurance proceeds.

Even if plaintiff conferred a benefit on defendant by defaulting on his debt, by failing to maintain insurance, and by taking no action to redeem the property, plaintiff's claim to an inequity is premised on the allegation that defendant failed to comply with the terms of the mortgage agreement to provide notice [*6] before an insurance settlement and apply any proceeds to either rebuild or reduce the debt. However, this claim fails because the foreclosure sale extinguished the mortgage. *New York Life Ins Co v Erb, 276 Mich. 610, 615; 268 NW 754 (1936); Bank of Three Oaks v Lakefront Properties, 178 Mich. App. 551, 555; 444 N.W.2d 217 (1989).*

After foreclosure, the rights and obligations of the parties are governed by statute. *Senters v Ottawa Savings Bank, FSB, 443 Mich. 45, 50-53; 503 N.W.2d 639 (1993).* For example, MCL 600.3240 governs redemption of foreclosed property and provides that the mortgagor is obligated to pay post foreclosure interest only if the mortgagor chose to redeem. *Bank of Three Oaks, supra at 555.* Likewise, plaintiff would be obligated to pay the expense that defendant "charged" to plaintiff to maintain insurance on the foreclosed property only if he chose to redeem. *MCL 600.3240(4).* Absent fraud, accident, or mistake, the statute leaves no room for equitable considerations. *Senters, supra at 55.* [*7]

Moreover, a benefit is not unjust and the party conferring the benefit is not entitled to restitution where the benefit is unconditionally conferred without mistake, coercion, or request. *In re McCallum Estate, 153 Mich. App. 328, 335; 395 N.W.2d 258 (1986).* In the case of *McCallum Estate, supra at 331,* the plaintiff's decedent, a bank shareholder, objected to the bank's conversion to a holding company and requested that his shares be purchased by the successor bank pursuant to statutory procedure whereby the price per share was determined by an independent appraiser appointed by the Commissioner of the Financial Institutions Bureau. The plaintiff alleged unjust enrichment on the part of the successor bank. *Id.* This Court disagreed because the forces that resulted in the alleged benefit were all put in motion by the plaintiff's decedent and the successor bank was the "involuntary" recipient of the plaintiff's stock. *Id. at 335-336.*

Likewise in this case, defendant did not request that plaintiff default on his debt, which put in motion foreclosure, nor is there any allegation that defendant prevented plaintiff from [*8] redeeming the property. While a different case may have been presented if defendant had failed to credit any insurance settlement against the price to redeem, plaintiff here made no effort at all to redeem. Thus, it is not unjust to permit defendant to retain any profit from the sale of the property to which it obtained legal title after the redemption period had expired. *MCL 600.3236.* Contrary to plaintiff's argument on appeal, a fair reading of the record establishes that the trial court recognized that full title did not vest in defendant until after plaintiff allowed the redemption period to expire. Equity will not intervene, absent fraud, accident, or mistake, even where it appears that compliance with the statutory foreclosure (or redemption) procedure results in a "windfall" to a party. *Senters, supra at 57.*

Finally, plaintiff's reliance on cases that preclude the mortgagee from collecting fire insurance proceeds where a fire occurs before foreclosure and the mortgagee bids the full amount of the debt at the foreclosure sale, is misplaced. See, e.g., *Smith v General Mortgage Corp, 402 Mich. 125; 261 N.W.2d 710 (1978);* [*9] *Heritage Fed-*

*eral Savings Bank v Cincinnati Ins Co, 180 Mich. App. 720; 448 N.W.2d 39 (1989)*. These cases are based on the theory that where the mortgage requires the mortgagor to maintain insurance, with a loss payable clause to the mortgagee, the insurance serves as an alternative source to secure payment of the debt. *Smith, supra at 126-129*. Where the mortgagee purchases the property at foreclosure sale for the amount of the debt, the debt has been satisfied, and there is no right to collect insurance to pay what has already been satisfied - i.e., the mortgagee has no right to "double payment." *Id. at 128*; Heritage Federal Savings Bank, supra at 724-726*. The same rule applies where the fire occurs before foreclosure, and the mortgagee relies on an assignment of insurance proceeds in the mortgage. *Emmons v Lake States Ins Co, 193 Mich. App. 460, 464-465; 484 N.W.2d 712 (1992)*.

The present case is distinguished because the fire occurred *after* the foreclosure sale. Also, it is undisputed that defendant maintained the insurance specifically to protect itself from the possibility [*10] of damage to the property during the redemption period and was also the named insured. Further, while the insurance policy had a reverse loss-payable clause extending rights to the mortgagor, plaintiff's rights, if any, arise from the insurance contract. *Better Valu Homes, Inc v Preferred Mutual Ins Co, 60 Mich. App. 315, 319; 230 N.W.2d 412 (1975)*. Here, plaintiff did not file a claim for insurance, nor did he file a breach of contract action against the insurance company or companies. Indeed, plaintiff dismissed his claim against the insurance company. As noted above, where a person's rights are dependent upon an express contract, the law will not imply a contract to establish an unjust enrichment claim. *Barber, supra at 375*; Martin, supra at 177*.

Finally, "double payment" is not present in this case. The amount of insurance proceeds as alleged in plaintiff's complaint was less than the amount of plaintiff's debt. Moreover, it is undisputed that defendant did not collect the insurance settlement until after the redemption period had expired, and it had succeeded to "all the right, title, and interest which the mortgagor [*11] had at the time of the execution of the mortgage, or at any time thereafter." *MCL 600.3236*. Therefore, defendant's interest in the insurance proceeds extended to the full value of the damage to the property and was not limited by the amount of plaintiff's debt. See *Heritage Federal Savings Bank, supra at 724*; Better Valu Homes, supra at 319*.

In summary, the trial court properly granted defendant's motion for summary disposition under *MCR 2.116(C)(8)*. Plaintiff failed to state a claim of unjust enrichment because the allegations of his complaint, viewed in the light most favorable to him, did not estab-lish the necessary elements of conferring a benefit on defendant that would be inequitable for defendant to retain. *Barber, supra at 375*; B & M Die Co, supra at 181*.

Plaintiff's final claim that summary disposition was premature is without merit because it was so clearly unenforceable as a matter of law that no further factual development could possibly justify a right of recovery.

The purpose of summary disposition is to avoid extensive discovery when a case can be quickly [*12] resolved on an issue of law. *American Community Mutual Ins Co v Comm'r of Ins, 195 Mich. App. 351, 362; 491 N.W.2d 597 (1992)*. However, summary disposition may be premature if granted before discovery on a disputed issue is complete. *State Treasurer v Sheko, 218 Mich. App. 185, 190; 553 N.W.2d 654 (1996)*. Where further discovery cannot reasonably be expected to uncover factual support for the opposing party's position, summary disposition is appropriate. *Village of Dimondale v Grable, 240 Mich. App. 553, 566; 618 N.W.2d 23 (2000)*.

Moreover, in this case the parties agree that the trial court based its decision on *MCR 2.116(C)(8)*, failure to state a claim upon which relief may be granted, which should be granted only when the claim is so clearly unenforceable as a matter of law that no factual development could possibly justify a right of recovery. *Maiden, supra at 119*. Here, the trial court properly concluded that plaintiff had failed to state a claim upon which relief could be granted.

Here, the only disputed fact was whether plaintiff had originally [*13] procured the American Modern Home insurance policy, a fact not material to rights and obligations of the parties at the time of the fire loss when it is undisputed that defendant had "maintained," or paid the insurance premium to keep the policy in force. Because plaintiff failed to assert a claim for insurance within the redemption period, or redeem the property as permitted by law, further discovery could not possibly improve his unjust enrichment claim. Summary disposition was therefore appropriate despite plaintiff's claim that further discovery was necessary. *Maiden, supra at 119*; Grable, supra at 566*.

We affirm.

/s/ William C. Whitbeck

/s/ Jane E. Markey

/s/ Kirsten Frank Kelly

# TAB J

Not Reported in F.Supp.2d, 1999 WL 33502378 (W.D.Mich.)
**(Cite as: 1999 WL 33502378 (W.D.Mich.))**

H Only the Westlaw citation is currently available.

United States District Court, W.D. Michigan.
Mark G. PETERS, and Allen Piechowski, individually
and on behalf of all others similarly situated, Plain-
tiffs,
v.
CARS TO GO, INC., a Michigan corporation, De-
fendant.
**No. 1:97-CV-920.**

March 17, 1999.

MEMORANDUM ORDER

QUIST, District J.

