UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID DATE, JR. and ELLIOT
HANDLER, Individually and On Behalf of All
Others Similarly Situated,

        Plaintiffs,

vs.

SONY ELECTRONICS, INC. and ABC
APPLIANCE, INC., d/b/a ABC
WAREHOUSE,

        Defendants.

Case No. 07-CV-15474

Honorable Paul D. Borman
Magistrate Judge R. Steven Whalen

---

**APPENDIX OF UNPUBLISHED AUTHORITIES
IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
<u>AGAINST DEFENDANT SONY ELECTRONICS, INC.</u>**

## UNPUBLISHED AUTHORITIES

**CASES**                                                                    **TAB**

*Aramburu v. Healthcare Financial Services,*
No. 02-CV-6535, 2005 U.S. Dist. LEXIS 42257 (E.D.N.Y. Apr. 18, 2005) ............................ A

*Cannon v. Nationwide Acceptance Corp.,*
No. 96-C1136, 1997 U.S. Dist. LEXIS 3517 (N.D. Ill. March 25, 1997) ................................... B

*Carroll v. United Compucred Collections,*
No. 1-99-0152, 2002 U.S. Dist. LEXIS 25032 (M.D. Tenn. Nov. 15, 2002) ............................ C

*Colbert v. Trans Union Corp.,*
No. 93-6106, 1995 U.S. Dist. LEXIS 578 (E.D. Penn. Jan. 12, 1995) ........................................ D

*Date v. Sony Electronics, Inc.,*
No. 07-15474, 2009 U.S. Dist. LEXIS 15837 (E.D. Mich. Feb. 20, 2009) ................................ E

*Eddleman v. Jefferson County,*
1996 U.S. App. LEXIS 25298 (6th Cir. Aug. 29, 1996) ................................................................. F

*Gasperoni v. Metabolife, International Inc.,*
No. 00-71255, 2000 U.S. Dist. LEXIS 20879 (E.D. Mich. Sept. 27, 2000) ............................... G

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine Products Liability Litigation),*
Nos. 1203, 99-C20593, 2000 U.S. Dist. LEXIS 12275 (E.D. Pa. Aug. 28, 2000) ..................... H

*Menagerie Productions v. Citysearch,*
No. CV-08-4263, 2009 U.S. Dist. LEXIS 108768 (C.D. Cal.  Nov. 9, 2009) ............................. I

*Polydene, Inc. v. Kirk,*
Nos. 99-4085, 99-4153, 2000 U.S. App. LEXIS 33892 (6th Cir. Dec. 19, 2000) ....................... J

*Quintero v. Mulberry Thai Silks, Inc.,*
No. C-08-02294-MHP, 2008 U.S. Dist. LEXIS 84976 (N.D. Cal. Oct. 22, 2008) .................... K

*Rannis v. Recchia,*
No. 09-55859, 2010 U.S. App. LEXIS 10858 (9th Cir. May 27, 2010) ....................................... L

By:      /s/ Lance A. Raphael

Dani K. Liblang                    Alan Mansfield                 Lance A. Raphael
LIBLANG & ASSOCIATES   CONSUMER LAW GROUP    THE CONSUMER
346 Park Street, Suite 200      OF CALIFORNIA                ADVOCACY CENTER, P.C.

Birmingham, Michigan 48009

9466 Black Mountain Road
Suite 225
San Diego, California 92126

180 West Washington
Suite 700
Chicago, Illinois  60602

Darren T. Kaplan
CHITWOOD HARLEY
HARNES LLP
1230 Peachtree Street, NE,
Suite 2300
Atlanta, GA 30309

Brian S. Kabateck
KABATECK BROWN
KELLNER LLP
644 South Figueroa Street
Los Angeles, CA 90071

# TAB A



LEXSEE 2005 U.S. DIST. LEXIS 42257

**ELAINA ARAMBURU, Plaintiff, -against- HEALTHCARE FINANCIAL SERVICES, Defendant.**

**02 CV 6535 (ARR)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*2005 U.S. Dist. LEXIS 42257*

**April 14, 2005, Decided**
**April 18, 2005, Filed**

**NOTICE:**    [*1]  NOT FOR PUBLICATION

**SUBSEQUENT HISTORY:** Motion granted by, Sanctions allowed by, in part, Sanctions disallowed by, in part *Armamburu v. Healthcare Fin. Servs., 2007 U.S. Dist. LEXIS 49039 (E.D.N.Y., July 6, 2007)*

**COUNSEL:** For Elaina Armamburu, on behalf of herself and all others similarly situated, Plaintiff: Lawrence Katz, Katz & Kleinman, Uniondale, NY; Abraham Kleinman, Katz & Kleinman PLLC, Uniondale, NY.

For Healthcare Financial Services, Inc, Defendant: David J. Gold, David J. Gold, P.C., New York, NY.

For Healthcare Financial Services, Inc, Counter Claimant: David J. Gold, David J. Gold, P.C., New York, NY.

**JUDGES:** Allyne R. Ross, United States District Judge.

**OPINION BY:** Allyne R. Ross

**OPINION**

*OPINION AND ORDER*

ROSS, United States District Judge:

Plaintiff Elaina Aramburu ("Aramburu" or "plaintiff") has brought suit against Healthcare Financial Services, Incorporation ("Healthcare" or "defendant") alleging a violation of the Federal Debt Collection Practices Act ("FDCPA"), *15 U.S.C. § 1692 et seq.*, which prohibits debt collectors from engaging in abusive, deceptive,

and unfair practices. Plaintiff brings this suit as a putative class action on behalf of all similarly situated consumers. Plaintiff has moved for summary judgment, and defendant has cross-moved for summary judgment. Plaintiff also moves for class certification. For the reasons [*2] stated below, the court grants plaintiff's motion for summary judgment and denies defendant's cross-motion for summary judgment. The court also grants plaintiff's motion for class certification.

**BACKGROUND**

Plaintiff is a consumer who allegedly incurred a personal debt to Transcare, doing business as Metrocare, in the amount of $ 362. On November 5, 2002, Healthcare, a collection agency, sent a collection letter to Aramburu, the legality of which is disputed here. The body of the letter stated:

> PAYMENT DUE IMMEDIATELY.
>
> THIS ACCOUNT HAS BEEN ASSIGNED TO OUR OFFICE FOR COLLECTION.
>
> IF YOUR CHECK OR MONEY ORDER IS NOT RECEIVED IN THIS OFFICE WITHIN 30 DAYS WE SHALL RECOMMEND FURTHER ACTION BE TAKEN AGAINST YOU TO COLLECT THIS OUTSTANDING BALANCE.
>
> NOTE: THAT WE HAVE THE RIGHT TO REPORT THIS DEBT TO THE APPROPRIATE CREDIT BU-

Case 2:07-cv-15474-PDB-RSW   Document 166   Filed 01/03/11   Page 6 of 158

Page 2
2005 U.S. Dist. LEXIS 42257, *

REAU WHICH MIGHT HAVE A NEGATIVE IMPACT ON YOUR CREDIT RATING. MAKE YOUR CHECK OR MONEY ORDER PAYABLE TO HEALTHCARE FINANCIAL SERVICES.

Complaint Ex. A. In addition, the letter contained the following language below a dotted line:

PLEASE READ BELOW

THIS COMMUNICATION IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL [*3] BE USED FOR THAT PURPOSE.

IN COMPLIANCE WITH THE PROVISIONS OF PARAGRAPH 809 OF THE CUSTOMER CREDIT PROTECTION ACT, AMENDMENTS, YOU ARE HEREBY NOTIFIED OF THE FOLLOWING:

UNLESS YOU NOTIFY THIS OFFICE WITHIN 30 DAYS AFTER RECEIVING THIS NOTICE THAT YOU DISPUTE THE VALIDITY OF THIS DEBT OR ANY PORTION THEREOF, THIS OFFICE WILL ASSUME THIS DEBT IS VALID.

IF YOU NOTIFY THIS OFFICE IN WRITING WITHIN 30 DAYS FROM RECEIVING THIS NOTICE, THIS OFFICE WILL OBTAIN VERIFICATION OF THE DEBT OR OBTAIN A COPY OF A JUDGEMENT [sic] AND MAIL YOU A COPY OF SUCH JUDGEMENT [sic] OR VERIFICATION.

IF YOU REQUEST FROM THIS OFFICE IN WRITING, WITHIN 30 DAYS AFTER RECEIVING THIS NOTICE, THIS OFFICE WILL PROVIDE YOU WITH THE NAME AND ADDRESS OF ORIGINAL CREDITOR. IF DIFFERENT FROM THE CURRENT CREDITOR.

*Id.*

Plaintiff claims that defendant violated the FDCPA in that the validation notice required by the statute (*i.e.,* notice of the means by which to challenge the validity of the debt) is overshadowed by a contradictory statement and therefore violates 15 U.S.C. § 1962g by presenting the validation information in an unclear and ineffective manner. [*4] Accordingly, Aramburu commenced this action on December 23, 2002. Healthcare answered and counterclaimed, apparently on the basis of *15 U.S.C. § 1692k(a)(3)*, that plaintiff had initiated the action in bad faith. These cross-motions for summary judgment followed.

## DISCUSSION

### I. *Class Action Certification*

Plaintiff moves for certification of a nationwide class defined as: "all consumers who have received debt collection notices and/or letters from the defendant which are in violation of the FDCPA, as of the date of plaintiff's complaint." Complaint at 2. In order to certify a class, a litigant must meet the four requirements of *Rule 23(a) of the Federal Rules of Civil Procedure* and demonstrate that the proposed class action fits into one of the three categories described in *Rule 23(b)* of the Federal rules. *See Green v. Wolf Corp., 406 F.2d 291, 298 (2d Cir. 1968)*. Although plaintiff has the burden of proving that its proposed class is appropriate for certification, the plaintiff is not obliged to make an extensive evidentiary showing in support of its motion. *Vega v. Credit Bureau Enterprises, 2005 U.S. Dist. LEXIS 4927, No. 02 Civ. 1550 (DGT), 2005 WL 711657, *2 (E.D.N.Y. March 29, 2005)*. [*5] A court considering a motion for class certification must accept the allegations in the complaint as true and should not conduct a preliminary inquiry into the merits of the action. *Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178, 94 S. Ct. 2140, 40 L. Ed. 2d 732 (1974)*. The law in the Second Circuit favors the liberal construction of *Rule 23*, however, and courts may exercise broad discretion when they determine whether to certify a class. *Labbate-D'Alauro v. GC Servs. Ltd. Pshp., 168 F.R.D. 451, 454-55 (E.D.N.Y. 1996)*.

### A. *Requirements of Rule 23(a)*

In pertinent part, *Fed. R. Civ. P. 23(a)* provides that:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claim or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

2005 U.S. Dist. LEXIS 42257, *

*Fed. R. Civ. P. 23(a)* [*6] . Each of these requirements will be addressed in turn.

### 1. Numerosity

The numerosity requirement is satisfied when the class is large enough to make ordinary joinder of all members impractical. *Fed. R. Civ. P. 23(a)(1)*. The plaintiff is not obligated to identify the exact number of class plaintiffs, *see Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993)*, and "courts may 'make common sense assumptions' to support a finding of numerosity." *Weissman v. ABC Fin. Servs., Inc., 203 F.R.D. 81, 84 (E.D.N.Y. 2001)* (quoting *Pecere v. Empire Blue Cross and Blue Shield, 194 F.R.D. 66, 69 (E.D.N.Y. 2000))*. Nevertheless, a plaintiff seeking class certification "must show some evidence of or reasonably estimate the number of class members." *Pecere, 194 F.R.D. at 70* (internal quotation marks and citation omitted). Generally, numerosity is presumed when a class is comprised of forty members or more. *Robidoux, 987 F.2d at 936*.

Plaintiff does not allege the total number of individuals included in the proposed class, stating only that the class is composed of all consumers who [*7] received the "form letter" including the language "payment due immediately." Some courts within this circuit have refused to find the numerosity requirement to have been established where the plaintiff did little more than speculate that, because the cause of action was based on a form letter, there must be numerous similarly situated parties. *Wilner v. OSI Collection Services, Inc., 198 F.R.D. 393, 397 (S.D.N.Y. 2001); Weissman, 203 F.R.D. at 84*. The instant case is distinguishable from those cases. The court finds it appropriate to assume that the number of potential class members satisfies the numerosity requirement where, as here, the defendant used standardized forms in collecting debts and evidence in the record reflects that the potential class members number in the thousands.

Defendant contends that plaintiff has not established numerosity, arguing that the only evidence plaintiff has submitted in support of a finding of numerosity is the single collection letter she received and defendant's deposition statement that 114,779 new accounts were placed with defendant over the one and one-half year period from December 2001 until July 2003. Defendant [*8] makes a number of arguments seeking to explain that the number of collection letters containing the above-mentioned language is substantially smaller than 114,779. Defendant admits, however, that it used the form letter containing this language for a period of approximately two to four months. Defendant's Affidavit in Opposition to Plaintiff's Notice of Motion for Class Certification at 8. Defendant's deposition testimony also suggests that, during a one year period, defendant sends

out tens of thousands of collection letters. Deposition Transcript of John G. Chipko at 38-40. One can approximate, therefore, that defendant likely sent out several thousand of the form letters in question. The court notes that plaintiff is unable to estimate the class size with any greater degree of specificity in large part because defendant provided only general answers to plaintiff's interrogatories during discovery, stating that it could not determine the number of consumers to whom the letter including the "immediate payment" language was sent. In any event, based on the deposition testimony, the court concludes that it is reasonable to infer, even if the letter including the language in question [*9] were only used during a period of several months, that many individuals received the form collection letter and that joinder of all the individuals would be impracticable.

### 2. Commonality

To meet the commonality requirement, the plaintiff must demonstrate that common questions of law or fact are at the core of the cause of action. *Fed. R. Civ. P. 23(a)(2)*. "In cases like this one where FDCPA plaintiffs have received similar debt collection letters from the defendant's mailing as the basis of the lawsuit, courts have found common questions of law or fact sufficient to certify the class." *Vega, 2005 U.S. Dist. LEXIS 4927, 2005 WL 711657 at *3* (internal quotation marks and citations omitted); *Macarz v. Transworld Systems, Inc., 193 F.R.D. 46, 49 (D.Conn. 2000)* ("Courts have previously found common questions of law or fact sufficient to certify a class where FDCPA plaintiffs alleged the receipt of the same or similar collection letter as the basis of the lawsuit."). Whether the contents of the defendant's debt collection letter received by members of the prospective class violated the FDCPA is the overriding legal question in this case. This [*10] standardized conduct weighs heavily in favor of a finding of commonality. *Labbate-D'Alauro, 168 F.R.D. at 456*. The court concludes that plaintiff has satisfied this prong of *Rule 23*.

### 3. Typicality

The typicality requirement "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *In re Drexel Burnham Lambert, 960 F.2d 285, 291 (2d Cir. 1992)*. Here, plaintiff's claims arise from the same conduct that gives rise to the proposed class claim, that defendant's letter violates the FDCPA. As a result, the members of the proposed class will invoke the identical legal theory. Accordingly, the typicality requirement is met.

### 4. Fair and Adequate Protection of the Interests of the Class

Finally, to satisfy the fourth requirement of *Rule 23(a)*, plaintiff must demonstrate that "the representative parties will fairly and adequately protect the interests of the class." *Fed. R. Civ. P. 23(a)(4)*. Adequate representation is a two-pronged inquiry: "[f]irst, class counsel must be qualified, experienced and generally able [*11] to conduct the litigation. Second, the class members must not have interests that are antagonistic to one another." *Labbate-D'Alauro, 168 F.R.D. at 457* (internal quotation marks and citations omitted).

Plaintiff has met the first prong of the inquiry. Plaintiff's counsel, the firm Katz & Kleinman, P.L.L.C., are sufficiently experienced and have represented plaintiffs in class actions brought under the FDCPA. Thus, it appears that plaintiff's counsel will adequately represent the interests of the class.

Plaintiff has also met the second prong of the inquiry. Plaintiff claims that there is no conflict or antagonism between plaintiff and the potential class members. "A number of courts that have considered . . . FDCPA class actions challenging form collection letters have found named plaintiffs who received versions of the challenged collection letters to be adequate class representatives for purposes of *Rule 23(a)(4)*." *Harrison v. Great Springwaters of America, Inc., 1997 U.S. Dist. LEXIS 23267, No. 96 Civ. 5110, 1997 WL 469996, *6 (E.D.N.Y. June 18, 1997)* (citations omitted). While defendant argues that "plaintiff is not concerned with anyone other than herself in this action," speculating [*12] that plaintiff would have settled "without a thought for any other 'class members'" had defendant offered a settlement in an amount higher than the statutory damages, Defendant's Affidavit in Opposition to Plaintiff's Notice of Motion for Class Certification at 10, the court sees no reason to question plaintiff's assertions. Accordingly, the adequacy of representation requirement is met.

### B. Requirements of *Rule 23(b)(3)*

Once it is determined that a potential class satisfied the requirements of *Rule 23(a)*, the class must be certified under one of the categories set forth in *Rule 23(b)*. Plaintiff seeks to certify the class pursuant to *Rule 23(b)(3)* and therefore must demonstrate that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Fed. R. Civ. P. 23(b)(3)*. Both of these requirements are met in this case. It is clear that questions of law and fact common to the members of the class predominate over any questions affecting only members. It has been [*13] recognized in this district that "common questions of law and fact surrounding the contents and mailing of [standardized form debt collec-

tion] letters predominate over individual issues." *Labbate-D'Alauro, 168 F.R.D. at 458*. Here, the issue of defendant's liability is common to all members of the proposed class and clearly predominates. Consequently, the first prong of *Rule 23(b)(3)* is satisfied. Moreover, the class action is superior to other available methods for the fair and efficient adjudication of the controversy. "Suits brought under the FDCPA . . . regularly satisfy the superiority requirement of *Rule 23*." *In re Risk Management Alternatives, Inc., 208 F.R.D. 493, 507 (S.D.N.Y. 2002)* (citations omitted). Therefore, plaintiff has satisfied both prongs of *Rule 23(b)(3)*.

Having met the *Rule 23(a)* requirements of numerosity, commonality, typicality, and adequate representation and having qualified under the *Rule 23(b)(3)* category, the plaintiff class is certified, and the following class definition is adopted: all persons to whom defendant sent initial communications in the form of the November 5, 2002 letter mailed to plaintiff Elaina Aramburu in an [*14] attempt to collect a consumer debt as of the date of plaintiff's complaint.

### II. *Summary Judgment Standard*

Under *Rule 56*, summary judgment is proper if the pleadings, depositions, answers, interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. Proc.56(c)*. An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party," and facts are material to the outcome of the litigation if application of the relevant substantive law requires their determination. *See Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. The moving party has the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. The substantive law determines the facts that are material to the outcome of a particular litigation. *See Anderson, 477 U.S. at 250*; [*15] *Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1320 (2d Cir. 1975)*. In determining whether summary judgment is appropriate, a court must resolve all ambiguities, and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (citing *United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962)*).

If the moving party meets its burden, the burden then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for

trial." *Fed. R. Civ. Proc. 56(e)*. The non-moving party must "do more than simply show there is some meta-physical doubt as to the material facts." *Matsushita, 475 U.S. at 586.* "[T]he mere existence of some alleged factual dispute between the parties will not defeat an other-wise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson, 477 U.S. at 247-48.* Only when it is apparent that no rational finder of fact "could find in favor of the non-moving party because [*16] the evidence to support its case is so slight" should summary judgment be granted. *Gallo v. Prudential Residential Servs., Ltd. Pshp., 22 F.3d 1219, 1223 (2d Cir. 1994).*

### III. *Fair Debt Collection Practices Act*

*Section 1692g(a) of the FDCPA* requires that an in-dependent debt collector soliciting payment provide the consumer with a detailed validation notice within five days of the initial communication. [1] "It is not enough for a debt collection agency simply to include the proper debt validation in a mailing to a consumer." *Russell v. Equifax A.R.S., 74 F.3d 30, 35 (2d Cir. 1996).* If "a notice contains language that 'overshadows or contradicts' other language informing a consumer of her rights, it violates the Act." *Id. at 34* (quoting *Graziano v. Harrison, 950 F.2d 107, 111 (3d Cir. 1991)).* In making this determination, courts apply "an objective standard, measured by how the 'least sophisticated consumer' would interpret the notice received from the debt collector." *Id.* (citing *Clomon v. Jackson, 988 F.2d 1314, 1318 (2d Cir. 1993)).* Thus, "[a] debt collection notice is over-shadowing [*17] or contradictory if it fails to convey the validation information clearly and effectively and thereby makes the least sophisticated consumer uncertain as to her rights." *Savino v. Computer Credit, Inc., 164 F.3d 81, 85 (2d Cir. 1998)* (citing *Russell, 74 F.3d at 35);* see also *DeSantis v. Computer Credit, Inc., 269 F.3d 159, 161 (2d Cir. 2001)* ("Even if a debt collector conveys the required information, the collector nonethe-less violates the [FDCPA] if it conveys that information in a confusing or contradictory fashion so as to cloud the required message with uncertainty."). The Second Circuit has made clear, however, that "in crafting a norm that protects the naive and the credulous the courts have care-fully preserved the concept of reasonableness.'" *McStay v. I.C. System, Inc., 308 F.3d 188, 190-91 (2d Cir. 2002)* (quoting *Clomon, 988 F.2d at 1319).* The plaintiff need not prove that the contradiction is threatening. *Russell, 74 F.3d at 35.*

    1 *Section 1692g(a)* provides:

>       Within five days after the initial
>       communication with a consumer
>       in connection with the collection

of any debt, a debt collector shall, unless the following information is contained in the initial communi-cation or the consumer has paid the debt, send the consumer a writ-ten notice containing--

>       (1) the amount of the debt;

>       (2) the name of the creditor to whom the debt is owed;

>       (3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

>       (4) a statement that if the con-sumer notifies the debt collector in writing within the thirty-day pe-riod that the debt, or any portion thereof, is disputed, the debt col-lector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and

>       (5) a statement that, upon the consumer's written request within the thirty-day period, the debt col-lector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

[*18]   In *Savino,* the leading case in the Second Circuit, the debt collector mailed the consumer an initial debt collection notice stating that the consumer must make "immediate payment" or provide "a valid reason" for failure to do so. *164 F.3d at 84.* Below the body of the letter, the consumer was further advised, "PLEASE SEE IMPORTANT NOTICE ON BACK," which re-ferred to the validation notice printed on the back of the letter. *Id.* The Second Circuit found that the debt collec-tor's request for immediate payment did not, standing alone, violate the FDCPA. Rather, the court concluded that the debt collector's "violation of the Act consisted of its decision to ask for immediate payment without also explaining that its demand did not override the con-sumer's rights under *Section 1692g* to seek validation of the debt." *Id. at 86.* The court explained that the debt collector "could have both sought immediate payment

and complied with the Act simply by inserting into the text of its letter transitional language that referred the addressee to the validation notice." [2] *Id.*

> 2   The court provided the following examples of acceptable language:

> > Although we have requested that you make immediate payment or provide a valid reason for non-payment, you still have the right to make a written request, within thirty days of your receipt of this notice, for more information about the debt. Your rights are described on the reverse side of this notice.

> > Our demand for immediate payment does not eliminate your right to dispute this debt within thirty days of receipt of this notice. If you choose to do so, we are required by law to cease our collection efforts until we have mailed that information to you. Your rights are described on the reverse side of this notice.

> > *Savino,* 164 F.3d at 86.

[*19]  In the instant case, it is undisputed that the November 5, 2002 letter contained a validation notice. The sole issue is whether it was overshadowed or contradicted by other language in the letter. Plaintiff contends that the notice was "overshadowed" by the statement "PAYMENT DUE IMMEDIATELY" at the top of the notice. The court agrees.

The majority of cases in which courts in this circuit have found a statement in a collection letter to "overshadow" the validation notice, in violation of *section 1692g,* have involved demands for *immediate* payment as in *Savino. See Rumpler v. Phillips & Cohen Assocs.,* 219 F. Supp. 2d 251, 259 (E.D.N.Y. 2002) (collecting cases). As noted above, in *Savino,* the Second Circuit affirmed the district court's grant of summary judgment in favor of the consumer, finding that the request for immediate payment without "transitional language" explaining that its demand did not override the consumer's statutory rights constituted a violation of *section 1692g.* 164 F.3d at 85-86. Courts have consistently ruled in favor of plaintiffs where the collection agency demanded payment "immediately" or "at once" without such transitional [*20] language. In *Sokolski v. Trans Union Corp.,*

53 F. Supp. 2d 307 (E.D.N.Y. 1999), the district court found that a collection letter demanding payment "at once" overshadowed the validation notice, concluding that it made no difference that the validation notice appeared on the front of the letter as opposed to appearing on the back as in *Savino. Id. at 314.* The court stated that "[t]he consumer is being told to act immediately . . . while at the same time being told that he has thirty days in which to obtain information regarding the validity of the debt." *Id.* Similarly, in *Unger v. National Revenue Group. Ltd.,* 2000 U.S. Dist. LEXIS 18708, No. 99 civ. 3087 (JG), 2000 WL 1897346 (E.D.N.Y. Dec. 8, 2000), the court found language in a collection letter stating that "payment in full is due now," without the kind of transitional language required by *Savino,* "overshadowed" the validation notice. *Id.* 2000 U.S. Dist. LEXIS 18708, at [WL] *3. Courts have thus interpreted *Savino* to mean that "an immediate demand for payment must be paired with 'transitional language' that might inform the consumer of the statement of her rights in the validation notice." *Swift v. Maximus, Inc., 2004 U.S. Dist. LEXIS 13190, No. 04 Civ. 216 (JBW), 2004 WL 1576618, *4 (E.D.N.Y. July 15, 2004). [*21]

In the instant case, there is a clear demand for immediate payment. "PAYMENT DUE IMMEDIATELY" appears centered on the page in all capital letters. This is the first line of the notice below the perforation separating the portion to be remitted to the agency from the collection letter itself. Although a validation notice is included in the letter, there is no transitional language accompanying the demand and explaining that it does not override the consumer's rights under section 1962g to seek validation of the debt. That the validation notice in this case appeared on the front of the letter, as opposed to that at issue in *Savino* and *Russell,* does not compel a finding that the letter complied with the FDCPA. *See Sokolski,* 53 F. Supp. 2d at 314 (concluding that the request for immediate action overshadowed the validation notice notwithstanding that it appeared on the front of the letter). Similarly, that the demand for immediate payment and the validation both appeared on the letter in all capitals and in the same typeface does not undermine the court's conclusion. The demand for immediate payment is conspicuously placed at the top [*22] of the letter and centered on the page. More importantly, it is not accompanied by "transitional language" as required by *Savino.* Based on this omission, the court concludes that Healthcare violated *section 1692g* by contradicting the validation notice in a manner that would confuse the least sophisticated consumer as to his or her rights.

## CONCLUSION

For the foregoing reasons, the court rules on the parties' motions as follows. Plaintiff's motion for summary

2005 U.S. Dist. LEXIS 42257, *

judgment with respect to the claim that the November 5, 2002 collection letter violates the validation requirement of the FDCPA, *15 U.S.C. § 1692g*, is granted. Defendant's cross-motion for summary judgment seeking dismissal of the complaint on the ground that plaintiff has failed to state a cause of action upon which relief may be granted is denied. Plaintiff's motion for class certification is granted.

SO ORDERED.

Allyne R. Ross

United States District Judge

Dated: April 14, 2005

Brooklyn, New York

# TAB B



LEXSEE 1997 U.S. DIST. LEXIS 3517

**DEVONA CANNON, on behalf of herself and all others similarly situated, Plaintiff, v. NATIONWIDE ACCEPTANCE CORPORATION and MICHAEL LUTZ, Defendants.**

**No. 96 C 1136**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1997 U.S. Dist. LEXIS 3517*

**March 24, 1997, Decided
March 25, 1997, DOCKETED**

**DISPOSITION:**　　[*1]　Plaintiff's petition for class certification granted.

**COUNSEL:** For DEVONA CANNON, on behalf of herself and all others similarly situated, plaintiff: Daniel A. Edelman, James O. Latturner, Cathleen Combs Cohen, Louise T. Walsh, Sara E. Lorber, Edelman & Combs, Chicago, IL.

For NATIONWIDE ACCEPTANCE CORPORATION, defendant: Bonita L. Stone, Katten, Muchin & Zavis, Chicago, IL.

**JUDGES:** David H. Coar, United States District Judge

**OPINION BY:** David H. Coar

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Plaintiff Devona Cannon ("Cannon") has moved to have the following class certified:

> All persons who (1) obtained credit from Nationwide Acceptance Corporation ("Nationwide"), (2) were later solicited by Nationwide to make, and ultimately made, additional extensions of credit before their existing credit was paid off, and (3) received additional money as part of this transaction which was documented as a

refinancing, and in which one or more of the refinanced loans was outstanding on or after January 11, 1993 (for purposes of counts I-II) or January 11, 1992 (for purposes of Count III). [1]

　1　Plaintiff's Motion for Class Certification ("Petition") at 1.

[*2]　Plaintiff has asserted against defendants civil claims under the Racketeer Influenced and Corrupt Organizations ("RICO") statute and the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFDBPA"), *815 ILCS 505/1 et seq.* Plaintiffs claims are based on defendant's alleged predicate acts of mail fraud in connection with "loan flipping." The relevant of facts of the underlying action as alleged in plaintiff's complaint (the "Complaint") are set forth in the Court's prior opinion involving this case. [2]

　2　See Memorandum Opinion and Order, March 18, 1997.

**Legal Standard for Motions for Class Certification**

Motions for class certification are governed by *Fed. R. Civ. P. 23*, which provides that the following prerequisites must be satisfied in order for one or more members of a class to sue as representatives of others in the class: (1) the class is so numerous that joinder of all

1997 U.S. Dist. LEXIS 3517, *

members is impracticable ["numerosity"]; (2) there are questions of law or fact common to the class ["commonality"]; [*3] (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ["typicality"]; and (4) the representative parties will fairly and adequately protect the interests of the class. *Fed. R. Civ. P. 23(a)*. In addition to these requirements, an action must meet the criteria under at least one of three sections of *Rule 23(b)*. Id.; Charles Wright, Arthur Miller, and Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 1759 (1986). *Rule 23(b)* provides that the action sought to be brought as a class action must be such that (a) the prosecution of separate actions by or against individual members of the class would create a risk of incompatible or varying adjudications with respect to the individual member or adjudications which would necessarily implicate the rights of other members not party to the action; (b) the opposing party has acted or refused to act on grounds generally applicable to the class as a whole; or (c) the court finds that the questions of law or fact common to the members of the class as a whole predominate over any questions affecting only individual members and that a class action is the most efficacious method of adjudication. [*4] See *Fed. R. Civ. P. 23(b)*. The Seventh Circuit has instructed courts to interpret *Rule 23* liberally in favor of the maintenance of class actions. *King v. Kansas City S. Indus., 519 F.2d 20, 25-26 (7th Cir. 1975)*.

For purposes of determining a motion for class certification, the court will deem true all of the allegations contained in the complaint. *Johns v. DeLeonardis, 145 F.R.D. 480, 482 (N.D. Ill. 1992)*. Moreover, the court will not consider the merits of the case; rather, the court focusses on whether the certification requirements are satisfied. *In Re VMS Sec. Litig., 136 F.R.D. 466, 473 (N.D. Ill. 1991)*. If the party seeking class certification meets each of the certification requirements, the court must certify the proposed class. *Vickers v. Trainor, 546 F.2d 739, 747 (7th Cir. 1976); Fujishima v. Board of Educ., 460 F.2d 1355, 1360 (7th Cir. 1972)*. However, this court has broad discretion concerning whether a proposed class satisfies certification requirements. See *Patterson v. General Motors Corp., 631 F.2d 476, 480 (7th Cir. 1980)*, cert. denied, *451 U.S. 914, 101 S. Ct. 1988, 68 L. Ed. 2d 304 (1981)*.

**Discussion**

**I. *Federal Rule* [*5] *of Civil Procedure 23(a)***

As established above, parties seeking class certification must prove that the proposed class satisfies the requirements of (1) numerosity, (2) commonality, (3) typicality, and (4) adequate representation. Plaintiffs' have met their burden of establishing each of these criteria as to the proposed class.

A. Numerosity

*Rule 23(a)(1)* requires that the class be so numerous that joinder is impractical. However, the number of class members alone is not dispositive. *Rosario v. Cook County, 101 F.R.D. 659, 661 (N.D. Ill. 1983)*. Rather the court must consider other relevant factors including "the nature of the relief sought, the ability of the individuals to press their own claims, the practicality of forcing religation of a common core of issues, and administrative difficulties involved in interpretation and joinder." Id. Indeed, "to require a multiplicity of suits by similarly situated small claimants would run counter to one of the prime purposes of a class action." *Swanson v. American Consumer Indus., 415 F.2d 1326, 1333 (7th Cir. 1969)*. Moreover, the court may "make common sense assumptions in order to find support for numerosity." *Evans* [*6] *v. United States Pipe & Foundry, 696 F.2d 925, 930 (11th Cir. 1983)*. see also *In re VMS Sec. Litig., 136 F.R.D. 466, 473 (N.D. Ill. 1991)*.

Plaintiffs assert that, "based on the size of defendants' loan portfolio and the fact that form documents were used to induce refinancing, it is reasonable to infer the classes are so numerous that joinder of all members is impractical." (Memorandum in Support of Plaintiff's Motion for Class Certification ("Pl. Memo.") at 4). Defendant Nationwide is a major consumer lender in the Chicago area. (See Complaint PP 5, 7-11). While it is difficult to ascertain at this time the number of potential class members in this suit, this Court assumes that the number would be significant enough to satisfy the numerosity requirement. Indeed, the exact number or identity of class members need not be pleaded to establish numerosity. *Marcial v. Coronet Ins. Co., 880 F.2d 954, 957 (7th Cir. 1989); Vergara v. Hampton, 581 F.2d 1281, 1284 (7th Cir. 1978)*, cert. denied, *441 U.S. 905, 99 S. Ct. 1993, 60 L. Ed. 2d 373 (1979); Gomez by Hernandez v. Comerford, 833 F. Supp. 702, 706 (N.D. Ill. 1993)*.

Furthermore, upon considering the other relevant [*7] factors, this Court finds that the common issues of fraud and unfair and deceptive business practices alleged by plaintiffs in the context of a "loan flipping" scheme suggest a finding of numerosity. Indeed, the solicitations in the instant case are form letters which can be quickly generated from a computer and thus permit defendants to contact countless persons. In addition, in light of the allegation that the plaintiffs are generally working class individuals (and, presumably, in financial need or would not have sought a loan from Nationwide), the Court concludes that such individuals would be unable to press their claims individually. Furthermore, it is in the interest of judicial economy that each potential claimant not be forced to litigate his or her claims independently of oth-

1997 U.S. Dist. LEXIS 3517, *

ers sharing similar grievances and seeking similar relief. Accordingly, the Court finds that the proposed class is sufficiently numerous.

Defendants argue, however, that there is no identifiable class. Defendants assert two reasons for their argument: (1) Defendants do not have records of each customer to whom they sent a solicitation letter, and (2) there are no objective criteria by which to identify [*8] class members. Defendants' first argument conveniently relies on the insufficiency of Nationwide's record keeping and the automation of its solicitation system. However, it has been established through deposition testimony that the solicitation received by Cannon was also sent, at various intervals, to all existing direct loan customers who had two hundred ($ 200) in available credit and had made at least one payment on their account. (Plaintiff's Reply in Support of Motion for Class Certification ("Pl. Reply") Appendix A, Deposition of Linda Stellon ("Stellon Depo.") pp. 31-31). Thus, based on this information, the identity of the class members can easily be revealed through discovery. Moreover, some class members might be able to demonstrate membership by producing the form letter that they received. It cannot be the rule that actions based on fraud cannot be maintained as class actions unless the defrauder has kept a record of those who he might have deceived.

Second, defendants contend that, because there is no record of who received the solicitations and the state of mind of each individual might vary with respect to the alleged scheme, there are no objective criteria by which [*9] to identify class members. In support of their position, defendants cite *Kohn v. Mucia, 776 F. Supp. 348 (N.D. Ill. 1991)*, and *Elliott v. ITT Corp., 150 F.R.D. 569, 573-74 (N.D. Ill. 1992)*. In Kohn, the plaintiff sought to bring suit on behalf of all persons who had their impounded vehicles sold or destroyed by the City of Chicago. The key issue in the case was whether the individual whose car was sold or destroyed had received sufficient notice of the impending sale or destruction. The proposed class in Kohn included both people who had and people who had not received notice. The court found the inclusion of the former group was inappropriate in light of the key issue in the case. However, the court denied class certification on the ground that there were too few potential plaintiffs.

By contrast, this Court has determined that there is sufficient numerosity. Kohn is therefore inapposite. Furthermore, in the instant case, the proposed class is tailored to include persons who *actually received* a solicitation from defendants and then obtained additional funds through a refinancing. These objective criteria are sufficient to identify potential class members. [*10] Furthermore, any assertion that persons to whom the solicitations were sent did not receive them is purely specula-

tive. Indeed, there is a legal presumption that letters mailed with sufficient postage to a valid address are received by the addressee.

In Elliott, the court held that "an identifiable class exists if its members can be ascertained by reference to objective criteria, but not if membership is contingent on the prospective member's state of mind. *150 F.R.D. at 574* (citing *Gomez v. Illinois State Bd. of Educ., 117 F.R.D. 394, 397 (N.D. Ill. 1987)*. However, Elliott goes on to observe that "[a] class may be certified even though the initial definition includes members who have not been injured or do not wish to pursue claims against the defendant." *150 F.R.D. at 575*. Moreover, because the allegations in the instant case are based upon a scheme to defraud rather than separate actions taken against plaintiffs, the individual plaintiff's state of mind is not pertinent. The Seventh Circuit "has reiterated on numerous occasions that the ultimate success of the fraud and the actual defrauding of a victim are not necessary prerequisites to a successful mail fraud prosecution." [*11] *United States v. Bucey, 876 F.2d 1297, 1311 (7th Cir.)* (citations omitted), cert. denied, *493 U.S. 1004, 110 S. Ct. 565, 107 L. Ed. 2d 560 (1989))*. Thus, that the proposed class members may have varying states of mind regarding the fraud is of no import. The Court thus finds that the class is identifiable and sufficiently numerous.

B. Commonality

The second requirement of *Rule 23(a)* is that there be questions of law or fact common to the class. In order to satisfy this requirement, the party seeking certification need only demonstrate that there is at least one common question-either of law or of fact. *Arenson v. Whitehall Convalescent and Nursing Home, 164 F.R.D. 659, 663 (N.D. Ill. 1993); Franklin v. City of Chicago, 102 F.R.D. 944, 949 (N.D. Ill. 1984)*. Moreover, factual variations among class members' experiences will not defeat class certification so long as there is a "common nucleus of operative fact." *Rosario v. Livaditis, 963 F.2d 1013, 1017-18 (7th Cir. 1992)*, cert. denied, *506 U.S. 1051, 113 S. Ct. 972, 122 L. Ed. 2d 127 (1993)*.

Plaintiff asserts that there are five common questions: (1) whether defendants engaged in the scheme complained [*12] of, that is, "loan flipping;" (2) whether defendants thereby engaged in a scheme or artifice to defraud, within the meaning of *18 U.S.C. § 1341*; (3) whether the mails were used in furtherance of the scheme; (4) whether defendants conducted the affairs of one or more enterprises using a pattern of mail fraud, thereby violating *18 U.S.C. § 1962(c)*; (5) whether defendants engaged in unfair and/or deceptive business practices. [3]

3    Plaintiffs' Motion for Class Certification ("Motion") at 2-3).

Defendants argue that these questions are not common to the proposed class since each class members' claim depends on his or her individualized circumstances. Defendants claim that each customer's refinancing is "divergent and individualized." (Defendants' Memorandum in Opposition to Plaintiff's Motion for Class Certification ("Def. Memo.") at 12). Again, defendants rely on Elliott, where the court denied class certification of the plaintiff's RICO and Illinois consumer fraud claims, because there was a lack of commonality [*13] and predominance of common issues. The court found that there was a "substantial likelihood on many individual questions in a piece of litigation involving a potentially enormous class." *150 F.R.D. at 583-84*. Similarly, defendants contend that each potential class member might have been informed about the refinancing differently. However, it has already been established that it is unlikely that the information that is relevant to this litigation was ever disclosed to *any* potential class members. Linda Stellon, Vice President of Direct Lending at Nationwide, admitted that it is not Nationwide's policy or part of the loan officers' job to instruct customers as to the differences between a renewal loan and an additional loan. (Stellon Depo. p. 79-80). Moreover, the key factual allegation that customers were solicited with deceptive propaganda is the same for each potential class member. Finally, this court concluded in a prior opinion in this case that "the eventual enlightenment of the defrauded is characteristic of the 'bait and switch' technique allegedly employed by defendants." Thus, it is of little consequence that potential class members may have ultimately received different information [*14] and different terms in their refinancings. The Court thus finds that the commonality requirement is satisfied.

C. Typicality

*Fed. R. Civ. P. 23(a)(3)* requires that the named plaintiffs' claims be typical of the class. A plaintiff's claim is typical if it arises out of the "same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc., 713 F.2d 225, 232 (7th Cir. 1983)*. Plaintiffs need not present the same factual circumstances so long there is a single issue common to all class members. *Allen v. Isaac, 99 F.R.D. 45, 54 (N.D. Ill. 1983)*. Moreover, each plaintiff need not allege that same injury. *De La Fuente, 713 F.2d at 232-33*.

Cannon moves to certify a class of persons who (1) obtained credit from Nationwide, (2) were later solicited by Nationwide to make, and ultimately made, additional extensions of credit before their existing credit was paid off, (3) received additional money as part of this transaction which was documented as a refinancing, and in which (b) one or more of the refinanced loans was outstanding on or after January [*15] 11, 1993 (for purposes of counts I-II) or January 11, 1992 (for purposes of Count III). According to the Complaint, Cannon meets each of these criteria, and thus, satisfies the requirement of typicality. However, defendants contest the typicality of Cannon's claim on the same grounds that they contested the issue of commonality. For the reasons stated above, the Court finds these arguments unpersuasive. The Court resolves that there is no meaningful discrepancy between the allegations Cannon asserts and those presumed of the proposed class; commonality is therefore established.

D. Fair and Adequate Representation

*Rule 23(a)(4)* requires that the named plaintiff provide fair and adequate protection for the interests of the class. Two factors are particularly important in that determination: (1) plaintiff's attorney's qualifications, experience, and ability to conduct the litigation and (2) whether the plaintiff has interests antagonistic to those of the class. *Rosario v. Livaditis, 963 F.2d 1013, 1018 (7th Cir. 1992)*, cert. denied, *506 U.S. 1051, 113 S. Ct. 972, 122 L. Ed. 2d 127 (1993)*.

The Court has no reason to question the qualifications of plaintiffs' counsel. Indeed, they have presented to the [*16] Court an extensive profile of their experience in class actions, in general, and consumer fraud, in particular, which indicates that they are competent to represent the proposed class. (Pl. Memo. Appendix B). Moreover, defendants raise no objections opposing counsel's qualifications. Rather, defendants argue that Cannon is not an adequate representative because she is not financially solvent.

Defendants maintain that Cannon filed Chapter 7 bankruptcy in 1995 and has thereby admitted her inability to pay the necessary expenses for the proposed class action. Class counsel has made clear that it will finance the entire litigation on a contingency basis pursuant to Rule 1.8(e)(1) of the Rules of Professional Conduct for the Northern District of Illinois and Rule 1.8(d)(2) of the Illinois Rules of Professional Conduct. (Pl. Reply at 5 ("In this action, class counsel will advance all costs of litigation. Repayment is contingent upon recovery.")). Thus, any argument regarding Cannon's inability to financially support this litigation is moot. Nonetheless, it should be made clear that a named plaintiff's willingness to vouch for the entire costs of litigation is not determinative of her adequacy [*17] to be a fair representative. *Rand v. Monsanto Co., 926 F.2d 596, 601 (7th Cir. 1991)*. Furthermore, based on the Court's review of the facts, it does not appear that the named plaintiff has in-

terests that would potentially compromise those of the class. The requirement of fair and adequate representation is therefore satisfied.

## II. *Federal Rule of Civil Procedure 23(b)*

Having satisfied the certification requirements of *Rule 23(a)*, plaintiffs must demonstrate that this action meets the demands of *Rule 23(b)*. Accordingly, the plaintiffs must prove that the action is such that (a) the prosecution of separate actions by or against individual members of the class would create a risk of incompatible or varying adjudications with respect to the individual member or adjudications which would necessarily implicate the rights of other members not party to the action; (b) the opposing party has acted or refused to act on grounds generally applicable to the class as a whole; or (c) the court finds that the questions of law or fact common to the members of the class as a whole predominate over any questions affecting only individual members and that a class action is the most efficacious [*18] method of adjudication. See *Fed. R. Civ. P. 23(b)*.

Plaintiff contends that the instant action satisfies the criteria of factor (c) because the economic status of the potential plaintiffs would preclude them from bringing individual suits and, given the individual sums involved, it would not make financial sense to bring an individual suit. Thus, plaintiff argues, and this Court agrees, that a class action is the most efficacious vehicle of adjudication. In addition, common issues of law and fact predominate in this case, especially since it is based upon a scheme to defraud. All that is required is "an essential common factual link between all class members and the defendant for which the law provides a remedy." *Johns v. DeLeonardis, 145 F.R.D. 480, 484-84 (N.D. Ill. 1992)*. Here Cannon alleges a scheme of mail fraud that is common to all potential plaintiffs and for which RICO and the Illinois consumer fraud laws provide remedies. Thus, in light of the foregoing and in the interest of judicial economy, this Court finds that a class certification is appropriate.

## III. Scope of the Class

Plaintiff's proposed class pertains, in part, to persons who received a solicitation [*19] from defendants to obtain additional money. However, because plaintiff's theory of recovery under RICO is that defendants alleged scheme or artifice to defraud was conducted through the United States mails and therefore constitutes mail fraud, the Court restricts the class as follows:

> All persons who (1) obtained credit from Nationwide Acceptance Corporation ("Nationwide"), (2) were later solicited by Nationwide, *though the United States mails*, to make (and ultimately made) additional extensions of credit before their existing credit was paid off, and (3) received additional money as part of this transaction which was documented as a refinancing, and in which one or more of the refinanced loans was outstanding on or after January 11, 1993 (for purposes of counts I-II) or January 11, 1992 (for purposes of Count III).

## Conclusion

WHEREFORE, for the reasons stated in this memorandum opinion, plaintiff's petition for class certification is granted as to the following class:

> All persons who (1) obtained credit from Nationwide Acceptance Corporation ("Nationwide"), (2) were later solicited by Nationwide, through the United States mails, to make, and ultimately [*20] made, additional extensions of credit before their existing credit was paid off, and (3) received additional money as part of this transaction which was documented as a refinancing, and in which one or more of the refinanced loans was outstanding on or after January 11, 1993 (for purposes of counts I-II) or January 11, 1992 (for purposes of Count III).

Plaintiff is directed to file a proposed notice to the class thus defined by April 14, 1997. Written objections to the proposed notice are to be filed by May 1, 1997. A hearing on objections to the proposed notice shall be held on May 16, 1997 at 9:30 a.m.

ENTER:

David H. Coar

United States District Judge

Dated: MAR 24 1997

TAB C



LEXSEE 2002 U.S. DIST. LEXIS 25032

**JAMES CARROLL and ELEANOR CARROLL, on behalf of themselves and all others similarly situated v. UNITED COMPUCRED COLLECTIONS, INC. and A.B. STINEMAN**

**No. 1-99-0152 H/ G**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE, COLUMBIA DIVISION**

*2002 U.S. Dist. LEXIS 25032*

**November 15, 2002, Decided
November 15, 2002, Entered**

**SUBSEQUENT HISTORY:** Adopted by, in part, Class certification granted by, Motion granted by, Summary judgment denied by *Carroll v. United Compucred Collections, Inc., 2003 U.S. Dist. LEXIS 5996 (M.D. Tenn., Mar. 31, 2003)*

**DISPOSITION:** [*1] Magistrate recommended that: (1) defendants' motion for summary judgment be denied; (2) plaintiffs' motion for partial summary judgment be granted on the plaintiffs' claim that defendant Compucred violated the FDCPA by failing to comply with *15 U.S.C. §§ 1692g(a)(3) and 1692g(a)(4)* and that plaintiffs' motion for partial summary judgment be denied on the plaintiffs' claim that the defendants violated *15 U.S.C. § 1692e(10)*; and (3) plaintiffs' motion for class certification be granted.

**COUNSEL:** For JAMES CARROLL, ELEANOR CARROLL, plaintiffs: Steven A. Taterka, Kingston Springs, TN.

For JAMES CARROLL, plaintiff: A. DeLoach Stewart, Jones & Trousdale, Florence, AL.

For JAMES CARROLL, ELEANOR CARROLL, plaintiffs: O. Randolph Bragg, Horwitz, Horwitz & Association, Chicago, IL.

For UNITED COMPUCRED COLLECTIONS INC, A. B. STINEMAN, defendants: Rex A. Wolfgang, Cuni, Ferguson, Wolfgang & LeVay Co., LPA, Cincinnati, OH.

For UNITED COMPUCRED COLLECTIONS INC, A. B. STINEMAN, defendants: P. Michael Richardson, Jason A. Golden, Richardson & Golden, PLLC, Columbia, TN.

**JUDGES:** JULIET [*2] GRIFFIN, United States Magistrate Judge. Honorable Thomas A. Higgins, Senior United States District Judge.

**OPINION BY:** JULIET GRIFFIN

**OPINION**

*REPORT AND RECOMMENDATION*

This action was brought pursuant to the Fair Debt Collection Practices Act, *15 U.S.C. §§ 1692 et seq.* ("FDCPA"), by the named plaintiffs on behalf of themselves and the class they seek to represent, alleging that standardized form collection letters sent by the defendants, United Compucred Collections, Inc. ("Compucred") and A. B. Stineman, demanding "Immediate payment" and "Send payment today" were in violation of the FDCPA. The plaintiffs seek a declaratory judgment that the defendants violated the FDCPA, an award of statutory damages, and attorneys' fees.

The stated purpose of the FDCPA is to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using

abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." *15 U.S.C. § 1692(e).* The legislative history reflects that the FDCPA was designed to eliminate [*3] unfair debt-collection practices, such as late-night telephone calls, false representations, and embarrassing communications. *See* Sen. Rep. No. 382, 95th Cong., 1st Sess. 2 (1977), *reprinted in* 1977 U.S.C.C.A.N 1695, 1696. To achieve its broad remedial purpose, the statute provides for actual damages, statutory damages, and attorney's fees. *15 U.S.C. § 1692k.*

At issue in this case is *section 1692e,* which prohibits a debt collector from using any "false, deceptive or misleading representation or means in connection with the collection of any debt," [1] and *section 1692g(a),* which provides that, in the initial communication to a consumer by a debt collector or within five days thereafter, the debt collector must send the consumer a written notice containing--

(1) the amount of the debt;

(2) the name of the creditor to whom the debt is owed;

(3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

(4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period [*4] that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of the judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and

(5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

---

1   That prohibition, set forth in the first sentence of *section 1692e* is essentially reiterated in subsection 1692e(10), which prohibits the use of any

"false representation or deceptive means to collect or attempt to collect any debt ...."

Currently pending before the Court are the plaintiffs' motion for class certification (Docket Entry No. 25), the plaintiffs' motion for partial summary judgment (Docket Entry No. 43), and the defendants' motion for summary judgment (Docket Entry No. 39). By order entered May 23, 2000 (Docket Entry [*5] No. 35), the plaintiffs' motion for class certification was referred to the Magistrate Judge for consideration and for report and recommendation as to disposition, and, by order entered June 28, 2000 (Docket Entry No. 51), the defendants' motion for summary judgment and the plaintiffs' motion for partial summary judgment were referred to the Magistrate Judge for consideration and submission of proposed findings of fact and recommendation for disposition.

*I. BACKGROUND*

The plaintiffs received two debt collection form letters from the defendants in reference to two separate accounts with Travelers Indemnity of America ("Travelers"). The letters were identical in substantive content beginning with the Compucred letterhead and ending with the facsimile signature of A.B. Stineman over his name and title of "President." The first letter was dated June 29, 1999, and demanded payment of $ 47.56 owing on Travelers' Account No. 478748-0. Exhibit A to Docket Entry No. 1. The second letter was dated July 12, 1999, demanding payment of $ 59.40 owing on Travelers' Account No. 475447-0. Exhibit B to Docket Entry No. 1. The body of both letters stated as follows:

You are hereby [*6] put on notice that your delinquent account has been forwarded to us for collection by Travelers Indemnity of America.

This is an attempt to collect this claim. Any information obtained will be used for that purpose. Immediate payment of this claim will forestall further disposition of the matter. Unless you, within 30 days after receipt of this notice, dispute the validity of this claim, or any portion thereof, this claim will be assumed to be valid. If you, within 30 days after receipt of this notice, notify the undersigned that the claim, or any portion thereof, is disputed, we will obtain verification of the claim. Upon written request, we will provide you with the name and address of your original creditor, if different from the creditor listed above. This notice is furnished in compliance with Federal Law

2002 U.S. Dist. LEXIS 25032, *

95-109 (*15 United States Code 1601 et seq.*).

Send payment today. Direct payment to us as listed above. Be sure to enclose the top portion of this letter and your payment in the return envelope for proper identification.

If you feel this balance is not due, check one of the following and return to the above address:

A.   You [*7] had insurance with another company for the period listed above.

PLEASE SEND PROOF OF COVERAGE. (copy of declaration or Insurance Card

B.   Policy was paid in full. Please send proof of payment.

C.   Other, explain

Very truly yours,

[facsimile signature]

A. B. Stineman

President

The plaintiffs allege that the form letter violated the FDCPA in the following manner: (1) the demand for "Immediate payment" and "Send payment today" contradicts and overshadows the 30 day period within which the debtor may request validation under *15 U.S.C. § 1692g(a)*; (2) the letter fails to inform the debtor that "a copy of such verification or judgment will be mailed to the consumer by the debt collector" as required by *15 U.S.C. § 1692g(a)(4)*; (3) the letter fails to inform the consumer that a request for verification must be "in writing" as required by *15 U.S.C. § 1692g(a)(4)*; and *(4)* the letter uses a false or deceptive means to collect or attempt to collect a debt in violation of *15 U.S.C. § 1692e(10)*. *See* plaintiffs' complaint (Docket Entry No. 1).

The plaintiffs [*8] seek certification of a class consisting of all persons in Tennessee to whom letters in the form of Exhibits A or B to the complaint were sent in an attempt to collect a debt incurred for personal, family, or household purposes, which were not returned by the U.S. Post Office as undelivered, during the one year period prior to filing the complaint on September 17, 1999. Based on the use of the standardized form letters, the plaintiffs assert that the number of class members makes

joinder impractical and that three common issues predominate over any issues involving only the named plaintiffs: (1) whether the demand for "Immediate payment" and "Send payment today" contradicts and overshadows the 30 days within which a debtor may request validation of the debt; (2) whether the form letter fails to inform the consumer that a copy of such verification or judgment will be mailed to the consumer by the debt collector; and (3) whether the form letter informs the debtor that a request for verification must be in writing.

## II. SUMMARY JUDGMENT

*Rule 56(c) of the Federal Rules of Civil Procedure* provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers [*9] to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgement as a matter of law." In order to prevail on a motion for summary judgment, the moving party must demonstrate that no genuine issue of material fact exists and that judgment as a matter of law should be granted in the moving party's favor. *Smith v. Hudson, 600 F.2d 60, 63 (6th Cir. 1979).*

In considering a motion for summary judgment, the court must view all facts and inferences to be drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); SEC v. Blavin, 760 F.2d 706 (6th Cir. 1985).* Although the moving party has the burden of showing that no genuine issue of material fact exists, the non-moving party, however, may not merely rest on conclusory allegations contained in the complaint, but must respond with affirmative evidence supporting its claim and establishing the existence of a genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986);* [*10] *Cloverdale Equipment Co. v. Simon Aerials, Inc., 869 F.2d 934, 937 (6th Cir. 1989).*

Not every factual dispute between the parties will prevent summary judgment. The disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* The dispute must also be genuine. The facts must be such that, if they were proven at trial, a reasonable jury could return a verdict for the non-moving party. *Id.* The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial. *First National Bank v. Cities Service Co.,*

*391 U.S. 253, 288-89, 20 L. Ed. 2d 569, 88 S. Ct. 1575 (1968).*

There is no dispute between the parties as to the underlying facts of this case, specifically, that the debt collection form letters received by the plaintiffs were sent by Compucred in an attempt to collect debts [*11] owed to its client, Travelers, and that, during the year prior to September 19, 1999, Compucred sent the same standardized letter on behalf of the same client to 164 people in Tennessee. However, both parties claim that they are entitled to summary judgment in their favor as a matter of law. Specifically, the defendant Stineman argues that he is entitled to summary judgment because his actions were taken within the scope and course of his duties as President of Compucred and that therefore he cannot be held personally liable for a violation of the FDCPA. Further, the defendants argue that they are entitled to summary judgment because the language in the form collection letter did not overshadow the validation notice required by the FDCPA, because the failure to specifically inform a consumer that a request for verification must be "in writing" does not constitute a violation of the FDCPA, and because the failure to specifically inform a consumer that a copy of such verification or judgment will be mailed to the consumer by the debt collector does not constitute a violation of FDCPA.

Similarly, the plaintiffs move for partial summary judgment on the following issues: (1) whether the [*12] demand "Send payment today" contradicts and overshadows the 30 day validation notice in violation of the FDCPA, (2) whether failing to inform the debtor that a "copy of such verification or judgment will be mailed to the consumer by the debt collector" is in violation of the FDCPA, and (3) whether failing to inform the consumer that a request for verification must be "in writing" is in violation of the FDCPA. In addition, the plaintiffs seek a declaratory judgment that the form letters that they received from the defendants are in violation of the FDCPA.

To the extent that the arguments in the plaintiffs' motion for partial summary judgment and the defendants' motion for summary judgment overlap on specific issues, they will be addressed together.

### III. SUMMARY JUDGMENT MOTIONS

#### A. Claim Against Defendant A.B. Stineman

The defendants contend that defendant Stineman is specifically excluded as a "debt collector" under *15 U.S.C. § 1692a(6)(A)*, and, accordingly, cannot be held liable under the FDCPA. Docket Entry No. 39, at 7. Thus, the defendants contend that, as president of Compucred, defendant Stineman cannot "be held individually responsible for [*13] alleged wrongful conduct in which he participated solely as an employee of his employer and not in any individual capacity," that the plaintiffs' allegations are insufficient to permit the Court to disregard the corporate entity, and that therefore summary judgment for defendant Stineman is appropriate.

*Section 1692a(6)* defines a "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in a business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another ...." The defendants rely upon subsection (6)(A) in support of their contention that defendant Stineman cannot be personally liable under the FDCPA. Subsection (6)(A) specifically excludes "any officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor." However, *section 1692a(6)(A)* is inapplicable to defendant Stineman, who is an officer or employee of the debt collection agency, Compucred, and not an employee or officer of the creditor, Travelers.

The defendants argue that their interpretation that subsection [*14]  (6)(A) exempts defendant Stineman from liability is supported by the Federal Trade Commission Staff Commentary interpretation of section 803(6)(A) of the FDCPA, [2] specifically:

> 4. *Specific exemptions from definition of debt collector.*
>
> (a) *Creditor employees.* Section 803(6)(A) [*15 U.S.C. § 1692a(6)(A)*] provides that "debt collector" does not include "any officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor." [3]
>
> The exemption includes a collection agency employee, who works for a creditor to collect in the creditor's name at the creditor's office under the creditor's supervision, because he has become a de facto employee.
>
> The exemption includes a creditor's salaried attorney (or other) employee who collects debts on behalf of, and in the name of, that creditor.

2   FTC pronouncements regarding the FDCPA are of limited precedential value in light of the restricted scope of its power under the Act. The Sixth Circuit has held that FTC advisory opinions regarding the FDCPA are "entitled to deference

2002 U.S. Dist. LEXIS 25032, *

only to the extent that their logic is persuasive." *Lewis v. ACB Bus. Servs., Inc.,* 135 F.3d 389, 398 (6th Cir. 1998); *Pressley v. Capital Credit & Collection Serv., Inc.,* 760 F.2d 922, 925 (9th Cir. 1985); *Fox v. Citicorp Credit Servs., Inc.,* 15 F.3d 1507, 1513 n.4 (9th Cir. 1994); *Dutton v. Wolpoff & Abramson,* 5 F.3d 649, 654 (3rd Cir. 1993).

[*15]

3   *See* FTC Official Staff Commentary, *Section 803--Definitions*

Section 803(4) defines "creditor" as "any person who offers or extends credit creating a debt or to whom a debt is owed." However, the definition excludes a party who "receives an assignment of transfer of a debt in default solely for the purpose of facilitating collection of such debt for another."

1. *General.* The definition includes the party that actually extended credit or became the obligee on an account in the normal course of business, and excludes a party that was assigned a delinquent debt only for collection purposes.

Travelers, not Compucred, is the creditor in this case. Defendant Stineman is not an officer or employee of Travelers, does not send out collection letters with Travelers' letterhead, does not work in Travelers' office or under Travelers' supervision. Rather, the letter at issue used the letterhead of Compucred and the facsimile signature of defendant Stineman was as president of Compucred. There is no dispute that defendant Stineman is employed by Compucred and maintains his office [*16] at Compucred under the supervision of the owner of Compucred, Mike Prince. [4]

4   Compucred cannot be considered a "creditor-controlled collector" pursuant to section 803(6)(B), which provides that a debt collector does not include a party collecting for another when they are both "related by common ownership or affiliated by corporate control ...."

Under *15 U.S.C. § 1692a(6)(A),* officers and employees of the original creditor, Travelers, are excluded from the definition of "debt collector," but officers and employees of the collection agency are included within the definition of "debt collector." [5] Moreover, courts have

held that officers and employees of the debt collecting agency may be jointly and severally liable with the agency. *See Musso v. Seiders,* 194 F.R.D. 43, 46-47 (D. Conn. 1999); *Ditty v. Checkrite, Ltd.,* 973 F. Supp. 1320, 1336-37 (D. Utah 1997); *Teng v. Metropolitan Retail Recovery, Inc.,* 851 F. Supp. 61, 67 (E.D.N.Y. 1994); [*17] *West v. Costen,* 558 F. Supp. 564, 587 (W.D. Va. 1983). Thus, under such an analysis, there is no issue of piercing the corporate veil or disregarding the corporate entity before defendant Stineman's liability can be considered. The circumstances in this case are different from those in *Pettit v. Retrieval Masters Creditors Bureau, Inc.,* 211 F.3d 1057 (7th Cir. 2000), in which the Court held that persons do not become "debt collectors" under the FDCPA simply by working for or owning stock in debt collection companies. [6] Defendant Stineman's signature appeared on the letter at issue. There is at least a disputed issue of fact as to whether or not defendant Stineman is a "debt collector" under the Act. [7] *See* Responses to the parties' respective statements of material undisputed facts. Docket Entry Nos. 48 and 52.

5   *See* FTC Official Staff Commentary, Appendix J, § 803, which provides in pertinent part:

Section 803(6) defines "debt collector" as a party "who uses any instrumentality of interstate commerce or the mails *** collection of *** debts owed *** another."

1. *Examples.* The term includes:

Employees of a debt collection business, including a corporation, partnership, or other entity whose business is the collection of debts owned (sic) another.

[*18]

6   The Seventh Circuit also held that the FDCPA does not provide for personal liability for shareholders or employees of debt collection companies, acting on behalf of those employees, "except perhaps in limited instances where the corporate veil is pierced." 211 F.3d at 1059. *See also White v. Goodman,* 200 F.3d 1016, 1019 (7th Cir. 2000).

7   *Section 1692a(6)(B)-(F)* provides additional exemptions, none of which apply in this case.

Accordingly, the defendants are not entitled to summary judgment on this issue. [8]

8   Denial of summary judgment for defendant Stineman does not, however, translate into a grant of summary judgment for the plaintiffs on the liability of defendant Stineman because the issue of whether defendant Stineman was personally involved in the collection of the debt at issue revolves around disputed issues of fact. *See* Docket Entry Nos. 48 and 52.

*B. Overshadowing* [*19]   *Claim*

The plaintiffs contend that the demand for "Immediate payment" and "Send payment today" forces the debtor "to choose between either abandoning his validation rights during the thirty day period and pay the alleged debt immediately or exercising his validation rights during the thirty day period and ignoring defendants' demand for 'Immediate payment' and 'Send payment today.'" Docket Entry No. 44, at 15. Accordingly, the plaintiffs argue that the letter clearly contradicts and overshadows the 30 day validation notice provision in violation of *15 U.S.C. § 1692g(a).*

In contrast, the defendants argue that the letter neither specifically demands nor implies that payment or any other action must be taken within a period shorter than 30 days, but merely requests payment as a mechanism by which the debtor can avoid further action. Docket Entry No. 39, at 15. They contend that the phrase "immediate payment of this claim will forestall further disposition of this matter" is an option offered to the debtor, not a demand for payment and therefore summary judgment in the defendants' favor is appropriate on this issue.

The FDCPA requires that the debt collector [*20] inform the debtor of his right to request validation of the debt. Specifically, *section 1692g(a)* provides in pertinent part as follows:

(a) Notice of debt; contents

Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication [9] or the consumer has paid the debt, send the consumer a written notice containing--

(1) the amount of the debt;

(2) the name of the creditor to whom the debt is owed;

(3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the

debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

(4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector;

(5) a statement that, upon the consumer's written request within the thirty-day [*21] period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

9   There is no dispute that only one letter regarding each debt was sent by the defendants and that there is no issue as to whether a second communication containing the required information was sent within the five day period.

The notice of the 30-day validation period must not only be stated, the debt collector must also "'effectively convey' the notice to the debtor." *Smith v. Computer Credit, Inc., 167 F.3d 1052, 1054 (6th Cir. 1999),* quoting *Swanson v. Southern Oregon Credit Serv., Inc., 869 F.2d 1222, 1225 (9th Cir. 1988).* Accordingly, "to be effective, the notice must not be overshadowed or contradicted by other messages or notices appearing in the initial communication from the collection agency." *Swanson, 869 F.2d at 1225; Ost v. Collection Bureau, Inc., 493 F. Supp. 701, 703 (D.N.D. 1980)* [*22] (communication must not be designed to "evade the spirit of the notice statute, and mislead the debtor into disregarding the notice"). In determining whether a statement by the debt collector is misleading or deceptive, the Court must analyze the language from the point of view of the "least sophisticated consumer." *Smith v. Transworld Sys., Inc., 953 F.2d 1025, 1028 (6th Cir. 1992),* citing *Jeter v. Credit Bureau, 760 F.2d 1168, 1172-75 (11th Cir. 1985).* The defendants contend that this standard contains a "reasonableness element," citing *Gammon v. GC Servs. Ltd. P'ship, 27 F.3d 1254, 1257 (7th Cir. 1994).* Docket Entry No. 40, at 11. However, the Court of Appeals for the Sixth Circuit has held that the "least sophisticated standard is 'lower than simply examining whether particular language would deceive or mislead a reasonable debtor.'" *Smith v. Computer Credit, Inc., 167 F.3d at*

*1054*, quoting *Swanson, 869 F.2d at 1227*. The Court finds persuasive the common sense analysis enunciated by the Seventh Circuit in grappling with the issue of what constitutes "contradicting or overshadowing" in this context: [*23]

> The statute does not say in so many words that the disclosures required by it must be made in a nonconfusing manner. But the courts, our own included, have held, plausibly enough, that it is implicit that the debt collector may not defeat the statute's purpose by making the required disclosures in a form or within a context in which they are unlikely to be understood by the unsophisticated debtors who are the particular objects of the statute's solitude.

> Most of the cases put it this way: the implied duty to avoid confusing the unsophisticated consumer can be violated by contradicting or "overshadowing" the required notice. This sounds like two separate tests, one for a statement that is logically inconsistent with the required notice and the other for a statement that while it doesn't actually contradict the required notice obscures it, in much the same way that static or cross-talk can make a telephone communication hard to understand even though the message is not being contradicted in any way. The required notice might be "overshadowed" just because it was in smaller or fainter print than the demand for payment.

> As with many legal formulas that get repeated from [*24] case to case without an effort at elaboration, "contradicting or overshadowing" is rather unilluminating--even though we hesitate to use the word in this context, confusing. The cases that find the statute violated generally involve neither logical inconsistencies (that is, denials of the consumer rights that the dunning letter is required to disclose) nor the kind of literal "overshadowing" involved in a fine-print, or faint-print, or confusing-typeface case. In the typical case, the letter both demands payment within thirty days and explains the consumer's right to demand verification within thirty days. These rights are not inconsistent, but by failing to explain how they fit together the letter confuses.

> It would be better if the courts just said that the unsophisticated consumer is to be protected against confusion whatever form it takes. A contradiction is just one means of inducing confusion; "overshadowing" is just another; and the most common is a third, the failure to explain an apparent though not actual contradiction ....

*Barlett v. Heibl, 128 F.3d 497, 500 (7th Cir. 1997)* (internal citations omitted).

The letter at issue sandwiches the 30-day [*25] validation notice between the instructions to the debtor that "immediate payment of this claim will forestall further disposition of the matter" and "send payment today." Notably, the letter gives no explanation as to possible actions encompassed by the ominous sounding phrase "further disposition," but, having begun the letter with the warning that "you are hereby put on *notice* that your delinquent account has been forwarded to us for collection," the end of the notice validation paragraph provides that "this *notice* is furnished in compliance with Federal Law 95-109 (*15 United States Code 1601 et seq.*)" (emphasis added). While the citation to federal law refers to the requirements of the FDCPA, layman would not necessarily understand the reference. Moreover, in this context, the reference could suggest to the least sophisticated debtor that the letter presages federal action, rather than informing the debtor of a requirement instituted for the consumer's protection. The least sophisticated debtor might well feel threatened and confused by the letter to the extent of concluding that disputing the debt would not stave off some unknown action.

Accordingly [*26] and because there are no material issues of disputed fact relating to this issue, *see* Docket Entry Nos. 48, 50, and 52, the defendants' motion for summary judgment should be denied and the plaintiffs' motion for partial summary judgment granted as a matter of law.

*C. Omission of Statutorily Required Information*

The plaintiffs allege that, in failing to inform the debtor that a request of verification must be "in writing," the defendants violated the FDCPA. The relevant portion of the letter at issue provides as follows:

> Unless you, within 30 days after receipt of this notice, dispute the validity of this claim, or any portion thereof this claim will be assumed to be valid. If you, within 30 days after receipt of this notice, notify

the undersigned that the claim or any portion thereof, is disputed, we will obtain verification of the claim. Upon written request, we will provide you with the name and address of your original creditor, if different from the creditor listed above.

The defendants argue that, because *15 U.S.C. § 1692g(a)(3)* does not specifically require that the debt collector inform the debtor that he must dispute the validity [*27] of the debt in writing, summary judgment in their favor is appropriate on this issue.

Although the defendants correctly note the subsection g(a)(3) requires only that a debtor be informed of the 30 day period in which to dispute the validity of the debt, without reference to the requirement that the dispute must be reduced to writing, when read in conjunction with the accompanying subsections, it is clear that the gravamen of subsection g(a)(3) is the limitation period, not the format of the dispute, and that subsections g(a)(4) and g(a)(5) supply the format and the actions that may be invoked if the debtor complies within the limitation period. *See also 15 U.S.C. § 1692g(b)*. Although it is theoretically possible for the debtor to dispute the validity of the debt in some other format, it is only a written dispute or request that impels the debt collector to respond in the statutorily required manner. Clearly, if a debt collector's action is only invoked by the written submission from the debtor, the debtor must necessarily be informed of that requirement.

Moreover, subsection g(a)(4) clearly requires that the debtor be informed that, if he notifies the [*28] debt collector "in writing" of a dispute, the debt collector will obtain and mail to the debtor verification of the debt or a copy of the judgment. The defendants, however, did not inform the debtor that, in order to obtain verification, the notice must be in writing. Whether this failure to inform the debtor of the writing requirement is a violation of *section 1692g(a)(3)* is not unequivocally clear, but it is clearly a violation of *section 1692g(a)(4)*. Further, in omitting the writing requirement relating to verification of the claim, but including the necessity of a written request to obtain the name of the original creditor, the defendants imply by omission that there is no writing requirement attached to verifying or disputing the claim. Thus this omission serves to confuse the least sophisticated debtor and fails to effectively convey the validation notice.

The defendants rely upon the case of *Smith v. Transworld Sys., Inc., 953 F.2d 1025 (6th Cir. 1992)*, as authority for the proposition that "the FDCPA does not specifically state that the debt collector must inform the

consumer that the request for verification be in writing and this Circuit has upheld as much. [*29] " Docket Entry No. 40, at 16. However, the issue in *Smith* was not whether the debtor must be informed that a dispute must be in writing, but whether the following language adequately informed the unsophisticated consumer of his right to dispute any portion of the debt:

> All portions of this claim shall be assumed valid unless disputed within thirty days of receiving this notice. If disputed *in writing*, verification of the debt will be provided to you.

*Id. at 1028* (emphasis added). Although the Sixth Circuit found that the language at issue "adequately informs the reader that the debt must be disputed, if at all, within thirty days--it is implicit that the claim can be wholly, or partially, challenged," *id. at 1029*, the Court did not consider the question at issue in this case. Moreover, the language in the notice in that case and approved by the Court included the information omitted in the defendants' letter, i.e., that, to obtain verification of the debt, the consumer's dispute must be in writing.

Accordingly, the Court recommends that summary judgment be granted to the plaintiffs and denied to the defendants on this issue.

[*30] Finally, the plaintiffs allege that the failure to inform the debtor that, upon written request, the debt collector would mail them a copy of the verification of the debt or judgment violates the FDCPA. *Section 1692g(a)(4)* requires that the debtor be informed that "if the debt ... is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector." *Section 1692g(b)* also provides as follows:

> If the consumer *notifies the debt collector in writing* within the thirty day period described in subsection (a) of this section that the debt, or any portion thereof, is disputed, or that the consumer requests the name and address of the original creditor, the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of the judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the original creditor, is mailed to the consumer by the debt collector.

Case 2:07-cv-15474-PDB-RSW    Document 166    Filed 01/03/11    Page 27 of 158

Page 9
2002 U.S. Dist. LEXIS 25032, *

*15 U.S.C. § 1692g(b)* [*31] (emphasis added).

The defendants contend that they are entitled to summary judgment on this issue because the failure to inform the debtor that, on written request, they will mail a "copy of such verification or judgment" does not violate the FDCPA. The defendants do not provide any support for this contention, but cite *Beeman v. Lacy, Katzen, Ryen & Mittleman, 892 F. Supp. 405, 409 (N.D.N.Y. 1995),* as support for the proposition that "requiring the debt collector to inform the consumer that it will obtain and send a copy of a nonexistent judgment serves no salutary ... purpose." This holding does not, however, address the issue of whether a debt collector is specifically required to inform the debtor that, if a debt is properly disputed, a copy of the judgment or verification of the debt will be obtained by the debt collector and mailed to the debtor by the debt collector. It does not appear that the Sixth Circuit has specifically considered this issue, but the following dicta in *Beeman* is persuasive:

> Section 1692g(a)(4)'s use of the disjunctive "or" between "verification of the debt" and "copy of the judgment" leads to the conclusion that the debt [*32] collector is free to choose the appropriate form of verification. If a judgment exists, the debt collector *should promise to provide it.* If a judgment does not exist, the debt collector *must promise to provide alternative verification* of the debt.

*Id. at 410* (emphasis added). The clear import of requiring the debt collector to "promise to provide" is that the debtor must be informed that, once verification is obtained by the debt collector, the debtor will receive a copy of it.

Accordingly, summary judgment for the defendants on this issue should be denied, and summary judgment granted to the plaintiffs.

Finally, the plaintiffs assert that the defendants have violated *15 U.S.C. § 1692e(10),* which prohibits the "use of any false representation or deceptive means to collect or attempt to collect any debt ...." This claim, involving the issue of deception, is not susceptible to summary judgment and should be decided by a jury. *See Dutton v. Wolpoff & Abramson, 5 F.3d 649 (3rd Cir. 1993).*

## IV. MOTION FOR CLASS CERTIFICATION

The plaintiffs seek to certify a class pursuant to *Rule 23(a)* and *Rule 23(b)(2)* and [*33] *(3),* which provide as follows:

> (a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous the joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
>
> (b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and, in addition:
>
> ***
>
> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
>
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy ....

[*34] The burden is on the plaintiffs, seeking certification of a class, to establish the right to do so. *Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 163, 94 S. Ct. 2140, 40 L. Ed. 2d 732 (1974); Senter v. General Motors Corp., 532 F.2d 511* (6th Cir.), *cert. denied, 429 U.S. 870, 97 S. Ct. 182, 50 L. Ed. 2d 150 (1976).* In this case, the plaintiffs propose a class of all Tennessee residents who received from the defendants, collecting on behalf of Travelers Indemnity, the form letter sent to the plaintiffs as attached to their complaint, during the time period between September 19, 1998, and September 19, 1999. Specifically, the plaintiffs define the proposed class as follows:

> All persons in Tennessee to whom letters in the form of Exhibits A or B [to the plaintiffs' complaint] were sent in an attempt to collect debt incurred for per-

sonal, family or household purposes, which were not returned by the U.S. Post Office as undelivered during the one year period prior to the date of filing of the complaint in this action.

Docket Entry No. 25, at 1.

In opposition to class certification, the defendants submitted a two page memorandum [*35] raising three grounds: (1) that the plaintiffs must exclude those who have filed for Bankruptcy protection, but did not list the claim as an asset or, if they listed the claim as an asset, they have not been discharged; (2) that, because the plaintiffs seek only statutory damages, the "class method is inferior to individual actions" in this case; and (3) that class certification is premature because the issues of liability and damages have not yet been addressed. Docket Entry No. 34.

The defendants' first objection is peripherally related to the *Rule 23* analysis and will be addressed *infra* in the context of the discussion of numerosity. Although the defendants argue that the amount of statutory damages available to the class has not yet been determined, [10] the defendants cite no authority for denial of class certification or deferral of the issue of class certification on this ground. As the plaintiffs point out, each class member would be informed of his rights as a class member, the ability to be excluded from the class, and the binding effect of the litigation if not excluded pursuant to *Rule 23(c)(2)*. *See* Docket Entry No. 38. Accordingly, any class member with a claim [*36] for actual damages may opt-out of the class to pursue his own action.

    10  *Section 1692k(a)(2)(B)* provides that, in class actions, statutory damages may be awarded in an amount not to exceed the amount of the lesser of $ 500,000.00 or one per cent of the net worth of the debt collector.

The defendants imply that the potential class members may not be capable of making informed decisions to opt out of the class and pursue individual actions. Specifically, the defendants contend as follows:

    Third, because the issues of liability and damages have not yet been addressed, the decision of whether or not it is prudent to proceed as a class action cannot adequately (sic) be addressed at this time. Granting class certification at this time would trigger the sending of notices to the purported class members and expect them to make an informed decision on whether to opt in or out of the class without knowing what

they reasonably might expect to receive from this litigation. Plaintiffs counsel has made it quite clear [*37] that this case should be handled on the "least sophisticated consumer" standard and therefore this standard must be applied to the class action determination. That is if the "least sophisticated consumer" Plaintiff cannot make a reasonable decision on whether to opt in or out of a class action then it is not the preferable method of proceeding at that point. Later, after a determination of liability (if any) and the amount of statutory damages available then each purported class member may be able to make an informed decision.

    In the instant case there is a very real possibility that there may be a finding of no liability and even if liability is found there is a very real possibility that the amount of statutory damages will be nominal. Given that scenario granting class certification and sending out notice to class members to create the impression that they may receive something of value in the future is more false and deceptive than anything that this Defendant is alleged to have committed.

Docket Entry No. 34, at 1-2.

The defendants cite no authority, nor is the Court aware of any, that supports the proposition that a *Rule 23* determination is to be based on the ability [*38] of the "least sophisticated consumers" to make reasonable determinations of their own best interests in deciding to remain a class member or to pursue the matter in a separate action. The defendants also cite no authority, nor is the Court aware of any, that would support their position that class status should be determined after, rather than before, a determination of liability and/ or damages.

Before certifying a class, the Court must conduct a "rigorous analysis" into whether the prerequisites of *Rule 23* are met. *General Tel. Co. v. Falcon of the Southwest, 457 U.S. 147, 161, 102 S. Ct. 2364, 2372, 72 L. Ed. 2d 740 (1982).* The Court's broad discretion in deciding to certify a class must be exercised within the framework of *Rule 23.* All four prerequisites of *Rule 23(a)* must be met before a class can be certified. Once these criteria have been satisfied, the party seeking certification must also demonstrate that it falls within at least one of the sub-categories of *Rule 23(b),* i.e., that separate actions would create a risk of inconsistent adjudications, that injunctive or declaratory relief is appropriate with respect to the

class as a whole, or that common questions [*39] predominate over the individual questions and a class action is superior to other methods of adjudication.

The plaintiffs' allegations on the merits of the case are accepted as true in determining whether class certification is appropriate, *Eisen, 417 U.S. 177-178, 40 L. Ed. 2d 732, 94 S. Ct. 2140 (Rule 23* does not give a court "authority to conduct a preliminary inquiry into the merits of a suit to determine whether it may be maintained as a class action"), [11] but a class action may not be maintained merely because it is so designated by the plaintiffs. *Cash v. Swifton Land Corp., 434 F.2d 569, 571 (6th Cir. 1970)*. The party seeking class certification bears the burden of proof and there must be a sufficient basis of facts to show that each requirement of *Rule 23* is met. *In re American Med. Sys., Inc., 75 F.3d 1069, 1079 (6th Cir. 1996); Weathers v. Peters Realty Corp., 499 F.2d 1197, 1200 (6th Cir. 1974)*. Accordingly, "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Falcon, 457 U.S. at 160*.

> 11  But see *Coopers & Lybrand v. Livesay, 437 U.S. 463, 469, 98 S. Ct. 2454, 2458, 57 L. Ed. 2d 351 (1978)* (the Court's determination of class certification may involve some considerations related to the factual and legal issues of the plaintiff's claims).

[*40] *A. Numerosity*

*Rule 23(a)(1)* permits maintenance of a class action only "when the class is so numerous that joinder of all class members is impracticable." The proposed class, as defined by the plaintiffs, includes all persons in Tennessee to whom letters were sent in the form of exhibits A or B attached to the plaintiffs' complaint in an attempt to collect a debt incurred for personal, family, or household, purposes, which were not returned by the U.S. Post Office as undelivered, during the one year period prior to the date of filing of the complaint. According to the plaintiffs, 164 such debt collections notices were sent to individuals with Tennessee addresses during the pertinent time period.

The defendants do not dispute the number of individuals who received the form letters, but argue that, because the plaintiffs fail to detail how individuals who have filed for Bankruptcy protection without listing the potential claim as an asset in the Bankruptcy estate or who have listed the potential claim as an asset but have not yet been discharged will be excluded from the class or "their class" transferred to the Bankruptcy estate, class certification is inappropriate. Docket [*41] Entry No. 34.

The plaintiffs point out, however, that knowledge of any members of the proposed class who have filed for Bankruptcy protection is more likely to be within the defendants' control as creditors of a debt that may have been discharged in Bankruptcy proceedings and, accordingly, the defendants may seek that recovery by any such class member be paid to the Bankruptcy estate. The defendants do not indicate whether any class members have, in fact, filed for Bankruptcy protection. In any class action, there is always a possibility that potential class members may file for Bankruptcy protection, and the Court acknowledges that the possibility may increase if the class consists of debtors. However, the defendants have not cited, nor is the Court aware of any cases in which this issue has been addressed in the context of the propriety of class certification.

The Court finds that the plaintiffs have met the numerosity requirement. *See Afro American Patrolmens League v. Duck, 503 F.2d 294 (6th Cir. 1974); Van Vels v. Premier Athletic Center of Plainfield, Inc., 182 F.R.D. 500, 507 (W.D. Mich. 1998)*.

*B. Commonality*

*Rule 23(a)(2)* requires [*42] that there be questions of fact or law common to the class. The plaintiffs contend that there are three issues common to the proposed class: (1) whether the demand for "Immediate payment" and "Send payment today" contained in the form letter contradicts and overshadows the 30 days within which the consumer may request validation of the debt; (2) whether the form letter fails to inform the consumer that "a copy of such verification or judgment will be mailed to the consumer by the debt collector;" and (3) whether the letter fails to inform the consumer that a request for verification must be "in writing."

The *Rule 23(a)(2)* standard for commonality is "qualitative rather than quantitative--that is, there need be only a single issue common to all members of the class." 1 Herbert Newburg & Alba Conte, *Newburg on Class Actions* § 3.10 (3d ed. 1992). In addressing the prerequisites of *Rule 23(a)*, the United States Supreme Court has noted as follows:

> The commonality and typicality requirements of *Rule 23(a)* tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's [*43] claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge

with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest.

*Falcon, 457 U.S. at 157 n. 13, 102 S. Ct. at 2370 n.13.*

Because all of the proposed class members received the form letter at issue, the allegations in the complaint are common to all proposed class members. *See Avila v. Van Ru Credit Corp., 1995 U.S. Dist. LEXIS 461, 1995 WL 41425, * 11 (N.D. Ill. Jan. 31, 1995); Colbert v. Trans Union Corp., 1995 U.S. Dist. LEXIS 578, 1995 WL 20821, * 2 (E.D. Pa. Jan. 12, 1995).* This case involves the standardized conduct of the defendants and the claims of the individual class members do not have to match precisely. *Adames v. Mitsubishi Bank, Ltd., 133 F.R.D. 82, 90 (E.D.N.Y. 1989).* When the questions of law involve "a standardized conduct of the defendants toward members of the proposed class, a common nucleus of operative facts is typically presented and the commonality [*44] requirement of *Rule 23(a)(2)* is usually met. *Franklin v. City of Chicago, 102 F.R.D. 944, 949 (N.D. Ill. 1984).*

The Court finds that common questions of law and fact are presented and that, therefore, the plaintiffs have met the commonality requirement of *Rule 23(a)(2).*

### C. Typicality

*Rule 23(a)(3)* requires that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." A plaintiff's claim is typical if it "arises from the same event or course of conduct that gives rise to the claims of other class members and is based on the same legal theory." *Paskel v. Heckler, 99 F.R.D. 80, 84 (E.D. Pa. 1983).*

In this case, the plaintiffs' claims arise from the same course of conduct, i.e., the mailing of at least one of the two form notices at issue. When the same alleged "unlawful conduct was directed at both the named plaintiff and the class to be represented, the typicality requirement is usually met irrespective of varying fact patterns which underlie individual claims." 1 *Newburg, supra,* at 3.13. Although the debt claimed in the individual notices may vary, individual damages are not likely [*45] to vary greatly among class members. In almost every class action, damages will vary for each member and the existence of individual issues does not bar class certification. *See Simon v. Westinghouse Elec. Corp., 73 F.R.D. 480, 486 (E.D. Pa. 1977).* In addition, the FDCPA provides for class-wide awards, obviating the need for calculating individual damages. *15 U.S.C. § 1692k(a)(2)(B).*

Accordingly, the Court finds that the plaintiffs have satisfied the typicality requirement.

### D. Adequacy of Representation

There are two criteria for determining whether the representation of the class will be adequate: (1) the representative(s) must have common interests with the unnamed members of the class, and (2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel. *Senter, 532 F.2d at 524-25.* The plaintiffs, as debtors, having received debt collection notices that allegedly violated the FDCPA, have common interests with those of the class on all issues asserted in this case. [12]

> 12   The *Rule 23(a)(4)* requirement that "the representative parties will fairly and adequately protect the interests of the class" is satisfied "when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Robidoux v. Celani, 987 F.2d 931, 936 (2d Cir. 1993),* citing *In re Drexel Burnham Lambert Group, 960 F.2d 285, 291 (2d Cir. 1992), cert. dismissed, 506 U.S. 1088, 113 S. Ct. 122,* L. Ed. 2d 497 (1993).

[*46] The second criterion is also met inasmuch as the affidavits of plaintiffs' counsel indicate that they are well qualified to undertake the representation of the plaintiff class. In addition to competent local counsel, the plaintiffs are represented by O. Randolph Bragg, a member of the bars of the United States Supreme Court, the Sixth Circuit Court of Appeals, and numerous other United States courts of appeal and district courts, whose practice since the early 1970s has focused on consumer representation. He has represented plaintiffs in numerous class action and consumer lawsuits, including *Bartlett v. Heibl, 128 F.3d 497 (7th Cir. 1997), Dutton v. Wolpoff & Abramson, 5 F.3d 649 (3rd Cir. 1993),* and *Van Vels v. Premier Athletic Center of Plainfield, Inc. 182 F.R.D. 500 (W.D. Mich. 1998),* cited herein, and numerous other consumer cases in United States courts of appeals and district courts. *See* Docket Entry No. 14; [13] Docket Entry No. 28 (Exhibit 3 to Docket Entry No. 25).

> 13   The Court notes that, in April 2000, the plaintiffs moved for an extension of time in which to file dispositive motions because Mr. Bragg underwent a kidney transplant operation. Mr. Bragg remains counsel of record and, accordingly, the Court presumes that his health issues will not affect his active representation of the plaintiffs in this action.

[*47] *E. Requirements of Rule 23(b)*

Once the plaintiffs have shown that they have met the requirements of *Rule 23(a)*, they must then show that they met at least one of the following additional requirements of *Rule 23(b)*: (1) that separate actions would create a risk of inconsistent adjudications; (2) that injunctive or declaratory relief is sought; or (3) that common questions of law or fact predominate over individual questions. It is the plaintiffs' position that the second and third requirements of *Rule 23(b)* have been met.

*Rule 23(b)(3)* provides that a class should be certified when "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

When there is an "essential common factual link between all class members and the defendant for which the law provides a remedy," questions of law or fact common to the class exist. *Halverson v. Convenient Food Mart, Inc., 69 F.R.D. 331, 334 (N.D. Ill. 1974)*. Specifically, cases addressing the legality of [*48] standardized documents and practices often result in the predomination of common questions of law or fact and are, therefore, generally appropriate for class certification. *See Haynes v. Logan Furniture Mart, Inc., 503 F.2d 1161, 1164 (7th Cir. 1974)* (class action was appropriate under the Truth in Lending Act when the defendant used a standardized form installment retail contract). Further, plaintiff classes have been certified in several cases involving claims under the FDCPA based upon a defendant's use of standardized forms. *See, e.g., Avila, 1995 U.S. Dist. LEXIS 461, 1995 WL 41424*; *Colbert, 1995 U.S. Dist. LEXIS 578, 1995 WL 20821*; *Carr v. Trans Union Corp., 1995 U.S. Dist. LEXIS 567, 1995 WL 20865 (E.D. Pa. Jan. 12, 1995)*.

In this case, it is the use of standardized debt collection letters that has given rise to the plaintiffs' claims. The questions of law and fact involved in this case relate to the use of the debt collection letters admittedly mailed by the defendants to the proposed class members. The common questions of law and fact relating to the contents and mailing of these letters predominate over any individual issues. Accordingly, the Court finds that the plaintiffs have satisfied [*49] this prong of *Rule 23(b)(3)*.

In addition to the predomination of common questions of law or fact, a class action must be the superior method to resolve the controversy to fully satisfy the requirements of *Rule 23(b)(3)*. Class actions are the superior method for resolving controversies when the main objectives of *Rule 23* are served, i.e., the efficient resolution of the claims of many individuals in a single action, as well as the elimination of repetitious litigation and possibly inconsistent adjudications. *See Califano v. Yamasaki, 442 U.S. 682, 700-01, 99 S. Ct. 2545, 2557-58, 61 L. Ed. 2d 176 (1979)*. The Court is required to determine the best available method for resolving the controversy in keeping with "judicial integrity, convenience and economy." *Hurwitz v. R.B. Jones Corp., 76 F.R.D. 149, 172 (W.D. Mo. 1977)*. It is appropriate to consider the "inability of the poor or uninformed to enforce their rights and the improbability that large numbers of class members would possess the initiative to litigate individually." *Haynes, 503 F.2d at 1165*. "Class actions are often the most suitable method for resolving suits to enforce compliance [*50] with consumer protection laws because the awards in an individual case are usually too small to encourage the lone consumer to file suit." *Colbert, 1995 U.S. Dist. LEXIS 578, 1995 WL 20821, *3*.

In this case, the proposed plaintiff class is comprised of consumers who are not likely to bring suit on their own and the maximum individual recovery is not likely to entice many attorneys to undertake individual lawsuits. For these reasons, the Court finds that a class action is the superior method for resolving this controversy.

In addition, the plaintiffs seek a declaratory judgment that the defendants' use of the standardized form letter is violative of the FDCPA, [14] and the Court finds that certification of a class is also appropriate under *Rule 23(b)(2)*. *See Gammon v. GC Serv. Ltd. P'ship, 162 F.R.D. 313, 319 (N.D. Ill. 1995)* (upon remand from 7th Circuit).

> 14   Injunctive relief is not available under the Act. *See Gammon, 162 F.R.D. at 319*.

Therefore, the plaintiffs have met each of prerequisites [*51] in *Rule 23(a)* and have satisfied both prongs of *Rule 23(b)(2)* and *(3)*, and a plaintiff class should be certified.

The differences between a *Rule 23(b)(2)* and a *Rule 23(b)(3)* class must be addressed. *Rule 23(b)(3)* class members must be given notice of the class and an opportunity to opt out. That procedure is unnecessary in a *Rule 23(b)(2)* class, which is considered a "mandatory" class. *See Coleman v. General Motors Acceptance Corp., 296 F.3d 443, 447 (6th Cir. 2002)*. In *Coleman*, the Sixth Circuit noted that money damages are recoverable by a *Rule 23(b)(2)* class in "certain situations," but were not recoverable in that case brought under the Equal Credit Opportunity Act. *Id. at 447*. The Court cautioned that "close scrutiny is necessary if money damages are to be included in any mandatory class to protect the individual interests at stake." *Id. at 448*. Although this case presents more homogeneity among the plaintiff class than did

2002 U.S. Dist. LEXIS 25032, *

*Coleman,* notice and an opportunity to opt out should be provided to each of the class members in this case in accord with a *Rule 23(b)(3)* class.

## V. RECOMMENDATION

Based on the foregoing, the [*52] Magistrate Judge respectfully recommends the following:

(1) That the defendants' motion for summary judgment (Docket Entry No. 39) be DENIED in full.

(2) That the plaintiffs' motion for partial summary judgment (Docket Entry No. 43) be GRANTED on the plaintiffs' claim that defendant Compucred violated the FDCPA by failing to comply with *15 U.S.C. §§ 1692g(a)(3)* and *1692g(a)(4).*

(3) That the plaintiffs' motion for partial summary judgment (Docket Entry No. 43) be DENIED on the plaintiffs' claim that the defendants violated *15 U.S.C. § 1692e(10).*

(4) That the plaintiffs' motion for class certification (Docket Entry No. 25) be GRANTED, and the following class be certified under *Rule 23(b)(3) of the Federal Rules of Civil Procedure*:

All persons in Tennessee to whom letters in the form of Exhibits A and B attached to the plaintiffs' complaint were sent in an attempt to collect a debt incurred for personal, family or household purposes, which were not returned by the United States Post Office, during the period September 19, 1998, and September 19, 1999.

Any objections to this Report and Recommendation must be filed with the [*53] Clerk of Court within ten (10) days of receipt of this notice, and must state with particularity the specific portions of this Report & Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order. *See Thomas v. Arn, 474 U.S. 140, 88 L. Ed. 2d 435, 106 S. Ct. 466 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).*

Respectfully Submitted,

11/15/02

JULIET GRIFFIN

United States Magistrate Judge

# TAB D



LEXSEE 1995 U.S. DIST. LEXIS 578

**STACY COLBERT, Plaintiff v. TRANS UNION CORPORATION, TRANS UNION CREDIT INFORMATION COMPANY, Defendants**

**CIVIL ACTION NO. 93-6106**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*1995 U.S. Dist. LEXIS 578*

**January 12, 1995, Decided**

**COUNSEL:** [*1] FOR STACY COLBERT, INDI-VIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, PLAINTIFF: PHILIP STEPHEN FUOCO, HADDONFIELD, NJ. JOHN SHNIPER, PHOENIXVILLE, PA.

FOR TRANS UNION CORPORATION, DEFEN-DANT: MARK E. KOGAN, BRUCE S. LUCKMAN, MARION, SATZBERG, TRICHON & KOGAN, P.C., PHILA, PA. FOR TRANS UNION CREDIT INFOR-MATION COMPANY, DEFENDANT: BRUCE S. LUCKMAN, MARION, SATZBERG, TRICHON & KOGAN, P.C., PHILA, PA.

**JUDGES:** Robert S. Gawthrop, III, J.

**OPINION BY:** Robert S. Gawthrop, III

**OPINION**

*MEMORANDUM*

Plaintiff alleges that defendants sent her a debt col-lection notice which violated various provisions of the Fair Debt Collection Practices Act, *15 U.S.C. § 1692 et seq.* (the "Act"), and the Pennsylvania Unfair Trade Prac-tices and Consumer Protection Law, *73 P.S. § 201-3.1.* The state regulations governing debt collection practices, 37 Pa. Code § 303.1 et seq., are substantially similar to the federal.

According to the complaint, plaintiff received a form notice sent by defendants to individuals who allegedly owed debts to Bell Telephone of Pennsylvania. Pending before the court is plaintiff's motion to certify a class pursuant to *Fed.R.Civ.Proc. 23(a), 23(b)(3),* which pro-vide: [*2]

(a) One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so nu-merous that joinder of all members is im-practible, (2) there are questions of law or fact common to the class (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the in-terests of the class.

(b) An action may be maintained as a class action if the prerequisites of subdivi-sion (a) are satisfied, and in addition:

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fair and efficient adjudication of the controversy.

Plaintiff bears the burden of proving that the class should be certified. *Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 163, 40 L. Ed. 2d 732, 94 S. Ct. 2140 (1974).*

The proposed class consists of all Pennsylvania resi-dents who, since November 19, 1992, have received from defendants, collecting [*3] on behalf of Bell of

1995 U.S. Dist. LEXIS 578, *

Pennsylvania, a debt collection notice similar to that attached to plaintiff's complaint. Based upon an analysis of the factors enumerated in *Rule 23*, I shall certify this class.

## I. *Rule 23(a) Considerations*

### A. *Numerosity*

*Rule 23(a)(1)* permits class action treatment only when "the class is so numerous that joinder of all class members is impracticable." No specific number of class members is required. *Weiss v. York County Hospital, 745 F.2d 786, 808 (3d Cir. 1984)* (certification of a class comprising 92 members); *Philadelphia Electric Co. v. Anaconda American Brass Co., 43 F.R.D. 452, 463 (E.D. Pa. 1968)* (certifying a class of 25).

Plaintiff asserts that, upon information and belief, between 10,000 and 35,000 individuals received the allegedly illegal notices. Defendants do not challenge plaintiff's estimate, and it admits that it used the notice and envelope received by plaintiff for its mass mailings to Bell Telephone's debtors. *See* Defendants' Responses and Objections to Admissions. I shall accept plaintiff's estimates as sufficient, in spite of her inability to provide a precise figure. [*4] A class may be certified, even when its exact size is unknown, if "common sense or common knowledge indicates that it is large." *Bartelson v. Dean Witter & Co., 86 F.R.D. 657, 676 (E.D. Pa. 1980)*. The notice at issue is a form letter sent on behalf of a company which serves a large number of individuals. Considering this form was sent out on a recurring basis, tens of thousands of individuals might have received it.

The class must be so numerous that joinder is impracticable. Impracticability is "a subjective determination based on number, expediency and inconvenience of trying individual suits." *Pabon v. McIntosh, 546 F. Supp. 1328, 1333 (E.D. Pa. 1982)*. It is more convenient and expedient for the court to determine illegality of the notice, which will be the identical issue in every case, in one proceeding.

### B. *Commonality*

Class action treatment under *Rule 23(a)(2)* requires that there be questions of fact or law common to the class. Plaintiff argues that the predominant legal and fact issue in plaintiff's case, whether the form notice and envelope violated the Act, is common to a class of people who received the notice.

[*5] Defendants argue that plaintiff cannot establish commonality because two of her allegations would not be common to the class. First, the complaint alleges that plaintiff received an improper response when she phoned defendants to validate her debt. In order to establish commonality, defendants argue, plaintiff would have to establish that each class member called and received the same improper response. Plaintiff has agreed not to pursue any claims based upon oral misrepresentation or defendants' telephone practices. Thus, this issue does not defeat commonality.

Second, the complaint alleges that the window envelope sent to plaintiff revealed the words "Creditor: Bell Telephone" on the notice. Complaint, P 54. *15 U.S.C. § 1692f(f)(7)-(8)* prohibits creditors from identifying individuals as debtors on the exterior of collection envelopes. According to the complaint, the envelopes sent to the class members were defectively constructed to reveal those words. Defendants claim that mangling or some other distortion of the window caused the offending words to appear on the exterior of plaintiff's envelope; thus, it argues, plaintiff would have to establish [*6] that each class member received a similarly mangled envelope.

It is not apparent from the exhibits attached to the complaint that the envelopes must be mangled in order to reveal the offending words, and defendants have not submitted evidence to prove that a unique distortion caused the words to appear on the exterior of plaintiff's envelope. Although plaintiff has the burden to prove that the action satisfies *Rule 23*, the court "may consider reasonable inferences drawn from the facts before it at this stage of the proceedings." *Delgado v. McTighe, 91 F.R.D. 76, 78 (E.D. Pa. 1981)*. In the absence of evidence to the contrary, the court reasonably infers from the complaint and its exhibits that the defect appeared on all class members' envelopes. In any event, *Rule 23(a)(2)* does not require all issues to be common. *Weiss, 745 F.2d at 809*. Plaintiff alleges six specific violations of the Fair Debt Collection Practices Act. Complaint, P 14. Only one of those allegations concerns the defective envelope. Thus, even if the defect did not appear on every class member's envelope, common issues would still predominate over the individual [*7] issue. *See, e.g., West v. Costen, 558 F. Supp. 564, 573* (class must be decertified when individual rather than common issues predominate).

### C. *Typicality*

*Rule 23(a)(3)* requires that "the claims or defenses of the representative parties . . . [be] . . . typical of the claims or defenses of the class." "[A] plaintiff's claim is typical if it arises from the same event or course of conduct that gives rise to the claims of other class members and is based on the same legal theory." *Paskel v. Heckler, 99 F.R.D. 80, 83 (E.D. Pa. 1983)*.

In this case, plaintiff's claims arise from the same course of conduct, mailing the form notice, that gives rise to the proposed class's claims. Defendants argue that plaintiff's claim is not typical because individual damages in the case of each class member will be different. In almost every class action, damages will vary for each member; the existence of this individual issue is not a bar to a class action. *See Simon v. Westinghouse Elec. Corp.,* *73 F.R.D. 480, 486 (E.D. Pa. 1977).* Individual damages are not likely to vary greatly among class members. In any event, [*8] the Fair Debt Collection Practices Act provides for class-wide awards, obviating the need for calculating individual damages. *15 U.S.C. 1692k(A)(2)(B).* [1]

    1   The complaint does not seek damages under state law.

### D. *Adequacy of Representation*

*Rule 23(a)(4)* requires that "the representative parties will fairly and adequately protect the interests of the class." In *Wetzel v. Liberty Mutual & Life Ins. Co., 508 F.2d 239, 247* (3d Cir.), *cert. denied, 421 U.S. 1011, 44 L. Ed. 2d 679, 95 S. Ct. 2415 (1975),* the Third Circuit stated that "adequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." Defendants do not challenge the adequacy of plaintiff's counsel, nor do they argue that plaintiff's interests would [*9] be antagonistic to those of a class. Plaintiff's counsel appears to be competent and experienced in class action litigation, and plaintiff's interests are not in conflict with those of the other class members who received the form notice.

### II. *Rule 23(b) Considerations*

In addition to satisfying the four requirements of *Rule 23(a),* plaintiff must establish that class certification is appropriate under *Rule 23(b)(3).* The court has found one of the rule's requirements, that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members," to be satisfied under its *Rule 23(a)* analysis in Part I. *Rule 23(b)(3)* also requires the court to find that "a class action is superior to other available methods for fair and efficient adjudication of the controversy."

The rule lists the following four factors to guide the court's analysis:

A. *"The interest of members of the class in individually controlling the prosecution or defense of separate actions"*

Class actions are often the most suitable method for resolving suits to enforce compliance with consumer protection laws because the awards in an individual case are usually [*10] too small to encourage the lone consumer to file suit. *See, e.g., Watkins v. Simmons & Clark, Inc., 618 F.2d 398, 404 (6th Cir. 1980).* The Fair Debt Collection Practices Act limits awards beyond actual damages to $ 1000. *15 U.S.C. 1692k(a)(2)(A).* With minor damages awards at stake in this case, the interests of individual class members in controlling the litigation are small. Liability in each case will turn on the contents of the standardized notice form.

B. *"The extent and nature of any litigation concerning the controversy already commenced by or against members of the class"*

Neither party has brought to the court's attention litigation commenced by other class members.

C. *"The desirability or undesirability of concentrating the litigation of the claims in a particular forum"*

This factor invites considerations of judicial economy and convenience of the forum. *In re Fine Paper Antitrust Litigation, 685 F.2d 810 (3d Cir. 1982).* As noted above, it is judicially efficient to determine the defendants' liability for mailing this standardized form in a single proceeding. This court [*11] is also a convenient forum for a class comprising Pennsylvania residents.

D. *"The difficulties likely to be encountered in management of a class action"*

The court is not likely to encounter significant management problems in this case. The class is narrowly defined, and defendants' records will provide the names and addresses of potential members. The liability issue will be identical for each member, and as noted above, the Act simplifies the award of damages in class actions.

### III. *Conclusion*

In light of the considerations discussed above, I shall certify the proposed class pursuant to *Rule 23(b)(3).*

An order follows.

### ORDER

AND NOW, this 12th day of January, 1995, upon consideration of Plaintiff's Motion for Class Certification, and the responses thereto, Plaintiff's Motion is GRANTED.

The following class is certified pursuant to *Rule 23(b)(3):* all Pennsylvania residents who, since November 19, 1992, have received from defendants, collecting on behalf of Bell Telephone of Pennsylvania, a debt col-

1995 U.S. Dist. LEXIS 578, *

lection notice similar to that attached to plaintiff's complaint.

BY THE COURT:

Robert S. Gawthrop, III, J.

# TAB E



LEXSEE 2009 U.S. DIST. LEXIS 15837

**DAVID DATE JR., Plaintiff, v. SONY ELECTRONICS INC., and ABC APPLI-ANCE, INC. d/b/a ABC WAREHOUSE, Defendants.**

**Case Number:07-15474**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION**

*2009 U.S. Dist. LEXIS 15837*

**February 20, 2009, Decided**
**February 20, 2009, Filed**

**SUBSEQUENT HISTORY:** Motion denied by *Date v. Sony Elecs., Inc., 2010 U.S. Dist. LEXIS 96870 ( E.D. Mich., Sept. 16, 2010)*

**PRIOR HISTORY:** *Date v. Sony Elecs., Inc., 2009 U.S. Dist. LEXIS 65968 ( E.D. Mich., Jan. 16, 2009)*

**COUNSEL:** [*1] For David Date, Jr, Plaintiff: Hallen D. Rosner, LEAD ATTORNEY, Rosner & Mansfield, San Diego, CA; Lance A. Raphael, LEAD ATTORNEY, The Consumer Advocacy Center, Chicago, IL; Dani K. Liblang, Liblang Assoc., Birmingham, MI.

For Jason Demas, Plaintiff: Hallen D. Rosner, LEAD ATTORNEY, Rosner & Mansfield, San Diego, CA; Lance A. Raphael, LEAD ATTORNEY, The Consumer Advocacy Center, Chicago, IL.

For John Renninger, Plaintiff: Lance A. Raphael, LEAD ATTORNEY, The Consumer Advocacy Center, Chicago, IL.

For Sony Electronics, Incorporated, Defendant: Douglas C. Salzenstein, Honigman, Miller, (Detroit), Detroit, MI; Nancy S. Cohen, Ronald A. Valenzuela, Proskauer Rose LLP, Los Angeles, CA; Richard E. Zuckerman, Honigman, Miller, Detroit, MI.

For ABC Appliance, Incorporated, Doing business as ABC Warehouse, Defendant: Nancy S. Cohen, Ronald A. Valenzuela, Proskauer Rose LLP, Los Angeles, CA.

For Elliot Handler, Objector: Hans J. Massaquoi, Lewis & Munday, Detroit, MI.

**JUDGES:** PAUL D. BORMAN, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** PAUL D. BORMAN

**OPINION**

**ORDER (1) WITHDRAWING REQUEST FOR BRIEFING, AND (2) AMENDING THE COURT'S JANUARY 16, 2009, OPINION AND ORDER RE-JECTING CLASS ACTION SETTLEMENT**

Before the Court is Defendants' [*2] Motion to Amend Court's January 16, 2009 Order Rejecting Class Action Settlement. (Doc. No. 77). Having considered Defendants' motion, the Court has amended its January 16, 2009, order; consequently, briefing by Plaintiff and objector Elliot Handler is no longer necessary. The amended opinion and order is attached to this order. Sentences that have been deleted appear with a line through the sentence, and additions are underlined.

SO ORDERED.

/s/ Paul D. Borman

PAUL D. BORMAN

UNITED STATES DISTRICT JUDGE

Dated: 2/20/09

Detroit, Michigan

## AMENDED OPINION AND ORDER REJECTING CLASS ACTION SETTLEMENT

Before the Court is Plaintiff David Date, Jr.'s motion for final approval of the class action settlement, filed October 20, 2008. (Doc. No. 64). Defendants Sony Electronics Inc. and ABC Appliance, Inc. have filed a statement in support of final approval of the class action settlement. (Doc. No. 65). Nineteen people filed objections to the proposed settlement. The Court held a fairness hearing on November 3, 2008, at which the parties were present, and one objector, Elliot Handler, was represented by counsel. Having reviewed the entire record, and for the reasons discussed below, this Court concludes [*3] that the objectors have met their significant burden in opposing the settlement, and, therefore, the Court REJECTS the class action settlement.

## I. BACKGROUND

[EDITOR'S NOTE: TEXT WITHIN THESE SYMBOLS [O> <O] IS OVERSTRUCK IN THE SOURCE.]

Plaintiff David Date, Jr. ("Plaintiff") filed this action in the United States District Court for the Southern District of California on behalf of a nationwide class of consumers against Defendants Sony Electronics, Inc. and ABC Appliance, Inc., d/b/a ABC Warehouse, (collectively "Sony"), relating to the false advertising in the sale of certain Sony television sets. (Complaint, PP 10, 12). Specifically, Sony advertised and promoted the television sets as being capable of displaying 1080p resolution; but the television sets do not accept the 1080p digital video input signal. [1] (Def.'s Br. Ex. K, Jean-Pierre Guillou Decl. P 10). As sold, the television sets at issue [O> display <O] can, at best, display an upconverted 1080i digital video input signal from a 1080p device [O> resolution, a less desirable resolution. <O] [2] (Fairness Hr'g Schmidt 67-68). Today, as Sony Engineer Guillou noted, "only Blu-ray Disc Players and certain High-Definition DVD Players are [*4] capable of transmitting a 1080p signal." (Guillou Decl. P 12). [O> The instant television sets eamiot accept, and therefore eannot display a 1080p picture. <O] The television sets cannot accept and display a native 1080p digital video input signal, unless the 1080p device first downconverts the 1080p source material to a 1080i signal, and the 1080i signal is transmitted to the television set, where the television set then re-interlaces and upconverts the 1080i signal before it is displayed. (Fairness Hr'g Schmidt 67-68). This process creates artifacts, such as feathering, in the television picture. (Id. at 52-53). Feathering does not occur when a native 1080p digital video input signal is outputted on a 1080p television without de-interlacing and upconverting the signal. The Court observed the feathering, a deficient display, at the fairness hearing. Like the instant Sony television sets, the vast majority of television sets on the

market in 2004 and 2005 were not capable of accepting 1080p digital video input signals. (Id. at PP 10, 11). Finally, the instant television sets cannot be redesigned or augmented to display native 1080p digital video input signals.

> 1   1080p is the shorthand [*5] name for a category of display resolutions. The number "1080" represents 1,080 lines of horizontal pixel rows that the display component is capable of projecting onto the television screen, while the letter "p" stands for progressive scan. (Guillou Decl. P 7). A progressive scan television simultaneously scans all of the pixel rows onto the screen, whereas a 1080i television displays half of the pixel rows in one field, then displays the remaining half in the next field. (Id. at P 5). 1080p is the superior signal and display resolution.
>
> 2   Over-the-air television signals are not currently broadcast in 1080p, nor is it likely that television will ever be broadcast in 1080p because the necessary bandwidth is not available. (Guillou Decl. P 12). However, at the fairness hearing, Objector Handler claimed that the Dish Network is now broadcasting on-demand movies in 1080p. (Tr. 93-94).

Plaintiff's counsel accurately set forth the claim at the November 3, 2008, fairness hearing as follows:

> The essence of the lawsuit was that Sony misled consumers . . . that the televisions themselves gave what was known as a 1080p resolution . . . . [T]he essence of the litigation is that there's a difference [*6] between a television that was advertised or promoted as being a 1080p, or what's known as a progressive scan, and one that was 1080i, which is known as an interlaced scan.

Fairness Hr'g Tr, Mansfield, 9, November 3, 2008 [hereinafter Tr.].

Objector Handler's counsel later added: "Even though they were sold as 1080p televisions, they did not accept a 1080p signal, period, end of story. Defendants admit that." (Tr. 96, Kaplan).

Presently, there are devices that transmit 1080p digital video input signals. Sony Blu-ray disc players, certain HD-DVD players, specific gaming devices (e.g. PlayStation 3), and a limited number of personal computers all transmit a 1080p signal. (Id. at P 12; Def.'s Br. 11). The television sets at issue are not capable of displaying the 1080p signal that these devices transmit because the

television sets lack the input mechanisms to support them. Furthermore, [O> over-the-air television signals are not currently broadcast in 1080p, so the television sets cannot <O] while the television sets can input [O> the <O] a 1080p over-the-air broadcast signal, such a signal does not currently exist and it is not likely to ever exist. (Guillou Decl. P 12). This does not adversely [*7] affect Plaintiff's claim that Sony advertised the television sets as being capable of inputting a 1080p digital video signal, but the television sets cannot display that signal without deinterlacing and upconverting, which produces feathering.

In 2004, Sony introduced two of the television sets at issue, the KDS-70Q006 and KDX-46Q005 (the "QUALIA television sets"); the other two models, the KDS-R50XBR1 and KDS-R60XBR1 (the "XBR1 television sets") (collectively, "television sets"), were introduced in the Summer of 2005. (Def.'s Br. Ex. J, Jeff Goldstein Decl. P 2). Sony sold the majority of the television sets at issue to third-party retailers, such as ABC Warehouse, which in turn sold them to the public. (Id.) Sony sold a small number of these sets directly to consumers through its website and outlet stores. (Id.) Sony charged consumers $ 2,999 to $ 3,999 for the KDS-R50XBR1 model, $ 3,999 to $ 4,999 for the KDS-R60DBR1 model, $ 13,000 for the KDS-70Q006 model and $ 14,999 for the KDX-46Q005 model. (Parties' Response to Court's November 21, 2008 Order Requesting Information 3 n. 1). All totaled, Sony sold approximately 3,000 QUALIA television sets and 172,000 XBR1 television sets. (Goldstein [*8] Decl. P 2).

In the Summer and Fall of 2006, Sony introduced a new high-definition television product line to succeed the XBR1 television sets. (Id. at P 3). The QUALIA televisions sets were never succeeded by a second generation product line, and Sony no longer manufactures or sells either the QUALIA or XBR1 televisions sets. (Id.) The last shipment of XBR1 televisions sets was sent to retailers in September 2006. (Id. at P 2).

Plaintiff's lawsuit was transferred to this Court on December 27, 2007. (Doc. No. 1). In his second amended complaint, Plaintiff alleges that Sony and ABC misled consumers by describing the television sets' display resolution as "1080p" because the television sets do not display 1080p resolution, are incapable of accepting 1080p video signals, and cannot accept and display video content at 1080p resolution via the PC or HDMI input jacks. (Second Am. Compl. PP 21, 25, 27). Plaintiff alleged claims of breach of contract and warranty, false advertising, unjust enrichment and violations of the Magnuson-Moss Warranty Act, *15 U.S.C. §2301*, and the Michigan Consumer Protection Act, *M.C.L. §§445.901, et seq.* (Id.) Plaintiff sought damages to compensate him

for overpaying [*9] for what was advertised as, but was not, a 1080p capable television set. (Id.)

Sony argues, in response to Plaintiff's claims, that representing that a television set has a certain display resolution tells a consumer only what the display resolution is, and does not indicate which of the many types of video signals the television can accept. (Memo. of Points and Authorities in Support of Joint App. for Prelim. Approval of Settlement Class Action [hereinafter Memo.] 4).

The parties reached a proposed settlement on February 4, 2008. (Memo. 14). According to the parties, settlement discussions were conducted from September 2007 until February 4, 2008. (Doc. No. 27, Valenzuela Decl. P 6; Doc. No. 26, Alan Mansfield Decl. P 5). The parties claim that the settlement negotiations were often contentious, that the parties exchanged extensive information about the technical specifications of the television sets and the television sets' sales and marketing, and further that the parties participated in two all-day mediation sessions held on January 23 and 29, before retired Justice Howard B. Wiener, a former Associate Justice of the California Court of Appeal. (Valenzuela Decl. P 7; Mansfield Dec. [*10] PP 4-5; Doc. No. 23, Justice Howard B. Wiener Decl. PP 2, 6.) During the mediation, Sony performed a side-by-side comparison of three of its television sets, including the model Plaintiff purchased. (Id. at P 4). Justice Wiener concluded that the settlement terms, and the demonstration, supported the value of the proposed settlement. (Id.)

The proposed settlement class consists of all original United States end user consumers who purchased, or received as a gift from the original purchaser at retail, a QUALIA television set or XBR1 television set ("Settlement Class"). (Valenzuela Decl., Ex. A, Settlement Agreement § 1.10 [hereinafter Settlement Agreement]). The proposed settlement described by Plaintiff's counsel at the Court's fairness hearing on November 3, 2008, was set forth in this format:

**Settlement Terms**

. Class wide settlement

. 3 Benefits:

  Benefit I:

    . $ 90 Cash

    . called Sony prior to January 8, 2008

    . called about 1080p input & using TV as a computer monitor

  Benefit II:

. 180 e-credit if QUALIA owner

. 60 e-credit if XBR1 owner

. must have bought 1080p device (e.g., HD-DVD player, Blu-ray disc player, gaming console) -- any brand -- before July 25, 2008

Benefit III:

. $ 75 e-credit if [*11] QUALIA owner

. $ 28 e-credit if XBR1 owner

. must buy Sony Blu-ray Disc Player between July 25, 2008 and 30 days after final judgment is final

The proposed settlement offers two types of benefits: cash payments (Benefit I) and e-credit good toward the purchase of merchandise at Sony's online store (Benefit II), and e-credits good toward the purchase of a Sony Blu-ray Disc Player (Benefit III). (Settlement Agreement § 3.1).

## A. Benefit I

Only those very few Settlement Class members who contacted Sony, prior to the lawsuit to register a complaint about their television set's computer deficiency regarding 1080p input, are eligible to receive Benefit I, the $ 90 cash payment. (Settlement Agreement § 3.1.1).

According to Sony's counsel, the Benefit I class is restricted to the following purchasers:

> The Court: Well, let me ask, does the $ 90 go to anyone who called to complain about 1080p input?
>
> Ms. Cohen: No. If anybody called to complain about 1080p input, Your Honor, they will get direct notice from us, but this benefit only goes to the people who called who had a computer monitor which, Your Honor, as I mentioned in my statement, mirrors the *Date* case. So they brought a particular problem that [*12] -- at issue. They raised these other issues, but that was Mr. Date, and Mr. Date wanted the people in his position to have the benefit, and so we did.

(Tr. 90-91, Cohen). Thus, Benefit I does not even go to all purchasers who called to complain about the televi-

sion sets' 1080p deficiency; the caller had to fit within the further limitation set forth by Sony's counsel.

## B. Benefit II

Only those settlement class members who have already purchased a 1080p device before July 25, 2008, qualify for the Benefit II e-credit redeemable only at the Sony online store.

## C. Benefit III

Settlement class members who did not complain and did not purchase a 1080p device before July 25, 2008, but who purchase a Sony Blu-ray Disc Player between July 25, 2008 and 30 days "after final judgment is final" qualify for the Benefit III e-credit redeemable only at the Sony online store.

## D. The Benefits in General

Settlement Class members, eligible for the $ 90 cash payment, can also receive Benefit II, an e-credit redeemable for any item sold at Sony's online store, in the amount of $ 180 (QUALIA owners), or $ 60 (XBRI owners) (Settlement Agreement § 3.1.2 - 3.1.5). Benefit III is available to all settlement class members [*13] who did not complain or previously purchase a 1080p device, but only if they purchase a Sony Blu-ray Disc Player. Thus, Benefit III class members, to receive any settlement benefit, they must buy a Sony Blu-ray Disc Player, costing more than their e-credits--$ 75 for the 3000 potentially qualifying QUALIA set owners, and $ 28 for the 172,000 potentially qualifying XBRI set owners.

The bottom line is that not all 175,000 class members will receive "benefits" because those who did not utter the settlement required "magic words" in complaining or did not complain at all, or who have not purchased a 1080p device, must spend money to purchase a Sony Blu-ray to qualify for a non-cash Sony e-credit redeemable only at Sony's online store. Thus, category III class members who decline to further enrich Sony by purchasing a Sony Blu-ray Disc Player, receive nothing.

Significantly, none of the class members will have a television set capable of receiving and displaying a 1080p video signal natively. Thus, the Benefit II and III class members, even after the purchase of a 1080p device, will still not receive 1080p resolution when using the device.

As Objector Handler's counsel stated regarding Benefit [*14] III- the class member has to buy a Sony Blu-Ray player which outputs 1080p, while the television set that the class member purchased from Sony is incapable of accepting and displaying a native 1080p

video signal. "In order to take advantage of a [sic] settlement a class member is expected to purchase something that they can't use the full capability of which is the foundation of the case." (Kaplan, Tr. 95).

The settlement agreement also provides that Plaintiff Date will receive $ 5,000, plus costs related to the litigation, and the installation of his television, not to exceed $ 1,600. (Settlement Agreement § 3.4). Plaintiff's lawyers receive $ 300,000, plus $ 25,000 in litigation costs. (Settlement Agreement § 3.6.1).

Settlement Class members who are eligible for the $ 90 cash payment will automatically receive the payment from Sony. (Settlement Agreement § 3.3.1). Those who are eligible for an e-credit, applicable only to the Sony online store website, must submit a claim form and proof of purchase of their television set and their 1080p device or Sony Blu-ray disc player. (Settlement Agreement § 3.3.1).

With regard to the $ 90 cash payment, as of January 8, 2008, only 234 people had [*15] called Sony raising the specific issue complaint required by Sony to qualify for Benefit I. (Parties' Response to Court's November 21, 2008 Order Requesting Information 2). Thus, the cash payout for Sony to settle with this small subgroup is 234 x $ 90 = $ 21,060; that is the total Sony cash payout in this entire settlement. The remainder of the settlement, Benefits II and III, involve Sony e-credits, redeemable only for purchases at the Sony online store.

The parties are unable to estimate how many people qualify for Benefits II and III, because it is unknown how many class members have purchased or will purchase a 1080p device. (Id. at 5-6). Purchasers of the deficient television sets at issue who do not purchase a 1080p device receive nothing in the proposed settlement. There is no reason to assume that fifty percent of the class will qualify for any part of the settlement.

Sony states that the settlement is predicated on Sony's belief, with which Plaintiff disagrees, that unless a Settlement Class member has a device that generates a 1080p video signal, that member is not impacted by the fact that the television sets cannot accept a 1080p signal. (Memo. 11). This conclusion assumes [*16] that the consumer is not entitled to what Sony advertised he/she would receive from the instant purchase. Second, Sony contends that even though the television sets cannot accept a 1080p signal, the television sets still work with 1080p devices, because these devices offer not only a 1080p signal, but also other input video signals the televisions can accept. (Memo. 11; Guillou Decl. P 10). "If, for example, a Sony Blu-ray Disc Player is connected to a Television and delivers a 1080p signal to it, the disc player will receive an electronic message from the Television "telling" it that the Television cannot accept the

1080p signal. The disc player then sends a 1080i video signal to the Television that the Television can accept." (Memo. 11). Albeit a little bit of an extreme example, this reasoning is analogous to purchasing an automobile advertised as being able to run on gas or electricity and then having no ability to plug in the car for electric power.

Simply stated, Sony admits that these televisions, advertised and sold as capable of displaying 1080p resolution, are currently incapable of displaying 1080p resolution.

Nineteen objections to the settlement were filed with this Court. [*17] Two of the objections were not objections at all, and two objections were not timely but considered by this Court. The majority of the objectors complained that they were mislead by Sony's advertisements, and believed that the television sets would accept and display a 1080p signal. Many of the objectors complained about having to purchase a 1080p device in order to qualify for the settlement, which they believe does not remedy Sony's misrepresentation of the television sets' capabilities. Most of the objectors request a new 1080p capable television set, or compensation for the premium they paid for a 1080p television set. One objection filed was not an objection, but a letter in support of Sony. (Doc. No. 59, MacDonald Objection). Another objection was a rambling missive against the "prison industrial complex" from a prisoner housed in Florida, who did not even allege ownership of one of the television sets at issue. (Doc. No. 55, Rivera Objection).

Objector, Elliot Handler, was represented by counsel at the fairness hearing, after filing objections to the settlement. (Doc. No. 62, Handler Objection). Mr. Handler has a pending class action lawsuit concerning the Sony television sets [*18] at issue in this case, in the federal district court in the Central District of California. He objects to the settlement on these grounds: 1) the proposed settlement is fatally flawed because the settlement waives the legal claims of a substantial portion of the class for no compensation, the settlement awards the named plaintiff a recovery far in excess of the recovery of any other class member the settlement was reached before any meaningful litigation or discovery occurred, rendering plaintiff's counsel ill-informed to decide whether the settlement is the best option for the class; 2) the settlement is not the product of good faith negotiations; and 3) the proposed notice of the settlement is deficient. (Id. at 1-2).

## II. STANDARD OF REVIEW

The law favors the voluntary settlement of class action litigation. *Steiner v. Fruehauf Corp.,* 121 F.R.D. 304, 305 (E.D. Mich.1988), *aff'd sub nom. Priddy v.*

*Edelman, 883 F.2d 438 (6th Cir.1989)*. Therefore, this Court must not "decide the merits of the case or resolve unsettled legal questions," but, rather, must "judge the fairness of a proposed compromise" by "weighing the plaintiff's likelihood of success on the merits against the amount and  [*19] form of the relief offered in the settlement." *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. General Motors, 497 F.3d 615, 631 (6th Cir. 2007)* (quoting *Carson v. Am. Brands, Inc., 450 U.S. 79, 88 n. 14, 101 S. Ct. 993, 67 L. Ed. 2d 59, (1981))*.

As the Sixth Circuit recently noted in *UAW*, "before approving a settlement, a district court must conclude that it is 'fair, reasonable, and adequate.'" *497 F.3d at 631; see Fed. R. Civ.P. 23(e)(1)(C); Fed. R. Civ. P. 23(e)(1)(A)*. The Sixth Circuit specified:

> Several factors guide the district court's inquiry: 1) the risk of fraud or collusion; 2) the complexity, expense and likely duration of the litigation; 3) the amount of discovery engaged in by the parties; 4) the likelihood of success on the merits; 5) the opinions of class counsel and class representatives; 6) the reaction of absent class members; and 7) the public interest.

*UAW, 497 F.3d at 631*. The district court enjoys wide discretion in assessing the weight and applicability of these factors. *Granada Investments, Inc. v. DWG Corp., 962 F.2d 1203, 1206 (6th Cir. 1992)*.

## III. ANALYSIS

### A. The Risk of Fraud or Collusion

There is no evidence, or allegation, of fraud or collusion  [*20] between the parties in reaching this settlement. There is, however, a serious question about the aggressiveness and effectiveness of Plaintiff's attorneys' representation of the entire class in agreeing to this settlement, as discussed *infra*.

### B. The Amount of Discovery Engaged in by the Parties

Mr. Handler argues that this Court should not approve the final settlement because the settlement was reached in the "absence of any adversarial litigation." (Handler Objection, 8). According to Handler, plaintiff's counsel cannot know that this settlement is the best that can be achieved for the class because the litigation has not proceeded past the pleadings stage, and discovery has not been conducted. (Id. at 8-9). Plaintiff responds that while this case is in a relatively early stage of litigation,

his counsel benefitted from Sony supplying a significant amount of evidentiary information regarding the technical workings of the televisions and the claims at issue. (PL's Mot. 16). Plaintiff contradicts Handler's assertion that counsel was ill-informed, stating that his attorneys had sufficient information to evaluate the strengths and weaknesses of the lawsuit and make an intelligent and informed  [*21] decision regarding the reasonableness of the settlement. (Id. at 16-17). Sony states that Handler's objection is meritless because the parties had sufficient information to insure that their decision to settle was well-informed. (Memo. 9-10).

In considering whether there has been sufficient discovery to permit the plaintiff to make an informed evaluation of the merits of a possible settlement, the court should take into account the formal and informal discovery in which the parties engaged during the litigation. *UAW v. GM, No. 05-73991, 2006 U.S. Dist. LEXIS 14890, 2006 WL 891151, *19 (E.D. Mich. Mar. 31, 2006)* (Cleland, J.) (citing *Levell v. Monsanto Research Corp., 191 F.R.D. 543, 557 (S.D. Ohio 2000)* (although little formal discovery was conducted, class counsel retained experts and conducted informal discovery before negotiating the settlement agreement)). Here, the parties state that they had sufficient information to settle this case. Plaintiff asserts that Sony provided him with ample evidentiary information, and his counsel conducted its own investigation and hired a technological consultant. (PL's Mot. 16). Under these circumstances, particularly when the objectors have not contradicted the parties claim  [*22] that informal discovery was conducted, or disputed the technical information the parties' relied on to settle this lawsuit, this Court concludes that adversarial litigation is not a *sine qua non* of a supportable settlement of a class action lawsuit.

### C. The Likelihood of Success on the Merits

Sony urges this Court to approve the settlement because, it argues, Plaintiff's claims are fatally defective as a matter of law and susceptible to summary judgment. (Memo. 5-6). Plaintiff responds that he believes that his case is meritorious but decided to settle this case after considering the proof issues the class might face, and the fact that Sony may win this case, thereby reducing the class recovery to zero. (Pl.'s Mot. 12). Objector Handler believes that Plaintiff's claims are meritorious, and that there is a strong likelihood of success.

This Court concludes that Plaintiff's case can be regarded as meritorious. The objector-purchasers complain that they did not receive television sets with the capability that Sony had advertised; the objectors believed that they were buying a 1080p television set capable of accepting 1080p digital video signals and displaying 1080p digital video signals at  [*23] 1080p resolution when, in

fact, the television sets cannot accept and thus cannot display 1080p video signals natively.

The advertisements produced by Sony and ABC Warehouse touting the televisions' capabilities underscore this belief. Sony promoted the televisions as "Full HDTV," the "Worlds Greatest High Definition Television," and specifically as having "new display technology . . . to meet and exceed the demands of a High Definition Image at its full 1080 line resolution," and being able to display digitally transmitted high definition signals without interlacing. (Hayes Objection, Ex. A; Complaint, Ex. A, Spec. Sheet KDS-R50XBR1). Sony also stated in the specifications sheet that the televisions' native video resolution was 1080p. (Complaint, Ex. A). ABC Warehouse described the televisions as a "1080p." (Second Am. Compl. Ex. D). Based on these representations, a jury could conclude that Plaintiff was promised a 1080p television that accepted and displayed 1080p resolution natively.

Sony's advertising claims touting the instant television sets' 1080p capability are not "puffery." While an expression of opinion not made as a representation of fact constitutes puffery, Sony's advertising [*24] claims in this case are not statements of opinion; they are statements of fact. The United States Court of Appeals for the Fifth Circuit recently elaborated that even a statement of opinion may not constitute puffery:

> Although Skilling is correct that "an expression of opinion not made as a representation of fact" can constitute puffery, not all statements of opinion are properly classified as puffery.

*United States v. Skilling, 554 F.3d 529, No. 06-20885, 2009 U.S. App. LEXIS 204, 2009 WL 22879, at *18 (5th Cir. Jan. 6, 2009).* In the instant case, there is no basis for even claiming puffery; unlike *Skilling,* where there was an issue of whether the statement was opinion or fact, here we are dealing with Sony 1080p facts, not Sony opinion.

Sony further argues that Plaintiff is unlikely to succeed on the merits of this case because a federal district court in California granted summary judgment to a manufacturer of a television on claims similar to those at issue in this case. (Memo. 6-8). In *Johnson v. Mitsubishi Digital Electronics America, Inc., 578 F. Supp.2d 1229, 1238 (CD. Cal. 2008),* the court concluded that, although Mitsubishi designated its television set as a 1080p television set, the phrase 1080p "does [*25] not convey a specific claim that is recognizable to the targeted customer." This Court disagrees with that finding, noting the Los Angeles U.S. District Judge appears to have based his

conclusion, in part, on that plaintiff's admission that the term 1080p did not have a specific meaning to him. *Id.* at 7. [3] That is definitely not true in the instant case.

> 3   This Court disagrees with the following conclusion of the Los Angeles U.S. District Judge:
>
> > The ATSC Standard's intended audience is engineering professionals, not consumers; and the ATSC Standard is not written in such a manner as to be accessible to consumers.

*Johnson, 578 F.Supp.2d at 1237.* The Sony information sheet touting to consumers the KDS-R50XBR1 television set states in pertinent part:
Specifications:

*** 

VIDEO

Native Resolution: 1080p


The instant Plaintiff has stated that the term 1080p carried a specific meaning for himself and the objectors in the case at bar. Supporting Plaintiff's claim is the fact that the Advanced Televisions Systems Committee (hereinafter "ATSC") specifically defines 1080p resolution. The ATSC digital television standard in effect at the time the televisions were produced and sold called for television [*26] video inputs to *accept* a video signal format with 1080 lines of horizontal resolution by 1920 of vertical resolution in a progressive scan, i.e. 1080p video signals. (Doc. No. 72, Ex. A, ATSC Digital Television Standard)(emphasis added). [4]

> 4   The Los Angeles U.S. District Judge stated in his opinion:
>
> > The [Mitsubishi] manual explicitly states that the HDMI input ports can process 480i, 480p, 720p, and 1080i signals. . . .[T]he omission of the 1080p signal from this exhaustive list is as good as an affirmative disclosure that its HDMI input ports cannot process a 1080p signal.
>
> ***
>
> > Mr. Johnson admits that he did not search for information

about the television and was not exposed to any MDEA marketing materials prior to his purchase of the television. The truth of the matter is that Mr. Johnson did not care about whether the HDMI input ports on his television could accept 1080p signals.

*Johnson, 578 F.Supp.2d at 1240.*

This Court concludes that the term 1080p resolution carries a specific meaning for a reasonable consumer, and that Plaintiff and at least some of the class members were well aware of the specific meaning of and advantages of owning a television set capable of 1080p resolution when [*27] they purchased the television sets at issue. That the *Johnson* plaintiff just wanted to blindly purchase a "top of the line" TV set, and may not have known about or cared about 1080p resolution, does not "dumb down" Date, the instant purchaser, who read and bought a Sony television set based on Sony's fact-based advertising regarding 1080p resolution, and other purchasers such as Handler.

The *Johnson* opinion also notes that Mitsubishi only promised consumers that they would be able to "take full advantage" of new technology with the television, and that the television would provide "unsurpassed picture quality." *578 F.Supp. 2d at 1238.* Judge Carney concluded that these statements were mere sales puffery. *Id.* Those quotes may not constitute fact, and may indeed constitute puffery. However, in the instant case, Sony promised consumers "Full HDTV," the "Worlds Greatest High Definition Television" and native 1080p video input capability. ABC Warehouse described the television on its website as a "1080p" television set. Although the television sets at issue were the "Worlds Greatest" may be Sony's puffing opinion of superiority, the statements that the televisions were "Full HDTV" and "1080p" [*28] factually describes the technical capability of the television sets, and do not constitute mere opinion puffery.

**D. The Opinions of Class Counsel and Class Representative**

Class attorney Alan Mansfield submitted a declaration in support of final approval of the settlement. Mr. Mansfield states that, "[d]espite the relative strength of plaintiff's claims in this action . . . continued prosecution of this action was not without considerable risk in terms of recovering significant monetary relief for the Settlement Class members, particularly when compared to what the individual Settlement Class members are provided the opportunity to obtain under this settlement."

(Mansfield Decl. P 13). Mr. Mansfield further states that receiving immediate benefits for the class is preferable to protracted litigation that may result in no recovery, and he believes that the settlement is fair, reasonable and adequate. (Id.) Class representative David Date did not file a declaration, but in his motion to approve the settlement, Date states that the "settlement provides significant monetary relief to the individual class members" and argues that the settlement is fair, reasonable and adequate considering [*29] the risk of continued litigation. (Pl.'s Mot. 3, 12).

The Court notes that Mr. Mansfield is an experienced consumer protection attorney, and Mr. Date has been extensively involved in litigating and settling this case. However, this Court also notes that both Mr. Mansfield and Mr. Date will receive significant financial remuneration in the proposed settlement. If this Court were to approve the settlement, Mr. Mansfield and his co-counsel will receive an attorney fee award of $ 300,000, and Mr. Date will receive $ 6,600, which will fully compensate him for his allegedly defective television and for his litigation costs. The $ 300,000 of attorney fees come despite an absence of aggressive discovery, any litigation and, more importantly, a pittance or even nothing for the settling class. Only the few class members who complained will be compensated with cash. Other class members will only receive voucher benefits if they have spent or will proceed to spend yet even more money to further enrich Sony who they are suing for taking their money in exchange for a very expensive product that could not perform as advertised.

**D. The Reaction of Absent Class Members**

This Court received nineteen objections, [*30] seventeen of which were actual objections to the proposed settlement, out of a settlement class of approximately 175,000 persons who purchased the subject television sets.

Although the objectors are few, the objections illuminate the inherent unreasonableness of the settlement. The objectors complain that they were mislead by Sony and third-party sellers about the technical capabilities of the televisions. The objectors believed that they were buying a 1080p television that would accept and display 1080p signals natively. However, the televisions cannot display a 1080p video signal natively; instead the television de-interlaces the 1080p signal, turning it into a 1080i signal and then upconverts the 1080i signal when it is displayed on the television. (Tr 33-34). This process creates a picture that is close to what would appear if the television displayed a native 1080p signal, but the picture quality does not reach the level of a native 1080p signal displayed on a 1080p resolution television. Nevertheless, the settlement only provides a benefit to the class mem-

bers who, after purchasing a deficient television set, purchased or will purchase a 1080p device; this is best described as [*31] throwing good money after bad. As one objector cogently stated, "what good is a 1080p device without a 1080p TV?" (Sheffield Objection).

Sony defends the settlement by arguing that unless a Settlement Class member has a device that generates a 1080p video signal, that member is not impacted by the fact that the televisions cannot accept a 1080p signal. (Memo. 11).

This Court disagrees with Sony's theory that a Settlement Class member suffers damages only if he or she owns a 1080p device. The class members purchased these high-end televisions because of the advertised "bells and whistles" [approximately] 1080p display resolution [approximately] and were misled and shortchanged by Defendants. The class members thought they had purchased a 1080p capable television, in the midst of an electronics world that changes and upgrades everyday. These purchasers eagerly anticipated the possibility of 1080p over-the-air television signals, and 1080p devices, which have become a reality, e.g. Blu-ray, computers and Playstation 3.

That many of the class members have not previously purchased a 1080p device is not surprising given that it was only January of 2008, that an industry standard was created. [*32] A recent New York Times article stated:

The biggest news at the Consumer Electronics Show in Las Vegas last January was not the birth of a new product but the death of one.

A decision by Warner Brothers to withdraw support for the HD DVD video disc format sent shock waves through the electronics industry and appeared to hand the future of home entertainment to Blu-ray, a rival format.

\*\*\*

Still for some consumers, nothing beats the crisp, clear picture of a Blu-ray disc. "It's a huge difference," said Gary Tsang, 31, a computer network engineer in San Francisco who bought a $ 299 Blu-ray in October and was among the shoppers who rushed out to buy "The Dark Knight" last month.

Mr. Tsang added that Blu-ray made a real difference only when viewed on a good high-definition television, like the one his family bought in February for $

2,700. "We're not bleeding edge, but we're cutting edge."

Matt Richtel and Brad Stone, *Blu-ray's Fuzzy Future*, N.Y. Times, Jan. 5, 2009, at B1-2.

When the objectors discovered that the televisions would not display 1080p video signals, it is not surprising that many of them chose to not purchase a 1080p device that could not achieve fulfillment with the instant television [*33] sets. Under the terms of this proposed settlement, class members who purchased one of the deficient television sets, but do not own and refuse to purchase a 1080p device will not be compensated for their being victimized by Sony and third-party retailers.

Unlike Mr. Date, who is settling his claim with Sony for $ 6,600, which fully compensates him for his defective television, the unnamed Settlement Class members will not be compensated for what they believe is their injury: a television set that is not capable of the 1080p quality of display resolution advertised.

As noted before, Plaintiffs attorneys receive a $ 300,000 fee, and $ 25,000 in costs in this settlement; Sony reaps benefits by providing e-credits to certain class members, redeemable only at its online store, for partial payment of purchases. And to qualify for Benefit III, the settlement requires class members to further enrich Sony by purchasing a Sony Blu-ray Disc Player. With the exception of Mr. Date, Sony is not close to adequately compensating the Settlement Class members for their injuries.

This Court, therefore, concludes that a settlement that does not remedy the injury alleged by the class members, and is not [*34] close to a fair "compromise" meriting this Court's approval.

### G. The Public Interest

This settlement does not serve the public interest because it does not hold Sony accountable for its conduct, and does not come close to compensating the victim class for the injuries it caused. Furthermore, it would not sufficiently deter Sony from factually misrepresenting its products' technical capabilities in the future. In this proposed settlement, Sony provides $ 90 cash compensation only to a few early complainers, provides Sony-only vouchers to some other class members, the number unknown, and provides nothing to most of the class. Moreover, a component of the proposed settlement requires the victims to further enrich Sony by purchasing an additional product from Sony, the party that has victimized them.

All the class members allege the same injury. Because all the class members sustained the same injury, and their alleged damages are equal, all class members have the same right of recovery. *See Petruzzi's, Inc. v. Darling-Delaware Co., Inc., 880 F. Supp. 292, 300 (M.D. Penn. 1995).*

In *Petruzzi's*, a supermarket chain brought a class action alleging Sherman anti-trust violations against fat and [*35] bone rendering companies for restraint of trade. *Id. at 294.* The supermarket negotiated a settlement with one of the defendants, and moved for approval of a proposed partial settlement. *Id. at 293.* The proposed partial settlement discharged class members' claims, who sold raw materials to defendant Moyer Packing Company and co-defendant Darling-Delaware, Inc., in exchange for 'up to $ 2 million in 'premium certificates' which are to 'be claimed by class members based on the dollar value of their sale of raw materials to Moyer.'" *Id. at 293.*

A class member objected to the proposed settlement in *Petruzzi's* on the ground that it excluded more than 600 class members who only sold raw materials to Darling-Delaware, as those class members would receive no compensation for their release of Moyer. *Id. at 294.* U.S. District Court Judge Thomas Vanaskie, in rejecting the settlement, pointed out:

> Judicial review is not limited to ascertaining whether the settlement is the product of fraud or collusion. Instead, the reviewing court has an independent duty to ensure that the proponents of the settlement have met their burden of establishing that the settlement is fair, adequate, and reasonable.

*Id. fat 296.*

Judge [*36] Vanaskie held that the proposed partial settlement was not "fair, adequate or reasonable" largely because the settlement provided compensation to only fifty percent of the class, but required the entire class to release its claims against the settling defendant. *Id. at 299.* The court opined that the proponents of the proposed partial settlement carried a "substantial burden to show that the settlement is fair to the class as a whole," when the proposed partial settlement only benefitted fifty percent of the class, and found that the settlement proponents had not met that burden. *Id. at 299.* Further, with respect to the value of the settlement, Judge Vanaskie found that there was no basis for estimating the real value of the settlement, as neither party had presented evidence regarding likely redemption rates, which precluded the court from determining whether the settlement was reasonable "in light of the best possible recovery and

the risks of litigation." *Id. at 297.* Judge Vanaskie emphasized that it is "also important to estimate the actual value of the settlement in order to assess the appropriateness" of the attorney fees and expenses award. *Id. at 298.*

As in *Petruzzi's*, this proposed [*37] settlement does not compensate all class members equally, and will not compensate many class members at all. Unlike in *Petruzzi's*, where at least fifty percent of the class will be compensated, here, it is unknown whether even fifty percent of the class will receive compensation for the release of their claims against Sony.

Also like in *Petruzzi's*, in the present case, there are no facts upon which to estimate the real value of the settlement or the cost of the settlement to Sony; as neither party has provided any evidence regarding likely redemption rates. Thus, the Court is unable to determine whether the settlement is reasonable in light of the potential recovery and the risks of litigation. Further, it is impossible to assess whether the attorney fees and expenses award of $ 300,000 is appropriate, in light of the fact that the actual value of the settlement is unknown.

"In this regard, 'fairness' is not demonstrated by the silence of class members in response to the proposed settlement." *Id. at 299.* As in *Petruzzi's*, here, few class members objected to the proposed settlement. However, "[a]s stated by Judge Friendly in *National Super Spuds, Inc. v. New York Mercantile Exchange, 660 F.2d 9, 16 (2d Cir. 1981)*, [*38] '[l]ack of objection by the great majority of claimants means little when the point of objection is limited to a few who interests are being sacrificed for the benefit of the majority.'" *Id. at 300.* Here, an unknown but large number of class members will release their claims against Sony without being compensated. Only a very few will receive the $ 90 settlement. The remainder will either receive e-credits redeemable at Sony's online store or nothing at all. There is simply no justification for requiring those class members to release their claims without being provided any consideration for their release when they suffered the same injury as the class members who will be compensated, television sets advertised as displaying 1080p native resolution that do not deliver. [5] This Court will not sacrifice the claims of some class members in order to satisfy a select portion of the class' claims.

---

5   Mark Schmidt, Sony Electronics' TV Group Director of Quality Engineer testified at the fairness hearing that the Advanced Television Systems Committee (ATSC) standard defines 1080p. (Tr. 77, Schmidt). Schmidt further testified that as to the television sets at issue in the instant case, while the [*39] antenna input accepts 1080p signals, the composite and component inputs cannot accept a 1080p signal. (*Id.* at 78).

Schmidt further acknowledged during the television set demonstration provided to the Court at the fairness hearing on November 3, 2008, that there was "feathering" or shadowing of an image on the subject television sets at issue. (*Id.* at 81). To be clear, "feathering" is not a positive attribute. Further elaborating the mechanics of the deficiency, Objector attorney Kaplan asked: "And that [feathering] was because it was taking a 1080i signal off the Blu-ray player and deinterlacing it to display at 1080p? (*Id.* at 81). Schmidt answered, "yes," confirming that the deinterlacing is less than native 1080p resolution. (*Id.* at 81).

## III. CONCLUSION

The television sets at issue include approximately 175,000 Sony high-end, high resolution models manufactured between 2004 and 2006. (Tr. 9, Mansfield).

Sony mislead consumers about a particular feature of the television set-1080p native resolution. The television sets, advertised as having 1080p progressive scan capability did not; they had only 1080i capability.

Plaintiff Date noticed that when he plugged in his computer into the television, [*40] the television would only accept inputs of the 1080i signal, the lower resolution signal.

Plaintiff Date complained about the 1080p deficiency to the Better Business Bureau, to ABC Warehouse and to Sony. (Tr. 11, Mansfield).

The instant complaint was filed in San Diego, California. Motions filed by Defendant and answered by Plaintiff were not heard because the parties chose to proceed to facilitation. Plaintiff's counsel also deposed a Sony engineer and retained a consultant. (*Id.* at 20). A two day facilitation process took place that resulted in the instant proposed settlement. (*Id.* 11-12).

Of the 175,000 purchasers - i.e., settlement class members - over 65,000 received direct notice of the settlement.

At the fairness hearing on November 3, 2008, the Court viewed the television sets at issue and confirmed the deficiency between the advertised 1080p native resolution and the 1080i resolution upconverted. The Court noted the "feathering" or shadows on the 1080i television set at issue in the instant case. Feathering provides a defective resolution. The Court finds that Plaintiff's claim of damages is not *de minimis*. The instant expensive

television sets were advertised and touted as top [*41] of the line with 1080p resolution that did not "deliver" for Plaintiff Date and the other purchasers.

The Court strongly disagrees with Sony's counsel's description of the settlement:

We believe that the benefits generously compensate the settlement class members for the difference between watching an upconverted 1080i signal and the 1080p signal. And you'll see that that [sic] difference is de minimis.

(Tr. 46, Cohen). The benefits are not generous or adequate. In fact, it is likely that there will be no benefits at all for the majority of the class if they decide not to purchase a 1080p device that cannot provide them with 1080p capability on their inferior television set.

Benefit I, $ 90 cash, only goes to a very few members of the class.

Benefits II and II are not generous, much less fair. Benefit II's e-credit for class members who previously purchased a 1080p device is like a manufacturer's coupon to induce a consumer to buy products more expensive than the coupon at Sony's online store.

Benefit III requiring purchase of a Sony Blu-ray Disc player to receive the Sony online store e-credit is likely to create new revenue and profits for Sony.

The Court concludes that this settlement [*42] is not fair, adequate and reasonable. *See Williams v. Vukovich, 720 F.2d 909 (6th Cir. 1983).* The proposed settlement does not fairly or adequately compensate the unnamed Settlement Class members for their injuries. The objectors have met the heavy burden of demonstrating that the settlement is unreasonable. Because the parties have failed to come to an agreement that is beneficial to the class, this Court concludes that the settlement is unreasonable. The Court, therefore, rejects the settlement.

SO ORDERED.

/s/ Paul D. Borman

PAUL D. BORMAN

UNITED STATES DISTRICT JUDGE

Dated: 2-20-09

Detroit, Michigan

TAB F



LEXSEE 1996 U.S. APP. LEXIS 25298

**GEORGE EDDLEMAN, II; EUGENE HELM; SAM WATKINS, JR.; LEONARD A. CIAK; SHELLEY STRONG; LISA THOMPSON, Plaintiffs-Appellees, v. JEFFERSON COUNTY, KENTUCKY; JEFFERSON COUNTY DEPARTMENT OF CORRECTIONS; RICHARD A FREY, JR., Defendants-Appellants.**

No. 95-5394

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

*1996 U.S. App. LEXIS 25298*

**August 29, 1996, FILED**

**NOTICE:**    [*1]  NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 24 LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 24 BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**SUBSEQUENT HISTORY:**    Reported in Table Case Format at: *96 F.3d 1448, 1996 U.S. App. LEXIS 28927.*

**PRIOR HISTORY:**    ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY.

**DISPOSITION:**    Affirmed

**COUNSEL:** For GEORGE A. EDDLEMAN, II, Plaintiff - Appellee: Gregory A. Bolzle, Woodward, Hobson & Fulton, Louisville, KY.

For EUGENE HELM, Plaintiff - Appellee: Mark K. Gray, O'Koon, Menefee, Gray, Louisville, KY.

For SAM WATKINS, JR., Plaintiff - Appellee: Mark K. Gray, (See above).

For LEONARD A. CIAK, Plaintiff - Appellee: Mark K. Gray, (See above). Christina R. L. Norris, Louisville, KY.

For SHELLEY STRONG, Plaintiff - Appellee: Gregory A. Bolzle, (See above).

For LISA THOMPSON, Plaintiff - Appellee: Marvin L. Coan, Hummel & Coan, Louisville, KY. Christina R. L. Norris, (See above).

For JEFFERSON COUNTY KENTUCKY, Defendant - Appellant: N. Scott Lilly, Jefferson County Attorney's Office, Louisville, KY. R. Allen McCartney, McCartney & Swicegood,  [*2]  Louisville, KY. Suzanne D. Cordery, Jefferson County Attorney's Office, Louisville, KY.

For JEFFERSON COUNTY DEPARTMENT OF CORRECTIONS, Defendant - Appellant: N. Scott Lilly, (See above). R. Allen McCartney, (See above). Suzanne D. Cordery, (See above).

For RICHARD A. FREY, JR., Defendant - Appellant: N. Scott Lilly, (See above). R. Allen McCartney, (See above). Suzanne D. Cordery, (See above).

**JUDGES:** BEFORE: MERRITT, Chief Circuit Judge; ENGEL and RYAN, Circuit Judges.

**OPINION BY:** MERRITT

**OPINION**

**MERRITT, Chief Judge.** This appeal presents two procedural issues for interlocutory review under *28 U.S.C. § 1292(b).* The issues for review by this Court are whether the District Court erred in: (1) granting Plain-

tiffs' motion for class certification pursuant to *Federal Rule of Civil Procedure 23*, and *(2)* granting Plaintiffs' motion to amend their complaint. For the reasons discussed below, we affirm both the decision to certify the class and the decision to allow Plaintiffs' to file an amended complaint.

The named Plaintiffs each claim to have been strip searched by the Jefferson County Corrections Department after being arrested for minor, nonviolent offenses, primarily traffic stops, [*3] and seek relief under *42 U.S.C. § 1983* for violations of the *Fourth, Fifth, Eighth, Ninth* and *Fourteenth Amendments*. Plaintiffs allege that the Department of Corrections maintained an unconstitutional blanket policy or custom to strip search all arrestees, regardless of the circumstances or the existence of individualized suspicion necessitating a search. Determination of the merits of the case has been stayed at the District Court pending the outcome in this Court on the question of class certification, and this Court does not decide any issue concerning the merits of the action.

## I.

The named Plaintiffs here allege that they were required to remove their socks, shoes and belts, lift their shirts, drop their pants and open the waistbands of their underpants for inspection of their genital area by Corrections Department employees. At least one named Plaintiff was also subject to a hand search of the area below his underpants and a visual body cavity search. The searches of some of the named Plaintiffs were done in an open receiving area of the jail -- called a "sallyport" search -- in front of male and female corrections officers. All the named Plaintiffs were pre-trial detainees [*4] who were either released on their own recognizance or held for a few hours in a holding cell.

In the first six months of 1991, about two dozen individuals sued the County alleging violation of their right to be free of strip searches after arrest for minor offenses without individualized suspicion that they are carrying a weapon or contraband. In September 1991, several months after the complaints were filed by the named Plaintiffs herein, the Defendants moved to stay discovery in the case pending resolution of a dispositive argument by Defendants that the complaints filed against them were precluded by a consent decree into which the Department of Corrections had entered concerning strip searches. The District Court determined that the consent decree did not preclude Plaintiffs' claims and the stay of discovery was lifted in June 1992, nine months later. During this time several more plaintiffs filed similar claims against Defendants.

Two months later, in July 1992, the District Court urged the parties to settle. For the next six months, until

the end of 1992, the parties were engaged in settlement discussions. 17 of 22 similarly-situated plaintiffs settled during this time.

In [*5] June 1993, Plaintiffs filed a motion to amend their complaints to add class allegations. The motion was granted in a very brief order in September 1993:

> Upon motion, and after consideration of same, it is ORDERED that George A. Edleman, II, Eugene Helm and Sam Watkins, Jr. be and hereby are granted leave to file their First Amended Complaint.

Joint Appendix [1] at 333.

> 1   References to the Joint Appendix filed in this action will be referred to hereinafter as "J.A. at ."

In August 1993, the District Court entered a permanent injunction against Defendants prohibiting strip searches for minor offenses without reasonable suspicion that the person was carrying a weapon or contraband. (J.A. at 332) The entry of the permanent injunction mooted the Plaintiffs' request for injunctive relief but left their liability and money damages claims intact.

The named Plaintiffs moved to certify the class in January 1994 and the District Court granted class certification on August 11, 1994 (J.A. at 362). [*6] The class was certified as follows:

> All individuals who were arrested for non-violent minor offenses between April 25, 1990 and the present that were required by the Defendant to remove their clothing for visual inspection of all or part of their exposed bodies at the Jefferson County Jail, unless there existed reasonable cause to believe that they were carrying or concealing weapons or other contraband.

D. Ct. Opinion at 8, J.A. at 369. Interlocutory appeal was granted. The merits of the case have been stayed in the District Court pending resolution of the class certification issue by this Court.

## II.

### Plaintiffs' Rule 15(a) Joint Motion to Amend Their Complaints to Assert Class Certification

Defendants first argue that it was an abuse of discretion for the District Court to allow Plaintiffs to amend

their complaints to assert class certification. *Federal Rule of Civil Procedure 15(a)* states that leave to amend a pleading should be "freely given when justice so requires." Reasons to deny leave to amend a complaint include (1) undue prejudice, (2) undue delay in amending, (3) amendment not offered in good faith or (4) that the party has had sufficient [*7] opportunity to state a claim and has failed to do so. *See Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 28 L. Ed. 2d 77, 91 S. Ct. 795 (1971); Foman v. Davis, 371 U.S. 178, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962).* Defendants assert that Plaintiffs' two-year delay in moving to amend the complaints (1) constitutes inexcusable delay and (2) caused Defendants to be unduly prejudiced thereby.

There is no bright-line test to determine what is "undue delay." Given the circumstances here -- the pendency of a potentially dispositive motion regarding the effect of the consent decree on Plaintiffs' claims followed immediately by settlement negotiations -- the delay is not "inexcusable."

Defendants contend that they are prejudiced because class certification allows claims precluded by the statute of limitations to be revived, thereby exposing Defendants to liability from allegedly dead claims and increasing the size of the potential class. Defendants do not convince us that any prejudice to them is significant as a result of amending the complaint to add class certification. The addition of some class members that might otherwise be time barred due to the amendment when [*8] the class is already concededly large, if in fact this is the case, a point on which we make no opinion, does not constitute the type of "undue" prejudice that would outweigh the rule that complaints are to be freely amended. Class certification does not preclude a defense based on the statute of limitations as to one or more class members. The statute of limitations defense will be available only against plaintiffs whose claims arose more than one year before the filing of the first intervening complaint, not against plaintiffs whose claims arose more than one year before the amendment but not more than one year before the initial complaint. *See Fed. R. Civ. P. 15(c).* This, of course, does not take into consideration tolling or other circumstances that may bear upon the statute of limitations defense.

The District Court did not set out its reasons for allowing Plaintiffs to amend their complaints to add class certification. The order simply states that the motion to amend is granted. Despite the lack of analysis in the District Court's order, the facts in the record make clear that the delay in moving for class certification arose from (1) the nearly one-year stay granted in [*9] 1992 while the District Court decided whether the consent decree precluded the Plaintiffs' claims and (2) the settlement efforts ordered by Judge Johnstone that occurred from mid- to late 1992. There was then a delay of six months until the motion to amend to add class certification was filed in June 1993. Given the circumstances, the delay does not seem "undue" and any prejudice resulting to Defendants from the delay in certifying the class is minor.

**III.**

### Rule 23 Class Certification

The Supreme Court has held that district courts must conduct a "rigorous analysis" into whether the prerequisites of *Rule 23* are met before certifying a class. *General Tel. Co. v. Falcon, 457 U.S. 147, 161, 72 L. Ed. 2d 740, 102 S. Ct. 2364 (1982).* The district court has broad discretion in certifying class actions, but must exercise the discretion within the framework of *Rule 23. Cross v. National Trust Life Ins. Co., 553 F.2d 1026, 1029 (6th Cir. 1977).* When evaluating whether to certify the class, the district court must take the allegations of plaintiffs as true and any doubts as to certification should be resolved in favor of plaintiffs. *Id.*

#### A. *Rule 23(a)*

*Federal* [*10] *Rule of Civil Procedure 23(a)* contains four requirements that the named plaintiffs must meet for certification: numerosity, commonality, typicality and adequacy of representation to certify a class. *Rule 23(a)* states:

> (a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class and (4) the representative parties will fairly and adequately protect the interests of the class.

*Fed. R. Civ. P. 23(a).* Plaintiffs carry the burden of demonstrating their proposed class action meets the requirements of *Rule 23(a).* In addition to meeting the requirements of *Rule 23(a),* plaintiffs must also meet at least one of the requirements of *Rule 23(b),* described below.

Defendants concede that Plaintiffs meet the numerosity requirement under *Rule 23(a)* as there are thousands of potential plaintiffs in the class due to the number of persons that are processed through the Jefferson [*11] County Correctional Department each year. However, Defendants argue that Plaintiffs fail to meet the

other requirements of *Rule 23(a)* and the requirement of *Rule 23(b)*.

**1. Commonality.** *Rule 23(a)(2)* requires that questions of law or fact common to the class be present. Defendants contend that the representative Plaintiffs' claims have "substantive factual differences" and do not meet the commonality requirement of *Rule 23(a)*. Commonality does not require that Plaintiffs' claims be identical. *Rule 23(a)* requires that the resolution of common questions affect all or a substantial number of the class members. *In re American Med. Sys., Inc., 75 F.3d 1069, 1080 (6th Cir. 1996)*; *Senter v. General Motors Corp., 532 F.2d 511, 518 (6th Cir.), cert. denied, 429 U.S. 870, 50 L. Ed. 2d 150, 97 S. Ct. 182 (1976)*.

Here, each of the Plaintiff representatives alleges that he was brought to the jail after a minor, non-violent infraction and was told to remove shoes, socks and belt, then required to lift his shirt and then finally to drop his pants, pull out the waistband to his underwear to allow corrections officials to inspect his genital area and buttocks and, in some instances, [*12] subjected to a hand search of the area below his genitals. The only differences in the claims pertain to whether the subject was first handcuffed and exactly where in the jail facility the search took place.

Eighteen of the Plaintiffs who settled with the County before the class was certified were made to disrobe completely. It is possible that certain potential members of the class may have been required to disrobe completely. This fact does not defeat the commonality requirement because Plaintiffs' legal theory is that all members of the class were subject to unconstitutional searches after being arrested for minor offenses pursuant to a blanket policy or custom. Their theory is that both full and partial searches are unconstitutional without reasonable suspicion that the person is carrying a weapon or contraband. Common legal theories therefore bind the class even if some sets of facts are more severe than others. This is true even where the putative plaintiff is subject to a full strip search instead of a partial one, or the fact that some individuals may fail to meet the qualifications for the class because it can be shown that there was reasonable suspicion to search them or [*13] the fact that some potential plaintiffs may decide to "opt-out." These isolated instances of non-commonality are not grounds for denying class certification.

In sum, Plaintiffs allege similar conduct by the same Defendants. The legal theory is the same for each Plaintiff: whether the strip search violated the constitutional rights of the Plaintiffs. We find that the commonality requirement is met.

**2. Typicality.** The typicality requirement of *Rule 23(a)* requires that the claims of the representative plaintiffs be "typical" of the class. A claim is typical if it arises from the same event or course of conduct giving rise to the claims of other class members and is based on the same legal theory. *Senter v. General Motors Corp., 532 F.2d at 525.*

Like the arguments raised pursuant to the commonality requirement, Defendants contend that the Plaintiff representatives are not "typical" because they had only partial strip searches done while other members of the potential class were subject to full strip searches and body-cavity searches. The "typical" factor possessed by both the named and unnamed plaintiffs that form the class here is that each person was allegedly arrested [*14] for a minor violation and strip-searched in violation of their constitutional rights. The key factor for class membership is that the plaintiff must allege that he was subjected to an unconstitutional strip search after arrest for a minor infraction -- not the actual scope of the search. The legal theory under which the plaintiff would proceed is the same, regardless of whether a full or partial search is alleged. Because each named Plaintiff herein alleged an unconstitutional strip search after arrest for a minor violation, the named Plaintiffs are representative of the class.

**3. Adequacy of Representation.** As to the adequacy of representation requirement in *Rule 23*, this Court has specified two criteria for determining whether the named plaintiffs adequately will represent the class: (1) the representatives must have common interests with the unnamed class members and (2) it must appear that the representatives will vigorously prosecute the class action through qualified counsel. *Senter, 532 F.2d at 525.* Defendants argue first on the same ground raised above: that the representative Plaintiffs here cannot "adequately represent" the class of potential plaintiffs because [*15] they were subject to a partial strip search only -- not a full one. For the reasons already discussed, this does not present a bar to certification. Second, Defendants argue that the delay in moving to certify the class demonstrates that the representatives and their counsel will not vigorously represent the class. Given the course of the proceedings to date, however, we find no evidence that the Plaintiff representatives and counsel will not vigorously represent the class. Despite Defendants' arguments to the contrary, both adequacy criteria seem to be satisfied in this case. The named Plaintiffs adequately represent the class in that they were subject to the same conduct by Defendants and their claims are based on the same legal theory.

**B. Rule 23(b)**

If the requirements of *Rule 23(a)* are met, the Plaintiffs still must demonstrate that they meet the requirements of *Rule 23(b)*. Under *Rule 23(b)*, one of three con-

ditions must be met to maintain a suit as a class action: (1) there must be a risk of either incompatible standards of conduct or a risk that interests of prospective class members would be impaired by an adjudication of others' claims; (2) the party opposing the [*16] class has acted towards members of the class in a non-uniform way or (3) issues common to the class predominate over issues that are not common to the class and the best method of trying the suit is as a class action. Plaintiffs contend that they meet the criteria of both (b)(1) and (b)(3).

Pursuant to *Rule 23(b)(3)*, a class action may be maintained if the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and just adjudication of the controversy.

The District Court found, and we agree, that the criteria for *Rule 23(b)(3)* are met. The commonality question has already been discussed and the class action mechanism is an efficient and fair way to adjudicate the claims presented here. Defendants argue that because the reasonableness of any search must be examined on a case-by-case basis, the constitutionality of strip searches cannot be properly evaluated in a class action. The basis for the complaint, however, arises precisely because the Defendants did not conduct an individualized assessment of the need for each [*17] search. Plaintiffs allege, and that allegation must be taken as true for our purposes here, that their constitutional rights were violated by a policy or custom, written or unwritten, to search every arrestee who entered the jail, regardless of the individual circumstances. Due to the single legal theory and the similar facts for each Plaintiff, a class action would be superior to individual actions.

Defendants rely heavily on *Klein v. DuPage County, 119 F.R.D. 29 (N.D. Ill. 1988)*, as authority for their arguments against certification in the instant case. Despite Defendants' characterization of *Klein* as "patently analogous," *Klein* is readily distinguishable from the facts of this case. In *Klein*, inmates of a prison challenged the routine strip searches to which they were subject. The district court held that class treatment of the challenge was inappropriate in light of the particularized nature of the court's inquiry into the constitutionality of individualized intrusions and each individual's damages. The district court pointed out the special institutional security concerns, that each plaintiff had been arrested for differ-

ent crimes, that the plaintiffs may pose [*18] a safety threat and may have been searched numerous times in various ways over the course of his prison term in finding lack of commonality and typicality under 23(a) and (b). The district court in *Klein* specifically distinguished a Seventh Circuit case much more similar to the case here, *Mary Beth G. v. City of Chicago, 723 F.2d 1263 (7th Cir. 1983)*, where the City of Chicago's blanket policy of strip searching all females arrested for traffic violations was held unconstitutional. Although individualized trials were held on damages, the class was certified for liability determination. Accordingly, Defendants' reliance on *Klein* does not help their argument.

Defendants' final argument is that the damages to the class are too disparate to determine in a class action. Varying damage levels rarely prohibit a class action if the class members' claims possess factual and legal commonality. *Mayer v. Mylod, 988 F.2d 635, 640 (6th Cir. 1993)* (in securities fraud action, commonality and typicality requirements met even where some investors made money and some lost money because questions of liability are common to all class members regardless of their level of damages); *Sterling* [*19] *v. Velsicol Chem. Corp., 855 F.2d 1188, 1197 (6th Cir. 1988)* (in mass toxic tort action, even though damages may be disparate, where liability can be determined on a class-wide basis because it arises from a single course of conduct that is identical for each plaintiff, class action suitable for adjudication). Accordingly, this argument is also unavailing.

Plaintiffs also assert that they meet the requirements of *Rule 23(b)(1)(a)* that states "the prosecution of separate actions by or against individual members of the class would create a risk of . . . inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class." As we have already determined that Plaintiffs meet the requirement of *Rule 23(b)(3)*, we need not decide whether Plaintiffs also meet the requirements of 23(b)(1)(a).

The District Court issued a thorough and detailed opinion, going through each requirement of *Rule 23*. The "rigorous analysis" required in *General Tel. Co. v. Falcon, 457 U.S. 147, 161, 72 L. Ed. 2d 740, 102 S. Ct. 2364 (1982)*, has been met. Accordingly, we find that the District Court did not [*20] abuse its discretion and we affirm the granting of the motion to amend the complaint and the motion to certify the class.

# TAB G



LEXSEE 2000 U.S. DIST. LEXIS 20879

**MARIO GASPERONI and EUGENIA CORRY TRUMBULL, Plaintiffs, v. METABOLIFE, INTERNATIONAL INC., Defendant.**

**Case No. 00-71255**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION**

*2000 U.S. Dist. LEXIS 20879*

**September 27, 2000, Decided**
**September 27, 2000, Filed**

**DISPOSITION:**    [*1] Plaintiffs' motion for class certification GRANTED.

**COUNSEL:** For MARIO GASPERONI, EUGENIA CORRY TRUMBULL, plaintiffs: Mark S. Baumkel, Provizer & Phillips, Bloomfield Hills, MI.

For MARIO GASPERONI, EUGENIA CORRY TRUMBULL, plaintiffs: Gerard V. Mantese, E. Powell Miller, Marc L. Newman, Mantese, Miller, Troy, MI.

For METABOLIFE INTERNATIONAL, INCORPORATED, defendant: Bradley J. Schram, Bradford T. Yaker, Hertz, Schram, Bloomfield Hills, MI.

For AMY TADLOCK, MARY COOPER, SELKET POREA, movants: Dennis M. O'Bryan, O'Bryan, Baun, Birmingham, MI.

For JOHN BAHL, movant: Irwin M. Alterman, Kemp, Klein, Troy, MI.

**JUDGES:** AVERN COHN, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** AVERN COHN

**OPINION**

**ORDER GRANTING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

**I. Introduction**

This is a products liability case. [1] Plaintiffs Mario Gasperoni and Eugenia Corry Trumbull (collectively plaintiffs) are suing Metabolife international, Inc. (Metabolife), on behalf of themselves and as a class under *Fed. R. Civ. P. 23*, for misrepresentation for failing to warn Michigan consumers that ephedrine, an ingredient in Metabolife's diet product Metabolife 356, is capable of producing adverse health problems. Before [*2] the Court is plaintiffs' motion for class certification. For the reasons that follow, the motion will be granted.

> 1 On May 4, 2000, the Court denied defendant's motion to dismiss. *See* Memorandum And Order of May 4, 2000.

**II. Background**

A.

Metabolife manufactures and distributes the appetite suppressant Metabolife 356, which contains a combination of 18 different ingredients including ephedrine. The product label identifies Metabolife 356 as an "herbal formula to enhance your diet and provide energy," and states that the product is "independently laboratory tested for safety*." ("*Based upon multi-species clinical laboratory testing").

Plaintiffs claim that ephedrine is a potent central nerve stimulant, which can cause adverse health risks such as nervousness, dizziness, tremors, alteration in blood pressure or heart rate, headache, gastrointestinal distress, chest pain, myocardial infarctions, stroke, sei-

2000 U.S. Dist. LEXIS 20879, *

zures, psychosis, brain damage, and death. Metabolife's web site, found at <http://www.metabolife. [*3] com/shop/index.html>, warns Texas consumers that, "This product has ephedrine groups alkaloids in the form of herbal extracts and may cause serious adverse health effects." However, no such warning is directed to Michigan consumers.

Plaintiffs, who purchased and ingested Metabolife 356, claim that Metabolife's labeling is deceptive and misleading because it fails to warn Michigan consumers of the adverse health effects of ephedrine, it fails to adequately disclose to consumers that use of the product has not been clinically tested or FDA approved, and it fails to warn consumers that possession of a certain amount of ephedrine (the equivalent of 10 bottles of Metabolife 356) is against Michigan law and actually encourages consumers to possess such amounts by giving them a discount for purchases of 10 bottles or more. Through these omissions, and its affirmative statement that Metabolife 356 is "tested for safety," Plaintiffs maintain that Metabolife's labeling constitutes a fraudulent misrepresentation and a breach of warranty.

B.

Plaintiffs seek to represent a class composed of "all persons in the State of Michigan who purchased and/or consumed the appetite suppressant Metabolife [*4] 356 and other diet products containing ephedrine manufactured, distributed, marketed and sold by Defendant (the "Class") during the period commencing from February 4, 1994 up to the date of trial (the "Period")." Revised Amended Complaint P 33. [2] For each member of the class, plaintiffs seek damages/restitution in the amount of the purchase price of the product. Plaintiffs also seek injunctive relief in the form of an order requiring Metabolife to: (1) post an appropriate form of notice where the diet products have already been sold and are currently being sold, informing consumers of the dangers of consumption of the product, (2) revise its labeling to warn all future consumers of the serious risks associated with the consumption of the product; and (3) pay for medical examinations and health monitoring for all members of the class.

> 2   Initially, plaintiffs sought nationwide class certification, but later conceded in their reply brief that certification for a class consisting only of Michigan consumers would be more manageable at this time. Thus, the Court does not address the extensive arguments posed by Metabolife concerning issues involving a nationwide class.

[*5] Plaintiffs presently seek class certification solely on the issue of "whether the label on [Metabolife 356] is materially misleading when viewed as a whole." Proposed Order Granting Class Certification.

III. Analysis

A. Standard for Class Certification

Under *Fed. R. Civ. P. 23(a)*, a case may be brought as a class action if:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the class.

In addition to these requirements, the proposed class representatives must also demonstrate that common questions of law or fact predominate over individual questions and that a class action is superior to other available methods of adjudication. *Fed. R. Civ. P. 23(b)(3)*.

In evaluating a case for certification, the Court has broad discretion. *In re Jackson National Life Ins. Co. Premium Litigation, 183 F.R.D. 217 (W.D. Mich. 1998)*. The Court must conduct a "rigorous analysis" to determine if the *Rule 23* [*6] requirements are met and it may, but is not required to, go beyond the pleadings. *In re American Medical Systems, Inc., 75 F.3d 1069, 1078-79 (6th Cir. 1996)*.

Here, Metabolife opposes class certification mainly on the grounds that individual issues of fact and law predominate. Specifically, Metabolife contends that its product is not sold in a uniform manner, issues of reliance, causation, and injury must be proved individually, and plaintiffs' claim for medical monitoring transforms this case into a personal injury case, so as to preclude a class action. Metabolife also says that the named plaintiffs are neither typical nor adequate representatives of the class.

B. Bringing a Class Action Case (*Fed. R. Civ. P. 23(a)*)

1. Numerosity

The numerosity requirement is not in dispute here. Metabolife 356 has admittedly been sold to thousands of consumers in Michigan over the past several years. The class, therefore, is sufficiently numerous to make joinder impracticable. *See Smith v. General Motors Corp., 1977 U.S. Dist. LEXIS 17094, 14 Fair Empl. Prac. Cas. (BNA)*

*987 (E.D. Mich. 1977)* (stating that thirty-five is often the standard).

### 2. Commonality

Class members must have either a question of law or fact [*7] in common, not necessarily both. *See Fed. R. Civ. P. 23(a)*; *Ballan v. Upjohn Co., 159 F.R.D. 473 (W.D. Mich. 1994)*. Here, plaintiffs contend that there are several common questions of law and fact, including, *inter alia*:

> (1) whether Metabolife's labeling is misleading for failing to disclose health risks,
>
> (2) whether Metabolife knew of the risk of injury from Metabolife 356, and
>
> (3) whether Metabolife failed to adequately warn of the adverse effects in consuming Metabolife 356. [3]

---

3   Plaintiffs originally claimed also that Metabolife breached the warranty of safety appearing on the bottle. However, at oral argument, plaintiffs represented that they wished to proceed on the misrepresentation claim only. Therefore, the Court does not address the parties arguments on breach of warranty.

Metabolife does not seem to dispute that there exists common questions of law and fact, but rather, as will be discussed *infra*, argues that the individual issues predominate over [*8] the common questions. Indeed, every bottle of Metabolife 356, sold during the relevant period, carries (and omits) the same language and information that plaintiffs contend is false and misleading. Thus, there are common questions of law or fact present, as required by *Fed. R. Civ. P. 23(a)*.

### 3. Typicality

The purpose of the typicality requirement is to assure that the named representatives' interests align with those of the class. *Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992)*. The inquiry focuses special attention on "differences between class representative claims and class claims that would defeat the representative nature of the class action." *Van Vels v. Premier Athletic Center of Plainfield, Inc., 182 F.R.D. 500, 510 (W.D. Mich. 1998)*. Generally, the typicality requirement is met if the representative shares a common element of fact or law with the class. *Senter v. General Motors*

*Corp., 532 F.2d 511, 525 (6th Cir. 1976)*. Here, plaintiffs assert that the typicality requirement is met because their claims, like the entire class's claims, are based on Metabolife's marketing, sales, and labeling of its product. [*9] *See Van Vels, supra*. Since both Gasperoni and Trumbull purchased bottles containing the same misleading labels, they say their claims are typical of the class.

Metabolife, however, argues that the typicality requirement is not met because Metabolife has individual defenses to the named plaintiffs' claims which destroys typicality. Specifically, Metabolife contends that Gasperoni's intentional failure to consult a physician, and Trumbull's receipt of bad medical advice after she did consult a physician, were the causes of their injuries - not Metabolife's product. [4] Metabolife relies upon *Ballan v. Upjohn Co., supra*, a fraud-on-the-market securities case in which the plaintiff was found to be atypical of the class he sought to represent because he purchased the stock after curative disclosures had been made. The court in *Ballan* found that the plaintiff's "interest in the case will be different with regard to the materiality of the curative disclosure than the interest of class members who purchased prior to the curative disclosures." *159 F.R.D. at 480*.

---

4   This is also the essence of Metabolife's motion for summary judgment.

[*10]   In contrast to *Ballan*, there is no evidence here indicating that either named plaintiffs received curative disclosures prior to their purchase' or consumption of the product. Indeed, this is the whole point of this case -- plaintiffs charge that Metabolife's label does not sufficiently disclose the risks associated with its product and fail to place plaintiffs on notice as to the potential harm that they are incurring. Since both plaintiffs purchased and/or used Metabolife 356 without an adequate warning on the label, their claims are typical of the class they are seeking to represent.

Also, the fact that Trumbull has already received a refund for her purchase of Metabolife 356 is not dispositive because plaintiffs are seeking an injunction as well as money damages in the form of a refund of the purchase price.

### 4. Adequacy

The adequacy of class representation is measured by (1) the qualifications of the named plaintiffs' attorneys and (2) the extend to which the plaintiff's interests may be antagonistic to those of the class. *Senter, supra 532 F.2d at 524-25*. Here, there is no challenge to the qualification of plaintiffs' attorneys, E. Powell Miller and Gerald Mantese, [*11] nor to their firm, Mantese Miller and Mantese, P.L.L.C.

Metabolife instead argues that the named plaintiffs' interests are antagonistic to the class in that (1) they are proposing to waive available claims and elements of damages for absent class members, and (2) treating this case as a class action may preclude class members from later bringing personal injury claims for pain and suffering. *See Feinstein v. Firestone Tire & Rubber Co., 535 F. Supp. 595, 606-07 (S.D.N.Y. 1982)* (holding class representatives inadequate where they were "presenting putative class members with significant risks of being told later that they had impermissibly split a single cause of action.") Thus, Metabolife argues that Gasperoni and Trumbull are inadequate because they are creating a res judicata risk for the class members. [5]

> 5  In Michigan, the doctrine of res judicata is applied to bar claims that were not only actually litigated, but also unasserted claims arising out of the same transaction that might have been raised in the previous suit. *See VanDeventer v. Michigan Nat'l Bank, 172 Mich. App. 456, 464, 432 N.W.2d 338 (1988).*

[*12] Plaintiffs deny any such conflict, and question the validity of *Feinstein* in light of *Cooper v. Federal Reserve Bank of Richmond, 467 U.S. 867, 81 L. Ed. 2d 718, 104 S. Ct. 2794 (1984)* (holding that judgment in a class action where employer was found not to have engaged in a general pattern or practice of race discrimination against employees did not preclude class members from later maintaining individual race discrimination claims against the employer). *See also* NEWBERG ON CLASS ACTIONS § 1.7 (3d. ed. 1992) at p. 17-20 ("*Cooper* modified the rule barring a splitting of the cause of action in separate litigation in particular circumstances.") Alternatively, plaintiffs suggest that the class be defined to specifically exclude persons bringing individual personal injury claims.

Notwithstanding the academic discourse of the impact of *Cooper* regarding class action and res judicata, adopting the plaintiffs' alternative Suggestion to define the class so as to exclude persons who bring individual personal injury claims will alleviate most of Metabolife's res judicata "concerns." *See Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, 657 F.2d 890, 895 (7th Cir. 1981)* [*13] ("It is often the defendant, preferring not to be successfully sued by anyone, who supposedly undertakes to assist the court in determining whether a putative class should be certified. When it comes, for instance, to determining whether 'the representative parties will fairly and adequately protect the interest of the class,'... it is a bit like permitting a fox, although with pious countenance, to take charge of the chicken house.") If those people with individual personal injury claims can opt out of the class, or are specifically

excluded from the definition of the class, there is no danger of the class waiving any individual claims of its members. Moreover, the only legal issue to be certified is simply whether the label is materially misleading. Any personal injuries that develop in class members after the present suit, will not be subject to res judicata because their claim will not have been actually litigated, nor will it be one that "might have been raised" in the previous suit. This compromise solution seems to be the most equitable, allowing common issues to be litigated without waiving any individual claims. *See In re Diet Drugs ( Phentermine, Fenfluramine, Dexfenfluramine Products Liability Litigation, 2000 U.S. Dist. LEXIS 12275*, Nos. 1203, 99-20593, 2000 WL 1222042 [*14] (E.D. Pa. Aug. 28, 2000). Accordingly, the named representatives are adequate.

C. Maintaining a Class Action (*Fed. R. Civ. P. 23(b)(3)*)

1. Predominance

The bulk of Metabolife's opposition to class certification rests upon its contention that individual issues of fact and law predominate in this case. Specifically, it argues that: (1) liability for misrepresentation necessarily turns on the details of any pre-sale communication and sales of Metabolife 356 are materially different from one customer to the next, (2) reliance, causation, and injury must be proven individually and cannot be presumed, and (3) medical monitoring presents issues requiring individualized proof. Each will be addressed in turn.

a. Differences in Pre-sale Communication

Metabolife has submitted extensive documentation, in the form of declarations and exhibits, showing the various methods, beyond simply the bottle's label, by which information about Metabolife 356 is conveyed to customers. For example, in addition to receiving information through Metabolife's marketing and advertisements efforts via the radio, the Internet, newspapers, and television, customers can ask health-related and product usage questions [*15] by e-mail and by calling a toll-free telephone health-line. There are also direct sales representatives which provide different information to different customers, depending upon the circumstances each customer presents. Due to the variety of information provided to customers, Metabolife argues that plaintiffs' claim that customers were "lulled into a false sense of safety" by the label, is actually an individual question requiring a careful review of the total information that a particular customer received before any determination can be made on liability for misrepresentation. Presumably, the thrust of Metabolife's argument is that any potential misrepresentation that might arise from the label can be cured by additional information from external sources and, therefore, any claim of misrepresentation must 'be

2000 U.S. Dist. LEXIS 20879, *

analyzed individually in light of all the information received by that particular person.

In support, Metabolife relies on the Sixth Circuit case, *In re American Medical Systems, supra,* (class action against penile implant manufacturer), which, in reversing the district court's grant of class certification on the grounds that individualized issues predominated, [*16] reasoned that:

> Each plaintiff has a unique complaint and each receives different information and assurances from his treating physician... In this situation, the economies of scale achieved by class treatment are more than offset by the individualization of numerous issues relevant only to a particular plaintiff... Thus, even assuming common questions of law or fact, it cannot be said that those issues predominate...

*Id. 1085,* Metabolife likewise argues that individual issues predominate here as well, such as "why a consumer bought the product, what information the consumer considered, and whether the consumer used the product as directed and in accord with cautions given prior to initial use all must be considered." Metabolife's Response Brief at 15.

Metabolife's arguments, however, ring hollow. The only legal issue to be decided here is whether the label, taken as a whole, is materially misleading. Regardless of what other information a consumer may consider or rely on, every purchaser is exposed to the information on the label. If such information is shown to be false and misleading, it is not enough to say that truthful information is available [*17] somewhere else. Also, the essence of plaintiffs' case is that the *bottle label* is deficient and incomplete. Simply because a customer can find additional information from an external source does not sanitize the label. Moreover, plaintiffs' use (or misuse) of the product is irrelevant to the current claims, which are for consumer fraud and misrepresentation and not for personal injuries sustained as a result of use of the product.

Here, all the plaintiffs allege a common method of misrepresentation, and all allege the same legal claim. *See Dix v. American Bankers Life Assurance Co., 429 Mich. 410, 416, 415 N.W.2d 206 (1987); see also In re Diet Drugs, supra,* at *42-43 (holding that common issues involving "a common product, defendant and course of conduct" predominated over any individual issues between class members). Thus, the present case is distinguishable from the situation in *American Medical Systems* where the plaintiffs could not establish any common defect among the ten different models of implants. It is also distinguishable in that here, plaintiffs are not claiming that *use* of Metabolife 356 itself harmed them, but rather that the *label* is defective [*18] and incomplete, resulting in a material misrepresentation at the time of purchase.

b. Reliance, Causation, and Injury

Metabolife also argues that the elements of reliance, causation, and injury cannot be presumed here, and as such, individualized inquiries into each customer's reliance, causation, and injury are necessary. Metabolife contends that the presumption of reliance and causation given in securities cases is inapposite in this case. They argue that "it would be illogical. . . to presume reliance where the effect, if any, of various materials, including the label, on each class member's purchase are uncertain -- and where the record evidence on the two Plaintiffs shows that one did, and one did not, act in accordance with the label directions." Metabolife Response Brief at 18-19.

Each of plaintiffs' claims must be analyzed separately.

(i) Common Law Fraud

To state a claim for misrepresentation or omission, plaintiffs must allege the following: (1) defendant made a material representation; (2) the representation was false; (3) defendant either knew the representation was false, or acted with reckless disregard for truth or falsity; (4) defendant intended plaintiff to rely; [*19] (5) plaintiff acted in reliance; (6) plaintiff suffered harm/injury. *Hi-way Motor Co. v. International Harvester Co., 398 Mich. 330, 336, 247 N.W.2d 813 (1976).* Here, actual reliance is a required element of the claim of common law fraud. Plaintiffs have proffered no case which holds that reliance can be presumed in the context of a common law fraud case. As such, an individualized inquiry would be necessary for each class member and the claim for common law fraud is not fit for class action.

However, under Michigan law, a fraudulent omission (silent fraud) [6] occurs when there is: "(1) a material omission, (2) an affirmative duty by the defendant to disclose the fact, (3) a failure by defendant to speak when the duty to do so requires it, and (4) an intent to induce reliance on nondisclosure." *Clement-Rowe v. Michigan Health Care Corp., 212 Mich. App. 503, 538 N.W.2d 20 (1995).* Unlike a claim for an affirmative representation, a claim for fraudulent omission does not require any proof of actual reliance. *Id.* Rather, it merely requires an intent, on the part of the defendant, to induce reliance on nondisclosure. *Id.* This would require only [*20] an inquiry into the intent of Metabolife, not each class member. As such, it is amenable to class treatment.

6   Neither party addresses silent fraud in their papers. However it was mentioned in Metabolife's previous motion to dismiss.

### (ii) Michigan Consumer Protection Act

Plaintiffs also claim misrepresentation under the Michigan Consumer Protection Act, *M.C.L. § 445.901 et seq.* Under this statute, reliance and causation are satisfied by proof that plaintiffs purchased and consumed the product. *See Dix v. American Bankers Life Assurance Co. of Florida, 429 Mich. 410, 415 N.W.2d 206 (1987).* In *Dix*, the Michigan Supreme Court specifically held that:

members of a class proceeding under the Consumer Protection Act need not individually prove reliance on the alleged misrepresentation. It is sufficient if the class can establish that a reasonable person would have relied on the representation. Further, a defendant's intent to deceive through a pattern of misrepresentations can be [*21] shown on a representative basis under the Consumer Protection Act.

*Id. at 418.*

Metabolife's attempts to distinguish *Dix* are unpersuasive. Contrary to Metabolife's assertions, *Dix* is not limited to securities cases -- it has subsequently been held to apply in non-securities cases as well. *See e.g., Van Vels v. Premier Athletic Center of Plainfield, Inc., 182 F.R.D. 500, 508 (W.D. Mich. 1998)* (consumer class action against chain of health clubs; "Unlike common law fraud, misrepresentation claims under the MCPA do not require proof of individual reliance.")(citing *Dix*).

Additionally, it is important to remember that the purpose of the Michigan Consumer Protection Act is to "provide an enlarged remedy for consumers who are mulcted by deceptive business practices" and that it "should be construed liberally to broaden the consumers' remedy, especially in situations involving consumer frauds affecting a large number of persons." *Dix, supra, 429 Mich. at 417-18.* Accordingly, plaintiffs are entitled to class certification on their claim of misrepresentation under the Michigan Consumer Protection Act.

### c. Medical Monitoring

Metabolife additionally [*22]  argues that despite plaintiffs' assertions to the contrary, plaintiffs' claims for medical monitoring, which require Metabolife to pay for past and future treatment of injured class members as well as damages for "past and future risk of serious latent disease," invoke individual personal injury-type damages and consequently render this a personal injury case. Plaintiffs respond that Metabolife's argument is baseless - they are only seeking medical monitoring to allow consumers who ingested Metabolife 356 to find out whether they have physical damage attributable to the product. Plaintiffs say that although this medical monitoring may lead to personal injury suits after such examinations, it does not create individualized issues in the present case. The Court agrees, especially in light of the modification of the class to specifically exclude those persons with a personal injury claim. Thus, common issues predominate and allow for class certification.

### 2. Superiority

Metabolife finally argues that plaintiffs' trial plan is seriously flawed because it fails to show how the individual issues of reliance, causation, and damages can be handled in a way that would not create overwhelming [*23]  manageability problems. *See In re Ford Motor Co. Vehicle Paint Litig., 182 F.R.D. 214, 219-21 (E.D. La 1998)* (rejecting plaintiffs' propose trial plan where plan did not alleviate manageability problems concerning causation, reliance, and affirmative defenses.) Indeed, the court in *In re Ford Paint Litig,* expressly stated that courts are "explicitly prohibited from... certifying a class now and worrying about how to try it later. *Id. at 225.* Plaintiffs respond that Metabolife's "obstacles" are disingenuous and easily correctable. *See* NEWBERG, *supra* § 9.12 ("Class suits should rarely be denied or decertified solely because class management problems are complex.")

Given that plaintiffs seek only class certification on the discrete common issue of whether the label taken as a whole is materially misleading, the case would be entirely manageable as a class action. In addition to significantly advancing the litigation, maintaining this case as a class action is also desirable so as to prevent inconsistent rulings. *See Fed. R. Civ. P. 23(b)(1).* As a class action, the adequacy of Metabolife's labels will be decided by only one fact-finder.  [*24]  If plaintiffs lose on the common issue of whether the label is misleading or not, than any subsequent case relying upon the label would be barred.

Finally, and most importantly, it should be emphasized that in general, any doubts concerning the propriety of a class certification should be resolved in favor of upholding the class. *See Esplin v. Hirschi, 402 F.2d 94, 101 (2d Cir. 1968)* ("The interests of justice require that in a doubtful case. . . any error, if there is to be one, should be committed in favor of allowing the class ac-

tion.") This is especially so in a case such as here, where the individual damage claims are so small that denial of class certification would effectively eliminate the litigation. In such circumstances, courts should be liberal in granting class certification. *See Amchem Products, Inc. v. Windsor, 521 U.S. 591, 138 L. Ed. 2d 689, 117 S. Ct. 2231 (1997)* (noting that "'the policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.'") (quoting *Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir.1997))*. [*25]

Although Metabolife is technically correct that the named plaintiffs can still obtain their main objectives, i.e., a refund of the purchase price, a change in the labels and attorney fees, through an individual suit under the Michigan Consumer Protection Act, MCLA § 445.911(1)(a) and § 445.911(2), it misses the point -- which is that it is highly unlikely that the members of the class would ever file suit individually to recover only the small purchase price of the product. Thus, denying certification would seriously inhibit an avenue of legal redress for the members of the class, assuming that plaintiffs' claims have merit. *See Paley v. Coca-Cola Co., 389 Mich. 583, 595, 209 N.W.2d 232 (1973)* ("The class action. . . has been particularly helpful for one of today's most beleaguered and disaffected groups -- the consumer. It is a kind of better slingshot for the modern David to tackle Goliath with." Accordingly, a class action is the superior method of adjudication.

D.

In summary, the labels on the bottles of Metabolife 356 create common questions of law and fact under the Michigan Consumer Protection Act. The description of the class is limited to exclude class [*26] members who have individual personal injury claims and the legal issue is limited to whether the labels are materially misleading. The Court will not certify the common law fraud claim because it depends upon the resolution of individual questions of law and fact.

IV. Conclusion

For the reasons stated above, plaintiffs' motion for class certification is GRANTED. An order will be entered upon notice of presentation and opportunity to respond.

SO ORDERED.

AVERN COHN

UNITED STATES DISTRICT JUDGE

Dated: SEP 27 2000

Detroit, Michigan

TAB H



LEXSEE 2000 U.S. DIST. LEXIS 12275

IN RE: DIET DRUGS (PHENTERMINE, FENFLURA-
MINE, DEXFENFLURA-
MINE) PRODUCTS LIABILITY LITIGATION. THIS DOCUMENT RELATES
TO: SHEILA BROWN, et al. v. AMERICAN HOME PRODUCTS CORPORA-
TION

MDL DOCKET NO. 1203, CIVIL ACTION NO. 99-20593

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

*2000 U.S. Dist. LEXIS 12275*

August 28, 2000, Decided
August 28, 2000, Filed

**SUBSEQUENT HISTORY:** Motions ruled upon by, Motion to strike denied by *Brown v. Am. Home Prods. Corp. (In re Diet Drugs Prods. Liab. Litig.), 2000 U.S. Dist. LEXIS 13254 (E.D. Pa., Sept. 1, 2000)*
Related proceeding at *Coward v. Wyeth, 2003 U.S. Dist. LEXIS 26246 (S.D. Tex., Sept. 17, 2003)*
Enforcement granted by *Brown v. Am. Home Prods. Corp. (In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.), 2003 U.S. Dist. LEXIS 23717 (E.D. Pa., Dec. 3, 2003)*
Related proceeding at *In re Diet Drug Litigation, 384 N.J. Super. 525, 895 A.2d 480, 2005 N.J. Super. LEXIS 394 (Law Div., 2005)*
Related proceeding at *Montgomery v. Wyeth, 540 F. Supp. 2d 933, 2008 U.S. Dist. LEXIS 23591 (E.D. Tenn., 2008)*

**PRIOR HISTORY:** *Brown v. Am. Home Prods. Corp. (In re Diet Drugs Prods. Liab. Litig.), 2000 U.S. Dist. LEXIS 12304 (E.D. Pa., Aug. 16, 2000)*

**COUNSEL:** For VIVIAN NAUGLE, QUINTIN LAYER, PLAINTIFFS: SOL H. WEISS, ANAPOL, SCHWARTZ, WEISS & SCHWARTZ, P.C., PHILA, PA USA. R. ERIC KENNEDY WEISMAN, GOLD-BERG, WEISMAN & KAUFMAN CO., L.P.A., CLEVELAND, OH USA. MARK W. TANNER, FELDMAN, SHEPHERD, WOHLGELERNTER, PHILA, PA USA. JOHN J. CUMMINGS, III, CUMMINGS, CUMMINGS AND DUDENHEFER, NEW ORLEANS, LA USA. STANLEY M. CHESLEY, WAITE, SCHNEIDER, BAYLESS AND CHESLEY CO., L.P.A., CINCINNATI, OH USA. RICHARD S. LEWIS, COHEN, MILSTEIN, HAUSFELD AND TOLL, WASHINGTON, DC USA. DIANNE M. NAST, RODA AND NAST, P.C., LANCASTER, PA USA. ARNOLD LEVIN, LEVIN, FISHBEIN, SEDRAN & BERMAN, PHILADELPHIA, PA USA. MICHAEL D. FISHBEIN, LEVIN, FISHBEIN, SEDRAN & BER-MAN, PHILA, PA USA. RICHARD S. WAYNE, STRAUSS & TROY, CINCINNATI, OH USA. GENE LOCKS, GREITZER & LOCKS, PHILA, PA USA. CHRISTOPHER PLACITELLA, WILENTZ, GOLD-MAN & SPITZER, WOODBRIDGE, NJ USA.

For JOAN S. LAYER, PLAINTIFF: SOL H. WEISS, ANAPOL, SCHWARTZ, WEISS & SCHWARTZ, P.C., PHILA, PA USA.

For CIGNA HEALTHCARE OF PENNSYLVANIA, INC., ET AL, INTERVENOR-PLAINTIFF: JAMES L. JOHNSON, THE JOHNSON LAW FIRM, DALLAS, TX USA.

For HEALTH PLAN, INTERVENOR-PLAINTIFF: NEAL S. MANNE, HOUSTON, TX USA.

For AMERICAN HOME PRODUCTS CORPORA-TION, DEFENDANT: MICHAEL T. SCOTT, REED SMITH SHAW & MCCLAY, PHILA, PA USA. STE-VEN P. LOCKMAN, WASHINGTON, DC USA. PE-

TER ZIMROTH, NEW YORK, NY USA. PAUL KERRIGAN, REED SMITH & MCCLAY, PHILA, PA USA. DANIEL S. PARISER, ARNOLD & PORTER, WASHINGTON, DC USA.

For JANE SCUTERI, ET AL, RESPONDENT: PAUL J. NAPOLI, NAPOLI, KAISER & ASSOC., NEW YORK, NY USA.

For RHEINGOLD, VALET, RESPONDENT: DAVID B. RHEINGOLD, NEW YORK, NY USA.

RANDY G. ALLEN, RESPONDENT, PRO SE: RANDY G. ALLEN, THE LAW OFFICES OF RANDY G. ALLEN, COLORADO SPRINGS, CO USA.

For SHEFF LAW OFFICES, P.C., RESPONDENT: DONALD R. GRADY, SHEFF LAW OFFICES, BOSTON, MA USA.

For GONZALEZ PLAINTIFFS RESPONDENT: ERVIN A. GONZALEZ, ROBELS & GONZALEZ, P.A., MIAMI, FL USA. KEITH M. JENSEN, LAW OFFICE OF KEITH M. JENSEN, FORT WORTH, TX USA.

For For BLUE CROSS AND BLUE SHIELD UNITED OF WISCONSIN, MOVANT: RICHARD L. BERKMAN, DECHERT, PRICE & RHODES, PHILA, PA USA. MICHAEL J. LAFFEY, TUCKER ARENSBERG, P.C., PITTSBURGH, PA USA. KIMBERLY R. WEST, WALLACE, JORDAN, RATLIFF & BRANDT, BIRMINGHAM, AL USA.

For HMO LOUISIANA, MOVANT: MARK D. FISCHER, RAWLINGS & ASSOC., LOUISVILLE, KY USA.

For CAROL BLOOM, TAMMY STATEN, NORMA JEAN NORSE, JERRIE RAWLS TOYES, MOVANTS: TRACY D. REZVANI, FINKELSTEIN, THOMPSON & LOUGHRAN, WASHINGTON, DC USA. L. KENDALL SATTERFIELD, FINKELSTEIN, THOMPSON & LOUGHRAN, WASHINGTON, DC USA.

For FLEMING OBJECTORS, MOVANT: GEORGE M. FLEMING, HOUSTON, TX USA. JAMES L. DOYLE, II, RAND P. NOLEN, FLEMING, HOVENKAMP AND GRAYSON, P.C., HOUSTON, TX USA.

For NORTH TEXAS ATTORNEYS, MOVANT: KIP A. PETROFF, DALLAS, TX USA. C. L. SCHMIDT, THE SCHMIDT FIRM, DALLAS TX USA. MICHAEL P. MCGARTLAND, MCDONALD, CLAY, CROW & MCGARTLAND, FORTH WORTH, TX USA.

ROBERT M. KISSELBURGH, PETROFF & KISSELBURGH, DALLAS, TX USA.

For TERRI JACKSON, GLENDA O'NEAL, MOVANTS: R. STEPHEN GRIFFIS, R. STEPHEN GRIFFIS P.C., BIRMINGHAM, AL USA.

For JOSPEH PESTITO, TERRY STUBBS, MOVANTS: SEAN M. CLEARY, ROBLES & GONZALEZ, P.A., MIAMI, FL USA.

For ILLINOIS CLASS, MOVANT: EDWARD T. JOYCE, EDWARD T. JOYCE & ASSOCIATES, CHICAGO, IL USA.

For MICHAELE PRIDEMORE, MOVANT: DEBORA A. O'NEILL, THE MAGER LAW FIRM, P.C., PHILADELPHIA, PA USA. CAROL A. MAGER, THE MAGER LAW FIRM, PHILA, PA USA. THOMAS C. CRONIN, CUMMINS & CRONIN, LLC, CHICAGO, IL USA.

For SALIE TRAVIS, ANN WESTFALL, VIRGINIA KIESER, PATTY LEMONS, STACEY YATES, MOVANTS: DEBORA A. O'NEILL, THE MAGER LAW FIRM, P.C., PHILADELPHIA, PA USA.

For FRANK DEJULIUS, MOVANT: STEVEN KAPUSTIN, FLAMM, BOROFF AND BACINE, BLUE BELL, PA USA. EDWARD W. COCHRAN, SHAKER HEIGHTS, OH USA.

For RONALD WEINTRAUB, MOVANT: N. ALBERT BACHARACH, JR., GAINESVILLE, FL USA.

For DEBORAH PHILLIPS, MOVANT: STEVEN KAPUSTIN, FLAMM, BOROFF AND BACINE, BLUE BELL, PA USA. PAUL ROTHSTEIN, GAINESVILLE, FL USA.

For JOHN P. WILLS, III, MOVANT: BENJAMIN E. BAKER, JR., BIRMINGHAM, AL USA.

For KAREN M. SALTER, MOVANT: R. STEVEN BAKER, THE SOUTHERN LAW GROUP, BIRMINGHAM, AL USA.

For ANGELA S. DUFFY, MOVANT: EDWARD W. COCHRAN, SHAKER HEIGHTS, OH USA. ROBERT W. BISHOP. BISHOP AND WILSON, LOUISVILLE, KY USA.

For DANIEL E. BECNEL, JR., MOVANT: DANIEL E. BECNEL, JR., BECNEL, LANDRY AND BECNEL, RESERVE, LA USA.

2000 U.S. Dist. LEXIS 12275, *

For PHYLLIS M. RODRIGUEZ, FRANCES RAMMAGE, SHERRI D. WIENEKE, PAM BUTLER, LYNN REED, CARL WOLF, TED DOAK, SHERRIE BRICHETTO, MOVANTS: GEORGE W. COCHRAN, STREETSBORO, OH USA.

For LES LABORATOIRES SERVIER, MOVANT: ROBERT P. LOBUE, PATTERSON, BELKNAP, WEBB & TYLER, NEW YORK, NY USA.

For ROBERT CLAYCOMB, MOVANT: ROBERT B. BOWLING, BOWLING, JOHNSON & COSTANZO, MIDDLESBORO, KY USA.

For VICKI DUNN, CLAIMANT: ROBERT E. J. CURRAN, CURRAN & BYRNE, P.C., MEDIA, PA USA. EDWARD BLIZZARD, BLIZZARD & MCCARTHY, HOUSTON, TX USA.

For TRAVIS T. VANCE, JR., BOWMAR MCGEHEE, SIDRA BURNS, GLYNDA CRAFT SPARKS, DEE ANN ROME, GIDGET CHAMBERS, CLAIMANTS: JAMES W. NOBLES, JR., JACKSON, MS USA.

KIM HEATON, KIM HEATON, ET AL, OBJECTOR, MOVANTS: GEORGE W. COCHRAN, STREETSBORO, OH USA.

For BETTY JO BENSON, ET AL, OBJECTOR: CHARLES M. THOMPSON, KEARNEY D. HUTSLER, THOMPSON HUTSLER LAW FIRM, BIRMINGHAM, AL USA.

For YVONNE BUENTIEMPO, ET AL, OBJECTOR: PATRICK J. MULLIGAN, LAW OFFICE OF PATRICK J. MULLIGAN, DALLAS, TX USA.

For INTERNEURON PHARMACEUTICALS, INC, OBJECTOR: BARBARA WRUBEL, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, NEW YORK, NY USA.

For DISTRIBUTOR DEFTS OBJECTOR: ROBERT N. SPINELLI, KELLEY, JASONS, MCGUIRE & SPINELLI, PHILADELPHIA, PA USA.

For ALLSCRIPTS, INC., OBJECTOR: JOSEPH W. GIBLEY, GIBLEY AND MCWILLIAMS, P.C., MEDIA, PA USA.

For RUTH GILMER, OBJECTOR: ROBERT N. KATZ, HEWITT, KATZ & DUMICH, ATLANTA, GA USA.

For CHARLES OZATTA, OBJECTOR: GARY D. CORLEY, STAGNER & CORLEY, SERMAN TX USA.

For CINDY PATTISON, AILEEN HOFFER, OBJECTORS: LAWRENCE W. SCHOENBRUN, LAWRENCE W. SCHONBRUN, ATTY AT LAW, BERKELEY, CA USA.

For COMED MEDICAL EXPENSE PLAN, CITY OF CHICAGO MEDICAL CARE PLAN, CENTRAL STATES HEALTH AND WELFARE FUND, OBJECTORS: FRANK E. STEPNOWSKI, COGHLAN KUKANKOS COOK, CHICAGO, IL USA.

For SYLVIA SZKLARZ, LUIS SZKLARZ, OBJECTORS: PAUL D. RHEINGOLD, NEW YORK, NY USA.

For TRACY BENNETT JOHNS, OBJECTOR: GEORGE MICHAEL JAMAIL, BEAUMONT, TX USA.

For BARBARA D. JEFFERIES, DAVID E. JEFFERIES, OBJECTORS: EDWARD A. CORCORAN, BRENNAN, STEIL, BASTING & MCDOUGALL, MADISON, WI USA.

For NAPOLI OBJECTORS, OBJECTOR: MARC JAY BERN, NAPOLI, KAISER & BERN, NEW YORK, NY USA.

For MICHAEL RINIS, OBJECTOR: FRANK TOMLINSON, PRITCHARD, MCCALL & JONES, BIRMINGHAM, AL USA.

For TERI LAMPING, OBJECTOR: JOHN MORRISON, MELOY & MORRISON, HELENA, MT USA.

For VINSON CARITHERS, III, OBJECTOR: SEAN M. CLEARY, ROBLES & GONZALEZ, P.A., MIAMI, FL USA.

For AVIS F. REID, OBJECTOR: MARK W. DAVIS, DAVIS AND EMIL, GULFPORT, MS USA.

**JUDGES:** [*1] LOUIS C. BECHTLE, J.

**OPINION BY:** LOUIS C. BECHTLE

**OPINION**

**MEMORANDUM AND PRETRIAL ORDER NO. 1415**

BECHTLE, J.

2000 U.S. Dist. LEXIS 12275, *

AUGUST 28, 2000

Presently before the court is the Joint Motion of the Class Representatives and American Home Products Corporation ("AHP") for an order certifying and approving the nationwide settlement class embodied in the Settlement Agreement entered into between the parties on November 19, 1999. For the reasons set forth below, the court will grant the motion and will certify the class and approve the settlement pursuant to *Federal Rule of Civil Procedure 23*. The court's findings of fact and conclusions of law are as follows.

## TABLE OF CONTENTS

I. Background

   A. The Diet Drug Litigation

   B. The Settlement Negotiations

   C. Procedural Background and Fairness Hearing

   D. The Medical Circumstances of the Class

     1. The Risk of Valvular Heart Disease

       a. The Heart

       b. VHD in General

       c. VHD and Diet Drugs

     2. The Risk of Primary Pulmonary Hypertension ("PPH")

E. The Legal Circumstances of the Class

   F. The Settlement

     1. The Class

     2. The Benefits of the Settlement

       a. Medical Monitoring, Medical Screening and Matrix Compensation [*2] Benefits

       b. Prescription Reimbursement Benefits

       c. Reimbursement of Echocardiogram Expenses

       d. Establishment of a Medical Research Fund

       e. Establishment of a Registry/Database

       f. The Public Health Benefits of the Settlement

       g. Exit Rights

     3. Creation of a Settlement Trust

     4. The Settlement Fund

     5. Treatment of PPH Under the Settlement Agreement

     6. Release and Bar Provisions

     7. Attorneys' Fees

     8. The Accelerated Implementation Option

     9. Jurisdiction

II. Discussion

   A. Subject Matter Jurisdiction

   B. Personal Jurisdiction and Notice Requirements Under *Federal Rules of Civil Procedure 23(c)(2)* and *23(e)*

     1. Legal Standards

       a. Personal Jurisdiction

       b. *Rule 23(c)(2)*

       c. *Rule 23(e)*

     2. The Notice Plan

       a. Dissemination

       b. Content

       c. Response

     3. Analysis

   C. Article III Case or Controversy Requirement

D. *Rule 23* Class Certification Requirements

1. *Rule 23(a)(1)* Numerosity

2. *Rule 23(a)(2)* Commonality and *Rule 23(b)(3)* Predominance

3. *Rule 23(a)(3)* Typicality

4. Rule 24(a)(4) Adequacy of Representation

   a. Qualifications

   b. Conflicts

   (i) Class Counsel Were Not Disarmed in Their Negotiations

   (ii) There Are No Improper [*3] Allocations or Trade-Offs Involved

   (A) The Class is Cohesive

   (B) There Is No "Futures" Problem Similar to the One Encountered in Amchem

   (C) Objections Pertaining to Neurotoxic Injuries

   (D) Structural Protections

   (E) There Have Been No Lump Sum Allocations or Financial Trade-Offs

   (F) Issues Involving Subclasses and Subclass Counsel

   (G) Attorneys' Fees

5. *Rule 23(b)(2)*

6. *Rule 23(b)(3)* Superiority

   a. Progression and Latency

   b. Severity of Injury

   c. Duration of Exposure

   d. Injury to the Tricuspid Valve

e. Neurotoxicity

f. PPH

g. Summary

E. *Rule 23(e)* Fairness Requirements

1. Complexity, Expense and Likely Duration of the Litigation

2. Reaction of the Class to the Settlement

3. Stage of Proceedings and Amount of Discovery Completed

4. Risks of Establishing Liability and Damages

5. Risk of Maintaining Class Action Throughout Trial

6. Ability of AHP to Withstand Greater Judgment

7. Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and All the Attendant Risks of Litigation

8. Remaining Prudential Considerations

   a. Maturity of Underlying Substantive Issues as Measured by [*4] Experience in Adjudicating Individual Actions

   b. Development of Scientific Knowledge

   c. Comparison of Class Recovery to Individual Claimant Recovery

   d. Whether Class Members Have Opt Out Rights

   e. Reasonableness of Attorneys' Fees

f. Fairness of Procedure for Processing Individual Claims

9. Provision for Joint Tortfeasor Liability

10. Treatment of Subrogation Interests

11. Summary

III. Conclusion

## I. BACKGROUND

### A. The Diet Drug Litigation

This litigation involves claims regarding the health effects of two related prescription drugs--fenfluramine and dexfenfluramine.

Fenfluramine is an appetite suppressant that affects blood levels of the neurotransmitter, serotonin. Dexfenfluramine, the "d-isomer" of fenfluramine, is chemically related to fenfluramine and acts as an appetite suppressant by stimulating the release of serotonin from nerve cells in the brain and by reducing the reuptake of the released serotonin. In 1973, The United States Food and Drug Administration ("FDA") approved A.H. Robins, Inc.'s new drug application to market fenfluramine in the United States. (Ex. P-180.)

Before 1989, A.H. Robins, [*5] Inc. was responsible for the marketing, sale and labeling of fenfluramine in the United States. In 1989, AHP acquired A.H. Robins. Following the acquisition, fenfluramine was marketed by AHP under the trade name "Pondimin." Between December 1989 and September 15, 1997, AHP was the only company to market fenfluramine in the United States and had the exclusive responsibility for its regulatory compliance, adverse event reporting, safety surveillance and labeling.

Sales of Pondimin were relatively flat until 1992. In 1992, a series of articles by Michael Weintraub, M.D., were published in the Journal of Clinical Pharmacology and Therapy, in which Dr. Weintraub advocated the use of fenfluramine together with the drug phentermine for weight loss management without the adverse side effects associated with the use of fenfluramine alone. This regimen popularly became known as "Fen-Phen." With the introduction of "Fen-Phen" therapy to the market place, sales of Pondimin skyrocketed. From January 1995 to mid-September 1997, approximately 4,000,000 persons in the United States took the drug Pondimin. (Tr. 5/2/00 at 26-27; Ex. P-183 at 29 of 33; Ex. P-182 at 5 of 13.)

Dexfenfluramine, the [*6] chemical cousin of Pondimin, was developed by Les Laboratories Servier S.A. ("LLS") in France. The drug afforded the same anorexic effects as Pondimin without the need to add phentermine to ameliorate adverse side effects. Before 1994, the Lederle Division of American Cyanamid Company had the right, together with Interneuron Pharmaceuticals, Inc., to develop and promote dexfenfluramine in the United States under the trade name "Redux." In 1994, AHP acquired American Cyanamid. Following that acquisition, responsibility for the development and promotion of Redux in the United States in conjunction with Interneuron was assumed by AHP. Interneuron received approval to market Redux in the United States in mid-1996. As with Pondimin, sales of Redux were brisk. From June 1996 through September 15, 1997, two million people in this country took Redux. (Tr. 5/2/00 at 28; Ex. P-183 at 29 of 33; Ex. P-182 at 5 of 13.)

The distribution of Redux users by age and sex was virtually the same as that for Pondimin. (Ex. P-94 at 3 of 41; Ex. P-53 at 9 of 54.) Most of the individuals who took the diet drugs Pondimin and Redux were middle aged women. (Ex. P-94 at 3 of 41; Ex. P-53 at 9 of 44.)

From the [*7] viewpoint of plaintiffs' counsel, the evidence reveals that before Pondimin and Redux were withdrawn from the market in 1997, which is discussed infra, AHP received considerable information from a number of sources that both drugs could cause damage to the valves in the heart leading to valvular regurgitation. This information consisted of reports in the medical literature, reports from animal studies, reports concerning heart valve damage in patients taking drugs with similar effects on serotonin metabolism, adverse event reports and reports from a doctor commissioned to analyze certain facts for Interneuron. According to plaintiffs, notwithstanding this information, during the period of time AHP marketed dexfenfluramine and fenfluramine, it failed to investigate these reports, to look at whether or not the drugs were cardiotoxic or to label the drugs as being potentially harmful to the heart valves.

In response, AHP has vigorously contested the plaintiffs' interpretation of these events, noting that much of this information was submitted to the FDA for its own analysis; that none of the doctors or scientists who reported on Pondimin or Redux, either in the published literature [*8] or in the adverse event reports, concluded that either product caused any valvular disease; and that, given the substantial prevalence of such valvular disease in the general population, it was not possible to conclude,

on the basis of these reports, that its products caused disease.

In March 1997, researchers at the Mayo Clinic in Rochester, Minnesota began observing an association between the use of fenfluramine and/or dexfenfluramine and a particular type of valvular heart disease. Eventually, the Mayo Clinic researchers observed this unusual form of valvular heart disease in 24 women who had used fenfluramine in combination with phentermine. (*Ex. P-95 P 39*; Tr. 5/2/00 at 29; Ex. P-113; Ex. P-181; Ex. P-182.) The findings of the Mayo researchers were first brought to the attention of the public in a July 8, 1997 press release and were eventually published on August 28, 1997, in the New England Journal of Medicine. (Exs. P-181 & P-113.)

On July 8, 1997, the FDA issued a public health advisory, followed by letters to 700,000 physicians requesting information about similar patients. Based on information the FDA received in response, the FDA requested the withdrawal of fenfluramine [*9] and dexfenfluramine from the U.S. market. On September 15, 1997, AHP and the FDA announced that there would be no further sales of Pondimin and Redux in the United States. Subsequently, the causal relationship between valvular heart disease and the use of dexfenfluramine and fenfluramine was investigated and confirmed in three epidemiological studies published in the New England Journal of Medicine in September 1998. (Exs. P-127 (Jick), P-130 (Khan) & P-170 (Weissman).)

A wave of litigation followed. As of the time that class notice issued in this matter, approximately 18,000 individuals who used Pondimin or Redux filed lawsuits against AHP. (Tr. 5/2/00 at 196-97.) Many of these lawsuits involved actions in which individuals sought to recover for personal injuries, primarily valvular heart disease, that they sustained as a result of using Pondimin or Redux. In addition, over one hundred plaintiffs instituted class actions in which they sought either: (1) to create an equitable fund to provide medical screening services to patients who had used Pondimin and/or Redux for varying periods of time to determine if they had asymptomatic valvular heart disease; and/or (2) to recover the [*10] amounts expended by consumers to purchase Pondimin and/or Redux or to obtain echocardiograms as a consequence of exposure to these drugs; and/or (3) to recover personal injury damages on behalf of classes of persons who took Pondimin and/or Redux. (Tr. 5/2/00 at 20-21 & 36-39.)

To the extent that these actions were filed in the federal judicial system, the Judicial Panel for Multidistrict Litigation entered an order transferring all of the actions to the United States District Court for the Eastern District of Pennsylvania for coordinated and/or consolidated pre-

trial proceedings under MDL Docket No. 1203. As the transferee court, this court entered an order creating and appointing a Plaintiffs' Management Committee ("PMC") to oversee the conduct of the coordinated/consolidated pretrial proceedings on behalf of the plaintiffs. See Pretrial Order No. 6. [1]

> 1  Pursuant to Pretrial Order No. 6, the court appointed Arnold Levin, Esq., John J. Cummings, III, Esq. and Stanley Chesley, Esq. as co-chairs of the PMC.

[*11]  By the summer of 1999, a combination of state court and federal court decisions certified classes to pursue some form of relief on behalf of those persons who had used AHP's diet drugs. See Pretrial Order No. 865, *Jeffers v. American Home Prods. Corp., 1999 U.S. Dist. LEXIS 13228*, C.A. No. 98-CV-20626 (certifying nationwide medical monitoring class in MDL court); Burch, et al. v. American Home Prods. Corp., C.A. No. 97-C-204(1-11) (certifying medical monitoring and personal injury class in West Virginia); Rhyne v. American Home Prods. Corp., 98 CH 409 (certifying medical monitoring class in Illinois); Vadino, et al. v. American Home Prods. Corp., Docket No. MID-L-425-98 (certifying class seeking medical monitoring and damages for unfair and deceptive trade practices in New Jersey); In re: New York Diet Drug Litig., Index No. 700000/98 (certifying medical monitoring class in New York); In re: Pennsylvania Diet Drug Litig., Master Docket No. 9709-3162 (CCP, Phila.) (certifying medical monitoring class in Pennsylvania); Earthman v. American Home Prods. Corp., No. 97-10-03970 CV, (certifying medical monitoring class in Texas); St. John v. American Home Prods. Corp., [*12] 97-2-06368-4 (certifying medical monitoring class in Washington).

By the summer of 1999, the parties in both the state litigation and the federal MDL litigation had virtually completed discovery with respect to AHP's conduct. (Tr. 5/2/00 at 21-23.) More than 6,000,000 documents were produced by AHP and carefully reviewed, analyzed and collated by the plaintiffs. Id. In the federal litigation, the PMC took nearly 100 depositions of present and former employees of AHP, Interneuron, the FDA and other third parties. (Tr. 5/2/00 at 21-23; Ex. P-1000.) The state court plaintiffs conducted similar deposition discovery, deposing many of the individuals who were the subject of the MDL discovery effort.

In both the MDL litigation and the state court litigation, the plaintiffs consulted with experts in various subjects related to the litigation, including primary pulmonary hypertension, cardioepidemiology, cardiology, cardio-thoracic surgery, clinical pharmacology, cardiopathology, economics, and the like. These experts revealed their opinions in *Rule 26* disclosures and were subject to

both discovery depositions and, in many cases, depositions designed to preserve their testimony for use [*13] at trial. Thus, by the summer of 1999, the plaintiffs had a thorough understanding of the facts underlying the question of AHP's liability to those individuals and classes of individuals who had used Pondimin and Redux, as well as a firm grasp of the relevant scientific principles pertaining to liability, injury and causation in these cases. Also, by the summer of 1999, cases against AHP had begun to go to trial. The most significant of these was the New Jersey *Vadino* case in which New Jersey Superior Court Judge Marina Corodemus presided over a trial of the class claims certified in that action.

## B. The Settlement Negotiations

In late April 1999, AHP invited representatives of the varying constituencies of state and federal plaintiffs to begin negotiations with it for a "global resolution" of the Diet Drug Litigation. In response to that invitation, a negotiating coalition was formed among representatives of the PMC in the MDL court and representatives of the plaintiffs in state courts with pending certified class actions. (Tr. 5/2/00 at 40-42; AHP Ex. 629 at 65-66 and 71; AHP Ex. 628 at 60-61.)

The plaintiffs' negotiating coalition presented its initial proposal to [*14] AHP in the form of a "term sheet" on June 1, 1999. (Tr. 5/2/00 at 47-48.) AHP responded to that proposal with a counter-proposal on June 28, 1999. (Tr. 5/2/00 at 48-49.) Thereafter, intense, adversarial and arm's-length negotiations ensued for more than four months, during which time: Class Counsel in New Jersey prepared for and began the medical monitoring class action trial before Judge Corodemus; cases in Texas proceeded to trial and, in one case, to a substantial verdict against AHP; and individual cases were poised for remand for trial in the MDL 1203 proceedings. (Tr. 5/2/00 at 39; AHP Ex. 628 at 35.) Altogether, members of the negotiating coalition and representatives of AHP participated in approximately 73 negotiating sessions, over a period extending from April through November 1999. (Tr. 5/2/00 at 59.)

Those negotiating the settlement on behalf of the plaintiffs had no understandings, or even negotiations with AHP with respect to any of their individual cases. (Tr. 5/2/00 at 41 & 58-61.) The terms and conditions of the Settlement Agreement were the product of a bargaining process between the parties involving separately negotiating or "building up" the settlement's benefits [*15] and obligations in contrast to a process of negotiating a lump sum dollar amount that would then be allocated or "broken down" among class members. The negotiators proceeded by negotiating the types of screening and compensation benefits to be made available to class members and the eligibility for those benefits. Only

when those benefits and compensation amounts had been essentially resolved did the parties negotiate the maximum monetary commitment that AHP would incur in providing those benefits. (Tr. 5/2/00 at 59.) During the negotiations, AHP never offered, and the plaintiffs never requested, payment of a lump sum to resolve the claims of class members. To the contrary, the negotiations were devoted to working out a structure that would appropriately resolve the claims of all individuals who took Pondimin and/or Redux. Only when that structure was agreed upon did the parties determine the amount of money that would be necessary to fund the structure. (Tr. 5/2/00 at 58-61; Tr. 5/3/00 at 210-211; AHP Ex. 628 at 100.) Each of the major benefit features of the settlement was the subject of a separate, independent and, at times, heated negotiation process. Importantly, under the settlement [*16] process that was employed, there was no intra-class trading off of benefits. That is, one benefit of the settlement did not have to be reduced in exchange for the creation or increase of another benefit. (Tr. 5/2/00 at 42-59, 154-61 & 166-67; AHP Ex. 628 at 110-12.) Moreover, the subject of attorneys' fees was not discussed until the end of the negotiations and then only to limit the award of fees that might otherwise be payable, subject to appropriate limitations for the benefit of the class. (Tr. 5/2/00 at 88; AHP Ex. 629 at 208-39.)

Throughout the negotiations, the members of the negotiating coalition were willing to litigate their clients' claims in the event that negotiations broke down. (Tr. 5/2/00 at 49, 60-61.) Members of the negotiating coalition were armed with substantial leverage in their negotiations with AHP as a result of plaintiffs' willingness and ability to litigate their claims should negotiations fail. This leverage derived from, among other things, the pendency of the *Jeffers* action brought by the PMC in the MDL court, several certified state court medical monitoring class actions in which the negotiators or their constituencies were participating, individual [*17] diet drugs cases pending in the MDL proceedings and in state courts seeking compensation for personal injury, and the trial of the *Vadino* medical monitoring case which was underway when the negotiations were taking place.

By October 7, 1999, the parties had reached an understanding on the principal terms of the settlement, embodied in a Memorandum of Understanding ("MOU"). (Ex. P-49.) After the execution of the MOU, the parties continued with round-the-clock negotiations with respect to the terms left open by the MOU. (Tr. 5/2/00 at 57.) The court also ordered the PMC to make periodic reports to it on fifteen-day intervals concerning the status of the Settlement Agreement. The court was kept apprised of the status of the negotiations. *See* Pretrial Order No. 929.

Ultimately, on November 18, 1999, the parties executed a Nationwide Class Action Settlement Agreement

with AHP. (Exs. P-3 through P-30.) The Court granted preliminary approval of the Settlement Agreement on November 23, 1999 and set May 1, 2000 as the date to commence a Fairness Hearing regarding the Settlement Agreement. See Pretrial Order No. 997. The Agreement has since been subject to four amendments. (*First* [*18] *Amendment*, Ex. P-31; *Second Amendment* with Exhibits, Exs. P-32 through P-48; *Third Amendment*, Ex. P-47; and *Fourth Amendment*, Ex. P-278.)

## C. Procedural Background and Fairness Hearing

On January 28, 2000, the court entered Pretrial Order No. 1071. That order established a "Special Discovery Court" to convene on a weekly basis commencing Wednesday, February 2, 2000 "for the limited and exclusive purpose of promptly administering discovery requirements and resolving discovery disputes applicable to proceedings before the Court regarding consideration of the judicial approval of the nationwide class action Settlement Agreement." Pretrial Order No. 1071 at 1.

On February 3, 2000, the court entered Pretrial Order No. 1109. That Pretrial Order manifested the court's "intention that an eligible party have the opportunity to conduct, under reasonable terms and conditions: (1) discovery pertinent to the issues to be decided at the Fairness Hearing; or (2) discovery deemed important by the eligible person in order to make the decision whether or not to object to the settlement, appear at the Fairness Hearing to object or provide the Court with written comments without an appearance [*19] at the Fairness Hearing." Toward this end, Pretrial Order No. 1109 directed that:

> on or before February 20, 2000 class counsel and the defendant shall file with the Court: (i) a statement identifying all fact witnesses to be called to testify at the Fairness Hearing, together with a brief statement on the anticipated substance of the testimony of each witness; (ii) copies of all documents or other exhibits to be offered into evidence; and (iii) the identities of all expert witnesses to be called together with the information required in *Federal Rule of Civil Procedure 26(a)(2)(B)*. On or before April 10, 2000 any person or party who has fulfilled the requirements of paragraph 17 of PTO No. 997 shall provide to class counsel and the defendant: (i) a statement identifying all fact witnesses to be called to testify at the Fairness Hearing together with a brief statement on the anticipated subject of the testimony of each witness; (ii) copies of

> all documents or other exhibits to be offered into evidence; and (iii) the identities of all expert witnesses to be called, together with the information required in *Federal Rule of Civil Procedure 26(a)(2)(B)*.

Pretrial Order No. [*20] 1109. On February 10, 2000, the court entered Pretrial Order No. 1116 modifying Pretrial Order No. 1109 as follows:

> PTO No. 1109 is modified to the effect that class proponents shall have until Monday, February 28, 2000, to disclose the names of all their intended Expert Witnesses, provide Curriculum Vitae for each Expert Witness, provide a list of any prior case in which any of the experts have testified, and provide a summary of the expected subject area of each Expert's testimony consistent with *Rule 26(a)(2)(B)*. Also on that date, class counsel shall provide the completed disclosures for at least half of the expert witnesses identified. For any remaining Experts, full disclosures shall be completed on a rolling basis by March 20, 2000.

Pretrial Order No. 1116. Acting as liaison counsel for the plaintiffs in the above-entitled matter, Arnold Levin, Esq. transmitted copies of each of the above orders to each attorney in the United States known or believed to be representing individuals who are members of the class as defined above.

The beginning of the Fairness Hearing was adjourned, by one day, to May 2, 2000. At the Fairness Hearing, the proponents of the Settlement [*21] Agreement and the persons who objected to the settlement pursuant to the terms of Pretrial Order No. 997 ("the Objectors") had a full and fair opportunity to offer all of the evidence that they wished to tender to the court concerning the proposed nationwide class action Settlement Agreement.

Class Counsel offered the following witnesses in support of the settlement:

1. Michael D. Fishbein, Esquire. Mr. Fishbein's testimony concerned the litigation background for the Settlement Agreement, the negotiations leading up to the execution of the Settlement Agreement, and the terms of the Settlement Agreement.

2. Robyn J. Barst, M.D.. Dr. Barst is one of the leading experts regarding primary pulmonary hypertension.

The subject of Dr. Barst's testimony concerned the proper definition of primary pulmonary hypertension under the Settlement Agreement.

3. Troyen A. Brennan, M.D., J.D.. Dr. Brennan was offered as an expert in the fields of public health and epidemiology.

4. Professor John C. Coffee, Jr.. Professor Coffee is the Adolf A. Berle Professor of Law at Columbia University Law School. Professor Coffee was offered as an expert in class certification in the mass tort [*22] context.

5. Molly Kuehn Watson. Ms. Watson is a media planning consultant with 14 years of experience. Ms. Watson testified as an expert in media planning as it related to class notice.

6. Professor Arthur R. Miller. Professor Miller is a professor of law at Harvard Law School. Professor Miller was offered as an expert on issues related to *Federal Rule of Civil Procedure 23*.

7. Harvey S. Rosen, Ph.D.. Dr. Rosen was offered as an expert in the field of economics.

8. Eric D. Caine, M.D.. Dr. Caine was offered as an expert witness in the field of neuropsychiatry, which involves the psychiatric and neuropsychological symptoms and signs of brain diseases.

9. Dean G. Karalis, M.D., F.A.C.C.. Dr. Karalis was offered as an expert in the field of cardiology, valvular heart disease and echocardiography.

10. Steven N. Goodman, M.D., M.H.S., Ph.D.. Dr. Goodman was offered as an expert in the design and analysis of epidemiologic and clinical studies, meta-analysis and methods for making inferences from statistical summaries.

11. Samuel J. Kursh, D.B.A.. Dr. Kursh serves as vice president of the Center for Forensic Economic Studies where his responsibilities [*23] include damage modeling and projections in complex litigation.

12. Kenneth R. Feinberg, Esquire. Mr. Feinberg is an attorney and founder of the Feinberg Group, LLP, headquartered in Washington, D.C. Mr. Feinberg was offered as an expert on the resolution of mass tort litigation, particularly under *Federal Rule of Civil Procedure 23*.

13. Professor Sam Dash. Professor Dash is a professor of law at Georgetown University Law Center. Professor Dash was called to testify as an expert in the area of legal ethics, particularly as they apply in the class action context.

14. Class Counsel also offered other evidence including live testimony by Peter Pakradooni, a Declaration by Deborah A. Hyland, deposition transcripts, and a number of exhibits.

AHP offered a number of witnesses, subject to cross-examination, on matters relevant to the settlement, including:

15. Sanjiv Kaul, M.D.. Dr. Kaul is a professor of medicine and the Frances Myers Ball Professor of Cardiology at the University of Virginia where he is director of its Cardiac Imaging Center.

16. Pravin Shah, M.D.. Dr. Shah is the medical director of the Hoage Heart Institute and professor of medicine at Loma Linda [*24] University.

17. Walter F. Stewart, Ph.D., M.P.H.. Dr. Stewart is adjunct associate professor of epidemiology of Johns Hopkins School of Hygiene and Public Health, former consultant to the EPA, OSHA, National Cancer Institute, and the NIH; and a reviewer for the American Journal for Epidemiology, Epidemiology Review, and the American Journal of Public Health.

18. Arthur E. Weyman, M.D.. Dr. Weyman is a professor of medicine at Harvard Medical School, director of the Cardiac Ultrasound Laboratory at Massachusetts General Hospital, former chief of cardiology at Massachusetts General, president of the National Board of Echocardiography, former president of the American Society of Echocardiography, author of the text entitled Echocardiography, and is board certified in internal medicine and cardiology.

19. Professor Peter Schuck. Professor Schuck holds the Simeon E. Baldwin Professorship at Yale Law School. Professor Schuck is a member of the American Law Institute advisory committee on the Restatement of the Law (Third) of Torts: General Principles.

20. Mark McClellan, M.D., Ph.D.. Dr. McClellan holds a Ph.D. in Economics from the Massachusetts Institute [*25] of Technology, an M.D. from the Harvard-Massachusetts Institute of Technology Division of Health Sciences and Technology, and an M.A. from the Kennedy School of Government at Harvard University. Dr. McClellan is an Assistant Professor of Economics and an Assistant Professor of Medicine at Stanford University, and recently served as Deputy Assistant Secretary for Economic Policy at the Department of the Treasury.

21. Elizabeth Krupnick. Ms. Krupnick is an expert in communications and President of the Farago & Partners advertising agency. Ms. Krupnick's previous positions in the communications industry include (1) Senior Vice President of Corporate Communications and Ad-

vertising at New York Life Insurance Company, (2) Chief Communications Officer and Vice President of The Prudential Insurance Company of America and (3) Senior Vice President of Corporate Affairs for Aetna Life and Casualty.

Less than thirty class member objectors filed objections to the Settlement Agreement. No public interest group filed any objection to the Settlement. No academic filed any objection to the Settlement. Several Objectors cross examined witnesses at the Fairness Hearing. In addition, some objectors [*26] entered various documents and articles into the Fairness Hearing Record.

### D. The Medical Circumstances of the Class

The record before the court includes a substantial amount of medical testimony and evidence, including approximately ninety clinical and epidemiological studies, which is the foundation for the various monitoring and compensation provisions of the Settlement. By contrast, no expert for any party or any objector testified that any aspect of the Settlement was contrary to the scientific studies or was not a reasonable response to the medical issues raised in the lawsuits that the Settlement will resolve.

### 1. The Risk of Valvular Heart Disease

#### a. The Heart

The principal risk created by use of fenfluramine and dexfenfluramine is the risk of valvular heart disease ("VHD"). The human heart has four chambers. The upper chamber on the right side of the heart (the right atrium) functions to receive deoxygenated blood from the body. The lower chamber of the right side of the heart (the right ventricle) pumps the deoxygenated blood through the pulmonary arteries into the lungs where carbon dioxide is removed from the blood and replaced with oxygen. The upper [*27] chamber on the left side of the heart (left atrium) receives and collects oxygenated blood which has been pumped from the lungs to the heart through the pulmonary veins. The lower chamber on the left side of the heart (the left ventricle) pumps oxygenated blood from the heart through the aorta and into the arterial system. (Ex. P-95 P4; Tr. 5/2/00 at 216; Ex. P-63.)

Just as the heart has four chambers, it also has four valves. The valve structures function to assure that blood moves through the heart in a forward direction and that effective blood flow is maintained. The valve located between the right atrium and the right ventricle is the tricuspid valve. The valve between the right ventricle and the pulmonary artery is the pulmonic valve. The valve located between the left atrium and the left ventricle is the mitral valve. The valve located between the left ven-

tricle and the aorta is the aortic valve. (Ex. P-95 PP 5 & 6.)

#### b. VHD in General

VHD is a group of different conditions which cause a disruption in the normal structure and/or function of the heart valves. When a patient suffers from VHD, blood that is supposed to move in a forward direction through the heart leaks [*28] backward or "regurgitates" through the diseased valve. (Ex. P-95 P 8.) The existence of VHD and the extent of regurgitation associated with it can be diagnosed with echocardiography--a non-invasive study in which ultrasound waves are used to image cardiac structure and blood flow in the heart. (Ex. P-95 P 9.)

Apart from VHD related to the use of diet drugs (which is described below), several other conditions are the principal causes of valvular regurgitation in the left side of the heart. (Ex. P-95 P 10.) Each of these other conditions may be diagnosed with an echocardiogram in accordance with accepted, objective criteria. (Ex. P-95 P 10.)

The prevalence of valvular regurgitation in the general population also varies with the age of the population--with more regurgitation present in older individuals as a result of the normal aging process, as well as their exposure over time to these various diseases or agents that are known to cause such regurgitation. (Ex. P-95 P 16; AHP Ex. 613 P 9; AHP Ex. 610 P 13.) Because there is such a "background" or "control" rate of valvular regurgitation among the general population who never took diet drugs--and because that [*29] rate varies with the age of the patients and various other conditions--it is essential that any demonstration of causation with respect to diet drugs and such regurgitation be predicated on controlled studies which, on a blinded basis, compare the prevalence of such regurgitation among those who took the drugs and a similarly-situated population of others who did not. (AHP Ex. 611 PP 6-10 & 14-16; AHP Ex. 613 P 18; AHP Ex. 610 PP 7-9.)

The levels of valvular regurgitation caused by the varying conditions underlying VHD vary in severity. The degree of valvular regurgitation is measured by an echocardiogram in accordance with standardized techniques and criteria. (Ex. P-95 P 11.) Using these techniques of measurement, the degrees of valvular regurgitation are characterized as trace, mild, moderate or severe. (Ex. P-95 P 12.) Such valvular regurgitation occurs to varying degrees in the majority of entirely healthy individuals. As all of the cardiology experts testified, today's echocardiography technology is so sensitive that it can detect even trivial amounts of regurgitation that require no medical treatment and are not a precursor of any disease. (Ex. P-95 P 12; AHP Ex. 613 P 6; [*30] AHP Ex. 610 P 11.)

Mild or greater aortic regurgitation ("AR") and moderate or greater mitral regurgitation ("MR") is frequently referred to as "FDA positive regurgitation" based on the FDA's observation that "minimal degrees of regurgitation (i.e., trace mild mitral regurgitation or trace aortic regurgitation) are relatively common in the general population and are not generally considered abnormal." (*Ex. P-95 P 13*; Ex. P-182 at 2 & 6 of 13.) All of the experts who testified on this issue agreed that the FDA case definition--which has come to be known as "FDA Positive"--is the appropriate way to define medically relevant valvular regurgitation. Specifically, all the experts testified that the lesser degrees of regurgitation--including mild mitral regurgitation--are common in the general population and have no medical significance. (Ex. P-95 PP 13, 18; AHP Ex. 613 PP 6 & 10.)

Although the progression in severity of valvular regurgitation resulting from conditions other than diet drugs has not been subject to rigorous clinical investigation, it is generally accepted that VHD from such other causes is potentially progressive in nature; that is, once significant valvular [*31] regurgitation exists, it tends to beget more severe regurgitation in a significant subset of patients. (Ex. P-95 at P 14.) Clinical experience tends to suggest that the risk of progression of valvular regurgitation is related to the severity of regurgitation in the first instance, with mild forms of regurgitation tending not to progress, and moderate to severe levels of regurgitation tending to be progressive. (*Ex. P-95 P 15*.) Trace AR, trace MR and mild MR are relatively common conditions, while more severe forms of regurgitation tend to be less common in the general population. See, e.g., *Ex. P-95 P 16* (discussing results of Framingham Study).

The existence and degree of symptoms caused by VHD and the medical care required to manage such disease vary significantly depending upon the degree of valvular regurgitation that the patient presents. Trace AR, trace MR, and mild MR are completely asymptomatic conditions that do not impose any limitations on a patient's ability to function normally. Without some additional factor, such as impaired mobility of the valve "leaflets," patients with trace AR, trace MR and mild MR do not require medical management or treatment. (Ex. P-95 [*32] PP 17 & 18.)

Mild AR is an asymptomatic condition that does not impose any limitation on an individual's ability to function normally. However, mild AR poses two distinct health risks. First, the abnormal aortic valve is susceptible to bacteria introduced into the blood stream through invasive procedures, such as surgery or normal dental hygiene. This, in turn, creates an increased risk of the patient suffering an infection of the heart valve and surrounding heart muscle known as "bacterial endocarditis." Bacterial endocarditis is an extremely serious and often

fatal condition. Patients suffering from bacterial endocarditis can develop severe regurgitation or peripheral emboli which, in turn, can lead to stroke, loss of an extremity or major organ failure. Second, mild AR can progress to more severe levels of valvular regurgitation that can impair the functioning of the heart. (*Ex. P-95 P 19*; Tr. 5/3/00 at 102-103.)

Given these risks, the accepted regimen of medical management for patients with mild AR is the prescription of antibiotic prophylaxis in connection with invasive procedures, such as surgery or normal dental hygiene, and periodic evaluation by a cardiologist to determine [*33] if the degree of valvular regurgitation in the patient is progressing. (*Ex. P-95 P 20*.) Typically, the regimen for following such asymptomatic patients is a yearly examination by a cardiologist and serial echocardiographic testing. Since the risk of progression of valvular regurgitation in diet drug-induced VHD is unknown, an echocardiogram should be performed one year after the diagnosis of valvular regurgitation is made. If the aortic regurgitation remains mild, then follow-up echocardiograms should be performed every two to three years to screen for progressive valvular regurgitation. If the valvular regurgitation is found to be more severe on follow-up echocardiographic studies, then the echocardiogram should be performed yearly. (*Ex. P-95 P 21*.) Mild AR is difficult to appreciate by merely listening for abnormal heart sounds with a stethoscope (auscultation), particularly in obese individuals. Because of this, and because of the risks of endocarditis and progression of asymptomatic disease described above, many physicians believe that patients who are at risk for developing AR should receive screening echocardiograms. (Tr. 5/3/00 at 98-99; *Ex. P-95 P 41*.)

At the other end of [*34] the spectrum of VHD, severe AR and severe MR are conditions in which the percentage of blood ejected from the heart (the "ejection fraction") can fall significantly below normal. With chronic severe aortic and mitral regurgitation, patients are often asymptomatic at first and become symptomatic when the heart function begins to fail. (*Ex. P-95 P 22*.) When such patients are symptomatic, their symptoms will include shortness of breath, fatigue and/or diminished exercise capacity. (*Ex. P-95 P 23*.)

Severe valvular regurgitation leads to a volume overload of the heart. The size of the left atrium and/or left ventricle tends to increase in response to the volume overload created by severe regurgitation. This phenomenon is described as left ventricular and/or left atrial "dilatation" ("LV/LA"). In addition, the thickness of the walls of the atrium and/or ventricle also tends to increase in response to the volume overload created by severe regurgitation. This process is known as left ventricular hypertrophy and/or left atrial hypertrophy. Over time,

heart function will deteriorate, and as the left ventricular ejection fraction decreases, the pressure within the left ventricle increases. This, [*35] in turn, will lead to an increase in the pulmonary venous pressures and an increase in the pulmonary artery pressure. This secondary pulmonary hypertension (PH) is a marker of significant cardiac dysfunction and may not return to normal even after valve surgery. In addition, the hypertrophy and dilatation may also be permanent conditions that may not be corrected medically or surgically following valve repair or replacement. (*Ex. P-95 P 24.*)

When dilatation and/or hypertrophy progress to a sufficient level of abnormality, the patient is exposed to the following risks, among others:

. The patient is at risk of developing chronic atrial fibrillation in the case of severe MR, that can lead to a stroke or peripheral embolus;

. The patient is at risk of developing ventricular fibrillation or ventricular tachycardia, dangerous arrhythmias, that can precipitate the patient's sudden death;

. The patient has a high risk of developing congestive heart failure, an often fatal condition; and

. The patient is at risk of developing permanent pulmonary hypertension, that can lead to persistent symptoms of shortness of breath, fatigue, congestive heart failure and death.

[*36] (*Ex. P-95 P 26.*)

Drug therapies can be used in the treatment of severe AR and severe MR, particularly before the patient develops symptoms, hypertrophy, dilatation and/or pulmonary hypertension. These include drugs that increase the strength or the contractility of the heart and drugs that decrease the afterload of the heart to allow the heart to beat more easily. (*Ex. P-95 P 27.*) However, where a patient with severe MR or severe AR exhibits significant symptoms or begins to exhibit hypertrophy, dilatation and/or pulmonary hypertension (PH), surgery is usually the treatment of choice. Surgery involves the operative repair of the diseased valve, if possible, or the replacement of the diseased valve with either a mechanical valve or a porcine valve. (*Ex. P-95 P 28.*)

The average cost of valvular repair or replacement surgery, including both physician and hospital fees, ranges between $ 30,000-$ 50,000. (Ex. P-94 at 7-8 of 41.) Valvular repair/replacement surgery in properly

selected patients is a safe procedure. The morbidity/mortality associated with valvular repair/replacement surgery during the intra-operative and post-operative period in low risk patients is between 2 and [*37] 4 percent, with a long-term morbidity/mortality for such patients averaging about 3 percent per year. (*Ex. P-95 P 29.*) Patients who undergo valve repair or replacement surgery are normally able to resume their activities of daily living without significant restriction or disability. (*Ex. P-95 P 30.*)

However, valvular repair or replacement surgery is not without risk. Patients who receive metallic prosthetic valves must take blood thinning agents for the rest of their lives. Patients who receive tissue valves do not require blood thinners. However, tissue valves are less durable than metallic valves, and over one-third of patients with tissue valves will have valve failure within 11 years of surgery. (*Ex. P-95 P 31.*) Valve repair/replacement surgery is accompanied by the risk of stroke, peripheral embolus with severe impairment to the kidneys, abdominal organs, or extremities, renal failure, quadriplegia or paraplegia resulting from cervical spine injury and post-operative infection. (*Ex. P-95 P 31.*) Therefore, the decision to perform valve repair or replacement surgery involves striking a balance between the risks of surgery and the risks of severe regurgitation. (*Ex. P-95 P 32.*)

[*38] As Dr. Brennan, a public health expert and board-certified internist, testified--and as is well-accepted in the medical literature--the use of echocardiograms to screen and monitor patients who are at some increased risk of developing valvular regurgitation should further reduce the morbidity and mortality associated with possible progression and complications of the disease (which takes years to injure a patient's heart after it can be detected on an echocardiogram) as compared to patients who are not so screened and monitored. Specifically, a higher-risk population that is screened and monitored in this fashion can be treated--either through medication, valve repair or replacement--at the optimal time to reduce the likelihood that they will suffer permanent heart damage or other complications of unchecked valve disease. No expert testified to the contrary. (Tr. 5/3/00 at 101-104, 114-116.)

Given the above, the regimen to be followed in the management of patients suffering from severe AR and severe MR consists of:

1. prescribing antibiotic prophylaxis in connection with any invasive procedures, such as surgery or dental hygiene;

2. frequent examination and evaluation [*39] of the patient by a cardiologist,

including frequent use of echocardiograms, to assess the degree of regurgitation, the presence and extent of LV/LA dilatation, the presence and extent of LV/LA hypertrophy, the patient's ejection fraction, the patient's pulmonary artery pressure, the patient's symptom status and other cardiovascular parameters;

   3. treatment with medication; and

   4. surgery, where indicated.

(Ex. P-95 at P 33.)

Finally, moderate MR and moderate AR are asymptomatic conditions that do not impair an individual's ability to function normally. Typically, these conditions pose the same risk and require the same regimen of medical management as that which is appropriate for the management of mild AR. However, when moderate MR and/or moderate AR approach the level of severe regurgitation, the patient can begin to develop PH, LV/LA dilatation, and LV/LA hypertrophy. When such conditions develop, it is appropriate to treat the patient in the same manner as one would treat a patient who had severe regurgitation with such findings. (*Ex. P-95 P 34.*)

### c. VHD and Diet Drugs

The relationship between the ingestion of the fenfluramine derivatives and VHD has [*40] been subject to extensive scientific investigation. Since the withdrawal of Pondimin and Redux from the market in September 1997, a number of investigators have conducted controlled studies that have compared the prevalence of valvular regurgitation among patients who previously took fenfluramine, dexfenfluramine or the Fen/Phen combination to similarly situated subjects (i.e., matched controls) who had not taken diet drugs. There are 14 principal studies and a number of other investigations that studied a total of more than 12,000 patients who took fenfluramine and/or dexfenfluramine for varying lengths of time. (Exs. P-113, P-127, P-170, P-172, P-173, P-122, P-115, P-153, P-228, P-111, P-118, P-119, P-126, P-138, P-148 & P-149.) As stated in a February 1999 Review article that summarized a number of these studies, "Fenfluramine and more recently its d-isomer Dexfenfluramine have been the most extensively studied anorexic drugs for the past 30 years." (Dunn LT 84 at 123.) Although these studies vary in their design, each is a valid scientific study supported by the undisputed expert testimony as reliable and authoritative.

As a result of the unprecedented amount of study that diet [*41] drug-related valvulopathy has received, it is possible to reach reliable conclusions regarding the nature of the disease process, the effect of duration of use, latency, progression, incidence and prevalence. It appears clear that the fenfluramine derivatives, Pondimin and Redux, cause valvular heart disease by producing plaques that become "stuck-on" to the valve structures causing regurgitant lesions. (Ex. P-113.) Equally clear is that there is a duration-response relationship between exposure to the drugs and the development of regurgitant lesions. An enormous body of epidemiologic data from the authoritative, reliable studies described above establishes with a high degree of confidence that the population of patients who took fenfluramine and/or dexfenfluramine for less than three months does not have a significant increased risk of FDA Positive levels of valvular regurgitation. (Tr. 5/3/00 at 93-96; *Ex. P-90 P 5;* Tr. 5/8/00 at 24; Ex. P-122; AHP Ex. 587A; Ex. P-115; Ex. P-228; Ex. P-170.)

Moreover, although short-term therapy with Pondimin or Redux was reported to produce an increased risk when both FDA Positive and non-FDA levels of regurgitation were considered, there was no [*42] longer a significant difference between exposed and control subjects when the same population was re-evaluated 3 to 5 months after discontinuation of the use of the drugs and again at one year after discontinuation. (Exs. P-172 & P-173.) In contrast, there is epidemiologic evidence that the use of fenfluramine or dexfenfluramine for durations of three to six months or longer produces a significant increased risk of FDA Positive levels of regurgitation and that this risk increases in proportion to the duration of therapy. (*Ex. P-90 P 5;* Tr. 5/5/00 at 24; Tr. 5/3/00 at 96.)

With respect to the levels of regurgitation which the FDA has defined as medically relevant ("FDA Positive"), the studies are consistent in finding that the only increased risk of such regurgitation among patients who previously took fenfluramine or dexfenfluramine is a risk of mild aortic regurgitation, and that such increased risk does not occur until patients took the drugs for a "threshold" duration of three to six months or more. (Tr. 5/3/00 at 94-95; AHP Ex. 609 P 8; Tr. 5/8/00 at 78-79; AHP Ex. 611 P 17; AHP Ex. 610 P 10.) All of the other clinical studies are consistent [*43] with this durational finding with respect to the association between FDA Positive aortic regurgitation and the use of the drugs. Specifically, in the Ryan-Jollis, Weissman I, Weissman II, Weissman III, Gardin I, Gardin II and Davidoff Studies, there was no statistically significant increase in the prevalence of FDA Positive aortic regurgitation among the patients who had taken fenfluramine, dexfenfluramine, or the fen-phen combination for three months or less. (AHP Ex. 174A at Table 2; AHP Ex. 175 at 10; P-170 at Tables 1 and 2; P-172 at Tables 1 and 2; AHP Ex. 185A at Tables 1-4; P-122 at 1706; AHP Ex. 587A; AHP Ex. 121 at 11,

20 & 28; Tr. 5/3/00 at 94-95; AHP Ex. 609 P 8; Tr. 5/8/00 at 78-79; AHP Ex. 611 P 17; AHP Ex. 610 P 10.)

With respect to the relative prevalence of mitral regurgitation, the controlled clinical studies do not demonstrate a statistically significant increased risk of FDA Positive (moderate or greater) mitral regurgitation regardless of duration of use. For example, the Ryan-Jollis Study found that--in comparison to a background rate of 2 percent of FDA Positive mitral regurgitation among the untreated control subjects--none [*44] of the patients treated with the fen-phen combination for 90 days or less, 2 percent of the patients treated for 90 to 180 days, 3 percent of the patients treated 181 to 360 days, 3 percent of the patients treated 361 to 720 days, and 2 percent of the patients treated for 720 days or more had such regurgitation. None of these slight differences was statistically significant for any of the durational subgroups, nor was the rate of FDA Positive mitral regurgitation among all of the treated patients taken as a whole (2.5 percent) significantly different from the control rate of 2 percent. (AHP Ex. 175 at 12.)

All of the other controlled clinical studies similarly found that there was no statistically significant increased risk of FDA Positive (moderate or greater) mitral regurgitation among patients treated with fenfluramine, dexfenfluramine, or the fen-phen combination, regardless of duration of use. (Exs. P-153 at 2163; P-130 at Table 2; P-170 at Table 2; P-172 at Table 2; AHP Ex. 185A; P-122 at 1707; AHP Ex. 587A; AHP Ex. 121 at 13; AHP Ex. 609 P 8; AHP Ex. 611 P 18; AHP Ex. 610 P 10.) None of the clinical studies have reported an increased risk [*45] of either tricuspid or pulmonic regurgitation among patients treated with fenfluramine or dexfenfluramine regardless of duration of use. (Exs. P-170, P-115, P-111 and P-122.)

All of the expert witnesses who testified in this case and expressed an opinion with respect to the increased risk of medically significant valvular regurgitation likewise agreed that increased risk among former fenfluramine or dexfenfluramine patients is limited to the aortic valve and begins at a "threshold" level of at least three months or more. No expert testified to the contrary. (Tr. 5/3/00 at 93-95; AHP Ex. 609 P 8; AHP Ex. 613 PP 43-58; AHP Ex. 611 PP 17-32; AHP Ex. 610 P 10.)

The state of scientific knowledge concerning diet drug induced valvular heart disease was recently summarized by a prominent pharmaco-epidemiologist, Hershel Jick, in a recent editorial in the Journal of the American Medical Association as follows:

> millions of patients were prescribed Fenfluramines prior to 1997. For the substantial majority who took the drug for less than three months, the risk of heart valve disorders appears to be minimal. In those who took the drugs longer than three months, [*46] many will have developed echocardiographic evidence of cardiac valve disorders, particularly mild AR. In the majority of instances, these abnormalities most likely are benign and are unlikely to lead to clinical disease. However, a small proportion of patients have substantially increased risk for clinically important valvulopathy and cardiovascular consequences as a result of taking anorexigens. However, because Fenfluramines have been unavailable since 1997, judgments about the overall consequences of Fenfluramine use are likely to be limited to the results of those studies already completed.

Ex. P-128 at 2-3.

In sum, the medical situation of individuals who used AHP's products, Pondimin and Redux, is as follows. First, because the population of individuals who took diet drugs for more than three or four months is at an increased risk of asymptomatic valvular heart disease, it is appropriate for them to have a screening echocardiogram to determine if they have developed VHD as a consequence of exposure to Pondimin and Redux. Second, to the extent that diet drug recipients manifest FDA Positive levels of regurgitation, they require antibiotic prophylaxis and ongoing medical [*47] surveillance to determine if there is progression in their condition such that further medical treatment or intervention is appropriate. (Tr. 5/3/00 at 102-103.) Finally, if diet drug recipients have or develop serious levels of regurgitation (defined as either severe regurgitation or moderate regurgitation with dilatation, hypertrophy, reduced ejection fraction, or pulmonary hypertension) then such individuals suffer disabling conditions for which substantial compensation is warranted.

## 2. The Risk of Primary Pulmonary Hypertension ("PPH")

PPH is a disease that affects pulmonary circulation. PPH is characterized by scarring and fibrosis of the pulmonary arteries which carry deoxygenated blood from the right side of the heart to the lungs. This scarring prevents the blood cells from effectively absorbing oxygen as they pass the alveoli in the lungs. Moreover, the scarring within the pulmonary arteries obstructs the flow of blood within the vessels, causing the blood pressure in the pulmonary arteries pressure to rise. The right ventricle of the heart attempts to overcome the increasing re-

sistance to the flow of blood through the pulmonary arteries by growing larger and more [*48] muscular. Ultimately, this dilatation and hypertrophy of the right ventricle will cause the heart to fail and result in the patient's death. (Tr. 5/2/00 at 223-27 & 231-32.)

PPH is a relentlessly progressive disease that leads to death in virtually all circumstances. The only approved treatment for the disease involves the administration of a drug known as Prostacyclin ("Flolan"), which must be administered continuously through an intravenous pump. Flolan is not a cure for the disease. If it is used successfully, it can reduce the patient's symptoms and delay death for a few years. Administration of the drug is accompanied by a high incidence of serious complications. The drug can cause death if administered to patients who do not suffer from PPH, and is thus contraindicated for use in such patients. (Tr. 5/2/00 at 237-245.)

The proper diagnosis of primary pulmonary hypertension is extremely important for two reasons. First, the diagnosis is accompanied by enormous psychological trauma to the patient because it is a virtual death sentence. Second, proper diagnosis is important because the treatment administered as a result of the diagnosis is extraordinarily dangerous in patients [*49] who do not, in fact, suffer from the disease. (Tr. 5/2/00 at 236-38, 242-43.)

The community of physicians with expertise in diagnosing and treating PPH have repeatedly reached a consensus concerning the appropriate criteria for diagnosing and defining the disease. This consensus was expressed at the World Health Organization meeting in 1973, in a statement of the American College of Chest Physicians in 1993 and in the Executive Summary of the World Symposium on Primary Pulmonary Hypertension in 1998. In addition, this "consensus definition" of PPH was expressed in every major epidemiologic study concerning the disease that has ever been done. The consensus for defining and diagnosing PPH has three elements. The first of the three criteria necessary to make a diagnosis of primary pulmonary hypertension is a mean pulmonary artery pressure $>/= 25$ mm Hg at rest or $>/= 30$ mm Hg with exercise as measured at cardiac catheterization. [2] (Tr. 5/2/00 at 230-31, 254-55, 259-62, 265 & 268-69; Tr. 5/3/00 at 13.)

2  Doppler echocardiography does not accurately assess pulmonary artery pressure in a consistently reliable way. Pulmonary artery pressure can, however, be accurately measured by cardiac catheterization.

[*50]  There are many conditions aside from PPH that can cause an elevation in pulmonary artery pressure.

These include systemic hypertension (i.e., "high blood pressure") and a variety of diseases which affect the left side of the heart including cardiomyopathy, mitral stenosis, pulmonary vein obstruction, a stiff left ventricle, and like conditions. Because PPH is a disease that originates in the pulmonary arterial system, patients with the disease will have normal pressures in the left side of their heart even though they have abnormal pressures in the right side of their heart. In contrast, patients who have conditions other than PPH that result in an elevated pulmonary artery pressure will have an elevation in the "pulmonary capillary wedge pressure" which accurately reflects the pressure in the left atrium. The only way to measure pulmonary capillary wedge pressure is through a cardiac catheterization. Accordingly, the second criterion necessary for the diagnosis and treatment of PPH is the presence of a "normal" pulmonary capillary wedge pressure of $</= 15$ mm Hg. (Tr. 5/2/00 at 230-31, 258-62, 266, 268-69 & 279-80; Tr. 5/3/00 at 13, 53-54.)

Finally, PPH is a diagnosis of exclusion. [*51] Therefore, in order to reach the diagnosis, all "secondary" causes of pulmonary hypertension must be excluded. These include diseases known to be associated with pulmonary hypertension such as collagen vascular disease, congenital systemic to pulmonary shunts, portal hypertension, toxin-induced lung disease, significant obstructive sleep apnea, interstitial fibrosis (such as silicosis, asbestosis, or granulomatous disease), HIV infection and others. (Tr. 5/2/00 at 17, 19-20.)

The normal incidence of PPH in the population is 1 to 2 new cases per million people per year. Two well done epidemiologic studies establish that the use of fenfluramine and dexfenfluramine cause PPH. (Exs. P-209 & P-175.) In 1996, Dr. Abenhaim and his colleagues published the results of the International Primary Pulmonary Hypertension Study. This study demonstrated that the risk of developing PPH in individuals who used fenfluramine longer than three months increased twenty-three fold. (Ex. P-209.) In March of 2000, the journal CHEST published the results of an epidemiologic study entitled the Surveillance of North American Pulmonary Hypertension. This study confirmed the association between the use of fenfluramine [*52] derivatives and PPH. (Ex. P-175.)

E. The Legal Circumstances of the Class

Diet drug recipients have faced and will continue to face significant legal obstacles in obtaining appropriate relief. First, the statutes of limitation in various states pose significant obstacles to recovery. Most jurisdictions have a "discovery rule," which holds that an individual must commence suit within a specified period of time after he or she knows, or in the exercise of reasonable diligence, should have known that they have suffered an

injury and that it was caused by the defendant. See e.g., *Pearce v. Salvation Army, 449 Pa. Super. 654, 674 A.2d 1123, 1125 (Pa. Super Ct. 1996); Cochran v. GAF Corp., 542 Pa. 210, 666 A.2d 245 (Pa. 1995); HECI Exploration Co. v. Neel, 982 S.W.2d 881, 886 (Tex. 1998).* Pondimin and Redux were withdrawn from the market in September 1997 accompanied by an unprecedented amount of publicity which effectively warned diet drug users that they may have developed valvular lesions which could be detected through non-invasive echocardiograms. Also, these lesions are not latent. If they are going to occur, they are [*53] going to occur during drug use (or shortly thereafter) and be demonstrable on echocardiogram. Therefore, AHP has an argument that diet drug users, acting with reasonable diligence, should have learned that they had heart valve damage as a result of using Pondimin and Redux beginning with the withdrawal of the drugs from the market in September 1997. Since most states have statutes of limitation of two years or less, AHP could argue that the statute of limitations has run on claims of valvular heart damage by most diet drug recipients. Even though there are approximately 18,000 individuals who have commenced actions against AHP, at present this means that a substantial number of viable claims by diet drug recipients could be time-barred. (Tr. 5/2/00 at 34-35.)

Moreover, because of vagaries in the law governing recovery for potentially progressive injuries, the damage claims of individuals who are not presently suffering from serious diet drug-induced VHD are potentially subject to the following types of resolution by the courts:

> 1. many courts may hold that such plaintiffs are not entitled to any recovery of damages at the present time because they do not have a "symptomatic" [*54] injury, but that a cause of action will accrue in the future without a statute of limitations time bar if their disease progresses to a symptomatic level;

> 2. many courts may hold that plaintiffs can recover compensatory damages for asymptomatic valve disease today and that a separate cause of action may accrue in the future, without a statute of limitations time bar, in the event that their disease progresses to a more serious level; and

> 3. many jurisdictions may hold that claimants can recover compensatory damages for their asymptomatic valvular heart disease at the present time, but will never recover for the risk of future progression because that risk is too speculative, does

not meet "more likely than not" standards, and/or because valvular heart disease is not subject to a "two disease" rule that recognizes the accrual of two separate causes of action where there are more serious manifestations of an underlying disease process.

(Tr. 5/2/00 at 34-35.) Thus, it would be beneficial for diet drug recipients to obtain appropriate legal protections such that they have a viable claim for relief when, as, and if, they discover they have either FDA Positive levels of [*55] regurgitation or that they have serious VHD.

### F. The Settlement

#### 1. The Class

On October 12, 1999, a complaint entitled Brown v. American Home Products Corporation was filed in this action. (Class Action Compl. Ex. P-1; Am. Class Action Compl. Ex. P-2; Second Am. Class Action Compl. Ex. P-65.) The Brown Complaint was filed as a vehicle for combining the claims of class members asserted in pending federal and state diet drug litigation throughout the country into a single complaint to facilitate class action treatment of those claims for settlement purposes. (Tr. 5/2/00 at 56-57.) The Settlement Agreement was reached with respect to a class consisting of all persons in the United States who ingested Pondimin and Redux and their associated consortium claimants. (Ex. P-3 at 19 of 148.) The class includes five discrete subclasses:

> Subclass 1(a): those class members who took Pondimin or Redux for 60 days or less and who have not been diagnosed as having FDA Positive levels of valvular regurgitation by September 30, 1999;

> Subclass 1(b): those class members who ingested Pondimin or Redux for 61 days or more and who, likewise, have not been diagnosed as [*56] having FDA Positive levels of valvular regurgitation as of September 30, 1999;

> Subclass 2(a): those class members who ingested Pondimin or Redux for 60 days or less and who have been diagnosed as having FDA Positive levels of valvular regurgitation as of September 30, 1999;

> Subclass 2(b): those class members who ingested Pondimin or Redux for 61 days or more and who have been diagnosed as having FDA Positive levels of



2000 U.S. Dist. LEXIS 12275, *

valvular regurgitation by September 30, 1999; and

Subclass 3: those class members who ingested Pondimin or Redux and who are not FDA Positive but who have been diagnosed as having Mild Mitral Regurgitation.

(Ex. P-3 at 19-21 of 148.)

### 2. The Benefits of the Settlement

### a. Medical Monitoring, Medical Screening and Matrix Compensation Benefits

The Settlement Agreement provides that all persons who took diet drugs for 61 days or more who were not diagnosed as "FDA Positive" by September 30, 1999 (i.e., members of Subclass 1(b) as defined above) are entitled to receive a state-of-the-art transthoracic echocardiogram and a consultation with a cardiologist concerning the results of that echocardiogram. (Ex. P-3 at 34 of 148.) The Settlement [*57] Agreement makes certain provisions for members of Subclass 1(a) (those who took diet drugs for 60 days or less) to obtain monitoring relief in certain circumstances. In particular, members of Subclass 1(a) are entitled to recover the net out-of-pocket costs which they incur for echocardiograms conducted during the screening period if they are diagnosed as having FDA Positive valvular regurgitation. (Ex. P-3 at 35-36 of 148.) In addition, the Settlement Trustees may, at their discretion and in appropriate cases for compassionate and humanitarian reasons, provide a transthoracic echocardiogram and an associated interpretive physician visit for members of Subclass 1(a). [3] (Ex. P-3 at 36 of 148.) In addition, the Settlement Agreement provides that members of Class 1(a) and 1(b) can obtain echocardiograms upon trial court approval of the settlement in the case of financial hardship. [4] (Ex. P-3 at 37 of 148; Ex. P-3 at 2 of 13.)

---

3   The amount which may be expended under the Settlement Agreement to provide this benefit, in the aggregate, may not exceed $ 20 million.

4   The aggregate amount available under the settlement to provide this benefit to Class Members is limited to $ 10 million.

---

[*58]   The period of time provided during which echocardiograms described in the foregoing findings are to be completed under the terms of the Settlement Agreement (the "Screening Period") is 12 months from the date on which the settlement receives "Final Judicial Approval." As defined in the Settlement Agreement, Final Judicial Approval refers to the approval of the Settlement Agreement as a whole by the district court and

such approval becoming final by the exhaustion of all appeals, if any, without substantial modification of the order or orders granting such approval. The court may extend the Screening Period for an additional six months for cause shown. (Ex. P-3 at 10 & 12 of 148.) Class members who wish to receive the medical monitoring benefits described above must register to receive such benefits by Date 1, which is 210 days after the date of Final Judicial Approval. (Ex. P-3 at 9 & 34-36 of 148.)

The medical monitoring benefits are to be furnished free of charge by a Trust Fund established under the Settlement Agreement as described in greater detail below. (Ex. P-3 at 34-36 of 148.) It is expected that the Trust will contract with a network of approximately 10,000 board certified [*59] or board eligible cardiologists located throughout the country who are qualified to perform and interpret echocardiograms and to consult with patients concerning the results of those echocardiograms. (Tr. 5/2/00 at 69; Tr. 5/9/00 at 25-31.) This network will be sufficiently extensive to provide class members with the opportunity to choose among several conveniently located cardiologists to perform the monitoring services provided by the Settlement Agreement regardless of whether class members reside in a rural or urban setting. (Tr. 5/2/00 at 69; Tr. 5/9/00 at 25-31.) It is expected that, on average, the Trust's cost to provide an echocardiogram and interpretive physician visit pursuant to the Settlement Agreement will average approximately $ 800 per class member. (Tr. 5/2/00 at 69; Tr. 5/9/00 at 31.)

Each class member who is diagnosed as having Mild Mitral Regurgitation by the end of the screening period and who registers as such by a date which is 120 days after the end of the Screening Period (defined in the Settlement Agreement as "Date 2") will be entitled to recover compensatory damages pursuant to a settlement "matrix" in the event that they develop serious levels of mitral [*60] regurgitation by the year 2015, or, alternatively, each such person may exercise a "back-end opt-out." (Ex. P-3 at 38-56 & 61-63 of 148.) With respect to any class member who properly and timely exercises a right of back-end opt-out, AHP may not raise a defense based on a statute of limitations or repose or a defense based on improper splitting of a cause of action. By the same token, any class member exercising a back-end opt-out may not recover punitive, exemplary or multiple damages against AHP, and may not use any prior verdicts or judgments against AHP under the doctrines of collateral estoppel, res judicata, or other doctrine of issue or claim preclusion. (Ex. P-3 at 61-63 of 148.)

If a class member learns that he or she has FDA Positive levels of regurgitation after September 30, 1999 but before the end of the Screening Period, that individual has the right to opt out of the settlement and to pursue a claim for compensatory damages in the tort system

without meeting the bar of the statute of limitations or a defense of splitting of causes of action and without relying on any prior verdicts or judgment against AHP under the doctrines of collateral estoppel, res judicata, or [*61] other doctrine of issue or claim preclusion. This "intermediate opt-out" right is in addition to the initial opt-out right of all class members. (Ex. P-3 at 57-60 of 148.)

Those individuals who have FDA Positive levels of regurgitation but do not exercise an initial or intermediate opt-out right have the right to receive medical services from the Settlement Trust to the extent appropriate to monitor their VHD. Such services may include periodic medically appropriate echocardiograms, cardiology consultations, chest x-rays, laboratory studies, electrocardiograms and other services necessary and appropriate to determine the cardiac status of individuals who have FDA Positive levels of valvular regurgitation. (Ex. P-3 at 38 of 148.) Class members may elect to receive cash in lieu of the provision of such services. For class members who took diet drugs 61 or more days and who have FDA Positive levels of regurgitation, the settlement provides that they shall receive $ 10,000 in medical services or $ 6,000 in cash. For class members who took AHP's diet drugs for 60 days or less, the agreement provides that they shall receive $ 5,000 in medical services or $ 3,000 in cash. [5] (Ex. P-3 at [*62] 34-36 & 38 of 148.)

> 5 Dr. McClellan concluded that the "additional medical services" benefits provided under Fund A would be more than adequate to pay for the possible medical expenses of class members who are found to be FDA Positive but who do not have Matrix-level conditions. Relying on guidelines for the care of such patients, the reports of other experts in this proceeding and his own clinical experience, Dr. McClellan testified that such patients would need at least one follow-up echocardiogram, minimal additional cardiac screening during their periodic physical examinations, antibiotic drugs prior to certain medical procedures and perhaps additional echocardiograms in the future. Dr. McClellan concluded that the benefits provided to class members are more than adequate to pay for this limited additional care. (AHP Ex. 614 PP 18-23.) See generally, AHP Ex. 111; AHP Ex. 117; AHP Ex. 577; AHP Ex. 600; and AHP Ex. 601. No evidence was offered at the Fairness Hearing to suggest that the amounts provided under Fund A would be inadequate to pay for necessary medical care for class members qualifying for payments from Fund A.

[*63] Finally, if class members with FDA Positive levels of regurgitation progress to serious levels of VHD by the year 2015, they will have a right, as such conditions occur, to receive compensation pursuant to the terms of the settlement matrices or to exercise a "back-end opt-out" and pursue their claim for compensatory damages (but not punitive damages) in the tort system without any time bar or other defense arising from a statute of limitations, a statute of repose or the like. (Ex. P-3 at 38-56, 61-63 of 148.) Class members who progress to more serious levels of valvular heart disease have the right to "step up" to higher amounts of compensation as those levels occur pursuant to the settlement matrices. (Ex. P-3 at 38-56 of 148.)

There are four matrices under the settlement. Matrix A-1 describes the compensation available to diet drug recipients with serious VHD who took diet drugs for 61 days or longer, who are registered as having FDA Positive levels of valvular regurgitation by Date 2 and who do not have any of the alternative causes of VHD that make the B matrices applicable. (Ex. P-3 at 39-55 of 148.) Matrix A-2 describes the compensation available to spouses, parents, children [*64] and significant others of diet drug recipients entitled to compensation on Matrix A-1. (Ex. P-3 at 39-55 of 148.)

Matrix B-1 describes the compensation available to class members with serious VHD who were registered as having only Mild Mitral Regurgitation by the close of the Screening Period, or who took diet drugs for 60 days or less, or who have factors that would make it difficult for them to prove that their VHD was caused by the use of diet drugs. Id. These conditions include most conditions that are objectively identifiable as causes of VHD independent of the use of diet drugs. (Ex. P-3 at 39-55 of 148.) Matrix B-2 describes the compensation available to the spouses, parents, children and significant others of those entitled to compensation on Matrix B-1. (Ex. P-3 at 39-55 of 148.)

The matrices are composed of cells formed by the intersection of five separate matrix levels of severity and 11 separate age intervals ranging from diet drug recipients who are less than or equal to 24 years old to diet drug recipients who are 70 to 79 years of age. Generally, the amount of compensation provided by the matrices decreases with age both because younger individuals have a longer [*65] damage period and because, as discussed above, age increasingly confounds the effects of diet drugs in producing valvular regurgitation. (Tr. 5/2/00 at 76-77.)

The levels of VHD described on the settlement matrices correspond with the medical consensus regarding the stages of serious VHD. Level I describes those individuals who either have severe regurgitation or have suffered bacterial endocarditis. Level II describes those individuals with moderate to severe regurgitation who have

evidence of changes in their cardiac status such as hypertrophy, dilatation, reduced ejection fraction, pulmonary hypertension and the like. Level III describes those individuals who have or need valvular repair or replacement surgery. Level IV describes those individuals who suffer from either complications of valvular surgery or whose disease has progressed to the point that surgery is not an effective remedy. Level V describes those individuals whose VHD is so far advanced that it is terminal. (*Ex. P-95 P 48*; Ex. P-3 at 40-50 of 148.) Each cell formed by the intersection of an age interval with a severity level describes the amount of compensation to which a claimant meeting those criteria is entitled.

[*66] Class members do not have to demonstrate that their injuries were caused by ingestion of Pondimin and Redux in order to recover Matrix Compensation Benefits. Rather, the Matrices represent an objective system of compensation whereby claimants need only prove that they meet objective criteria to determine which matrix is applicable, which matrix level they qualify for and the age at which that qualification occurred. (Ex. P-3 at 38-56.)

In addition, the amounts specified by each cell of each matrix will be increased by 2% per year to provide protection against inflation for individuals who qualify for such payments in the future. This two percent increase is sufficient protection against inflation given the historical annual rate of change in the consumer price index. (Tr. 5/2/00 at 78; Ex. P-3 at 55-56 of 148; Ex. P-94 at 3 of 41.)

Under the Settlement Agreement, the determination of a matrix benefit is not subject to the exercise of discretion by the Administrators of the Settlement or by any court. Rather, benefits determinations are based on the sworn certification of a board certified physician--primarily a board certified cardiologist or cardiothoracic surgeon--that a class [*67] member either has or does not have each of the conditions applicable under the settlement matrices. (Tr. 5/2/00 at 79; Ex. P-3 at 101-02 of 148.)

In order to prevent fraud, the settlement requires the Trustees to perform a quarterly audit of five percent of the total claims for Matrix Compensation Benefits in accordance with a plan of audit adopted by those responsible for administration of the settlement. In addition, the settlement permits AHP to submit additional claims for quarterly audit of up to 10% of the matrix claims submitted and 10% of the non-matrix claims submitted. [6] (*Ex. P-278 P 31*.) The audit procedure requires those responsible for administration of the settlement to gather all medical records relevant to the audited claim and forward them to a highly qualified independent board certified cardiologist who is responsible for making a deter-

mination as to whether or not there was a reasonable medical basis for the representations made by any physician in support of the claim. (Ex. P-3 at 111-15 of 148.) If the auditing cardiologist makes the determination that there was a reasonable medical basis to support the class member's claim and there is no substantial evidence [*68] that fraud was committed in connection with the claim, the claim is to be allowed. Id. If not, those responsible for the administration of the settlement are required to apply to the court for relief. Id. The relief available to the court upon such an application includes an order disallowing the claim, an order directing an additional audit of other claims involving the same attorney and/or physician who was involved in the claim, an order directing such other additional audits as may be appropriate, an order imposing penalties including the payment of costs and attorneys fees and an order making a referral of the matter to the United States Attorney or other appropriate law enforcement officials for criminal prosecution if there is probable cause to believe that the claim was submitted fraudulently. Id.

> 6  In connection with AHP initiated audits, AHP has a right to obtain, at its expense, an independent transthoracic echocardiogram of a claimant who has made a claim for matrix benefits upon a demonstration of cause as specified in the Settlement Agreement. Id.

[*69] **b. Prescription Reimbursement Benefits**

The average Redux prescription cost $ 54.82 per month. The average Pondimin prescription cost $ 29.22 per month. Class members arguably had a right to recover these prescription costs under the consumer fraud theories advanced in many jurisdictions. Under the Settlement Agreement, class members who took diet drugs for 60 days or less have the right to receive reimbursement of the costs of purchasing Pondimin and/or Redux at the rate of $ 30 per month for prescriptions of Pondimin and $ 60 per month for prescriptions of Redux. Eligible class members must register for this benefit by Date 1. (Ex. P-3 at 35 of 148.) Class members who took diet drugs for 61 days or more have the right to receive reimbursement for the cost of their Pondimin and/or Redux prescriptions, subject to a maximum payment of $ 500 and further subject to the availability of money within Fund A after payment of all other benefits. Eligible class members must register for this benefit by Date 1. (Ex. P-3 at 35 of 148.)

**c. Reimbursement of Echocardiogram Expenses**

Under the consumer protection laws of many states, class members arguably had the right to recover the [*70] cost of echocardiograms which they incurred as a consequence of their exposure to Pondimin and Redux.

Under the Settlement Agreement, class members have the right to be reimbursed the net out-of-pocket expenses of obtaining echocardiograms outside of the medical monitoring program subject to the availability of money within Fund A after payment of all other benefits except prescription reimbursement benefits for those who took diet drugs 61 days or longer. Eligible class members must register for this benefit by Date 1. (*Ex. P-32 P 2.*)

### d. Establishment of a Medical Research Fund

The Settlement Agreement requires the establishment of a $ 25 million fund to be used to finance medical research and education related to heart disease. Specifically, the settlement requires the creation of a non-profit corporation named the "Cardiovascular Medical Research and Education Fund" to be managed by a Board of Directors consisting of seven persons. Twenty five million dollars in Settlement Funds are to be provided to the corporation. The corporation is required to solicit proposals for grants to physicians, scientists, researchers, healthcare providers and others for purposes of performing [*71] medical research or providing medical education concerning heart disease which will be beneficial to the settlement class. The corporation may provide individual grants not to exceed $ 2 million in response to such proposals upon a finding that the research or educational proposal made by the grant applicant will benefit the members of the class and the grant applicant undertakes, in writing, to submit the results of any research conducted pursuant to any grant proposal for publication by a peer reviewed journal. (Ex. P-3 at 36-37 of 148; Ex. P-7.)

### e. Establishment of a Registry/Database

In order to obtain benefits under the Settlement Agreement, all class members must submit one of several claim forms which requires: (1) basic personal information including the age and gender of the claiming class member; (2) information about both the use of Pondimin and Redux and the period of time during which it was used; (3) if the claim is based, in whole or in part, on the results of an echocardiogram, a copy of both the report of the echocardiogram and the videotape or computer disk on which the image of the echocardiogram is stored; and (4) if the claimant is making a claim for matrix [*72] benefits, relevant information from a board certified cardiologist on the claimant's condition and certain medical records. (Ex. P-3 at 87-91 of 148; Exs. P-12, P-17, P-24 & P-25.) Class members may either furnish the requested information directly or have the Settlement Administrators obtain it through execution of appropriate authorizations. (Ex. P-3 at 87-91 of 148; Exs. P-12, P-17, P-24, & P-25.)

This information is to be recorded in a computerized database suitable for use with standard medical research software and maintained as a "registry" for purposes of administering the settlement and for purposes of medical education and research. (Ex. P-3 at 91-95 of 148.) After redaction of all patient identifying information, the registry/database is to be made available to persons who: (1) provide written proof of their training, qualifications and experience to conduct medical research; (2) provide a research protocol setting forth the purposes for which they seek access to the registry, the research methodology, source of funding and a description of how the proposed research will benefit the settlement class; (3) undertake, in writing, to use the information they receive from the [*73] registry solely for medical, scientific and educational purposes; (4) undertake upon completion of the research to provide the Settlement Administrators, the court, AHP and Class Counsel with a copy of any publication based in whole or in part on the information contained in the registry; and (5) undertake not to testify at any time on behalf of any party in any lawsuit relating to the use of Pondimin and/or Redux. (Ex. P-3 at 91-95 of 148.)

### f. The Public Health Benefits of the Settlement

The benefits provided by the Settlement Agreement will significantly contribute to the protection and advancement of the public health. Specifically, the provision of screening echocardiograms under the settlement will allow for early diagnosis of individuals with asymptomatic VHD. Such early diagnosis will permit these individuals to receive antibiotic prophylaxis when having dental and surgical procedures, thereby minimizing the risk they would otherwise have of suffering from bacterial endocarditis. Moreover, early diagnosis of asymptomatic VHD together with the medical surveillance benefits offered by the settlement will allow patients to be carefully monitored over time to determine if [*74] the level of regurgitation attributable to their valve disease is progressing. This will permit these individuals to obtain medical and surgical treatment of their valve disease before they suffer irreversible injuries to their heart such as dilatation, hypertrophy, reduced ejection fraction and secondary pulmonary hypertension. In addition, the medical research and medical registry provisions of the Settlement Agreement provide a means to conduct extensive research with respect to the diagnosis and treatment of VHD in general and diet drug induced valvulopathy in particular. Collectively, implementation of these provisions will undoubtedly reduce the morbidity and mortality that would otherwise be attributable to diet drug induced valvular heart disease. (Tr. 5/3/00 at 110-12 & 115-16; *Ex. P-95 P 41.*)

### g. Exit Rights

The Settlement Agreement provides multiple opportunities for class members to gain information concern-

ing the injuries they have suffered as a result of taking Pondimin and Redux and to opt-out of the settlement in light of the information gained through those opportunities. The Settlement Agreement actually provides for four separate opt-out opportunities. [*75] All class members were eligible to exercise an "initial opt-out right" by submitting a notice of their intention to opt-out by March 30, 2000--a date that was 120 days from the date on which the class notice process commenced. (Ex. P-3 at 57 of 148; Pretrial Order Nos. 997 & 998.) Each class member who has timely and properly exercised an initial opt-out right may initiate, continue with, or otherwise prosecute any legal claim against AHP without any limitation, impediment or defense arising from the terms of the Settlement Agreement and subject to all defenses and rights which AHP would otherwise have in the absence of the Settlement Agreement. [7] (Ex. P-3 at 57 of 148.)

> 7   Class members may revoke an election to exercise a right of initial opt-out and thereby receive the benefits of the settlement provided that the revocation takes place with the written consent of AHP which shall not be unreasonably withheld. (Ex. P-3 at 57 of 148.)

All class members who are not members of Subclasses 2(a), 2(b) or 3 and who [*76] have been diagnosed as having FDA Positive levels of regurgitation by the end of the Screening Period may exercise an "intermediate opt-out right." (Ex. P-3 at 57-60 of 148.) A class member who timely and properly exercises an intermediate opt-out right may pursue all claims against AHP based on injury to the valve or valves which were diagnosed as having FDA Positive regurgitation except claims for punitive, multiple or exemplary damages, consumer fraud damages and medical monitoring. (Ex. P-3 at 57-60 of 148.) Each class member who wishes to exercise a right of intermediate opt-out must do so by submitting a written notice of his or her intent to do so no later than Date 2. (Ex. P-3 at 57-60 of 148.) With respect to each class member who timely and properly exercises the intermediate opt-out right and initiates a lawsuit against the AHP Released Parties within one year from the date on which the intermediate opt-out right is exercised, the AHP Released Parties shall not assert any defense based on any statute of limitations or repose, the doctrine of laches, any other defense predicated on the failure to timely pursue the claim, any defense based on "splitting" a cause of action, [*77] any defense based on any release signed pursuant to the Settlement Agreement and/or any other defense based on the existence of the Settlement Agreement. (Ex. P-3 at 57-60 of 148.)

All class members who are diagnosed as having mild or greater mitral regurgitation or mild or greater aortic regurgitation by the end of the Screening Period, who reach a matrix level condition after September 30, 1999, but before December 31, 2015 and who have registered for settlement benefits by Date 2 are entitled to exercise a "back-end opt-out." (Ex. P-3 at 61-63 of 148.) Each class member who wishes to exercise a right of back-end opt-out must submit a written notice of intent to do so within the latter of 120 days of the date on which the class member first knows (or should have known in the exercise of reasonable diligence) that the Diet Drug Recipient developed a matrix level condition or by Date 2. (Ex. P-3 at 61-63 of 148.) A class member who timely and properly exercises a back-end opt-out may pursue all of his or her settled claims against AHP and the AHP Released Parties except claims for punitive, multiple or exemplary damages, consumer fraud claims and medical monitoring claims. (Ex. P-3 [*78] at 61-63 of 148.) With respect to each class member who timely and properly exercises the back-end opt-out right and who initiates a lawsuit against AHP or any of the AHP Released Parties within one year from the date on which the back-end opt-out right is exercised, the AHP Released Parties shall not assert any defense based on any statute of limitations or repose, the doctrine of laches, any other defense predicated on the failure to timely pursue the claim, any defense based on "splitting" a cause of action, any defense based on a release signed pursuant to the Settlement Agreement and/or any other defense based on the existence of the Settlement Agreement. (Ex. P-3 at 61-63 of 148.)

Finally, the Settlement Agreement provides for a "financial insecurity opt-out right." (Ex. P-3 at 32-33 of 148.) If a condition of financial insecurity with respect to payment of AHP's obligations under the Settlement Agreement occurs in accordance with the conditions defined in the Agreement, then all Diet Drug Recipients who were diagnosed as having FDA Positive or Mild Mitral Regurgitation by the end of the Screening Period and who have registered for settlement benefits by Date 2 have a right [*79] to opt-out of the settlement and pursue all of their settled claims against AHP and the other Released Parties, including claims for punitive, multiple and exemplary damages. (Ex. P-3 at 32-33 of 148.)

### 3. Creation of a Settlement Trust

The Settlement Agreement requires the creation of a Settlement Trust which has responsibility for receiving the amounts deposited by AHP to fund the settlement, investing such amounts (under supervision of the court), administering the trust, providing the benefits contemplated by the Settlement Agreement and conducting the audits contemplated by the Settlement Agreement. [8] It is also required to issue regular reports to the court concerning these matters. (Ex. P-3 at 22-24, 73-81 & 100-15

2000 U.S. Dist. LEXIS 12275, *

of 148; Ex. P-4.) Pending the creation of the Trust, the functions of the Settlement Trust are to be performed by Interim Claims Administrators and an Interim Escrow Agent. (Ex. P-3 at 70-73 of 148.) On November 23, 1999, the Court appointed Gregory P. Miller, Esquire and the Honorable C. Judson Hamlin to serve as Interim Claims Administrators. Mr. Miller is an experienced trial lawyer who has served as Special Discovery Master in MDL 1203. Judge Hamlin served [*80] as a judge in the Superior Court of the State of New Jersey handling mass tort litigation until his retirement from that position in 1998. He has functioned as Special Settlement Master with respect to the Diet Drug Litigation pending in the state of New Jersey. (Tr. 5/9/00 at 18-20 & 54-56.) In Pretrial Order No. 1010, dated December 6, 1999, the court appointed PNC Bank to serve as Interim Escrow Agent.

> 8   The Settlement Trust is to be structured and managed to qualify as a Qualified Settlement Fund under *Section 468B of the Internal Revenue Code.* (Ex. P-3 at 28 of 148.)

The Settlement Agreement contemplates that there will be seven Trustees who will serve until the year 2005, and that, thereafter, there will be three Trustees for the Settlement Trust. (Ex. P-3 at 22 & 70 of 148.) By Pretrial Order No. 1159, the court appointed the following individuals to serve as Trustees for the Settlement Trust: Joseph L. Castle, II, Radnor, Pennsylvania; George A. Beller, M.D., Charlottesville, Virginia; Honorable Richard [*81] S. Cohen, New Brunswick, New Jersey; Senator Chris Harris, Arlington, Texas; Ms. Alison Overseth, New York, New York; Rose-Marie Robertson, M.D., FACC, Nashville, Tennessee; and Honorable Dean M. Trafelet, Chicago, Illinois. Although the court has issued an order appointing Trustees to the Settlement Trust, the Trust had not been formally organized as of the date of the Fairness Hearing. (Tr. 5/9/00 at 49.)

**4. The Settlement Fund**

The settlement requires the creation of two separate funds to provide benefits to class members. "Fund A" is intended to provide funding to pay for all non-matrix benefits available under the Settlement Agreement to class members and the associated costs of administering those benefits. "Fund B" is intended to provide funding to pay for matrix benefits for class members and the associated costs of administering those benefits.

Under the agreement, AHP is required to make payments into Fund A as follows: (1) $ 50 million 5 business days after preliminary approval; (2) $ 383 million 5 business days after trial court approval; (3)$ 383 million 180 days after the preceding payment of $ 383

million; and (4) $ 184 million 5 business days after Final Judicial [*82]  Approval. (Ex. P-3 at 22-23 of 148.)

With respect to Fund B, AHP agrees to have $ 2.55 billion available for Fund B payments which the Trustees may reasonably draw upon. (*Ex. P-278 P 4.*) In any given quarter, to the extent that the $ 2.55 billion is not drawn upon, such amount accrues interest at one and a half percent per quarter or six percent a year, which carries forward to increase the available amount. Any remaining balance from Fund A is also included in Fund B. In addition, AHP receives credits against this amount for payments made to those who exercised an initial opt out right. These credits are capped at $ 300 million, which AHP cannot apply until year 5. (*Ex. P-278 P 33.*) AHP also receives credits for payments made to those who exercise a back-end opt out right. The amount of both of these types of credits is the lesser of the payment AHP makes to the claimant or the matrix level for which such claimant would be entitled to under the Settlement.

Clearly, AHP has adequate financial coverage to meet these obligations. Dr. Rosen, who testified at the May 2000 proceedings and again on August 10, 2000, examined several AHP financial reports and statements and stated that [*83]  AHP currently has approximately $ 2.6 billion in cash and marketable securities. (Tr. 8/10/00 at 107.) In addition, Dr. Rosen testified that AHP continues to generate better than half a billion dollars per quarter, or approximately $ 2.3 billion per year.

The court is also satisfied that Funds A and B are sufficient to provide the necessary benefits under the Settlement Agreement. To analyze the adequacy of the funding for Fund A and Fund B, the experts who testified at the Fairness Hearing relied on a number of considerations, including: (1) the number of potential class members; (2) the participation rate in the Settlement; (3) the proportion of participants who took fenfluramine and/or dexfenfluramine 61 days or more; (4) the proportion of participants who will be diagnosed to have FDA Positive levels of regurgitation; (5) the costs of providing echocardiograms within the Screening Program; (6) the cost of reimbursing certain echocardiograms; (7) administrative costs; (8) costs for the registry and research funds; (9) rates of possible progression to severe levels of regurgitation among class members with FDA Positive levels of regurgitation or mild mitral regurgitation; (10) [*84]  progression among class members who will receive Matrix-level benefits to higher levels of the Matrix grid; and (11) the proportion of patients who have conditions entitling them to Matrix-level benefits who will receive benefits from the B Matrix rather than the A Matrix. (AHP Ex. 614 PP 9-16, 24, 26, 32-37; Ex. P-94 at 3-7.)

2000 U.S. Dist. LEXIS 12275, *

The experts used conservative assumptions likely to overstate the demands on Fund A and Fund B. Dr. McClellan (1) assumed a higher participation rate in the Settlement than has been seen to date; (2) assumed that a significantly higher proportion of class members who used the diet drugs for 61 days or longer would participate in the Settlement than would class members who used the drugs for 60 days or less; (3) did not take into account scientific evidence of regression of regurgitation in Diet Drug Recipients; (4) assumed higher prevalence rates of regurgitation than have been seen in Diet Drug Recipients; and (5) assumed progression to Matrix-level conditions despite the lack of evidence supporting appreciable progression among users of fenfluramine and dexfenfluramine. Dr. Kursh used similar assumptions. (AHP Ex. 614 PP 10, 16 & 32; Tr. 5/9/00 at 133-35; [*85] Ex. P-94 at 3-7.)

Employing these conservative assumptions, Dr. McClellan concluded that Fund A would not come close to exhaustion. Under Dr. McClellan's "base case," only $ 786 million of the $ 1 billion committed for Fund A would be used. ( AHP Ex. 614 P 25, Ex. C; Tr. 5/9/00 at 125.) The remaining funds would be available to pay for drug refunds to class members who used fenfluramine and/or dexfenfluramine for 61 days or longer and to reimburse class members for echocardiograms obtained outside the Screening Period. (Ex. P-32 at 2-3 of 13.)

With respect to Fund B, Dr. Kursh testified that, assuming a 100% participation rate in the settlement, the cost of paying matrix level benefits was $ 3.88 to 4.55 billion present value. (Tr. 8/10/00 at 97.) Dr. Kursh relied on previous analyses done by Drs. Karalis and Goodman, whose declarations were admitted at the Fairness hearing held in this court in May 2000. Dr. Rosen testified that $ 2.55 billion was a sufficient amount to cover all of the matrix claims likely to be filed in this Settlement. (Tr. 8/10/00 at 102.) Dr. Rosen relied on Dr. Kursh's testimony, the provisions in the *Fourth Amendment* to the Settlement Agreement, [*86] the prior declarations and analyses of Drs. Karalis and Goodman and a comparison of participation rates in other classes. Dr. Rosen concluded the payment structure contemplated under the *Fourth Amendment* would be sufficient to bear a 76%-90% participation rate. Dr. Rosen testified that prior to the *Fourth Amendment*, the amount provided under the Agreement was sufficient to bear 66%-79% participation. (Tr. 8/10/00 at 105-06.) Dr. Rosen also testified that, considering other classes in other cases, a participation rate of 30%-40% was considered a high participation rate. Id. (Tr. 8/10/00 at 105-06.)

No evidence was offered at the Fairness Hearing suggesting that the amounts to be paid into Fund A or Fund B are, or are likely to become, inadequate to pay for the benefits to be provided under the Settlement. No evidence was offered at the Fairness Hearing suggesting that the assumptions employed by the experts would understate the demands for benefits under the Settlement. Based on the methods and evaluations employed by these experts, the court is satisfied the amounts provided in Funds A and B are sufficient to provide all likely benefits under the Settlement Agreement.

5. [*87]   Treatment of PPH Under the Settlement Agreement

Under the terms of the Settlement Agreement, PPH is defined as follows:

> For a diagnosis based on examinations and clinical findings prior to death:
>
> > Mean pulmonary artery pressure by cardiac catheterization of > 25 medical monitoring Hg at rest or > 30 medical monitoring Hg with exercise with a normal pulmonary artery wedge pressure <</UNDERLINE> 15 medical monitoring Hg; or
> >
> > A peak systolic pulmonary artery pressure of > 60 medical monitoring Hg at rest measured by Doppler echocardiogram utilizing standard procedures; or
> >
> > Administration of Flolan to the patient based on a diagnosis of PPH with cardiac catheterization not done due to increased risk in the face of severe right heart dysfunction; and
> >
> > Medical records which demonstrate that the following conditions have been excluded by the following results:
> >
> > > (a)   Echocardiogram demonstrating no primary cardiac disease including, but not limited to, shunts, valvular disease (other than tricuspid or pulmonary valvular insufficiency as a result of PPH or trivial,

clinically insignificant left-sided valvular regurgitation), and congenital heart disease (other than [*88] patent foramen ovale); and

(b) Left ventricular dysfunction defined as LVEF < 40% defined by MUGA, Echocardiogram or cardiac catheterization; and

(c) Pulmonary function tests demonstrating the absence of obstructive lung disease (FEV[1]/FVC > 50% of predicted) and the absence of greater than mild restrictive lung disease (total lung capacity > 60% of predicted at rest); and

(d) Perfusion lung scan ruling out pulmonary embolism; and

(e) If, but only if, the lung scan is indeterminate or high probability, a pulmonary angiogram or a high resolution angio computed tomography scan demonstrating absence of thromboembolic disease; and

(f) Conditions known to cause pulmonary hypertension, including connective tissue disease known to be causally related to pulmonary hypertension, toxin induced lung disease known to be causally related to pulmonary hypertension, portal hypertension, significant obstructive sleep apnea, interstitial fibrosis (such as silicosis, asbestosis, and granulomatous disease) defined as greater than mild patchy interstitial lung disease, and familial causes, have been ruled out by a Board-Certified Cardiologist or Board-Certified Pulmonologist [*89] as the cause of the person's pulmonary hypertension.

-OR-

For a diagnosis made after the individual's death:

Autopsy demonstrating histopathologic changes in the lung consistent with primary pulmonary hypertension and no evidence of congenital heart disease (other than a patent foramen ovale) with left-to-right shunt, such as ventricular septal defect as documented by a Board-Certified Pathologist; and

Medical records which show no evidence of alternative causes as described above for living persons.

(Ex. P-3 at 12-15 of 148.)

This definition is consistent with the long standing consensus in the medical community with respect to the proper definition of the disease, except to the extent that it permits the diagnosis of PPH based on pulmonary artery pressure >/= 60 mm Hg as determined by Doppler echocardiography--and is thus somewhat over-inclusive. The evidence before the court, including the testimony of all three experts who addressed this issue and the consensus statements in the relevant medical literature, confirm that the definition of PPH set forth in the Settlement Agreement is the accepted definition in the field. (Tr. 5/2/00 at 267; Tr. 5/3/00 at [*90] 15 & 16.)

Dr. Barst, an expert in cardiology and pulmonary medicine with a specialty in the treatment of primary and secondary pulmonary hypertension, testified that: (1) the definition of PPH in the Settlement Agreement is the definition that has been accepted by experts in the field of cardiology since 1973; (2) right heart catheterization is the appropriate test to assess elevated pulmonary pressures in the context of diagnosing PPH; and (3) the other alternative causes of elevated pulmonary pressure must be excluded to arrive at a proper diagnosis of PPH. (Tr. 5/2/00 at 266; Tr. 5/300 at 15; *P-97 P 8.*) Dr. Weyman,

an expert in the fields of cardiology and echocardiography, also testified that the definition of PPH in the Settlement Agreement is medically appropriate and includes what cardiologists would recognize as PPH. ( AHP Ex. 610 P 27.) Dr. Shah, an expert in the fields of cardiology and echocardiography, who also treats PPH cases, similarly testified that the PPH definition included in the Settlement Agreement is reasonable. ( AHP Ex. 613 P 78.)

Indeed, Drs. Barst, Shah and Weyman all agreed that, if anything, the definition of PPH included in the [*91] Settlement Agreement is over-inclusive in that the Settlement Agreement definition allows a class member with an "exceedingly mild case" of PPH to maintain an action against AHP on the basis of his or her PPH claim. (Tr. 5/2/00 at 268; AHP Ex. 613 P 78; AHP Ex. 610 P 27.) There was no expert testimony contradicting the opinions of Drs. Barst, Weyman and Shah or to challenge the definition of PPH in the Settlement Agreement. Moreover, because PPH is a relentlessly progressive disease and because the definition contained in the Settlement Agreement includes individuals with very mild forms of the disease, it is inevitable that any individual who actually has PPH will meet the definition by the time they develop symptoms. (Tr. 5/2/00 at 268, 281-82.)

Under the Settlement Agreement, claims based on PPH, including claims for compensatory, punitive, exemplary or multiple damages based on PPH are not "settled claims." Thus, class members are not precluded by the settlement from instituting, prosecuting or maintaining claims against AHP and the AHP Released Parties with respect to the development of PPH. (Ex. P-3 at 17-18 of 148.) Moreover, the Settlement Agreement [*92] provides that "for purposes of any statutes of limitations or similar time bar, the AHP Released Parties shall not assert that a Class Member actually had PPH unless and until the condition of the Class Member meets the definition of PPH set forth in [the Settlement Agreement]." (Ex. P-3 at 119 of 148.) Moreover, the Settlement Agreement provides that "in the event that a Class Member initiates a claim based on PPH, the AHP Released Parties shall not assert a defense based on 'splitting' of claims, causes of action and/or parties by virtue of the fact that Class Member is included in the settlement. . . ." (Ex. P-3 at 119 of 148.) Although the Settlement Agreement does not provide any direct benefits for PPH, it fully preserves the rights of class members to recover against AHP if they have or develop PPH as a result of taking Pondimin and/or Redux. Indeed, the settlement protects Class Members against the running of any statute of limitations with respect to such claims. (Tr. 5/2/00 at 64-65.)

## 6. Release and Bar Provisions

Effective upon Final Judicial Approval, the Settlement Agreement will release all Settled Claims against Released Parties. (Ex. P-3 at 119 of 148.) Settled [*93] Claims are those claims by class members arising out of or relating to the purchase, use, manufacture, sale, dispensing, distribution, promotion, marketing, clinical investigation, administration, regulatory approval, prescription, ingestion and labeling of Pondimin and/or Redux, except claims based upon PPH and claims that are subject to validly exercised rights of opt-out under the Settlement Agreement. (Ex. P-3 at 17-18 of 148.) Class members are barred from asserting any Settled Claim against AHP or any other Released Party except those class members who timely and properly exercise opt-out rights. (Ex. P-3 at 119 of 148.)

The Released Parties under the Settlement Agreement are AHP, its subsidiaries, affiliates, and divisions, its predecessors, successors and shareholders, the suppliers of materials, components and services used in the manufacturer of Pondimin or Redux and distributors of Pondimin and Redux. In addition, physicians who prescribed and pharmacists who dispensed Pondimin and Redux are Released Parties except to the extent that claims against them are based on their independent negligence or culpable conduct. (Ex. P-3 at 15-16 of 148.) Servier, Interneuron, and any [*94] manufacturer, seller, wholesaler or distributor of phentermine are not Released Parties. [9] (Ex. P-3 at 16 of 148.)

> 9   To the extent that any distributor that distributed Pondimin or Redux also distributed phentermine, such distributor is released to the extent it distributed *Pondimin or Redux. (Ex. P-278 P 8.)*

## 7. Attorneys' Fees

The Settlement Agreement provides two vehicles for an award of counsel fees and reimbursement of litigation expenses that serve to limit the amount of class funds which can be paid to compensate class counsel for their services in achieving the relief provided by the settlement. With respect to the benefits afforded by Fund A, the Settlement Agreement requires that AHP deposit the sum of $ 200 million in an escrow account to pay for the services of counsel in creating that fund. The amount that will actually be awarded from this escrow account as counsel fees in relation to Fund A is to be determined by the court in accordance with applicable provisions of law. To the extent that [*95] any balance remains in the escrow account after payment of any fee awarded by the court, that balance will be returned to AHP. (Ex. P-3 at 134-135 of 148.) The court may order reimbursement of all out-of-pocket costs reasonably related to the creation of Fund A from the fund itself. (Ex. P-3 at 23 of 148.)

The Settlement Agreement provides that for purposes of awarding attorneys' fees from Fund B, attorneys' fees should be awarded and paid as a percentage of or otherwise based on the net present value, as of the date of Final Judicial Approval, of the maximum amounts AHP may be legally obligated to pay to Fund B for the benefit of the settlement class pursuant to the principle of law expressed in *Boeing v. Van Gemert, 444 U.S. 472, 62 L. Ed. 2d 676, 100 S. Ct. 745 (1980).* (Ex. P-3 at 135-136 of 148.) For this purpose, the parties have stipulated and the court finds that the net present value of the maximum amounts which AHP may be legally obligated to pay for the benefit of the class is $ 2,550,000,000.00. The amount of the actual attorneys' fees to be awarded to counsel for their services in creating Fund B and securing the benefits that it provides is subject to [*96] determination by the court under applicable principles of law. However, Class Counsel have agreed that the amount of such fees shall not exceed $ 229 million which is nine percent of the $ 2,550,000,000.00 present value amount of Fund B. (Ex. P-3 at 135-136 of 148.)

This cap on the award of common benefit fees in relation to Fund B is consistent with a prior determination by the court that it was appropriate to set aside nine percent of the amount recovered by plaintiffs in MDL 1203 and coordinated state litigation to pay "common benefit fees." See Pretrial Order Nos. 467 & 517. In addition, Class Counsel have the right to apply to the court for reimbursement of costs expended for the common benefit of class members from Fund B. (Ex. P-3 at 28 of 148.) Attorneys for individual class members who recover Matrix Compensation Benefits are entitled to recover the total attorneys' fees due under the terms of any valid written contingent fee agreement with such class member less the percentage amount awarded by the court to Class Counsel and other attorneys for their services in creating Fund B and securing the benefits it provides. (Ex. P-3 at 135-136 of 148; *Ex. P-278 P 37.*)

[*97] **8. The Accelerated Implementation Option**

The Settlement Agreement provides an Accelerated Implementation Option ("AIO"). (Ex. P-3 at 59-69 of 148.) For class members who are satisfied with the settlement and who are willing to waive their initial, intermediate and back-end opt-out rights, the AIO provides a means for such class members to obtain the benefits of the settlement without regard to Final Judicial Approval. Id. The AIO may be exercised by any class member. In order to do so, the class member must submit a signed PINK FORM in which the class member waives all opt-out rights and executes a release in favor of AHP and the other Released Parties. (Ex. P-3 at 64 of 148; Ex. P-12.) Upon execution of the completed PINK FORM, AHP is deemed to have entered into a private contract to provide all of the benefits that the class member would be entitled to receive under the Settlement Agreement regardless of whether or not the settlement receives Final Judicial Approval. Id. The start date for receiving benefits pursuant to the AIO is the date on which the trial court rules (favorably or unfavorably) on whether or not to approve the settlement. (Ex. P-3 at [*98] 64 of 148.)

**9. Jurisdiction**

The United States District Court for the Eastern District of Pennsylvania has original jurisdiction over all provisions of the Settlement Agreement including the creation and operation of the Settlement Trust and the award of attorneys' fees and reimbursement of litigation expenses, pursuant to *28 U.S.C. § 1332.* (Ex. P-3 at 130 of 148.)

However, the Settlement Agreement calls upon the court to create a "State Court Judicial Advisory Committee" consisting of the judges from the state courts which, as of October 7, 1999, had issued any order certifying state-wide class actions in relation to the effects of Pondimin and/or Redux. (Ex. P-3 at 130-131 of 148.) The duties of the State Court Judicial Advisory Committee are to provide advice and counsel to the court on all matters pertinent to the settlement, including approval of the settlement, which affect class members residing in the states of each committee member. [10] Id. In addition, prior to making any award of counsel fees and reimbursement of litigation expenses, the court is to consult with and give substantial deference to the views of the members of the State Court [*99] Judicial Advisory Committee concerning the actual contribution that was made to the overall resolution of the litigation by the attorneys with whom the members of the committee are familiar. Id. Finally, during the period of time from the date on which Settlement Trust is established until December 31, 2004, the majority of Trustees serving the Trust are to be approved by the State Court Judicial Advisory Committee. Id. On December 7, 1999, by Pretrial Order No. 1014, this court appointed the Honorable Stephen Levin, the Honorable Marina Corodemus, the Honorable Fred Edwards, the Honorable Helen E. Freedman, the Honorable Fred Risovich, II, the Honorable Richard J. Schroeder and the Honorable Ellis E. Reid to serve as members of the State Court Judicial Advisory Committee which has since operated in accordance with the above described provisions of the Settlement Agreement.

10   A State/Federal Coordination Conference was held in Philadelphia on January 13, 2000, at which the terms of the Settlement were presented to members of the State Court Judicial Advisory Committee.

[*100] **II. DISCUSSION**

**A. Subject Matter Jurisdiction**

This court has subject matter jurisdiction pursuant to *28 U.S.C. § 1332*. The named class representatives are all citizens of Pennsylvania. (Third Am. Compl. PP 3-8.) Defendant AHP is a Delaware corporation with its principal place of business in Madison, New Jersey. *Id. P 9*. Thus, complete diversity exists among the parties.

The $ 75,000.00 amount in controversy requirement is also met. Plaintiffs seek a comprehensive medical monitoring program. *Id. PP 87-95*; see supra, at § II.B.2.a.. In addition, the settlement provides for a $ 25 million medical research fund to examine the relationship between diet drugs and VHD.

In Jeffers v. American Home Products Corporation, the court found that a similar request in a class complaint for medical monitoring which included a research fund was sufficient to meet the jurisdictional amount. See *1999 U.S. Dist. LEXIS 13228, 1999 WL 673066* (E.D. Pa. Aug. 26, 1999); Pretrial Order No. 865 at 9-13 (finding that request for medical monitoring which included research fund met jurisdictional amount); see also *Katz v. Warner Lambert Co., 9 F. Supp. 2d 363, 364 (S.D.N.Y. 1998)* [*101] (holding that request for medical research fund satisfied jurisdictional amount). Here, the court adopts the reasoning in Jeffers and the authorities cited therein in support of its having subject matter jurisdiction. See Pretrial Order No. 865 at 9-13.

**B. Personal Jurisdiction and Notice Requirements Under *Federal Rules of Civil Procedure 23(c)(2)* and *23(e)*.**

**1. Legal Standards**

**a. Personal Jurisdiction**

In the class action context, "the district court obtains personal jurisdiction over the absentee class members by providing proper notice of the impending class action and providing the absentees with the opportunity to be heard or the opportunity to exclude themselves from the class." *In re Prudential Ins. Co. of Am. Sales Practice Litig., 148 F.3d 283, 306 (3d Cir. 1998)*, cert. denied sub nom., *Krell v. Prudential Ins. Co. of Am. Litig., 525 U.S. 1114, 142 L. Ed. 2d 789, 119 S. Ct. 890 (1999)* (citing *Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 811-12, 86 L. Ed. 2d 628, 105 S. Ct. 2965 (1985))*. Reasonable notice combined with an opportunity to be heard and withdraw from the class [*102] satisfy the due process requirements of the *Fifth Amendment*. Id. Thus, "silence

on the part of those receiving notice is construed as tacit consent to the court's jurisdiction." Id. (citing Shutts and *Carlough v. Amchem Prods., Inc., 10 F.3d 189, 199 (3d Cir. 1993))*.

**b. *Rule 23(c)(2)***

In addition, in a settlement class maintained under *Rule 23(b)(3)*, class notice must meet the requirements of both *Federal Rules of Civil Procedure 23(c)(2)* and *23(e)*. See *Carlough v. Amchem Prods., Inc., 158 F.R.D. 314, 324-25 (E.D. Pa. 1993)* (stating that requirements of *Rule 23(c)(2)* are stricter than requirements of *Rule 23(e)* and arguably stricter than due process clause). Under *Rule 23(c)(2)*, notice to the class must be "the best practicable notice under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Zimmer Paper Prods., Inc. v. Berger & Montague, P.C., 758 F.2d 86, 90 (3d Cir. 1985)*; see *Fed. R. Civ. P. 23(c)(2)*. The Rule also requires that the notice indicate an opportunity to opt out, that the judgment will bind all class members who do not opt out and that [*103] any member who does not opt out may appear through counsel. *Fed. R. Civ. P. 23(c)(2)*.

**c. *Rule 23(e)***

*Rule 23(e)* requires that notice of a proposed settlement must inform class members: (1) of the nature of the pending litigation; (2) of the settlement's general terms; (3) that complete information is available from the court files; and (4) that any class member may appear and be heard at the Fairness Hearing. See 2 H. Newberg, Newberg on Class Actions, § 8.32, at 8-103. The court should consider the mode of dissemination and its content to assess whether notice was sufficient. The notice need not be unduly specific. See In re "Agent Orange" *Prod. Liab. Litig., 818 F.2d 145, 170 (2d Cir. 1987)* (holding that settlement notice that failed to detail distribution plan was not inadequate); *Grunin v. International House of Pancakes, 513 F.2d 114, 122 (8th Cir. 1975)* (stating that "class members are not expected to rely upon the notices as a complete source of settlement information"); *Greenspun v. Bogan, 492 F.2d 375, 382 (1st Cir. 1974)* (stating that notice need not indicate arguments in favor of and against proposed settlement); [*104] *Carlough, 158 F.R.D. at 332* (stating that notice need not include entire settlement agreement). Instead, notice need only be reasonably calculated to inform interested parties of the pendency of the proposed settlement and afford them an opportunity to present their objections. See *Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 94 L. Ed. 865, 70 S. Ct. 652 (1950)* (stating that due process requires "notice reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections").

## 2. The Notice Plan

The Settlement Agreement provides for an elaborate and extensive plan of notice. This plan was approved by the court in Pretrial Order No. 997 as "the best notice practicable under the circumstances" and was implemented by the parties pursuant to the terms of the Settlement Agreement and Pretrial Order Nos. 997 and 998. The notice program had two essential parts. The first part of the notice program was designed to make class members aware of the potential risks posed by Pondimin and Redux, of the legal rights arising from the use of [*105] those drugs, of the proposed nationwide class action settlement which would resolve such claims and of their opportunity to opt out or object to the Settlement. In addition, the first part of the notice program was designed to inform class members of the opportunity to obtain a court authorized "notice package" describing their legal rights in relation to the settlement by registering to receive the notice package through a 1-800 number (1-800-386-2070) or through the world wide web (www.settlementdietdrugs.com). The second part of the notice program was to provide a detailed "notice package" to each person who had registered through the 1-800 number or web site and to all other class members whose names and addresses were known to the parties.

### a. Dissemination

The first part of the notice campaign employed sophisticated media techniques designed to reach all class members. A television commercial was developed. [11] This television message was broadcast 106 times over a period of five weeks on network television. The television commercial message was also broadcast 781 times, for six consecutive weeks on various cable networks. (Ex. P-68 at 7-8 of 88.)

> [11]  The text of this television commercial message was as follows:
>
> > If you took the diet drug combination known as FenPhen or the diet drugs Pondimin or Redux, you may have heart valve problems and not know it. As a result of a proposed class action settlement, you could be eligible for free medical testing and compensation. But you must act promptly. You must decide whether to participate in this settlement by March 30, 2000. If you do nothing, your legal rights will be affected. Call 1-800-386-2070 today.

The television advertisement also displayed the address of the website that class members could contact in order to obtain the notice package. The text of this television message was approved by the court. (Pretrial Order No. 997; Tr. 5/4/00 at 18; Ex. P-68 at 7-8 of 88; Ex. P-20; Ex. P-52.)

[*106]  A summary notice was prepared for use in the print media. (Exs. P-36; P-81; P-68 at 8-10 of 88.) The summary notice appeared repeatedly in several magazines between January and March 2000. [12] The summary notice appeared as a one-third page black and white ad in four national newspapers, 77 local newspapers, 3 newspapers distributed throughout the U.S. Territories and four newspapers targeted to the Hispanic market. [13] These newspapers were selected because they were national publications, or because they represented the principal newspapers in the top 15 markets in the United States, or because they were published in geographic areas having the highest usage of Pondimin and Redux and/or because they were targeted to African-American or Spanish speaking populations. (Ex. P-68 at 9-10 of 88.) In addition, the summary form of notice was published in a variety of publications targeted to healthcare providers and pharmacists. [14] Banner ads were also developed for use on the Internet, directing potential class members to the official settlement web site where class members could receive information concerning the settlement and obtain a notice package. These banner advertisements [*107] were placed within several media categories on a variety of Internet publishers. [15]

> [12]  The summary notice appeared ten times between January and February 2000 in the form of a full page black and white advertisement in Parade, People and Time magazines. A full page black and white version of the summary notice was inserted into eight monthly magazines during the month of February including Better Home & Gardens, Ladies Home Journal, Family Circle, McCalls, Women's Day, Redbook, Good Housekeeping and Ebony. Additional insertions of the summary notice appeared as a full page black and white advertisements in the March editions of Better Home & Gardens and Good Housekeeping. In addition, a two page black and white version of the summary notice was placed in Reader's Digest during the months of February and March 2000. (Ex. P-68 at 9 of 88.)
> [13]  Each newspaper received four insertions: one in December 1999, two in January 2000, and one in February 2000.
> [14]  These included nine primary care physician publications, two internist publications, one bara-

tritian publication, two endocrinology journals, one psychiatry journal, seven publications targeted to cardiologists and/or echocardiographers, and four pharmacists' publications. Each of these insertions ran throughout January and February 2000. (Ex. P-68 at 10 of 88.)

[*108]

15   Specifically, the categories included Keyword Searches, Message Boards, Clubs & Chat, Health Channels and Women's and Health destination sites. Publishers included AltaVista, GoTo, Yahoo, Deja.com, Egroups.com, Women.com., DRKoop.com, Flycast.com., I-village, and Gainesville. (Ex. P-68 at 10 of 88.)

In addition to the above, notice was transmitted by mail to all pharmacists in the United States and to doctors who were likely to have prescribed Pondimin or Redux or treated patients for complications resulting from the use of those drugs. Notices to these healthcare providers contained a "notice package," a letter of explanation and a counter card reflecting the summary form of notice described above, which pharmacists and physicians could display to alert patients about the existence of the settlement and the opportunity to obtain a "notice package" by contacting the 1-800 number or official web site. These counter cards contained "tear sheets" that referenced the settlement and contained the 1-800 number and website address which class members could contact to gain further information concerning [*109] the settlement. Such mailings were transmitted to 784,128 physicians and to 108,288 pharmacists. (Exs. P-8, P-21, P-40 and P-210; Tr. 5/9/00 at 79-80.)

The media program described above was highly successful. [16] Ms. Krupnick testified that the effectiveness of the publication notice plan was greatly enhanced by the enormous publicity that has surrounded the diet drugs involved in this litigation and the publicity of this Settlement. According to Ms. Krupnick, it is well-understood in the advertising field that a campaign is more effective when there is an existing understanding about an issue or a product. Ms. Krupnick testified that the publicity that occurred prior to the announcement of the proposed Settlement would have given users of Pondimin and Redux a base of knowledge and some understanding of the health concerns associated with the use of these drugs and the fact that they had potential legal remedies in some instances because of their use of the drugs. The coverage of the Settlement itself would also have enhanced the effectiveness of the publication notice of this Settlement. (AHP Ex. 608 PP 23-24; AHP Ex. 511; AHP Ex. 616.) As of the date of the settlement hearing, 735,289 [*110] people had called 1-800-386-2070 and registered to receive a notice package. The notice

package was transmitted to each of these 735,289 people. (Tr. 5/9/00 at 80-82.)

16   A sophisticated media analysis demonstrated that 97% of women between the ages of 25 and 54 viewed one or more forms of televised or printed notice an average of 10 times. A reach and frequency analysis indicated that almost 80% of women between the ages of 25 and 54 were exposed to the message contained in the televised or printed forms of notice a minimum of five times. Women between the ages of 25 and 54 account for a vast majority of the use of diet drugs Pondimin and Redux. (Ex. P-68 at 10 of 88.) In addition, a reach and frequency analysis indicated that the settlement message reached 97% of women 35 years and older an average of 11.4 times and that it reached 81% of women 35 years and older a minimum of five times. With respect to African-American women between the ages of 25 and 54, the reach and frequency analysis shows that the settlement message reached 97% of those women an average of 10.2 times and that 79% of African-American women between the ages of 25 and 54 viewed the message a minimum of five times. With respect to men age 25 through 54, 94% viewed the settlement message an average of 6.2 times and 54.3% were reached with the settlement message a minimum of five times. (Ex. P-68 at 10-11 of 88.)

[*111]   The website, www.settlementdietdrugs.com, became fully available on the World Wide Web in January 2000. Individuals could access the website and view and/or download the following: (1) the Settlement Agreement in its entirety; (2) the Table of Exhibits to the Settlement Agreement; (3) Amendments to the Settlement Agreement; (4) the forms (English or Spanish); (5) the class members' Guide (English or Spanish); (6) the Settlement Matrix Guide for Physicians, Attorneys, and class members; (7) the Official Legal Notice (English or Spanish); and (8) a summary of the benefits available to class members. Furthermore, one could sign up to receive the notice package. (AHP Exs. 7 & 507.) Class members were also able to view, download or register to receive the notice package at the official settlement website. [17]

17   As of the date of the hearing, there had been 1,485,371 "page views" of the website, the website was subject to 536,486 "user sessions," 349,410 forms had been downloaded from the website; and 87,908 individuals registered on the website to receive notice packages by mail. (Tr. 5/9/00 at 80-84.) As of August 8, 2000, there had been 1,741,720 "page views" of the website, the

website was subject to 673,375 "user sessions," 369,093 forms had been downloaded from the website; and 93,778 individuals registered on the website to receive notice packages by mail. (AHP Ex. 646; Tr. 8/10/00 at 56-58.)

[*112]  In addition, the parties had in their possession or control the names and addresses of 287,108 individuals who had taken Pondimin and Redux, either because such individuals had filed claims against AHP, because they had filed claims against Interneuron, or because their identity was reflected in AHP's corporate records. Notice packages were transmitted by first class mail to each of these 287,108 individuals. (Tr. 5/9/00 at 75-76 & 85; Tr. 5/8/00 at 125-126; Ex. P-287; AHP Ex. 618.)

**b. Content**

The official notice package approved by the court and transmitted to class members was optimally designed to be read and understood by class members. The Official Court Notice and the brochure were sent in a red and blue 8 1/2 "by 11" envelope bearing a picture of Pondimin and Redux pills. The text on the envelope read: "Attention: Anyone Who Took 'Fen-Phen,' Pondimin and/or Redux-- Important Notice Inside." The envelope advised recipients that it contained an Official Court Notice and that the information contained within "may have an impact on your legal rights, your health and your future medical expenses." (Ex. P-211.)

The notice itself consisted of several elements. The first [*113] component of the notice was a colorful brochure entitled "A Class Member's Guide to Settlement Benefits." It was designed to describe the background of the Diet Drug Litigation and the Settlement Agreement in a way that would be read and understood by all class members. Towards this end, it was written in plain English and contained a number of pictures, charts and graphs. (Exs. P-211, P-42 & P-34.) The next element of the notice package was the Official Court Notice of the nationwide Diet Drug Class Action Settlement. This "official notice" contained a detailed description of the Settlement Agreement, typeset in the manner traditionally used to provide legal notice. (Exs. P-211, P-54 & P-35.)

The notice package also included a PINK FORM that class members were required to complete if they elected AIO benefits. The deadline for completing the PINK FORM was either the date on which Final Judicial Approval was obtained or the date on which it was determined that Final Judicial Approval would not be obtained. (Exs. P-211, P-44 & P-33.) The notice package also contained a BLUE FORM that class members were required to complete in order to register to receive settlement benefits in the [*114] event that the settlement received Final Judicial Approval. The deadline for completing the BLUE FORM was open-ended. (Exs. P-211, P-24, P-46 & P-38.) The notice package also contained a GREEN FORM that class members and physicians were required to complete in order for class members to obtain Matrix Compensation Benefits now or in the future. This form included a comprehensive guide to Matrix Compensation Benefits to assist class members in completing the form and understanding class members' rights to Matrix Compensation Benefits. This guide contained quotations and illustrations from standard medical texts which were used to define the concepts relevant to a determination of Matrix Compensation Benefits. (Exs. P-211, P-45 & P-22.)

The notice package also contained a simple one page ORANGE FORM that class members could complete to exercise their initial opt-out rights. In the alternative, class members could exercise an initial opt-out right by transmitting any written manifestation of their intent to do so to the Interim Claims Administrators. (Exs. P-211, P-43 & P-9.) The court directed that class members be given the right to opt-out by March 30, 2000, which was 120 days from [*115] the date that class notice commenced. ( Pretrial Order No. 997 P 11; *Ex. P-31 P 2*.) Finally, the notice package contained a postage-prepaid business reply envelope that class members could use to return the relevant forms. (Exs. P-211 & P-48.)

The notice packages were not the only source of information concerning the settlement. The Interim Claims Administrators employed the Official Settlement Website to post answers to frequently asked questions about the settlement, to reply to questions submitted via E-mail, to provide a news letter regarding the settlement, and to otherwise communicate with class members concerning the settlement. In addition, the Interim Claims Administrators established a separate 1-800 number and provided staff to answer questions submitted via telephone concerning the settlement. (Tr. 5/9/00 at 32-34 & 37-38.)

**c. Response**

Altogether, notice packages were transmitted by first class mail to 944,723 individuals. (Tr. 5/9/00 at 85-86; AHP Ex. 618.) As of May 8, 2000, 44,423 people had signed and submitted ORANGE FORMS (or the substantial equivalent) exercising the right of initial opt-out under the settlement. (Tr. 5/9/00 at 89; and AHP Ex. [*116] 618.) Although there is currently no deadline for the submission of PINK FORMS or BLUE FORMS, as of May 8, 2000, 119,011 class members had executed PINK FORMS registering for AIO benefits and 97,544 class members had executed BLUE FORMS registering for settlement benefits in the event that the settlement received Final Judicial Approval. (Tr. 5/9/00 at 89; AHP Ex. 618.) In addition, as of May 8, 2000, 12,253 people

had submitted GREEN FORMS manifesting an intent to receive Matrix Compensation Benefits. By August 8, 2000, 51,467 ORANGE FORMS, 164,291 PINK FORMS, 108,572 BLUE FORMS and 12,014 GREEN FORMS were submitted. (AHP Ex. 646.) However, it appears that many of these forms need more complete information. (Tr. 8/10/00 at 65 & 80.)

The response by members of the class to the notice is significant in three ways. First, it demonstrates that the plan of notice was highly effective in meeting its goals to make class members aware of the circumstances leading up to the proposed settlement, the nature of the settlement and the potential impact of the settlement on their legal rights. Second, the response to the notice clearly indicates that the notice program was sufficient to afford [*117] all class members a full, informed and effective opportunity to exercise their initial opt-out rights under the Settlement Agreement. Finally, the response to the class notice shows that although there are a number of class members who chose to opt-out of the settlement, the class overwhelmingly supports the settlement as fair and equitable.

### 3. Analysis

Under these circumstances, the notice plan implemented here satisfies the requirements of personal jurisdiction, due process and *Federal Rules of Civil Procedure 23(c)(2) and 23(e)*. The notice plan was implemented by experienced specialists and utilized a wide variety of media to disseminate notice, including mailings to individual class members where possible, mailings to physicians and pharmacists, publication in magazines, newspapers and on the Internet, and through use of cable and network television, a toll free phone number and the Internet. This notice was amplified by the wide publicity that followed the controversy surrounding the diet drugs. This comprehensive notice program fulfills the "best notice practicable" requirement of *Rule 23(c)(2)*, as articulated in Shutts. See *Shutts, 472 U.S. at 812*. [*118] In addition, the settlement agreement clearly provided an opportunity for members to exclude themselves from the class by exercising their initial opt out right by March 30, 2000. In fact, class members may become eligible for three subsequent opt out rights under the settlement agreement. Thus, this notice program, coupled with opt out opportunities, is sufficient to warrant this court's exercise of personal jurisdiction over the class. See *In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d at 306*.

In Amchem Products, Inc. v. Windsor, the Supreme Court recognized that adequate notice to the class could be impeded where many class members were not even aware of their exposure to a defendant's product. *Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 628, 138 L.*

*Ed. 2d 689, 117 S. Ct. 2231 (1997)*. The initial opt out right in Amchem was not meaningful due to the fact that some asymptomatic class members were unaware that they were even exposed to asbestos. Id. Here, however, there are no class members unwittingly exposed to the diet drugs, which were available only through a doctor's prescription and had to be consciously ingested. [*119] In addition, class members were made aware of the risks these drugs posed in 1997, when AHP withdrew them from the market. Moreover, Class Counsel employed an expansive notice plan to inform class members of their initial opt out right. In sum, unlike Amchem, the initial opt out right has meaning because all class members were aware of their exposure to the diet drugs. In Amchem, the Supreme Court also raised the concern that even if class members "fully appreciate the significance of class notice, those without current afflictions may not have the information or foresight needed to decide, intelligently, whether to stay in or opt out." *Amchem, 521 U.S. at 628*. Here, the instant settlement's intermediate and back-end opt out rights allow class members to make informed choices about whether to remain in or opt out of the settlement. Moreover, the settlement's provisions of medical monitoring provide the mechanism to inform class members of their injury status.

In addition, the content of the notice is sufficient to satisfy the requirements of *Rules 23(c)(2) and 23(e)*. The notice package contains a "plain language" description of the settlement and class members' [*120] rights thereunder, in addition to the more traditional class action notice. More generally, the class notice details the nature of the litigation and the right of class members to opt out. It further indicates that those who do not opt out will be bound by a final judgment, that complete information is available in the court files and that any class member could have appeared and been heard at the Fairness Hearing. For the reasons set forth above, the court finds that it has personal jurisdiction over this settlement class, and that the accompanying notice plan comports with the requirements of due process under the *Fifth Amendment* and *Federal Rules of Civil Procedure 23(c)(2) and 23(e)*.

### C. Article III Case or Controversy Requirement

The Brown Complaint was filed for settlement purposes only. Nevertheless, the court's jurisdiction over this settlement class does not violate the Article III case or controversy requirement. Settlement class actions have been held by several courts to present a case or controversy. See *In re Asbestos Litig., 90 F.3d 963, 988 (5th Cir. 1996)*, rev'd on other grounds, *Ortiz v. Fibreboard Corp., 527 U.S. 815, 144 L. Ed. 2d 715, 119 S. Ct. 2295 (1999)*; [*121] *In re Orthopedic Bone Screw Prod. Liab. Litig., 176 F.R.D. 158, 172 (E.D. Pa. 1997)*; *Carlough v. Amchem Prod., Inc., 834 F. Supp. 1437, 1462-66 (E.D.*

*Pa. 1993)*, rev'd on other grounds sub nom., *Georgine v. Amchem Prods., Inc., 83 F.3d 610 (3d Cir. 1996)*, aff'd sub nom., *Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 138 L. Ed. 2d 689, 117 S. Ct. 2231 (1997)*.

This settlement resolves highly contentious litigation that has been conducted in state and federal courts, including this MDL No. 1203, since 1997. See *supra*, at § I.A.. This litigation includes several claims certified in state courts as well as the *Jeffers* action before this court. Based on this litigation background, the court is confident that these claims would have been pursued to trial in the absence of settlement. Class Counsel's choice to file the *Brown* Complaint as the procedural mechanism for bringing this settlement class before the court does not transform this into a "friendly" suit for which there is no jurisdiction. See *Carlough, 834 F. Supp. at 1465* (stating that "looking at the nature of the controversy, [*122] and not the timing of the settlement agreement, it is clear that the plaintiffs and the . . . defendants are true adversaries. . . . [and that] the proposed settlement simply represents a compromise of a genuine dispute"). Thus, the court finds that the *Brown* action meets the case or controversy requirement of Article III of the Constitution.

### D. *Rule 23* Class Certification Requirements

*Federal Rule of Civil Procedure 23* governs class action certification in the federal courts. Under *Rule 23(a)*, four threshold requirements must be met in all class actions: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *Fed. R. Civ. P. 23(a)*. In addition to *Rule 23(a)*'s requirements, parties seeking class certification must meet the requirements of either *Rule 23(b)(1), (2)* or *(3)*. See e.g., *Fed. R. Civ. P. 23(b)(2)* (permitting class actions for declaratory or injunctive relief where the "party opposing the class has acted or refused to act on grounds generally applicable to the class"); *Fed. R. Civ. P. 23(b)(3)* (permitting class actions where common questions of law and fact predominate and where class treatment is superior to other available [*123] methods).

In *Amchem Products, Inc. v. Windsor*, the Supreme Court held that settlement is relevant to class certification. *521 U.S. at 619*. The Court stated that: "confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, see *Fed. R. Civ. Proc. 23(b)(3)(D)*, for the proposal is that there be no trial." *Id. at 620*. Nonetheless, other requirements of *Rule 23*, "those designed to protect absentees by blocking unwarranted or overbroad class definitions-- demand undiluted, even heightened, attention in the settlement context." Id. Importantly, federal courts may not substitute a finding that a settlement is fair under *Rule*

*23(e)*, for a finding that certification is proper under *Rule 23(a)* and *(b)*. See *id. at 621-22* (finding that *Rule 23(e)*'s fairness criteria function as additional requirement to findings under *Rules 23(a)* and *(b)* that class has sufficient unity).

### 1. *Rule 23(a)* Numerosity

*Rule 23(a)(1)* permits class treatment where "the class is so numerous that joinder of all members is impracticable." *Fed. R. [*124] Civ. P. 23(a)(1)*. Potentially six million people nationwide were exposed to Pondimin or Redux (four million Pondimin prescriptions and two million Redux prescriptions). The vast number of class members and their dispersed geographic locales exceeds the threshold for a conclusion that joinder is impracticable. See *Eisenberg v. Gagnon, 766 F.2d 770, 785-86 (3d Cir. 1985)* (holding that 90 geographically dispersed plaintiffs met numerosity requirement); *Lerch v. Citizens First Bancorp., Inc., 144 F.R.D. 247, 250 (D.N.J. 1992)* (stating that "impracticability does not mean impossibility, but rather that the difficulty or inconvenience of joining all members of the class calls for class certification"). Indeed, no objector has disputed that *Rule 23(a)(1)*'s numerosity requirement is met here. Based on the vast size and geographical dispersement of the class, the court finds that *Rule 23*'s numerosity requirement is met.

### 2. *Rule 23(a)(2)* Commonality and 23(b)(3) Predominance

*Rule 23(a)(2)* requires that there are questions of law or fact common to the class. [18] *Fed. R. Civ. P. 23(a)(2)*. *Rule 23(b)(3)* requires that common questions of law or fact predominate [*125] over questions affecting individual class members. The court will treat these requirements together "because 23(b)(3)'s predominance requirement incorporates the commonality requirement" of *Rule 23(a)(2)*. *Georgine, 83 F.3d at 626*. The predominance inquiry "trains on the legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement." *Amchem, 521 U.S. at 623*; see id. (stating that benefits to be gained from settlement's establishment of compensation scheme is not pertinent to predominance inquiry). Common issues need only predominate, not outnumber, individual issues. The Third Circuit has instructed:

> there may be cases in which class resolution of one issue or a small group of them will so advance the litigation that they may fairly be said to predominate. Resolution of common issues need not guarantee a conclusive finding on liability, . . . nor is it a disqualification that

damages must be assessed on an individual basis.

*In re School Asbestos Litig., 789 F.2d 996, 1010 (3d Cir. 1986)* (citations omitted). "Even mass tort cases arising from a common [*126] cause or disaster may, depending upon the circumstances, satisfy the predominance requirement." *Amchem, 521 U.S. at 625.*

18   The commonality requirement is satisfied "if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Baby Neal v. Casey, 43 F.3d 48, 56 (3d Cir. 1994)*; see *Georgine, 83 F.3d at 627* (identifying commonality requirement as low threshold).

Here, there exist several common issues to the class to support a finding of predominance and cohesiveness. With regard to common questions of fact, the diet drugs at issue here are essentially a single product--in that Pondimin and Redux are chemically related--marketed by a single major manufacturer--AHP. In addition, use of the diet drugs spanned a finite and relatively short period of time. Moreover, there is, in general, a common injury type to heart valves, albeit to varying degrees. Moreover, there is a common body of science establishing the [*127] causal connection between the diet drugs and heart valve injuries.

In addition, plaintiffs' claims in this litigation all stem from allegations involving a common course of conduct followed by AHP. See *In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d at 314-15* (agreeing with district court's predominance finding where common interest existed in determining whether defendant's course of conduct was actionable). Plaintiffs' negligence and failure to warn claims will revolve around AHP's conduct and knowledge in developing and marketing Pondimin and Redux. Although there are some individual differences among class members, the common class-wide focus on AHP's knowledge and conduct predominate such that judicial efficiency will be improved through the class mechanism as opposed to relitigating these same issues in a series of individual cases. Furthermore, the class wide need for medical monitoring, as evidenced by the classes certified by this court in Jeffers, and in several state courts throughout the country, establish another concern common to the class. In sum, these common concerns which preexisted the settlement confirm the cohesiveness of [*128] the class.

The instant class is more cohesive than the classes sought to be certified in the asbestos and tobacco litigation arenas. For example, this class is not as "sprawling" as the class rejected by the Supreme Court in Amchem.

Where Amchem involved class members exposed to asbestos in differing ways and through a wide range of different asbestos-containing products, the instant class was exposed to only two diet drugs, which are chemically related, and through a single method of exposure--oral ingestion of the drugs. See *Amchem, 521 U.S. at 624.* Where Amchem involved 20 asbestos defendants, the instant class involves a single manufacturer defendant--AHP. Where Amchem involved a wide variety of injuries including pleural scarring, lung cancer, asbestosis and mesothelioma, the instant class involves essentially a single type of injury--heart valve injury. See *id. at 624.* Additionally, unlike Amchem, the instant class involves one scientific theory of causation.

The instant class also differs from the class decertified by the district court and affirmed by the Third Circuit in *Barnes v. American Tobacco Company, 161 F.3d 127 (3d Cir. 1998)*, [*129] cert. denied, *526 U.S. 1114, 143 L. Ed. 2d 791, 119 S. Ct. 1760 (1999).* In Barnes, the Third Circuit affirmed the decertification of a medical monitoring class involving tobacco litigation due to the presence of too many individual issues. See *161 F.3d at 143.* Where Barnes involved the entire tobacco industry, which manufactured hundreds of different products containing different ingredients, the class here involves a single defendant with essentially a single diet drug product. See *id. at 135.* In Barnes, plaintiffs claimed that defendants manipulated nicotine levels. Thus, nicotine levels in different products at different times became an individual issue destroying class cohesion. See *id. at 144-45.* No such individual issues divide the instant class. Moreover, addiction, an inherently individual issue, worked to further splinter the tobacco class in Barnes. No such individual issue exists with respect to the instant class.

Moreover, when taking the settlement into consideration for purposes of determining class certification, individual issues which are normally present in personal injury litigation [*130] become irrelevant, allowing the common issues to predominate. For example, differences in state law with regard to contributory negligence and comparative fault, learned intermediary doctrine, medical monitoring, punitive damages and the statute of limitations do not destroy class cohesion because the settlement agreement provides for distribution of benefits based on the objective criteria described therein. Similarly, individual issues relating to causation, injury and damage also disappear because the settlement's objective criteria provide for an objective scheme of compensation. The court notes that this is not the same as finding that the benefits of the settlement itself provide a common issue which satisfies the predominance requirement. Rather, the court finds that the common issues that preexisted this settlement--involving a common product,

defendant and course of conduct--when considered in light of the proposed settlement, predominate over any individual issues between class members. [19]

19   With respect to *Rule 23(b)(2)*, although there is no predominance requirement, it is well settled that the class claims must be cohesive and that an analysis of whether individual issues that exist among class members destroy the cohesive nature of the class. See *Barnes, 161 F.3d 127, 142-43 (3d Cir. 1998)*. The court's findings with respect to predominance extend to its finding that this class has the "cohesion" necessary for certification under *Rule 23(b)(2)*.

[*131] **3.** *Rule 23(a)(3)* **Typicality**

*Rule 23(a)(3)* requires the named plaintiffs' claims to be typical of the claims of the class. *Fed. R. Civ. P. 23(a)(3)*. The typicality requirement "is intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." *Baby Neal, 43 F.3d at 57*. The Third Circuit has stated:

"Typicality entails an inquiry whether 'the named plaintiff's individual circumstances are markedly different or . . . the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based.'"

*Id. at 58* (quoting *Hassine v. Jeffes, 846 F.2d 169, 177 (3d Cir. 1988)* (quoting *Eisenberg, 766 F.2d at 786*)). Courts have found that typicality is satisfied where the claims of the class representatives and class members arise from the same alleged course of conduct by the defendant. See *Baby Neal, 43 F.3d at 58* (stating that factual differences "will [*132] not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory"); *Eisenberg, 766 F.2d at 786* (stating that "typical" is not same as "identical").

Here, the claims of the class representatives are aligned with those of the class members. Both the class representatives and class members either ingested the diet drugs over the relatively short time those drugs were available on the market or have a personal or legal relationship with such a class member. Each class member's claim alleges a common defect in the diet drugs and a common course of conduct by AHP with regard to developing and marketing those diet drugs. Thus, the court finds that *Rule 23(a)(3)*'s typicality requirement is satisfied.

**4.** *Rule 23(a)(4)* **Adequacy of Representation**

*Rule 23* requires that the class representatives "will fairly and adequately protect the interests of the class." *Fed. R. Civ. P. 23(a)(4)*. This inquiry encompasses two prongs. First, the adequacy or representation inquiry "tests the qualifications of the counsel to represent the class." *In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 800 (3d Cir. 1995)*; [*133] see *In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d at 312*. Second, the adequacy of representation inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem, 521 U.S. at 625*; see *In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d at 308* (stating that "the key to Amchem appears to be the careful inquiry into adequacy of representation").

*Rule 23(a)(4)*'s adequacy of representation requirement "'tends to merge' with the commonality and typicality criteria of *Rule 23(a)*, which 'serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Amchem, 521 U.S. 626, 117 S. Ct. at 2251 n.20* (quoting *General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 157 n.13, 72 L. Ed. 2d 740, 102 S. Ct. 2364 (1982))*. [20] Several considerations here confirm that the interests of these class members will be fairly and adequately represented. [*134]

20   For this reason, the court's reasoning discussed above with respect to typicality and commonality also apply to its reasoning regarding adequacy of representation.

**a. Qualifications**

Each of Class Counsel and Subclass Counsel satisfy the adequacy of representation requirement as it respects these attorneys' qualifications to represent the class. Class Counsel are Arnold Levin, John J. Cummings, III, Stanley Chesley, Michael D. Fishbein, Gene Locks, Sol Weiss and Charles Parker ("Class Counsel"). (Ex. P-276 at 32.) Each of the Class Counsel are experienced in the conduct of class litigation, mass tort litigation and complex personal injury litigation involving products liability, medical malpractice, drugs and medical devices. Messrs. Levin, Fishbein, Chesley and Cummings served as counsel for the class certified by this court in Jeffers. Messrs. Locks and Weiss served as class counsel in those actions that were certified to proceed as class actions to

recover medical monitoring and other relief [*135] from AHP by Judge Corodemus in New Jersey, by Judge Levin in Pennsylvania and by Judge Freedman in New York. Charles Parker was one of the attorneys for the class certified by Judge Edwards in Texas.

As set forth in the Settlement Agreement, Pretrial Order No. 997 and the Third Amended Complaint, Dianne Nast is counsel for Subclass 1(a), Richard Lewis is counsel for Subclass 1(b), Mark Tanner is counsel for Subclass 2(a), Eric Kennedy is counsel for Subclass 2(b) and Richard Wayne is counsel for Subclass 3 ("Subclass Counsel"). Each of the Subclass Counsel referred to above are highly skilled competent attorneys with substantial experience in mass tort litigation, class actions and complex personal injury litigation involving medical malpractice, products liability, drugs and medical devices. (Ex. P-270 at 7-8; AHP Ex. 626 at 8; AHP Ex. 629 at 17, 116-20; Tr. 5/2/00 at 53-54.) Based on their experience in personal injury litigation, mass tort litigation, class action practice and their involvement in diet drug litigation, the court finds that each of the Subclass Counsel is well qualified to represent his or her respective Subclass. These attorneys were also qualified to make assessments [*136] of the extent to which he or she needed to be involved in the negotiations on behalf of his or her respective subclass in order to protect its interests in connection with any potential or actual antagonism or conflict with the interests of any other subclass.

### b. Conflicts

#### (i) Class Counsel Were Not Disarmed in Their Negotiations.

Both Amchem and Ortiz caution against any "side agreements" or "inventory settlements," where class counsel negotiate a separate settlement of their individual cases, contingent upon the success of the global settlement. See *Ortiz, 527 U.S. at 852-53* (stating that prospect of inventory settlements provides great incentive to reach any agreement in global settlement negotiations rather than best possible arrangement for global settlement class); *Amchem, 521 U.S. at 627-28* (agreeing with Third Circuit finding that there was no assurance in terms of settlement or structure of negotiations that named plaintiffs operated under proper understanding of their representational responsibilities); *Georgine, 83 F.3d at 630* (noting objectors' argument that class counsel cannot adequately represent [*137] class where their separate inventory settlements are contingent upon successful resolution of global settlement). With regard to the instant class, it is clear from the evidence introduced at the Fairness Hearing that there were no side deals or inventory settlements entered into by Class Counsel. (Tr. 5/2/00 at 41 & 58-61.)

Neither were Class Counsel disarmed by a lack of leverage in their negotiations. In Amchem, the Supreme Court rejected the notion that in a settlement class context, a fairness inquiry under *Rule 23(e)* could eclipse the certification requirements under *Rules 23 (a) & (b)*. *Amchem, 521 U.S. at 621*. The court held that such an approach would disarm both class counsel and the court. Id. The Court stated that "class counsel confined to settlement negotiations could not use the threat of individual litigation to press for a better offer, . . . and the court would face a bargain proffered for its approval without the benefit of adversarial investigation." Id. (citations omitted). Here, Class Counsel were armed with leverage in their negotiations, including the threat of imminent and ongoing litigation. By the time settlement negotiations [*138] were underway, thousands of individual personal injury and medical monitoring suits were proceeding through discovery and toward trial. Several other class actions were certified in the states and before this MDL No. 1203 transferee court. Also, the class action medical monitoring trial in New Jersey was underway. Thus, throughout the negotiations, Class Counsel were able to use the threat of present and continuing litigation as a bargaining chip in reaching the best possible deal they could achieve for the class.

#### (ii) There are No Improper Allocations or Trade-Offs Involved.

The settlement classes in Amchem and Ortiz failed in part because they suffered from disabling intraclass conflicts. In Amchem, the Supreme Court detected an intraclass conflict between those class members with immediate injuries and those class members who were merely exposed to asbestos. The conflict was amplified because some of the exposure-only class members were not even aware of their exposure. In addition, there was a long latency period associated with asbestos diseases. Under these circumstances, the Supreme Court noted that the goal of generous immediate payments for the [*139] currently injured tugged against the goal of ensuring an ample, inflation-protected fund for the future for exposure-only plaintiffs. *Amchem, 521 U.S. at 626*. The Supreme Court found that the terms of the settlement reflected "essential allocation decisions designed to confine compensation and to limit [the] defendants' liability." *Id. at 627*. Specifically, the Supreme Court pointed out that the settlement included no adjustment for inflation, only a few claimants per year could opt out at the back end and that loss of consortium claims were to be extinguished without compensation. Thus, under those

circumstances, the Court held that the settling parties "achieved a global compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected." Id. Unlike Amchem, the named class representatives' interests are closely aligned with those of the class, such that fair and adequate representation of the class is ensured. Specifically: the instant class is not as sprawling as that in Amchem; the "futures" problem that existed in Anchem does not exist here; and the settlement provides for structural [*140] protections which make it fair to bind absent class members here.

**(A) The Class is Cohesive.**

As discussed above, the instant class has a great deal of cohesion in that the class was basically exposed to one substance, manufactured by one defendant over a relatively short period of time and suffers or is at risk of suffering one particular type of injury. See supra, at § II.D.2..

**(B) There Is No "Futures" Problem Similar to the One Encountered in Amchem.**

The instant class does not suffer from the same problems that exposure-only class members suffered from in Amchem. In Amchem, the Court found that class members could not fairly be bound by a settlement where some members were unaware of their exposure to asbestos or where their potential injuries could have a latency period of 30 to 40 years. Here, all class members are aware of their exposure to Pondimin or Redux, which have been off the market since September 1997. In addition, the class members have a diagnosable condition that can be detected through an echocardiogram.

Objectors argue that a "futures" problem similar to that in Amchem exists here because issues regarding the latency [*141] and progression of VHD remain vague. The clinical and epidemiological studies demonstrate--and all the experts agree--that insofar as the use of fenfluramine or dexfenfluramine results in an increased prevalence of valvular regurgitation, that regurgitation is detectable by echocardiogram shortly after the patients discontinue use of diet drugs. Conversely, there is no evidence that the use of the drugs results in any increased risk of regurgitation that is "latent" and not detectable by today's sophisticated echocardiographic technology. (*Ex. P-95 P 42*; Tr. 5/3/00 at 82 & 86; AHP Ex. 613 PP 59-65; AHP Ex. 610 PP 10 & 20; AHP Ex. 611 P 41; Tr. 5/8/00 at 79.)

The absence of a latency period between ingestion of fenfluramine and/or dexfenfluramine and the development of clinically detectable VHD is also confirmed by a number of studies that have followed former fenfluramine/ dexfenfluramine patients for a number of years, either through the use of echocardiograms or comprehensive medical record review. [21] Each of these studies finds that there was no emergence of new disease after some latency period. Moreover, these studies suggest that regurgitation attributable to [*142] diet drug-induced VHD remains stable or regresses in a substantial portion of the exposed population, but that there may be progression of the severity of the disease among a small percentage of those who have developed FDA Positive levels of VHD after being exposed to diet drugs, particularly those who develop moderate or greater levels of regurgitation while taking the drugs. (*Exs. P-95 P 43*, P-118, P-119, P-126, P-153, P-138, P-149, P-172 & P-173.) The studies show that a patient who is diagnosed with mild aortic regurgitation shortly after he or she ceased the use of the drugs is thus more likely to improve than to progress to a more severe level of regurgitation. (Ex. P-172 at Table 4; AHP Ex. 185A; AHP Ex. 587A; Ex. P-126 at 1, Table 1 & Ex. P-149.)

21 The studies that have tracked former fenfluramine/dexfenfluramine patients in this manner and did not find latency or progression--and more often found improvement in patients who had previously been FDA Positive--are as follows: Weissman II Study (Ex. P-172 at Table 4) (no progression or latency observed in comparison of dexfenfluramine patients' echocardiograms taken three to five months after cessation of drugs to echocardiograms of same patients one month after cessation; improvement noted in number of patients who had previously been "FDA positive"); Weissman III Study (AHP Ex. 185A) (comparison of echocardiograms one year after cessation to prior echocardiograms of same dexfenfluramine patients one month after cessation--no progression, additional improvement); Gardin II Study (AHP Ex. 587A) (one year follow-up of patients who had taken fen-phen combination or dexfenfluramine--no progression; improvement in some patients); Hensrud Study (Ex. P-126 at 1, Table 1) (comparison of echocardiograms one year after cessation of use to initial echocardiograms at time of cessation--no progression; improvement in some patients); D. H. Ryan Study (Ex. P-149) (comparison of echocardiograms of same fen-phen patients over twenty-four months following cessation of use at six month intervals--no progression; improvement in about one-third of cases); Davidoff Study (AHP Ex. 121 at 21) (no increased prevalence of aortic regurgitation--and hence no latent effect--among treated patients

who were given echocardiograms four years after their use of fenfluramine, as compared to untreated control patients); Jick Study (P-127 at 1, Table 3) (comprehensive medical record review of 8900 patients identifying only eleven cases of any new evidence of valvular regurgitation, and no surgeries, over five year period after their use of fenfluramine/dexfenfluramine); and Eichelberger Study (P-118) (evaluation of patients who had taken fen-phen combination on long-term basis some fifteen years after they had used drugs-- finding no severe regurgitation, no valve surgeries, and no greater degree of regurgitation than would be expected in such patients).

[*143] The objectors presented no evidence from any study to support the contrary view that such valvulopathy is either latent or that it progresses in most former patients. The absence of any evidence of latent onset of regurgitation or significant progression of regurgitation in former fenfluramine and dexfenfluramine patients is also consistent with both the general observation that progression of valvular regurgitation occurs primarily in patients who already have moderate or severe disease-- but not in patients who have only mild regurgitation--as well as studies with other drugs which are known to cause valvular regurgitation but which cease to do so once a patient stops taking the drug. ( AHP Ex. 613 P 61; Ex. P-95 P 15; AHP Ex. 107.)

All of the experts who testified in this case agreed that fenfluramine, dexfenfluramine and the fen-phen combination do not cause latent valvular regurgitation; that there is no evidence of significant progression among such patients after they cease taking the drugs; and that there has been clear evidence of improvement in the mild regurgitation previously noted in some former patients. No expert testified to the contrary. (Tr. 5/3/00 at [*144] 81-82, 85-86; Ex. P-95 P 43; AHP Ex. 609 P 8; Tr. 5/8/00 at 79; AHP Ex. 613 PP 62-70; AHP Ex. 611 PP 33-40; AHP Ex. 610 P 10.) In sum, as it relates to latency, the "futures" problem present in Amchem is not present here.

### (C) Objections Pertaining to Neurotoxic Injuries.

The Objectors also argue that an improper "allocation" similar to the allocations made in Amchem exists here in that class counsel "agreed to 'fold in' claims for neurotoxic injuries without procuring any benefit for those whose claims were extinguished." (Dunn Proposed Finding of Fact P 82.) A neurotoxic effect occurs where exposure to a potentially toxic substance has caused an organic effect in the brain which is expressed in some abnormal behavior or mood change. (Ex. P-93 at 2-4 of 26.) There is suggestive evidence that fenfluramine, dexfenfluramine and their combination with phentermine cause neurotoxic brain damage in a variety of tests involving animal species. However, there is also a significant degree of controversy in the available literature, with findings depending on the types of animals used, the dosages and routes of administration, the duration of [*145] exposure and the experimental laboratory methods used to detect the changes in neuronal elements. (Ex. P-93 at 3 of 26.) There is also debate as to whether drug induced changes are permanent or transient and whether damaged neurons can sprout anew portions that have apparently "died back" due to toxic effects. Indeed, there is debate about how to define neurotoxicity in these animal models, and whether findings can be generalized to human beings. (Ex. P-93 at 3 of 26.)

In human beings, neurotoxic effects are characterized by disturbances in mood or behavior such as depression, memory defects, and the like. (Ex. P-93 at 2-4 of 26.) Such alterations or disturbances in behavior and mood are common and can result from both organic and non-organic factors including various life circumstances. (Ex. P-93 at 2-4 of 26.) Therefore, in order to determine whether or not exposure to a potentially toxic substance, such as a pharmaceutical product, has caused an adverse psychological outcome or whether the patient's behavioral manifestations are the result of other factors such as life circumstances, it is essential to conduct clinical investigations systematically comparing well defined psychologic [*146] outcomes of interest in a population exposed to a potentially toxic pharmaceutical compound with outcomes in a matched population which has not been exposed to the drug. (Ex. P-93 at 2-4 of 26.)

Despite the fact that the fenfluramine derivatives have been marketed in this country and in Europe since at least the early 1970s, there is very little clinical information concerning any association between the ingestion of fenfluramine derivatives and what might be described as neurotoxic clinical manifestations in human beings. There are episodic case reports of individuals who had disturbances in mood or behavior who have taken fenfluramine derivatives. However, these case reports are "anecdotal" at best and do not provide any credible information from which a reasonable scientist could conclude that diet drugs are neurotoxic. (Ex. P-93 at 4 of 26.)

Significantly, there have been no controlled or systematic studies evaluating the claimed neurotoxic effects of the fenfluramine derivatives. Specifically, there have been no studies comparing defined psychological outcomes in diet drug users with outcomes in a matched population not exposed to such drugs or in the form of studies following [*147] a population of individuals exposed to diet drugs to determine who developed neu-

ropsychiatric symptoms and signs and compare the characteristics of affected and unaffected individuals. (Ex. P-93 at 4 of 26.) There is no reliable scientific evidence that fenfluramine or dexfenfluramine, when given at normal therapeutic doses, is neurotoxic in humans, i.e., causes lasting central nervous system impairment. No expert testified to the contrary. (Ex. P-93 at 3; Dunn LT-160 at 670.)

Although the issue of whether fenfluramine and dexfenfluramine are neurotoxic has been studied for over twenty-five years, the very articles relied upon by objectors acknowledge that, as recently as 1998--after the drugs were no longer on the market--no studies have ever shown any neurotoxic effects in humans. (LT-160 at 669-70.) There have been a number of well-designed clinical studies on fenfluramine and dexfenfluramine--including randomized, double-blind, placebo-controlled studies involving thousands of patients--that included evaluation of potential central nervous system side effects in which there were no significant differences between the subjects who took the drugs and subjects who received placebos [*148] on neuropsychological and psychiatric assessments. (AHP Ex. 559.)

While there were some reports of adverse neurological or psychiatric effects after use of fenfluramine or dexfenfluramine among the millions of people who used them from 1973 to 1997, even the review article cited by the objectors notes that "a causal link cannot be established" because those are individual reports rather than controlled epidemiological studies. Specifically, because neuropsychiatric problems sometimes occur spontaneously in the general population, individual reports cannot establish a cause and effect relationship between the use of fenfluramine or dexfenfluramine and development of neuropsychiatric difficulties. (LT-160 at 669; P-93 at 3.)

All of this data on the neurological effects of both fenfluramine and dexfenfluramine was reviewed by the FDA before 1993 and 1996, when Redux was approved for distribution in the United States. Most notably, in October 1995 the FDA reviewed data submitted by Interneuron on the "neurologic, psychometric, behavioral [and] cognitive data included in 17 controlled clinical trials, of 10 years of post-marketing spontaneous reports and of 55 reports in the published [*149] literature . . . to evaluate the human risk for adverse psychologic, neurologic or psychiatric effects associated with dexfenfluramine . . . treatment." (AHP Ex. 559.) That review of all the available data showed that "at the clinical dose recommended for the treatment of obesity, dexfenfluramine is safe and well tolerated and is without risk of acute or delayed adverse effects involving the central nervous system." (AHP Ex. 559.) Shortly thereafter, the expert panel convened by the FDA to study this issue recommended that the FDA approve dexfenfluramine for

sale in the United States--and the FDA ultimately did so. (Tr. 5/11/00 at 51; AHP Ex. 559.) In the absence of such studies, it is not possible to establish that exposure to the fenfluramine derivatives resulted in the development of neuropsychiatric symptoms or signs in any human beings. (Ex. P-93 at 4 of 26.)

The Settlement Agreement does not provide any benefits for neurotoxic injuries alleged to result from ingestion of Pondimin and Redux. However, claims for neurotoxic injury are "settled claims" such that class members release and discharge these claims in the event they have not exercised their initial opt-out right by March 30, 2000. (Ex. [*150] P-3 at 17-18 of 148.)

In this regard, the colorful, consumer oriented notice which was sent to class members stated:

> Some people believe that a very subtle kind of brain damage - neuropsychiatric or neurotoxic injury - may be caused by the use of Pondimin and/or Redux. However, the question of whether such brain injury can occur as a result of diet drug use is controversial. Also, there are presently no published clinical studies that show that people who took Pondimin or Redux have any brain injury as a result. The settlement provides no benefits for such neuropsychiatric or neurotoxic injuries. If you do not opt-out of the settlement, you will not be able to pursue in Court any claim for neuropsychiatric or neurotoxic injury.

(Ex. P-211 at 14; Ex. P-15 at 13 of 14.) In light of this clear statement and in light of the fact that there is absolutely no clinical evidence that Pondimin or Redux cause neuropsychiatric injury, class members who have not exercised an initial opt-out right have properly relinquished any claim for neurotoxic or neuropsychiatric injury against AHP and the AHP Released Parties.

### (D) Structural Protections.

The settlement provides for [*151] structural protections that were absent in Amchem. To the extent that some class members can be characterized as "futures" because their existing injuries may progress over time, they are protected by the settlement in that they may "step up" to higher amounts of compensation on the matrices as their level of disease progresses. In addition, unlike Amchem, there are no case flow maximums designed to limit defendants' payments. See *Amchem, 521 U.S. at 604.* Also, unlike Amchem, the settlement matrices here are indexed for inflation. See *id. at 604.* More-

over, the settlement's fraud prevention mechanism protects against fund depletion.

Most importantly, unlike Amchem, where only a small number of class members per year had the opportunity to reject the settlement and pursue their claims in court, the instant class has several meaningful opt out rights accompanied by protections against statute of limitations and claims splitting defenses. [32] See *Amchem, 521 U.S. at 604-05*; see supra, at § I.F.2.g.. The centrality of the medical monitoring relief sought by the class enhances these opt out rights by allowing class [\*152] members to make an informed choice about whether to remain in the settlement or pursue their claims in court.

> 22   Under the Settlement, class members who exercise an intermediate or back-end opt out are prohibited from seeking punitive or multiple damages. In return, AHP has given up its right to assert statute of limitations and claims-splitting defenses. Objectors argue that this represents an inappropriate trade-off. This argument is illusory.
>
> First, class members had an opportunity to preserve their punitive damages claims by exercising the initial opt out. Second, the Settlement's provisions prohibiting AHP from asserting statute of limitations and claim-splitting defenses serve to protect the class against some of the main risks they face toward recovery. Many class members might be barred from filing suit, "given that there were only about 18,000 claims filed out of six million people as of the time" the Settlement was negotiated. (Tr. 5/2/00 at 196-97.) Statute of limitation defenses could also have the effect of requiring class members to bring suit before determining the state of their health. Id. Last, punitive damage claims are often illusory. See *Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 346 (4th Cir. 1998)* (stating that award of punitive damages is always "necessarily uncertain"); *Haynes v. Logan Assistance Corp., 1994 U.S. Dist. LEXIS 2510*, No. Civ.90-1800, 1994 WL 66701, at *19 (E.D. Pa. March 4, 1994) (stating that even where jury awards punitive damages, "it is always speculative as to how much a jury will award in punitive damages"). Moreover, in the case of punitive damage awards, which are intended to punish the defendant, plaintiffs run the risk that a defendant may have already been punished enough, thus barring any further award of punitive damages. See *Dunn v. Hovic, 28 V.I. 467, 1 F.3d 1371, 1388 (3d Cir. 1993)* (en banc) (finding arguments against multiple punitive damage awards "powerful"); *In re School Asbestos Litig., 789 F.2d 996, 1005 (3d Cir. 1986)*

(stating that "as a matter of constitutional law or substantive tort law, the courts should shoulder some responsibility for preventing repeated awards of punitive damages for the same acts or series of acts"); In re "Agent Orange" *Prods. Liab. Litig., 100 F.R.D. 718, 728 (E.D.N.Y. 1983)* (stating that, in theory, "when a plaintiff recovers punitive damages against a defendant, that represents a finding by the jury that the defendant was sufficiently punished for the wrongful conduct" and that "there must, therefore, be some limit either as a matter of policy or as a matter of due process, to the amount of times defendants may be punished for a single transaction").

Consequently, courts have approved settlements even where some plaintiffs might have recovered additional punitive damages. See *Petrovic v. Amoco Oil Co., 200 F.3d 1140, 1150 (8th Cir. 1999)* (finding that speculative possibility of punitive damages was not enough to find that district court abused its discretion in approving settlement). In sum, the court finds that Class Counsel's agreement to waive punitive damage claims on intermediate and back-end opt outs in exchange for protection against statute of limitations and claim-splitting defenses represents a fair and wholly appropriate trade-off. These provisions do not represent an improper allocation, nor do they affect the procedural fairness of the settlement.

[\*153]

### (E) There Have Been No Lump Sum Allocations or Financial Trade-Offs.

In Ortiz, part of the fund of the settlement was comprised of an insurance policy that covered the defendant for pre-1959 asbestos claims. See *Ortiz, 527 U.S. at 850.* However, the proposed settlement class included those exposed to the defendant's asbestos products both before and after 1959. See *id. at 857.* Class counsel used those insurance assets, which should have benefitted only the pre-1959 claimants, to cover the post-1959 claimants as well. See id. The Supreme Court found that this type of allocation decision-- where class counsel was forced to allocate a lump sum among different class members-- represented an intraclass conflict that revealed the lack of structural protection for the class as required by *Rule 23(a)(4).* Unlike Ortiz, Class Counsel here has not been forced to allocate a lump sum amongst different class members. See supra, at § I.B. (describing settlement negotiations).

The Objectors have pointed to several documents to support their position that allocations were made in achieving this settlement. [23] The Objectors point to [*154] a July 3, 1999 letter from Class Counsel to AHP setting forth a "term sheet" of Class Counsel's proposal for settlement that set out $ 4,243,000,000 as the total cost of their June 1 settlement proposal. (Dunn Ex. 20 at 14-15.) The Objectors characterize this term sheet as Class Counsel's request to AHP for a lump sum. However, the evidence introduced at the Fairness Hearing does not support that characterization. In fact, the July 3 letter merely quantifies the amounts AHP would be required to pay for the separately negotiated benefits.

> [23]   At the Fairness Hearing, the Objectors did not attempt to impeach Mr. Fishbein's testimony regarding the style of the negotiations. In fact, they did not present him with a document, fact or circumstance suggesting that lump sum demands or trade-offs occurred.

The Objectors also point to plaintiffs' economist's estimates of the amount it would cost to provide matrix benefits, a document representing AHP's estimate of the amount which would cost to provide all benefits under [*155] the agreement, a spread sheet proposing a schedule of periodic payments to provide the benefits and a document showing the position of the parties on various issues at one point during the negotiations. (Dunn Exs. 99, 188, 189, 101, 118, 191, 187 & 117.) Each of these documents is consistent with the unimpeached testimony of Mr. Fishbein that the parties reached an agreement on what benefits would be provided to class members, without an allocation being made, before an assessment of the aggregate amount necessary to pay for those benefits was made. In sum, the Objectors have not shown that any intra-class financial trade-offs were made in these negotiations. The court finds that these documents do not support the Objectors' view, but instead confirm the style of negotiations as set forth in the testimony of Class Counsel Michael D. Fishbein, Esquire.

**(F) Issues Involving Subclasses and Subclass Counsel.**

The Objectors have also argued that the settlement negotiations were conducted almost exclusively by Class Counsel, that Subclass Counsel's involvement in the negotiations was negligible, that the class representatives played no role in the negotiations and that Class Counsel [*156] "allocated" benefits between groups of claimants. Initially, these arguments are diluted by the fact that the Objectors were unable to point to any lump sum allocations or intra-class trade-offs, and thus, no disabling conflicts requiring subclassing arose in this instance. The Eighth Circuit's recent decision addressing the propriety of subclasses provides this court with guidance:

> if the objectors mean to maintain that a conflict of interest requiring subdivision is created when some class members receive more than other class members in a settlement, we think that argument is untenable. It seems to us that almost every settlement will involve different awards for various class members. Indeed, even if every class member were to receive an identical monetary award in settlement, the true compensation would still vary from member to member since risk tolerance varies from person to person.

*Petrovic v. Amoco Oil Co., 200 F.3d 1140, 1146 (8th Cir. 1999); In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d at 294-97* (noting that different claims were weighted according to strength and given different benefits accordingly); [*157] *Elkins v. Equitable Life Ins. Co. of Iowa, 1998 U.S. Dist. LEXIS 1557,* No.Civ.A. 96-296- Civ-T-17B, 1998 WL 133741, at *15 (M.D. Fla. Jan. 27, 1998) (stating that "nor is an impermissible intra-Class conflict or antagonism created by [a] settlement" that compensates class members based on the strength of their claim rather than trading off theoretical subgroup's interests "to the benefit of any other theoretical subgroup").

Nonetheless, subclasses were created here as a structural protection to be employed if such a conflict situation arose. With regard to the class representatives, the Objectors' chief complaint is that they were inactive and that three of the five were replaced. In a massive class action, however, "it is counsel for the class who has the laboring oar. The class representatives furnish the factual basis to invoke jurisdiction of the court and provide the outline of the controversy, but the lawyers shape the claims . . . by the compilation of factual and expert testimony and the presentation of . . . evidence." *Goodman v. Lukens Steel Co., 777 F.2d 113, 124 (3d Cir. 1985).* The class representatives are not expected to have detailed knowledge or participate [*158] integrally in complex settlement negotiations. See *Lewis v. Curtis, 671 F.2d 779, 789 (3d Cir. 1982)* (stating that "adequacy of representation test is not concerned with whether plaintiff personally derived the information pleaded in the complaint or whether he will personally be able to assist his counsel"); *Greenfield v. Villager Indus., Inc., 483 F.2d 824, 832 n.9 (3d Cir. 1973)* (stating that "experience teaches that it is counsel for the class representative and not the named parties, who direct and manage these actions . . . [and that] every experienced federal judge knows that any statement to the contrary is sheer sophistry"). Nor does replacement of class representa-

2000 U.S. Dist. LEXIS 12275, *

tives destroy adequate representation of the class. See e.g., *Kremens v. Bartley, 431 U.S. 119, 134-35, 52 L. Ed. 2d 184, 97 S. Ct. 1709 (1977)* (remanding action to district court, for, among other things, substitution of class representatives with live claims); *Schlick v. Penn-Dixie Cement Corp., 551 F.2d 531, 533 (2d Cir. 1977)* (recognizing court's ability to substitute class representative if it finds named plaintiff "to be in a conflicting [*159] or untenable position either for the conduct of the trial or settlement").

With regard to subclass counsel, the Objectors' chief complaint is that they were not sufficiently involved and adversarial in negotiations. Subclass counsel are deemed adequate where they are competent and have no interest that conflicts with the class they represent. See *Amchem, 521 U.S. at 625-26*; *In re Prudential Ins. Co. Sales Practices Litig., 148 F.3d at 312*; *In re GM Motors Corp. Pickup Truck Fuel Tank Prods. Liab. Litig., 55 F.3d at 800*; *Barnes, 161 F.3d at 141*. Nothing in *Rule 23* requires that subclass counsel fight among one another or attend every negotiation session in attempting to work out a global resolution.

Initially, the court finds that each of Subclass Counsel is competent and experienced in handling class actions and mass tort litigation. (AHP Ex. 639 at 7-16; AHP Ex. 627 at 6-12; AHP Ex. 637 at 7-9; AHP Ex. 626 at 7-8, 16-17, 21 & 23-24; Ex. P-270 at 7-11.) In addition, Subclass Counsel have no disabling conflicts of interest that prevent them from serving as Subclass Counsel. Last, their participation in the negotiations [*160] satisfies their fiduciary obligation to protect the interests of the subclasses they represent. Subclass Counsel began serving in that capacity in late July or early August 1999. (Ex. P-270 at 15-16 & 123; Tr. 5/2/00 at 54-55.) From the point in the negotiations where the parties decided to create subclasses, Subclass Counsel agreed to serve. By late July, prior to the signing of the MOU, Eric Kennedy, Dianne Nast and Richard Lewis had agreed to serve. As the subclass structure was in a nascent stage, Ms. Nast and Mr. Lewis were initially asked to represent those persons who had not received echocardiograms (and those who were not diagnosed FDA Positive), and Mr. Kennedy was asked to represent those who had been diagnosed FDA Positive. This was an appropriate division of responsibilities. These three Subclass Counsel actively participated in the negotiations in late July and early to mid-August prior to the submission of the MOU that led to the current subclass structure and basic compensation scheme. In fact, all three testified that well before they met with members of AHP's defense team in late July or early August 1999, they had numerous discussions with the PMC about the settlement [*161] and what they thought it should include. At meetings among Class Counsel, Subclass Counsel and AHP during late July and early to mid-August, the subclass definitions were refined and the benefits surrounding the fundamental distinctions were solidified. Soon thereafter, Mark Tanner and Richard Wayne were selected to be Subclass Counsel. At this point: Ms. Nast represented Subclass 1(a), Mr. Lewis represented Subclass 1(b), Mr. Tanner represented Subclass 2(a), Mr. Kennedy represented Subclass 2(b), and Mr. Wayne represented Subclass 3. (AHP Ex. 629 at 132; AHP Ex. 627 at 35-37 & 39-40; AHP Ex. 630 at 24 & 31-32; AHP Ex. 626 at 34 & 37.)

These Subclass Counsel assisted in negotiating one of the key elements of the Settlement Agreement--the duration of use that would distinguish group "a" from group "b," which impacted the benefits that persons would receive under the settlement. In addition, the distinction between persons who had been diagnosed with FDA Positive valvular regurgitation by September 30, 1999, and persons who had not been so diagnosed by that date was also successfully negotiated with the assistance of Subclass Counsel. Finally, in September of 1999, when plaintiffs [*162] believed that the parties were coming close to agreement, a draft of the MOU was circulated to Subclass Counsel for their comments. Subclass Counsel commented on that draft, and the individuals who were directly involved in the negotiation with AHP at that point took direction from Subclass Counsel and made sure to obtain their approval regarding the remaining details of the agreement. (AHP Ex. 633 at pp. 24-25 & 48; AHP Ex. 630 at 42-43; AHP Ex. 629 at 133-35; Ex. P-270 at pp. 21-22.)

In sum, the court finds a sufficient amount of involvement by Subclass Counsel. Although some Subclass Counsel were less active than others, this alone does not cause the court to find that Subclass Counsel shirked their obligations to the subclasses they represented.

### (G) Attorneys' Fees.

Objectors assert that Class Counsel negotiated their attorneys fees simultaneously with the class, that they reached a deal to divide the fee among themselves, that lead counsel used their leverage to coerce Subclass Counsel to go along with the settlement, that the settlement does not provide for a mechanism to award fees and that the Agreement does not provide a separate fee structure for Subclass Counsel. [*163] (Dunn Proposed Conclusions of Law PP 21-24.) Objectors argue that, thus, Class Counsel and Subclass Counsel had a conflict in that they were economically motivated to simply enact a global settlement and share in the $ 429 million pot of attorneys' fees that AHP agreed to provide. Objectors' assertions are off the mark.

First, the court determines whether and to what extent Class Counsel are entitled to fees for services performed in generating a common fund. In the Third Circuit, common benefit fees are appropriately determined by both a Lindy approach and a percentage of the fund approach. See Report of the Third Circuit Task Force, "Court Awarded Attorneys' Fees", *108 F.R.D. 237, 255 (1985)*; *In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d at 333* (stating that it is sensible to use both Lindy approach and percentage approach as "crosscheck"); *GM Trucks, 55 F.3d at 820* (same). Also, Class Counsel may agree to limit the amount of fees awarded by the court or negotiate with defendants to create a separate fund for the payment of attorneys' fees to be awarded by the court and it is permissible for counsel to [*164] do so prior to the conclusion of negotiations regarding the benefits of the settlement itself. See *Ashley v. Atlantic Richfield Co., 794 F.2d 128, 138 (3d Cir. 1986)*.

Here, while Class Counsel reached an understanding among themselves with regard to the relative contributions made by attorneys, they did not make a deal to split fees. The determination of fees is for the court. Also, it is clear that Class Counsel did not make a deal with AHP for the payment of attorneys' fees. The $ 200 million fee cap on Fund A was negotiated after the benefits for Fund A were determined. (Tr. 5/2/00 at 88.) With regard to Fund B, Class Counsel voluntarily agreed to limit their fee request to a maximum of 9% of the value of Fund B. (Tr. 5/2/00 at 95-97.) Last, there is no evidence that lead counsel possessed any leverage with regard to counsel fees which would allow them to pressure Subclass Counsel into acceding to the terms of the settlement. In fact, such a suggestion ignores the fact that it is the court that controls the award of attorneys' fees. In sum, the cap on fees provided for in the Settlement Agreement does not constitute a disabling force upon Class or Subclass Counsel [*165] which destroys their ability to adequately represent the class.

### 5. Rule 23(b)(2)

A class action is maintainable under *Rule 23(b)(2)* when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." *Fed. R. Civ. P. 23(b)(2)*. Subsection (b)(2) class actions are "limited to those class actions seeking primarily injunctive or corresponding relief." *Barnes v. American Tobacco Co., 161 F.3d 127, 142 (3d Cir. 1998)* (quoting 1 H. Newberg, Newberg on Class Actions, § 4.11, at 4-39). Plaintiffs here seek "equitable, injunctive and declaratory relief" to create a court-supervised fund to provide medical screening, medical services, medical research and education, and a medical/legal registry to assure that Diet Drug Recipients receive prompt and proper diagnosis and treatment of Diet Drug induced health problems. (Ex. P-2 PP 2, 31-34 & 87-95.) Establishment of a court-supervised program through which class members would undergo periodic medical examinations in order to promote early detection of [*166] diseases is a "paradigmatic request for injunctive relief." *Barnes v. American Tobacco Co., 161 F.3d at 132*.

The Third Circuit examined the medical monitoring remedy in Barnes and articulated the following elements for recovery: (1) plaintiff was significantly exposed to a proven hazardous substance through the negligent actions of the defendant; (2) as a proximate result of exposure, plaintiff suffers a significantly increased risk of contracting a serious asymptomatic disease; (3) that increased risk makes periodic diagnostic medical examinations reasonably necessary; (4) monitoring and testing procedures exist that make the early detection and treatment of the disease possible and beneficial; and (5) a reasonable physician would prescribe a monitoring regime different than the one that would have been prescribed in the absence of that particular exposure. *Barnes, at 138 n.10* (citing *In re Paoli Railroad Yard PCB Litig., 916 F.2d 829, 852 (3d Cir. 1990)*; *In re Paoli Railroad Yard PCB Litig., 35 F.3d 717, 788 (3d Cir. 1994)*). These legal requirements correspond with various public health criteria identified in the hearing [*167] testimony by Troyen Brennan, J.D., M.D., M.P.H. as prerequisites for implementing a medical monitoring program: (1) asymptomatic progression of disease following toxic exposure; (2) the existence of a test with high sensitivity; (3) exposed population with relatively high prevalence; (4) the test has a high predictive value; (5) the test is relatively low cost; (6) monitoring is capable of integration into standard clinical follow-up of those with disease; (7) monitoring should allow early preventive care; and (8) monitoring should allow appropriate timing of definitive care. (Tr. 5/3/00 at 80-104.) The legal and medical requirements are met here. Integration of these elements into the settlement between the parties demonstrates the important public policy and public health objectives achieved by this settlement.

The same public policy objectives are often poorly served by tort litigation. As Dr. Brennan explained, the tort system often fails to accurately identify injured individuals. The economics of tort litigation means that intervention can only occur after a litigant has already sustained an injury. There are no incentives for the tort system to screen asymptomatic individuals, [*168] since such persons generally have limited compensation rights. Medical monitoring, on the other hand, suits public health goals of prevention and early treatment, because it seeks to preserve health and prevent injury rather than

maximize damages, thereby ameliorating the harsh dynamics of an injury-compensation based tort system. Equally important, in the context of a class action settlement achieved in the midst of an ongoing public health emergency, medical monitoring allows for informed choice about medical and legal options.

### 6. *Rule 23(b)(3)* Superiority

*Rule 23(b)(3)* requires that a class action be "superior to other available methods for the fair and efficient adjudication of the controversy." *Fed. R. Civ. P. 23(b)(3)*. In making a finding under this rule, the court should consider:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; [and] (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum.

Id. As discussed, [*169] the difficulties likely to be encountered in the management of a class action is not a relevant consideration in the class action settlement context. See *Fed. R. Civ. P. 23(b)(3)(D)*; *Amchem, 521 U.S. at 620* (stating that district court need not inquire whether case, if tried, would present intractable management problems). With regard to the interest of class members individually controlling their litigation, the Settlement honors that concern through its multiple opt out rights, which are further enhanced by the information class members can receive about their injury status through the Settlement's medical monitoring provisions. In essence, the combination of medical monitoring and unprecedented opt out rights allows a class member to make informed choices about how to control their own destinies, whether it be through settlement or through litigation. In addition, from the perspective of judicial efficiency, there is a strong desirability in implementing a settlement in this MDL No. 1203 transferee court, the jurisdiction with the most individual and class actions pending.

The Settlement's Accelerated Implementation Option also weighs in favor of superiority [*170] here as it further expands the amount of choice individual class members may exercise through the provisions of the Settlement. Under the AIO, class members may enjoy the benefits under the settlement without waiting for the conclusion and outcome of any appellate process. The AIO presents a unique opportunity in that class members

may accept the benefits of the Settlement without having to await court approval of the class.

Another factor weighing in favor of superiority is that the relief provided in the Settlement would not practically be available in the absence of class treatment. The Fifth Circuit has recognized that the "'most compelling rationale for finding superiority in a class action . . . [is] the existence of a negative value suit.'" *Allison v. Citgo Petroleum Corp., 151 F.3d 402, 420 (5th Cir. 1998)* (quoting *Castano v. American Tobacco Co., 84 F.3d 734, 748 (5th Cir. 1996))*. Negative value claims are claims in which the costs of enforcement in an individual action would exceed the expected individual recovery. Here, the small monetary amount involved with a medical monitoring claim makes an individual claim for monitoring prohibitive [*171] in the absence of class treatment.

Objectors argue that this settlement involves an immature mass tort, and thus, fails the superiority prong of *Rule 23*. See *Castano, 84 F.3d at 746-47* (stating that immature certification dramatically affects the stakes for defendants); see also *Arch v. American Tobacco Co., Inc., 175 F.R.D. 469, 494 (E.D. Pa. 1997)*. Specifically, Objectors assert that because there are only a limited number of verdicts and settlements involving diet drugs, it is more difficult for claimants to assess the reasonableness of the settlement offered here by AHP. Objectors' reliance on the immature tort theory is unpersuasive. In *Castano*, the Fifth Circuit noted the dangers of early certification:

> in the context of mass tort class actions, certification dramatically affects the stakes for defendants. Class certification magnifies and strengthens the number of unmeritorious claims. Aggregation of claims also makes it more likely that a defendant will be found liable and results in significantly higher damage awards.
>
> In addition to skewing trial outcomes, class certification creates insurmountable pressure on defendants to [*172] settle, whereas individual trials would not.

*Castano, 84 F.3d at 746*. Here, none of these concerns are present. In fact, it appears that the objectors have turned the immature tort argument--typically a defense theory against certification--on its head.

In addition, the science underlying this litigation is sufficiently mature. While superiority concerns may exist where litigation involves a novel legal theory or where injuries have a considerable latency period or where there is inadequate evidence to support liability, causa-

tion and damages, none of those concerns exist here. In that regard, Objectors' views of the science are refuted by the record developed at the Fairness Hearing with regard to the following topics: progression, latency, severity of injury, duration of exposure, tricuspid claims, neurotoxicity claims and PPH claims.

#### a. Progression and Latency

As discussed above, the scientific evidence does not indicate a long latency period or slow progression of VHD. See supra, at II.D.4.b.(ii)(B). Objectors have cited two studies--the Eichelberger and the Fischer studies--in support of their assertion that diet drugs may have a history of slow [*173] progression. (Ex. P-118; Ex. P-119.) Neither of these studies support Objectors' arguments. In fact, the exact conclusion of the Eichelberger study was that:

> the prevalence and severity of fenfluramine/phentermine associated valvulopathy fifteen years after exposure is similar to published reports of patients with recent exposure, suggesting a lack of significant regression or progression of valvulopathy over the time period examined. Most patients have only mild regurgitation associated with the aortic valve, and no patient in this study developed significant valvular complications.

(Ex. P-118.) Likewise, the Fischer study concluded that "in a subset of patients with FDA defined clinically relevant valvular regurgitation, there does not appear to be progression off anorexic agents." (Ex. P-119.)

Objectors have also cited to the Jick study and asserted that VHD may emerge years after ingestion because that study reported that four of 8900 patients evaluated were not clinically diagnosed with regurgitation until a few years after they had taken the drugs. (Ex. P-127.) This study does not support Objectors' views of the evidence. The Jick Study focused on VHD detected [*174] in clinical practice based upon the presentation of symptoms. The study did not employ echocardiography in evaluating the exposed population. All of the experts who testified at the Fairness Hearing agreed that echocardiography can accurately diagnose diet drug induced VHD substantially before it progresses to the point of producing symptoms. (Ex. P-95 P 9 & 12; AHP Ex. 613 P 6; AHP Ex. 610 P 11.)

#### b. Severity of Injury

Objectors argue that FDA positive is not the appropriate benchmark for clinically significant VHD. They cite to the Kahn Study, which detected trace aortic valve

insufficiency in some patients, suggesting that FDA thresholds for may be too high to detect all valvular damage. (Dunn LT 81 at 717.) However, studies performed since the Kahn study and introduced into this record demonstrate that increased incidence of non-FDA positive levels of valvular regurgitation disappear within six months after exposure to the drugs. (Ex. P-172 at 1 of 8; Ex. P-173 at 2 of 23; AHP Ex. 587A; Ex. P-126 at 1, Table 1; Ex. P-149; AHP Ex. 609 P 8; Tr. 5/8/00 at 79; AHP Ex. 613 PP 62-70; AHP Ex. 611 PP 33-40; & AHP Ex. 610 P 10.) [*175]

#### c. Duration of Exposure

At least six experts testified in person or by declaration that individuals who took diet drugs for less than three months did not have an increased risk of FDA positive levels of regurgitation. (Tr. 5/3/00 at 93-96; Tr. 5/8/00 at 24; AHP Ex. 609 P 8; Tr. 5/8/00 at 78-79; AHP Ex. 611 P 17; and AHP Ex. 610 P 10.) Despite the evidence introduced at the Fairness Hearing as discussed above, the Objectors argue that 60 days of diet drug exposure is an inappropriate benchmark for settlement benefits. This argument is without merit.

First, the Objectors cite to the PMC's response to a paper AHP submitted to the FDA which pointed out that there was a "higher prevalence of VHD reported with exposures [to diet drugs] as brief as one month." (Dunn Proposed Findings of Fact PP 93 & 96.) Although this is true, it is also true that there is no increased prevalence of FDA regurgitation in individuals who used diet drugs for less than three to six months and that the increase in non-FDA levels of regurgitation manifested for short term users disappears within six months to one year after cessation of diet drug use. (Tr. 5/3/00 at [*176] 93-96; Ex. P-90 P 5; Tr. 5/8/00 at 24; Ex. P-122; AHP Ex. 587A; Ex. P-115; Ex. P-228; Ex. P-170; Ex. P-172; & Ex. P-173.)

Second, Objectors cite to the Biswas report, which involved a single patient. (Dunn Proposed Finding of Fact P 93.) Such anecdotal evidence is insufficient to support an inference about increased risk. Third, Objectors cite to a study by Dr. Jick. Id. However, this study caused Dr. Jick, as well as every other expert who reviewed that study, to conclude that individuals who used diet drugs for less than three months were not at increased risk of VHD. (Ex. P-128 at 2-3; Tr. 5/3/00 at 112-14.) Fourth, the Objectors cite to Dr. Goodman's declaration stating that the duration-response relationship of diet drugs is an "open scientific question." (Ex. P-90 P 5.) However, Objectors ignore Dr. Goodman's declaration that "if there is an excess risk in the class of persons with less than 60 days of exposure, it is likely to be substantially smaller" and that there is a "scientifically justifiable separation of individuals into different classes with

regard to the strength of evidence for causation and with regard to screening practices." Id. Last, Objectors point [*177] to the fact that a one-month cut-off date was used to define the class in Jeffers. However, the one month cut-off used in Jeffers has no evidentiary significance. That certification decision was made without the benefit of scientific studies that have been published over the last year showing that a thirty day cut-off period was too short.

### d. Injury to the Tricuspid Valve

Objectors further argue that there are indications that diet drugs may also affect the tricuspid valve. (Dunn Proposed Finding of Fact P 97.) In support, Objectors cite to the Connolly Study, a case series involving 24 patients which detected some tricuspid regurgitation in patients. However, there was no confirmation that such tricuspid regurgitation was caused by the same kind of stuck-on plaques that characterize diet drug induced VHD. (Ex. P-113 at Table 1.) On the other hand, at least four epidemiologic studies confirmed that fenfluramines did not produce an increased risk of tricuspid regurgitation. (Ex. P-170; Ex. P-115; Ex. P-111; & Ex. P-122.) In keeping with these studies, several experts offered opinions that diet drugs did not pose an increased risk of tricuspid regurgitation. ( AHP Ex. 611 P 18.) [*178] The Objectors did not attempt to prove otherwise through cross-examination or direct testimony.

### e. Neurotoxicity

The court has already discussed the science with regard to neurotoxicity. See supra, at II.D.4.b.(ii)(C). Although the neurotoxicity hypothesis has been advocated for several years, no evidence suggests that the drugs are neurotoxic in humans.

### f. PPH

The Objectors argue that the definition of PPH in the Settlement Agreement precludes individuals who have non-cardiac related secondary causes of pulmonary hypertension (such as collagen vascular disease) from pursuing PPH claims against AHP if they manifest pulmonary hypertension as a result of taking diet drugs. (Dunn Proposed Findings of Fact PP 101-03.) This is a misreading of the Settlement Agreement. Under the definition of PPH in the Settlement Agreement, a person with pulmonary hypertension which is not related to left-sided VHD, obstructive lung disease or pulmonary embolism has the right to make a claim against AHP for PPH provided that a board certified cardiologist or pulmonologist determines that diet drugs were the cause of the person's pulmonary hypertension. (Ex. P-3 at 14 of 148.) Thus, [*179] the Agreement does not foreclose those with secondary causes of pulmonary hypertension from mak-

ing claims that they developed pulmonary hypertension as a result of taking the drugs.

### g. Summary

The Objectors assert that there are a number of scientific uncertainties that undermine the superiority of this class action settlement. Nonetheless, several scientific experts testified otherwise at the Fairness Hearing. The Objectors did not cross-examine these witnesses, challenge their credentials, or question the studies that they argue are contrary to the experts' views. Moreover, the Objectors neglected to offer any expert testimony of their own. Instead, they offer their own interpretation of studies, absent any expert explanations supporting these interpretations. Under these circumstances, the court is satisfied that the scientific state of this litigation is not so underdeveloped as to destroy the superiority of class treatment under Rule 23.

In conclusion, and for the reasons discussed above, the court finds that this proposed class meets the requirements of Rule 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure and that the "proposed class has sufficient [*180] unity so that absent members can fairly be bound by decisions of class representatives.'" In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d at 316 (quoting Amchem, 521 U.S. at 621).

### E. Rule 23(e) Fairness Requirements

As a separate inquiry, the court must determine the fairness of any class action settlement. Fed. R. Civ. P. 23(e). Where the parties simultaneously seek certification and settlement approval, a court should "'be even more scrupulous than usual'" when examining the fairness of the proposed settlement. In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d at 317 (stating that heightened standard ensures that class counsel demonstrate sustained advocacy throughout proceedings and protect interests of class members) (quoting G.M. Trucks, 55 F.3d at 805). In Girsh v. Jepson, 521 F.2d 153 (3d Cir. 1975), the Third Circuit set out the traditional factors to consider in evaluating the fairness of a class action settlement:

(1) the complexity, expense and likely duration of the litigation . . .; (2) the reaction of the class to the settlement . [*181] . .; (3) the stage of the proceedings and the amount of discovery completed . . .; (4) the risks of establishing liability . . .; (5) the risks of establishing damages . . .; (6) the risks of maintaining the class action through trial . . .; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the set-

Case 2:07-cv-15474-PDB-RSW   Document 166   Filed 01/03/11   Page 111 of 158

Page 47
2000 U.S. Dist. LEXIS 12275, *

tlement fund in light of the best possible recovery . . .; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. . . .

*In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d at 317* (quoting *Girsh, 521 F.2d 153 at 157*).

In addition, the Third Circuit has expanded the Girsh factors in the mass tort context to include, when appropriate, a consideration of:

the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and [*182] probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved--or likely to be achieved--for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d at 323.* The court now turns to an examination of these factors.

### 1. Complexity, Expense and Likely Duration of the Litigation.

This factor is "intended to capture the probable costs, in both time and money, of continued litigation." *G.M. Trucks, 55 F.3d at 812* (internal quotations omitted). This court, sitting as the MDL No. 1203 transferee court, has presided over hotly contested discovery and motion practice for over two years. See *supra,* at § I.A. (discussing MDL No. 1203 proceedings). Litigation of these cases would require great time and expense in concluding discovery, obtaining [*183] numerous expert witnesses and in setting trial dates throughout the country. See *supra,* at § I.A. (discussing diet drug litigation in

general). Given the complexity and number of cases involved, this litigation would place a strain on court dockets throughout the nation. Consequently, many plaintiffs could wait substantial periods of time before their cases reach trial. This factor weighs in favor of settlement.

### 2. Reaction of the Class to the Settlement.

This factor must be analyzed by examining the number and vociferousness of the objectors, as well as gauging whether members of the class support the settlement. See *G.M. Trucks, 55 F.3d at 812.* Of the potential class size of six million, over 200,000 class members have already registered for settlement benefits. Approximately 160,000 of those class members have elected the AIO. On the other hand, approximately 50,000 class members have opted out of the settlement and less than thirty objections to the settlement were filed. The court finds that these numbers represent a low number of objectors and strong reaction by the class in favor of the settlement. Thus, this factor weighs in favor of settlement. [*184]

### 3. Stage of Proceedings and Amount of Discovery Completed.

"To ensure that a proposed settlement is the product of informed negotiations, there should be an inquiry into the type and amount of discovery the parties have undertaken." *In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d at 319.* It is appropriate to measure the stage of proceedings either in the class action at issue or in some related proceeding. *G.M. Trucks, 55 F.3d at 813.* As discussed above, litigation in both MDL No. 1203 and in state court proceedings had progressed to a point that allowed those plaintiffs negotiating the settlement to appreciate the merits of their claims against AHP. See *supra,* at § I.A. (discussing progression of discovery and litigation in general). In fact, litigation had proceeded to the point of mid-trial in the Vadino medical monitoring class action in New Jersey. In light of the extensive discovery undertaken in state and federal courts, the court finds that Class Counsel were informed of the merits of this litigation. This factor weighs in favor of settlement.

### 4. Risks of Establishing Liability and Damages

[*185] "The fourth and fifth Girsh factors survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of the immediate settlement." *In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d at 319.* Initially, the court recognizes that "the risks surrounding a trial on the merits are always considerable." *Weiss v. Mercedes-Benz*

2000 U.S. Dist. LEXIS 12275, *

*of N. Am., Inc.,* 899 F. Supp. 1297, 1301 (D.N.J. 1995); see *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 962 F. Supp. 450, 539 (D.N.J. 1997) (quoting Weiss), aff'd, *148 F.3d 283 (3d Cir. 1998).*

Here, the risks of establishing liability and damages are readily apparent. Although the court makes no determination of the merits of the claims of plaintiffs, it notes several obstacles that they would have to overcome:

> . damages for pain and suffering and future medical expenses are often speculative and pose an uncertainty that plaintiffs may be able to prove these damages at trial;

> . while plaintiffs assert that AHP was aware of information confirming the [*186] association between diet drugs and VHD, AHP argues that such information did not indicate such an association and the regulatory agencies including the FDA evaluated similar information and did not perceive the association;

> . based on the studies discussed above, several causation issues pose a risk, especially for class members who used diet drugs for less than three to six months;

> . the scientific complexity of this case is likely to lead to a battle of expert testimony which enhances the unpredictability of a trial outcome. See *In re Warner Communications Sec. Litig.,* 618 F. Supp. 735, 744-45 (S.D.N.Y. 1985) (discussing "virtual[] impossibility" of predicting which testimony will be credited in battle of experts);

> . several class members may face difficulty in establishing present or future damages, such as those who took the drug and are uninjured or have only mild aortic regurgitation, an asymptomatic condition that does not affect a person's ability to function normally;

> . depending on the jurisdiction, other asymptomatic class members may not be able to recover damages; and

> . AHP has asserted several other defenses in individual cases, [*187] including the statute of limitations, claim-splitting, res

judicata, contributory negligence, comparative negligence, pre-existing condition, Daubert challenges to plaintiffs' experts and attacks against plaintiffs' damages evidence.

These risks to establishing liability and damages show that plaintiffs' success at trial can not be guaranteed. Thus, these factors weigh in favor of settlement.

## 5. Risk of Maintaining Class Action Throughout Trial

Under *Rule 23,* the court has authority to decertify a class that proves unmanageable, and thus, there is always a risk that the class may not be maintained throughout trial. *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 148 F.3d at 321. AHP has also represented that it would contest certification if this case proceeds to trial. AHP has also sought review of the Jeffers class and has challenged and defeated class certification in some state court actions. Thus, this factor weighs in favor of settlement. However, the court finds that this factor is insignificant and does not figure prominently in the court's decision. Amchem's directive to take settlement into consideration negated the inquiry [*188] into whether case, if tried, would present intractable management problems. *Amchem,* 521 U.S. at 620. Thus, the Third Circuit has stated that "after Amchem the manageability inquiry in settlement- only class actions may not be significant." *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 148 F.3d at 321.

## 6. Ability of AHP to Withstand Greater Judgment

This factor does not require that the defendant pay the maximum it is able to pay. *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 148 F.3d at 321-22 (finding that defendant's declining credit rating during litigation supported settlement). "Where the ability of the defendant to take a bigger hit is in doubt . . . the courts generally view this as a major factor weighing in favor of the settlement." *In re Chambers Dev. Sec. Litig.,* 912 F. Supp. 822, 839 (W.D. Pa. 1995). Where a defendant has resources to pay a larger judgment, courts often accord this factor little weight. See *G.M. Trucks,* 55 F.3d at 818 (agreeing with district court determination that although defendant could withstand a greater judgment, no significance [*189] would be attributed to this factor); *Lazy Oil Co. v. Witco Corp.,* 95 F. Supp. 2d 290, 318 (W.D. Pa. 1997) (presuming defendants would have resources to withstand greater judgment but according factor little weight in light of risks that plaintiffs would not be able to achieve greater recovery at trial).

Here, AHP has committed a substantial portion of its book value toward this settlement. While the court pre-

sumes that AHP could withstand a greater judgment, it accords little weight to this Girsh factor in light of the attendant risks plaintiffs would face if these cases proceeded to trial. See infra, at § II.F.7. (discussing attendant risks of litigation).

### 7. Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and All the Attendant Risks of Litigation.

"The last two Girsh factors ask whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." *In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d at 322.* Objectors argue that the matrix benefits are substantially below the real world settlement [*190] value in comparison to certain individual settlements reached in the diet drug litigation. This reasoning is flawed. First, this argument incorrectly assumes that all class members will want to pursue the risk of proceeding toward trial. See *id. at 322* (stating that present value of damages must be discounted for risk of not prevailing). Second, variables such as the specific nature of the proceeding, the venue, the skill of attorneys and several other factors render individual settlements or verdicts incapable of direct comparison with the nationwide resolution contemplated here. Third, the fact that over 120,000 class members have chosen the AIO option (which, in essence, is a separate agreement with AHP to receive the same benefits as provided for in the Settlement) is a strong indication that the settlement's benefits are within the range of reasonableness.

The court has already noted the other obstacles to plaintiffs' success if the case were to proceed to trial. See supra, at § II.E.4. (discussing risks to establishing liability and damages). While the settlement avoids these risks, it also offers choice. Class members who wish to bear the risks of trial [*191] had an initial opt out right, and may have additional opt out rights in the future. The court finds that the benefits offered here are within the range of reasonableness considering the best possible recovery and all the attendant risks of litigation, and thus, these factors weigh in favor of settlement.

### 8. Remaining Prudential Considerations.

#### a. Maturity of Underlying Substantive Issues as Measured by Experience in Adjudicating Individual Actions.

As discussed above, the discovery conducted in both state and MDL courts has progressed to the point of general "trial readiness" for plaintiffs. See supra, at § I.A. (discussing progression of discovery and litigation). The substantive issues involved here are sufficiently shaped, as seen through the risks of establishing liability and damages as outlined earlier by the court. See supra, at § II.E.4. (discussing risks). This "trial readiness" allowed Class Counsel to negotiate this Settlement from a position of strength. This factor weighs in favor of settlement.

#### b. Development of Scientific Knowledge.

As discussed above, there has been extensive investigation into the relationship between diet drugs [*192] and VHD. See supra, at § I.D. (discussing medical circumstances and scientific issues affecting class). There have been at least thirteen major scientific investigations involving over 12,000 patients. (Tr. 5/11/00 at 69.) In fact, fenfluramine and dexfenfluramine "have been the most extensively studied anorectic drugs of the past 30 years." (Dunn LT-84 at 123.) As stated above, the court finds that the scientific knowledge is sufficiently developed here and that this factor weighs in favor of settlement.

#### c. Comparison of Class Recovery to Individual Claimant Recovery.

For the reasons discussed with regard the eighth and ninth Girsh factors, the court finds this factor weighs in favor of settlement. See supra, at § II.E.7..

#### d. Whether Class Members Have Opt Out Rights.

Class members have multiple and unprecedented opt out opportunities, and thus, this factor weighs in favor of Settlement. See supra, at § I.F.2.g..

#### e. Reasonableness of Attorneys' Fees.

Attorneys' fees under the Settlement are to be fashioned by the court and determined in accordance with prevailing Third Circuit precedent. See supra, at § II.D.4.b.(ii)(F). The [*193] Settlement Agreement provides for a cap on these fees. As the ultimate determination of fees is for the court, this factor is neutral with regard to the Settlement.

#### f. Fairness of Procedure for Processing Individual Claims.

Case 2:07-cv-15474-PDB-RSW   Document 166   Filed 01/03/11   Page 114 of 158

Page 50
2000 U.S. Dist. LEXIS 12275, *

The court has already discussed the provisions of the Settlement Agreement relating to the review, processing and administration of claims by class members. See *supra*, at § I.F.2.a.. These procedures are fair and reasonable for two reasons. First, they precisely define the criteria necessary for a class member to qualify for benefits. For medical monitoring benefits, an intricate network of cardiologists has been established to perform echocardiograms, interpretive visits and additional medical services. With respect to Matrix benefits, claims administrators are essentially bound to accept the certification of a qualified board-certified physician regarding a claimant's medical condition when that certification is accompanied by appropriate information on the claim form. These provisions serve to protect against the insertion of subjective judgment on the part of the claims administrators in making benefits determinations. Second, the audit [*194] and appeal procedures protect against fraud and the misuse of Settlement funds.

### 9. Provision for Joint Tortfeasor Liability.

The Settlement Agreement states that it is the intent of the settling parties that no class member "shall recover, directly or indirectly, any sums for Settled Claims from AHP or any Released Party" in addition to those received under the Settlement. (Ex. P-3 at 121 of 148.) The Settlement Agreement also reflects the settling parties' intent that AHP "shall make no payments" to any non-settling defendant "for any amounts arising out of a Settled Claim" brought by a class member against a non-settling defendant. Id.

The settling parties also agreed that class members "shall reduce any judgments" that class members may obtain from non-settling defendants to the extent necessary to "relieve AHP and the Released Parties of liability for contribution or non-contractual indemnity" to any non-settling defendant. Id. The express terms of the Settlement Agreement further provide that non-settling defendants, at a minimum, retain the set-off or judgment reduction rights to which they are entitled by operation of applicable law. *Id. at 121-22* of 148. [*195] In the event that non-settling defendants' rights are not extinguished by operation of law, a class member who recovers a judgment against such a non-settling defendant "shall reduce his judgment against the Non-Settling Defendant by the amount, percentage, or share of such judgment necessary, under applicable law, to relieve AHP and the Released Parties of liability for contribution or non-contractual indemnity." *Id. at 122-23* of 148.

The Settlement Agreement also expressly incorporates what is known in Pennsylvania as a "Griffin release" and/or known in Wisconsin and elsewhere as a "Pierringer release." In this provision, class members agree that the lack of a judicial determination that the settling defendant is a joint tortfeasor does not preclude non-settling defendants from obtaining set-off or judgment reduction rights they would otherwise have under applicable law in the absence of the Settlement Agreement. (Ex. P-3 at 123-24 of 148 (citing *Griffin v. United States, 500 F.2d 1059 (3d Cir. 1974); Pierringer v. Hoger, 21 Wis. 2d 182, 124 N.W.2d 106 (Wis. 1963)).* The Settlement Agreement states that the settling parties intended [*196] to obviate the need, and eliminate the expense, of having AHP and Released Parties added or remain as parties or participate in trials merely for the purpose of determining if in fact they were joint tortfeasors. The settling parties state in the Agreement that the "Griffin release" and/or "Pierringer release" was incorporated in the Agreement to "facilitate the adjudication" of non-settling tortfeasors' set-off and judgment reduction rights in any verdict. (Ex. P-3 at 123-24 of 148.)

In light of the set-off and judgment reduction rights provided to the non-settling defendants, the Settlement Agreement provides for a bar order to be entered, prohibiting the assertion of claims of contribution or non-contractual indemnity. (Ex. P-3 at 133 of 148.) The Settlement Agreement defines "non-contractual indemnity" as "a right of indemnity based upon the relationship between or conduct of the parties." Non-contractual indemnity includes "a contractual indemnification voluntarily assumed by AHP to the extent AHP would have been liable to such claimant for indemnity in the absence of such contractual indemnification." (Ex. P-3 at 126-27 of 148.)

As further protection for the non-settling [*197] defendants' interests, the settling parties provided a mechanism in the Agreement by which non-settling defendants may apply to the court for relief from the bar order. A non-settling defendant may obtain relief from the bar order when necessary to "protect set-off or judgment reduction rights to which the Non-Settling Defendants would be entitled under applicable law but for the provisions of the Settlement Agreement." (Ex. P-3 at 126 of 148.) These provisions in the Settlement Agreement are taken almost verbatim from the comparable provisions of the settlement agreement approved by this Court in *In re Orthopedic Bone Screw Prod. Liab. Litig., 176 F.R.D. 158, 182 (E.D. Pa. 1997).* As in that case, the "set-off and reduction provisions [in the Diet Drug Settlement Agreement] assure that the non-settling defendants will pay no more than they would have paid had they been able to seek contribution or indemnity." Id.

Non-settling defendant Interneuron Pharmaceuticals, Inc. ("Interneuron") asserts that its substantive state law contribution and indemnity rights cannot be altered by the Settlement Agreement. Initially, the court recognizes that the law "favors [*198] settlement, particularly in class actions and other complex cases where substantial

2000 U.S. Dist. LEXIS 12275, *

resources of the parties and the judiciary can be conserved by avoiding" further litigation. *G.M. Trucks, 55 F.3d at 784.* Consequently, courts have encouraged the use of devices such as bar orders against contribution and indemnity claims. See id.; *Eichenholtz v. Brennan, 52 F.3d 478, 486 (3d Cir. 1995); In re Orthopedic Bone Screw Prod. Liab. Litig., 176 F.R.D. at 181.*

Interneuron argues that the Settlement's contribution and indemnity bar provisions are at odds with the Rules Enabling Act. *28 U.S.C. § 2072(b);* see *Ortiz, 527 U.S. at 845* (stating that no reading of *Rule 23* can ignore the Rules Enabling Act's mandate that "rules of procedure shall not abridge, enlarge or modify any substantive right"); *Amchem, 521 U.S. at 629* (stating that *Rule 23* must be interpreted with fidelity to Rules Enabling Act). Here, however, the Settlement Agreement does not affect any of Interneuron's substantive rights to reduce any liability it might have to a class member through contribution or indemnity [*199] claims. The Settlement Agreement preserves Interneuron's set-off or judgment reduction rights which it has in some jurisdictions, accords it any additional set-off or judgment reduction rights necessary under applicable law in other states to extinguish its claims and, as a fall back, in jurisdictions which would not extinguish such claims, provides that the class member will reduce his or her judgment against Interneuron by the amount, percentage or share of such judgment necessary to relieve AHP of any liability. (Ex. P-3 at 121-23 of 148.) Moreover, if any applicable state law did not permit the parties' intentions to be effectuated, the Settlement Agreement provides that a non-settling defendant may apply to this court for relief from the bar order. Further, the Griffin/Pierringer release provisions make it unnecessary for the non-settling defendant to obtain a determination that AHP was a joint tortfeasor and provide that class members waive any rights they might have against the non-settling defendant, the assertion of which might permit the non-settling defendant to add or retain AHP in the litigation for adjudicating such setoff or judgment reduction rights. [24]

> 24   Interneuron argues that the Griffin/Pierringer release provisions have the effect of altering some of Interneuron's substantive state law rights. In support they cite only to Maine law. See *Petit v. Key Bancshares of Me., Inc., 614 A.2d 946, 947 (Me. 1992)* (holding that order dismissing contribution claims based on Pierringer release cannot be entered over objection of non-settling defendant). However, AHP has represented that it is unaware of any diet drug cases pending in the state courts of Maine or case transferred to this court from federal courts in Maine. (AHP's Objs. to and Comments on Other Parties' Findings of Fact and Conclusions of Law at 28-29.) In addi-

tion, if such a case is brought in Maine, or any other state which did not permit the procedures contemplated by the Settlement Agreement, Interneuron may seek relief from the bar order in this court. The court also notes that recently, the Maine legislature has overruled the decision in Petit. See *2000 Me. Legis. Serv. Ch. 633 (S.P. 630 (L.D. 1795)* (amending 14 *Me. Rev. Stat. Ann. tit. 14, §§ 156 & 163).*

[*200]   Both non-settling defendants Interneuron and Les Laboratories Servier ("Servier") object to the Settlement Agreement's definition of "non-contractual indemnity." They argue that their contractual rights of indemnity would be affected to the extent that they overlapped with non-contractual rights because they would first have to pursue those rights through judgment reduction against class members and only then sue AHP for any additional sums to which they might be entitled. Again, the court finds that the Settlement Agreement does not deprive Servier or Interneuron of any indemnity rights against AHP, but merely transfers financial exposure for such claims to the class members. Indeed, should a particular state law have any other effect, non-settling defendants have the ability to apply to this court for relief from the bar order.

In sum, the Settlement Agreement provides that class members will reduce any judgment obtained against any non-settling defendant to the extent necessary to extinguish any claims the non-settling defendant may have against AHP for contribution and non-contractual indemnity, and that non-settling defendants would be barred from asserting any such claims against [*201] AHP. For the reasons set forth above, the court finds that in doing so, the Settlement Agreement treats the Contribution and Indemnity Claims of Non-Settling Defendants in a fair, adequate and reasonable manner without affecting the non-settling defendants' rights to reduce any liability they might have to a class member.

### 10. Treatment of Subrogation Interests

The Settlement Agreement carefully preserves the rights of subrogees under applicable law. First, and most importantly, the agreement specifically provides that claims by subrogees against AHP and class members can only be barred, released and discharged to the extent permitted by applicable law. (Ex. P-3 at 128 of 148.) Thus, to the extent that any principle of federal or state law does not permit a settlement to preclude the assertion of a subrogation claim without the subrogee's consent, such claims are preserved. (Tr. 5/2/00 at 95; Ex. P-3 at 128 of 148.)

Second, the Settlement Agreement provides a mechanism to adjudicate subrogation claims with respect to Matrix Compensation Benefits. (Ex. P-3 at 96-106 &

128 of 148.) In order to qualify for Matrix Compensation Benefits, class members are required to notify the [*202] Trustees of the identity of any insurer, HMO, government agency, or other third party payor who has paid or provided healthcare benefits related to the conditions which are the basis for the class member's matrix compensation claim. Upon receiving that information, the Trustees are required to contact the putative subrogee and afford it an opportunity to demonstrate to what extent it has a right of subrogation with respect to the class member's claim for Matrix Compensation Benefits. The Trustees are required to adjudicate that claim under applicable law. If either the class member or the subrogee is not satisfied with the Trustee's adjudication of the claimed subrogation right, then there is an opportunity to appeal de novo--first to an arbitrator appointed by the court and then to the court itself. In distributing Matrix Compensation Benefits to class members, the Trustees are required to pay the subrogation claims adjudicated through this process. [25] (Ex. P-3 at 96-106 & 128 of 148.)

> [25] Objectors representing subrogation interests quarrel with the mechanisms established for resolving subrogation claims with respect to Fund B payments. These objectors characterize these mechanisms as inefficient and burdensome. The court, however, has reviewed the provisions in the Settlement Agreement which provide for resolution of subrogation claims and is satisfied that this represents a fair and reasonable treatment of these claims. In fact, the Settlement's subrogation mechanism has certain benefits. In a normal subrogation context, an insurer would have to show that the medical expense paid was incurred to the injury as well as show that the alleged tortfeasor was liable. Here, subrogees are relieved of the burden of showing that AHP engaged in conduct that constituted a basis for liability.
>
> While the subrogee objectors have offered ways to make the process even more convenient for them, the court notes that it does not have the duty to be assured that the Settlement Agreement is carefully tailored to meet subrogation concerns. Instead, the court must evaluate whether the procedures in place represent and fair and reasonable treatment of subrogation interests. The court so finds.

[*203] Objectors representing subrogation interests have made a number of arguments in opposition to the Settlement. The subrogees argue that they have a right of participation in the Settlement negotiations and that the Class Representatives are not typical or representative of the subrogees. However, a right of subrogation is wholly derivative of the subrogees' insureds. The subrogees only "stand in the shoes" of their insureds.

The subrogees also argue that their subrogation rights cannot be released or compromised by their insureds. (Blue Cross Conclusions of Law P 63.) However, the cases cited in support of this proposition state that an insured may indeed release subrogation claims, except in the event that the tortfeasor had notice of the specific subrogation claim at the time of release. See e.g., *Commercial Union v. Blue Cross and Blue Shield of Alabama, 540 So. 2d 1368, 1370 (Ala. 1989)* (stating that "if the tortfeasor has notice or knowledge of the insurer's rights as subrogee at the time the release is executed by the insured, that release will be regarded as subject to the rights of the insurer-subrogee" and that "if, on the other hand, the tortfeasor is [*204] without notice or knowledge of those rights at the time of execution of the release, the release will act as a bar to the insurer-subrogee's claim"); *Home Ins. Co. v. Hertz Corp., 71 Ill. 2d 210, 375 N.E.2d 115, 118, 16 Ill. Dec. 484* (Ill.)(1978) (holding that "an unlimited release executed by an insured-subrogor for consideration not specifically including an amount designated as covering the insurer's subrogation interest does not bar a subsequent subrogation action by an insurer-subrogee against the tortfeasor, if the tortfeasor or his insurance carrier had knowledge of the insurer-subrogee's interest prior to the release"). The Objector subrogees here have not provided notice to AHP of any insureds for whom they claim subrogation rights.

The subrogee Objectors also complain that Fund A has no comparable mechanism for resolving subrogation interests. However, Fund A primarily provides for future medical services to class members. Thus, these subrogees cannot yet claim any interest in such future medical benefits. The subrogee Objectors also claim rights with respect to Fund A's reimbursement of the purchase prices of Pondimin and Redux. AHP argues that a valid [*205] subrogation interest does not arise unless a subrogee's payment was related to personal injury to an insured caused by the tortfeasor. AHP further asserts that the cost of diet drugs was not a payment related to a personal injury caused by AHP, but rather a payment used to treat a pre-existing malady--obesity. The subrogee objectors, however, argue that subrogation is routinely applied to causes of action other than personal injury actions. Without resolving this dispute, the court notes that the subrogation bar order would not prohibit the assertion of a such a claim. See Ex. P-3 at 128-29 of 148 (barring subrogation claims "except to the extent that it would be impermissible to bar such claims under provisions of applicable law").

The subrogee Objectors also argue that the Settlement may not be approved until it knows how much of

the Settlement amounts will go to each insured and how much each insured might owe to subrogees. The court finds that such a task would be nearly impossible and would have the effect of indefinitely suspending the class. Here the class has been informed that subrogation is an issue and that the Settlement seeks to deal with the issue:

> to [*206] the extent that any person has rights of subrogation by virtue of payments made for the benefit of any specific Class Member who has not exercised a right of opt-out, such rights of subrogation may be asserted only with respect to the obligation under the Settlement Agreement to make Compensation Payments from Fund B to that Class Member. Subrogation claims may not be asserted directly against AHP and/or the Released Parties except to the extent required by law. Notice of a subrogation claim will be provided to an affected Class Member, and the Class Member will be given an opportunity to object to the subrogation claim. Subrogation claims will be paid only to the extent that they are recognized by applicable law.

(Ex. P-211 at 10.)

**11. Summary**

In conclusion, upon consideration of the factors set forth in *Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975)* and *In re Prudential Ins. Co. of Am. Sales Practice Litig., 148 F.3d 283 (3d Cir. 1998)*, the court finds this Settlement to be fair, adequate and reasonable. Thus, it will approve this Settlement in accordance with *Federal Rule of Civil Procedure 23(e)*.

**III. CONCLUSION** [*207]

For the reasons set forth above and pursuant to *Federal Rule of Civil Procedure 23*, the court will grant the Joint Motion of the Class Representatives and American Home Products Corporation ("AHP") for an order certifying and approving the nationwide settlement class embodied in the Settlement Agreement entered into between the parties on November 19, 1999.

An appropriate Pretrial Order follows.

**PRETRIAL ORDER NO. 1415**

The court has conducted extensive proceedings to determine whether the proposed class action settlement set forth in the Nationwide Class Action Settlement

Agreement with American Home Products Corporation and Amendments thereto (the "Settlement Agreement") filed with the court in the above-captioned action merits final approval, and if the plaintiff class previously certified by the court in Pretrial Order No. 997 should be confirmed for purposes of effectuating the Settlement. For the reasons set forth in the attached Pretrial Memorandum and upon consideration of all papers filed, all evidence and testimony presented and the presentations and arguments on pertinent issues in the Fairness Hearing Proceedings conducted herein, the court has determined that [*208] the proposed class action settlement should be approved pursuant to *Federal Rule of Civil Procedure 23(e)* as fair, reasonable and adequate.

Accordingly, IT IS ORDERED that:

> 1. The court's findings of fact and conclusions of law are incorporated herein as though fully set forth in this Final Order and Judgment. The definitions and terms set forth in the Settlement Agreement are incorporated herein as though fully set forth in this Final Order and Judgment.

> 2. The court has jurisdiction over the subject matter of this action with respect to all claims, and has jurisdiction over all parties to this action, including all members of the settlement class and subclasses as defined below.

3. The court hereby confirms that this action is properly certified as a class action for settlement purposes, in compliance with the applicable *Rule 23* criteria; and that the settlement merits final approval under the criteria articulated in *Girsh v. Jepson, 521 F.2d 153 (3d Cir. 1975)* and *In re Prudential Ins. Co. of Am. Sales Practice Litig., 148 F.3d 283 (3d Cir. 1998)*, cert. denied sub nom., *Krell v. Prudential Ins. Co. of Am. Litig., 525 U.S. 1114, 142 L. Ed. 2d 789, 119 S. Ct. 890 (1999).* [*209] The settlement class and its subclasses are defined as:

> All persons in the United States, its possessions and territories who ingested Pondimin (R) and/or Redux TM ("Diet Drug Recipients"), or their estates, administrators or other legal representatives, heirs or beneficiaries ("Representa-

tive Claimants"), and any other persons asserting the right to sue AHP or any Released Party independently or derivatively by reason of their personal relationship with a Diet Drug Recipient, including without limitation, spouses, parents, children, dependents, other relatives or "significant others" (Derivative Claimants"). The Settlement Class does not include any individuals whose claims against AHP and/or the AHP Released Parties, arising from the use of Diet Drugs, have been resolved by judgment on the merits or by release (other than releases provided pursuant to this Settlement).

. "Subclass 1(a)" - All Diet Drug Recipients in the Settlement Class (1) who ingested Pondimin (R) and/or Redux TM for 60 days or less, and (2) who have not been diagnosed by a Qualified Physician as FDA Positive by an Echocardiogram performed between the commencement of Diet Drug use and September 30, 1999, and [*210] all Representative and Derivative Claimants in the Settlement Class whose claims are based on their personal or legal relationship with a Diet Drug Recipient (1) who ingested Pondimin (R) and/or Redux TM for 60 days or less, and (2) who has not been diagnosed by a Qualified Physician as FDA Positive by an Echocardiogram performed between the commencement of Diet Drug use and September 30, 1999.

. "Subclass 1(b)" - All Diet Drug Recipients in the Settlement Class (1) who ingested Pondimin (R) and/or Redux TM for 61 or more days, and (2) who have not been diagnosed by a Qualified Physician as FDA Positive by an Echocardiogram performed between the commencement of Diet Drug use and September 30, 1999, and all Representative and Derivative Claimants in the Settlement Class whose claims are based on a personal or legal relationship with a Diet Drug Recipient (1) who ingested Pondimin (R) and/or Redux TM for 61 or more days, and (2) who has not been diagnosed by a Qualified Physician as FDA Positive by an Echocardiogram performed between the commencement of Diet Drug use and September 30, 1999.

. "Subclass 2(a)" - All Diet Drug Recipients in the Settlement Class (1) who ingested [*211] Pondimin (R) and/or Redux TM for 60 days or less, and (2) who have been diagnosed by a Qualified Physician as FDA Positive by an Echocardiogram which was performed between the commencement of Diet Drug use and September 30, 1999, and all Representative and Derivative Claimants in the Settlement Class whose claims are based on a personal or legal relationship with a Diet Drug Recipient (1) who ingested Pondimin (R) and/or Redux TM for 60 days or less, and (2) who has been diagnosed by a Qualified Physician as

FDA Positive by an Echo-cardiogram which was performed between the commencement of Diet Drug use and September 30, 1999.

. "Subclass 2(b)" - All Diet Drug Recipients in the Settlement Class (1) who ingested Pondimin (R) and/or Redux TM for 61 or more days, and (2) who have been diagnosed by a Qualified Physician as FDA Positive by an Echo-cardiogram which was performed between the commencement of Diet Drug use and September 30, 1999, and all Representative and Derivative Claimants in the Settlement Class whose claims are based on a personal or legal relationship with a Diet Drug Recipient (1) who ingested Pondimin (R) and/or Redux TM for 61 or more days, and (2) who has been [*212] diagnosed by a Qualified Physician as FDA Positive by an Echo-cardiogram performed between the commencement of Diet Drug use and September 30, 1999.

. "Subclass 3" (which may include persons also included in Subclasses 1(a) and 1(b)) - All Diet Drug Recipients in the Settlement Class who have been diagnosed by a Qualified Physician as having Mild Mitral Regurgitation by an Echocardiogram performed between the commencement of Diet Drug use and the end of the Screening, but who have not been diagnosed by a Qualified Physician as FDA Positive by an Echocardiogram performed between the com-mencement of Diet Drug use and the end of the Screening Period, and all Representative and Derivative Claimants in the Settlement Class whose claims are based on a personal or legal relationship with a Diet Drug Recipient who has been diagnosed by a Qualified Physician as having Mild Mitral Regurgitation by an Echocardio-gram performed between the commencement of Diet Drug use and the end of the Screening Period, but who has not been diagnosed by a Qualified Physician as FDA Positive by an Echocardiogram performed between the commencement of Diet Drug use and the end of the Screening Period.

4. [*213] The court has determined that the Class Representative plaintiffs named in the operative Third Amended Complaint (Brenda Chambers, Donna Jarrell, Vivian Naugle, Quentin Layer, Joan S. Layer and Isabel Connor), have standing to represent, and adequately represent, the Class and their respective Subclasses, and they are confirmed as representatives of the Settlement Class and of each of their respective Subclasses. Class and Subclass counsel are likewise confirmed as follows:

Class Counsel:

John J. Cummings

Cummings, Cummings & Dudenhefer

Arnold Levin

Levin, Fishbein, Sedran & Berman

Michael D. Fishbein

Levin, Fishbein, Sedran & Berman

Stanley Chesley

2000 U.S. Dist. LEXIS 12275, *

Waite,        Schneider,
Bayless & Chesley

Sol H. Weiss

Anapol,        Schwartz,
Weiss, Cohan, Feldman &
Smalley, P.C.

Charles R. Parker

Hill & Parker

Gene Locks

Greitzer & Locks

Subclass   Representa-
tives and Counsel:

. Subclass 1(a)

Subclass   Representa-
tive: Brenda Chambers

Subclass   Counsel:
Diane M. Nast, Roda &
Nast, P.C.

. Subclass 1(b)

Subclass   Representa-
tive: Donna Jarrell

Subclass   Counsel:
Richard S. Lewis, Cohen,
Milstein, Hausfeld & Toll,
P.L.L.C.

. Subclass 2(a)

Subclass [*214] Rep-
resentative: Vivian Naugle

Subclass   Counsel:
Mark W. Tanner, Feldman,
Shepherd & Wohlgelertner

. Subclass 2(b)

Subclass   Representa-
tive: Quentin Layer & Joan
S. Layer

Subclass Counsel: R.
Eric Kennedy, Weisman,
Goldberg & Weisman Co.,
L.P.A.

. Subclass 3

Subclass   Representa-
tive: Isabel Connor

Subclass    Counsel:
Richard Wayne, Strauss &
Troy

5. The court hereby approves the set-
tlement as set forth in the Nationwide
Class Action Settlement Agreement with
American Home Products Corporation
(including the First through *Fourth
Amendments* thereto) in its entirety and
finds and determines that said settlement
is, in all respects, fair, reasonable and
adequate to the Class, within the authority
of the parties, and non-collusive.

6. The court hereby dismisses, with
prejudice and with each party to bear their
own costs, the Third Amended Complaint
in this action, as well as all other claims
or actions asserting Settled Claims against
American Home products Corporation
("AHP") pending before the court. These
dismissals are to be vacated, and the com-
plaints reinstated, in the event that this
Order and Judgment is reversed or va-
cated, in whole or material part, on [*215]
appeal.

7. The court hereby bars and enjoins
all class members who have not, or do
not, timely and properly exercise an Ini-
tial, Intermediate, Back-End or Financial
Insecurity Opt-Out right from asserting,
and/or continuing to prosecute against
AHP or any other Released Party any and
all Settled Claims which the class member
had, has or may have in the future in any
federal, state or territorial court.

8. The court hereby bars and enjoins
the commencement and/or prosecution of
any claim for contribution and/or non-
contractual indemnity, pursuant to Section
VII.C of the Settlement Agreement and
subject to the provisions of Section
VII.C.2 of the Settlement Agreement, in
any federal, state or territorial court
against AHP or any other Released Party
by any Non-Settling Defendant arising
from or relating to any Settled Claim as-
serted by any class member.

9. The court hereby bars and enjoins
the commencement and/or prosecution of
any claim or action against AHP in any
federal, state or territorial court based on

rights of subrogation by virtue of a payment or payments made to or for the benefit of a class member arising out of or in relation to any Settled Claims, except [*216] to the extent that it would be impermissible to bar such claims under provisions of applicable law.

10. This Order and Judgment is binding upon AHP and upon all members of the Settlement Class and Subclasses, as defined herein above, who have not timely effected exclusion from the class under the procedures set forth in the Class Notice. A final list of timely and proper exclusions shall be filed herein by the Interim Claims Administrators as soon as practicable. This Final Order and Judgment is without prejudice to the prospective exclusion rights of the class members as set forth in the Settlement Agreement.

11. Without affecting the finality of this Final Order and Judgment in any way, the court hereby retains continuing and exclusive jurisdiction over this action and each of the Parties, including AHP and the class members, to administer, supervise, interpret and enforce the Settlement in accordance with its terms; to supervise the operation of the Settlement Trust; to determine applications for and make reasonable awards of attorneys' fees and reimbursement of costs to Class and Subclass Counsel, the Plaintiffs' Management Committee, and others for work contributing [*217] to the common benefit of the class; and to enter such other and further orders as are needed to effectuate the terms of the Settlement.

12. There is no just reason for delay of the entry of this Final Order and Judgment as set forth herein, and it is therefore directed that judgment be entered.

SO ORDERED, this 28th day of August, 2000.

BY THE COURT:

LOUIS C. BECHTLE, J.

# TAB I



LEXSEE 2009 U.S. DIST. LEXIS 108768

**MENAGERIE PRODUCTIONS, et al., Plaintiff(s), vs. CITYSEARCH, et al., Defendant(s).**

**Case No. CV 08-4263 CAS (FMO)**

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

*2009 U.S. Dist. LEXIS 108768*

**November 9, 2009, Decided**
**November 9, 2009, Filed**

**COUNSEL:**  [*1] For Tom Lambotte, individually and on Behalf of All Others Similarly Situated, Sarah Bloch, on behalf of herself and all others similarly situated, Chad Bordeaux, on behalf of himself and all others similarly situated, Plaintiffs: Alfredo Torrijos, Joshua H Haffner, Michael V. Storti, LEAD ATTORNEY, Kabateck Brown Kellner, LLP, Los Angeles, CA; Brian S Kabateck, LEAD ATTORNEY, Kabateck Kellner LLP, Los Angeles, CA; Erik S Syverson, LEAD ATTORNEY, Pick & Boydston LLP, Los Angeles, CA.

For Menagerie Productions, an Oregon general partnership, on behalf of themselves and all others similarly situated, Redwolf, LLC, a South Carolina limited liability company, on behalf of themselves and all others similarly situated, Plaintiffs: Alfredo Torrijos, Michael V. Storti, LEAD ATTORNEY, Kabateck Brown Kellner, LLP, Los Angeles, CA; Brian S Kabateck, LEAD ATTORNEY, Kabateck Kellner LLP, Los Angeles, CA; Erik S Syverson, LEAD ATTORNEY, Pick & Boydston LLP, Los Angeles, CA.

For IAC/InteractiveCorp, a Delaware Corporation, Ticketmaster, a Delaware Corporation, doing business as Citysearch.com, Defendants: Emily St. John Cohen, Jennifer Lloyd Kelly, LEAD ATTORNEYS, Fenwick and West LLP, San Francisco,  [*2] CA; Guinevere L Jobson, LEAD ATTORNEY, Fenwick & West LLP, San Francisco, CA; Laurence F Pulgram, LEAD ATTORNEY, Fenwick and West, San Francisco, CA.

For Citysearch.com, an entity unknown, Defendant: Guinevere L Jobson, LEAD ATTORNEY, Fenwick & West LLP, San Francisco, CA; Jennifer Lloyd Kelly, LEAD ATTORNEY, Fenwick and West LLP, San Francisco, CA; Laurence F Pulgram, LEAD ATTORNEY, Fenwick and West, San Francisco, CA.

For Citysearch, LLC, Delaware limited liability company, Defendant: Jennifer Lloyd Kelly, LEAD ATTORNEY, Fenwick and West LLP, San Francisco, CA.

**JUDGES:**   CHRISTINA A. SNYDER, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** CHRISTINA A. SNYDER

**OPINION**

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (filed 08/11/09)

**INTRODUCTION**

On May 27, 2008, plaintiff Tom Lambotte ("Lambotte"), on behalf of himself and all others similarly situated, filed the instant class action suit in the Los Angeles County Superior Court against defendants IAC/Interactive Corp., Ticketmaster, d/b/a Citysearch.com, Citysearch.com (collectively, "Citysearch"), and Does 1-20. On June 27, 2008, Citysearch removed the action to this Court. The class action complaint asserted claims for breach of contract,  [*3] violation of California's Unfair Competition Law ("UCL"), *Cal. Bus. & Prof. Code §§ 17200 et seq.*, and negligence.

2009 U.S. Dist. LEXIS 108768, *

On July 7, 2008, Citysearch filed a motion for summary judgment on Lambotte's first and second claims for relief. On July 31, 2008, the Court granted Citysearch's motion for summary judgment on Lambotte's claims for breach of contract and injunctive relief under the UCL. [1] The Court granted Lambotte 30 days leave to add former customers to the complaint who were not subject to the defense raised by Citysearch in its motion for summary judgment.

> 1   The Court granted summary judgment for Citysearch on the breach of contract claim because, at the time of the motion, Citysearch had refunded all of the advertising fees that Lambotte had paid to Citysearch, and, under the express terms of the contract at issue, Lambotte was only entitled to recover fees actually paid to Citysearch.

On September 3, 2008, Lambotte filed a first amended complaint, in which two additional named plaintiffs were included: Chad Bordeaux ("Bordeaux") and Sarah Bloch ("Bloch"). In the first amended complaint, plaintiffs asserted claims for breach of contract and violation of California's Unfair Competition [*4] Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq.

Citysearch filed a motion to dismiss plaintiffs' breach of contract claim on September 29, 2008. On November 4, 2008, the Court denied Citysearch's motion to dismiss, except insofar as it sought dismissal of Lambotte as a plaintiff on the breach of contract claim.

On July 23, 2009, plaintiffs filed a second amended complaint ("SAC"), in which Menagerie Productions ("Menagerie") and Redwolf, LLC ("Redwolf") replaced Bordeaux, Bloch, and Lambotte as plaintiffs. In the SAC, plaintiffs again assert claims for breach of contract and violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq. The gravamen of the SAC was that plaintiffs entered into a contract with Citysearch to place "pay-per-click" advertisements on the Citysearch website, and that Citysearch failed to detect and prevent "click fraud." [2]

> 2   The SAC alleges that the term "click fraud" is understood in the industry "to describe clicks on a search advertisement with no intention of doing business with the advertiser and for some purpose other than that contemplated by the ad." SAC P 24. Citysearch argues that plaintiffs cannot proceed with [*5] their claims because, as an initial matter, plaintiffs failed to include "double clicks" or "a failure to apply automatic filters to traffic from syndication partners" in their definition of "click fraud" in the SAC. Opp'n at 1. The Court hereby deems the SAC to include "double clicks"

and "a failure to apply automatic filters to traffic from syndication partners" in plaintiffs' definition of "click fraud." Thus, notwithstanding plaintiffs' offer to amend the complaint, they need not do so.

On August 11, 2009, plaintiffs filed the present motion for class certification. Citysearch filed its opposition thereto on September 10, 2009. Plaintiffs filed their reply on September 24, 2009. After carefully considering the arguments set forth by the parties, the Court finds and concludes as follows.

## II. BACKGROUND

Plaintiffs allege that Citysearch provides, among other things, online advertising services, which generate most of Citysearch's revenue. SAC P 14. Such advertising services may be purchased for a flat monthly fee or on a pay-per-click basis. SAC P 15. If a customer chooses the pay-per-click advertising option, Citysearch charges the customer only when a user clicks on the customer's [*6] advertisement. SAC P 16.

Plaintiffs contend that Citysearch began offering pay-per-click advertising in mid to late 2004. Mot. at 3: Kabateck Decl., Exhib. 7. Plaintiffs assert that in late 2005, Citysearch claimed internally that "[o]ur industry leading traffic quality systems are constantly analyzing user behavior across our site and our partner network to detect unusual and fraudulent click behavior. Attempts to artificially drive up an advertiser's clicks, whether manually or via robots or other deceptive tools, will be detected by our systems and automatically thrown out." [3] Mot. at 4: Kabateck Decl., Exhib. 9. Plaintiffs further assert that by May 2006, Citysearch was giving its customers a "Fraud Prevention Guarantee." [4] Mot. at 4-5: Kabateck Decl., Exhib. 11. Plaintiffs assert that Citysearch did not update its invalid click filters until 2007. Mot. at 4: Kabatech Decl., Exhib. 7.

> 3   Defendants contend that Exhibit 9 was for internal use only and would have been viewed in an ad hoc manner by Citysearch employees, but that it was never shown to advertisers. Asher Decl., P 15. Accordingly, the Court does not rely on it.
> 4   It appears that the Fraud Prevention Guarantee relied upon by [*7] plaintiffs was disseminated for internal use and training. Accordingly, the Court does not rely on the Fraud Prevention Guarantee. The parties have filed numerous additional evidentiary objections. In so far as the Court does not rely on the evidence that is the subject of these objections, the Court overrules them as moot.

Plaintiffs allege that in January 2008, Menagerie entered into a written form contract for the placement of pay-per-click advertising on Citysearch.com. [5] SAC P 33. Plaintiffs allege that after having received no new clients after the first billing cycle, Menagerie requested a refund, but that Citysearch refused to refund the majority of the fees. SAC P 34. Plaintiffs allege that over a three month period, Menagerie paid $ 1,900 in fees without receiving any new customers. SAC P 35.

[5]   The Agreement describes the pay-per-click performance package as follows:

> The Performance Package is Citysearch's pay for performance advertising program where businesses set a monthly advertising budget (the "CAP") and pay for Click-Throughs or Program Calls (defined below) up to the CAP. On a monthly basis, Business shall pay to Citysearch a monthly listing fee and the cost per click [*8] and/or cost per call for each Click-Through and/or for each Program Call, up to the CAP set forth on the Enrollment Form. "Click-throughs" are defined as (i) clicks on Business' advertising located on the Citysearch website or a Citysearch distribution partner website, which directs users to Business' website or Business' profile page on the Citysearch website, (ii) clicks on certain content links located on Business' Citysearch profile page.

SAC, Ex. A (plaintiffs' contract) P 3a. The Agreement includes the following disclaimer:

> Business acknowledges and agrees that Citysearch's services are provided to business on an "as is" basis, and Citysearch disclaims any and all express or implied warranties . . . . Furthermore, to the fullest extent permitted by law, Citysearch disclaims all warranties and guarantees regarding . . . the quality or timing of click-throughs, click-through rates, conversions or other performance or results for any advertising.

SAC, Ex. A (plaintiffs' contract) P 8. Furthermore, the Agreement states:

> The terms of this Agreement and the Enrollment form may be changed by Citysearch from time to time, and any notices hereunder shall be made, by providing you with email [*9] or written notice, or by posting any such changes on the Citysearch website, and you agree to be bound by any changes . . . ."

SAC, Ex. A (plaintiffs' contract) P 8.

Plaintiffs allege that Citysearch's "About Us" page states the following to potential customers: "We connect you to more customers. You only pay for results. Advertise on Citysearch today and only pay for clicks to your Website or business profile page." SAC P 21; SAC Exhib. B. Plaintiffs further allege that the "FAQ" page that Citysearch makes available to potential customers during the sign-up process states the following:

> Q: How do I know that clicks to my website are legitimate?
>
> A: Citysearch proactively researches and develops processes, policies, and technologies to identify invalid click activity with regard to our customers' advertising. Citysearch employs advanced security filters and blocks out clicks from spiders and robots.

SAC P 23; SAC Exhib. C. Plaintiffs allege that Citysearch devotes an entire webpage to explain its "Invalid Click Policy" to potential customers, where it states in part:

> As a leader in Local Pay for Performance advertising one of Citysearch's key concerns is detection of invalid clicks. Citysearch [*10] proactively researches and develops processes, policies, and technologies to identify invalid click activity with regard to our customers' advertising. We are committed to protecting our customers' investment in Local Pay

2009 U.S. Dist. LEXIS 108768, *

for Performance Advertising with us.

Citysearch actively monitors and analyzes clicks to our customers' advertising to try to detect any abuse of Our Local Pay for Performance advertising program. Citysearch attempts to prevent clicks that are caused by automated robots or spiders, clicks generated from within the Citysearh organization, or clicks which show a pattern of fraudulent abuse . . . .

While we endeavor to charge customers solely for valid clicks, we cannot ensure that all invalid clicks will be detected. Therefore, please contact Citysearch Customer Service . . . if you have any questions or concerns about clicks charged to your account, and a customer service specialist will investigate your account.

SAC P 23; SAC Exhib. D.

Plaintiffs further allege that in March 2008, Redwolf entered into the same written form contract for the placement of pay-per-click advertising on Citysearch.com. SAC P 37. Plaintiffs allege that shortly thereafter, Redwolf suspected click [*11] fraud and requested that the charges it incurred be reversed, and that Citysearch refused. SAC P 38. Plaintiffs allege that Redwolf cancelled its account in August 2008, at the end of its contractual obligation, after paying over $ 700 in fees to Citysearch. SAC P 39.

The gravamen of plaintiffs' lawsuit is two-fold. First, plaintiffs allege that they entered into a written form contract (the "Agreement") for the placement of pay-per-click advertising on Citysearch.com, and that the Agreement contained an implied covenant of good faith and fair dealing "that Citysearch would not do anything that would have the effect of injuring the rights of Plaintiffs and the Class to receive the benefits of the contract." SAC P 52. Plaintiffs allege that Citysearch breached both the express terms of the Agreement and its covenant of good faith and fair dealing "by collecting fees from plaintiffs and the Class for click fraud even though Citysearch knew, or should have reasonably known, that the clicks were not 'actual clicks' but rather purposeful clicks made for an improper purpose. Citysearch further breached its contract with plaintiffs and the Class by failing to implement effective oversight, [*12] investi-

gating oversight and prevention of click fraud." SAC P 53.

Second, plaintiffs allege that Citysearch violated the unfair, unlawful, and fraudulent prongs of the UCL. Plaintiffs allege that Citysearch's business practices are unfair because Citysearch "(a) fails to employ any method to track fraudulent clicks, including clicks originating from its own employees and/or agent and clicks originating from Citysearch's "partner sites"; (b) fails to inform its customers that it does not employ a method to track fraudulent clicks, including clicks originating from its own; and (c) charges customers for invalid clicks." SAC P 58. Plaintiffs allege that Citysearch's business practices are unlawful "because the conduct constitutes a breach of the Agreement." SAC P 59. Plaintiffs allege that Citysearch's business practices are fraudulent "because they are likely to deceive its customers into believing that they will not be charged for 'invalid' clicks, when in fact, Citysearch routinely charges its customers for clicks that it knows, or by the exercise of reasonable care, should know are not clicks that originate from potential customers who actively and legitimately chose the advertiser's [*13] link." SAC P 60.

By this motion, plaintiffs seek to certify the following nationwide class: "All persons or entities in the United States who paid money for pay-per-click advertising through Citysearch.com." Mot. at 2.

### III. LEGAL STANDARD

"Class actions have two primary purposes: (1) to accomplish judicial economy by avoiding multiple suits, and (2) to protect rights of persons who might not be able to present claims on an individual basis." *Haley v. Medtronic, Inc., 169 F.R.D. 643, 647 (C.D. Cal. 1996)* (citing *Crown, Cork & Seal Co. v. Parker, 462 U.S. 345, 103 S. Ct. 2392, 76 L. Ed. 2d 628 (1983))*. Federal Rule of Civil Procedure 23 governs class actions. A class action "may be certified if the trial court is satisfied after a rigorous analysis, that the prerequisites of *Rule 23(a)* are been satisfied." *General Tel. Co. of the Southwest v. Falcon, 457 U.S. 147, 161, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)*.

To certify a class action, plaintiffs must set forth prima facie facts that support the four requirements of *Rule 23(a)*: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *Dunleavy v. Nadler (In re Mego Fir. Corp. Sec. Litig.), 213 F.3d 454, 462 (9th Cir. 2000)* (internal quotations omitted). These requirements effectively [*14] "limit the class claims to those fairly encompassed by the named plaintiff's claims." *Falcon, 457 U.S. at 155* (quoting *Califano v. Yamasaki, 442 U.S. 682, 701, 99 S. Ct. 2545, 61 L. Ed. 2d 176 (1979))*.

If the district court finds that the action meets the prerequisites of *Rule 23(a)*, the court must then consider whether the class is maintainable under one or more of the three alternatives set forth in *Rule 23(b)*. Plaintiffs seek certification under *Rule 23(b)(3)*. A class is maintainable under *Rule 23(b)(3)* where "questions of law or fact common to the members of the class *predominate* over any questions affecting only individual members," and where "a class action is *superior* to other available methods for fair and efficient adjudication of the controversy." *Fed. R. Civ. P. 23(b)(3)* (emphasis added). "The *Rule 23(b)(3)* predominance inquiry tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon v. Chrysler Corp., 150 F.3d 1011, 1022 (9th Cir. 1998) (citing Amchem Products, Inc. v. Windsor, 521 U.S. 591, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997))*. The predominance inquiry measures the relative weight of the common to individualized claims. Id. "Implicit in the satisfaction of the predominance test [*15] is the notion that the adjudication of common issues will help achieve judicial economy." *Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1189 (9th Cir. 2001) (citing Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir. 1996))*. In determining superiority, the court must consider the four factors of *Rule 23(b)(3)*: (1) the interests members in the class have in individually controlling the prosecution or defense of the separate actions; (2) the extent and nature of any litigations concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely encountered in the management of a class action. *Id. at 1190-1193*. "If the main issues in a case require the separate adjudication of each class member's individual claim or defense, a *Rule 23(b)(3)* action would be inappropriate." Id. (citing 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1778 at 535-39 (2d. ed. 1986) (hereinafter "Wright, Miller & Kane")).

## IV. DISCUSSION

### A. RULE 23(A) REQUIREMENTS

### 1. NUMEROSITY

*Rule 23(a)(1)* requires [*16] the members of a proposed class to be so numerous that joinder of all of the class members would be impracticable. *Fed. R. Civ. P. 23(a)*. However, "[i]mpracticability does not mean 'impossibility,' but only the difficulty or inconvenience in joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc., 329 F.2d 909, 913-14 (9th Cir. 1964) (quoting Advertising Specialty Nat. Ass'n v. FTC, 238 F.2d 108, 119 (1st Cir. 1956))*.

Plaintiffs argue that the numerosity requirement is met. Plaintiffs contend that while the exact size of the class is not known, "it clearly numbers in the thousands." Mot. at 8. Plaintiffs assert that of Citysearch's 15,000 active customers, at least 10,000 pay for pay-per-click advertising. Id. at 8-9. Plaintiffs further argue that this number does not include the thousands of class members who, like plaintiffs, were previously pay-per-click customers but have since canceled their advertising accounts with Citysearch. Id. at 9 (citing *Stuart v. Radioshack Corp., 2009 U.S. Dist. LEXIS 12337, 2009 WL 281941, at *5 (N.D. Cal. Feb. 5, 2009)* ("courts have found that numerosity is satisfied when class size exceeds 40 members")).

Citysearch does not dispute that plaintiffs' proposed [*17] class is sufficiently numerous to satisfy *Rule 23(a)(1)*. Joinder is impracticable. As such, there is no dispute that the numerosity requirement of *Rule 23(a)(1)* is therefore met.

### 2. COMMONALITY

Commonality requires "questions of law or fact common to the class." *Fed. R. Civ. P. 23(a)(2)*. The commonality requirement is generally construed liberally; the existence of only a few common legal and factual issues may satisfy the requirement. *Jordan v. County of L.A., 669 F.2d 1311, 1320 (9th Cir. 1982)*.

Plaintiffs argue that the commonality requirement is met, because the adjudication of the same core questions of fact and law will resolve all of the class members' claims. Mot. at 9. Plaintiffs assert that for the breach of contract claim, the issues to be resolved are: "(1) whether Citysearch's failure to implement objectively reasonable invalid click prevention measures amounts to a breach of the express terms of its contract with plaintiffs and the class, and (2) whether Citysearch's discretionary decision to charge plaintiffs and the class for objectively unreasonable clicks constitutes a breach of the covenant of good faith and fair dealing contained in its contract with plaintiffs and [*18] the class." Id. at 9-10. Plaintiffs' UCL claim hinges on a single question: "whether Citysearch acted fraudulently or unfairly." Id. at 10.

Citysearch does not dispute that there exist questions of law or fact common to the class. See *Jordan, 669 F.2d at 1320*. The court agrees that the commonality requirement of *Rule 23(a)(3)* is therefore met.

### 3. TYPICALITY

Typicality requires a determination of whether the named plaintiffs claims are typical of those of the proposed class that they seek to represent. *Fed. R. Civ. P. 23(a)(3)*. "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class mem-

2009 U.S. Dist. LEXIS 108768, *

bers; they need not be substantially identical." *Hanlon, 150 F.3d at 1020; Schwartz v. Harp, 108 F.R.D. 279, 282 (C.D. Cal. 1985)* ("A plaintiff's claim meets this requirement if it arises from the same event or course of conduct that gives rise to claims of other class members and the claims are based on the same legal theory").

Plaintiffs argue that their claims are "reasonably co-extensive with those of the absent class members," because like every other proposed class member, they advertised using Citysearch's pay-per-click advertising program and they were [*19] charged for clicks that were allegedly "clearly and objectively invalid." Mot. at 11. Plaintiffs further assert that their consumer protection claims are reasonably coextensive with those of absent class members, because "they arise from Citysearch's common scheme of failing to apply reasonable methods for filtering out clearly invalid clicks as well as Citysearch's deceptive statements regarding the existence and quality of its click filters." Id. Plaintiffs contend that as victims of Citysearch's common course of conduct, plaintiffs' and the class members' injuries are identical, as are the claims that arise therefrom. Id. (citing *Schaefer v. Overland Express Family of Funds, 169 F.R.D. 124, 128-29 (S.D. Cal. 1996)* ("[C]ases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims."); *In re First Alliance Mortgage Co., 471 F.3d 977, 992 (9th Cir. 2006)* (holding that where a "centrally-orchestrated scheme to mislead" is alleged, it is the scheme and not the precise details of any individual's experience that forms the nucleus [*20] of the class claims)).

Citysearch responds that here, because "the substantive claims depend on individual permutations . . . the claims of the named plaintiffs who have the same general complaint against the defendant as the class are not typical." Opp'n at 15 (quoting *Gartin v. S&M Nutec LLC, 245 F.R.D. 429, 434 (C.D. Cal. 2007)*). Citysearch argues that plaintiffs have not identified any actionable injury they have suffered, much less a similar one by the rest of the class. Opp'n at 15. Citysearch asserts that plaintiffs have not offered any evidence that they were charged for invalid clicks, but have "merely advanced a theory that they and other class members *want to explore* whether they have been charged for some as-yet-unidentified categories of 'objectively invalid' clicks." [6] Opp'n at 16. Thus, Citysearch argues that "there is nothing before the Court that would permit it even to speculate, much less conclude, that these plaintiffs paid for (and thus were injured by) objectively invalid clicks." Id. Citysearch further argues that plaintiffs' expert analyzed its click logs and did not find a single click that appeared to be fraudulent. Id. (citing Jansen Depo. at 46: 5-8).

Citysearch [*21] contends that plaintiffs' depositions show that their real grievance is not that they were charged for invalid clicks, but that they received a poor return on their investment--a wholly different injury that defeats typicality. Id. (citing *Gen. Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 157-58, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982); Akkerman v. Mecta Corp., Inc., 152 Cal. App. 4th 1094, 1101, 62 Cal. Rptr. 3d 39 (2007)*).

> 6   Citysearch argues that this new theory is not set forth in the SAC, which alleges that Citysearch failed to take any steps to combat click fraud. Opp'n at 16.

Citysearch contends that even if plaintiffs could show actual injury, they still cannot establish typicality because there is no evidence they read and relied upon a misrepresentation made to all class members. Opp'n at 17. Citysearch asserts that plaintiff Menagerie relied solely upon verbal representations and read no documents, while plaintiff Redwolf relied on a combination of verbal and written representations, but did not read the Terms, the Policy, or the FAQ page on Citysearch's website. Id. Furthermore, Citysearch asserts that neither defendant had heard about any purported "fraud guarantee." Id. Yet, Citysearch asserts that according to the SAC and [*22] plaintiffs' motion, other class members read and heard about Citysearch's representations. Id. Thus, Citysearch contends that because "the class, as defined by the plaintiffs, potentially includes class members who received [representations] other than those received by the named plaintiffs, the class definition is broad and overinclusive." Id. (quoting *Scott v. Mascott, 1999 U.S. Dist. LEXIS 21950, 1999 WL 33117204, *1 (W.D. Wash. Apr. 13, 1999)*; see also *Akkerman, 152 Cal. App. 4th at 1100-01*)).

Plaintiffs reply that they have provided evidence that both named plaintiffs were harmed by paying for invalid clicks, and thus assert that they have standing. Reply at 2. Plaintiffs argue that their expert, Dr. Jansen, identified clicks in plaintiffs' click-logs that appeared to be invalid. Id. However, plaintiffs argue that because Citysearch had not produced information regarding the clicks for which plaintiffs have been charged prior to Dr. Jansen's completing his expert report, Dr. Jansen was unable to determine whether plaintiffs have been charged for invalid clicks. Id. Plaintiffs assert that subsequently, Citysearch produced this information, and thus they can now demonstrate that they were improperly charged [*23] for objectively invalid clicks. Id. Specifically, plaintiffs contend that they were both charged for two clicks on the same ad, made from the same source, that were less than a second apart. [7] Id.

7 For example, plaintiffs argue that on June 19, 2008, plaintiff Redwolf received two clicks to its advertisement on 18:31:39, which both came from the same Citysearch syndication partner, "synd_abc." Reply at 3 (citing Torrijos Decl., Exhib. 33). They were the only two clicks Redwolf received from that syndication partner that day. Id. (citing Torrijos Decl., Exhib. 33). On June 19, 2008, Citysearch charged plaintiff for thirteen clicks, including two from "synd_abc." Id. (citing Torrijos Decl., Exhib. 33). Thus, Citysearch charged Redwolf for both clicks even though they both occurred within the same second. Id. (citing Torrijos Decl., Exhib. 33).

Plaintiffs further reply that Citysearch's assertion that plaintiffs are not typical because "there is no evidence that plaintiffs read and relied upon a misrepresentation made to all class members" completely ignores the fact that plaintiffs' claims regarding Citysearch's deceptive practices are made pursuant to California's Unfair Competition Law [*24] ("UCL"), and not common law fraud. Id. at 5. Plaintiffs assert that "relief under the UCL is available without individualized proof of decision, reliance and injury," but instead plaintiffs need only show that "members of the public are likely to be deceived." Id. (quoting *In re Tobacco II Cases, 46 Cal. 4th 298, 312, 93 Cal. Rptr. 3d 559, 207 P.3d 20 (2009))*. Plaintiffs argue that they, like other class members, were "never informed that they would be charged for invalid clicks because Citysearch did not take adequate steps to prevent invalid clicks." Id. at 6.

Moreover, plaintiffs reply that Citysearch's argument that typicality is lacking because of the differences in the manner in which plaintiffs Menagerie and Redwolf enrolled in Citysearch's advertising services fails because plaintiffs' claims are based on an alleged common course of conduct by Citysearch. Id. (citing *Stern v. AT&T Mobility Corp., 2008 U.S. Dist. LEXIS 110305, 2008 WL 4382796, *7 (C.D. Cal. 2008))*. Plaintiffs argue that here, as in Stern, plaintiffs' claims are based on Citysearch's material omission to its potential customers that it fails to detect and prevent invalid clicks and its conduct of charging its advertisers for invalid clicks. Id.

The Court finds Citysearch's arguments [*25] unpersuasive. First, plaintiffs have presented evidence that they suffered an actionable injury, because they both presented evidence that Citysearch charged them for double-clicks made within the same second from the same source. See Torrijos Decl., Exhibs. 30-33. Indeed, Citysearch's expert acknowledges that such doubleclicks are patently "invalid," and that customers should not be charged for them. See Kabateck Decl., Exhib. 28. Second, like every other proposed class member, plaintiffs advertised using Citysearch's pay-per-click advertising program and were allegedly charged by Citysearch for invalid clicks. Notwithstanding any asserted differences between class members, plaintiffs' claims are based on an alleged common course of conduct by [Citysearch] to (1) charge its advertisers for invalid clicks, and (2) make material omissions regarding the existence and quality of its click filters. Accordingly, plaintiffs' claims arise from the "same event or course of conduct" as those of the various absent class members, as required under *Rule 23(a)(3)*, and are typical of the claims of the proposed class. *Schwartz, 108 F.R.D. at 282; Rosario v. Livaditis, 963 F.2d 1013, 1018 (7th Cir. 1992)*.

## 4. [*26] ADEQUACY OF REPRESENTATION

The adequacy of representation requirement of *Rule 23(a)(4)* involves a two-part inquiry: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon, 150 F.3d at 1020*.

Plaintiffs argue that the plaintiffs' interests here are fully aligned with those of the class because the basis of their claims and the nature of their injury are exactly the same as those of the class members they seek to represent. Mot. at 12. Plaintiffs further argue that they understand and are prepared to fulfill their duties to the class. Id. (citing Decl. of S. Bloch; Decl. of C. Bordeaux). Plaintiffs contend that the firms representing them are experienced class action counsel, having successfully conducted numerous consumer class actions. Id. Plaintiffs further contend that counsel remains committed to devoting all necessary resources to prosecuting this matter and possesses the resources necessary to represent the proposed class. Id.

Citysearch responds that plaintiffs are not adequate class representatives because they lack standing [*27] to pursue all of the claims for relief set forth in their SAC. Opp'n at 18. Citysearch repeats its argument that plaintiffs have failed to present evidence that they paid for invalid clicks, and thus argue that plaintiffs cannot serve as class representatives. Id. Citysearch further argues that because plaintiffs are not currently Citysearch advertisers, they cannot seek injunctive relief under the UCL. Id.

The Court concludes that the adequacy of representation prong is met in this case. As discussed *supra*, plaintiffs have provided evidence that they paid for invalid clicks, and thus have standing to serve as class representatives. While plaintiffs do not have standing to request prospective injunctive relief under the UCL, see *Heffelfinger v. Elec. Data Sys. Corp., 2008 U.S. Dist. LEXIS 5296 (C.D. Cal. Jan. 7, 2008)* ("because plaintiffs are no longer employed by EDS, they lack standing to seek prospective injunctive relief under the UCL."), they

have standing to pursue restitutionary relief under the UCL because they paid to advertise with Citysearch. See e.g., *So. Cal. Housing Rights Center v. Los Feliz Towers, 426 F. Supp. 2d 1061, 1069 (C.D. Cal. 2005)* (stating that the plaintiff [*28] "has standing because it presents evidence of actual injury based on loss of financial resources in investigating this claim and diversion of staff time from other cases to investigate the allegations here"). Therefore, the Court finds that the plaintiffs have the same incentive as current advertisers with Citysearch to prosecute the UCL claim vigorously for the class. See *Hanlon, 150 F.3d at 1020*. Furthermore, while plaintiffs may not have advertised with Citysearch during the time that Citysearch failed to run its syndication traffic through all of its automatic filters, [8] the Court finds that plaintiffs have the same incentive as those advertisers that did advertise with Citysearch during that time to prosecute such claims for the class, because they were allegedly harmed by other types of invalid clicks.

> 8   Plaintiffs rely on an internal Citysearch document dated March 23, 2007 for the proposition that Citysearch did not apply all of its automatic filters to its syndication traffic until sometime in 2007 or later. Kabatech Decl., Exhib. 10. Plaintiff Menagerie advertised with Citysearch from December 27, 2007 to March 26, 2008, and plaintiff Redwolf advertised with Citysearch from [*29] March 27, 2008 to July 21, 2008. Asher Decl., P 12 n.3.

## B. RULE 23(B)(3) REQUIREMENTS

Certification under *Rule 23(b)(3)* is proper "whenever the actual interests of the parties can be served best by settling their differences in a single action." *Hanlon, 150 F.3d at 1022* (internal quotations omitted). As noted above, *Rule 23(b)(3)* calls for two separate inquiries: (1) do issues common to the class "predominate" over issues unique to individual class members, and (2) is the proposed class action "superior" to other methods available for adjudicating the controversy. *Fed. R. Civ. P. 23(b)(3)*. The latter requirement requires consideration of the difficulties likely to be encountered in the management of this litigation as a class action, including, especially, whether and how the case may be tried. In making these determinations, the Court does not decide the merits of any claims or defenses, or whether the plaintiffs are likely to prevail on their claims. Rather, the Court must determine whether plaintiffs have shown that there are plausible class-wide methods of proof available to prove their claims.

## 1. PREDOMINANCE AND COMMONALITY

"Implicit in the satisfaction of the predominance test is [*30] the notion that the adjudication of common issues will help achieve judicial economy." See *Valentino, 97 F.3d at 1234*. Thus, the Court must determine whether common issues constitute such a significant aspect of the action that "there is a clear justification for handling the dispute on a representative rather than on an individual basis." 7A Wright, Miller, & Kane § 1778 (3d ed. 2005). For the proponent to satisfy the predominance inquiry, it is not enough to establish that common questions of law or fact exist, as it is under *Rule 23(a)(2)*'s commonality requirement--the predominance inquiry under *Rule 23(b)* is more rigorous. *Amchem Prods., Inc., 521 U.S. at 624*. The predominance question "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id. at 623*. The Court, therefore, must balance concerns regarding the litigation of issues common to the class as a whole with questions affecting individual class members. *Abed v. A. H. Robins Co. (In re Northern District of California, Dalkon Shield IUD Products Liability Litigation), 693 F.2d 847, 856 (9th Cir. 1982)*.

### a. Breach of Contract Claims

### i. Breach of Contract

Plaintiffs allege that Citysearch [*31] breached the express terms of the contract between Citysearch and the class, and also breached the covenant of good faith and fair dealing. Mot. at 14. With regard to each of these claims, plaintiffs assert that common issues of law and fact predominate. Id. Plaintiffs argue that predominance is readily satisfied in cases such as this one which involve form agreements with the class and the Citysearch's standardized conduct. [9] Id. (citing *Kleiner v. First Nat'l Bank of Atlanta, 97 F.R.D. 683, 691 (N.D. Ca. 1983)* ("When viewed in light of *Rule 23*, claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action . . . . "); *Heartland Commc'ns, Inc. v. Spring Corp., 161 F.R.D. 111 (D. Kan. 1995)* (certifying a class where contracts signed by all class members contained virtually the same provision as that challenged by the class representative)). Plaintiffs assert that the entire class agreed to standard form agreements prepared by Citysearch and that every class member is a party to the form contract provisions in dispute. Id. at 15. Plaintiffs contend that even when class members' claims arise out of similar, but not identical [*32] contracts, claims arising out of pre-printed form contracts are particularly appropriate for class action treatment. Id. (citing *DeBoer v. Mellon Mortg. Co., 64 F.3d 1171 (8th Cir. 1995)*; *Heartland Commc'ns, 161 F.R.D. at 114-17*).

> 9   Plaintiffs further argue that the predominant questions raised by the claims in this case con-

2009 U.S. Dist. LEXIS 108768, *

cern whether the invalid click filters employed by Citysearch were sufficient to eliminate clicks that were clearly and objectively invalid. Id. at 14 (citing *Local Joint Executive Board of Culinary/Bartender Trust Fund v. Las Vegas Sands Inc., 244 F.3d 1152, 1162-63 (9th Cir. 2001)* ("When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis.")).

Plaintiffs further contend that under California law, in interpreting a contact, "the question is not what [the parties] subjectively intended, but what a reasonable person would believe the parties intended." Id. (quoting *Beard v. Goodrich, 110 Cal. App. 4th 1031, 1038, 2 Cal. Rptr. 3d 160 (2003))*. Thus, plaintiffs assert that admissible extrinsic evidence [*33] does not include evidence of a party's unilateral or subjective intent as to the meaning of a contract word or term. Id. (citing *Abbott Lab. v. Alpha Therapeutic Corp., 164 F.3d 385, 387 (7th Cir. 1999); Peoples v. Sebring Capital Corp., 2002 U.S. Dist. LEXIS 4104, 2002 WL 406979, *8 (N.D. Ill. Mar. 15, 2002)* [10] ). Therefore, plaintiffs argue that the determination of whether the express terms of the contract between Citysearch and the class impose certain obligations on Citysearch will be made on a class-wide basis using an objective standard, and the scope and enforceability of Citysearch's form contracts present common issues of law and fact. Id. at 16.

10   Citysearch argues that plaintiffs' reliance on this case for the proposition that a court will not consider extrinsic evidence of the intent of each plaintiff in entering a form contract is misplaced, because the basis for the Court's decision in *Peoples* was that neither party argued that the form contract was ambiguous. Opp'n at 25.

Citysearch responds that plaintiffs' breach of contract claim raises individual issues that defeat predominance. Opp'n at 25. Citysearch argues that to prove this claim plaintiffs would need to rely on extrinsic evidence, which [*34] would vary widely among advertisers. Id. at 25-6. Citysearch argues that plaintiffs previously argued in opposing Citysearch's prior motion to dismiss that the Court decided November 4, 2008, that only clicks by "users" were chargeable under the contract, and offered a contorted interpretation of the term "user" to mean a "potential client" of the advertiser, thereby attempting to overcome the contract's requirement that advertisers pay for "each click" and Citysearch's express disclaimer of warranty as to click quality. Id. (citing Jobson, Exhib. F at 6). Citysearch contends that in response to this Court's skepticism as to plaintiffs' definition of "user," plaintiffs stated that they would introduce extrinsic evidence to support their interpretation. Id. at 25-26 (citing Jobson, Exhib. F, at 8 (dismissal on pleadings inappropriate because "at oral argument, plaintiffs stated that they intend to introduce additional extrinsic evidence beyond that which was already submitted to support their interpretation"). Citysearch argues that plaintiffs have since offered no such evidence. Id.

Citysearch further argues that a contract's objectively reasonable meaning can be determined only in [*35] context. Id. at 26. Citysearch asserts that if, for example, an advertiser was actually told about a purported "fraud guarantee," that fact might support an objectively reasonable interpretation of the contract that is far different than in the case of another advertiser who saw or heard only a disclaimer of click quality and Citysearch's policy that it could not guarantee it would detect all click fraud. Id.

Plaintiffs reply that Citysearch does not contest that the only terms of the contract relevant to this case, that the advertiser will pay for clicks from "users," do not differ in any material respect among class members. Reply at 7. Plaintiffs argue that Citysearch's argument--that an individual analysis of each class members' understanding of the contract is required to determine whether they intended the contract to require payment for all clicks regardless of the source--is contrary to established principles of contract law. Id. Plaintiffs assert that "[a] standardized agreement 'is interpreted wherever reasonable as treating alike those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing.'" Id. (quoting *Sebring Capital Corp., 2002 U.S. Dist. LEXIS 4104, 2002 WL 406979, at *8* [*36] (quoting *Restatement (Second) of Contracts § 211(2)* 1981)).

The Court finds that common issues of law and fact predominate with regard to plaintiffs' breach of contract claim. Here, the claim arises from a standard form contract prepared by Citysearch to which all advertisers in the class agreed. [11] See *Kleiner, 97 F.R.D. at 691* ("When viewed in light of *Rule 23*, claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action, and breach of contract cases are routinely certified as such."). To the extent that the language in the contract is unambiguous, the Court would apply that meaning and not look to extrinsic evidence. *Beard, 110 Cal. App. 4th at 1038* ("[I]f the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning."); *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co., 69 Cal. 2d 33, 38, 69 Cal. Rptr. 561, 442 P.2d 641 (1968)*. Extrinsic evidence, however, would be properly admitted to construe the terms of the contract if the Court deter-

mines that its language is ambiguous. *Pac. Gas & Elec. Co., 69 Cal. 2d at 39-40* ("[R]ational interpretation requires at least a preliminary consideration of all credible evidence [*37] offered to prove the intention of the parties. Such evidence includes testimony as to the circumstances surrounding the making the agreement--including the object, nature and subject matter of the writing--so that the court can place itself in the same situation in which the parties found themselves at the time of contracting. If the court decides, after considering this evidence, that the language of a contract . . . is fairly susceptible of either one of the two interpretations contended for, extrinsic evidence relevant to prove either of such meaning is admissible."); *Pac. State Bank v. Greene, 110 Cal. App. 4th 375, 385-86, 1 Cal. Rptr. 3d 739 (2003)*. Extrinsic evidence that the Court would consider in making this determination, such as representations on Citysearch's website, can be established on a classwide basis. Therefore, it cannot be said that individual issues predominate as to plaintiff's claim of breach of contract.

> 11   Citysearch does not contend that the form agreements varied by class member. However, class action treatment may still be appropriate when the claim arises out of similar, but not identical contracts. See *Heartland Commc'ns. Inc., 161 F.R.D. at 114-17*.

### ii. Breach of the Implied [*38] Covenant of Good Faith and Fair Dealing

Plaintiffs argue that the determination of Citysearch's liability for breach of the implied covenant of good faith and fair dealing is a question common to the class, because [a] party violates the covenant if it subjectively lacks belief in the validity of its act or if its conduct is objectively unreasonable." Mot. at 16 (quoting *Carma Dev., Inc. v. Marathon Development Cal., Inc., 2 Cal. 4th 342, 371-2, 6 Cal. Rptr. 2d 467, 826 P.2d 710 (1992)*). Plaintiffs contend that under either standard, proof of Citysearch's liability will be common to the class: Citysearch will be liable if it either subjectively knew that it should not charge its advertisers for certain types of clicks, or if its failure to prevent such charges was objectively unreasonable. Id. at 16-17.

Citysearch responds that plaintiffs' claim for breach of the implied covenant of good faith and fair dealing likewise raises individual issues. Opp'n at 27. First, Citysearch asserts that because the reach of the covenant is dependent on the contract's express terms, the extent of Citysearch's obligations will vary dramatically based on what each class member saw and heard. Id. (citing *Carma Dev., 2 Cal. 4th at 374*). Second, [*39] Citysearch asserts that while plaintiff's have acknowledged that one element of the legal test is whether defendant subjectively acted in bad faith--that is, whether Ci-

tysearch knew that clicks it was charging for were fraudulent or invalid--plaintiffs' algorithm cannot make this determination anymore than it can determine the subjective intent of an Internet user. Id. Third, Citysearch contends that even if plaintiffs' theory rested on objective fair dealing alone, an examination of the facts of which Citysearch was aware would remain necessary because it is only by analyzing the many individual characteristics of clicks that one could possibly determine whether Citysearch objectively should have known not to charge for particular clicks. Id.

Plaintiffs reply that with respect to their claim for breach of the implied covenant, Citysearch will be in breach if the invalid click procedures it uniformly employs are found to be objectively unreasonable. Reply at 9-10 (citing *Carma Dev., 2 Cal. 4th at 372*). Plaintiffs contend that Citysearch will also be in breach of the implied covenant if it subjectively believed that its invalid click procedures were unreasonable. Id. at 10. Plaintiffs [*40] argue that both of these inquiries are susceptible to common proof, and there will be no need to analyze the individual characteristics of each click to make these determinations because the determination of Citysearch's liability will rest on whether the procedures employed were reasonable. Id.

In this case, the Court finds that the alleged breach of contract--namely failing to filter and otherwise monitor for click fraud--if proven, is objectively unreasonable conduct that can be established without resort to individualized proof. *Carma Dev., 2 Cal. 4th at 371-2* ("A party violates the covenant if it subjectively lacks belief in the validity of its act or if its conduct is objectively unreasonable."). Accordingly, because the Court determines that common issues of law and fact predominate with regard to plaintiffs' breach of contract claim, the Court also concludes that common issues predominate with regard to plaintiffs' breach of the implied covenant of good faith and fair dealing claim.

### b. Claims Under the UCL

#### i. "Fraudulent" Prong

Plaintiffs argue that common issues of law predominate as to their claims under the "fraudulent" and "unfair" prongs of the UCL. Mot. at 17. Plaintiffs [*41] assert that their claim under the "fraudulent" prong will not be adjudicated based on their individual circumstances, but instead under the "reasonable consumer" test which only requires that plaintiffs "show that members of the public are likely to be deceived." Id. (citing *Williams v. Gerber Products Co., 523 F.3d 934, 938 (9th Cir. 2008)*). Because the "UCL's focus [is] on the defendant's conduct, rather than the plaintiffs' damages," plaintiffs argue that proof of deception, reliance, and injury are not required. Id. (quoting *In re Tobacco II Cases, 46*

Cal. 4th 298, 312, 93 Cal. Rptr. 3d 559, 207 P.3d 20 (2009)). Plaintiffs further contend that the UCL "imposes strict liability," and thus "it is not necessary to show that the defendant intended to injure anyone." Id. at 18 (quoting South Bay Chevrolet v. General Motors Acceptance Corp., 72 Cal. App. 4th 861, 877, 85 Cal. Rptr. 2d 301 (1999)).

Citysearch responds that the UCL's "fraudulent" prong requires individualized analysis of what class members saw or heard. Opp'n at 29. Citysearch concedes that plaintiffs are correct that whether a practice is "fraudulent" under the UCL focuses on whether the representations in question are likely to deceive members of the public. Id. But, Citysearch [*42] argues that plaintiffs are not correct in their assertion that this ends the discussion. Id. at 29-30. Instead, Citysearch urges that there is a need for individualized inquiry concerning such representations, because all advertisers were not exposed to the same alleged misrepresentations. Id. (citing Hodes v. Van's Int'l Foods, 2009 U.S. Dist. LEXIS 72193, 2009 WL 2422214, *4 (C.D. Cal. July 23, 2009) (even though individualized proof of reliance on allegedly deceptive statement is not required of non-class representatives, common issues did not predominate where many other individualized inquiries remained, including whether the products purchased by each class member contained the purported misrepresentation); Stern, 2008 U.S. Dist. LEXIS 110305, 2008 U.S. WL 4382796, at *10 (absent evidence that defendant's sales representatives used a "standardized script or forms when making sales calls," it was unclear how plaintiff could prove her claim on a classwide basis)). Here, Citysearch argues that it is undisputed that the putative class members became advertisers with Citysearch through different methods, and received different information, and there is no evidence of any common script. Id. at 30. Thus, Citysearch argues that predominance [*43] is not met. Id.

Plaintiffs reply that liability under the UCL stems not only from affirmative misrepresentation but also from failure to disclose material information. Reply at 8 (citing Day v. AT&T Corp., 63 Cal. App. 4th 325, 332-333, 74 Cal. Rptr. 2d 55 (1998)). Plaintiffs assert that they have offered sufficient evidence to show a common classwide omission because (1) the information available on Citysearch's website does not disclose that Citysearch will charge its advertisers for invalid clicks, (2) the training materials Citysearch provides to its sales representatives do not state that Citysearch will charge its advertisers for invalid clicks, and (3) Citysearch admits that in most conversations with potential advertisers, the potential for invalid clicks is never discussed. Id. (citing Kabatech Decl. Exhibs. 2, 9, 11; Asher Decl. at P 19). Plaintiffs contend that having demonstrated that Ci-

tysearch fails to disclose the same material information from all class members, the Court is left with the question of whether this omission is likely to deceive a reasonable consumer. Id. (citing In re Tobacco II Cases, 46 Cal. 4th at 320).

The Court agrees with plaintiffs that common issues predominate with [*44] regard to plaintiffs' claim of a common classwide omission under the "fraudulent" prong of the UCL. See Day, 63 Cal. App. 4th at 332-334 (finding defendant liable for failing to disclose material information to all class members under the "fraudulent" prong of the UCL). This UCL claim will be adjudicated under the "reasonable consumer" standard rather than by examining the individual circumstances of each plaintiff. The "reasonable consumer" standard requires plaintiffs to "show that members of the public are likely to be deceived." Williams, 523 F.3d at 938. Here, the "focus is on the defendant's conduct, rather than the plaintiff's damages." In re Tobacco II Cases, 46 Cal. 4th at 312, 320 ("relief under the UCL is available without individualized proof of deception, reliance and injury"). Because the UCL claim arises out of Citysearch's common course of conduct towards all class members, and the "reasonable consumer" standard is employed to adjudicate the claim, the Court finds that predominance prong is met with regards to plaintiffs' claim under the "fraudulent" prong of the UCL.

ii. "Unfairness" Prong

Plaintiffs argue that to establish a UCL claim based on the "unfairness" prong, [*45] plaintiffs need only show a connection between the alleged wrongdoing and the resulting harm. Mot. at 17 (citing In re Firearm Cases, 126 Cal. App. 4th 959, 981-82, 24 Cal. Rptr. 3d 659 (2005)). Therefore, plaintiffs assert that the proof they must present, and the legal standard they must satisfy to support their UCL claims are objective in nature and thus ideally suited for class treatment. Id.

Citysearch responds that plaintiffs' claim under the "unfairness" prong of the UCL requires individualized analysis of advertisers' expectations. Opp'n at 28. Citysearch argues that this Court has stated it will apply a balancing test to determine whether Citysearch's alleged practice is "unfair" under the UCL. Id. Under this test, "the determination of whether a particular business practice is unfair necessarily involves an examination of its impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer." Id. (quoting Motors, Inc. v. Times Mirror Co., 102 Cal. App. 3d 735, 740 n.2, 162 Cal. Rptr. 543 (1980)). Citysearch asserts that under this test, a plaintiff's individual expectations about the practice are relevant to determining the extent of its harm, and thus could defeat predominance. [*46] Id. (citing Lozano, 504 F.3d at 736

("We agree that evidence about individual knowledge and expectations may help the court determine the extent of the harm for the purposes of the UCL's balancing test.")).

Plaintiffs reply that while plaintiff Menagerie advertised make-up artistry in Portland, Oregon and plaintiff Redwood advertised payroll services in Charlotte, North Carolina, clicks to their advertisements went through the same set of filters as any other Citysearch advertiser and the same types of clicks were or were not filtered out. Reply at 8. Plaintiffs thus assert that any determination of the propriety of Citysearch's invalid click procedures can be done on a classwide basis. Id. at 8-9. Plaintiffs argue that while Citysearch claims that since 2004 it has used "sophisticated computer algorithms called filters to identify clicks Citysearch treats as invalid," Citysearch does not contend that its automated invalid click procedures function differently depending on the particular advertiser. Id. at 9. Furthermore, plaintiffs assert that Citysearch has collected and stored the same relevant information on each click throughout the class period (citing Rhoden Decl. PP7-8; Exhibs. [*47] E-F), and plaintiffs' expert was able to identify suspect clicks using this data (including date, time, session cookie, ad id, and IP address of the clicks). Id. (citing Kabatech Decl. Exhib 27, at 15-16). Plaintiffs argue that this uniform application of Citysearch's invalid click procedures to all of its advertisers makes the adjudication of plaintiffs' claims under the implied covenant of good faith and fair dealing and the unfair prong of the ULC amenable to class treatment because liability for both depends on whether Citysearch failed to filter out clicks that it reasonably should have. Id.

Furthermore, plaintiffs reply that in determining Citysearch's liability for violation of the "unfairness" prong of the UCL, the Court will weigh the utility of Citysearch's failure to properly filter invalid clicks against the harm this practice caused the class. Id. Plaintiffs argue that individual inquiries into each class members' expectations will not be required to determine liability under the unfair prong of the UCL, because where the district court concludes that a defendant engaged in a single course of wrongful conduct, a determination that common issues predominate is proper. Id. [*48] (citing Lozano, 504 F.3d at 737).

The Court finds that common issues do not predominate with regard to plaintiffs' "unfairness" prong claim under the UCL. "The test of whether a business practice is unfair involves an examination of that practice's impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer." South Bay Chevrolet, 72 Cal. App. 4th at 886. Under this test, a plaintiff's individual expectations about the business practice are relevant to determining the ex-

tent of its harm. Id. at 895 (finding defendant's method of calculating interest not "unfair" under UCL, where plaintiff had entered into the contract "knowing, understanding, agreeing, and expecting" that defendant would calculate interest by this method)); see also Lozano, 504 F.3d at 736-37. Indeed, a plaintiff's individual expectations about Citysearch's business practices are relevant in all three of plaintiffs' claims under the unfairness prong of the UCL. Accordingly, the court finds that predominance under Fed. R. Civ. Pro. Rule 23(b)(3) is not met for plaintiffs' "unfairness" prong claim under the UCL.

### c. The Nationwide Application of California Law

Plaintiffs [*49] argue that "[a] court may certify a nation-wide class for alleged violations of state law," but for "certification to be proper, application of the state's laws to out-of-state class members must comport with due process." Mot. at 18 (quoting Parkinson v. Hyundai Motor America, 258 F.R.D. 580, 2008 WL 5233200, at *6 (C.D. Cal. 2008)). "Once plaintiffs make this showing, the burden shifts to the non-movant to show that the laws of another state apply." Parkinson, 258 F.R.D. 580, 2008 WL 5233200, at *6. "To satisfy their burden, plaintiffs must show that California has a significant contact or aggregation of contacts to the claims of the class members to ensure that California law is not being applied arbitrarily." Id. (quoting Parkinson, 258 F.R.D. 580, 2008 WL 5233200, at *6). Plaintiffs argue that all versions of the contract between Citysearch and the class in force during the class period contain a choice of law clause stating that California law governs the contract. Id. at 19 (citing Kabateck Decl., Exhibs. 19-26). Therefore, plaintiffs argue that there is no dispute that California law applies to plaintiffs' breach of contract claims. Id.

Plaintiffs contend that national certification of their unfair competition claims is also [*50] warranted because Citysearch's unfair and fraudulent conduct originated and emanated from California. Id. Plaintiffs assert that defendant Citysearch, LLC is headquartered in West Hollywood, California, every division responsible for Citysearch's invalid click procedures is based in California, and Citysearch's CEO is located in California. Id. Plaintiffs contend that these significant contacts insure that the application of California's UCL is not arbitrary and is fully consistent with the requirements of due process. Id. at 19-20 (citing Mazza v. American Honda Co., 254 F.R.D. 610, 620 (C.D. Cal. 2008) (finding significant contacts where principal place of business and corporate headquarters was in California, including its headquarters for sales, marketing, research, and development)). Plaintiffs assert that the burden thus shifts to Citysearch to show that the laws of another state should apply. Id.

Plaintiffs further argue that "in California, a three-step 'governmental interest' test is used to determine choice of law questions," where the Court (1) "first determines whether the laws of each potentially concerned state are different from those of California," (2) then "examines [*51] each jurisdiction's interest in the application of its own law," and (3) if "the non-forum state laws differ from those of the forum state and the non-forum states have an interest in applying their laws in the action, the Court will select the law of the state whose interests would be most impaired." Id. at 20 (quoting *Parkinson, 258 F.R.D. 580, 2008 WL 5233200, at \*7*). Plaintiffs contend that "California's consumer protection statutes, upon which some of plaintiffs' claims are based, are largely homogeneous with those of the other fifty states and, if anything, afford greater protection to consumers." Id. (quoting *Parkinson, 258 F.R.D. 580, 2008 WL 5233200, at \*7*). Plaintiffs further contend that California "has a strong interest in policing wrongful conduct allegedly occurring within its borders, including when the victims of such conduct are out-of-state residents." Id. (quoting *Parkinson, 258 F.R.D. 580, 2008 WL 5233200, at \*7; Mazza, 254 F.R.D. at 622-624* (holding that no other state has an interest in the litigation and, even if others did, California's interest would be more impaired if its laws were not applied)).

The Court concludes that California law can be applied to the plaintiffs' breach of contract claims, because [*52] all versions of the contract between the class and Citysearch in force during the class period contain a choice of law clause stating that California law governs the contract. See Kabateck Decl., Exhibs. 19-26. Furthermore, the Court agrees that California's UCL can be applied to the nationwide class, as Citysearch has not shown that any "differences between California law and the law of other jurisdictions are material," nor that "other states have an interest in applying their laws in this case." *Mazza, 254 F.R.D. at 621-24* (holding that California's UCL can be applied to a nationwide class).

## 2. SUPERIORITY

In addition to a predominance of common questions, a class proponent must also demonstrate that the class action is superior to other methods of adjudicating the controversy. See *Valentino, 97 F.3d at 1235* (explaining that the party seeking certification needs to make a "showing [as to] why the class mechanism is superior to alternative methods of adjudication"). A class action may be superior where "class-wide litigation of common issues will reduce litigation costs and promote greater efficiency." *Id. at 1234. Rule 23(b)(3)* provides the following non-exhaustive list of four factors [*53] to consider in this assessment:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

(D) the difficulties likely to be encountered in the management of a class action.

*Fed. R. Civ. P. 23(b)(3)*.

The greater the number of individual issues to be litigated, the more difficult it will be for the court to manage the class action. See, e.g., *Dalkon Shield, 693 F.2d at 856*. Thus, a class action is inappropriate where an individual class member would be compelled to try "numerous and substantial issues to establish his or her right to recover individually, after liability to the class is established." Schwarzer et al., supra, at § 10:361. On the other hand, the fact that individual members seek separate damages is not fatal to class treatment. Id.

Plaintiffs argue that each of the *Rule 23(b)(3)* factors that guide the superiority inquiry is satisfied here. Mot. at 21. First, plaintiffs assert that individually [*54] prosecuting plaintiffs' claims is impractical because the cost of litigating a single case would exceed the potential return. Id. (citing *Mazza, 254 F.R.D. at 628*). Plaintiffs assert that the second and third factors also support certification of this action, because to plaintiffs' knowledge, there are no other actions against Citysearch for the claims asserted by plaintiffs, and concentrating the litigation in this Court will allow it to proceed in an efficient manner without risking inconsistent outcomes. Id. Finally, plaintiffs contend that there will be little difficulty in managing this action as a class action, and that they need only show that their methods of calculating damages are plausible at the certification stage. Id. at 21-22 (citing *Negrete v. Allianz Life Ins. Co. of North America, 238 F.R.D. 482, 495-96 (C.D. Cal. 2006)*).

Although the parties respectively in their moving papers and opposition dispute whether there is a plausible, classwide method for establishing liability and proving damages, plaintiffs best articulate this methodology as follows:

Step 1: Plaintiffs will first establish liability by showing that there are catego-

ries of clicks that are (i) clearly [*55] and objectively invalid for which plaintiffs and the class should not have been charged, and (ii) that Citysearch could have filtered these clicks out if it had chosen to do so. By definition, these categories of clearly invalid clicks will be defined by objective criteria available in the click-log files--otherwise Citysearch could never have filtered these clicks out if it had chosen to do so.

Step 2: Using the objective criteria determined in Step 1, plaintiffs will then establish (i) whether a class member was charged for a clearly invalid click; (ii) how many clearly invalid clicks the class members were charged for; and (iii) how much each class member paid for each of these clicks. Because, as noted above, clearly invalid clicks will be defined by objective criteria (for example, double-clicks would be defined as multiple clicks on the same link originating from the same user session within seconds of each other), identifying invalid clicks will simply require running a database query against Citysearch's click-log data to extract any clicks that satisfy the objective criteria. Those clicks can be compared against Citysearch's billing database in order to determine whether the [*56] class member was charged for the clearly invalid click, and if so, how much the class member paid for the invalid click.

Step 3: Finally damages will be calculated using the information obtained from Step 2. Calculating damages will be a simple matter of arithmetic, consisting of multiplying the number of clearly invalid clicks that the class member was charged for by the amount that the class member paid for each of those clicks.

Reply at 14-15.

Plaintiffs argue that based on the data stored by Citysearch, their expert will be able to retroactively identify invalid clicks for the class. [12] Id. at 22 (citing Jansen Rep.). Plaintiffs assert that because Citysearch claims to record each day's clicks and then filter them retroactively, plaintiffs should be able to filter retroactively on a class wide basis. Id. at 24. Plaintiffs acknowledge that a computer algorithm cannot always determine an Internet user's true intent and that no algorithm or filter can cur-

rently be developed that will identify all invalid clicks. Id. at 23. Nonetheless, plaintiffs argue that there are certain types of clicks where the user's intent can be inferred with a high degree of certainty and where there is zero [*57] probability of the click creating any value for the advertiser, such as doubleclicks and clicks that violate an advertising platform's invalid click policy. [13] Id. at 23-24 (citing Kabateck Decl., Exhib. 28 at 10; Exhib. 1 at 16-17).

12   In order to bolster their argument of a plausible methodology to determine classwide liability and damages, plaintiffs submit the report of Dr. Bernard Jansen. Dr. Jansen opines that it is possible to determine retroactively whether a click was invalid using historical data that is stored in Citysearch's customer account databases. Jansen Rep. at 3. According to Dr. Jansen, this process would involve taking this historical data and running it through an algorithmic process to detect invalid clicks. Id. Dr. Jansen testifies that the classification of such clicks "is not a 100% accurate process" but there are "standard approaches" that achieve "industry-standard, acceptable results." Id. Furthermore, Dr. Jansen opines that based on examining spreadsheets of Citysearch customer account click data, he noted click patterns that appeared to him to be invalid. Id.

To counter Dr. Jansen's report, Citysearch submits the report of Dr. Alexander Tuzhilin. Dr. Tuzhilin [*58] opines that "[i]t is not possible to retroactively determine, through running click log data through an algorithm, whether a click is valid or not, as Dr. Jansen has defined validity," because "it is impossible for the advertising platform to design an algorithm that could measure the subjective intent of the user who clicks on an online advertisement and measure the "business value" of that click." Tuzhilin Rep. at 5. Dr. Tuzhilin further opines that "[e]ven if such an algorithm could be designed, it would not and could not answer any of the following questions with respect to any click identified by the algorithm as invalid: (1) whether the advertiser was actually charged for it; (2) if so, how much that advertiser was charged; or (3) whether Citysearch knew or should have known that the click was invalid at the time it occurred." Id.

13   Plaintiffs argue that they have presented evidence that Citysearch charges for the second click of a doubleclick. Reply at 12. While plaintiffs assert that determinations must be made regarding the number of clicks and the time span that would define a "doubleclick," the Court would decide these questions on a classwide basis so that the

definition [*59] of a doubleclick would apply to all clicks for all advertisers. Id. Plaintiffs further assert that they have presented evidence that Citysearch failed to exclude automated clicks from its syndication traffic for over two years. Id. (citing Kabateck Decl., Exhib. 10). Plaintiffs assert that whether Citysearch should charge for automated clicks is a question that can be objectively determined and this determination will apply to all class members. Id.

Citysearch responds that the procedure proposed by plaintiffs would not provide a classwide basis for proving their case, because a host of individual issues would be required to be determined at every step. Opp'n at 21. First, Citysearch asserts that there is no way to define all the categories of invalid clicks in purely objective classwide terms, as plaintiffs' expert defines an "invalid" click as one having "no probability of generating value." Id. (citing Jansen Rep. at 10). Citysearch argues that this formulation mandates a case-by-case inquiry that is incompatible with classwide treatment since what may have value to one advertiser may be worthless to another. Id. Even in the case of doubleclicks, Citysearch asserts that judgment [*60] calls must be made, because there is no industry standard for the time period between clicks. Id. (citing Jansen Depo. at 53:20-24; 55:3-6).

Second, Citysearch argues that any set of purportedly "objective" rules would likely be at once over-inclusive and under-inclusive. Id. at 22. Citysearch asserts that an automated algorithm could flag perfectly valid traffic, and could miss larger patterns in the data that suggest fraud. Id. (citing Jansen Depo. at 218:1-220:7). Therefore, Citysearch argues that the automated procedures proposed by plaintiffs would not avoid the need for case-by-case judgments about each advertiser's click data. Id.

Third, Citysearch argues that any set of "objective" invalid-click rules that might make sense today would not be appropriate for application to click data generated years ago, because norms and expectations about which clicks should be filtered are constantly evolving. [14] Id. (citing Jansen Rep. at 13). Fourth, Citysearch argues that the data necessary to form plaintiffs' retrospective analysis does not exist in its entirety, and the data that does exist is inconsistent, fragmented, and unsuitable for the proposed process. Id. at 23 (citing Rhoden PP [*61] 20-24). Thus, Citysearch asserts that for many advertisers in the putative class, plaintiffs' proposal would afford no basis for relief whatsoever. Id.

14   For example, Citysearch asserts that new spiders, robots, and bad IP addresses that should be added to exclusion lists are identified continuously, and conversely, addresses that once were

bad may later become perfectly acceptable when they are newly assigned by service providers. Id. Citysearch argues that the doubleclick was not excluded by Google until 2005. Id. (citing Kabatech, Ex. 1 at 31).

Finally, Citysearch contends that the results of any algorithmic process must be measured against what each advertiser actually paid, as plaintiffs concede that their proposed algorithm could not determine whether any given invalid click that it detects was actually charged to the advertiser. Id. (citing Mot. at 25; Jansen Depo. at 43; Tuzhilin Rep. at 17-18). Citysearch asserts that without this information, liability cannot be determined in the first place. Id. In sum, Citysearch argues that plaintiffs' proposed attempt at classwide adjudication falls flat, because their proposed methodology is not only riddled with conceptual flaws and individual [*62] issues but is entirely unmanageable. Id.

Moreover, Citysearch argues that plaintiffs' method of calculating damages does not include any means for addressing the issue of "invalid" clicks for which refunds may already have been obtained, but as to which there is no one-to-one refund correlation, or the issue of "invalid" clicks for which offsets exist in the form of valid clicks that should have been charged to advertisers but were not because of the pre-set cap on monthly charges. Id. at 24-25 (citing *Bell Atl. Corp. v. AT&T Corp., 339 F.3d 294, 306-07 (5th Cir. 2003)* (finding class treatment not suitable where the calculation of damages is not susceptible to a mathematical or formulaic calculation, "or where the formula proposed to calculate individual damages is clearly inadequate.")).

Plaintiffs reply that they only need to show that their proposed method for calculating damages is plausible, and that they have met their burden here. Reply at 13 (citing *Negrete, 238 F.R.D. at 495-96*). Plaintiffs reply that any need to account for different click validity standards over time can be done on a classwide basis. [15] Reply at 12. Plaintiffs further argue that Citysearch's arguments that [*63] the calculation of damages prevents certification because some class members may have received refunds or some class members may have received "valid" clicks for which they were not charged and for which Citysearch should receive an "offset" are baseless. Reply at 15. Plaintiffs assert that supposed refunds or offsets can be addressed mechanically and efficiently since they necessarily involve the analysis of billing data. Id. (citing *Roper v. Consurve, Inc., 578 F.2d 1106, 1112 (5th Cir. 1978)* ("While it may be necessary to make individual fact determinations with respect to charges, if that question is reached, these will depend on objective criteria that can be organized by a computer, perhaps with some clerical assistance. It will not be necessary to hear evidence on each claim.")). Plaintiffs fur-

ther argue that regardless of their veracity or applicability, these issues regarding the calculation of damages are not sufficient to deny certification. Id. (citing *Negrete, 238 F.R.D. at 494* ("The individuation of damages in consumer class actions is rarely determinative under *Rule 23(b)(3)*."); *Smilow v. SW Bell Mobile Sys., Inc., 323 F.3d 32, 40 (1st Cir. 2003)* ("Where as here, common [\*64] issues predominate regarding liability, and then courts generally find the predominance requirement to be satisfied even if individual damages issues remain.")).

> 15   Plaintiffs assert that the factfinder may ultimately determine that different time spans should be used for the definition of a doubleclick depending on the year in which it was made. Id. But plaintiffs contend that since this set of definitions would apply to every click regardless of the advertiser, the factfinder would only need to make the determination once. Id.

The Court finds that the *Rule 23(b)(3)* factors that guide the superiority inquiry are satisfied. First, it is clear that individually prosecuting plaintiffs's claims is impractical because the cost of litigating a single case would exceed the potential return. See *Mazza, 254 F.R.D. at 628* (where "potential damages for each class member are approximately $ 4,000, the court finds that the individual class members do not have a strong interest in controlling the litigation"). Second, it does not appear that any members of the class have commenced any other litigation concerning the controversy alleged herein. Third, concentrating the litigation in this Court will [\*65] allow it to proceed in an efficient manner without risking inconsistent outcomes, and there is no reason to think that this is an undesirable forum to litigate these claims.

Finally, notwithstanding Citysearch's arguments to the contrary, the Court finds that this class action will be manageable. Plaintiffs' claims are based on an alleged common course of conduct by Citysearch to (1) charge its advertisers for invalid clicks, and (2) make material omissions regarding the existence and quality of its click filters. Furthermore, plaintiffs' proposed three-step method for establishing liability and calculating damages is plausible. *Negrete, 238 F.R.D. at 495-96.*

## V. CONCLUSION

In accordance with the foregoing, the Court GRANTS plaintiffs' motion for national class certification with regard to their breach of contract claims, and their claim under the "fraudulent" prong of the UCL. The Court DENIES class certification to plaintiffs with regard to their claim under the "unfairness" prong of the UCL. The national class is as follows:

> All persons or entities in the United States who entered into form contracts for pay-per-click advertising through Citysearch.com, paid money for this advertising [\*66] service, and experienced click fraud by reason of double clicks or Citysearch's failure to apply automatic filters to traffic from its syndication partners up through March 23, 2007.

IT IS SO ORDERED.

Dated: November 9, 2009

/s/ Christina A. Snyder

CHRISTINA A. SNYDER

UNITED STATES DISTRICT JUDGE

# TAB J



LEXSEE 2000 U.S. APP. LEXIS 33892

**Polydyne, Inc., Chemtall, Inc., and Ronald LoSasso, Plaintiffs-Appellees/Cross-Appellants, v. Richard Kirk, and Allpure Waste & Water Treatment, Inc., Defendants-Appellants/Cross-Appellees.**

Nos. 99-4085/99-4153

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

*2000 U.S. App. LEXIS 33892*

**December 19, 2000, Filed**

**NOTICE:**      [*1]   NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**SUBSEQUENT HISTORY:**    Reported in Table Case Format at: *2000 U.S. App. LEXIS 36350.*

**PRIOR HISTORY:**      ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO. 98-07287. Carr. 8-6-99.

**DISPOSITION:**    Affirmed.

**COUNSEL:** For POLYDYNE, INC., CHEMTALL, INC., Plaintiffs - Appellees (99-4085): Robert J. Gilmer, Jr., Eastman & Smith, Toledo, OH.

For POLYDYNE, INC., CHEMTALL, INC., Plaintiffs - Appellees (99-4085): Brent J. Savage, R. Scot Kraeuter, Savage, Herndon & Turner, Savannah, GA.

For RONALD A. LOSASSO, Plaintiff - Appellee, Cross-Appellant (99-4085, 99-4153): Robert J. Gilmer, Jr., Eastman & Smith, Toledo, OH.

For RONALD A. LOSASSO, Plaintiff - Appellee, Cross-Appellant (99-4085, 99-4153): Brent J. Savage, Savage, Herndon & Turner, Savannah, GA.

For RONALD A. LOSASSO, Plaintiff - Appellee, Cross-Appellant (99-4153): R. Scot Kraeuter, Savage, Herndon & Turner, Savannah, GA.

For RICHARD KIRK, Defendant - Appellant, Cross-Appellee [*2] (99-4085, 99-4153): William G. Tishkoff, Ann Arbor, MI.

For ALLPURE WASTE & WATER TREATMENT, INC., Defendant - Appellant, Cross-Appellee (99-4153): William G. Tishkoff, Ann Arbor, MI.

For ALLPURE WASTE & WATER TREATMENT, INC., Defendant - Appellant (99-4085): William G. Tishkott, Ann Arbor, MI.

**JUDGES:** BEFORE: MERRITT, KENNEDY and GILMAN, Circuit Judges. KENNEDY, Circuit Judge, concurring in part and dissenting in part.

**OPINION BY:** Merritt

**OPINION**

   **Merritt, Circuit Judge.** Plaintiffs filed an action in Superior Court of Liberty County, Georgia, seeking a declaratory judgment that the parties had no contractual relationship. Plaintiff Ronald LoSasso also filed a claim for defamation against defendant Richard Kirk. Kirk removed the case to federal court in the Southern District of Georgia and filed counterclaims for, *inter alia*, breach

of contract, promissory estoppel, breach of implied contract, fraud, negligent misrepresentation, breach of fiduciary duty, and intentional infliction of emotional distress. The case was then transferred to the Northern District of Ohio. The district court granted motions for summary judgment filed by both sets of parties, disposing of all claims.  [*3]  Both sets of parties appeal the district court's summary judgment against their respective claims. Because the record reveals genuine issues of material fact relating to defendants' claims for promissory estoppel and fraud, we reverse the district court's order granting summary judgment on those claims. We affirm with regard to all other claims.

I. Background

In May 1996, plaintiff Polydyne, Inc., contracted with the City of Philadelphia to provide the city with water treatment chemicals. Polydyne was subject to a municipal regulation requiring it to subcontract at least five percent of its contract to one or more "minority owned disadvantaged business enterprises." Seeking to replace their original minority participant, plaintiffs began discussions with defendant Kirk in August 1996. Kirk had expressed to plaintiffs his interest in forming a relationship with Polydyne as early as June 1996. The parties met numerous times between September 1996 and March 1997. One such meeting took place on September 12, 1996, at the airport in Detroit, Michigan; most meetings occurred in Toledo, Ohio, at or near Polydyne's principal office. At the time, Kirk was a resident of Michigan and was employed  [*4]  by The Dow Chemical Company. Plaintiff LoSasso was at all relevant times a resident of Georgia and an officer and director of plaintiffs Polydyne and Chemtall, Inc, a Georgia corporation. Polydyne and Chemtall are sister subsidiaries of SNF Holdings, Inc.

Based on his discussions with plaintiffs during the fall of 1996, and anticipating acting as Polydyne's minority participant in Philadelphia and elsewhere, Kirk made some preparatory investments, incorporated defendant Allpure Waste & Water Treatment, Inc., and tendered his resignation to Dow. Kirk apparently believed that he had reached an agreement with plaintiffs to serve as Polydyne's sole minority participant under its contract with the City of Philadelphia. Kirk expected to receive five percent of the gross dollar value of that contract. On January 31, 1997, hours after Kirk's resignation from Dow became effective, however, LoSasso called Kirk and informed him that plaintiffs did not intend to pay Kirk the entire five percent minority participation portion of the Philadelphia contract. Kirk claims that, in March 1997, plaintiffs proposed to pay him less than five percent of the contract but to lead the City of Philadelphia  [*5]  to believe that he would receive the full five percent. After the collapse of the parties' relationship, Kirk made a number of unfavorable statements about plaintiffs and about LoSasso in particular.

II. Choice of Law

Although the parties have not briefed or argued conflict of laws issues, we must decide which laws apply to the various questions before us. When a diversity case is transferred from one federal court to another, the transferee court applies the same laws that the original court would have applied. *See Van Dusen v. Barrack, 376 U.S. 612, 639, 11 L. Ed. 2d 945, 84 S. Ct. 805 (1964)*. This diversity case was transferred from a district court in Georgia, which would have applied Georgia laws, including Georgia's choice of law provisions. *See Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941)*.

A. *Contract claims*. Georgia law generally provides that contract matters are governed by the law of the place of contracting -- i.e., lex loci contractus. *See International Business Machines v. Kemp, 244 Ga. App. 638, 536 S.E.2d 303, 2000 WL 821678*, at *3 (Ga. Ct. App. 2000). One notable exception  [*6]  to this traditional approach is Georgia's so-called "presumption of identity" rule, according to which Georgia courts apply Georgia law if there are no statutory laws on point in the state of the place of contracting. *See Shorewood Packaging Corp. v. Commercial Union Ins. Co., 865 F. Supp. 1577, 1578-81 (N.D. Ga. 1994)* (citing *Menendez v. Perishable Distribs., Inc., 254 Ga. 300, 329 S.E.2d 149 (Ga. 1985))*; *but see Old Hickory Prods. Co. v. Hickory Specialties, Inc., 366 F. Supp. 913, 915-22 (N.D. Ga. 1973)* (finding the rule "at variance with reason"). Because the parties do not allege that Ohio or Michigan -- the only states other than Georgia where the parties might have made a contract -- have any relevant statutory laws, Kirk's contract claim is controlled by Georgia law.

B. *Equitable claims*. Georgia courts do not apply the doctrines of lex loci contractus or "presumption of identity" to claims for promissory estoppel because it is an equitable doctrine and not strictly contractual in nature. *See Simpson Consulting v. Barclays Bank, 227 Ga. App. 648, 490 S.E.2d 184, 193 (Ga. Ct. App. 1997)*; *Nickell v. IAG Federal Credit Union, 213 Ga. App. 516, 445 S.E.2d 335, 337 (Ga. Ct. App. 1994)*.  [*7]  Georgia courts apply Georgia law to claims for promissory estoppel. *See Simpson Consulting, 490 S.E.2d at 193*. In Georgia, an action for breach of implied contract similarly sounds in equity and is not a contract action. *See Smith Dev., Inc. v. Flood, 198 Ga. App. 817, 403 S.E.2d 249, 251 (Ga. Ct. App. 1991)*. It follows that Georgia courts would apply Georgia law to resolve a claim for breach of implied contract. Thus, Georgia law governs Kirk's promissory estoppel and implied contract claims.

C. *Tort claims*. Georgia law provides that tort claims are governed by the law of the place of injury -- i.e., lex loci delictus. *See Best Canvas Prods. & Supplies, Inc. v. Ploof Truck Lines, Inc., 713 F.2d 618, 622 (11th Cir. 1983); Mullins v. M.G.D. Graphics Sys. Group, 867 F. Supp. 1578, 1580 (N.D. Ga. 1994)*. We agree with the district court that, if Kirk or Allpure suffered injuries, those injuries occurred in Michigan, since Kirk and Allpure reside. Michigan law therefore governs Kirk's claims for fraud, negligent misrepresentation, breach of fiduciary duty, and infliction of emotional distress. We also find that, if plaintiff LoSasso [*8] suffered injuries, those injuries occurred in Georgia, and his libel claims are governed by Georgia law.

III. Kirk's State Law Claims

Kirk appeals the district court's grant of plaintiffs' summary judgment with respect to his state law claims for promissory estoppel, breach of contract, breach of implied contract, fraud, negligent misrepresentation, breach of fiduciary duty, and intentional infliction of emotional distress. For the reasons discussed below, we reverse the district court's order with respect to Kirk's claims for promissory estoppel and fraud and affirm the district court with respect to Kirk's remaining claims.

A. *Promissory estoppel*. Georgia law authorizes claims for promissory estoppel. *See Ga. Code Ann. § 13-3-44(a)*. To recover on such a claim, one must prove: 1) that the offending party made a promise; 2) that the promisor reasonably should have expected the promisee to rely on the promise; 3) that the promisee did rely on the promise to his detriment; and 4) that an injustice can be avoided only by enforcement of the promise. *See Simpson Consulting v. Barclays Bank, 227 Ga. App. 648, 490 S.E.2d 184, 192-93 (Ga. Ct. App. 1997)*. Georgia [*9] courts have also held that "if a promise within the terms of [*Ga. Code Ann. § 13-3-44(a)*] is in terms conditional ... the promisor is bound thereby, but performance becomes due only upon the occurrence of the condition ... ." *Kemira, Inc. v. Williams Investigative & Sec. Servs., Inc., 215 Ga. App. 194, 450 S.E.2d 427, 431 (Ga. Ct. App. 1994); Restatement (Second) of Contracts § 91*.

The district court apparently found a question of fact as to whether or not Kirk detrimentally relied on a promise by plaintiffs and explicitly found that the reasonableness of this possible reliance could not be resolved on summary judgment. The district court disposed of Kirk's claim for promissory estoppel, however, by finding that plaintiffs' alleged promise was conditioned upon the City of Philadelphia certifying Allpure as a minority participant, a condition that had not been met when plaintiffs expressed their intention not to pay Kirk five percent of their contract. The court's order states: "Under Georgia law, plaintiffs did not have to pay under the Five Percent Proposal before [Allpure became certified in] April[] 1997. Therefore, Kirk's claims may not be triggered by [*10] the phone call from LoSasso in January[] 1997 or [by] plaintiffs' failure to pay in February, 1997."

Georgia law concerning promissory estoppel and conditional promises provides otherwise. According to the rule from *Kemira* recited above, a party becomes bound on a conditional promise once its promisee detrimentally relies thereon, but that party does not have to perform its promise until the condition is met. Under Georgia law, plaintiffs could have become bound by a conditional promise to pay Kirk five percent even though plaintiffs' performance on the promise would have been due only upon Allpure's certification by the City of Philadelphia. Thus, Kirk's claim for promissory estoppel could have been triggered by plaintiffs' refusal to pay prior to Allpure's certification.

Denying Kirk's motion to alter or amend its grant of plaintiffs' summary judgment motion, the district court found that Kirk did not provide evidence sufficient to raise a question of fact as to whether or not plaintiffs promised to pay him beginning on February 1, 1997. Kirk did, however, present the court with his deposition testimony that he expected to begin receiving payment on February 1, 1997, regardless [*11] of whether or not Allpure had been certified by the City of Philadelphia at that time. This testimony was apparently made an exhibit to Kirk's memorandum in opposition to plaintiffs' motion for summary judgment. J.A. at 468. In the portion of Kirk's testimony included as an exhibit, Kirk also referred to an income forecast statement allegedly prepared by an officer of Polydyne and given to him in October 1996 that calculated payments to him from plaintiffs beginning in February. *Id*. That income forecast statement was available to the district court as a deposition exhibit at the time the court was deciding plaintiffs' summary judgment motion. [1] We find that Kirk created a question of material fact as to whether or not plaintiffs had promised to begin performing on February 1, 1997. Kirk provided evidence that he reasonably relied on a promise by plaintiffs to pay him five percent of Polydyne's Philadelphia contract beginning in February 1997. We agree with the district court that the question of whether or not Kirk's reliance was reasonable is an issue of fact for the jury to decide. We therefore find that the district court erred in granting plaintiffs' motion for summary judgment [*12] on Kirk's promissory estoppel claim.

---

1   The district court is correct in noting that parties have an obligation to bring information to its attention. Order at 5, J.A. at 109. This evidence was specifically mentioned in the abridged portion of Kirk's testimony included as an exhibit to

defendants' memorandum opposing summary judgment. Considering that the parties did not have the opportunity to address the district court's specific concerns in oral argument, it appears that defendants satisfied their obligation to bring relevant evidence to the attention of the court.

B. *Breach of contract.* Under Georgia law, "a contract is an agreement between two or more parties for the doing or not doing of some specified thing." *Ga. Code Ann. § 13-1-1.* The two elements of an action for breach of contract are 1) breach of the agreement, and 2) resultant damages. *See Odem v. Pace Academy, 235 Ga. App. 648, 510 S.E.2d 326, 331-32 (Ga. Ct. App. 1998); Budget Rent-A-Car of Atlanta, Inc. v. Webb, 220 Ga. App. 278, 469 S.E.2d 712, 713 (Ga. Ct. App. 1996).* [*13] Kirk alleges that he entered into an oral unilateral contract with plaintiffs to provide services due under plaintiffs' contract with the City of Philadelphia. We find that Kirk has not established a dispute of material fact and has not shown that plaintiffs are not entitled to judgment as a matter of law on his contract claim.

Kirk has not provided evidence that the parties mutually assented to a definite set of contractual terms regarding his participation in Polydyne's contract with the City of Philadelphia. Kirk testified that he reached an agreement with plaintiffs at the Detroit, Michigan, airport on August 12, 1996. J.A. at 2102. He also testified that the parties' contract was formed in November 1996. J.A. at 2007. A review of correspondence between Kirk and LoSasso from June 1996 until February 1997, however, strongly suggests that the parties were continuing to negotiate material terms of their relationship throughout this period. On September 30, 1996, for example, after the parties' meeting at the Detroit airport, LoSasso sent a letter to Kirk, specifically refusing to sign an agreement offered by Kirk and offering instead "to work on loose association on [a] case by [*14] case basis." J.A. at 2449. It appears that Kirk's proposed agreement is included in a fax sent by Kirk to LoSasso on August 28, 1996. J.A. at 2453. It is styled "Contract No.1 -- Draft," and the transmittal page requests LoSasso's review and comments. *Id.* Neither document mentions Polydyne's contract with the City of Philadelphia.

Similarly, Kirk's letter to LoSasso on October 6, 1996, appears to be a continuation of negotiations concerning material terms of their relationship. J.A. at 2447-48. In this letter, Kirk expresses regret that the plaintiffs do not want to sign an agreement and he tries to allay plaintiffs' concerns about his employment with Dow by noting his plans to retire. He also includes a list of his demands, including 1) a guarantee of supplies; 2) a non-compete agreement; 3) a "firm pricing" agreement; 4) and a "letter/contract ... signed by Chemtall or Polydyne." J.A. at 2448. He writes: "If we are not able to

reach an agreement, I need to know this as soon as possible ... ." *Id.* The October 6 letter does not include any mention of Polydyne's contract with the City of Philadelphia.

From early September until early December, Kirk sent regular updates to [*15] plaintiffs describing his progress toward certain goals -- e.g., incorporating Allpure, retaining professional services, and securing a contract with plaintiffs. J.A. at 2409, 2411, 2414, 2444. Only one of these updates, dated October 20, 1996, refers to Polydyne's contract with the City of Philadelphia, stating only that Kirk has "received information" from the City of Philadelphia. J.A. at 2409. In that update, Kirk also notes that "[a] meeting needs to be set up between Chemtall, Polydyne and myself to work out the particulars of an agreement sometime during the first part of November." *Id.* The next update, dated December 8, 1996, recites: "verbal agreement completed on Supply Contract -- waiting on final agreement from Chemtall." J.A. at 2444. This December update does not mention Polydyne's contract with the City of Philadelphia.

There is evidence in the record to indicate that, as of January 9, 1997, plaintiffs did not believe that they had reached an agreement with Kirk concerning the City of Philadelphia contract. In a memo from Steven Karakas, a manager at Polydyne, to LoSasso summarizing a meeting with city officials in Philadelphia, Karakas explains that Allpure would [*16] be a satisfactory minority participant and writes: "... Shall we move forward with All Pure?" J.A. at 149. As late as January 30, 1997, the parties were apparently still discussing material terms of their alleged agreement. In a communication from Kirk to LoSasso on that date, Kirk writes: "the amount of 5% just barely covers expenses. ... Please call and let's get this on the table and work through it." J.A. at 2393.

From the pleadings, affidavits, and depositions included in the record, it appears that there is no issue of fact regarding the parties alleged agreement on Kirk's participation in Polydyne's Philadelphia contract. The only evidence of such an agreement, Kirk's deposition testimony, is itself not definite enough to establish that plaintiffs are not entitled to judgment as a matter of law on this claim. We find that the district court correctly granted plaintiffs' motion for summary judgment with respect to Kirk's breach of contract claim.

C. *Breach of implied contract.* Georgia has codified an action for implied contract at *Ga. Code Ann. § 9-2-7* ("Ordinarily, when one renders service or transfers property which is valuable to another, which the latter accepts, a [*17] promise is implied to pay the reasonable value thereof."). This action is based on a theory of quantum meruit. *See Smith Dev., Inc. v. Flood, 198 Ga. App. 817, 403 S.E.2d 249, 251 (Ga. Ct. App. 1991).* Thus, the

2000 U.S. App. LEXIS 33892, *

party seeking enforcement of an implied contract must have conferred some benefit upon the opposing party that it seeks to have returned or for which it seeks compensation.

Kirk argues that he provided services or conferred benefits on plaintiffs in the course of their relationship. Specifically, Kirk notes 1) that he invested money in a communications system to provide technological support to plaintiffs and 2) that he helped plaintiffs avoid violating their Philadelphia contract by allowing plaintiffs to represent Kirk as their designated minority participant. Kirk has not brought forth evidence that his investment in a communications system did benefit plaintiffs in any way, nor has he shown that he conferred any benefit on plaintiffs by appearing to be plaintiffs' minority participant. The district court correctly determined that plaintiffs are entitled to judgment as a matter of law on this claim.

D. *Fraud.* To recover for fraud under Michigan law, [*18] one must show: 1) that the offending party made a material representation; 2) that the representation was false; 3) that the offending party knew the representation was false or was reckless with regard to the truth of the representation; 4) that the offending party intended the claimant to act in reliance on the representation; 5) that the claimant did act in reliance on the representation; and 6) that the claimant was thereby injured. *See Wilson v. Kiss, 751 F. Supp. 1249, 1255 (E.D. Mich. 1990); Hi-Way Motor Co. v. Int'l Harvester Co., 398 Mich. 330, 247 N.W.2d 813, 816 (Mich. 1976).* Generally, the offending misrepresentation must be factual in nature. *See Wilson, 751 F. Supp. at 1255; Higgins v. Lawrence, 107 Mich. App. 178, 309 N.W.2d 194, 197 (Mich. Ct. App. 1981).* A promise of future performance is generally not a factual misrepresentation. *See Wilson, 751 F. Supp. at 1255; Higgins, 309 N.W.2d at 197.* If such a promise is made in bad faith without the intention of performance, however, it may give rise to a claim of fraud. *See Wilson, 751 F. Supp. at 1256; Higgins, 309 N.W.2d at 197;* [*19] *Crowley v. Langdon, 127 Mich. 51, 86 N.W. 391 (Mich. 1901).*

In opposing plaintiffs' summary judgment motion, Kirk provided evidence that establishes a question of fact as to whether or not plaintiffs' promised to pay him five percent of the City of Philadelphia contract. As discussed *supra,* for example, Kirk testified in his deposition that plaintiffs represented to him that he would be entitled to five percent of their contract. According to the testimony of Charles E. Thorpe, a minority business coordinator for the City of Philadelphia, officers from Polydyne specifically assured him on January 9, 1997, in Kirk's presence, that Kirk's services would be worth five percent of plaintiffs' contract with the City of Philadelphia. J.A. at 1356-58.

After the parties met with Thorpe, one of the attending Polydyne officers wrote a memorandum to LoSasso to inform him that the City of Philadelphia expected Polydyne to pay its minority participant the full five percent and that "the City will be monitoring our activity closely. They have reiterated that they will only accept copies of our cancelled checks to the [minority participant] as proof of payment." J.A. at 149.

[*20] In addition, Kirk alleges that LoSasso telephoned him a few hours after Kirk's resignation from Dow became effective to tell Kirk that plaintiffs would not pay him five percent of their Philadelphia contract. If plaintiffs had previously led Kirk to believe that he would be compensated at the five percent rate, this telephone call and the internal memorandum to LoSasso concerning the meeting with Thorpe together create a question of fact regarding plaintiffs' good faith in negotiating a potential agreement with Kirk. It is for a jury to decide whether or not plaintiffs made a promise to Kirk in bad faith without intending to perform. A reasonable jury could infer that the close timing of Kirk's resignation from Dow and LoSasso's repudiation of the five percent rate indicated that LoSasso had long since decided not to honor the agreement and, instead, was only waiting for an opportune moment to express his repudiation. Plaintiffs are therefore not entitled to judgment as a matter of law with respect to Kirk's claim for fraud.

E. *Negligent representation.* Under Michigan law, a claim for negligent misrepresentation [2] consists of the same elements as those comprising a claim for [*21] fraud, except that the claimant need not prove intent or recklessness on the part of the offending party. *See Derda, Inc. v. Foley-Belsaw Co., 1992 U.S. Dist. LEXIS 4078, No. 1:90- CV-965, 1992 WL 71815, at *5 (W.D. Mich. Mar. 2, 1992).* Rather, the claimant must show that the offending party acted negligently -- i.e., that the party breached a duty of care. *Id.* Michigan courts will imply a duty of good faith on contracting parties, *see Flynn v. Korneffel, 451 Mich. 186, 547 N.W.2d 249 (Mich. 1996),* but this rule generally does not extend to negotiations, *see Restatement (Second) of Contracts § 205 cmt. c.* We have already found that the parties were not operating under a contractual agreement. Kirk has not cited any authority for the proposition that plaintiffs owed him a duty of care in negotiation under tort principles.

2  Defendants appeal the district court's summary judgment on their claim for negligent representation. In their brief, however, defendants do not discuss negligent misrepresentation but set forth an argument relating to a claim for innocent representation. Innocent misrepresentation is a distinct tort involving elements of contract law and unjust enrichment. The district court was never

presented with a claim for innocent misrepresentation; rather, defendants brought a claim for negligent misrepresentation and this claim was rejected by the district court. We therefore disregard defendants' argument regarding innocent misrepresentation and review the district court's summary judgment on defendants' claim for negligent misrepresentation. *See Noble v. Chrysler Motors Corp., 32 F.3d 997, 1002 (6th Cir. 1994).*

[*22] Even if this court were to imply a duty of good faith in negotiation under a theory of tort, Kirk would not be able to support a claim for negligent misrepresentation. Kirk has only provided evidence supporting allegations that plaintiffs' conduct was either intentional or reckless -- i.e., that plaintiffs encouraged Kirk's reliance while intending not to complete an agreement. Such evidence may, as discussed *supra*, create a question of fact relevant to a claim of fraudulent misrepresentation but it does not suggest negligence. We agree with the district court that plaintiffs are entitled to judgment as a matter of law on Kirk's claim for negligent misrepresentation.

F. *Breach of fiduciary duty.* Under Michigan law, an action for breach of fiduciary duty requires an existing fiduciary relationship. *See Portage Aluminum Co. v. Kentwood Nat'l Bank, 106 Mich. App. 290, 307 N.W.2d 761, 763 (Mich. Ct. App. 1981).* Kirk argues that a fiduciary relationship exists among and between members of a joint venture or partnership. The district court found, however, that Kirk did not provide evidence that his relationship with plaintiffs was a joint venture. Kirk repeats [*23] this argument to this court but still provides no evidence to suggest that he and plaintiffs were partners or joint venturers. We find that the parties were not engaged in a fiduciary relationship and that plaintiffs are entitled to judgment as a matter of law on Kirk's claim for breach of fiduciary duty.

G. *Intentional infliction of emotional distress.* The Michigan Supreme Court has not specifically held that an action for intentional infliction of emotional distress exists under Michigan law. *See Roberts v. Auto-Owners Ins. Co., 422 Mich. 594, 374 N.W.2d 905, 912 (Mich. 1985)* (declining to decide whether or not to adopt the tort). The state's intermediate appellate courts, however, have recognized such an action. *See Dickerson v. Nichols, 161 Mich. App. 103, 409 N.W.2d 741, 743 (Mich. Ct. App. 1987).* Furthermore, this court has found that Michigan law recognizes the tort. *See Pratt v. Brown Mach. Co., 855 F.2d 1225, 1238-39 (6th Cir. 1988).* To state a claim for intentional infliction of emotional distress, a claimant must show that the offending party intentionally or recklessly engaged in extreme and outrageous conduct that [*24] caused the claimant to experience severe emotional distress. *See Pratt, 855 F.2d at*

*1239; Wilson v. Kiss, 751 F. Supp. 1249, 1251-52 (E.D. Mich. 1990).* Kirk argues that plaintiffs engaged in extreme and outrageous conduct by: 1) threatening Kirk with litigation; 2) backing out of the parties' agreement as soon as Kirk retired from Dow; and 3) trying to condition performance of the parties' agreement on Kirk's participating in an illegal kick-back scheme.

Under Michigan law, "extreme and outrageous conduct" has been defined as conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Roberts, 374 N.W.2d at 908-09* (quoting *Restatement (Second) of Torts § 46 cmt. d*). Kirk has not alleged any conduct that, if true, would satisfy this definition of "extreme and outrageous." We therefore agree with the district court that plaintiffs are entitled to judgment as a matter of law on Kirk's claim for intentional infliction of emotional distress.

IV. LoSasso's Libel Claim

LoSasso claims that Kirk committed [*25] libel on three occasions by: 1) imputing criminal acts and unethical commercial dealing to LoSasso in a letter sent to two owners of LoSasso's employer, Rene Pich and Hubert Issaurat, on April 11, 1997; 2) imputing the same in statements to Ronald Jones, an employee of another company in LoSasso's industry; and 3) accusing LoSasso of being a racist in a letter sent by fax to LoSasso's office on June 9, 1997. Kirk admits making each communication but argues that none give rise to liability.

In Georgia, libel is a statutory tort defined as a false, malicious, and injurious statement. *See John D. Robinson Corp. v. Southern Marine & Indus. Supply Co., 196 Ga. App. 402, 395 S.E.2d 837, 839 (Ga. Ct. App. 1990); Ga. Code Ann. § 51-5-1.* [3] Statements that impute a "criminal, dishonest, or debasing act," *Jamison v. First Georgia Bank, 193 Ga. App. 219, 387 S.E.2d 375, 378 (Ga. Ct. App. 1989)*, and statements injurious to a person's business or trade, are libelous per se, *see John D. Robinson Corp., 395 S.E.2d at 840* (citing *Walker v. Sheehan, 80 Ga. App. 606, 56 S.E.2d 628, 632 (Ga. Ct. App. 1949)).* If a claimant establishes [*26] that a statement is libelous per se, he or she is not required to allege special damages. *Id.* Otherwise, a claimant must prove special damages -- loss of a "material temporal advantage capable of being assessed in monetary value." *Jamison, 387 S.E.2d at 378.*

> 3 *Ga. Code Ann. § 51-5-1* provides: "(a) A libel is a false and malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridi-

cule. (b) The publication of the libelous matter is essential to recovery."

A. *The April 17, 1997, letter*, Kirk included this statement in his letter to Messrs. Pich and Issaurat: "I advised Mr. LoSasso that if I accepted his proposal, I would be committing a felony ... ." J.A. at 851. He also wrote: "[LoSasso] knew some of the confidential information I had shared with another supplier and did not appreciate my calling him unethical ... ." J.A. at 852. The district court was correct in [*27] finding that these are not defamatory statements. The first statement relates to Kirk's understanding of his own potential culpability and does not support a claim that he imputed criminal intent or criminal behavior to LoSasso. The second statement concedes only that LoSasso believed Kirk had called him unethical; it does not, in itself, constitute an attack on LoSasso in his trade or commercial activities.

B. *The statements to Mr. Jones.* Kirk admits that he explained to Mr. Jones that "I was looking for a reputable supplier of polymers to my company because I did not agree with the ethical conduct of my present supplier -- Chemtall/Ron LoSasso ... . Within two months Ron LoSasso indicated to me that ... I should not have called him a 'crook.'" J.A. at 856. The first sentence shows that Kirk disagreed with LoSasso's ethical judgment, but it falls short of accusing LoSasso of being unethical. The second sentence suggests only that LoSasso believed Kirk had called him a crook. The district court was correct in finding that these statements were not defamatory.

C. *The June 9, 1997, letter to Plaintiff.* LoSasso claims that Kirk referred to him as a racist in this letter. Kirk [*28] wrote: "To be open with you, I felt that you were a racist by your actions involving helping my company." J.A. at 2757. He devotes the rest of this letter, however, to explaining why he thinks that this earlier opinion was wrong. The letter acknowledges that LoSasso and other contractors in LoSasso's industry "got burned" by previous minority participants and that they might be guarded in future dealings with minority participants. Considering this communication as a whole, Kirk appears to be explaining why he believes that LoSasso is *not* a racist, despite his earlier contrary opinion. Accordingly, we find that the content of Kirk's fax was not defamatory and we do not reach the question of whether or not the statement was published.

V. Conclusion

For the foregoing reasons, we reverse the district court's order granting plaintiffs' summary judgment with respect to Kirk's claims for promissory estoppel and fraud and we remand for further proceedings on these two claims. We affirm the district court with respect to all other claims.

**CONCUR BY:** KENNEDY (In Part)

**DISSENT BY:** KENNEDY (In Part)

**DISSENT**

KENNEDY, Circuit Judge, concurring in part and dissenting in part. I write separately with respect [*29] to Parts III.A and III.D of the majority opinion to dissent from the majority's conclusions that the district court improperly granted summary judgment on defendants' promissory estoppel and fraud claims. I agree with the district court that defendants failed to demonstrate a genuine issue of material fact on either claim. Unlike the majority, I would affirm the district court's grant of summary judgment in favor of plaintiffs on those claims. I concur with the majority's holdings as to all other claims.

**A. Promissory Estoppel**

The majority correctly summarizes the required elements of a Georgia action for promissory estoppel. However, I would hold that defendant failed to raise a genuine issue of material fact as to whether plaintiffs should have foreseen defendant's reliance on the promise to pay five percent of the city contract. I would hold that, based on the evidence presented, defendant's reliance was unreasonable as a matter of law, and I would affirm summary judgment in favor of plaintiffs.

Under Georgia law, an action for promissory estoppel requires a showing that (1) the promisor made a certain promise, (2) the promisor should have reasonably expected the promisee [*30] to rely on that promise, (3) the promisee did rely to his detriment, and (4) injustice can be avoided only by enforcement of the promise. *See Simpson Consulting, Inc. v. Barclays Bank PLC, 227 Ga. App. 648, 490 S.E.2d 184, 192 (Ga. Ct. App. 1997).* The district court concluded that there was a question of fact as to whether plaintiffs here promised to pay defendants five percent of the overall city contract. Even if there is a factual question as to whether a promise was made, defendant has not made any showing that plaintiffs should have foreseen defendant's reliance on such a promise. The *Restatement (Second) of Contracts, § 90* reviews the elements of promissory estoppel and comments that "the promisor is affected only by reliance which he does or should foresee, and enforcement must be necessary to avoid injustice." *Id.* at comment b. "Since promissory estoppel is an equitable doctrine, there must be reasonable reliance on [the] promise." *Simpson Consulting, 490 S.E.2d at 193.* In other words, the promisor can only foresee reliance by the promisee if that reliance was reasonable under the circumstances.

In the present case, even if plaintiffs [*31] did promise to pay defendant five percent of the city contract, defendant was not reasonable in relying on that promise. The promise was made in the context of sophisticated business negotiations between two experienced parties. The evidence shows that the parties had not reached any kind of agreement as to what defendant might do in exchange for the five percent. In the context of complicated and on-going business negotiation, it was not reasonable for defendant simply to assume that the negotiations would ultimately be successful. Thus, I cannot hold that the plaintiffs should have foreseen such reliance by defendant. I would affirm the grant of summary judgment in favor of plaintiffs.

## B. Fraud

The majority correctly states the elements of a fraud action under Michigan law, as well as the important exception that despite the general rule, "an action for fraud . . . may be predicated upon a promise made in bad faith without a present intent to perform." *Wilson, 751 F. Supp. at 1256*. Under Michigan law, therefore, summary judgment on this fraud claim should be denied if defendants successfully demonstrated that plaintiffs never intended to perform the future [*32] promises made. Rather than addressing the question of plaintiffs' intent at the time of promising, the majority states that "defendants provided evidence that establishes a question of fact as to whether or not plaintiffs promised to pay defendants five percent of the City of Philadelphia contract" and then reviews that evidence in detail. The question of whether or not plaintiffs made a promise is not the critical issue. The relevant issue is whether they intended to perform at the time of promising. Even if plaintiffs did clearly promise to pay five percent of the city contract to defendants, a fraud action would not stand unless defendants can demonstrate that at time of promising, plaintiffs did not intend to keep that promise.

I agree with the district court's determination that defendants failed to raise a genuine issue of material fact as to whether plaintiffs made a promise in bad faith and without the intent to perform. On summary judgment, defendants made a tenuous argument that bad faith was shown by plaintiffs' prior dealings with Citi-Chem. Defendants argued that Citi-Chem was listed as providing technical support to Polydyne initially, that Polydyne did not subsequently [*33] need defendants' technical support, and that thus plaintiffs had lied about their plans for Citi-Chem. Finally, defendants somehow drew the conclusion that plaintiffs had also lied about their plans for defendants. As the district court concluded, "this reasoning is speculative and unsupported by the record." (Order Granting Pls.' Mot. Summ. J., p.13). Plaintiffs' lack of need for technical support does not point to a conclusion that plaintiffs did not intend to pay defendants for other services to be provided.

In their appellate brief, defendants added arguments not previously raised before the district court that plaintiffs never intended to perform. Defendants make an unsupported allegation that the conversation between the city of Philadelphia M-DBE coordinator and plaintiffs regarding the need for canceled checks to prove payment to the certified M-DBE somehow indicates that plaintiffs never intended to honor their representations. The majority opinion emphasizes defendants' allegation that plaintiffs' call to defendant Kirk within three hours of his leaving Dow shows that plaintiffs never intended to keep their promises. Clearly plaintiffs actions on the day that Kirk left his [*34] job at Dow cannot indicate their intentions months earlier at the time of the alleged misrepresentations.

Defendants did not make these arguments to the district court on summary judgment. In addition, even if they had, defendants provide no factual support for the allegations they are making and do not raise a genuine issue of material fact as to plaintiffs' intent when the representations were made. I would affirm the district court's grant of summary judgment in favor of plaintiffs.

TAB K



1 of 1 DOCUMENT

**SAMANTHA QUINTERO on behalf of herself and on behalf of a Class Comprised of the Other Similarly Situated Former Employees of Defendants, Plaintiffs, v. MULBERRY THAI SILKS, INC., d/b/a MULBERRY NECKWEAR, LLC, Defendant.**

No. C 08-02294 MHP

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

*2008 U.S. Dist. LEXIS 84976; 28 I.E.R. Cas. (BNA) 607*

October 21, 2008, Decided
October 22, 2008, Filed

**COUNSEL:** [*1] For Samantha Quintero, on behalf of herself and on behalf of a Class Comprised of the Other Similarly Situated Former Employees of Defendants, Plaintiff: Diego F. Acevedo, LEAD ATTORNEY, Douglas Evans Dexter, Farella Braun & Martel LLP, San Francisco, CA; M. Vance McCrary, Mary Olsen, Pro Hac Vice, The Gardner Firm PC, Mobile, AL; Stuart J. Miller, Pro Hac Vice, Lankenau & Miller LLP, New York, NY.

For Mulberry Thai Silks, Inc., doing business as Mulberry Neckwear, LLC, Defendant: Matthew Alexander Stratton, San Francisco, CA.

**JUDGES:** MARILYN HALL PATEL, United States District Court Judge.

**OPINION BY:** MARILYN HALL PATEL

**OPINION**

*MEMORANDUM & ORDER*

**Re: Plaintiff's Motion for Class Certification and Other Relief**

On May 2, 2008, plaintiff Samantha Quintero ("Quintero") brought this class action against Mulberry Thai Silks, Inc., d/b/a Mulberry Neckwear, LLC ("Mulberry"), alleging violations of the federal Worker Adjustment and Retraining Notification Act, *29 U.S.C. §§ 2101 et seq.* ("the WARN Act") and its California coun-

terpart, *California Labor Code §§ 1400 et seq.* ("the California provisions"). Now before the court is plaintiff's motion for class certification pursuant to *Federal Rule of Civil Procedure 23*. Having considered [*2] the parties arguments, plaintiff's submissions and for the reasons set forth below, the court enters the following memorandum and order.

*BACKGROUND*

On June 16, 2008, plaintiff filed a first amended complaint, setting forth the following factual allegations: Mulberry is a California corporation with a facility at 880 Harbour Way South, Richmond, CA ("Facility"). *See* Pl.'s First Amended Complaint at PP 5-6. Mulberry employed one hundred or more employees who worked at least four thousand hours per week within the United States. *Id.* at P 12. Mulberry employed approximately seventy-five employees, including Quintero, at the Facility. *Id.* at P 7. On or about April 18, 2008, Mulberry ordered a mass layoff of Facility employees, which resulted in the termination of at least fifty employees, excluding part-time employees. *Id.* at PP 9, 13, 14. At least thirty-three percent of the employees, excluding part-time employees, lost employment because of the terminations on or about April 18, 2008 or as the reasonably expected consequence of the terminations. *Id.* at P 14. Approximately sixty similarly situated employees, including plaintiff, had worked at or reported to the Facility, and were discharged [*3] without cause on or about April 18, 2008 or thereafter. *Id.* at PP 9, 15. Prior to their terminations, Mulberry did not serve Quintero and the

Case 2:07-cv-15474-PDB-RSW   Document 166   Filed 01/03/11   Page 150 of 158

Page 2

2008 U.S. Dist. LEXIS 84976, *; 28 I.E.R. Cas. (BNA) 607

other class members a written notice sixty days before the mass layoff, and Mulberry did not provide these class members with their wages and benefits for the sixty days following the mass layoff. *Id.* at P 17.

On August 7, 2008, after defendant failed to file a responsive pleading to plaintiff's first amended complaint, an order of default was entered against defendant. On September 4, 2008, plaintiff filed a motion for class certification pursuant to *Federal Rule of Civil Procedure 23.* No written opposition was filed by defendant. At the September 22, 2008 hearing on the matter, defendant's counsel of record appeared. Although the defendant's counsel of record opposed plaintiff's motion to certify the class, he did not provide any reasons against certifying the class. No reasons were provided because the defendant's counsel of record did not know of any grounds to oppose class certification and he did not want to impede future counsel.

*LEGAL STANDARD*

*Motion for Class Certification*

To certify a class, the four prerequisites enumerated in *Rule 23(a)* [*4] must be satisfied, as well as at least one of the requirements of *Rule 23(b). Fed. R. Civ. P. 23.* Under *Rule 23(a),* the party seeking class certification must establish: (1) that the class is so large that joinder of all members is impracticable ("numerosity"); (2) that there are one or more questions of law or fact common to the class ("commonality"); (3) that the named parties' claims are typical of the class ("typicality"); and (4) that the class representatives will fairly and adequately protect the interests of other members of the class ("adequacy of representation"). *Fed. R. Civ. P. 23(a).* In addition to the explicit requirements set out by *Rule 23(a),* the class definition must set forth a class which is ascertainable and clearly identifiable. *Lamumba Corp. v. City of Oakland, No. 05-2712, 2007 U.S. Dist. LEXIS 81688, 2007 WL 3245282 (N.D. Cal. Nov. 2, 2007)* (Patel, J.). Finally, a party seeking class certification must also show that one of *Rule 23(b)*'s provisions applies. *Fed. R. Civ. P. 23(b); Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997).*

The party seeking class certification bears the burden of establishing that the requirements of *Rule 23(a)* and *(b)* have been met. *Zinser v. Accufix Research Inst., 253 F.3d 1180, 1186 (9th Cir. 2001),* [*5] *amended by 273 F.3d 1266 (9th Cir. 2001); Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992).* When adjudicating a motion for class certification, the court accepts the allegations in the complaint as true so long as those allegations are sufficiently specific to permit an informed assessment as to whether the requirements of *Rule 23* have been satisfied. *Blackie v. Barrack, 524 F.2d 891,*

*901 (9th Cir. 1975).* The merits of the class members' substantive claims are generally irrelevant to this inquiry. *Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-78, 94 S. Ct. 2140, 40 L. Ed. 2d 732 (1974); see also Moore v. Hughes Helicopters, Inc., 708 F.2d 475, 480 (9th Cir. 1983).* However, courts may "consider evidence which goes to the requirements of *Rule 23* even though the evidence may also relate to the underlying merits of the case." *Hanon, 976 F.2d at 509, citing In re Unioil Sec. Litig., 107 F.R.D. 615, 618 (C.D. Cal. 1985); see also Moore, 708 F.2d at 480* ("some inquiry into the substance of a case may be necessary to ascertain satisfaction of the commonality and typicality requirements of *Rule 23(a)*").

*DISCUSSION*

Plaintiff seeks to certify as members of the class all of the persons who worked at or reported [*6] to the Facility and were terminated without cause within a thirty day period surrounding the April 18, 2008 date of the mass layoff ordered by defendant or as an otherwise reasonably foreseeable consequence of that mass layoff, who are affected employees, within the meaning of *29 U.S.C. section 2101(a)(5),* and who do not file a timely request to opt-out of the class. *See Miller Dec. P 7.*

As a threshold matter, and apart from the explicit requirements of *Rule 23(a),* the party seeking class certification must demonstrate that an identifiable and ascertainable class exists. "An implied prerequisite to certification is that the class must be sufficiently definite." *Whiteway v. FedEx Kinko's Office & Print Servs., Inc., 2006 U.S. Dist. LEXIS 69193, 2006 WL 2642528, at *3 (N.D. Cal. 2006).* "A class definition should be precise, objective, and presently ascertainable," though "the class need not be so ascertainable that every potential member can be identified at the commencement of the action." *O'Connor v. Boeing N. Am., Inc., 184 F.R.D. 311, 319 (C.D. Cal. 1998)* (internal quotations omitted). Plaintiff's proposed class consists of former employees of Mulberry who worked at a specific location within a definite time [*7] period. This proposed class definition is based on an objective determination that can be readily identified, e.g., through employment records. Accordingly, the court finds this class of persons sufficiently ascertainable and identifiable. The court now turns to an examination of the explicit *Rule 23(a)* requirements for class certification.

I. *Rule 23(a) Requirements*

A. *Numerosity*

Pursuant to *Rule 23,* the class must be "so numerous that joinder of all members is impracticable." *Fed. R. Civ. P. 23(a)(1).* As a general rule, classes numbering

greater than forty individuals satisfy the numerosity requirement. *See* 5 James Wm. Moore et al., *Moore's Federal Practice § 23.22[1][b]* (3d ed. 2004). Although plaintiffs need not allege the exact number or identity of class members to satisfy the numerosity prerequisite, mere speculation as to the number of parties involved is not sufficient to satisfy the numerosity requirement. *See Freedman v. Louisiana-Pac. Corp., 922 F. Supp. 377, 398 (D. Or. 1996)*. Plaintiff "must proffer evidence of the number of members in the purported class, or at least a reasonable estimate of that number." 5 James Wm. Moore et al., *Moore's Federal Practice § 23.22[3]* (3d [*8] ed.2004).

Plaintiff's first amended complaint alleges the purported class includes approximately sixty employees who were terminated within a thirty day period surrounding the April 18, 2008 date of the mass layoff or as an otherwise reasonably foreseeable consequence of that mass layoff. The court finds that the numerosity requirement is satisfied.

B. *Commonality*

To fulfill the commonality prerequisite of *Rule 23(a)(2)*, plaintiff must establish that there are questions of law or fact common to the class as a whole. *Fed. R. Civ. P. 23(a)(2)*. *Rule 23(a)(2)* does not mandate that each member of the class be identically situated, but only that there be substantial questions of law or fact common to all. *Harris v. Palm Springs Alpine Estates, Inc., 329 F.2d 909, 914 (9th Cir. 1964)*. Individual variation among plaintiffs' questions of law and fact does not defeat underlying legal commonality, because "the existence of shared legal issues with divergent factual predicates is sufficient" to satisfy *Rule 23*. *See Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998)*. In the Ninth Circuit, the requirements of *Rule 23(a)(2)* are to be construed "permissively." *Id.*

The claims of plaintiff and [*9] the proposed class arise from a common core of facts and legal issues. Plaintiff alleges Mulberry was an employer under the WARN Act and the California provisions with more than one hundred employees. Plaintiff alleges the proposed class members were Mulberry employees. Plaintiff alleges Mulberry ordered a mass layoff, and the putative class members were discharged without cause on or about April 18, 2008 or thereafter as a reasonably foreseeable consequence. Plaintiff further alleges these proposed class members did not receive the required written notice sixty days before the mass layoff, and Mulberry did not provide wages and benefits for the required sixty days following the mass layoff. Plaintiff claims these facts create liability under the WARN Act and the California provisions and entitle recovery for each class member. The court finds these factual contentions concerning Mulberry's mass layoff and the legal applicability of the WARN Act and the California provisions to each proposed class member sufficiently shared so as to meet the requirement of commonality.

C. *Typicality*

Under *Rule 23(a)(3)*, the claims of the representative plaintiff must be typical of the claims of the class. [*10] *Fed. R. Civ. P. 23(a)(3)*. To be considered typical for purposes of class certification, the named plaintiff need not have suffered an identical wrong. *See Hanlon, 150 F.3d at 1020*. Rather, the claims of the putative class must be "fairly encompassed by the named plaintiff's claims." *General Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 156, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)* (internal quotation omitted). The Ninth Circuit has held that "[w]here the challenged conduct is a policy or practice that affects all class members, the underlying issue presented with respect to typicality is similar to that presented with respect to commonality, although the emphasis may be different." *Armstrong v. Davis, 275 F.3d 849, 868-69 (9th Cir. 2001)*.

Quintero, as representative plaintiff, alleged that she suffered the same injury as the rest of the proposed class. Quintero alleges that she and the proposed class members were Mulberry employees, who were terminated as a result of Mulberry's mass layoff. Quintero and the proposed class members claim injuries because Mulberry did not provide prior written notice or subsequent wages and benefits as required under the WARN act and the California provisions. Based on the allegations, Quintero's [*11] claims are identical to the proposed class. They arise from the same course of conduct which gives rise to the claims of the other proposed class members. Thus, the typicality requirement is satisfied.

D. *Adequacy*

*Rule 23(a)(4)* dictates that the representative plaintiff must fairly and adequately protect the interests of the class. *Fed. R. Civ. P. 23(a)(4)*. To satisfy constitutional due process concerns, unnamed class members must be afforded adequate representation before entry of a judgment that binds them. *See Hanlon, 150 F.3d at 1020, citing Hansberry v. Lee, 311 U.S. 32, 42-43, 61 S. Ct. 115, 85 L. Ed. 22 (1940)*. "Adequate representation depends on the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive." *Crawford v. Honig, 37 F.3d 485, 487 (9th Cir. 1994)* (internal quotation omitted). A determination of legal adequacy rests on the resolution of two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members; and (2) will the named plaintiffs and

their counsel prosecute the action vigorously on behalf of the class? *Hanlon, 150 F.3d at 1020.*

As [*12] to the first question, in this case, plaintiff and her counsel appear to have no conflicts of interest with any of the members of the class. As discussed above, the interests of Quintero and the putative class members are sufficiently aligned. As to the second question, plaintiff and her counsel have demonstrated their intent to vigorously prosecute this action. Plaintiff has timely sought relief for defendant's alleged violations. By seeking class certification shortly after the default entry, plaintiff has prosecuted with efficiency. Moreover, plaintiff's counsel has extensive experience prosecuting claims as class actions under the WARN Act. *See* Miller Dec. PP 10-17. The court finds that Quintero and her counsel will fairly and adequately protect the interests of the class. Accordingly, the adequacy of representation requirement has been satisfied.

II. *Rule 23(b) Requirements*

In addition to meeting the prerequisites for class certification under *Rule 23(a)*, a class must also meet one of the three alternative requirements for treatment as a class action under *Rule 23(b). Fed. R. Civ. P. 23.* In this case, plaintiff alleges that the class meets the requirements of *Rule 23(b)(3)*. Class certification [*13] pursuant to *Rule 23(b)(3)* requires plaintiff to establish that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Fed. R. Civ. P. 23(b)(3)*. The court examines each of these two requirements in turn.

A. *Predominance*

The predominance inquiry "focuses on the relationship between the common and individual issues." *Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc., 244 F.3d 1152, 1162 (9th Cir. 2001)*. Consequently, the presence of common issues of fact or law sufficient to satisfy the requirements of *Rule 23(a)(2)* is not by itself sufficient to show that those common issues predominate. *Hanlon, 150 F.3d at 1022.* Nonetheless, "[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Id.* (internal quotations omitted). The predominance inquiry focuses on whether [*14] the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Culinary/Bartender Trust Fund, 244 F.3d at 1162, quoting Amchem, 521 U.S. at 623.* Central to this inquiry is "the notion that the adjudication of common issues will help

achieve judicial economy." *Zinser, 253 F.3d at 1189, quoting Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir. 1996).*

Plaintiff asserts that factual and legal issues arising from defendant's plant closing on April 18, 2008 are common to the claims arising under the WARN Act and the California provisions for each class member. The class members' claims may only diverge with respect to the damages for each individual class member. Accordingly, because the common questions predominate over the individual differences, the court finds that plaintiff has satisfied the predominance requirement.

B. *Superiority*

The second prerequisite for certification of a class under *Rule 23(b)(3)* requires plaintiff to show that a class action is superior to other methods available for the adjudication of the parties' dispute. "Where classwide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action [*15] may be superior to other methods of litigation." *Valentino, 97 F.3d at 1234.* In considering whether a class action is superior, the court must focus on whether the interests of "efficiency and economy" would be advanced by class treatment. *Zinser, 253 F.3d at 1189* (internal quotations omitted). Relevant factors include:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

*Fed. R. Civ. P. 23(b)(3).*

Considering these factors, the court finds a class action would be superior to individual adjudications. Plaintiff asserts that many of the claims are small, and that the class members would most likely be financially unable and not sufficiently motivated by such small amounts to pursue their claims individually. Plaintiff is unaware of any other pending litigation with claims involving the WARN Act or the California [*16] provisions between any other class member and defendant. *See* Quintero Dec. P 12. The desirability of adjudicating the claims in one forum is favored because the class members' claims are based on the mass layoff at the Facility, and a class action will avoid multiple individual actions. There are

2008 U.S. Dist. LEXIS 84976, *; 28 I.E.R. Cas. (BNA) 607

minimal case management issues because the class members can be easily identified, the potential liability of defendant can be readily calculated, and the claims are centered around defendant's course of conduct. Thus, plaintiff has satisfied the *Rule 23(b)(3)* requirements.

*CONCLUSION*

For the foregoing reasons, it is hereby ordered that:

1) Plaintiff's motion for class certification is **GRANTED**. Plaintiff's motion to certify pursuant to *Rule 23(b)(3)* is **GRANTED**.

2) The class certified herein is defined as follows: All persons who worked at or reported to defendant's facility located at 880 Harbour Way South, Richmond, CA 94804 (the "Facility") and were terminated without cause on or about April 18, 2008, were terminated without cause within 30 days of April 18, 2008, or were terminated without cause as the reasonably foreseeable consequence of the mass layoff or plant closing ordered by defendant [*17] on or about April 18, 2008, and who are affected employees, within the meaning of *29 U.S.C. §*

*2101(a)(5)* who do not file a timely request to opt-out of the class (the "Class").

3) The named class representative is Samantha Quintero.

4) The counsel of named plaintiff is counsel for the class.

5) The proposed form of Notice to the Class is approved. Plaintiff shall set the matter on calendar for the purpose of determining when class notice should be mailed and for the setting of future dates.

**IT IS SO ORDERED**.

Dated: October 21, 2008

/s/ Marilyn Hall Patel

MARILYN HALL PATEL

United States District Court Judge

Northern District of California

TAB L



LEXSEE 2010 U.S. APP. LEXIS 10858

**PHILLIP RANNIS, Plaintiff-Appellee, v. PETER L. RECCHIA, Defendant-Appellant.**

**No. 09-55859**

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

*2010 U.S. App. LEXIS 10858*

**May 7, 2010, Argued and Submitted, Pasadena, California**
**May 27, 2010, Filed**

**NOTICE:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**PRIOR HISTORY:** [*1]
Appeal from the United States District Court for the Central District of California. D.C. No. 5:06-cv-00373-AG-JC. Andrew J. Guilford, District Judge, Presiding.

**COUNSEL:** For PHILIP RANNIS, on behalf of himself and all others similarly situated, Plaintiff - Appellee: Owen Randolph Bragg, Esquire, Attorney, HORWITZ HORWITZ & ASSOCIATES, LTD, Chicago, IL; Robert Stempler, Attorney, Consumer Law Office of Robert Stempler, APLC, Palm Springs, CA.

EMILY DANIELS, Objector, Pro se, Hacienda Heights, CA.

For FAIR CREDIT LAWYERS, INC., Defendant: Gino Paul Pietro, Esquire, Attorney, Pietro & Associates, Santa Ana, CA.

PETER LOUIS RECCHIA, Attorney, Defendant - Appellant, Pro se, Santa Ana, CA.

**JUDGES:** Before: B. FLETCHER and PAEZ, Circuit Judges, and KORMAN, District Judge. **

** The Honorable Edward R. Korman, Senior United States District Judge, Eastern District of New York, sitting by designation.

**OPINION**

**MEMORANDUM** *

* This disposition is not appropriate for publication and is not precedent except as provided by *9th Cir. R. 36-3.*

Peter L. Recchia, an attorney licensed to practice law in California, appeals from a judgment of the district court granting final approval of a class settlement from a lawsuit which, *inter alia,* [*2] alleged violations of the Credit Repair Organizations Act ("CROA"), *15 U.S.C. §§ 1679-1679j.* Recchia also appeals from "all interlocutory orders that gave rise to the judgment." The settlement agreement reserved Recchia's right to appeal the issues he raises.

Recchia represented clients on a variety of issues relating to consumer protection and unfair debt collection under the firm name Fair Credit Lawyers, Inc. Relevant here, Recchia offered a non-litigation "credit resolution program," in which he charged clients $ 499 to $ 599 for his services purportedly achieving a "maximally accurate" and "positive" credit report. To solicit clients, Recchia placed advertisements in the *PennySaver* circulated in several counties in Southern California which read in part, "Improve Your Credit Score Now!"

After viewing the PennySaver advertisement, Phillip Rannis contacted and ultimately retained Recchia to resolve his credit/debt collector issues. In December 2003, Rannis entered into a standard retainer agreement with Recchia. The contract specified that Rannis would pay $ 499 for Recchia's services and required payment prior to Recchia's performance of those services. Rannis paid at least $ 474 [*3] before Recchia completed services on his behalf.

2010 U.S. App. LEXIS 10858, *

On April 6, 2006, Rannis filed a complaint against Recchia in the United States District Court for the Central District of California on behalf of himself and other individuals who had entered into contracts with Recchia for credit repair services during or after December 2002. The complaint claimed, *inter alia*, that Recchia had violated the CROA by accepting payment in advance of services and by failing to provide required disclosures. The district court granted Rannis's motion for class certification under *Federal Rule of Civil Procedure 23(b)(3)*. The class included 74 potential members.

Subsequently, the district court, ruling on cross-motions for summary judgment, granted Rannis's motion for partial summary judgment, holding that Recchia had violated the CROA. The parties then reached a settlement in which Recchia agreed to pay $ 600 to each class member and $ 5,000 to Rannis, the class representative. Recchia reserved the right to appeal the district court's determination of liability and attorneys' fees but explicitly waived the right to appeal damages.

On appeal, Recchia challenges the district court's determination of liability [*4] under the CROA. Recchia also argues that the district court should have granted his motion to decertify the class on numerosity grounds and that the court should not have granted final approval of the settlement agreement. We reject all of these arguments.

I.

The CROA defines a "credit repair organization" as "any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of . . . improving any consumer's credit record, credit history, or credit rating." *15 U.S.C. § 1679a(3)(A)*.

Recchia meets these requirements. Specifically, he admits that he used interstate commerce and the mail in providing credit resolution services and that he provided those services in exchange for valuable consideration. Although Recchia argues that he did not provide those services for the express or implied purpose of "improving" clients' credit reports, the record evidence confirms that he did. In addition to the advertisement in the PennySaver soliciting clients, which explicitly advertised [*5] "Improve Your Credit Score Now!", Recchia had clients sign retainer agreements with his firm expressly stating that his goal was to "achiev[e] a maximally accurate and positive credit report on Client's behalf." The documents accompanying the contract also indicated his purpose of improving clients' credit reports. The "Wel-

come" document that detailed fees and explained the steps a client should follow read, "This package contains the beginning of what you need to be on the road to a *maximally accurate* credit report and *improved* credit score!" (emphasis added.) Likewise, the "Welcome" document that accompanied a packet of information on Fair Credit Lawyers advised that "[t]he information contained herein explains what we can do to result in your credit reports being maximally accurate and put you on the road to a *totally positive credit report. . . . By choosing Fair Credit Lawyers you will receive positive results and positive credit reports for a very reasonable fee*" (emphasis added).

Nevertheless, Recchia argues that he was not acting as a credit repair organization because the CROA exempts attorneys acting in the course and scope of the practice of law. We rejected a similar argument [*6] in *FTC v. Gill, 265 F.3d 944, 950 (9th Cir. 2001)*. In *Gill*, an attorney licensed to practice law in California "offered credit repair services to consumers, ostensibly through his law office, but in reality through" his co-defendant who operated a credit repair business. *Id.* The defendants attempted to remove all negative information from consumers' credit reports, regardless of its accuracy, and did so "almost exclusively" by "inundating" credit reporting agencies with letters that falsely alleged that various items on credit reports were incorrect. *Id. at 952*.

While the defendants in *Gill* acted in a fraudulent and deceptive fashion, whereas Recchia claims he aimed only to correct inaccuracies, this distinction does not undermine *Gill*'s applicability. As we held in *Gill*, attorneys are credit repair organizations if they qualify under the CROA. *See id. at 950*. Under the definition provided in *15 U.S.C. § 1679a(3)(A)*, Recchia qualifies as a "credit repair organization" so long as he acted for the purpose of "improving any consumer's credit record, credit history, or credit rating." Although an important purpose of the CROA is "to protect the public from unfair and deceptive advertising [*7] and business practices by credit repair organizations," *15 U.S.C. § 1679(b)(2)*, and certain provisions in *15 U.S.C. § 1679b(a)* specifically require a deceitful or misleading intent, one need not engage in fraud either to qualify as a credit repair organization or to violate other provisions of the statute.

Because Recchia met the definition of a credit repair organization, he was required to comply with the CROA, including its provisions prohibiting charging clients before fully performing services, *see 15 U.S.C. § 1679b(b)*, and mandating certain disclosures prior to contracting with clients for the credit resolution services he offered, *see 15 U.S.C. §§ 1679c-1679e*. Recchia violated the CROA by failing to comply with these provisions.

II.

In rejecting Recchia's motion to decertify the class, the district court evaluated the appropriate size of the plaintiff class and determined that, in addition to the 13 members who received notice and did not opt out, the class should include the seven members whose notice was returned as undeliverable and never remailed because those members received "the best notice practicable under the circumstances." We review de novo whether the notice afforded [*8] to those seven members satisfies the demands of due process. Because we conclude that it does, those members can be included in the class.

The notice provided to a class certified under *Rule 23(b)(3)* must satisfy *Rule 23(c)(2)*, which requires "the best notice that is practicable under the circumstances." *Fed. R. Civ. P. 23(c)(2)(B)*. These requirements are designed to ensure that class notice procedures comply with the demands of due process. *Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 173, 94 S. Ct. 2140, 40 L. Ed. 2d 732 (1974)*.

Best practicable notice requires individual notice "to all class members whose names and addresses may be ascertained through reasonable effort." *Id.* Nevertheless, it does not necessarily require that every in-state class member "actually receive[]" notice. [1] *Silber v. Mabon, 18 F.3d 1449, 1453-54 (9th Cir. 1994)*. That is, due process requires reasonable effort to inform affected class members through individual notice, not receipt of individual notice.

> [1]   We do not address the notice requirements when a class action includes out-of-state plaintiffs who lack even minimum contacts with the forum state.

In this case, the Class Administrator, CPT, sent the seven members whose notice was returned [*9] and never remailed fully descriptive notice by first-class mail to the addresses last known to Recchia. In addition, CPT performed skip trace searches on each member whose notice was returned as undeliverable in an effort to locate better addresses. These measures demonstrate a "reasonable effort" to ascertain the addresses of and send notice to the seven members at issue here. Accordingly, those members received the "best notice that is practicable under the circumstances," *Fed. R. Civ. P. 23(c)(2)(B)*, and are properly included in the class.

The district court likewise did not abuse its discretion in determining that the class of 20 satisfies the numerosity requirement. To satisfy the numerosity requirement under *Rule 23(a)*, a proposed class must be "so numerous that joinder of all members is impracticable." *Fed. R. Civ. P. 23(a)*. Joinder need not be impossible, as long as potential class members would suffer a strong litigation hardship or inconvenience if joinder were required. *Harris v. Palm Springs Alpine Estates, Inc., 329 F.2d 909, 913-14 (9th Cir. 1964)*.

The numerosity requirement is not tied to any fixed numerical threshold--it "requires examination of the specific facts of [*10] each case and imposes no absolute limitations." *Gen. Tel. Co. of the Nw., Inc. v. EEOC, 446 U.S. 318, 330, 100 S. Ct. 1698, 64 L. Ed. 2d 319 (1980)* (citing cases). Nevertheless, precedent provides some guidance. In general, courts find the numerosity requirement satisfied when a class includes at least 40 members. *EEOC v. Kovacevich "5" Farms, No. CV-F-06-165, 2007 U.S. Dist. LEXIS 32330, 2007 WL 1174444, at *21 (E.D. Cal Apr. 19, 2007)*. On the low end, the Supreme Court has indicated that a class of 15 "would be too small to meet the numerosity requirement." *Gen. Tel. Co., 446 U.S. at 330*. The Court based this assessment on a review of lower court cases in which certification was denied to classes in the 16 to 37 range. *See id. at 330 & n.14*. In light of this trend, the Court concluded that a trial court would almost certainly require joinder of all class members rather than certify a class of 15. *See id. at 330*. Relying on this holding, we have declined to uphold classes of seven, nine, and ten members. *See Harik v. Cal. Teachers Ass'n, 326 F.3d 1042, 1051 (9th Cir. 2003)* ("The Supreme Court has held fifteen is too small. The certification of those classes must be vacated on numerosity grounds.").

Although the 20-member class in this case could [*11] be considered "a jurisprudential rarity," *Estate of Felts v. Genworth Life Ins. Co., 250 F.R.D. 512, 520 (W.D. Wash. 2008)*, the small class size does not preclude a finding that the numerosity requirement is met. The Supreme Court's analysis in *General Telephone Co.* questioned the likelihood that a district court would certify a class of this size--it did not undermine a district court's discretion to do so. *See 446 U.S. at 330 & n.14*. Other circuits have upheld class certifications of 20 and even 18. *See, e.g., Ark. Educ. Ass'n v. Bd. of Educ., 446 F.2d 763, 765-66 (8th Cir. 1971)* (upholding class of 20); *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n, 375 F.2d 648, 653 (4th Cir. 1967)* (upholding class of 18).

In this case, the district court determined that the numerosity requirement was met because, "[g]iven the circumstances of this case, . . . joinder of individual class members would be impracticable." Specifically, the district judge found that considerations of judicial economy weighed in favor of maintaining the class mechanism because decertification would likely be "inefficient," potentially clogging the court's docket with many separate lawsuits, as well as "costly," [*12] imposing unnecessary financial burdens on class members whose damages likely would not exceed $ 600. Moreover, decertifi-

cation could confuse those class members who had already been notified of the settlement award.

District courts have broad leeway in making certification decisions. Recchia has not persuaded us that the district court's decision was a clear abuse of discretion. *See In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 461 (9th Cir. 2000).*

Moreover, we observe that Recchia aggressively urged at least one class member to opt out. An employee of Recchia called this class member, informing him that he would be receiving class notice and urging him to opt out--even specifying the wording he should use on the opt-out form. Recchia himself afterward tried to contact the class member twice, purportedly about litigation that had already settled months before, as well as about what Recchia described as "the other matter." Thereafter, the class member was contacted yet again, this time by a former employee of Recchia who also insisted that the class member opt out.

The record is silent with respect to others who opted out, at least in part because the district court denied Rannis's [*13] motion to investigate the 31 class members who received notice but opted out. Nevertheless, Recchia's actions may account for the fact that the overwhelming majority of potential members who received notice took the time to mail in opt out forms to decline a $ 600 refund when their recovery from an individual suit was unlikely to exceed the $ 499 to $ 599 they paid for credit repair services. Under all these circumstances, the reduction from 74 to 20 class members did not compel the district court to decertify the class. *Cf. Ark. Educ. Ass'n, 446 F.2d at 765-66.*

III.

Recchia argues that the district court erred in approving the settlement agreement because the agreement provides Recchia with the right to appeal liability issues and is thus "not conclusive, negating any benefits the Class members expect to receive, by putting the settlement on hold, indefinitely, pending the appeal." Although Recchia reserved the right to appeal the issues of "liability, attorney's fees, and costs," the settlement provided benefit to the plaintiff class because Recchia explicitly waived the right to appeal the issue of damages. The district court acknowledged this benefit in the judgment following final [*14] approval of the settlement, in which it found that the terms of the settlement agreement were "particularly fair, adequate, and reasonable" to Rannis and all class members "in light of the risk of establishing liability and damages, and the expense of further litigation."

Significantly, the district judge was in a superior position to gauge whether the terms of the settlement are "fair, reasonable, and adequate" under *Rule 23(e)* because he had the opportunity to observe the parties throughout the settlement process and was familiar with their concerns, priorities, and intentions. Indeed, by the time of the final fairness proceeding, the district court had already "dealt with a lot of the issues before." In sum, the district court did not abuse its discretion in granting final approval of the class settlement.

CONCLUSION

The judgment of the district court is **AFFIRMED.**