*1 On December 29, 1998, following oral argument,
the Court entered an Order granting Plaintiffs' motion
for summary judgment on their itemization claim
under the Truth In Lending Act ("TILA"), denying
Plaintiffs' and Defendant's motions for summary
judgment on Plaintiffs' finance charge claim under the
TILA, denying both Plaintiff Peters' and Defendant's
motions for summary judgment on Peters' breach of
contract claim, and denying Plaintiffs' and granting
Defendant's motions on Plaintiffs' fraud claim. The
Court also granted Defendant's request to file a
post-hearing brief on various issues in connection with
Plaintiffs' Michigan Consumer Protection Act
("MCPA") claims. The Court has before it the parties'
post-hearing briefs and will address the issues raised
by Defendant regarding Plaintiffs' MCPA claim.

Defendant first contends that the Court's finding that
Defendant violated the technical provisions of the
TILA by representing to Plaintiffs that the entire
amount charged for vehicle service contracts was
being paid to third parties, when in fact Defendant
actually retained a portion of the price, cannot also
support a finding of liability under the MCPA because
the MCPA should be construed with reference to
common law fraud. Defendant argues that summary
judgment is not appropriate because technical viola-
tions of the TILA do not amount to common law
fraud. In support of this argument, Defendant cites
*Mayhall v. A.H. Pond Company, Inc.,* 129 Mich.App.

178, 341 N.W.2d 268 (1983) (per curiam). The court
in *Mayhall* was faced with the issue of whether a
plaintiff who suffers only frustrated expectations
without also suffering a monetary loss has suffered a
"loss" that is compensable under the MCPA. In an-
swering the question, the court noted that "the great
majority of the specific prohibited practices enume-
rated in the statute ... involve fraud," and on that basis
found that the section of the MCPA authorizing civil
actions should be construed "with reference to the
common-law tort of fraud." *Id.* 182-83, 341 N.W.2d at
270. However, the court did not hold a plaintiff must
prove fraud to prevail under the MCPA. Rather, it
stated that the MCPA "has a somewhat broader scope"
than fraud, as it "prohibits not only 'deceptive' busi-
ness practices but also those which are 'unfair' or
'unconscionable.' " *Id.* at 182, 341 N.W.2d at 270.

Plaintiffs rely on the Michigan Supreme Court's opi-
nion in *Dix v. American Bankers Life Assurance Co. of
Florida,* 429 Mich. 410, 415 N.W.2d 206 (1987) in
support of their position that a plaintiff may maintain a
claim under the MCPA without being required to
prove common law fraud. In *Dix,* the plaintiffs as-
serted claims for common law fraud, breach of fidu-
ciary duty, and violations of the MCPA. The trial court
denied the plaintiffs' motion for class certification on
all claims and dismissed the complaint on the grounds
that none of the plaintiffs had asserted a claim that
exceeded the jurisdictional limit for circuit court ac-
tions. The Michigan Supreme Court affirmed the
dismissal of the fraud and breach of fiduciary duty
claims but found that the trial court erred in denying
class certification on the MCPA claim. The court
found that the MCPA claim should have been certified
because the MCPA provides an enlarged remedy for
consumers. The court stated:

   *2 The Consumer Protection Act was enacted to
   provide an enlarged remedy for consumers who are
   mulcted by deceptive business practices, and it
   specifically provides for the maintenance of class
   actions. This remedial provision of the Consumer
   Protection Act should be construed liberally to
   broaden the consumers' remedy, especially in situ-
   ations involving consumer frauds affecting a large
   number of persons.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 33502378 (W.D.Mich.)
**(Cite as: 1999 WL 33502378 (W.D.Mich.))**

*Id.* at 417-18, 415 N.W.2d at 209 (footnotes omitted).

Based upon its reading of both *Mayhall* and *Dix,* the Court finds that Plaintiffs need not prove fraud in order to show that Defendant violated the MCPA. While the *Mayhall* court did find that the legal principles applicable to the common law tort of fraud may provide guidance in interpreting the MCPA, it also found that conduct not amounting to fraud may support a violation of the MCPA. *See Vandegiessen v. First of Michigan Corp.,* No. K86-276A CA, 1989 WL 159588, at *3 (W.D.Mich. Jan. 19, 1989) (citing *Mayhall* for proposition that MCPA's "scope is broader than common-law fraud"). Thus, even though the alleged TILA violations may not rise to the level of common law fraud, they may nonetheless support a claim for violation of the MCPA.

Defendant's second argument is that the Court cannot grant summary judgment to Plaintiffs on their MCPA claim because Plaintiffs have not shown that they purchased their cars "primarily for personal, family, or household purposes," as required by the MCPA. In addition, Defendant contends that plaintiff Piechowski's deposition testimony shows that he uses his car for business purposes because he drives his car approximately 290 miles per week in connection with his current job as a salesman for Keebler. (*See* Piechowski Dep. at 40, Def.'s Suppl. Br. Ex. A.)

In their verified complaint, both Peters and Piechowski alleged that they purchased their cars from Defendant primarily for "personal, family or household purposes." (2d Am.Compl.¶¶ 11, 36.) With the exception of Piechowski's testimony, Defendant has not submitted any evidence to show that Plaintiffs purchased their cars for anything other than their own personal use. Moreover, Plaintiffs have shown that Defendant's reliance on Piechowski's deposition testimony is misplaced. Piechowski testified that at the time he purchased his car, he was employed in a position which did not require him to travel. (*See* Piechowski Dep. at 46-48, attached to Pls.' Suppl. Br.) Piechowski did not obtain his job with Keebler until March 1998, several months after he purchased his car from Defendant. (*See id.* at 42.) Thus, Defendant has not shown that Piechowski purchased his car for anything other than personal use. Finally, given that Defendant used TILA disclosure documents for each of the sales to the class members, there is no basis for concluding that the class members did not purchase

their cars for "personal, family, or household purposes." 15 U.S.C. § 1602(h) (defining "consumer").

**\*3** Although the Court rejects both arguments raised by Defendant, it does not necessarily follow that Plaintiffs are automatically entitled to summary judgment on their MCPA claim. Plaintiffs have not cited, and this Court has not found, any case which has held that conduct which violates the TILA *ipso facto* violates the MCPA. However, in Count II, which alleges Plaintiffs' MCPA claim, Plaintiffs allege that Defendant's conduct in failing to disclose that Defendant was retaining a portion of the price of the vehicle service contracts violated MCPA §§ 3(1)(o), (s), M.C.L. §§ 445(1)(o), (s), by causing a probability of confusion or of misunderstanding as to the terms or conditions of credit and by failing to reveal a material fact, the omission of which tended to mislead or deceive Plaintiffs about a fact which could not have been known to them. (*See* 2d Am. Compl. ¶¶ 67(b), (c).) The Court finds that the conduct of Defendant relating to the TILA itemization claim also violates the cited provisions of the MCPA. Therefore, under these facts, Defendant's violation of the TILA also amounts to a violation of the MCPA.

For the foregoing reasons and in accordance with its December 29, 1998, Order, the Court finds that Plaintiffs are entitled to summary judgment on their MCPA claim based upon the TILA itemization claim but that Plaintiffs are not entitled to summary judgment to the extent that their MCPA claim is based upon their TILA finance charge claim or Plaintiff Peters' breach of contract claim. Therefore,

IT IS HEREBY ORDERED that Plaintiffs' Motion for Partial Summary Judgment (docket no. 42) is GRANTED and Defendant's Motion for Partial Summary Judgment (docket no. 47) is DENIED with respect to Plaintiffs' Michigan Consumer Protection Act claim in Count II of the Second Amended Class Action Complaint ("SACAC") based upon the itemization claim under the Truth In Lending Act.

IT IS FURTHER ORDERED that both motions are DENIED with respect to Plaintiffs' Michigan Consumer Protection Act claim in Count II of the SACAC based upon the finance charge claim under the Truth In Lending Act and upon Plaintiff Peters' breach of contract claim.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 33502378 (W.D.Mich.)
**(Cite as: 1999 WL 33502378 (W.D.Mich.))**

W.D.Mich.,1999.
Peters v. Cars to Go, Inc.
Not Reported in F.Supp.2d, 1999 WL 33502378
(W.D.Mich.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

TAB K



LEXSEE 2003 U.S. DIST.. LEXIS 5600

**Pressalite Corporation, an Illinois Corporation, Plaintiff, v. Matsushita Electric Corporation of America, a Delaware Corporation, Defendant.**

**Cause No. 02 C 7086**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2003 U.S. Dist. LEXIS 5600; 50 U.C.C. Rep. Serv. 2d (Callaghan) 410*

**April 3, 2003, Decided
April 4, 2003, Docketed**

**DISPOSITION:** [*1] Defendant's motion to dismiss granted in part and denied in part.

**COUNSEL:** For PRESSALITE CORPORATION, plaintiff: John M. McGuirk, Hoschett, McGuirk & Cuscaden, P.C., St. Charles, IL.

For PRESSALITE CORPORATION, plaintiff: John Joseph Hoscheit, Hoscheit McGuirk & Cuscaden, P.C., St. Charles, IL.

For MATSUSHITA ELECTRIC CORPORATION OF AMERICA, defendant: Steven P. Mandell, Stephen J. Rosenfeld, James David Duffy, Leon E. Farbman, Mandell, Menkes & Surdyk, LLC, Chicago, IL.

**JUDGES:** GERALDINE SOAT BROWN, United States Magistrate Judge.

**OPINION BY:** GERALDINE SOAT BROWN

**OPINION**

MEMORANDUM OPINION AND ORDER

Plaintiff Pressalite Corporation ("Pressalite") has brought a five count complaint against defendant Matsushita Electric Corporation of America ("Matsushita") for breach of express warranty, breach of implied warranty of merchantability, breach of implied warranty of fitness for particular purpose, common law fraud, and statutory fraud under the Illinois Consumer Fraud and Deceptive Business Practices Act (*815 ILCS § 505/1 et. seq.*)("the

Consumer Fraud Act"). [Dkt # 1.] The case was removed from state court on the basis of diversity jurisdiction, and Matsushita has moved to dismiss all [*2] counts under *Fed. R. Civ. P. 12(b)(6)* for failure to state a claim for which relief can be granted. [Dkt # 6.] The parties have consented to the jurisdiction of a magistrate judge. [Dkt # 14, 15.] For the following reasons Matsushita's motion is GRANTED IN PART and DENIED IN PART. The motion is denied as to Counts I-III. The motion is granted with regard to Count IV and Count IV is dismissed without prejudice. The motion is granted with regard to Count V, which is dismissed with prejudice for failure to state a claim.

PRESSALITE'S COMPLAINT AND MATSUSHITA'S MOTION TO DISMISS

Pressalite's Complaint alleges the following facts, which are taken as true for purposes of the motion to dismiss. Pressalite contracted with Matsushita for Matsushita to provide batteries to Pressalite for use in Pressalite's manufacture of flashlights. (Compl. P 3.) In April, 1999, purchasers of Pressalite's flashlights returned numerous flashlights to due to defective batteries. (*Id.*) Having been assured that the problem had been identified and corrected, Pressalite entered into a settlement agreement with Matsushita and continued to use Matsushita's batteries in its flashlights. (*Id.* P 4.) [*3] Matsushita failed to remedy the defect or remove the defective batteries from distribution as promised. (*Id.* P 18-19.) Following the settlement, Pressalite again began to receive flashlights returned due to defective batteries. (*Id.* P 5.) After being contacted by Pressalite, Matsushita acknowledged that there was a second manufacturing

defect in the batteries it had been supplying and that Matsushita had known about the defect at the time of the settlement agreement but remained silent while continuing to ship 1,600,000 defective batteries. (*Id.* P 7.) Prior to and during the course of its relationship with Matsushita, Pressalite was promised by Matsushita that Matsushita would manufacture batteries that were of a high quality, free of defect and suitable as components for Pressalite's flashlights. (*Id.* P 6.)

In its motion to dismiss, Matsushita argues that the agreement between the parties is governed by the "terms and conditions of sale" allegedly sent to Pressalite with every order. (Def.'s Mem. at 4.) These terms disclaim any warranties of merchantability and fitness for a particular purpose and state that the transaction is to be governed by the laws of New York. [*4] (*Id.*, Ex. 3.) In its response to Matsushita's motion, Pressalite denies ever receiving the documents upon which Matsushita relies. (Pl.'s Resp. at 3.)

LEGAL STANDARD

*Federal Rule of Civil Procedure 12(b)(6)* allows a defendant to move for dismissal on the basis of the plaintiff's "failure to state a claim upon which relief can be granted." The Rule further provides that on such a motion, if "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in *Rule 56*, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by *Rule 56*."

In deciding a *Rule 12(b)(6)* motion, a court must consider "whether relief is possible under any set of facts consistent with the allegations of the plaintiff's complaint." *Pokuta v. Trans World Airlines, Inc., 191 F.3d 834, 839 (7th Cir. 1999).* Thus, the court must "accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences therefrom in favor of the plaintiff." *Perkins v. Silverstein, 939 F.2d 463, 466 (7th Cir. 1991).* [*5] In addition, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).*

I. Counts I-III: Breach of Express Warranty, Breach of Implied Warranty of Merchantability, Breach of Implied Warranty of Fitness for Particular Purpose.

Counts I-III of Pressalite's complaint allege that Matsushita's sale of defective products constituted a breach of both express and implied warranties. (Compl. PP 12-17.) Matsushita has moved to dismiss these counts on the grounds that it expressly and conspicuously disclaimed liability for all warranties other than those stated in a written contract that allegedly governed the terms and conditions of sale. (Def.'s Mem. at 2-3.) Pressalite maintains that it did not receive the alleged contract, and consequently, was not aware of any warranty disclaimers. (Pl.'s Resp. at 3-4.)

A. Sufficiency of Pressalite's Claims

a. Count I: Breach of Express Warranty

Pressalite alleges that when Matsushita sold and delivered [*6] defective batteries to Pressalite it breached a prior express warranty that the batteries would be high quality, free from defects, and subject to strict quality control. (Compl. PP 6, 12.) Under the Illinois Uniform Commercial Code ("IUCC"), "any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." *810 ILCS § 5/2-313(1)(a).* Thus, "to state a claim for breach of express warranty, the buyer must allege that the seller made: (1) an affirmation of fact or promise made to the plaintiff; (2) relating to the goods; (3) which becomes part of the basis of the bargain; and (4) guaranteeing that the goods will conform to the affirmation or promise." *Int'l. Bd. of Teamsters Local 734 Health & Welfare Trust Fund v. Phillip Morris, Inc., 34 F. Supp. 2d 656, 664 (N.D. Ill. 1998), aff'd., 196 F.3d 818 (7th Cir. 1999).*

Pressalite's Complaint includes allegations that Matsushita made affirmations to Pressalite relating to the goods for sale. (Compl. PP 6, 12.) Pressalite also alleges that Matsushita [*7] guaranteed the goods would conform to those affirmations. (*Id.* PP 3-4, 6, 12.) Although Pressalite does not state explicitly that the affirmations became part of the "basis of the bargain," it alleges that it based its decision to continue to use Matsushita as a supplier of goods on those assurances. (*Id.* PP 3-4.) Under Illinois law, a buyer must show reliance on the seller's representations in order for those representations to form part of the basis of the bargain. *Coryell v. Lombard Lincoln-Mercury Merkur, Inc. 189 Ill. App. 3d 163, 544 N.E.2d 1154, 1158, 136 Ill. Dec. 379 (Ill. App. Ct. 1989).*

The test for whether a vendor's representation is an express warranty is "whether the vendor assumes to assert a fact of which the buyer is ignorant, or merely states an opinion or judgment on a matter of which the vendor has no special knowledge, and on which the buyer may be expected also to have an opinion and to exercise his judgment." *Weiss v. Rockwell Mfg. Co., 9 Ill. App. 3d 906, 293 N.E.2d 375 (Ill. App. Ct. 1977)*(citing *Keller v. Flynn, 346 Ill. App. 499, 105 N.E.2d 532, 536 (Ill. App. Ct. 1952)).* In the first case there [*8] is a warranty, in the second, however, there is not. *Id.* While "it is not

Case 2:07-cv-15474-PDB-RSW   Document 138   Filed 08/02/10   Page 73 of 84

Page 3

2003 U.S. Dist. LEXIS 5600, *; 50 U.C.C. Rep. Serv. 2d (Callaghan) 410

necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, . . . an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." *810 ILCS § 5/2-313(2).* Thus, "sales talk which relates only to the value of the goods or the seller's personal opinion or commendation of the goods is considered puffing and is not binding on the seller." *Redmac, Inc. v. Computerland of Peoria, 140 Ill. App. 3d 741, 489 N.E.2d 380, 382, 95 Ill. Dec. 159 (Ill. App. Ct. 1986).*

Vendors' assertions to customers that their products are of high quality and that the customers will be pleased with the products are viewed as "puffing," rather than express warranties. *See Olin Mathieson Chemical Corp. v. Moushon, 93 Ill. App. 2d 280, 235 N.E.2d 263, 264 (Ill. App. Ct. 1968)*(plaintiff's oral statements to defendant that his product was of good quality, good results would be obtained and the [*9] customer would be pleased were statements of the seller's opinion rather than an express warranty); *Royal Business Machines, Inc. v. Lorraine Corp. 633 F.2d 34, 42 (7th Cir. 1980)*(under Indiana UCC provision identical to Illinois provision, seller's descriptions of goods as being of "high quality," requiring "few repairs" and likely to produce "substantial" profits for the buyer were viewed as expressions of the seller's opinion of the goods' value and not an express warranty). Conversely, sellers' statements to a buyer that a product will be "free of defects" upon delivery and will "work for a reasonable time" can create an express warranty. *Redmac, 489 N.E.2d at 383.* Consequently, Matsushita's alleged assertions that its products were free from defects could constitute an express warranty to Pressalite under Illinois law if those assertions became part of the basis of a bargain.

Ultimately, whether an express warranty exists is a question for the trier of fact, and consequently, beyond the scope of this court's *Rule 12(b)(6)* determination. *Alan Wood Steel Co. v. Capital Equip. Enter., Inc., 39 Ill. App. 3d 48, 349 N.E.2d 627, 633 (Ill. App. Ct. 1976).* [*10] As previously mentioned, for the purposes of a motion to dismiss, this court must accept as true all well-pled factual allegations in a complaint. *Perkins, 939 F.2d at 466.*

Matsushita does not contend that Pressalite has failed to meet the pleading requirements for breach of express warranty. Although Pressalite did not attach the alleged express warranty to the complaint, the terms of an express warranty may be stated *or* attached to a complaint. *Smith v. BOC Group PLC,* 2001 U.S. Dist. LEXIS 5712, No. 00 C 7909, 2001 WL 477237 at * 6 (N.D. Ill. May 4, 2001)(Pallmeyer, J.)(holding breach of express warranty claim sufficient where alleged warranty terms

were outlined in the complaint instead of attached to it). In addition, while Pressalite does not specify whether Matsushita's assurances were written or oral, Pressalite's complaint states the terms of the alleged express warranty. (Compl. PP 6, 12.) This is sufficient to meet the liberal standard of notice pleading under the Federal Rules. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993); See Specialty Moving Systems, Inc. v. Safeguard Computer Services, Inc.,* 2002 U.S. Dist. LEXIS 18814, No. 01 C 5816, 2002 WL 31178089 (N.D. Ill. Sept. 30, 2002) [*11] (Grady, J.)("It is not necessary that plaintiff plead specific facts regarding whether the contract was written or oral"); *But see R&L Grain Co. v. Chicago Eastern Corp., 531 F. Supp. 201, 209 (N.D. Ill. 1981)*(requiring that plaintiff amend complaint in part because plaintiff failed to specify whether an alleged express warranty was written or oral). Pressalite has met the pleading requirements for breach of express warranty.

b. Count II: Breach of Implied Warranty of Merchantability

Pressalite alleges that, "by selling [to Pressalite] goods that were not fit for the ordinary purpose for which such goods are used," Matsushita breached an implied warranty of merchantability to Pressalite under the IUCC. (Compl. P 16); *810 ILCS § 5/2-314.* To state a claim for breach of implied warranty of merchantability, "plaintiffs must allege that (1) the defendant sold goods that were not merchantable at the time of sale; (2) the plaintiff suffered damages as a result of the defective goods; and (3) the plaintiff gave the defendant notice of the defect." [*12] *Industrial Hard Chrome, Ltd. v. Hetran, Inc., 64 F. Supp. 2d 741, 748 (N.D. Ill. 1999).* For goods to be considered merchantable, they must conform to a set of standards which includes being "fit for the ordinary purposes for which such goods are used." *810 ILCS § 5/2-314(2)(c).*

Pressalite alleges that Matsushita's products were defective due to a manufacturing defect. (Compl. PP 3-5, 7.) In addition, it alleges that it suffered damages as a result of the defective goods and gave Matsushita notice of the defect. (*Id.* PP 7-8.) Although Pressalite states that the goods it purchased from Matsushita were not fit for the ordinary purpose for which such goods are used, Pressalite does not identify the ordinary purpose of the products. (*Id.* § 16.) At least one court has held that in a claim for breach of implied warranty of merchantability, the plaintiff must specify what the product's ordinary purpose is in the complaint. *See Industrial Hard Chrome, 64 F. Supp. 2d at 748* (finding that plaintiff should have stated in its breach of implied warranty of merchantability claim the ordinary purpose of a series of machines purchased from defendant). However, [*13] the ordi-

Case 2:07-cv-15474-PDB-RSW   Document 138   Filed 08/02/10   Page 74 of 84

Page 4

2003 U.S. Dist. LEXIS 5600, *; 50 U.C.C. Rep. Serv. 2d (Callaghan) 410

nary purpose of Matsushita's batteries can be inferred easily from the other allegations of the Complaint, and Matsushita does not contend that Pressalite has not met the pleading requirements for breach of implied warranty of merchantability. Pressalite has sufficiently pled the elements necessary to state a claim for breach of implied warranty of merchantability.

c. Count III: Breach of Implied Warranty of Fitness for Particular Purpose

In Count III, Pressalite alleges that Matsushita breached an implied warranty of fitness for a particular purpose when it sold goods that it knew at the time of shipment did not meet Pressalite's particular purpose for which the goods were required. (Compl. P 17.) Under the IUCC, "where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified . . . an implied warranty that the goods shall be fit for such purpose." *810 ILCS § 5/2-315.* In order to state a claim for breach of implied warranty of fitness for a particular purpose, a plaintiff "must [*14] allege that (1) the seller had reason to know of the particular purpose for which the buyer required the goods; (2) the buyer relied on the seller's skill and judgment to select suitable goods; and (3) the seller knew of the buyer's reliance on its skill and judgment." *Industrial Hard Chrome, 64 F. Supp. 2d at 746.*

Pressalite alleges in its Complaint that Matsushita promised to manufacture high quality batteries suitable as components in two models of Pressalite's flashlights, and Matsushita knew at the time of shipment that its products did not meet the particular purpose for which the goods were required. (Compl. PP 6, 17.) In addition, Pressalite alleges it relied on Matsushita's assurances that the problem in its manufacturing process was resolved, and Pressalite communicated to Matsushita that it was relying on Matsushita's expertise, skill, knowledge and abilities to produce superior quality products suitable as components for Pressalite's flashlights. (*Id.* PP 3-4, 17.) Thus, Pressalite has alleged that Matsushita knew of the particular purpose for which Pressalite intended to use its products, Pressalite relied on Matsushita's skill and judgment to produce [*15] suitable goods, and Matsushita was aware of this reliance. Therefore, Pressalite has sufficiently stated a claim for breach of implied warranty of fitness for particular purpose.

B. Matsushita's Position That the Warranties Were Disclaimed

Matsushita argues that it had a written contract with Pressalite that disclaimed all warranties but those in the contract and established a limit on the time during which a claim for breach of the contract's warranty might be brought. (Def.'s Mem. at 6, 10.) This allegedly took the form of invoices and order acknowledgments sent to Pressalite with each order. (Def.'s Mot., Ex. 2-3.) Pressalite maintains it never received these invoices or orders of acknowledgment, and consequently, had no knowledge of any warranty disclaimers. (Pl.'s Resp. at 3.)

Matsushita asks that, in determining the sufficiency of Pressalite's Complaint, the court rely on exhibits consisting of copies of the alleged warranty disclaimers. (Def.'s Am. Mem. at 5.) It argues that those documents contradict allegations in the Complaint, and thereby trump the allegations. (*Id.* at 4-5.) However, Matsushita's exhibits constitute "matters outside the pleading," and pursuant [*16] to *Rule 12,* the court must either exclude the documents from its deliberations, or treat the motion "as one for summary judgment" and give all parties "reasonable opportunity to present all material made pertinent to such a motion by *Rule 56.*" *Fed. R. Civ. P. 12(c).*

As a general rule, "documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim. Such documents may be considered by a district court in ruling on the motion to dismiss." *Rosenblum v. Travelbyus.com, Ltd., 299 F.3d 657, 661 (7th Cir. 2002)* (quoting *Wright v. Associated Ins. Cos., 29 F.3d 1244, 1248 (7th Cir. 1994)).* Matsushita incorrectly asserts that its documents meet this standard. (Def.'s Am. Mem. at 5.) In *Rosenblum,* an individual plaintiff sued the company to whom he had sold his former business, claiming breach of contract and fraud. *299 F.3d at 659.* Although the contractual provisions attached by exhibit to defendant's motion to dismiss differed from those included in the complaint, the court allowed their inclusion because the two agreements were clearly interrelated [*17] and "explicitly part of the 'entire agreement.'" *Id. at 661.* In the instant case, Matsushita's exhibits do not constitute part of any agreement referred to or offered up by Pressalite. Rather, Pressalite claims to have no knowledge of the alleged contractual provisions upon which Matsushita relies.

In *Kaczmarek v. Microsoft Corp., 39 F. Supp. 2d 974, 975 (N.D. Ill. 1999),* also cited by Matsushita, the court agreed to consider as part of its *Rule 12(b)(6)* determination warranties attached to the defendant's motion to dismiss, because the plaintiff had specifically referred to the warranties her complaint. Conversely, Pressalite does not refer to the invoices and order acknowledgments appended to Matsushita's motion to dismiss at any point in the complaint. Indeed, Pressalite specifically denies ever having received them. (Pl.'s Resp. at 3.)

Case 2:07-cv-15474-PDB-RSW   Document 138   Filed 08/02/10   Page 75 of 84

Page 5

2003 U.S. Dist. LEXIS 5600, *; 50 U.C.C. Rep. Serv. 2d (Callaghan) 410

In view of the factual dispute between the parties as to whether the documents relied upon formed any part of the contract between them, those documents cannot be considered on a motion to dismiss. Further discovery is required regarding the factual dispute. Thus, the motion to dismiss will not be converted into [*18] a summary judgment motion. Because Pressalite has sufficiently stated a claim upon which relief can be granted in Counts I-III, Matsushita's motion to dismiss those three counts is denied.

## II. Count IV: Common Law Fraud

Matsushita has moved to dismiss Count IV on the grounds that Pressalite has failed to state its claim with particularity as required by *Fed. R. Civ. P. 9(b)*, and that the claim is duplicative of Matsushita's claim for breach of warranty. Pressalite has failed to state its fraud claim with particularity as required by *Fed. R. Civ. P. 9(b)*, and thus Count IV will be dismissed without prejudice and with leave to replead.

Pressalite's fraud claim is not a duplicate of its warranty claim. The parties dispute whether this issue is governed by the law of Illinois or New York. (Pl.'s Resp. at 5; Def.'s Am. Mem. at 5.) Fortunately, it is not necessary to resolve this issue as the same result applies in either case. *See e.g. In re Air Crash Disaster, 526 F. Supp. 226, 228 (N.D. Ill. 1981)*(no need to determine whether state or federal law govern if application of either leads to the same result).

Pressalite's claim is not a duplicate under Illinois [*19] law. Although it is clear that a mere breach of contract cannot be the premise of a fraud claim, that is not a fair description of Pressalite's Complaint. *See Continental Grain Co. v. Pullman Standard, Inc. 690 F. Supp. 628, 634 (N.D. Il. 1988)*(applying Illinois law). Pressalite alleges that after Matsushita became aware of the second defect in its product it failed to disclose this defect and continued to ship defective batteries to Pressalite. (Compl. P 7.) Pressalite also alleges that Matsushita failed to remedy the first defect or remove these batteries from distribution as promised and instead continued to ship defective batteries to Matsushita. (*Id.* PP 7, 19, 21.) This factual situation is similar to that addressed in *AMPAT/Midwest, Inc. v. Illinois Tool Works Inc., 896 F.2d 1035 (7th Cir. 1990)*. In this case the defendant had produced faulty screws. *Id. at 1038*. After the plaintiff discovered the fault, the defendant agreed to ship new screws. *Id. at 1039*. Prior to shipping defendant tested the new screws and discovered that twenty-six out of the thirty tested were defective but shipped them anyway, without [*20] informing the plaintiff. Plaintiff eventually sued for breach of warranty and fraud. *Id. at 1040*. In upholding the findings of breach of warranty and fraud, the court explained, "A seller who has reason to

know that the failure of his product to perform in the manner warranted is due to a defect in the product [cannot] keep silent . . . Such a seller commits fraud." *Id. at 1041*. Here, Pressalite does not allege fraud based on the Matsushita's "alleged *contractual* obligation," as in *General Electric Railcar Leasing Services Corp. v. Carlson Marketing Group.*, 1992 U.S. Dist. LEXIS 5210, No. 91 C 5345, 1992 WL 70319 at *2 (N.D. Ill. Mar. 31, 1992)(Conlon, J.)(emphasis in original). Rather, it alleges an entirely separate fraud arising from Matsushita's alleged intentional concealment of defects. (Compl. PP 19-25.) As a result, Pressalite's claim is not duplicative.

New York law, like Illinois law, provides that, "[a] cause of action to recover damages will not lie when the only fraud alleged relates to a breach of contract." *Morgan v. A.O. Smith Corp., 265 A.D.2d 536, 697 N.Y.S. 2d 152, 152 (N.Y. App. Div. 1999)*. However, "where, as here, [*21] [plaintiff's] allegation of intentional fraud, though parallel in many respects to the breach of contract claim include[s] claims of fraudulent misrepresentations" outside of the contract then the fraud claim can be maintained separate from the contract claim. *Gizzi v. Hall, 300 A.D.2d 879, 754 N.Y.S. 2d. 373, 375 (N.Y. App. Div. 2002)*(internal citations omitted).

*Fed. R. Civ. P. 9(b)* states that "In all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity." Under the Rule, the plaintiff must provide "the who, what, when, where, and how: the first paragraph of any news story." *DiLeo v. Ernst and Young, 901 F.2d 624, 627 (7th Cir. 1990)*. Within this framework the plaintiff must plead with a level of specificity consistent with the rest of the Federal Rules and the purposes of *Rule 9*. In *Reshal Associates Inc. v. Long Grove Trading Co.* the court observed that

> *Rule 9(b)* must also be read in conjunction with [*Federal Rule of Civil Procedure*] 8, which requires a plaintiff "to make known his claims simply and concisely in short, plain statements." Furthermore, *Rule 9(b)* must not be applied blindly, but [*22] rather must be applied in view of its purposes, which are (1) to inform the defendants of the nature of the claimed wrong and enable them to formulate an effective response and defense; (2) to eliminate the filing of a conclusory complaint as a pretext for using discovery to uncover wrongs; and (3) to protect defendants from unfounded charges of fraud which may injure their reputations.

Case 2:07-cv-15474-PDB-RSW Document 138 Filed 08/02/10 Page 76 of 84

Page 6

2003 U.S. Dist. LEXIS 5600, *; 50 U.C.C. Rep. Serv. 2d (Callaghan) 410

*754 F. Supp. 1226, 1230 (N.D. Ill. 1990)*(internal quotations omitted).

With regard to the 'who' requirement, a plaintiff provides proper *Rule 9(b)* notice by identifying the individuals making the alleged misrepresentations as employees of the defendant. *Heller Brothers Bedding, Inc. v. Leggett & Platt, Inc.*, 2001 U.S. Dist. LEXIS 25152, No. 01 C 3409, 2001 WL 740514 at * 3 (N.D. Ill. June 28, 2001)(Conlon, J.). Pressalite meets this requirement, alleging that the relevant misrepresentations were made by "Matsushita," (Compl. PP 4, 6-7, 18, 20-21), or "Matsushita's representatives." (*Id.* P 19.)

To properly plead the "what" element, a plaintiff must identify the "specific content" of the alleged misrepresentations. *Graue Mill Development Corp. v. Colonial Bank & Trust Co. of Chicago, 927 F.2d 988, 993 (7th Cir. 1991)* [*23] (quoting *Moore v. Kayport Package Express, 885 F.2d 531, 540 (9th Cir. 1989)*). A plaintiff need not, however, provide "evidentiary details" but need only plead a "basic outline of the scheme." *Caliber Partners, Ltd. v. Affeld, 583 F. Supp. 1308, 1311 (N.D. Ill. 1984); see also Reshal, 754 F. Supp at 1231* ("Plaintiffs have provided several concrete examples . . . and one reason for the lack of further specificity may be a desire to avoid overwhelming the complaint with impenetrable and complex details that could be more easily shared during discovery"). Pressalite meets this requirement by stating, for example that "Matsushita's representatives intentionally misrepresented to Pressalite that 'most' of the defectively [*sic*] n-sized batteries had been removed from distribution and also misrepresented that it had remedied the defects." (Compl. P 19; *see also* PP 4, 6-7, 18, 20-21.) This is sufficient to provide an outline of the allegedly fraudulent scheme.

In *Sequal Capital Corp., v. Airship International Ltd., 148 F.R.D. 217, 219-220 (N.D. Ill. 1993)*, the court held that failure to allege the location of allegedly [*24] fraudulent communications, in conjunction with failure to allege the manner in which the statements were communicated, warranted dismissal under *Rule 9(b)*. In contrast, in *Towers Financial Corp. v. Solomon, 126 F.R.D. 531, 535-536 (N.D. Ill. 1989)*, the court stated that "the specificity requirements of *Rule 9* are imposed to ensure that the defendants are appraised of the claimed fraud in a manner sufficient to permit adequate responsive pleadings" and failure to plead the location of a fraud does not automatically render a complaint insufficient under *Rule 9(b)*. Here, Pressalite's Complaint alleges that all communications between the parties, as well as the alleged intentional concealment, took place in Illinois, where Pressalite is located. (Compl. PP 27, 30.) This is sufficient, when read with the rest of the Complaint, to allow Matsushita to formulate an effective response.

Pressalite's present Complaint provides insufficient information to meet the "when" and "how" requirements. To plead the "when" requirement properly, a plaintiff need not identify the precise time at which an alleged misrepresentation was made but may provide a "general time." *Caliber Partners, Ltd. v. Affeld, 583 F. Supp. 1308, 1311.* [*25] In *Caliber,* the time frame was "spring 1981." *Id. at 1310.* In *Shields on behalf of Sundstrand Corp. v. Erickson, 710 F. Supp. 686, 689 (N.D. Ill. 1989),* the court allowed a four year period based in part on the significant number of transactions and the extended period of time over which they had taken place. *See also Heller Brothers,* 2001 U.S. Dist. LEXIS 25152, 2001 WL 740514 at * 3 (plaintiff provides proper *Rule 9(b)* notice by identifying the "general time frame" in which the alleged misrepresentations were made). Pressalite fails to meet the "when" requirement as to all of the alleged fraudulent acts. A relatively short time frame for most of the fraudulent acts is identified. (Compl. PP 4, 7, 19, 20-22.) However, the time frame alleged for the statements that Matsushita "would manufacture (a) high quality batteries suitable as a component in the Model 110 and Model 220 flashlights, and (b) products that were free [from] defects and subject to strict quality control" is alleged to be "prior to and during the course of Pressalite's development and sale of its flashlights." (*Id.* P 6.) That does not comply with *Rule 9(b)*. Matsushita cannot be assumed to know during what period Pressalite was [*26] developing its flashlights.

To meet the "how" requirement Pressalite need not plead in significant detail, but some information must be provided. *See Sequal Capital, 148 F.R.D. at 219-220.* In *Cortes v. Gratkowski, 1990 U.S. Dist. LEXIS 17712, 1991 WL 632 at * 4 (N.D. Ill. Jan. 3, 1991)*(Holderman, J.), the court found that an allegation that defendant made "various oral and written untrue statements" was sufficient under *Rule 9(b)*, given the inferences that could be drawn from other parts of the complaint in that case. Pressalite's Complaint alleges that Matsushita's representatives intentionally misrepresented the quality of its batteries and concealed the existence of a known manufacturing defect. (*E.g.* Compl. PP 3-7.) However, Pressalite has failed to plead even the form, oral or written, in which the allegedly fraudulent statements were made. In oral argument to this court on the motion to dismiss, Pressalite stated that the alleged misrepresentations were both oral and written in various brochures. Pressalite's Complaint fails to provide sufficient information to allow the Matsushita to identify which allegedly fraudulent statements come from brochures and which are statements [*27] of its employees.

When an unamended complaint fails to comply with *Rule 9(b)*, dismissal of the complaint with leave to refile is the appropriate remedy. *See Fed. R. Civ. P.*

Case 2:07-cv-15474-PDB-RSW   Document 138   Filed 08/02/10   Page 77 of 84

Page 7

2003 U.S. Dist. LEXIS 5600, *; 50 U.C.C. Rep. Serv. 2d (Callaghan) 410

*15(a)*(leave to amend shall be freely given when justice requires); James W. Moore *et. al., Moore's Federal Practice--Civil* vol. 2 § 9.03(1)(g)(4)(2002)("The pleader usually will be permitted or have the right to amend to bring the pleading into compliance with the requirements of *Rule 9(b)*"); *Robinson v. Midlane Club, Inc.*, 1995 U.S. Dist. LEXIS 10729, No. 94 C 1459, 1995 WL 453057 at * 7 (N.D. Ill. July 28, 1995)(Marovich, J.)(allegation of fraud that was "far too vague and conclusory" dismissed under *Rule 9(b)* after plaintiff was offered four opportunities to plead in compliance with the rule). Thus, Count IV is dismissed without prejudice, and Pressalite is granted leave to file an amended complaint, amending only Count IV to comply with the requirements of *Rule 9(b)*.

III. Count V: Statutory Fraud

Matsushita has moved to dismiss Count V on the grounds that Pressalite fails to state a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act (the "Act"), fails to state its statutory [*28] fraud claim with particularity, and Pressalite's fraud claim duplicates its warranty claim. Matsushita's motion is granted because Pressalite fails to state a claim under the Act.

Pressalite argues that Matsushita does not meet the Act's definition of "consumer" and has failed to plead the necessary consumer nexus. A business may have standing under the Act in some circumstances. *Lake County Grading Co. v. Advance Mechanical Contractors*, 275 Ill. App. 3d 452, 654 N.E.2d 1109, 1114, 211 Ill. Dec. 299 (Ill. App. Ct. 1995)("Plaintiff is correct in noting that the protections of the Act are not limited only to consumers.") However, Pressalite has failed to plead the necessary nexus to consumer protection concerns.

The fact that Pressalite purchased component parts from Matsushita does not render it a consumer under the Act. *815 ILCS § 505/1(e)*(consumer defined as "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household"); *Stepan Co. v. Winter Panel Corp. 948 F. Supp. 802, 807 (N.D. Ill. 1996)* [*29] (company that purchased component incorporated into product later resold to consumers found not to be a consumer).

In the case when "a dispute involves two businesses that are not consumers, the proper test is 'whether the alleged conduct involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns.'" *Lake County*, 654 N.E.2d at 1115 quoting *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 190 Ill. App. 3d 524, 546 N.E.2d 33, 41, 137 Ill. Dec. 409 (Ill. App. Ct. 1989); *Athey*

*Products Corp. v. Harris Bank Roselle, 89 F.3d 430, 436-437 (7th Cir. 1996)*. While the Act was amended subsequent to *Downers Grove*, "post amendment case law has continued to recognize that the Act does not apply to every commercial transaction regardless of the relationship between the parties." *Id.*

Pressalite acknowledges that "there must be some nexus between the complaint of conduct and consumer protection concerns." (Pl.'s Resp. at 7.) Pressalite states that because it sold 514,500 flashlights, of which 23,170 were returned as defective, "clearly the flashlights were placed into the stream [*30] of commerce and affected consumers." (*Id.* at 7-8.) However, that argument has been rejected. "Courts have consistently resisted attempts by plaintiffs to portray otherwise ordinary breach of contract claims as causes of action under the Illinois Consumer Fraud Act." *188 LIC v. Trinity Indus.*, 2001 U.S. Dist. LEXIS 6285, 2001 WL 506891 at * 2. While "almost every product or service sold by one commercial party to another will ultimately affect a consumer . . . the act does not apply to all commercial transactions." 2001 U.S. Dist. LEXIS 6285, [WL] at * 3. Thus "to state a cause of action under the Act, something more must be alleged than a mere effect on consumers." *Id.; See Williams Electronic Games Inc. v. Barry*, 2001 U.S. Dist. LEXIS 16412, No. 97 C 3743, 2001 WL 1104619 at * 10 (N.D. Ill. Sept. 18, 2001)(Gettleman, J.)("The mere fact that plaintiff's product may ultimately be sold to a consumer is too attenuated."); *See Simon v. Oltmann*, 2001 U.S. Dist. LEXIS 13924, No. 98 C 1759, 2001 WL 1035719 at * 8 (N.D. Ill. Aug. 21, 2001)(Leinenweber, J.)("Courts have struggled to define the scope of . . . [consumer protection concerns] but it generally involves sharp practices designed to mislead consumers about a competitor . . . or public health, safety or welfare issues. [*31]  "). Pressalite fails to identify a nexus other than the ultimate sale of its flashlights to consumers and thus fails to state a claim under the Act.

At oral argument on the motion to dismiss, Pressalite's counsel was asked whether, if given leave to replead, there were any additional facts that Pressalite could allege to support a consumer nexus. Pressalite's counsel answered, consistent with his responsibility as an officer of the court, that there were no additional facts that could be alleged. Thus, Count V is dismissed without leave to amend.

CONCLUSION

For the above reasons Matsushita's motion is GRANTED IN PART and DENIED IN PART. The motion is denied as to Counts I, II and III. The motion is granted with regard to Count V, which is dismissed with prejudice. The motion is granted with regard to Count IV, and Count IV is dismissed without prejudice. Pres-

2003 U.S. Dist. LEXIS 5600, *; 50 U.C.C. Rep. Serv. 2d (Callaghan) 410

salite is given leave to file on or before April 30, 2003, an Amended Complaint revising the allegations of Count IV to state that Count with the particularity required by *Rule 9(b)*.

IT IS SO ORDERED.

GERALDINE SOAT BROWN

United States Magistrate Judge

DATED: April 3, 2003

TAB L



LEXSEE 1989 U.S. DIST. LEXIS 16231

**NELLIE VANDEGIESSEN and FREDERICK VANDEGIESSEN, Plaintiffs, v.
FIRST OF MICHIGAN CORPORATION and MONTE MONGREIG, Defendants**

**File No. K86-276A CA**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
MICHIGAN, SOUTHERN DIVISION**

*1989 U.S. Dist. LEXIS 16231*; *Fed. Sec. L. Rep. (CCH) P94,772*

**January 19, 1989, Decided and Filed**

**OPINION BY:** [*1] GIBSON

**OPINION**

*OPINION*

BENJAMIN F. GIBSON, UNITED STATES DIS-
TRICT JUDGE

Plaintiffs Nellie and Frederick VandeGiessen (the
"VandeGiessens") filed the present action alleging secu-
rities fraud in connection with investments purchased
through defendants First of Michigan Corporation and
Monte Mongreig. Plaintiffs allege that defendants sold
speculative and inappropriate securities for their retire-
ment portfolios by means of deceptive, fraudulent, and
untrue representations. Plaintiffs filed this four-count
action alleging violations of Section 10(b) of the Securi-
ties Exchange Act of 1934, *15 U.S.C. § 78j(b)*, and Secu-
rities and Exchange Commission *Rule 10b-5, 17 C.F.R. §
240.10b-5* (Count I), violations of the Racketeer Influ-
enced and Corrupt Organization Act (RICO), *18 U.S.C.
§§ 1961 et seq.* (Count II), common-law fraud (Count
III), and violation of the Michigan Consumer Protection
Act, *M.C.L.A. §§ 445.901 et seq.* (Count IV). Presently
pending before the Court are defendants' motions for
summary judgment pursuant to *Federal Rule of Civil
Procedure 56*. For the reasons stated below, defendants'
motions are granted in part and denied in part.

*FACTS*

Plaintiffs Nellie and Frederick [*2] [1] VandeGiessen
established and maintained accounts with First of Michi-
gan which were handled by former First of Michigan

sales representative Monte Mongreig. The VandeGies-
sens developed investment objectives, with the aid of
defendants, to provide for their financial security as re-
tired persons. The vandeGiessens allege that defendants
knew their investment objectives and financial circum-
stances when advising, persuading, and recommending
the purchase of various income funds of oil and gas, real
estate, government securities and government bonds,
including Damson Oil. These investments were to pro-
vide the VandeGiessens security of principal, tax-free
yield, and immediate liquidity without penalty. The
VandeGiessens further allege that as retired and unso-
phisticated investors with modest estates and fixed in-
comes, they acted in justifiable reliance on the alleged
misrepresentations. The VandeGiessens invested much
of their life savings in the allegedly unsuitable securities
recommended by defendants, resulting in financial loss
when the securities declined in value.

1   Nellie VandeGiessen is acting on behalf of
Frederick VandeGiessen as spouse, next friend,
and pursuant to a power of attorney. Frederick
suffers from Alzheimer's Disease, thus no longer
has understanding nor interest in his financial
situation.

[*3]   Defendants First of Michigan and Monte
Mongreig argue that the VandeGiessens made their in-
vestments with knowledge and a full explanation of the
various investments. Evidence shows that Mrs.
VandeGiessen was provided with a prospectus at the
time she made her first investment, which she admittedly
read. Defendants further argue that they did not engage
in fraudulent conduct; the investments were considered a
safe, conservative, income producing long-term invest-

1989 U.S. Dist. LEXIS 16231, *; Fed. Sec. L. Rep. (CCH) P94,772

ment at the time of the purchase, although there was no guaranteed rate of return. Defendants conclude that they are not liable for the decline in the securities which corresponded with declining oil and gas prices.

## STANDARD FOR REVIEW

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *Atlas Concrete Pipe, Inc. v. Roger J. Au & Son, Inc., 668 F.2d 905, 908 (6th Cir. 1982)*. There is no material issue of fact for trial unless, by viewing the evidence in favor of the non-moving party, a reasonable jury could return a verdict for that party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249* [*4] *(1986)*; *Boddy v. Dean, 821 F.2d 346, 349 (6th Cir. 1987)*. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson, 477 U.S. at 249* (citations omitted).

The party moving for summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which demonstrate the absence of a material issue of fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)*; *Potters Medical Center v. City Hospital Association, 800 F.2d 568, 572 (6th Cir. 1986)*. Once the moving party has met its burden, the non-moving party must go beyond the pleadings and come forward with specific facts to show that there is a genuine issue for trial. *Fed. R. Civ. P. 56(e)*; *Celotex, 477 U.S. at 322-24*. If after adequate discovery the party bearing the burden of proof fails to make a showing sufficient to establish an essential element of his claim, summary judgment is appropriate. *Id.*

## SECURITIES FRAUD

In order to state a claim under Section 10(b) and *Rule 10b-5*, plaintiffs must allege that defendants implemented a deceptive or manipulative practice in connection [*5] with the purchase or sale of a security thereby causing damages. *See Mansbach v. Prescott, Ball & Turben, 598 F.2d 1017, 1026 (6th Cir. 1979)*. Liability may arise under Section 10 and *Rule 10b-5* for knowing or intentional misconduct, *Ernst & Ernst v. Hochfelder, 425 U.S. 185, 215 (1976)*, as well as for reckless conduct. *Mansbach, 598 F.2d at 1023*. Recklessness is defined as highly unreasonable conduct constituting an extreme departure from standards of ordinary care. *Ohio Drill & Tool Co. v. Johnson, 625 F.2d 738, 741 (6th Cir. 1980)*. Mere mismanagement or inaccurate predictions is not sufficient. *Auslender v. Energy Management Corp., 832 F.2d 354, 356 (6th Cir. 1987)*.

Whether conduct is reckless is a question of fact. The Court concludes that evidence at trial may show that Mrs. VandeGiessen has limited financial knowledge and may not have been able to understand the mechanics of sophisticated, speculative investments. Therefore, a jury could reasonably conclude that a failure to apprise the VandeGiessens of the allegedly risky nature of the transaction constituted reckless conduct. Upon review of the evidence in the record, the Court is not able to determine [*6] as a matter of law that defendants' alleged misrepresentations were not made recklessly. This issue requires further development of the facts.

In addition, whether plaintiffs' reliance on defendants' alleged misrepresentations was unreasonable is also a question of fact. Defendants argue that the VandeGiessens had knowledge of the investments, were given a prospectus, and had an opportunity to sell. However, the VandeGiessens contend that the prospectus was not given until the time of their initial investment and that Mrs. VandeGiessen was told by Mongreig that there was no need to read it. Further, the VandeGiessens contend that even after the investments took an initial decline in value, they were encouraged to retain the securities by defendant Mongreig when they had the opportunity to sell.

At trial plaintiffs must show that defendants made material misrepresentations or nondisclosures to the VandeGiessens in connection with the purchase or sale of a security, that they were made either recklessly or with the intention of defrauding the VandeGiessens, that the VandeGiessens relied on such misrepresentations, and that they were thereby injured. Although the VandeGiessens may have [*7] difficulty proving one or more of the elements of their case, they have sufficiently alleged their cause of action and are entitled to the opportunity to present it to a jury. Accordingly, the Court must deny summary judgment on this count.

## COMMON LAW FRAUD

The elements required to prove fraudulent misrepresentation are similar to those required in an action for securities fraud under Section 10 and *Rule 10b-5*. *See Mansbach v. Prescott, Ball & Turben, 598 F.2d 1017, 1024 (6th Cir. 1979)*. Michigan law requires plaintiff to prove:

(1) That defendant made a material misrepresentation; (2) that it was false; (3) that when [defendant] made it he knew it was false, or he made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that [defendant] made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that [plaintiff] thereby suffered injury.

*Hi-Way Motor Co. v. International Harvester Co., 398 Mich. 330, 336 (1976)*. Further, the plaintiff has the bur-

Case 2:07-cv-15474-PDB-RSW   Document 138   Filed 08/02/10   Page 82 of 84

Page 3

1989 U.S. Dist. LEXIS 16231, *; Fed. Sec. L. Rep. (CCH) P94,772

den of proving each element of fraud by satisfactory and convincing evidence. *Id.*

Based on the factual issues which remain regarding [*8] the representations made, whether they were made with a fraudulent intent or recklessly, and whether plaintiffs' reliance was reasonable, the Court must deny defendants' motion for summary judgment on this count.

*MICHIGAN CONSUMER PROTECTION ACT*

Michigan law construes the Michigan Consumer Protection Act with reference to common-law fraud, although in fact its scope is broader than common-law fraud. *See Mayhall v. A. H. Pond Co., 129 Mich. App. 178, 182-83 (1983).* The Court concludes that for the same reasons given above, factual issues remain which preclude judgment as a matter of law. Accordingly, defendants' motion for summary judgment on this count is also denied.

*RICO*

Plaintiffs' complaint alleges that defendants injured plaintiffs by investing in and operating a RICO enterprise in violation of Title *18 United States Code Sections 1962(a)* and *1962(c). Section 1962(a)* provides in pertinent part:

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, . . . in acquisition of any interest in, or the establishment or [*9] operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

*Section 1962(c)* provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

In order to establish a violation of *Section 1962(a)*, plaintiffs must prove that the defendants received income from a pattern of racketeering activity, then used such income to invest in or operate an enterprise. A civil action under *Section 1962(c)* requires conduct of an enterprise through a pattern of racketeering activity which has caused injury to the plaintiff. *Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985).*

Plaintiffs allege that the enterprise, First of Michigan, acting through its senior vice president, Vernon Dean Holley, and its sales representative, defendant Monte Mongreig, sold inappropriate and unsuitable secu-

rities to at least three retired couples in separate transactions by means of [*10] fraudulent misrepresentations made in person, over the telephone, and in writing through the mails. Plaintiffs further claim that First of Michigan knowingly participated in such activities by facilitating Mongreig's conduct and accepting the profits made.

Defendants have made numerous attacks on the maintenance of an action under both *Section 1962(a)* and *Section 1962(c).* First, defendants argue that First of Michigan should be dismissed because there cannot be an identity of the enterprise and the defendant under RICO. Plaintiffs allege that the enterprise consisted of First of Michigan and that Monte Mongreig is the person who engaged in the unlawful conduct. Under the language of *Section 1962(c)* only the person "employed by or associated with" the enterprise is liable. Therefore, the enterprise cannot be liable since an enterprise cannot be employed by or associated with itself. *See D & S Auto Parts, Inc. v. Schwartz, 838 F.2d 964, 967* (7th Cir.), *cert. denied, 108 S. Ct. 2833 (1988); United States v. Computer Sciences Corp., 689 F.2d 1181, 1190 (4th Cir. 1982), cert. denied, 459 U.S. 1105 (1983); Robinson v. Kidder, Peabody & Co., 674 F. Supp. 243, 247 (E.D.* [*11] *Mich. 1987).* Accordingly, defendant First of Michigan must be dismissed from this action under *Section 1962(c).*

However, the enterprise as well as the individual may be liable under *Section 1962(a)* when the enterprise is also the perpetrator of the racketeering. *See, e.g., Masi v. Ford City Bank & Trust Co., 779 F.2d 397, 401 (7th Cir. 1985).* Therefore, First of Michigan may be liable under *Section 1962(a)* if it has received income directly or indirectly from a pattern of racketeering activity in which it has participated and if it has then used such income in the enterprise.

The issue in this case is whether First of Michigan "participated" in the alleged racketeering activity. The courts that have addressed the issue have generally stated that vicarious liability is inconsistent with RICO. *See, e.g., D & S Auto Parts, Inc., 838 F.2d at 967.* Therefore, liability only attaches if the enterprise took an active role in perpetrating the wrongdoing and was not merely the passive conduit for the wrongdoing of others. *See id.*

Plaintiffs have attempted to impute the actions of Mongreig, a lower-level sales representative, or Holley, a senior vice president, to First of Michigan [*12] in order to establish liability against First of Michigan. However, neither the acts of Mongreig nor Holley can be attributed to First of Michigan for purposes of RICO liability since neither is a policymaker for the company. *See* affidavit of John Martin, President, Chief Executive Officer, and Compliance Officer of First of Michigan Corporation, at

2. Further, there is no evidence that a policy-making officer participated in, had knowledge of, influenced, or controlled any wrongdoing. Accordingly, since First of Michigan has not been an active participant in the alleged misconduct of its employees, it must also be dismissed from liability under *Section 1962(a)*. [2]

> 2   Defendants have also argued that plaintiffs have not alleged RICO violations with sufficient particularity as to defendant First of Michigan. Since the Court has dismissed First of Michigan from these claims, the Court does not need to address this argument.

Next, defendants argue that plaintiffs have failed to show that defendants have invested money in an enterprise as required under *Section 1962(a)*. Plaintiffs, relying on *Snider v. Lone Star Art Trading Co., 659 F. Supp. 1249 (E.D. Mich. 1987)*, argue that [*13] retention of profits by a culpable enterprise is sufficient under *Section 1962(a)* to satisfy the "investment" requirement since the money derived from the racketeering activity was thereby indirectly used to operate the enterprise. However, *Snider* is not controlling or persuasive as applied to this case. In fact, in *Snider* the court noted that the enterprise appeared to exist only for the purpose of committing the fraud and was not a separate legal entity. *Id. at 1256*. Although defendant Mongreig apparently received commissions from the investments made on behalf of the VandeGiessens, there is no evidence that he used such to "acquire an interest in or to operate" an enterprise, or that he intended to benefit First of Michigan through his allegedly wrongful activities. Accordingly,

summary judgment is also granted as to defendant Mongreig under *Section 1962(a)*.

Finally, defendants argue that plaintiffs have not met RICO's pattern requirement. Plaintiffs allege that defendants engaged in a pattern of securities fraud through transactions with at least three couples. A pattern of racketeering activity consists of "at least two acts of racketeering activity." *18 U.S.C. §* [*14] *1961(5)*. The Court concludes that plaintiffs' allegations meet the pattern requirement because they allege predicate acts occurring in completely separate and independent transactions, not merely separate acts in furtherance of the same transaction. *See McIntyre's Mini Computer Sales Group, Inc. v. Creative Synergy Corp., 644 F. Supp. 580, 584 (E.D. Mich. 1986)*. Therefore, the motion for summary judgment as to defendant Mongreig under *Section 1962(c)* is denied.

*CONCLUSION*

In conclusion, for the reasons stated, defendants First of Michigan and Monte Mongreig's motions for summary judgment are granted in part and denied in part. The motion for summary judgment as to Counts I, III, and IV is denied. The motion for summary judgment as to Count II is granted as to defendant First of Michigan, granted as to defendant Mongreig under *Section 1962(a)*, but is denied as to defendant Mongreig under *Section 1962(c)*.

DATED: January 19, 1989

## CERTIFICATE OF SERVICE

LANCE A. RAPHAEL certifies that he is an attorney with the Consumer Advocacy Center, P.C., one of Plaintiffs' attorneys, and that on August 2, 2010, he served a copy of ***Plaintiffs' Opposition to Defendant ABC Appliance, Inc.'s Motion to Dismiss the Third Amended Complaint*** and ***Appendix of Unpublished Authorities in Support of Plaintiffs' Opposition to Defendant ABC Appliance, Inc.'s Motion to Dismiss*** electronically pursuant to the court service of notice.

/s/ Lance A. Raphael
Lance A. Raphael
lance@caclawyers.com
One of Plaintiffs' Attorneys
180 W. Washington, Suite 700
Chicago, Illinois  60602
(312) 782-5808

DATED: August 2, 2010